UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| NATIONAL UNION FIRE COMPANY OF PITTSBURGH, PA, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. 03-1288 ) |
| PONTIAC FLYING SERVICES, INC., | ) ) |
| Defendants and Third Party Plaintiff, | ) ) ) |
| vs. | ) ) |
| HARDY AVIATION INSURANCE, INC., | ) ) |
| Third Party Defendant. | ) |

## RESPONSE TO MOTION TO BAR

## NATURE OF THE PROCEEDING

This is a cause of action for declaratory judgment regarding the obligation of the Plaintiff, NATIONAL UNION FIRE COMPANY OF PITTSBURGH, PA ("NATIONAL UNION"), to provide property damage coverage to PONTIAC FLYING SERVICES, INC., ("PONTIAC FLYING"), under NATIONAL UNION Policy No. AV3391999-04. At the time the property damage was sustained the insured plane was engaged in a turbine transition training flight to qualify a pilot in the aerial application of seeds and fertilizers. Under the policy coverage is afforded for **Aerial Application** which is defined as follows: "**Aerial Application**" means the application by aircraft of seeds, fertilizers or chemicals and includes flights required in direct support thereof."

In its Complaint for Declaratory Judgment NATIONAL UNION takes the position that qualifying, educating and training pilots in the application of seeds, fertilizers and chemicals by aircraft is not in direct support thereof. On the other hand, PONTIAC FLYING contends that nothing could be more inextricably tied to or directly supportive of aerial application than flights which are required to train pilots for that purpose. PONTIAC FLYING also submits that the language employed in the definition is ambiguous to the extent that there is a question as to whether pilot training flights are required in direct support of the application "by aircraft of seeds, fertilizers or other chemicals."

It is the Defendant's position that in the agricultural aviation industry, of which PONTIAC FLYING SERVICE is a member, it is understood without exception that flight instruction, including turbine transition training, is an integral component of the aerial application of chemicals, seeds and fertilizers. NATIONAL UNION disputes that understanding. The basis for that dispute is never articulated other than on a singular and *ad hoc* basis.[1] In order to elicit the meaning of the phrase "flights in direct support thereof" PONTIAC submitted those Rule 36 requests to admit with interlocking discovery to the Plaintiff, copies of which are attached to this Response. The following admissions typify NATIONAL UNION's ignorance.

### REQUEST TO ADMIT FACTS

> Now comes the Defendant and Third Party Plaintiff, PONTIAC FLYING SERVICES, INC., by its attorney, DAVID B. MUELLER of the firm of CASSIDY & MUELLER, and pursuant to Rule 36 serves the following Requests for Admissions of Facts and Genuineness of Documents upon the Plaintiff, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, ("NATIONAL UNION"), to be answered within thirty (30) days.

---

[1] PONTIAC submits that the Plaintiff's approach is that it doesn't know what the term "flights in direct support thereof" means but it is willing to define it in the context of "what it doesn't mean" in order to deny coverage.

16.     The term "includes fights required in direct support thereof" as it appears in the definition of "Aerial Application" is not defined in the policy.

RESPONSE:    Plaintiff objects to this request on the basis that *it* seeks a response that s irrelevant and on the basis that the quoted phrase *is* self-explanatory; notwithstanding these objections, admitted.

17.     NATIONAL UNION has no documents which define the term "includes flights required in direct support *thereof*" *as* it appears in the policy definition of "Aerial Application.

RESPONSE:    Plaintiff objects to this request on the basis that it seeks a response that is irrelevant and on the basis that the quoted phrase is self-explanatory; notwithstanding these objections, admitted.

18.     That NATIONAL UNION knows of no NATIONAL UNION employees. current or past, who have ever defined the term "includes flights required in direct support thereof" as it is used in the definition of "Aerial Application" In the *policy* in writing.

RESPONSE:    Plaintiff objects to this request on the basis that it seeks a response that is irrelevant and on the basis that the quoted phrase is self-explanatory; notwithstanding these objections, admitted.

19.     That NATIONAL UNION knows of no NATIONAL UNION employees, current or past, who have ever defined the term "includes flights required in direct support thereof" as it is used in the definition of "Aerial Application" in the policy.

RESPONSE:    Plaintiff objects to this request on the basis that it seeks a response that is irrelevant and on the basis that the quoted phrase is self-explanatory; notwithstanding these objections, admitted.

