E-FILED
Friday, 18 March, 2005  02:53:36 PM
Clerk, U.S. District Court, ILCD

SKS 257914                                                                3917-8

## IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) ) |
| Plaintiff, | ) Case No. 03-CV-01288 |
| v. | ) ) |
| PONTIAC FLYING SERVICE, INC., JUSTYN WEBSTER, As Special Administrator of the Estate of NEIL WEBSTER, Deceased, and CAREN S. LUCENTE, as Independent Executor of the Estate of RICHARD P. LUCENTE, Deceased, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| And | ) ) |
| PONTIAC FLYING SERVICE, INC. v. | ) ) ) |
| HARDY AVIATION INSURANCE, INC., | ) ) |
| Third Party Defendant. | ) ) |
| . | ) |

## NATIONAL UNION'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. ("National Union"), by its attorneys, HASSELBERG, ROCK, BELL & KUPPLER and TRESSLER, SODERSTROM, MALONEY & PRIESS, submits the following Statement of Facts and Memorandum of Law In Support of Its Motion For Summary Judgment against Defendant, Pontiac Flying Service, Inc. ("Pontiac"), JUSTYN WEBSTER, and CAREN S. LUCENTE, pursuant to Federal Rule of Civil Procedure 56:

## I.    INTRODUCTION

This declaratory judgment action arises out of the fatal crash of a turbine powered agricultural airplane (also known as "crop duster" airplanes) which took place in Pontiac, Illinois on May 5, 2003.  The aircraft was being used by Pontiac to provide turbine transition training to an out-of-state pilot pursuant to Pontiac's nationally advertised turbine transition training program.  Both occupants of the two-seat, tandem aircraft were killed. National Union filed the instant declaratory judgment action seeking a declaration that it has no obligation to reimburse Pontiac in connection with the loss of the aircraft hull under the National Union policy because the aircraft was being used for the purpose of commercial flight instruction, a purpose not covered by Pontiac's aerial applicator policy, at the time of the loss.  National Union also seeks a declaration that the independent contractor pilot who was providing commercial flight instruction at the time of the accident, Rick Lucente, is not an insured under the National Union policy.  Finally, National Union seeks a declaration that the policy issued to Pontiac does not provide third-party liability coverage for the injuries and death sustained by either Lucente or the passenger/student pilot, Neil Webster.

Pontiac has filed a third party claim against its broker, Hardy Aviation, in the instant case, alleging professional negligence in connection with the procuring of Pontiac's insurance coverage.   The third party claim against Hardy is not at issue in this motion.

## II.    MATERIAL UNDISPUTED FACTS

1.    PONTIAC FLYING is in the business of, *inter alia*, aerial application of agricultural products (i.e. – "crop dusting).   It is owned and operated by Scott and Sarah

2

Petersen.

2.    In or about February, 2002, Pontiac purchased a turbine powered Air Tractor AT 503 from Harold Miller's Flying Service to compliment its existing piston powered "Ag Cat" airplanes[1] and so that it could do work on Gypsy Moth contracts. (Scott Petersen Deposition, p. 26).[2]   Pontiac's insurance agent, Randy Hardy, had the Air Tractor added to Pontiac's National Union policy by endorsement effective March 1, 2002. (Randy Hardy Deposition, p. 69).

3.    The aircraft was added to the policy for the purpose of aerial application. (Hardy, p. 74).

4.    Hardy's notes from the time coverage was bound on the aircraft indicate that Scott Petersen had already obtained his own turbine transition training in the aircraft while the aircraft was still owned by Harold Miller's Flying Service, where Petersen previously performed crop dusting work on an independent contractor basis. (Hardy, p. 127-128).

5.    Hardy never had any discussions with Scott or Sarah Petersen about the possibility of using the Air Tractor for the purpose of operating a commercial turbine transition training program. (Hardy, p. 76).

