E-FILED
Friday, 18 March, 2005  02:55:04 PM
Clerk, U.S. District Court, ILCD

```
1   STATE OF ILLINOIS        )
                             )
2   COUNTY OF COOK           )

3           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                 COUNTY DEPARTMENT, LAW DIVISION
4
    NATIONAL UNION FIRE INSURANCE  )
5   COMPANY OF PITTSBURGH, PA.,    )
                                   )
6           Plaintiff,             )
                                   )
7           vs.                    ) No. 03-1288
                                   )
8   PONTIAC FLYING SERVICE, INC.,  )
    Et al.,                        )
9                                  )
            Defendants.            )
10                                 )
                And                )
11                                 )
    PONTIAC FLYING SERVICE, INC.,  )
12                                 )
            Third Party Plaintiff,)
13                                 )
            vs.                    )
14                                 )
    HARDY AVIATION INSURANCE, INC.,)
15                                 )
            Third Party Defendant.)
16

17

            The discovery deposition of SCOTT PETERSEN
18  called for examination pursuant to the provisions of the
    Civil Practice Act and Rules of the Supreme Court as they
19  apply to the taking of discovery depositions, taken
    before Laura J. Amberg, CSR, State of Illinois, on the
20  22nd day of February, 2005, at the hour of 11:20 a.m., at
    416 Main Street in the City of Peoria, County of Peoria,
21  State of Illinois.

22

23
```

MERIT REPORTERS
P. O. Box 413, Morton, IL 61550

1          A.    That I don't recall.

2          Q.    Okay.  And why did you purchase that plane?

3          A.    So that we could become involved in the gypsy

4    moth abatement programs.

5          Q.    Did you tell anyone from Hardy Insurance that

6    you were buying that plane?

7          A.    Yes.

8          Q.    Who did you tell?

9          A.    I spoke with Angie and I spoke with Randy.

10         Q.    And Angie is Angie Banz?

11         A.    That's correct.

12         Q.    When did you speak with Angie Banz about it?

13         A.    To my recollection, early February.

14         Q.    Of '02?

15         A.    Of '02.

16         Q.    Okay.  And did you call her or how was it

17    that you spoke to her?

18         A.    Yes, I phoned her.

19         Q.    And what did you say to her and what did she

20    say to you?

21         A.    If I recall, I told her that we were pursuing

22    purchasing the assets of Harold Miller, which included

23    the 503, and wanted to know what the insurance premiums

1          MR. MUELLER:  Initial training with Lucente.

2    Are we talking about the acquisition taking place after

3    that?

4          MR. BANOVETZ:  No, no.  I was talking about

5    at the time of the purchase.

6          MR. MUELLER:  Okay.  Would that be the five

7    hours?

8          Q.    (Mr. Banovetz continuing.)  Is that all the

9    hours that you had in that airplane at that time?

10         A.    At the time we inked the deal, yes.

11         Q.    So the flying that you did for Harold

12    Miller's Flying Service was all in piston aircraft, other

13    than the training?

14         A.    That's correct.

15         MR. BANOVETZ:  Okay.  Thanks.

16

17         Q.    (Ms. Baron continuing.)  Just so that I'm

18    clear, you're saying that the purchase was the last day

19    of February of '02; correct?

20         A.    That's correct.

21         Q.    And then you mentioned a date of April of

22    '02.  Is that when you -- I'm just trying to figure out

23    why the difference in dates.  What happened?

1  USAIG to AIG?

2        A.    Yes.

3        Q.    Why?

4        A.    USAIG would not underwrite gypsy moth

5  application.

6        Q.    When did you receive these few hours of

7  training with Rick Lucente in the AT-503?

8        A.    I don't have an exact date.  It was after the

9  purchase and the time when the grass strip dried up and

10  we could get the airplane, but I don't have the exact

11  date.

12            MR. MUELLER:  I believe we do have records

13  that would show that.

14        Q.    Okay.  Did you use the AT-503 for training

15  anyone else?

16        A.    Not at that time, no.

17        Q.    At any time.

18        A.    In -- would you repeat the question?  I'm not

19  understanding what you're looking for.

20        Q.    Sure.  I wanted to know if you used the

21  AT-503 for turbine transition training for anyone else?

22            MR. MUELLER:  When you're using the term

23  "you" are you referring to him individually or to the

1  Hardy all the time, but that normally was handled by

2  Sarah.

3          MS. BARON:  Okay.  Let's mark that.

4          (Whereupon Deposition Exhibit #2 was

5          Marked for identification.)

6      Q.   (Ms. Baron continuing.)  All right.  Showing

7  you what's been marked as Deposition Exhibit Number Two,

8  is that a copy of one of the ads that you ran for the

9  turbine transition training with the AT-503?

10     A.   Yes, that's correct.

11     Q.   And when did you run these ads, for what

12 period of time?

13     A.   If I recall, it started in December of 2002

14 and it ran up through the time of the accident, I

15 believe.  At that time we canceled those particular

16 advertising.

17     Q.   And did -- but you're saying that no one else

18 came for training until May of '03?

19     A.   We had several inquiries.

20     Q.   But no one took the training?

21     A.   No.

22     Q.   Did you tell anyone at Hardy Insurance that

23 you were using the AT-503 for turbine transition

1  training?

2      A.   Yes.  Randy specified that when we originally

3  bought the aircraft, that I was to have additional

4  training in it and I told him that we would add Rick

5  Lucente as the instructor pilot on that aircraft.

6      Q.   Did you request coverage, insurance coverage

7  for using the plane for training, transition training at

8  that time?

