**E-FILED**
Thursday, 14 April, 2005  01:37:14 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATIONAL UNION FIRE COMPANY OF PITTSBURGH, PA, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 03-CV-01288 |
| PONTIAC FLYING SERVICE, INC., JUSTYN WEBSTER, as Special Administrator of the Estate of NEIL WEBSTER, Deceased, and CAREN S. LUCENTE, as Independent Executor of the Estate of RICHARD P. LUCENTE, Deceased, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| PONTIAC FLYING SERVICE, INC., | ) ) | |
| Third Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| HARDY AVIATION INSURANCE, INC., | ) ) | |
| Third Party Defendant. | ) | |

**RESPONSE TO NATIONAL UNION'S
MOTION FOR SUMMARY JUDGMENT**

Now comes the Defendant and Third Party Plaintiff, PONTIAC FLYING SERVICE,

INC., ("PONTIAC FLYING") by its attorney, DAVID B. MUELLER of the firm of CASSIDY

& MUELLER, and makes the following response to National Union's Motion for Summary

Judgment:

**INTRODUCTION**

NATIONAL UNION claims that it is entitled to summary judgment under Rule 56 because, as a matter of law, the turbine powered Air Tractor 503 (AT503) was not being used for aerial application at the time of the loss. In that regard it submits that turbine transition training of the type which was being conducted by Rick Lucente was not a "flight required in direct support of . . . the application by aircraft of seeds, fertilizers and chemicals" within the following policy definition:

> "Aerial Application" means the application by aircraft of seeds, fertilizers or chemicals *and includes flights required in direct support thereof*;[1]

The insurer takes that position generally as to all training flights, and specifically in the context of using the plane to train persons other than employees of the insured.

PONTIAC FLYING opposes the motion. Its opposition is based upon the fact that coverage under the insuring agreement attaches to the plane and encompasses training flights as an activity or use which is in direct support of aerial application. Moreover, under fundamental rules of insurance policy construction, when an *activity or use*, i.e. training flights, involving an insured instrumentality is covered, one must look for exclusions to limit, restrict or vitiate that coverage. Here the policy contains no "business activity" or other pertinent exclusion.

PONTIAC FLYING's answer also includes the defenses of "waiver" and "estoppel". The undisputed facts show that as of March 1, 2002, when the endorsement for the AT503 became effective, Mary Beth Schwaegel of AIG/NATIONAL UNION, acting through Randy Hardy, specifically authorized use of the plane for turbine transition training. That authorization extended to Rick Lucente as the instructor pilot. Based upon that authorization and understanding, the plane was purchased, premiums were paid for the policy, and Lucente was permitted to use the plane for turbine transition training. Under these circumstances, as well as

those which are set forth in greater detail in the facts *infra*, PONTIAC FLYING submits that

summary judgment would be improper both as to the issues joined in the complaint and those

raised by its affirmative defenses.

### UNDISPUTED MATERIAL FACTS

PONTIAC FLYING agrees that the facts identified in the following paragraphs of Point

II of the plaintiff's motion are undisputed:

> 1, 2, 10, 11 (second sentence), 12, 16, 17, 18 (with the exception of the last sentence
> which would be better phrased as "the training flight ended in the fatal accident on
> May 5, 2003."), 21, 22, 23, 24, 25, 26 (the second sentence only), 27, 28, 29, 30, 31,
> 32, 33, 34.

### MATERIAL FACTS CLAIMED TO BE DISPUTED

PONTIAC FLYING disputes each of the following facts proffered by NATIONAL

UNION for the following reasons:

> 3.      The aircraft was added to the policy for the purpose of aerial application.

(Hardy, p. 74).

> DISPUTE:      "Aerial application" as defined in the policy includes turbine

transition training. The aircraft was added to the policy for the purpose of aerial

application, including turbine transition training, which was the same use that was made

of the plane by Harold Miller's Flying Service from which it was purchased. The covered

use of the plane for turbine transition training using Rick Lucente as the training

instructor was specifically approved by NATIONAL UNION and HARDY. (Petersen

---

[1] That interpretative fact was found to be reasonable by this court on March 1, 2005 (Tr. 5-6).

Affidavit 4/11/05; Hardy dep. pp. 58-63, 86-90, and Hardy dep. Ex. E, pp. 121-123;

Petersen dep. pp. 19-25, 35-36, 47-49).

4.      Hardy's notes from the time coverage was bound on the aircraft indicate

that Scott Petersen had already obtained his own turbine transition training in the aircraft

while the aircraft was still owned by Harold Miller's Flying Service, where Petersen

previously performed crop dusting work on an independent contractor basis. (Hardy dep.

p. 127-128).

DISPUTE:     Hardy's "notes" do not establish the undisputed fact that ". . . Scott

Petersen had already obtained his own turbine transition training in the aircraft while the

aircraft was still owned by Harold Miller's Flying Service. . ." The actual facts are that

NATIONAL UNION and HARDY knew and approved the covered use of the plane after

coverage became effective for Petersen to receive additional transition turbine training

from Rick Lucente. (Petersen dep. pp. 19-25, 34-36, 47-49, Hardy dep. pp. 31-34, 66-67,

86-90, 124-125, 128-132; Hardy Ex. E, pp. 121-123).

5.      Hardy never had any discussions with Scott or Sarah Petersen about the

possibility of using the Air Tractor for the purpose of operating a commercial turbine

transition training program. (Hardy dep. p. 76).

DISPUTE:     HARDY had discussions with Scott Petersen about the use of the

Air Tractor for turbine transition training with Rick Lucente as the training instructor.

(Petersen dep. pp. 19-25, 34-36, 47-49, Hardy dep. pp.124-126, 128-132 and Ex. E, pp.

121-123).

6.      When asked whether he ever did any research or took any steps to find out

what the insurance requirements would be for operating a turbine transition training

program with the Air Tractor, Scott Petersen replied "[n]ot for the transition training, just

for the aerial application." (Scott Petersen Sworn Statement, p. 25).

DISPUTE:    The complete testimony of Scott Petersen is as follows on pp. 25-

27:

Q.    Okay. When you – after you purchased the Air Tractor, did you
yourself do any research or take any steps to see about what the
insurance requirements would be for the aerial application or the
turbine transition training?

SCOTT PETERSEN: Not for the transition training, just for the aerial
application.

Q.    Okay. So you don't recall talking to any insurance agents or
brokers about the possibility of purchasing insurance to cover
transition training as part of your business?

SCOTT PETERSEN: On our initial contact, I believe I talked with Randy
Hardy about adding Rick as an instructor pilot and as an open
policy pilot to fly the aircraft.

Q.    And Randy Hardy is with who?

SCOTT PETERSEN: hardy Aviation Insurance.