20.     That NATION UNION knows of no written definition of the term "includes flights required in direct support *thereof*" as it appears in the definition of "Aerial Application."

RESPONSE:    Plaintiff objects to this request on the basis that it seeks a response that is irrelevant and on the basis that the quoted phrase is self-explanatory notwithstanding these objections, admitted.

21.     That NATIONAL UNION has no definition of the term include flights' required m direct support thereof' as it appears in the definition of "Aerial Application"

RESPONSE:    Denied.

- 3 -

>25. That pilot turbine training flights are required for the application by turbine powered aircraft of seeds, fertilizers or chemicals.
>
>RESPONSE: Plaintiff objects on the basis that this request is vague and irrelevant, is unlimited in reference to aircraft, application or materials, and seeks information more appropriately provided by a properly certified instructor pilot; notwithstanding this objection, the general statement is admitted.
>
>26. That at the time the policy was issued NATIONAL UNION knew that pilot turbine training flights were required for "**Aerial application**" as that term is used in the policy.
>
>RESPONSE: Denied.

Answers to the interlocking interrogatories reveal that the following individuals profess knowledge.

>21. Peter Guy, AIG Aviation; Mark Breitenbach, AIG Aviation; Jim Anderson, Light Aviation Division (LAD) Underwriting Branch Manager, AIG Aviation.

However, as the Plaintiff's response to the interlocking request for production demonstrates, that comprehension is *not* founded upon any documents.

By its present Motion to Bar the insurer acknowledges a paradox. It argues that the term ". . . flights required in direct support thereof" is not ambiguous. In other words, the phrase is susceptible of only one reasonable interpretation. *McNeilly v. Bankers United Life Assurance Co.*, 999 F.2d 1199, 1201-02 (7 Cir., 1993), *First Insurance Funding Corp. v. Federal Insurance Co.*, 284 F.3d 799, 804-05 (7 Cir., 2002). However, it admits that the language is undefined in the policy *and* that NATIONAL UNION has no written expression of its meaning. Nor has the insurer put forth a definition in this case or provided any source for *possible* interpretation other than identifying some of its employees who may have intuitive powers which are expressed from time to time to deny coverage.

At the same time it admits ignorance of what flights are or may be required in direct support of aerial application, the Plaintiff contends that they cannot include flight instruction. Thus, the argument proceeds that an understanding that training flights directly support the aerial application of seeds, fertilizers and chemicals by its very nature must be *unreasonable,* thereby negating the propriety and admissibility of testimony to that effect.

The following legal analysis demonstrates the legal framework, including interpretive standards and principles within which the policy language is to be considered. It does so against the backdrop of the policy under consideration, the disputed language, NATIONAL UNION's admissions, and the opinions of Marshall Wilson Reavis, III. In turn, those opinions, as they relate to the NATIONAL UNION policy, derive from and are expressions of: (1) the witness' understanding of how specialty lines coverages, such as aviation insurance, are written for and sold to persons and entities within the specialized industry, i.e. agricultural aviation companies and (2) how the term is understood by those to whom the policies are sold, i.e. agricultural aviators. In the latter respect, and attached to this Response and made a part hereof, are the affidavits of experienced and qualified persons within the agricultural aviation industry.[2] They demonstrate the following understanding of the inextricable interrelationship between pilot training and the aerial application of seeds, fertilizers and chemicals:

> Based upon his [her] personal experiences in aerial application and his [her] contacts and discussions with others in the industry and his [her] involvement with the Arkansas [Illinois, Iowa] Agricultural Aviation Association and the National Agricultural Aviation Association, he [she] has a good understanding of all aspects of the agricultural aviation business and its customs.
>
> The aerial application of seeds, fertilizers and chemicals requires specific training and instruction in the operation of aircraft and application equipment for that

---

[2] Including the affidavits of past and present officers of the Illinois and National trade associations (IAAA and NAAA).

purpose. That training and instruction includes flights in the type of aircraft, piston or turbine, which is to be used for the application.

It is commonly understood and accepted in the agricultural aviation industry that pilot instruction flights, including turbine transition training for the operation of turbine driven application aircraft, are necessary and essential to the aerial application of chemicals, seeds and fertilizers.

It is commonly and generally understood and accepted in the agricultural aviation industry that pilot instruction flights, including turbine transition training flights, are flights which are in direct support of the application by aircraft of seeds, fertilizers or chemicals.