6.    When asked whether he ever did any research or took any steps to find out what the insurance requirements would be for operating a turbine transition training program with the Air Tractor, Scott Petersen replied "[n]ot for the transition training, just for the aerial application." (Scott Petersen Sworn Statement, p. 25).

7.    Scott Petersen never discussed with his insurance agent, Randy Hardy, the

---

[1] Pontiac also owned various general aviation airplanes used for non-agriculture aviation, including rental and flight instruction.  Those aircraft were covered under a separate insurance policy that is not at issue here.

[2] The portions of the Sworn Statement of Scott Petersen, the Deposition of Scott Petersen, and the Deposition of Randy Hardy referenced in this Motion will be filed electronically in PDF format with this brief, per Central District Rule 7.1.  Because of the length of these documents, the entire transcripts will not be provided with the Motion.  If the Court directs, counsel will provide the entire transcripts immediately.

possibility of using the Air Tractor for turbine transition training, although he recalls discussing the possible use of Rick Lucente (who had trained him in the airplane when it was owned by Harold Miller) to give him additional training in the aircraft. (Petersen Sworn Statement, p. 26).

8.     Hardy cannot recall specifically what was discussed but recalls that Petersen already had the required training in the aircraft to be added as an approved pilot in the airplane (Hardy, p. 127).[3]

9.     Referring to Scott Petersen, Hardy testified "…He's transitioned in the airplane. Is he transitioning others or in the business of transitioning otherwise, no, and I'll testify to the fact that that was never part of the policy nor part of any of the conversations." (Hardy, p. 124).

10.     When the National Union policy was renewed, effective May 19, 2002, Scott Petersen was listed as a named pilot for the Air Tractor aircraft. (Amended Dec. Complaint, Exhibit B, Endorsement No. 2).   The same endorsement included "OPW," or "open pilot warranty" requirements that would allow any pilot meeting certain criteria to fly the aircraft.

11.     Scott Petersen wished to have the policy cover the aircraft in the event that it were to be flown by Rick Lucente, as Petersen intended to have Lucente assist him in aerial application required to complete "Gypsy Moth" contracts. (Petersen Sworn Statement, p. 21; Scott Petersen Deposition, p. 19; 29). It is undisputed that Rick Lucente, who previously flew the Air Tractor when it was owned by Harold Miller's Flying Service, met the OPW requirements to fly the airplane for aerial application work.

12.     Beginning  in December, 2002, and up through the date of the accident, Pontiac began running advertisements in a national aerial applicator publication called "AgAir Update."

---

[3] Some of the confusion on this point could stem from the fact that Scott and Sarah Petersen called to inquire about insurance requirements before purchasing the airplane, at which time Scott may not have been done with his training – therefore prompting Hardy to advise him that he would need to complete his transition training *before* getting coverage.

(Scott Petersen Deposition, p. 36).   The advertisements were entitled "Turbine Transition Training" and provided that the course would include "5 hour Ground Instruction," "5 hour Dual Instruction" with a certified flight instructor "Ag Pilot," "Turbine Sign-Off" and "Lodging Provided." (See Exhibit 2, attached to Scott Petersen Deposition Transcript).

13.     Scott Petersen never told anyone at Hardy Aviation, his agent, that he was advertising a turbine transition training program. (Scott Petersen Deposition, p. 37).

14.     At some point prior to the accident, in approximately July, 2002, Scott and/or Sarah Petersen had contacted Hardy to inquire about running an agricultural flight training school using their piston-powered "Ag Cat" airplanes and Hardy discussed with them some of the required changes needed for a policy to include training activity with the ag airplanes. (Hardy, p. 113).

15.     Hardy recalls, and his company's office notes establish, that insurance companies had previously declined to quote Pontiac for agricultural flight training activity in the piston-powered airplanes. (Hardy, p. 94).

16.     Prior to the accident, Pontiac was contacted by its first and only customer for turbine transition training in the turbine powered Air Tractor.  Neil Webster was referred to Pontiac by Del Finup, an aerial applicator in Lakeview, Michigan. (Sworn Statement of Scott Petersen, p. 33).