9      A.   I believe it was all covered in what we had

10  discussed.

11      Q.   And what do you mean by that?  Do you recall

12  asking him for coverage for that use?

13      A.   Randy specified that we had to have

14  additional training and I told him that was fine, that I

15  would do it with Rick Lucente and we would add him as the

16  instructor pilot on the aircraft.

17      Q.   Did you ever tell Hardy Insurance that you

18  were advertising to do transition training on that

19  aircraft?

20      A.   I never told them that I was advertising.

21      Q.   Did you tell them that you were offering to

22  do it for other people?

23      A.   No.

1          A.    Yes.

2          Q.    Is that your signature at the bottom of the

3    second page?

4          A.    Yes, that is.

5          Q.    Did you read this application before you

6    signed it?

7          A.    Yes, I did.

8          Q.    And it includes the Air Tractor, AT-503;

9    correct?

10          A.    Yes, it does.

11          Q.    If you look at the second page up at the top

12    where -- under the aircraft liability coverages, the box

13    passengers excluded is checked, correct, up in the

14    left-hand corner?

15          A.    On the second page?

16          Q.    Yes.

17          A.    Oh, yes, it is.

18          Q.    So that indicated that passenger coverage was

19    excluded under the policy?

20          A.    We never carried any passengers in the

21    airplane.

22          Q.    When you were using the Air Tractor 503 for

23    your own training weren't there two of you in the plane?

1          A.    That's correct.

2          Q.    Just a second here.

3                MR. BANOVETZ:  Can I interject a question

4     again?

5                MS. BARON:  Sure, go ahead.

6                          EXAMINATION

7     BY MR. BANOVETZ:

8          Q.    Scott, did you ever have an opportunity to

9     review your policy definition of passenger?

10          A.    Say that again, Mark.

11          Q.    Sure.  Before the date of the loss had you

12     ever had an opportunity to read any of the insurance

13     policy issued on these agricultural airplanes?

14          A.    I don't recall.

15          Q.    As you sit here today, not at the time, but

16     as you sit here today do you understand both occupants in

17     that airplane would be passengers as defined by the

18     policy?

19          A.    No, that aircraft was never certified as

20     having a passenger seat in the rear.

21          Q.    Okay.  Are you aware as you sit here today

22     that this -- the insurance policy that was in effect at

23     the time of the loss defines a passenger as anyone in the

1  airplane including crew?

2          MR. MUELLER:  Objection; asks for a legal

3  conclusion.

4          MR. BANOVETZ:  I'm just trying to avoid

5  forcing him to read the policy here.  He can do that.

6  I'm just trying, Scott, to get an understanding.

7          A.    Sure.

8          Q.    (Mr. Banovetz continuing.)  You understood

9  passengers would not be covered under your liability

10 policy in that aircraft?

11         A.    In your -- response to your question, we

12 never carried passengers.  Anybody that was in the

13 aircraft was considered crew members because that's how

14 that airplane was certified.  It doesn't have a passenger

15 seat; it has a crew member seat.

16         Q.    Okay.  For the sake of expediency -- well,

17 let me just refer you to Exhibit One, which is the

18 policy, and the definition of passenger.  If I could just

19 ask you to read that into the record.

20         A.    Sure passenger --

21         MR. MUELLER:  Counsel, I think that you have

22 his understanding, then you have the policy, which is

23 obviously a part of the record in the case.

1          MR. BANOVETZ:  I'm just --

2          MR. MUELLER:  I'm not going to, you know,

3    prohibit him from doing it, but as far as shortening it

4    up, it is -- it says what it says.

5          MR. BANOVETZ:  Okay.  I just want to be on

6    the same page with Scott so that I can ask my follow-up

7    question --

8          MR. MUELLER:  Okay.

9          MR. BANOVETZ:  -- so we are both on the same

10   page, if I could.

11        A.   Okay.  Passenger means any person in, on or

12   boarding the aircraft for the purpose of riding or flying

13   therein or alighting therefrom after a flight or

14   attempted flight therein, including crew members.

15        Q.   (Mr. Banovetz continuing.)  Did you have an

16   understanding as of the date of this loss as to whether

17   there would be liability coverage for anyone in that

18   airplane?

19        A.   I assumed that it would be covered.

20        Q.   Okay.  Now, I'm not talking about coverage

21   for the aircraft hull.  I'm talking about third party

22   liability for claims against you by the pilot -- or I'm

23   sorry, by a crew member or their family.  Did you have an

1        A.    No.

2        Q.    Can you tell me what portions of the policy

3    you recall reviewing?  That's Exhibit One if you'd like

4    to refer to it.

5             MR. MUELLER:  Again, these are all in the

6    context before the loss?

7             MR. BANOVETZ:  Correct.

8        A.    Probably the biggest thing is that the

9    insured value is what we had stated on it and second,

10   what it was going to cost me as far as premiums.

11       Q.    (Mr. Banovetz continuing.)  Prior to the loss

12   had you ever reviewed the definition of aerial

13   application in the policy?

14       A.    No.

15            MR. BANOVETZ:  That's all I have.  Thanks.

16            MS. BARON:  I do have another question.

17                   FURTHER EXAMINATION

18   BY MS. BARON:

19       Q.    Do you recall ever calling anyone at Hardy

20   Aviation Insurance with questions regarding that policy?

21       A.    Do I recall calling anybody?

22       Q.    Yes.

23       A.    No, I don't.