Q.    And did you ultimately purchase additional insurance with respect
to Mr. Lucente's work as a transition pilot?

SCOTT PETERSEN: As I recall in our conversation with Randy, we were
covered because he was going to have to give me additional time
in the aircraft. And as I remember it, we did talk about adding him
as an open policy pilot to fly the airplane if we needed him to do
aerial application.

Q.    But did you have any specific discussions with Randy Hardy about
insurance requirements for flight training operations as opposed toi
aerial application operations?

SCOTT PETERSEN: Just the initial naming Rick as an instructor pilot on
the policy when we bought the aircraft.

Q.    Naming him as an instructor pilot?

SCOTT PETERSEN: That's correct.

Q.    Or just an additional pilot?

SCOTT PETERSEN: No, instruction because he was going to give me
instruction in that particular aircraft.

Q.    Okay. Would he be named – as your recollection of this, would he
be named as an instructor pilot only for the limited purpose of
instructing you, the owner of the aircraft, or generally as an
instructor pilot on the aircraft?

SCOTT PETERSEN: *To my knowledge, it was as an instructor pilot in the
aircraft.* (Emphasis supplied).

On our initial contact, I believe I talked with Randy Hardy about adding Rick as an instructor pilot and as an open policy pilot to fly the aircraft." (Sworn statement of Scott and Sarah Petersen, p. 25).

Petersen always understood that he had coverage for transition training in the plane using Rick Lucente as the training instructor. (Petersen dep. pp. 19-25, 34-46, 47-49; Hardy dep. p. 100 and Ex. E, pp. 121-123).

7.    Scott Petersen never discussed with his insurance agent, Randy Hardy, the possibility of using the Air Tractor for turbine transition training, although he recalls discussing the possible use of Rick Lucente (who had trained him in the airplane when it was owned by Harold Miller) to give him additional training in the aircraft. (Petersen Sworn Statement, p. 26).

DISPUTE:    Scott Petersen always understood that he had coverage for turbine transition training using Rick Lucente as the training instructor. He discussed that with Randy Hardy. (Petersen affidavit 4/11/05; Petersen dep. pp. 19-25, 34-37 47-49; Hardy dep. pp. 100, 124-126, 128-132, and Ex. E, pp. 121-123).

8.    Hardy cannot recall specifically what was discussed but recalls that Petersen already had the required training in the aircraft to be added as an approved pilot in the airplane. (Hardy, p. 127).

DISPUTE:    NATIONAL UNION and HARDY informed Petersen that Petersen was to have additional transition turbine training in the plane after coverage was bound using Rick Lucente as the training instructor. (Petersen dep. pp. 19-25, 47-49; Hardy dep. pp. 124-126, 128-132; Ex. E pp. 121-123).

9.    Referring to Scott Petersen, Hardy testified ". . . He's transitioned in the airplane. Is he transitioning others or in the business of transitioning otherwise, no, and

I'll testify to the fact that that was never part of the policy nor part of any of the conversations." (Hardy, p. 124).

DISPUTE:     Hardy, with the authorization of NATIONAL UNION, specifically approved turbine transition training in the plane using Rick Lucente as the training instructor after March 1, 2002, the effective date of the endorsement. (Petersen dep. pp. 19-25, 47-49; Hardy dep. pp. 124-126, 128-132; Ex. E, pp. 121-123).

11.     Scott Petersen wished to have the policy cover the aircraft in the event that it were to be flown by Rick Lucente, as Petersen intended to have Lucente assist him in aerial application required to complete "Gypsy Moth" contracts.

DISPUTE:     Scott Petersen intended to have the plane covered for turbine transition training using Rick Lucente. That training was approved after the effective date of the endorsement, March 1, 2002, and was a part of the policy. (Petersen dep. pp. 19-25, 34-37, 47-49; Hardy dep. pp. 124-126, 128-132; Ex. E, pp. 121-123).

13.     Scott Petersen never told anyone at Hardy Aviation, his agent, that he was advertising a turbine transition training program. (Petersen dep., p. 37).

DISPUTE:     Scott Petersen told Randy Hardy that he intended to use Rick Lucente as an instructor pilot for turbine transition training, which was an approved use of the plane after the effective date of the endorsement, March 1, 2002. (Petersen dep. pp. 19-25, 34-37, 47-49; Hardy dep. pp. 124-126, 128-132; Ex. E, pp. 121-123). Randy Hardy had to know that PONTIAC FLYING was advertising a turbine transition training program as that advertisement appeared in the publication Ag Air Update immediately opposite Hardy's own ad. (Hardy dep. pp. 82-84, Exhibits G and G1, November 27, 202 issue of Ag Air Update).

14.     At some point prior to the accident, in approximately July, 2002, Scott and/or Sarah Petersen, had contacted Hardy to inquire about running an agricultural flight training school using their piston-powered "Ag Cat" airplanes and Hardy discussed with them some of the required changes needed for a policy to include training activity with the ag airplanes. (Hardy dep. p. 113).

DISPUTE:     PONTIAC FLYING explored the possibility of instructional training by Scott Petersen in the piston driven aircraft which would be purchased for that purpose. They never purchased or located the aircraft. Scott Petersen understands that no "quotes" were received because *he* did not have sufficient hours to qualify for that purpose. (Petersen dep. pp. 45-46 and Hardy Ex. E, p. 118 which states:

> Get quote on 2 place Ag Cat for ag training $80,000 building now with parts from Hershey.
> Scott will train –in Harold's old program.
> Mary Beth at AIG – Not interested Scott is too low time to instruct. Needs at least 5000 total hrs & __ before AIG will consider insuring *him* for ag training. (Italics supplied).

15.     Hardy recalls, and his company's office notes establish, that insurance companies had previously declined to quote Pontiac for agricultural flight training activity in the piston-powered airplanes. (Hardy, p. 94).

DISPUTE:     PONTIAC FLYING explored the possibility of instructional training by Scott Petersen in the piston driven aircraft which would be purchased for that purpose. They never purchased or located the aircraft. Scott Petersen understands that no "quotes" were received because *he* did not have sufficient hours to qualify for that purpose. (Petersen dep. pp. 45-46 and Hardy Ex. E, p. 118).

19.     Randy Hardy never had any conversations with the Petersens about their use of the Air Tractor for turbine transition training. (Hardy, p. 70).

- 8 -

DISPUTE:      Scott Petersen always understood that he had coverage for turbine transition training using Rick Lucente as the training instructor. He discussed that with Randy Hardy. (Petersen dep. pp. 19-25, 34-37, 47-49; Hardy dep. pp. 124-126, 128-132; Ex. E, pp. 121-123).