Reavis' report embodies the expert's comprehension and opinions of how NATIONAL UNION's underwriters would or reasonably should understand the disputed term in the context of policies which are issued for and sold to persons within the specialized agricultural aviation industry. As appears *supra,* in that industry there is a uniform understanding that a direct nexus exists between training flights and the aerial application of seeds, fertilizers and chemicals. In that regard Reavis' original report provides:

> None of these suggested flights is specifically excluded in the policy nor are any endorsed on the policy. All of these are in my opinion *"flights required in direct support"* of the primary mission of the aircraft; i.e. aerial application. This is particularly true of training flights. Seeds, fertilizers and chemicals cannot be applied unless the pilot is trained to fly the turbine powered aircraft. *An aviation underwriter or producer would anticipate and even expect such activities to take place in addition to the actual applying of seeds, fertilizers or chemicals.*
>
> *Underwriters for aviation insurance, just as those insurance producers who sell aviation insurance products, are specialists familiar with types and uses of aircraft and aviation insurance policies. Many are experienced pilots themselves and understand the multiple uses of an aircraft within and outside of specific aviation activities.* (Italics supplied).

As appears from the attached Supplement to Report and Analysis, the preceding opinions derive *inter alia* from the customs and usages of the policy holders which are expressed in the affidavits of those within the industry.

# ARGUMENT

## A.

## GENERAL INTERPRETIVE PRINCIPLES

This is a diversity case. Consequently, the substantive law of Illinois controls the construction and interpretation of the policy. *Allen v. Trans-American Insurance Co.*, 128 F.3d 462, 466 (7 Cir., 1997) and *McFarland v. General American Life Insurance Co.*, 149 F.3d 583, 586 (7 Cir., 1998). Under Illinois law the interpretation of an unambiguous insurance contract poses a question of law. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 108 (1992). If the language of the policy is susceptible to more than one reasonable interpretation it is ambiguous. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 74 (1991). Any ambiguities will be construed in favor of the insured and against the insurer which drafted the policy. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, *supra*, and *First Insurance Funding Corp. v. Federal Insurance Co.*, 284 F.3d 799, 804 (7 Cir., 2002).

In determining the meaning of words within a policy the court must afford them their "*plain, ordinary and popular meaning.*" *McFarland v. General American Life Insurance Co.*, *supra* at 585. The plain and ordinary meaning of terms which are undefined in a policy is that which appears in the dictionary. *LE Rincon Supportive Services Organization, Inc. v. First Non-Profit Mutual Insurance Co.*, 346 Ill.App.3d 96 (2004) and *Abrams v. State Farm Fire & Casualty Co.*, 306 Ill.App.3d 545 (1999). As applied to the instant case, the terms "direct" and "support" have the following pertinent meaning in Webster's New Collegiate Dictionary (9th Ed.):

> "Direct" *adj.* . . . 6: characterized by a close logical, causal or consequential relationship

> "Support" *n*. . . . 2: one that supports
> "Support" *vt*. . . . 2b(1) assist, help.

PONTIAC FLYING submits that the plain and ordinary meaning of the disputed phrase compels the inclusion of training flights within the definition of aerial application. However, and assuming *arguendo* that more is required, the plain meaning rule also considers understanding of language which is used in a policy from the perspective an insured of average intelligence and understanding. *McNeilly v. Bankers United Life Assurance Co.*, 999 F.2d 1199 (7 Cir., 1993). As stated in *El Rincon Supportive Services, et al. v. First Nonprofit Mutual Ins. Co.*, 346 Ill.App.3d 96, 102 (2004): "The standard used to determine whether an insurance policy is ambiguous is 'what a reasonably prudent insured would understand the language to mean."

Also bearing upon the determination of whether a policy is ambiguous, and if so, its meaning, is due regard to the risk undertaken, the situation of the parties, the subject matter of the insurance, and the purposes of the entire insurance contract. *Dora Township v. Indiana Insurance Co.*, 78 Ill.2d 376, 378 (1980) and *West Suburban Bank of Darien v. Badger Mutual Insurance Co.*, 141 F.3d 720 (7 Cir., 1998). As recognized by the court in *Badger Mutual*, the predominant purpose of an insurance contract is to "indemnify the insured." *Id.*, 724.