17.     Webster was already flying piston powered aerial application airplanes, most recently in Wyoming, but wanted to upgrade his ratings to fly turbine equipment. (Sworn Statement of Scott Petersen, p. 33).

18.     Pontiac hired Lucente as an "independent contractor" to train Webster for $100 per hour. (Sworn Statement of Scott Petersen, p. 34).  Pontiac would then charge Webster $5,200

for the training. (Id., p. 35).    The training resulted in the fatal accident flight on May 5, 2003.

19.    Randy Hardy never had any conversations with the Petersens about their use of the Air Tractor for turbine transition training. (Hardy, p. 76).

20.    On the morning of the crash, Hardy recalls reading, for the first time, a comment from the editor of an aerial application trade publication that Pontiac Flying Service was offering turbine transition training, causing Hardy to bring a copy of the publication to his assistant, Angie Banz, to inquire whether she had any knowledge of this situation – coincidentally, it was at this time that Ms. Banz was taking the call regarding notice of the accident. (Hardy, p. 76-77).

21.    Prior to the loss, Scott Petersen had not read the definition of "aerial application" contained in the National Union policy. (Scott Petersen Deposition, p. 57).

22.    Scott Petersen acknowledges that the policy application that he signed provides, under liability coverages, that "passengers excluded" is "checked." (Scott Petersen Deposition, p. 39).

23.    Scott Petersen testified that "we never carried any passengers in the airplane." (Scott Petersen, p. 39).  Scott Petersen does not recall whether he ever reviewed the definition of the term "passenger" in the National Union policy. (Scott Petersen Deposition, p. 40).  Scott Petersen recalls that the Air Tractor "…was never certified as having a passenger seat in the rear." (Id.).

24.    The definition of "passenger" set forth in the policy is "…any person in, on or boarding the aircraft for the purpose of riding or flying therein, or alighting therefrom after a flight or attempted flight therein, including crew members." (Scott Petersen Deposition, p. 42).

25.    Scott Petersen testified that "we never carried passengers," but rather only "crew." (Id., p. 41).  Scott Petersen believed that there would be liability coverage applicable to

anyone in the airplane. (Id.).

26.     The Air Tractor crashed on May 5, 2003 during the first instructional flight with Rick Lucente as instructor pilot and Neil Webster as a student pilot passenger.  National Union disclaimed hull coverage for the loss of the aircraft by letter dated July 31, 2003 to Pontiac.

27.     On April 22, 2004, Neil Webster's Estate filed a complaint against Pontiac and Lucente in the Circuit Court of Livingston County, Illinois styled *Justyn Webster, as Special Administrator of the Estate of Neil Webster, Deceased v. Pontiac Flying Service, Inc. and Caren S. Lucente, as Independent Executor of the Estate of Richard P. Lucente, Deceased*, pending as Case No. 04 L 15 (A copy of the Webster Complaint is attached to National Union's Amended Declaratory Complaint as Exhibit "A.")

28.     The Webster Complaint seeks damages under the Illinois Wrongful Death Act and Survival Act. National Union denied coverage in connection with the Webster Complaint by letter dated June 10, 2004 to Pontiac.

29.     National Union issued a liability insurance policy to Pontiac under Policy No. AV 3391999-04, effective May 19, 2002 to July 6, 2003.  A copy of the National Union policy is attached to its Amended Declaratory Complaint as Exhibit "B."

30.     The National Union policy covered three aircraft, including the Air Tractor, and provided non-chemical and chemical liability coverage and physical damage coverage. The "Bodily Injury – excluding Passengers" limit of liability is $100,000 each person, $300,000 each occurrence/aggregate.  The Physical Damage Coverage identified for the Air Tractor includes an Insured Value of $350,000.