20.      On the morning of the crash, Hardy recalls reading, for the first time, a comment from the editor of an aerial application trade publication that Pontiac Flying Service was offering turbine transition training, causing Hardy to bring a copy of the publication to his assistant, Angie Banz, to inquire whether she had any knowledge of this situation – coincidentally, it was at this time that Ms. Banz was taking the call regarding the notice of the accident. (Hardy, p. 76-77).

DISPUTE:      NATIONAL UNION and HARDY knew and had authorized the use of the plane for turbine transition training using Rick Lucente after the effective date of the endorsement, March 1, 2002. (Petersen dep. pp. 19-25, 34-36, 47-49; Hardy dep. pp. 31-34, 66-67, 124-126, 128-132; Ex. E, pp. 121-123). Also, Hardy had to know that Pontiac Flying Service was offering turbine transition training as its advertisement for that service appeared directly opposite Hardy's own ad in Ag Air Update. (Hardy dep. pp. 82-84; Exhibits G and G1).

## ADDITIONAL MATERIAL UNDISPUTED FACTS

1.      This case involves property damage and liability coverage under **Aerial Applicator Aircraft Policy** No. AV3391999-04 (Originally effective March 1, 2002, as Policy No. AV 3391999-03) issued to the Defendant, PONTIAC FLYING SERVICE, INC. ("the Policy").

2.      Coverage was extended by **Aircraft Endorsement** effective March 1, 2002, to include a 1991 Air Tractor 503. (Petersen affidavit 1/16/04 and Exhibits).

3.      The claim in Count I of the Amended Complaint for Declaratory Judgment relates to first party property damage coverage for PONTIAC FLYING SERVICE, INC. ("PONTIAC") for which the Policy has coverage limits of $350,000.00. (See Count I of Amended Complaint).

4.      Counts II and III involve liability coverage under the Policy for the death of Neil Webster. Count II involves a passenger exclusion under the Policy and Count III concerns whether or not Richard Lucente was an insured under the Policy. (See Counts II and III of Amended Complaint).

5.      The loss which is the subject of the property damage and liability claims took place on May 5, 2003, in Pontiac, Illinois, while the Policy was in force and effect. (Petersen dep. p. 46; Banz, dep. p. 27; Hardy dep. p. 77).

6.      At the time of the loss the plane was being used to provide turbine transition training to Neil Webster and for the flight of turbine powered aircraft in the application of seeds, fertilizes or chemicals, also known as "crop dusting". (Petersen dep., p. 46; Petersen, Sara dep., p. 23, Sworn Statement of Scott and Sarah Petersen, pp. 31-36).

7.      The plane was an Air Tractor 503 which contained two seats and dual controls. It was of a type which was specifically designed and manufactured for turbine flight training purposes. (Hardy dep. pp. 59-60; Petersen, Sarah dep. p. 10, Affidavit of Scott Petersen 4/11/05).

8.      At the time of the loss turbine transition training was being given to Webster by Richard P. Lucente, who was a qualified and licensed flight instructor in that type of plane *inter alia*. (Petersen dep. p. 30; Sworn Statement of Scott and Sarah Petersen pp. 13, 18, 29, 29-31).

- 10 -

9.    In the specialized agricultural aviation industry it is commonly understood and accepted that pilot instruction flights, including turbine transition training for the operation of turbine driven application aircraft are necessary and essential to the aerial application of chemicals, seeds and fertilizes. (See affidavits of Frank Ousley, Cora Gorusch, Harley Curless and Dennie Stokes and Hardy dep. pp. 61-63, 93, 134).

10.    In the agricultural aviation industry it is commonly and generally understood and accepted that pilot instruction flights, including turbine transition training flights, are flights which are in direct support of the application by aircraft of seeds, fertilizers or chemicals. (See affidavits of Frank Ousley, Cora Gorusch, Harley Curless and Dennie Stokes and Hardy dep. pp. 61-63, 93, 134).

11.    In the agricultural aviation industry it is commonly and generally understood and accepted that pilot instruction flights, including turbine transition training flights provided to third party students by a qualified and licensed flight instructor involve the use of the plane in direct support of the application by aircraft of seeds, fertilizers and chemicals. (Ousley 4/6/05 affidavit).

12.    The Policy contains no definition of the term "flights required in direct support"…of "the application by aircraft of seeds, fertilizers or chemicals". (Hardy dep. pp. 103-104; Banz dep. p. 25; Response to paragraph 16 of Request to Admit to NATIONAL UNION).

13.    NATIONAL UNION has no documents which define the term "includes flights required in direct support *thereof' as* it appears in the policy definition of "Aerial Application. (Response to paragraph 17 of Request to Admit to NATIONAL UNION).

14.    NATIONAL UNION knows of no NATIONAL UNION employees. current or past, who have ever defined the term "includes flights required in direct support thereof' as it is

- 11 -

used in the definition of "Aerial Application" In the *policy* in writing. (Response to paragraph 18 of Request to Admit to NATIONAL UNION).

15.     NATIONAL UNION knows of no NATIONAL UNION employees, current or past, who have ever defined the term "includes flights required in direct support thereof" as it is used in the definition of "Aerial Application" in the policy. (Response to paragraph 19 of Request to Admit to NATIONAL UNION).

16.     NATION UNION knows of no written definition of the term "includes flights required in direct support *thereof*" as it appears in the definition of "Aerial Application." (Response to paragraph 20 of Request to Admit to NATIONAL UNION).

17.     NATIONAL UNION has admitted that pilot turbine training flights are required for the application by turbine powered aircraft of seeds, fertilizers or chemicals. (See NATIONAL UNION response to paragraph 25 of PONTIAC'S Request to Admit Facts).

18.     In a specialized industry, such as agricultural aviation, policies which are prepared for that industry are deemed to be written taking the customs and usages of the industry into account. *W.M. Smith Hotel Services, Inc. v. Wendy's International, Inc.*, 25 F.3d 422, 429 (7th Cir., 1994).[*] At the time the endorsement providing coverage on the Air Tractor 503 was issued the Hardy Insurance Agency was acting as the agent/broker for PONTIAC FLYING SERVICE. (Hardy dep. pp. 13-14, 137; Petersen dep. p;. 17; Petersen, Sarah dep. p. 6; Sworn Statement of Scott and Sarah Petersen, p. 45).

19.     Randy Hardy is and was the President of Hardy Aviation Insurance, Inc. (Hardy dep. pp. 6-7).

---

[*] On this point PONTIAC also adopts the report and supplement to report of Marshall W. Reavis, III, Ph.D. which the court has previously barred. The purpose of this adoption is to protect the Defendant's record by seeing that all facts, including expert opinions, are before the court.