**B.**

**CUSTOM AND USAGE**

In determining the "situation of the parties" and the circumstances surrounding the "formation of the contract" the court will consider evidence of the customs and usages of the business or industry in which the contract is written. *Sterling-Midland Coal Co. v. Great Lakes Coal and Coke Company*, 334 Ill. 281, 289-90 (1929) and *Fifteenth Avenue Christian Church v. Moline Heating and Construction Co.*, 131 Ill.App.2d 766, 769 (1972). The disputed opinions of Marshall Wilson Reavis, III address that issue from the perspective of the insurer in a highly

- 8 -

specialized field. Where, as here, the contract involves a specialized field, and the language under consideration is susceptible of more than one reasonable meaning, evidence of custom and usage is relevant to its interpretation *vis a vis* the mutual understanding of the parties. *W.H. Smith Hotel Services, Inc. v. Wendy's International, Inc.*, 25 F.3d 422, 429 (7 Cir., 1994).

*Sub judice* custom and usage has two interrelated components. The first focuses upon the agricultural aviation industry's understanding of the phrase "flights required in direct support of . . . the application by aircraft of seeds, fertilizers and chemicals." That understanding is provided by members of the industry. The second component accepts that understanding and considers the generally accepted practices of the insurance business in providing coverage which reflects the "customs and usages" of the specialized industry which it insures. Marshall Wilson Reavis, III is an expert in the area of insurance. His opinions address the latter component of the interpretative process, and in doing so consider how the policy drafters and underwriters took those customs and usages of the agricultural aviation industry into account.

Contrary to the contentions of NATIONAL UNION, Marshall Wilson Reavis, III has *not* been engaged to usurp the function of the court by providing a legal interpretation of the policy. cf. *Loeb v. Hammond*, 407 F.2d 779, 781 (7 Cir., 1969). To the contrary, his anticipated testimony and opinions are and will be restricted to the understanding which the insurer would have had of the term ". . . flights in direct support thereof" at the time it issued and sold the insurance contract to PONTIAC FLYING SERVICE. Of necessity, as the interpretative process views the intent of the parties from both sides, Reavis' opinions take into account the uniform agreement in the agricultural aviation industry that flight instruction is required in direct support of the application of seeds, fertilizers, and chemicals by airplane. Thus, it is Reavis' opinion that

in writing specialized coverage for that industry, NATIONAL UNION and its underwriters would have been aware of that understanding and would have written the policy with it in mind.

Evidence of custom and usage within a specialized field is admissible to explain the interpretation which the parties gave to an otherwise ambiguous term at the time the contract was made. That is particularly true where, as here, the term is used in a technical context and is shown to have a uniformly accepted meaning when used in that context, i.e. the type of flights which support "crop dusting". As stated in *Rush Presbyterian St. Luke's Medical Center v. Safeco Insurance Co.*, 722 F.Supp. 485, 495 (N.D. Ill. 1989):

> Under Illinois law, evidence of custom and usage in an industry is admissible to explain the terms and provisions of ambiguous contracts, see *Bean v. Norfolk & Western Ry. Co.*, 84 Ill.App.3d 395, 400, 39 Ill.Dec. 665, 673, 405 N.E.2d 418, 426 (1980), or to supplement the terms of a contract where there is no provision in the contra\ct regarding the subject to the contrary, see *Fifteenth Ave. Christian Church v. Moline Heat,* 131 Ill.App.2d 766, 769, 265 N.E.2d 405, 408 (1970). A party's suggestion that something is a custom or usage, however, is insufficient to put evidence relating to it in play. The custom or usage must be " ' so uniform long-established and generally acquiesced in and so well known as to induce the belief that the parties contracted with reference to it. . . ' " *Clark v. General Foods Corp.*, 81 Ill.App.3d 74, 78, 36 Ill.Dec. 447, 451, 400 N.E.2d 1027, 1031 (1980), quoting *Kelly v. Carroll*, 223 Ill.App. 309, 315-16 (1921).

Custom and usage may be proved by multiple witnesses (*National Diamond Syndicate, Inc. v. United Parcel Service, Inc.*, 897 F.2d 253, 260 (7 Cir., 1989)) or experts (*Rush Presbyterian*, *supra*, and *Clark v. General Foods Corp.*, 81 Ill.App.3d 74, 79-80 (1980)) or, as here, by both. *Sub judice* custom and usage in the agricultural aviation industry is established by persons in that industry and its effect upon insurance underwriters and companies in drafting policies is the subject of Reavis' opinions.