31.     The National Union policy provided coverage as follows under INSURING AGREEMENTS:

## AERIAL APPLICATOR AIRCRAFT POLICY

### INSURING AGREEMENTS

The Company… in consideration of the payment of the premium, in reliance upon the statements of the Declarations made a part hereof, subject to all of the terms of this policy including the applicable limits of liability, the Company agrees with the **Named Insured** with respect to those coverages in Items 3 and 4 of the Declarations.

I.      **LIABILITY COVERAGES**

**Coverage A – Bodily Injury** Liability Excluding **Passengers** – To pay on behalf of the Insured those sums which the **Insured** shall become legally obligated to pay as damages because of **bodily injury** sustained by any person **excluding any passenger**[.]

**Coverage B – Property Damage** Liability – To pay on behalf of the **Insured** those sums which the **Insured** shall become legally obligated to pay as damages because of **property damage**.

…

caused by an **occurrence** and arising out of the ownership, maintenance or use of the **aircraft**.

*      *      *

III.    **PHYSICAL DAMAGE COVERAGES**

**Coverage F – All Risk Basis** – To pay for **physical damage** loss to the **aircraft**, including **disappearance** of the **aircraft** unless otherwise described in this policy.

*      *      *

(Dec Complaint, Exhibit B.)

32.     The Declarations page of the National Union Policy provides, in part:

### DECLARATIONS

…

**ITEM 6.** The aircraft will be used only for the purpose **Aerial Application**.

8

*      *      *

(Dec Complaint, Exhibit B.)

33.    The National Union policy provides, *inter alia*, as follows under DEFINITIONS:

**DEFINITIONS**

"**Aerial Application**" means the application by aircraft of seeds, fertilizers or chemicals and includes flights required in direct support thereof.

"**Bodily Injury**" means bodily injury, sickness, disease, and if arising out of the foregoing, mental anguish sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

"**Crew**" means the pilot in-command, co-pilot, flight engineer, flight attendant or anyone else who is in, on, or boarding the **aircraft** for assisting in the operation of the **aircraft**.

"**Passenger**" means any person in, on, or boarding the **aircraft** for the purpose of riding or flying therein or alighting therefrom after a flight or attempted flight therein, including **crew** member(s).

*      *      *

(Dec Complaint, Exhibit B.)

34.    The National Union policy includes the following exclusions:

**EXCLUSIONS**

This policy does not apply:

9

1.    a)    while the **aircraft** is being operated with the knowledge and consent of the **Insured** or of any executive officer or partner thereof, for any unlawful purpose, or for any purpose or use other than **aerial application**, unless specifically endorsed on the policy;

(Dec Complaint, Exhibit B.)

### III.    APPLICABLE LAW

**A.    STANDARD FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56 governs summary judgment procedure in the United States District Courts.

(b)    A party against whom a claim . . . is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

Fed. R. Civ. P. 56 (b).  *See also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)*; Horkey v. J.V.D.B. & Assoc., Inc.*, 333 F.3d 769 (7th Cir. 2003); *Fischer v. Mt. Olive Lutheran Church, Inc.*, 207 F. Supp. 2d 914 (E.D. Wis. 2002).

A court should grant summary judgment for the moving party "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The purpose of filing a motion for summary judgment is to avoid a trial in cases where it is unnecessary and where it would only cause delay and expense.  Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3rd Cir. 1976).  Thus, the moving party must demonstrate that there are no material issues of fact to be resolved, and the Court must view the facts presented in the pleadings and any inferences to be drawn therefrom in

10

the light most favorable to the nonmoving party.  Id. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to raise a genuine issue and defeat a summary judgment motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**B.      STANDARD FOR CONSTRUCTION OF AN INSURANCE POLICY**

The construction of an insurance policy is a question of law. Am. States Ins. Co. v. Koloms, 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 75 (1997).  A court's primary objective in construing the language of the policy is to ascertain and give effect to the intentions of the parties as express in their agreement.  Crum & Forster Managers Corp. v. Resolution Trust Corp., 156 Ill.2d 384, 391, 620 N.E.2d 1073, 1078 (1993).  When the language of an insurance policy is clear and unambiguous, it must be accorded its plain and ordinary meaning.  Outboard Marine v. Liberty Mutual Insurance Co., 154 Ill.2d 90, 607 N.E.2d 1204, 1212 (1992).