20.    The plane was purchased by PONTIAC from Harold's Flying Service in Leland, Illinois, together with other business assets of Harold's Flying Service, on February 28, 2002. Prior to February 28, 2002, Harold Miller, d/b/a Harold's Flying Service, used the plane for flight instruction, including turbine transition training. (Petersen dep. pp. 19-20; Hardy dep. pp. 58-64; Sworn Statement of Scott and Sarah Petersen, pp. 11-13, 23).

21.    Lucente was a flight instructor who flew the plane for Harold's Flying Service in providing flight instruction to students, including turbine transition training. (Petersen dep. p. 23).

22.    Prior to the purchase of the plane by PONTIAC Randy Hardy was the agent/broker for Harold's Flying Service and in that capacity had procured coverage on the plane which was in force and effect prior to PONTIAC'S purchase of the plane. (Hardy dep. pp. 58-65).

23.    Prior to the purchase of the plane by PONTIAC Randy Hardy knew the uses which Harold's Flying Service had made of the plane, including turbine transition training instruction by Lucente. (Hardy dep. pp. 60-62, 64).

24.    Scott Petersen on behalf of PONTIAC sought coverage on the plane for the same uses which Harold's Flying Service had made of it, including transition turbine training involving Lucente. (Affidavit of Scott Petersen 4/11/05).

25.    For the aerial applicator endorsement on the plane, which was effective March 1, 2002, PONTIAC paid Two Thousand Five Hundred Ninety-Eight Dollars ($2,598.00). (Petersen Affidavit 1/16/04 and Exhibits).

26.    At the time the endorsement was issued Scott Petersen was told by Randy Hardy that coverage was in effect as of March 1, 2002, but that he was to have additional transition

turbine training in the plane. (Petersen dep. pp. 22, 34, 37, 47-49; Hardy dep. pp. 125-126). In

that regard see attached "Houston, we have a problem" memorandum [Hardy Ex. E, pp. 121-

123] identified by Randy Hardy in his deposition which contains the following admission:

> "…[t]hey [Scott and Sarah Petersen] may have assumed since commercial and
> ag use what difference is the training, *especially since transition for Scott was
> approved*." (Emphasis supplied).

27.     After March 1, 2002, when coverage under the policy became effective Scott

Petersen received additional turbine transition training from Lucente. (Petersen dep. p. 28;

Petersen, Sarah dep. p. 11).

28.     It was and is Scott Petersen's understanding that Harold's Flying Service had

coverage on the plane for turbine transition training provided to third party students by Rick

Lucente. (Petersen dep. pp. 34-37, 49; Hardy dep. p. 100 and Ex. E, pp. 121-123).

29.     It was and is Scott Petersen's understanding that he received the same coverage

on the plane which Harold's Flying Service had. (Affidavit of Scott Petersen 4/11/05; Petersen

dep. p. 34).

30.     It was and is Scott Petersen's understanding that there was coverage on the plane

for turbine transition training provided by Rick Lucente both at the time the coverage became

effective on March 1, 2002, and at the time of the loss. (Affidavit of Scott Petersen 4/11/05;

Petersen dep. pp. 34-37, 47-49; Hardy dep. pp. 100, 125-126; Ex. E, pop. 121-123).

31.     At the time Randy Hardy informed Scott Petersen that coverage was effective

under the Policy as of March 1, 2002, including coverage for turbine transition training to be

provided by Rick Lucente, Hardy was working with Mary Beth Schwaegel of AIG/

NATIONAL UNION regarding that coverage. (Hardy dep. pp. 31-34, 66-67; Ex. E 121-123).

- 14 -

32.     Any endorsement or extension of coverage for turbine transition training came from and was authorized by Mary Beth Schwaegel of AIG/NATIONAL UNION. In that regard Hardy testified at page 136:

> Q.    And if Scott were told that there was coverage, would that have come from you or AIG or do you know?
> A.    Any conversations between the client regarding his coverage generally comes from us as the agency because we are an agent for that client.
> Q.    Since you don't recall it, would you agree that if you had said to Scott that he had that coverage, you would have received the authorization from AIG?
> MS. BARON: I'm just going to object to the hypothetical nature of the question again.
> A.    I don't want to answer that if I don't have to.
> BY MR. MUELLER:
> Q.    Well, you go to. You got no choice.
> A.    Okay. State the question again, please.
> MR. MUELLER: Would you read it back?
>     (At this time the reporter read the following: "Q. Since you don't recall it, would you agree that if you had said to Scott that he had that coverage, you would have received the authorization from AIG?")
> A.    Yes.

33.     Scott Petersen had previously requested "quotes" on but did not apply for coverage for Scott Petersen to provide flight instruction in a piston driven aircraft. Quotes were declined because Scott Petersen did not have enough "hours". (Petersen dep. pp. 45-46 and Hardy Ex. E, p. 118).

34.     At no time was Scott Petersen told by Randy Hardy that PONTIAC did not have coverage on the plane for turbine transition training by Rick Lucente or that such coverage was limited to transition turbine training to Scott Petersen. (Petersen dep. pp. 19-25, 34-36, 47-49; affidavit of Scott Petersen, 4/11/05; Hardy dep. pp. 95-97, 100).

35.     Advertisements for PONTIAC'S turbine transition training program appeared in a trade publication, Ag Air Update, directly opposite Hardy's ads for its insurance brokerage

- 15 -

business. (In that regard see attached Exhibits G and G1 which is identified by Hardy in his deposition testimony at pp. 82-84).

36.     The Policy contains no exclusion for business related uses of the plane, including its use in PONTIAC'S turbine transition training instruction program.

37.     No one knows who was piloting the plane at the time of loss.

38.     As Randy Hardy testified, there's nothing more confusing to the policyhyolder than reading one of these policies. Specifically, at pages 106-107:

> Q.     Would you agree that there are few things that are more confusing than the language of one of these policies?
> A.     Depends on who you ask.
> Q.     Well, I'm asking you.
> A.     Would I agree to the fact that policies are written –
> Q.     In a confusion fashion as far as the policyholders are concerned.
> A.     Yeah, I'll have to agree to that, sure. You guys wrote them. Excuse my comment. Strike that.
> MR. BANOVETZ: I'm not sure I understand the question.
>         (Discussion held off the record.)
>         (Thereupon, a recess was taken; whereupon, the following was had):
> BY MR. MUELLER:
> Q.     When we left off, you were talking about or had just answered a question which discussed the fact that – if I recall it that nothing's more confusing than reading one of these insurance policies. Do you recall that?
> A.     I do and I would agree.

# III.

# APPLICABLE LAW

## A.

## Standard for Summary Judgment

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317,322(1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 255 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir., 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. lndus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, the Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir., 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v.*

*Liberty Lobby. Inc.,* 477 U.S. 242, 248 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir., 1995).