The prevalence of a custom within a specific industry is a composite of its duration and general acceptance by persons in the industry. In the instant case that is demonstrated by the affidavits of officers of the IAAA and NAAA from the view point of the policy holder. As stated

in *Clark v. General Foods Corp.*, *supra*: "Whether a custom or usage is prevalent in a particular field of business is a question of fact for the fact finder, to be determined from the evidence presented." *Id.*, 79. Reavis is competent to express the opinion that a custom and usage such as that *sub judice* is *deemed to be known and accepted* by insurance underwriters and companies in drafting and selling policies which are responsive to and representative of the concerns and practices of insureds in a specialized field. *American Bar Endowment v. Mutual of Omaha Insurance Co.*, 2002 WL 480960 (N.D. Ill. 2002).

Where, as here, a company such as NATIONAL UNION profits from business relations with a specialized industry, a presumption arises that its dealings are consistent with the customs and usages of that industry. As otherwise expressed in *American Bar Endowment v. Mutual of Omaha*, *supra* at 11:

> When a company engages in commerce in a particular industry it is presumed that it deals in accordance with general and uniform customs and usages in that market. *Clark v. General Foods Corp.*, 81 Ill.App.3d 74, 77-79 (1980).

That presumption remains without the necessity of proving actual knowledge of the custom under the circumstances. *Clark v. General Foods Corp.* at 79. Nor is it necessary to prove that the custom was followed in every case. *American Endowment v. Mutual of Omaha* at 11.

It is sufficient that the expert have knowledge of the *general practice* to which he testifies, as opposed to its use in the precise setting which is under consideration. Thus, in *Clark v. General Foods Corp.*, *supra*, an expert in the field of "executive employment and recruiting" was allowed to render opinions regarding the duration of an employment placement with General Foods even though she ". . . had never faced the precise factual situation involved in [the] case" before. In affirming the expert's testimony the court recognized that by their nature customary practices are general rules which have application to a multitude of factual settings:

> . . . Customs and usages are, by definition, general and apply broadly to a variety of factual situations within the areas where they have developed. It is not necessary to show that an expert has first-hand knowledge of a custom and usage being used in precise factual circumstances identical to the circumstances of the case in which he or she testifies. The presence is unique factual circumstances may have some bearing on the application of the custom in a particular case, but it does not disqualify otherwise qualified experts in the business, profession or field involved. . . *Id.*, 80.

In the instant case Reavis' opinions are being offered on the insurance side of the meaning of "flights required in direct support [of the aerial application of seeds, fertilizers and chemicals]." Specifically, he will testify that it is the custom and usage of the insurance companies and their underwriters to conform the coverages which are written for a specialized business to the customs and usages which are peculiar to that business. In the field of agricultural aviation it is uniformly understood that instructional training flights are required and directly supportive of aerial application. That factual predicate comes from the industry itself. Reavis' opinions simply explain how it is incorporated into the language of the policy.

For the foregoing reasons it is respectfully submitted that the Motion to Bar should be DENIED.

CASSIDY & MUELLER

By: s/  DAVID B. MUELLER
    Attorneys for Defendant,
    PONTIAC FLYING SERVICE, INC.

CERTIFICATE OF SERVICE

    I hereby certify that on November 18, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Mr. Jeffrey B. Rock | jrock@hrbklaw.com, cpoehlman@hrbklaw.com |
| Ms. Diane M. Baron | dbaron@clausen.com, pkebr@clausen.com |
| Mr. Michael S. Krzak | msk@cliffordlaw.com, jmg@cliffordlaw.com |
| Kevin P. Durkin | kpd@cliffordlaw.com; jg@cliffordlaw.com |

And I hereby certify that I have mailed by United States Postal Service the document to the foregoing non CM/ECF participants:

    Mr. Mark T. Banovetz
    Tressler, Soderstrom, Maloney & Priess
    233 S. Wacker Dr., 22nd Floor
    Chicago, IL  60606-6308

        s/DAVID B. MUELLER
        David B. Mueller - #01980661
        CASSIDY & MUELLER
        416 Main Street, Suite 323
        Peoria, IL  61602
        Telephone: 309/676-0591
        Fax: 309/676-8036
        E-mail: dmueller@cassidymueller.com