**IV.      ARGUMENT**

**A.      COUNT I – Unauthorized Use Of Aircraft/Unauthorized Use Exclusion**

Under Illinois law, an insurer is not liable under an insurance policy when the conditions precedent to coverage are not met. See Kioutas v. Life Ins. Co. of Virginia, 35 F. Supp.2d 616, 621 (N.D. Ill. 1998) (citing Continental Illinois Nat'l Bank & Trust Co. v. Columbian Nat'l Life Ins. Co., 76 F.2d 733, 735 (7th Cir. 1935)).  There is no dispute that the National Union Policy requires that the covered aircraft, the Air Tractor, be used only for the purpose authorized by the policy, "aerial application" to trigger coverage.  Pontiac agrees in its Answer that the Air Tractor may not be used other than for "aerial application."   "Aerial Application" is defined by the

policy as "the application by aircraft of seeds, fertilizer or chemicals and includes flights required in direct support thereof." Therefore, in order for coverage under the National Union Policy to apply, the insured must have been using the Air Tractor for the purpose of applying said substances by the subject aircraft or a flight required in direct support thereof.

Pontiac was not engaged in the application by aircraft of seeds, fertilizer or chemicals nor were Mr. Lucente and Mr. Webster flying in "direct" support of such an application by the subject aircraft on behalf of Pontiac. Pontiac was using the Air Tractor for a different purpose, the purpose of providing commercially advertised turbine transition training to an out-of-state pilot employed by another aerial applicator. Pontiac attempts to suggest that turbine transition training may constitute "aerial application" to the extent that it is in direct "general" support of the application of seeds, fertilizers or chemicals, since training is required to fly airplanes, and airplanes are required for aerial application. However, such an argument is meritless on its face because flight training and aerial application are obviously entirely different undertakings. Pontiac's admissions and statements in its Answer provide fatal blows to such an untenable position. Pontiac admits that the aircraft was being used to train an out-of-state pilot, pursuant to a nationally advertised training program, who was employed with another aerial applicator at the time of the loss. Such training could not possibly be tied, even remotely, to the use of the covered aircraft for applying seeds, fertilizers or chemicals.

Pontiac repeatedly claims (incorrectly) that "flights which are required to train pilots in the application by *covered aircraft* of seeds, fertilizers or chemicals are *in direct support of aerial application*." (Pontiac Answer, par. 26.) (Emphasis added.). This is an interesting statement because, while untrue for the reasons which follow, this statement concedes that the flight training would necessarily have to be tied to the use of the covered aircraft for aerial

application – which is not the case here.  Given these statements, Pontiac cannot reasonably deny that flights such as the accident flight, which are intended to train pilots for <u>other</u> aerial applicators in the application by *non-covered aircraft* of seeds, fertilizers or chemicals are <u>not</u> in direct support of Pontiac's aerial application operations.  (Pontiac Answer, Par. 26).

It is evident on the face of the policy that the coverage afforded does not apply to any type of flight training – even if such training involved Pontiac's own employees (note that the policy excludes all passenger coverage, and any pilot providing flight instruction is not within the definition of "insured" – as discussed in further detail under arguments B and C below).  Pontiac, however, was not even engaged in a flight to train its <u>own</u> employee nor was it training a pilot in the application by the "covered aircraft" of seeds, fertilizers or chemicals.  Rather, Pontiac admits that it was advertising and holding itself out as a commercial flight school offering a turbine transition training program.  Pontiac admits that it was hired by a third party to provide Webster with "turbine transition training" and that it hired Lucente as an independent contractor to do the training.  Yet, the President of Pontiac, Scott Petersen ("Petersen") has stated that he did not do any research or take any steps to see what insurance requirements would exist for turbine transition training. (Sworn Statement of Scott Petersen, p. 25).  He does not remember whether the insurance broker advised him that transition training would be covered under the policy.  (Sworn Statement of Scott, Petersen, p.27).  Nor does he remember having any specific discussions with the insurance broker or any other insurance agent concerning insurance requirements for operating a flight school with the Air Tractor, an airplane that he himself had only recently learned to fly  (Sworn Statement of Scott Petersen, p.28).  This is despite the fact that he had recently been turned down for insurance to do similar training in the less complicated piston powered Ag Cat airplanes.  When Pontiac started its turbine transition training business,