**B.**

**<u>Standard For Construction Of An Insurance Policy</u>**

This is a diversity case. Consequently, the substantive law of Illinois controls the construction and interpretation of the policy. *Allen v. Trans-American Insurance Co.*, 128 F.3d 462, 466 (7 Cir., 1997) and *McFarland v. General American Life Insurance Co.*, 149 F.3d 583, 586 (7 Cir., 1998). Under Illinois law the interpretation of an unambiguous insurance contract poses a question of law. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 108 (1992). If the language of the policy is susceptible to more than one reasonable interpretation it is ambiguous. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 74 (1991). Any ambiguities will be construed in favor of the insured and against the insurer which drafted the policy. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, *supra*, and *First Insurance Funding Corp. v. Federal Insurance Co.*, 284 F.3d 799, 804 (7 Cir., 2002).

In determining the meaning of words within a policy the court must afford them their "*plain, ordinary and popular meaning.*" *McFarland v. General American Life Insurance Co.*, *supra* at 585. The plain and ordinary meaning of terms which are undefined in a policy is that which appears in the dictionary. *LE Rincon Supportive Services Organization, Inc. v. First Non-Profit Mutual Insurance Co.*, 346 Ill.App.3d 96 (2004) and *Abrams v. State Farm Fire & Casualty Co.*, 306 Ill.App.3d 545 (1999). As applied to the instant case, the terms "direct" and "support" have the following pertinent meaning in Webster's New Collegiate Dictionary (9th Ed.):

"Direct" *adj.* . . . 6: characterized by a close logical, causal or consequential relationship
"Support" *n.* . . . 2: one that supports
"Support" *vt.* . . . 2b(1) assist, help.

PONTIAC FLYING submits that the plain and ordinary meaning of the disputed phrase compels the inclusion of training flights within the definition of aerial application. However, and assuming *arguendo* that more is required, the plain meaning rule also considers understanding of language which is used in a policy from the perspective of an insured of average intelligence and understanding. *McNeilly v. Bankers United Life Assurance Co.*, 999 F.2d 1199 (7 Cir., 1993). As stated in *El Rincon Supportive Services, et al. v. First Nonprofit Mutual Ins. Co.*, 346 Ill.App.3d 96, 102 (2004): "The standard used to determine whether an insurance policy is ambiguous is 'what a reasonably prudent insured would understand the language to mean."

Also bearing upon the determination of whether a policy is ambiguous, and if so, its meaning, is due regard to the risk undertaken, the situation of the parties, the subject matter of the insurance, and the purposes of the entire insurance contract. *Dora Township v. Indiana Insurance Co.*, 78 Ill.2d 376, 378 (1980) and *West Suburban Bank of Darien v. Badger Mutual Insurance Co.*, 141 F.3d 720 (7 Cir., 1998). As recognized by the court in *Badger Mutual*, the predominant purpose of an insurance contract is to "indemnify the insured." *Id.*, 724.

In determining the "situation of the parties" and the circumstances surrounding the "formation of the contract" the court will consider evidence of the customs and usages of the business or industry in which the contract is written. *Sterling-Midland Coal Co. v. Great Lakes Coal and Coke Company*, 334 Ill. 281, 289-90 (1929) and *Fifteenth Avenue Christian Church v. Moline Heating and Construction Co.*, 131 Ill.App.2d 766, 769 (1972). Where, as here, the contract involves a specialized field, and the language under consideration is susceptible of more than one reasonable meaning, evidence of custom and usage is relevant to its interpretation *vis a*

*vis* the mutual understanding of the parties. *W.H. Smith Hotel Services, Inc. v. Wendy's International, Inc.*, 25 F.3d 422, 429 (7 Cir., 1994).

### C.

### Pleadings

The pleadings involving NATIONAL UNION and PONTIAC consist of the amended Complaint for Declaratory Judgment and the Defendants' Answer and Affirmative Defenses. The affirmative defenses which are pertinent to the Motion are as follows:

### SECOND DEFENSE

> For its second defense, PONTIAC FLYING SERVICE, INC., states that the Plaintiff, through its agent, has waived the limited interpretation which it gives the term "aerial application" in the Complaint.

### THIRD DEFENSE

> For its third defense, PONTIAC FLYING SERVICE, INC., states that the Plaintiff, acting through its agent, is estopped to assert the limited interpretation which it gives to the term "aerial application" in its Complaint.

Count I of the Complaint involves PONTIAC'S first party claim for property damage. The *sole* issue for consideration in Count I involves the construction to be given the phrase "… Flights required in direct support thereof" as it is used in the definition of "**Aerial Application**". Specifically, and as it bears upon the present Motion, the issue to be decided is whether a material question of fact exists as to the meaning of that term in the context of the coverage which was purchased by PONTIAC from NATIONAL UNION. That context is defined by the allegations of the Complaint *and* the defenses of *waiver* and *estoppel*. Those defenses are discussed in greater detail *infra* as they bear upon the assurance which was given to Scott

Peterson that turbine transition training coverage was included under the policy.[2] PONTIAC submits that the plane was purchased and the increased premium of $2,598.00 was paid based upon the assurance of that coverage, which paralleled like coverage which the previous owner of the plane had. Thus, NATIONAL UNION both *waived* its right to deny that coverage was included for turbine transition training and is *estopped* to dispute that fact.

Coverage under Count I is "first party". That means that the contract is between the named insured, PONTIAC FLYING SERVICE and the insurer, NATIONAL UNION. Therefore, for the purposes of PONTIAC'S property damage claim it makes no difference whether LUCENTE was also an insured under the policy or the passenger exclusion applies. Both of those considerations are directed at the liability portion of the policy.

## IV.

## ARGUMENT

### A.

### Count I

### Whether Turbine Transition Training Flights Fall Within The Definition Of "Aerial Application"?

As discussed *supra*, the sole issue on this point is whether turbine transition training flights fall within the phrase:

> … flights required in direct support thereof as it is used in the following definition of **Aerial Application**.

While conceding that the phrase is undefined in the policy *and* that its meaning has never been articulated, the plaintiff denies that turbine transition training flights fall within its ambit. The

---

[2] That assurance was given by Randy Hardy following discussion with the underwriters at NATIONAL UNION. At a minimum, a question of fact exists regarding the scope and breadth of the turbine transition

ARGUMENT in that regard consumes more than four pages without containing other than a

prefatory legal citation. That citation (*Kioutas v. Life Insurance Co. of Virginia*, 35 F.Supp.2d

616, 621 (N.D. Ill.. 1998) is directed to the disputed assertion that the language of the insuring

agreement of a policy is a condition precedent to coverage under the policy. The discourse

thereafter is directed to a business exclusion which the policy does not contain. In that regard the

plaintiff's analysis misapprehends fundamental principles of insurance policy construction which

focus *first* upon whether the use *per se* falls within the language of the insuring agreement, and if

it does *then* whether there is an exclusion which vitiates that coverage.