there was no inquiry as to insurance coverage for such operations.  Pontiac knew to inquire as to insurance coverage for training it planned to do in its piston powered Ag Cat aircraft, but now expects this Court to believe that it considered the operation of a turbine transition training program using its Air Tractor, its most complicated aircraft, to somehow be automatically covered under the definition of  "aerial application" – a definition which Scott Petersen never actually read.

At the time of the accident, Pontiac was not using the Air Tractor to train Webster for a flight required to apply substances by the covered Air Tractor.  Rather, Pontiac authorized Lucente to use the Air Tractor for a flight to train Webster so that Webster could use other aircraft – those owned or operated by his employer – not so that Webster could use the aircraft covered under the National Union Policy.  Hence, the turbine transition training by Pontiac did not even remotely constitute a flight required in direct support of any application of seeds, fertilizers or chemicals by Pontiac or its Air Tractor, and hence, was not "aerial application" as defined by the National Union Policy.

Pontiac attempts to assert "some metaphysical doubt as to the material facts", where no real doubt exist.  There is no genuine issue as to whether a  commercially offered training flight can be viewed as a flight in direct support of the application of seeds, fertilizer or chemicals - it simply cannot.  It is inconceivable that a commercial aviation operator such as Pontiac, which actually had specific insurance coverage under a separate policy for flight training operations using its non-agricultural airplanes, would not be aware of the monumental change in insurance risks involved when transforming its crop-dusting business into a nationally advertised turbine transition training flight school.  In this case, proof exists that Pontiac knew better, because it had applied for and was denied similar coverage on its Ag Cat airplanes previously.

14

The flight in question was for the purpose of commercially advertised flight instruction undertaken by an independent contractor for Pontiac's and Lucente's profit.  Thus, even viewed in a light most favorable to Pontiac, the undisputed facts establish beyond question that Pontiac was not using the Air Tractor for the only purpose authorized under the National Union Policy - "aerial application."  Pontiac was engaged in a completely separate commercial undertaking which involved completely different risks than those insured against by the National Union policy. The policy clearly reflects that the intent of the parties was to insure the use of the subject aircraft for the application of seeds, fertilizer or chemicals or flights needed to support the application.  Such support might include refueling, flights to another location for maintenance, or flights to pick up seeds, fertilizer or chemicals, but this definition certainly cannot reasonably be extended to include commercial flight training operations that are wholly unrelated to the insured's aerial application business.  Accordingly, National Union has no obligation under the National Union Policy to Pontiac for its loss of the Air Tractor because Pontiac was using the aircraft for a purpose not authorized by the policy.

Pontiac's use of the Air Tractor for a purpose other than that for which it was authorized under the Policy also invokes Exclusion 1.a. of the policy.  At the time of the accident, the Air Tractor was being operated with the knowledge and consent of Pontiac for turbine transition training, a purpose and/or use other than aerial application.  Application of Exclusion 1.a. of the National Union Policy precludes coverage for the loss of the Air Tractor.  The undisputed material facts compel a single conclusion under the law.  This Court should declare that National Union has no obligation under the policy to Pontiac for the loss of the Air Tractor hull or any liability claims arising therefrom, and should enter judgment in favor of National Union on Count I of its Amended Complaint for Declaratory Judgment.