    Some of the ground covered by this portion of this Argument was previously trod in the

NATIONAL UNION'S *Motion to Bar* the reports and opinions of Marshall Reavis, III. In

response to that Motion PONTIAC *inter alia* provided the affidavits of four witnesses who have

extensive experience in the agricultural aviation industry: Frank Ousley, Cora Gorsuch, Harley

Curless and Denny Stokes. Each of them made the following averments regarding custom and

usage in that specialized business as it bears upon turbine transition training:

> The aerial application of seeds, fertilizers and chemicals requires specific
> training and instruction in the operation of aircraft and application equipment
> for that purpose. That training and instruction includes flights in the type of
> aircraft, piston or turbine, which is to be used for the application.
>
> It is commonly understood and accepted in the agricultural aviation industry
> that pilot instruction flights, including turbine transition training for the
> operation of turbine driven application aircraft, are necessary and essential to
> the aerial application of chemicals, seeds and fertilizers.
>
> It is commonly and generally understood and accepted in the agricultural
> aviation industry that pilot instruction flights, including turbine transition
> training flights, are flights which are in direct support of the application by
> aircraft of seeds, fertilizers or chemicals.[3]

---

training endorsement which was authorized by NATIONAL UNION and thereafter communicated by
Hardy to Peterson.
[3] These affidavits are attached to and made a part of this Response to the Motion for Summary Judgment.

The preceding affidavits were proffered in response to NATIONAL UNION'S contention that, despite the absence of a definition, the term "flights required in direct support thereof" could not be construed to include those which are required to train pilots in the operation of the aircraft. To the extent that the language in question involved a latent ambiguity on the issue of what flights are supportive of the aerial application of seeds, fertilizers and chemicals the affidavits uniformly establish how the term is understood in the custom and usage of the specialized industry to which the language applies. On that issue the court agreed with PONTIAC that a reasonable construction of the provision is one which includes training flights *per se* within the definition of Aerial Application. However, the court went on to state that:

> THE COURT: Okay. Without further characterizing the language from the Court's perspective, it seems to me a reasonable construction of the provision that the insured was told that flights by you in direct support of your aerial application is covered.  That is the – that is my initial view of what that language means. The facts of this case are that Pontiac is not training its own people in this turbine powered but they are doing it for third parties as an independent business activity.
>
> That to me is not within, on the surface, the intent of the language. However, if that is – if the language were meant to cover that, I'm prepared to hear that type of testimony and evidence because that is that ambiguity that I was talking about. Now, frankly, I'm not impressed with Mr. Reavis and his ability to assist the Court in making that determination. (RC pp. 6-7).

In making that preliminary determination the court stated that it would consider further affidavits or testimony "… from people who have some experience in that industry" (the agricultural aviation industry). That testimony is provided by the supplemental affidavit of Frank Ousley which contains the following additional averment.

> It is commonly and generally understood and accepted in the agricultural aviation industry that pilot instruction flights, including turbine transition training flights provided to third party students by a qualified and licensed flight instructor involve a use of the plane in direct support of the application by aircraft of seeds, fertilizers and chemicals.

- 23 -

PONTIAC submits that the sworn statement of Frank Ousley supplies the additional link that custom and usage in the agricultural aviation industry considers transition turbine training flights to be in direct support of the "aerial application" of seeds, fertilizers and chemicals *without regard to whether they are provided by the named insured to the named insured's employees or through use of the covered aircraft in giving training to third party students.*

The Ousley averment is also consistent with cardinal rule of policy interpretation that determinations of coverage first consider whether an activity is covered under the insuring agreement and *thereafter* focus upon whether there is a policy exclusion which vitiates, limits or modifies that coverage. Where, as here, a vehicle or aircraft is considered, coverage attaches to the instrumentality to the extent that the *type of use* which is made of that instrumentality fits within the language of the insuring agreement.

The insuring agreement tells the policy holder what type of activity involving the covered auto or aircraft is protected. In this case that activity is **Aerial Application**, which includes training flights. If there is to be any limitation upon the coverage for that use it must be found in the language of an exclusion which the drafter of the policy included for that purpose. Here, the limitation which is addressed by NATIONAL UNION, and which was the basis of the Court's concern at the March 1, 2005 hearing, relates to PONTIAC'S use of the plane for third party pilot instruction for which PONTIAC receives payment. *However, the first party property damage coverage policy contains no business use exclusion*. Simply stated, if NATIONAL UNION intended to limit coverage which was otherwise provided for turbine transition training it had the obligation to do so by an exclusion for that purpose.

In *Industrial Indemnity Company v. Vukmarkovic*, 205 Ill.3d 176, 562 N.E.2d 1073 (1990) the Court considered whether there was coverage under an automobile dealer's personal

umbrella policy for a limousine service employee who struck a pedestrian while driving a vehicle which had been leased by the dealer to the limousine company. The insuring agreement of the policy provided coverage to "… any person while using an automobile or watercraft owned by … the individual named insured … with the individual named insured's permission." Thus the loss was covered. However, the policy contained the following exclusion in the context of that coverage:

> Paragraph 3(c) of the umbrella extension, section B, defines "Individual Named Insured" as meaning:
>
>> "the individual named in the General Declarations and also includes the spouse thereof if a resident of the same household. The unqualified word 'insured' includes the individual Named Insured and also:
>>
>> (2) any person while using an automobile or watercraft owned by * * * the individual Named Insured * * * with the individual Named Insured's permission."
>>
>> "4. Exclusions. This Coverage Part V, Section B shall not apply:
>>
>> * * * * * *
>>
>> g.   to any business or business pursuits of an Insured or to property on which a business is conducted by an Insured * * *."

The insured dealer was compensated for leasing the limousine to the livery service which employed the driver. The case then focused upon whether that exclusion for the named insured would apply to the driver who was not engaged in "business activity" at that time of the accident. The court held that coverage under the policy for the driver would be considered apart from the coverage for the named insured. Consequently, the business pursuits exclusion which applied to the owner did not limit coverage for the driver.

The significance of *Vukmarkovic* to the instant dispute is threefold. First, the coverage analysis commences with the insuring agreement. There coverage was clearly provided to "… any person while using an automobile by the named insured with the permission of the named

insured". Second, consideration is given to the activity i.e. use of the vehicle. Third, focus is had upon any exclusions which apply to that use. *Sub judice* the insuring agreement provides property damage insurance to the named insured for use of the covered aircraft in aerial application, which includes turbine transition training flights. In *Vukmarkovic* the court then looked at the "business activity" exclusion and found that it did not apply to livery driver. Here there is no exclusion which limits, restricts or vitiates coverage once a covered use, i.e. **Aerial Application** is found.