15

A court should not strive to find ambiguity in an insurance policy where none exists.  Nor should the court endeavor to find some set of facts pursuant to which an ambiguity could be argued to exist.  Pontiac's efforts to create artificial ambiguity by arguing that flight training generally is required to fly turbine aircraft, and that such training therefore is in "direct support" of aerial application, should not be entertained.  It turns the reasonable interpretation of the National Union policy on its ear and in essence would re-write commercial aviation coverage for aerial applicators. No reasonable interpretation of "aerial application" could be deemed to include the insured's operation of an entirely separate business enterprise of turbine transition flight training.  The National Union policy clearly does not apply to the use of the Air Tractor in connection with a nationally advertised turbine transition training program.

**B.**      <u>**COUNT II – No "Passenger" Liability Coverage**</u>

The National Union policy issued to Pontiac is, by its terms, intended to provide coverage for "bodily injury" to individuals on the ground or in other airplanes, not for "bodily injury" to the occupants of the insured aircraft – who usually are subject to workers compensation protection as employees of the aerial applicator/aircraft owner or subject to their own business coverage as an independent contractor.  Accordingly, the face of the Declarations page of the National Union provides under Item 3A: "Bodily Injury -excluding Passengers."

Section I of the National Union policy, "Liability Coverages" provides for "**Bodily Injury** Liability Excluding **Passengers**" and states that the Company will "…pay on behalf of the Insured those sums which the **Insured** shall become legally obligated to pay as damages because of **bodily injury** sustained by any person **excluding any passenger**."  The "Definitions" section in the National Union policy provides that "Passengers" means "…any person in, on, or boarding the aircraft for the purpose of riding or flying therein or alighting therefrom after a

flight or attempted flight therein, including **crew** members." Lucente and Webster were "passengers" as defined by the National Union policy while aboard the Air Tractor on May 5, 2003 and therefore the National Union policy does not provide coverage for any damages arising out of "bodily injury" sustained by either Lucente or Webster.

Inasmuch as the policy explicitly does not include liability coverage for passengers, including crew, there is no coverage applicable under the policy for the Webster claim nor would there be coverage applicable to any such claim as might be pursued by or on behalf of Lucente. National Union is therefore entitled to summary judgment as a matter of law on Count II of its Amended Complaint for Declaratory Judgment.

## C.    COUNT III – Lucente Not An Insured

Lucente was hired by Pontiac as an independent contractor to provide turbine transition flight instruction to Webster and Lucente was not an employee of Pontiac.

The National Union policy provides, *inter alia*, as follows under DEFINITIONS:

### DEFINITIONS

"**Insured**" means with respect to Coverages A, B, C and D, not only the Named Insured but also officers, directors and employees of the Named Insured and pilots under contract to the Named Insured, but only while acting within the scope of their duties as such and provided the actual use of the aircraft is with the express permission of the Named Insured. Except with respect to the Named Insured the provisions of this paragraph do not apply:

* * *

    b)    to any person or organization or to any agent or employee thereof (other than any employee of the Named Insured while acting in the course of his employment by the Named Insured):

* * *

3) who is engaged in the activity of instruction, evaluation, examination or certification of any pilot or crew member or prospective pilot or crew member;

4) who is charging a fee and/or receiving any remuneration or benefit for providing any type of service whatsoever in connection with the ownership, maintenance or use of any insured aircraft;

c) to any person or organization operating the aircraft under the terms of any rental agreement or training program which provides any remuneration or benefit to the Named Insured for the use of the aircraft;

* * *

On May 5, 2003, at the time of the loss of the Air Tractor and the death of its occupants, Lucente, as an independent contractor for Pontiac, was engaged in the activity of flight instruction of Webster and Lucente therefore is not included within the definition of "Insured" pursuant to paragraph b(3) under the definition of "Insured" in the policy.