In *Rusk Aviation, Inc. v. Northcott*, 151 Ill.App.3d 126 502 N.E.2d 1309 (1986) the court made the identical two step analysis under circumstances which resemble those in the instant case, as closely as any which have come to light. There the insuring agreement of an aircraft liability policy provided coverage for "… the named insured and any person while using or riding in the aircraft and any person or organization legally reasonable for its use, provided the actual use is with the permission of the Named Insured". At the time of the accident the pilot, Wolenski, was operating the Piper aircraft as a student of the named insured's "flight instructional school."  The plaintiff, Rusk Aviation,  sought damages to its parked aircraft from the student pilot who tendered the defense to the insurer which had coverage on the plane, Shelby Mutual.

The  court found that there was coverage under the insuring agreement because Wolenski was a permissive user of the plane. However, the policy also expressly excluded coverage for "… any persons operating aircraft under the terms of any rental agreement or training program which provide remuneration to the Named Insured for the use of said aircraft." As Wolenski was paying the "Named Insured" for flight instruction at the time of the accident the exclusion was triggered and coverage was denied.

As was the case in *Vukmarkovic*, *supra,* the court first focused upon coverage for the activity which involved the insured instrumentality, i.e. using the plane, and then upon the nature of any exclusion which limited or restricted that coverage. To the same effect is *Coleman v. Charlesworth*, 157 Ill.2d 257, N.E.2d 1366 (1993) in which the activity fell within the insuring agreement but coverage was barred by a specific exclusion.

PONTIAC respectfully submits that to the extent NATIONAL UNION wanted to exclude flight instruction, including turbine transition training, from the insuring agreement it could have done so by defining the language "… flights required in direct support thereof" accordingly. Moreover, and consistent with the rationale in *Vukmarkovic, Rusk* and *Coleman, supra*, if it intended to limit or restrict otherwise covered activity it could have provided an exclusion for that purpose. *Sub judice* the Plaintiff seeks to engraft a business use exclusion upon the policy where none exists. The rule is that exclusions will be strictly construed against the insurer. *Adman Products Co. v. Federal Ins. Co.,* 187 Ill.App.3d 322, 325 (1989). PONTIAC submits that there are no cases in which a non existent exclusion is hypothesized for the purpose of denying coverage.

In considering the policy in question, it is also significant to note that NATIONAL UNION knew the distinction between coverage under the insuring agreement and an exclusion which limits that coverage at the time it drafted *this* insurance contract. The liability coverage portion of the policy[4] contains the same type of business activity exclusion which is discussed in *Rusk Aviation, Inc. v. Northcott*, *supra*. Here, as in *Rusk*, the policy specifically excludes coverage which would otherwise exist for *use* of the aircraft: ". . . c) [for] any person or organization operating the aircraft under the terms of any rental agreement or *training program*

---

[4]  Which is considered in greater detail in the following portion of this ARGUMENT.

*which provides any remuneration or benefit to the named insured for the use of the aircraft*.

(Italics supplied). From the preceding language it is evident that: (1) NATIONAL UNION knew that the plane might be used in a "training program" and *ergo* that training fell within the ambit of **Aerial Application** *and* (2) that it also knew how to exclude that business activity, had it chosen to do so under the property damage coverage of its **AERIAL APPLICATOR AIRCRAFT POLICY**. The failure to include that exclusion under **Coverage F** resonates the intention that *use* of the aircraft for training flights in direct support of aerial application includes the remunerated use of the plane in a "training program".

**B.**

**Liability Coverage**

Coverage under the liability portion of the policy is *controlled* by the language of the policy as it applies to the allegations of the complaint against PONTIAC FLYING in the following wrongful death action:

IN THE CIRCUIT COURT OF 11TH JUDICIAL CIRCUIT
LIVINGSTON COUNTY, ILLINOIS

| | | |
|---|---|---|
| JUSTYN WEBSTER, as Special Administrator | ) | |
| of the Estate of NEIL WEBSTER, Deceased, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 04 L 15 |
| PONTIAC FLYING SERVICES, INC., and | ) | |
| CAREN S. LUCENTE, as Independent | ) | |
| Executor of the Estate of RICHARD P. | ) | |
| LUCENTE, Deceased, | ) | |
| Defendants. | )[5] | |

Pertinent portions of the **INSURING AGREEMENT** show that NATIONAL UNION has the obligation to both indemnify and defend PONTIAC FLYING against covered claims. In those regards the pertinent portions of the policy state:

**INSURING AGREEMENTS**

---

[5]  A copy of the Complaint in the *Webster* action is attached to this Response as Exhibit A.

I. **LIABILITY COVERAGES**
   **Coverage A – Bodily Injury** Liability Excluding **Passengers** – To pay on behalf of the **Insured** those sums which the **Insured** shall become legally obligated to pay as damages because of **bodily injury** sustained by any person excluding any **passenger**. . .

IV. **DEFENSE, SETTLEMENT AND SUPPLEMENTARY PAYMENTS**
   Coverages A, B, C, and D
   The Company shall have the right and duty to defend any suit against the **Insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

The threshold consideration is whether a duty to defend exists, as an insurer's duty to defend is broader than its duty to indemnify. *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 125 (1992). An insurer's duty to defend is determined by comparing the allegations of the underlying complaint to the provisions of the policy. *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 193 (1976). Where the allegations of the pleading fall within or potentially within the coverage provisions of the policy, a duty to defend arises. *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, *supra* at 108. The duty to defend exists even if the allegations are groundless, false or fraudulent. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 73 (1991). The threshold requirements for construing the allegations of the complaint are low. *Management Support Associates v. Union Indemnity Insurance Co. of New York*, 129 Ill.App.3d 1089, 1096 (1984). In determining whether there is a duty to defend, the underlying complaint is to be liberally construed in favor of the insured, and doubts and ambiguities are to be interpreted in favor of the insured. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, *supra* at 74. As stated in *Wilkin Insulation Co.*:

An insurer may not justifiably refuse to defend an action against its insured unless it is *clear* from the face of the underlying complaints that the allegations fail to state facts which bring the case within or potentially within, the policy's coverage. *Wilkin Insulation Co.*, 144 Ill.2d at 73.

*Sub judice* the underlying complaint in pertinent part alleges:

> 4.      On or before May 5, 2003, PONTIAC FLYING SERVICE, INC. retained the services of Richard P. Lucente, Jr., to provide turbine transition flight instruction to the Plaintiff's Decedent, NEIL T. WEBSTER, for a fee.

> 5.      At all times relevant hereto, Richard P. Lucente, Jr., was an employee and/or agent of Defendant, PONTIAC FLYING SERVICE, INC.