At the time of the destruction of the Air Tractor and the death of its occupants, Lucente, as an independent contractor for Pontiac, was charging a fee to Webster, in exchange for providing turbine transition flight training services to Webster and Lucente therefore is not included within the definition of "Insured" pursuant to paragraph b(4) under the definition of "Insured" in the policy.   In addition, at the time of the accident, Lucente, as an independent contractor for Pontiac, was operating the aircraft under the terms of a training program which provided remuneration to Pontiac for the use of the aircraft and Lucente therefore is not included within the definition of "Insured" pursuant to paragraph c under the definition of "Insured" in the policy.

Inasmuch as there is no dispute as to the material facts, and the National Union policy language is not in dispute, Lucente is not an insured under the National Union policy for this loss as a matter of law and National Union is therefore entitled to summary judgment in its favor under Count III of its Amended Complaint for Declaratory Judgment.

## V.     CONCLUSION

For the reasons set forth above, Plaintiff National Union Fire Insurance Company of Pittsburgh, PA respectfully requests that this Court enter summary judgment in its favor and against Pontiac Flying Service,  on Counts I, II and III of its Amended Complaint for Declaratory Judgment, and declare as follows:

A.     The loss of the Air Tractor and the Webster Complaint do not come within the coverage of NATIONAL UNION Policy No. AV 3391999-04, and are also expressly excluded from coverage under the policy, because the loss of the Air Tractor and the death of its occupants on May 5, 2003 resulted from a purpose of use of the aircraft other than "aerial application;"

B.     NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. owes no indemnity obligation to PONTIAC FLYING in connection with the loss of the Air Tractor;

C.     NATIONAL UNION Policy No. AV 3391999-04 does not provide coverage for any damages arising out of "bodily injury" sustained by either LUCENTE or WEBSTER because they were "passengers" aboard the Air Tractor at the time of the loss on May 5, 2003 and therefore liability in connection with such claims is not included within, and is expressly excluded from, coverage;

D.     LUCENTE is not an "Insured" as defined by NATIONAL UNION Policy No. AV 3391999-04 with respect to the loss of the Air Tractor and the death of its occupants on May 5, 2003; and

E.   NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. owes no defense or indemnity obligation to PONTIAC FLYING and/or LUCENTE in connection with the Webster Complaint under the terms of NATIONAL UNION Policy No. AV 3391999-04.

**ORAL ARGUMENT REQUESTED**

NATIONAL   UNION   FIRE   INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

By: ___s/___ Jeffrey B. Rock_____
Jeffrey B. Rock, Esq., Bar No. 2360039
Attorney for Plaintiff
Hasselberg, Rock, Bell & Kuppler LLP
Suite 200 Associated Bank Building
4600 N. Brandywine Drive
Peoria, IL 61614-5591
Telephone: (309) 688-9400
Facsimile: (309) 688-9430
E-mail: jrock@hrbklaw.com

Mark T. Banovetz, Esq.
Tressler, Soderstrom, Maloney & Priess
Sears Tower, 22nd Floor
233 South Wacker Drive
Chicago, IL 60606-6308
Telephone: (312) 627-4000

Attorneys for Plaintiff NATIONAL UNION

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of March, 2005, I electronically filed **National Union's Motion For Summary Judgment** with the Clerk of the Court using the CM/ECF system which will send notification of such following to the following:

David B. Mueller, Esq.
CASSIDY & MUELLER
323 Commerce Bank Building
416 Main Street
Peoria, IL  61602

Michael S. Krzak, Esq.
Kevin P. Durkin, Esq.
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street
Suite 3100
Chicago, IL  60602

Diane M. Baron, Esq.
CLAUSEN MILLER, P.C.
10 South LaSalle Street
Chicago, IL  60603-1098

George K. Flynn, Esq.
CLAUSEN MILLER, P.C.
10 South LaSalle Street
Chicago, IL  60603-1098

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

None.

> NATIONAL     UNION     FIRE     INSURANCE
> COMPANY OF PITTSBURGH, PA., Plaintiff,
>
> By:   s/     Jeffrey B. Rock
>           Jeffrey B. Rock, Esq., Bar No. 2360039