> 6.      On May 5, 2003, the Air Tractor departed from Pontiac Municipal Airport with Richard P. Lucente, Jr., acting as pilot in command and Plaintiff's decedent, NEIL WEBSTER, as the student pilot passenger.

> 7.      On May 5, 2003, the Air Tractor impacted the ground at some point after its departure from Pontiac Municipal Airport resulting in the death of NEIL WEBSTER.

> 8.      At all times relevant hereto, Defendants, PONTIAC FLYING SERVICE, INC. and Richard P. Lucente, Jr. owed a duty to exercise due care in providing flight instruction services and in maintaining the Air Tractor aircraft.

> 9.      On May 5, 2003, Defendant, PONTIAC FLYING SERVICE, INC. by and through its employees and/or agents, including Richard P. Lucente, Jr., was negligent in one or more of the following way:

>> a.      Failed to properly control the aircraft;
>> b.      Failed to properly and adequate instruct NEIL WEBSTER on the flight of the Air Tractor Aircraft;
>> c.      Failed to properly communicate with NEIL WEBSTER during flight training;
>> d.      Failed to properly and adequately maintain the Air Tractor Aircraft.

> 10.      As a direct and proximate result of one or ore of the aforementioned acts of negligence, Plaintiff's decedent, NEIL WEBSTER, sustained injuries which resulted in his death on May 5, 2003.

The complaint does not allege who was piloting the plane *at the time of loss*. It had dual controls

and could have been operated by either Webster or Lucente at any time. As appears from the

- 30 -

undisputed facts which are included in this response, no one knows who the pilot was when the plane went down.

The policy excludes liability to passengers. Passengers are persons, including crew members, who are "riding or flying" in the aircraft. However, the term "passenger" does not include the person who is actually flying the plane at the time of the loss. As otherwise expressed, in the context of the definitions portion of the policy, a crew member who qualifies as a "passenger" is passively present in the plane for the purpose of ". . . assisting in the operation of the **aircraft**", but is not the person actually operating the plane.

NATIONAL UNION argues that the passenger exclusion applies to the pilot at the time of the loss as well as any person who is on board the plane at the time. Thus, it includes both Lucente and Webster as "passengers" without regard to which was the pilot when the accident occurred. The justification for that interpretation is proffered by the inclusion of "**crew** members" within the exclusion. PONTIAC FLYING submits that the argument misapprehends the language which is used in the definition. A "**crew** member" will be considered a passenger when he is riding or flying in the plane to assist the pilot "in the operation of the **aircraft**." However, the act of operating the aircraft is separate and distinct from simply "riding or flying therein".

## <u>CONCLUSION</u>

Randy Hardy was both perceptive and candid in his admission that "nothing is more confusing to the policyholder . . . than reading one of these insurance policies." For that reason the courts logically prefer and presume the construction of policy language which favors

coverage. In that regard ambiguities and uncertainties will be construed against the drafter. PONTIAC FLYING submits that this is such a case.

NATIONAL UNION chose not to define or identify by example or otherwise the type of flights which are or are not "required in direct support" of ". . . the application by aircraft of seeds, fertilizers or chemicals." Common sense, as well as Webster's Dictionary, presuppose that flight instruction or "training" is the prerequisite of that type of activity. That understanding is uniformly accepted within the agricultural aviation industry, whether the training is provided by the owner of the plane to his employees or to third parties through a training program.

Apart from legal rules of contract interpretation and the custom and usage of other agricultural pilots, PONTIAC FLYING SERVICE purchased the turbine powered AT503 with the understanding that training flights were covered under the NATIONAL UNION policy. Specifically, Scott Petersen asked and was assured by the agent, Randy Hardy, that Rick Lucente was included as a "flight instructor" for the purpose of providing turbine transition training in the plane. As Hardy testified, his authority in making those representations came from Mary Beth Schwaegel of AIG/NATIONAL UNION. In addition to justifying the purchase of the plane, those representations led to the payment of an additional premium of two thousand five hundred ninety-eight dollars ($2,598.00). NATIONAL UNION has both waived and is estopped from denying that the policy contains coverage for turbine transition training, including that which was involved at the time of the loss.

PONTIAC FLYING submits that the understanding provided to Scott Petersen regarding the use of the plane for turbine transition purposes *and* the inclusive definition of training flights as in "direct support" of aerial application are consistent and comport with the standards principles which apply to policy interpretation. In that regard the insuring agreement defines the

activity or use which is covered. Here that activity or use is defined in terms of "flights required in direct support" of ". . . the application by aircraft of seeds, fertilizers or chemicals." As discussed *supra*, and as the court has previously found, turbine transition training flights reasonably fall within that definition. Where the activity or use is covered then the insurer must prove that there is an exclusion which limits, restricts or vitiates it. None is found in the third party property damage coverage of the NATIONAL UNION policy. In fact, the only exclusion for "training" appears in the liability coverage of the contract where it is limited to depriving persons who are receiving "training" from coverage.

No one knows who was flying the plane when it went down. The passenger exclusion to liability coverage extends only to persons who are riding or flying in the aircraft. It does not extend to the pilot who is operating the plane at the time of the loss.

Liability coverage is determined by comparing the language of the insurance contract to the complaint for which coverage is sought. Here the Webster complaint alleges that PONTIAC FLYING SERVICE is liable for ground related acts and omissions, such as maintenance, which may have caused the accident. Coverage for those risks is triggered and NATIONAL UNION's failure to defend is a breach of its policy obligations.

For the foregoing reasons PONTIAC FLYING SERVICE respectfully submits that the Motion for Summary Judgment of NATIONAL UNION FIRE INSURANCE COMPANY should be denied in its entirety. Alternatively, the Defendant asks that the motion be considered separately as to the first party property damage and liability coverage.

CASSIDY & MUELLER


By: s/  DAVID B. MUELLER
        Attorneys for Defendant,

- 33 -

PONTIAC FLYING SERVICE, INC.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2005, I electronically filed the foregoing and its exhibits with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Jeffrey B. Rock          jrock@hrbklaw.com, cpoehlman@hrbklaw.com

Ms. Diane M. Baron         dbaron@clausen.com, pkebr@clausen.com

Mr. Michael S. Krzak        msk@cliffordlaw.com, jmg@cliffordlaw.com

Mr. Kevin P. Durkin         kpd@cliffordlaw.com; jg@cliffordlaw.com

Mr. Mark T. Banovetz        mbanovetz@tsmp.com

and I hereby certify that I have mailed by United States Postal Service the document to the foregoing non CM/ECF participants:

s/<u>DAVID B. MUELLER</u>
David B. Mueller - #01980661
CASSIDY & MUELLER
416 Main Street, Suite 323
Peoria, IL 61602
Telephone: 309/676-0591
Fax: 309/676-8036
E-mail: dmueller@cassidymueller.com