1

```
 1    STATE OF ILLINOIS      )
                             )
 2    COUNTY OF COOK         )

 3            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                    COUNTY DEPARTMENT, LAW DIVISION
 4
      NATIONAL UNION FIRE INSURANCE  )
 5    COMPANY OF PITTSBURGH, PA.,    )
                                     )
 6            Plaintiff,             )
                                     )
 7            vs.                    ) No. 03-1288
                                     )
 8    PONTIAC FLYING SERVICE, INC.,  )
      Et al.,                        )
 9                                   )
              Defendants.            )
10                                   )
                 And                 )
11                                   )
      PONTIAC FLYING SERVICE, INC.,  )
12                                   )
              Third Party Plaintiff, )
13                                   )
              vs.                    )
14                                   )
      HARDY AVIATION INSURANCE, INC.,)
15                                   )
              Third Party Defendant. )
16
```

17
        The discovery deposition of SCOTT PETERSEN
18  called for examination pursuant to the provisions of the
    Civil Practice Act and Rules of the Supreme Court as they
19  apply to the taking of discovery depositions, taken
    before Laura J. Amberg, CSR, State of Illinois, on the
20  22nd day of February, 2005, at the hour of 11:20 a.m., at
    416 Main Street in the City of Peoria, County of Peoria,
21  State of Illinois.

22

23

**14**
1  A. Airport management, maintenance and
2  agricultural flying.
3  Q. And you are an owner of Pontiac Flying
4  Services?
5  A. Co-owner with my wife.
6  Q. Is it a corporation?
7  A. Pontiac Flying Service is not. Pontiac
8  Flying Service, Inc., is incorporated. There's two
9  separate entities within that business.
10  Q. Okay. And what is the distinction between
11  the two entities besides the fact one is a corporation,
12  one isn't; what do they do?
13  A. When we purchased the 503 we put those assets
14  into Pontiac Flying Service, Inc., formed the corporation
15  at that time.
16  Q. So that was the only asset of the Inc.,
17  Pontiac Flying Services, Inc.?
18  A. That, a pickup truck, one enclosed trailer,
19  one small flat open trailer, and some numerous parts and
20  pieces.
21  Q. And why is it that you did it that way, put
22  that into a separate company?
23  A. We just decided to put that into the

**15**
1  corporation. I don't recall.
2  Q. And who are the shareholders of that
3  corporation?
4  A. Sarah Petersen and myself.
5  Q. And how is that split? 50/50?
6  A. 51/49.
7  Q. Who has 51?
8  A. Myself.
9  Q. Does Pontiac Flying Services, Inc., have any
10  other employees -- have any employees?
11  A. At this time Inc. has no employees.
12  Q. Did it ever?
13  A. Yes. We had myself, my wife. I think we
14  were the only, I guess, employees of the corporation.
15  Q. And were you officers of the corporation as
16  well?
17  A. Yes.
18  Q. What offices did you hold?
19  A. President.
20  Q. And your wife?
21  A. She's, I believe, the secretary.
22  Q. Okay. Is that corporation still in
23  existence?

**16**
1  A. Yes.
2  Q. What does it currently own?
3  A. The pickup truck that was originally included
4  and the two trailers and some miscellaneous parts and
5  pieces.
6  Q. Now, the other entity, Pontiac Flying Service
7  -- Services?
8  A. Service.
9  Q. Service, Pontiac Flying Service, does it own
10  any planes?
11  A. Yes.
12  Q. Could you tell me what planes it owns
13  currently?
14  A. Under that there's a 502 Air Tractor; there
15  are two G164A Ag Cats, there's a Piper Turbo Arrow, a
16  Piper Warrior.
17  Q. Now, when was the 502 Air Tractor acquired?
18  A. It was acquired in late May of 2003.
19  Q. And what is that used for?
20  A. Agricultural flying.
21  Q. And what about the two G164A Ag Cats, when
22  were they acquired?
23  A. One is the original derelict airplane that I

**17**
1  mentioned earlier that we still own. It's used for
2  agricultural operations. The second one we just
3  completed a restoration on it and it has yet to have
4  performed any aerial application at this time.
5  Q. And what about the Pipers, the Turbo Arrow --
6  A. They're used for flight instruction and
7  rental.
8  Q. And that would be the Warrior and the Arrow?
9  A. That's correct.
10  Q. And when were they acquired?
11  A. The Warrior was purchased I believe in July,
12  2002; and the Arrow was purchased I think in September of
13  2002.
14  Q. And do you have a separate insurance policy
15  that covers the instruction, flight instruction that's
16  done with those planes?
17  A. That I don't recall.
18  Q. Okay. Who is your insurance broker?
19  A. Randy Hardy, Hardy Aviation Insurance.
20  Q. And when did you start doing business with
21  him as your broker?
22  A. I believe in 1997.
23  Q. And what types of insurance policies has

**Page 18**

1  Hardy Aviation Insurance obtained for you over the years?
2      A.   Agricultural and also for our rental
3  instruction airplanes.
4      Q.   And he is still your insurance broker;
5  correct?
6      A.   That's correct.
7      Q.   All right. At some point Pontiac Flying
8  Services, Inc., purchased the AT-503; correct?
9      A.   That's correct.
10     Q.   When was that?
11     A.   That purchase was finalized the last day of
12 February, 2002.
13     Q.   And when did Pontiac take possession of it?
14     A.   It would have been probably in April of that
15 same year.
16     Q.   And what is an AT-503 plane?
17     A.   It's an agricultural crop duster airplane,
18 turboprop powered with two seats.
19     Q.   And when did you buy it?
20     A.   When?
21     Q.   I'm sorry. From whom did you buy it?
22     A.   Harold Miller.
23     Q.   And for what -- what was the price?

**Page 19**

1      A.   That I don't recall.
2      Q.   Okay. And why did you purchase that plane?
3      A.   So that we could become involved in the gypsy
4  moth abatement programs.
5      Q.   Did you tell anyone from Hardy Insurance that
6  you were buying that plane?
7      A.   Yes.
8      Q.   Who did you tell?
9      A.   I spoke with Angie and I spoke with Randy.
10     Q.   And Angie is Angie Banz?
11     A.   That's correct.
12     Q.   When did you speak with Angie Banz about it?
13     A.   To my recollection, early February.
14     Q.   Of '02?
15     A.   Of '02.
16     Q.   Okay. And did you call her or how was it
17 that you spoke to her?
18     A.   Yes, I phoned her.
19     Q.   And what did you say to her and what did she
20 say to you?
21     A.   If I recall, I told her that we were pursuing
22 purchasing the assets of Harold Miller, which included
23 the 503, and wanted to know what the insurance premiums

**Page 20**

1  and costs would be if this all worked out.
2      Q.   And what did she say?
3      A.   She said she would work up a quote and get
4  back to us.
5      Q.   And did you describe for her just exactly
6  what it is that you were purchasing? You said you were
7  purchasing the assets and the AT-503?
8      A.   I told her most -- I guess basically is the
9  AT-503 is basically what I was seeking insurance coverage
10 for.
11     Q.   Did you tell her what you planned to use the
12 AT-503 for?
13     A.   No.
14     Q.   Did she get back to you with a quote?
15     A.   Yes.
16     Q.   How soon after that conversation?
17     A.   I -- it was within a week or ten days, I
18 believe.
19     Q.   And did she call you?
20     A.   I think there was a call and a fax, if I
21 remember.
22     Q.   And do you recall first of all from the phone
23 call that you're referring to what was said?

**Page 21**

1      A.   No.
2      Q.   And then you said you received a fax. Do you
3  recall what was on the fax?
4      A.   I believe a quote.
5      Q.   And do you recall who it was from, what
6  company?
7      A.   Company?
8      Q.   Yeah, the insurance company.
9      A.   Not the exact insurance company, but it was
10 from Hardy.
11     Q.   Okay. And did you approve the quote?
12     A.   Not at that time.
13     Q.   Why not?
14     A.   The finalization of the purchase of the Air
15 Tractor had not taken place as of then.
16     Q.   So what did you do in response to receiving
17 the fax? Just hold off or what?
18     A.   I told them that we had not yet gone through
19 with the purchase.
20     Q.   Did you then contact anyone from Hardy
21 Aviation Insurance again after you did go through with
22 the purchase?
23     A.   Yes.

**Page 22**

1 Q. And who did you contact?
2 A. I believe I spoke with Randy.
3 Q. Randy Hardy?
4 A. Randy Hardy.
5 Q. And did you call him?
6 A. Yes.
7 Q. Do you recall when that took place?
8 A. Probably the 28th of February when we -- when
9 we signed the deal.
10 Q. Okay. That's of '02?
11 A. That's correct.
12 Q. And what did you tell Randy at that time?
13 A. I don't remember exactly.
14 Q. Do you recall generally?
15 A. No.
16 Q. Do you recall anything Randy said to you in
17 that conversation?
18 A. I recall that Randy said that before I put
19 the airplane to work I was going to have to have some
20 additional training in the airplane because the insurance
21 company required it.
22 Q. How much training had you had at that point?
23 A. I had gone through the initial turbine

**Page 23**

1 transition training and I believe that was all.
2 Q. And what is initial turbine transmission
3 training? Can you describe it?
4 A. It's transition from piston-powered airplanes
5 into turboprop operations.
6 Q. And how much time does that involve, that
7 type of training?
8 A. My initial was a little over five hours.
9 Q. And who provided you that training?
10 A. Company or individual?
11 Q. Both.
12 A. It was through Harold's Flying Service and
13 the instructor pilot was Rick Lucente.
14 Q. In what plane was that training done?
15 A. The Air Tractor 503.
16 Q. Do you recall anything else Randy said in
17 that conversation?
18 A. No.
19 Q. Did he tell you how much more additional
20 training you needed?
21 A. No; not specified.
22 Q. Did you ask him?
23 A. No.

**Page 24**

1 Q. Okay. What was your next contact with anyone
2 from Hardy Aviation Insurance regarding the insurance on
3 that AT-503?
4 A. I don't recall. I believe there was a change
5 because they had found some cheaper insurance, but I
6 don't recall the date.
7 Q. Was it after you had possession of the
8 AT-503?
9 A. I think so.
10 Q. Was there -- is it your understanding there
11 was already coverage for it and then there was a change
12 being made to another policy? I'm not sure I know what
13 you mean when you say there was a change.
14 A. There was a change, to my knowledge, in the
15 insurance underwriter.
16 Q. Meaning a change in companies? I'm still not
17 quite sure I'm following what you're saying.
18 A. I believe originally we were with AIG.
19 Q. Okay.
20 A. And I think at that time it was switched to
21 USAIG and then after that it was switched back to AIG.
22 Q. Okay. When you say AIG, was it your
23 understanding the policy was issued by National Union

**Page 25**

1 Insurance Company?
2 A. I -- I don't know who it was issued by.
3 Q. You don't know. Okay. What did you use the
4 AT-503 plane for when you acquired it?
5 A. When we first acquired it I received training
6 in it and then we put it to work doing agricultural
7 operations.
8 MR. BANOVETZ: Diane, could I just interject?
9 MS. BARON: Sure.
10 MR. BANOVETZ: Keep the --
11 MS. BARON: Sure.
12 EXAMINATION
13 BY MR. BANOVETZ:
14 Q. At the time, Scott, that you acquired the 503
15 do you recall how many hours you had in the airplane at
16 that time?
17 A. No, not total.
18 Q. Can you estimate the total time?
19 MR. MUELLER: Show my objection. When we're
20 talking about acquiring, what are we -- when are we
21 talking about the acquisition? If we're talking about
22 February 28th, I think he said he had five hours.
23 MR. BANOVETZ: Initial training.

**Page 26**

1  MR. MUELLER: Initial training with Lucente.
2  Are we talking about the acquisition taking place after
3  that?
4      MR. BANOVETZ: No, no. I was talking about
5  at the time of the purchase.
6      MR. MUELLER: Okay. Would that be the five
7  hours?
8  Q. (Mr. Banovetz continuing.) Is that all the
9  hours that you had in that airplane at that time?
10 A. At the time we inked the deal, yes.
11 Q. So the flying that you did for Harold
12 Miller's Flying Service was all in piston aircraft, other
13 than the training?
14 A. That's correct.
15     MR. BANOVETZ: Okay. Thanks.
16
17 Q. (Ms. Baron continuing.) Just so that I'm
18 clear, you're saying that the purchase was the last day
19 of February of '02; correct?
20 A. That's correct.
21 Q. And then you mentioned a date of April of
22 '02. Is that when you -- I'm just trying to figure out
23 why the difference in dates. What happened?

**Page 27**

1  A. The difference in dates is that Harold's
2  place, he had a grass strip and in the springtime when
3  the snow melted it got muddy and soft and we could not
4  physically remove the airplane at that time.
5  Q. Okay. So it basically sat there until April?
6  A. It sat in his hangar, yes.
7      MR. MUELLER: Just so we're on the same
8  wavelength, we lawyers have a tendency to talk about
9  possession in the context of a real estate closing, so I
10 guess, Scott, you had the right to the plane, it was your
11 plane as of February 28th, but you simply couldn't take
12 it and fly it away --
13 A. Right.
14     MR. MUELLER: -- until April.
15 A. It was ours, but it stayed in Harold's
16 hangar.
17 Q. (Ms. Baron continuing.) Okay. That helps.
18 And as of when it became yours February 28th, did you
19 have insurance coverage on it?
20 A. Yes.
21 Q. And what coverage did you have?
22 A. I don't know. I -- I don't recall.
23 Q. And then when you first then were able to

**Page 28**

1  move it off of the mud --
2  A. Right.
3  Q. -- and then started using it as your own
4  property, Pontiac's property, what was it used for at
5  that time?
6  A. Well, the first day that we were able to fly
7  it I received training in it with Rick Lucente.
8  Q. And how much training did you receive with
9  Rick Lucente overall in that plane?
10 A. In that particular plane?
11 Q. Yeah.
12 A. When -- after we purchased it?
13 Q. Uh-huh, yes.
14 A. I'm going to say approximately three more
15 hours.
16 Q. And then did you then have contact with
17 someone from Hardy Aviation Insurance regarding coverage
18 for the AT-503 while you were having this training?
19 A. Not at that time that I remember.
20 Q. Do you recall when the coverage for the
21 AT-503 was changed from AIG to USAIG?
22 A. No.
23 Q. Do you know why it was changed back from

**Page 29**

1  USAIG to AIG?
2  A. Yes.
3  Q. Why?
4  A. USAIG would not underwrite gypsy moth
5  application.
6  Q. When did you receive these few hours of
7  training with Rick Lucente in the AT-503?
8  A. I don't have an exact date. It was after the
9  purchase and the time when the grass strip dried up and
10 we could get the airplane, but I don't have the exact
11 date.
12     MR. MUELLER: I believe we do have records
13 that would show that.
14 Q. Okay. Did you use the AT-503 for training
15 anyone else?
16 A. Not at that time, no.
17 Q. At any time.
18 A. In -- would you repeat the question? I'm not
19 understanding what you're looking for.
20 Q. Sure. I wanted to know if you used the
21 AT-503 for turbine transition training for anyone else?
22     MR. MUELLER: When you're using the term
23 "you" are you referring to him individually or to the

### Page 30

1  corporation?
2  Q.  Corporation.
3  A.  Corporation, yes.
4  Q.  Okay. Tell me about that. When did you
5  start doing that?
6  A.  That would have been in May of 2003.
7  Q.  And who did that training?
8  A.  Mr. Rick Lucente.
9  Q.  And who received the training?
10 A.  Neal Webster.
11 Q.  Did anyone else receive the training?
12 A.  No.
13 Q.  Was Rick Lucente an employee of Pontiac?
14 A.  No.
15 Q.  What was his arrangement then? Why was he
16 flying that plane?
17 A.  Private contractor.
18 Q.  And what were the financial arrangements
19 then?
20 A.  He was paid $100 per hour of instruction time
21 whether it was in the classroom or in the air.
22 Q.  And did he provide instruction in other
23 planes of Pontiac as well?

### Page 31

1  A.  No.
2  Q.  Just the AT-503?
3  A.  Just the 503.
4  Q.  And what was charged to Neal Webster to
5  receive this training?
6  A.  Ultimately there was no -- no payment for any
7  services rendered.
8  Q.  Okay. What was the initial arrangement to
9  be?
10 A.  Five thousand two hundred dollars.
11 Q.  And what was this training to consist of?
12 You mentioned classroom and air. Could you describe that
13 training?
14 A.  That would have been up to Mr. Lucente.
15 Q.  Did you advertise this training?
16 A.  Yes.
17 Q.  Let me find that.
18 MR. BANOVETZ: Can I ask a question while
19 you're looking?
20 MS. BARON: Sure, go ahead.
21 EXAMINATION
22 BY MR. BANOVETZ:
23 Q.  Scott, in the documents that you brought with

### Page 32

1  you today I notice that there's an Aircraft Endorsement
2  which has a date of issue of March 5, 2002, that lists
3  the Air Tractor 503. Is that consistent with your
4  recollection of when your insurance became effective on
5  this aircraft after you purchased it?
6  A.  No. It's my understanding coverage was bound
7  on the 1st of March.
8  Q.  Okay. March 1st?
9  A.  Yes.
10 Q.  Okay. Did you receive something in writing
11 from Hardy Aviation or from National Union evidencing the
12 fact that the 503 was now covered?
13 A.  I don't recall. That would have been --
14 Sarah took care of the insurance stuff that came in in
15 the office.
16 Q.  Are the documents that you brought with you
17 today from your files as opposed to something that your
18 attorney provided?
19 A.  I think that is -- to my knowledge it's all
20 from our files.
21 Q.  Okay. But you don't --
22 MR. MUELLER: He provided the files to me and
23 I then gathered the materials, so --

### Page 33

1  MR. BANOVETZ: Fair enough. I'm just trying
2  to get -- I'm not trying to be tricky. I'm just trying
3  to get at what documentation you folks might have
4  received evidencing the coverage.
5  Q.  (Mr. Banovetz continuing.) Is it a fair
6  assumption, if your lawyer will let me ask the question
7  that way, that the documents that I have that you have
8  provided your lawyer today are documents that you
9  received from Hardy, the policy documents?
10 MR. MUELLER: You might show them to him. I
11 -- I think the notice was a little bit broader than just
12 documents received from Hardy.
13 Q.  Fair enough. The document entitled Aircraft
14 Endorsement, which is endorsement ten, dated March 5th,
15 2002.
16 A.  Endorsement becomes effective March, 2002.
17 Q.  Is that a document you recall receiving from
18 Hardy?
19 A.  I don't recall it, but Sarah may.
20 Q.  Okay, thanks. Just a couple more, if I
21 could, Diane.
22 MS. BARON: Certainly.
23 Q.  (Mr. Banovetz continuing.) Do you recall

34
1  receiving a pilot warranty endorsement from Hardy that
2  indicated who could fly the AT-503 when you purchased it?
3      A.   No, I don't remember seeing that.
4      Q.   Did you have an understanding as to who was
5  going to be allowed to fly the AT-503 once you began
6  operations in the spring?
7      A.   Yes, yes.
8      Q.   Who would be allowed to fly that aircraft as
9  you understood it?
10     A.   Myself, Rick Lucente as an instructor pilot,
11 and then anyone that met the open pilot warranty.
12     Q.   Is it fair to say that your understanding was
13 that you were approved to fly the airplane immediately
14 without any further instruction?
15     A.   No.
16     Q.   Was it your understanding at the time you
17 purchased the aircraft that you would be required to
18 undergo additional training in order to fly the aircraft?
19     A.   Yes.
20     Q.   Do you recall receiving a pilot warranty
21 endorsement document you have just referred to which
22 indicated without restriction that you were approved to
23 fly the aircraft, do you recall receiving that document

35
1  in or about March of 2002.
2      A.   No.
3          MR. BANOVETZ:  Thank you.
4          MS. BARON:  Let's mark this.
5     (Whereupon Deposition Exhibit #1 was
6     Marked for identification.)
7      Q.   (Ms. Baron continuing.)  Showing you what's
8  been marked as Deposition Exhibit Number One, could you
9  take a look at that and tell us if you recall seeing that
10 before?
11         MR. MUELLER:  Do you have extra copies?
12         MS. BARON:  Sure.  For the record, it's a
13 copy of the policy that was attached to the complaint.
14         MR. MUELLER:  I assumed as much.
15    (Off the record.)
16         MR. KRZAK:  What's the exhibit?
17         MR. MUELLER:  It's the policy that's attached
18 to the complaint.
19         MR. KRZAK:  Okay.
20     A.   I don't recall specifically seeing it.
21     Q.   (Ms. Baron continuing.)  Do you recall
22 receiving any of your insurance policies and seeing them?
23     A.   Oh, I know there was stuff that come from

36
1  Hardy all the time, but that normally was handled by
2  Sarah.
3          MS. BARON:  Okay.  Let's mark that.
4     (Whereupon Deposition Exhibit #2 was
5     Marked for identification.)
6      Q.   (Ms. Baron continuing.)  All right.  Showing
7  you what's been marked as Deposition Exhibit Number Two,
8  is that a copy of one of the ads that you ran for the
9  turbine transition training with the AT-503?
10     A.   Yes, that's correct.
11     Q.   And when did you run these ads, for what
12 period of time?
13     A.   If I recall, it started in December of 2002
14 and it ran up through the time of the accident, I
15 believe.  At that time we canceled those particular
16 advertising.
17     Q.   And did -- but you're saying that no one else
18 came for training until May of '03?
19     A.   We had several inquiries.
20     Q.   But no one took the training?
21     A.   No.
22     Q.   Did you tell anyone at Hardy Insurance that
23 you were using the AT-503 for turbine transition

37
1  training?
2      A.   Yes.  Randy specified that when we originally
3  bought the aircraft, that I was to have additional
4  training in it and I told him that we would add Rick
5  Lucente as the instructor pilot on that aircraft.
6      Q.   Did you request coverage, insurance coverage
7  for using the plane for training, transition training at
8  that time?
9      A.   I believe it was all covered in what we had
10 discussed.
11     Q.   And what do you mean by that?  Do you recall
12 asking him for coverage for that use?
13     A.   Randy specified that we had to have
14 additional training and I told him that was fine, that I
15 would do it with Rick Lucente and we would add him as the
16 instructor pilot on the aircraft.
17     Q.   Did you ever tell Hardy Insurance that you
18 were advertising to do transition training on that
19 aircraft?
20     A.   I never told them that I was advertising.
21     Q.   Did you tell them that you were offering to
22 do it for other people?
23     A.   No.

38

Q. Now, when the AT-503 was added to your aviation insurance policy it was initially done by endorsement, correct, to your knowledge or --
A. I don't know.
Q. Okay. Do you know what policy that plane was added to?
A. Not off the top of my head I don't, but I know it was added.
Q. Do you know what policy period it was added to?
A. No.
MS. BARON: Mark this.
(Whereupon Deposition Exhibit #3 was Marked for identification.)
Q. (Ms. Baron continuing.) Showing you what's been marked as Deposition Exhibit Three, do you recognize that document?
A. Yes.
Q. Is this an insurance application regarding Pontiac Flying Service, Inc.?
A. I believe it is.
Q. And is it for -- an application for coverage effective April 10th of '02 to April 10th of '03?

39

A. Yes.
Q. Is that your signature at the bottom of the second page?
A. Yes, that is.
Q. Did you read this application before you signed it?
A. Yes, I did.
Q. And it includes the Air Tractor, AT-503; correct?
A. Yes, it does.
Q. If you look at the second page up at the top where -- under the aircraft liability coverages, the box passengers excluded is checked, correct, up in the left-hand corner?
A. On the second page?
Q. Yes.
A. Oh, yes, it is.
Q. So that indicated that passenger coverage was excluded under the policy?
A. We never carried any passengers in the airplane.
Q. When you were using the Air Tractor 503 for your own training weren't there two of you in the plane?

40

A. That's correct.
Q. Just a second here.
MR. BANOVETZ: Can I interject a question again?
MS. BARON: Sure, go ahead.
EXAMINATION
BY MR. BANOVETZ:
Q. Scott, did you ever have an opportunity to review your policy definition of passenger?
A. Say that again, Mark.
Q. Sure. Before the date of the loss had you ever had an opportunity to read any of the insurance policy issued on these agricultural airplanes?
A. I don't recall.
Q. As you sit here today, not at the time, but as you sit here today do you understand both occupants in that airplane would be passengers as defined by the policy?
A. No, that aircraft was never certified as having a passenger seat in the rear.
Q. Okay. Are you aware as you sit here today that this -- the insurance policy that was in effect at the time of the loss defines a passenger as anyone in the

41

airplane including crew?
MR. MUELLER: Objection; asks for a legal conclusion.
MR. BANOVETZ: I'm just trying to avoid forcing him to read the policy here. He can do that. I'm just trying, Scott, to get an understanding.
A. Sure.
Q. (Mr. Banovetz continuing.) You understood passengers would not be covered under your liability policy in that aircraft?
A. In your -- response to your question, we never carried passengers. Anybody that was in the aircraft was considered crew members because that's how that airplane was certified. It doesn't have a passenger seat; it has a crew member seat.
Q. Okay. For the sake of expediency -- well, let me just refer you to Exhibit One, which is the policy, and the definition of passenger. If I could just ask you to read that into the record.
A. Sure passenger --
MR. MUELLER: Counsel, I think that you have his understanding, then you have the policy, which is obviously a part of the record in the case.

### Page 42

1  MR. BANOVETZ: I'm just --
2  MR. MUELLER: I'm not going to, you know,
3  prohibit him from doing it, but as far as shortening it
4  up, it is -- it says what it says.
5  MR. BANOVETZ: Okay. I just want to be on
6  the same page with Scott so that I can ask my follow-up
7  question --
8  MR. MUELLER: Okay.
9  MR. BANOVETZ: -- so we are both on the same
10  page, if I could.
11  A.  **Okay. Passenger means any person in, on or**
12  **boarding the aircraft for the purpose of riding or flying**
13  **therein or alighting therefrom after a flight or**
14  **attempted flight therein, including crew members.**
15  Q.  (Mr. Banovetz continuing.) Did you have an
16  understanding as of the date of this loss as to whether
17  there would be liability coverage for anyone in that
18  airplane?
19  A.  **I assumed that it would be covered.**
20  Q.  Okay. Now, I'm not talking about coverage
21  for the aircraft hull. I'm talking about third party
22  liability for claims against you by the pilot -- or I'm
23  sorry, by a crew member or their family. Did you have an

### Page 43

1  understanding as of the date of this loss as to whether
2  you had coverage for a liability claim against you by
3  someone in that aircraft?
4  A.  **My understanding, it would be covered.**
5  Q.  Did you have an understanding as to what the
6  passenger exclusion or noninclusion of passenger coverage
7  meant? What was your understanding of the significance
8  of that?
9  A.  **I -- I couldn't tell you at this point, Mark.**
10  **I don't remember.**
11  MR. BANOVETZ: Okay. Thanks, Diane.
12  MS. BARON: Sure. Let's mark this one.
13  (Whereupon Deposition Exhibit #4 was
14  Marked for identification.)
15  Q.  (Ms. Baron continuing.) Showing you what's
16  been marked Deposition Exhibit Number Four, are you
17  familiar with this?
18  A.  **Familiar, I have seen it.**
19  Q.  Is that an application, insurance application
20  for Pontiac Flying Service for coverage effective May
21  19th, 2002, to May 19th, 2003?
22  A.  **Yes, it is.**
23  Q.  And do you recognize your wife's signature at

### Page 44

1  the bottom of the second page?
2  A.  **Yes, I do.**
3  Q.  And do you understand this to be the
4  application that was submitted when the insurance was
5  then being transferred, as you say, back to AIG?
6  A.  **Yes.**
7  Q.  And that also indicates on page two, as the
8  other application did, that passengers are excluded;
9  correct?
10  A.  **Yes, it does.**
11  Q.  And is it your understanding that the policy
12  that I have previously marked as, I believe, Exhibit One,
13  was the policy that was then provided to you?
14  A.  **Yes, the dates would match up.**
15  Q.  Okay. Now, has Pontiac Flying Service, Inc.,
16  had -- strike that.
17  Has Pontiac Flying Service had any planes
18  they had used for instructional flying?
19  A.  **Any planes?**
20  Q.  Yes.
21  A.  **Yes.**
22  Q.  And did you purchase instruction insurance
23  for those?

### Page 45

1  A.  **Yes, we did.**
2  Q.  Did you ever contact Hardy Aviation Insurance
3  to request coverage for instructional flying in the -- in
4  an Ag Cat plane?
5  A.  **We, I guess, explored that possibility. It**
6  **was a hypothetical; we never purchased or located an**
7  **aircraft. It was -- just was something that we were**
8  **maybe looking to do.**
9  Q.  Do you recall when you were looking to do
10  that?
11  A.  **It would have been probably in 2002, 2003. I**
12  **don't remember right off the top of my head.**
13  Q.  What do you recall about your discussions
14  with anyone from Hardy Aviation Insurance about that?
15  A.  **If I remember it was if we move forward with**
16  **this and we purchase this type of aircraft, what would**
17  **coverage potentially cost, what kind of a ballpark**
18  **figure?**
19  Q.  And did he get some quotes for you, Hardy
20  Aviation?
21  A.  **Randy didn't.**
22  Q.  Did Angie get some quotes for you?
23  A.  **I believe she finally did -- or they didn't**

## 46

1 get a quote, nobody would quote it, if I remember.
2    Q.  Okay.
3    A.  Because of my, I guess, interpretation of my
4 limited time as a pilot.
5    Q.  So it was your recollection that they never
6 got a quote for you for training with the Ag Cat?
7    A.  That's what I recall.
8    Q.  The AT-503 crashed on May 5th of 2003;
9 correct?
10   A.  That's correct.
11   Q.  Who was in the plane at the time?
12   A.  Rick Lucente and Neal Webster.
13   Q.  And was it being used for turbine transition
14 training at that time?
15   A.  Yes, it was.
16   Q.  And they were both killed; correct?
17   A.  That's correct.
18   Q.  How did you learn about the crash?
19   A.  I was notified by cell phone from one of my
20 employees that someone had called the airport saying that
21 an aircraft had gone down.
22       (Off the record discussion.)
23   Q.  (Ms. Baron continuing.)  Did you then have

## 47

1 any contact with Hardy Aviation Insurance about it?
2    A.  Say that again.
3    Q.  Did you have any contact with Hardy Aviation
4 Insurance about the crash?
5    A.  I didn't on that day, no.
6    Q.  What about on any other day?
7    A.  I think Sarah made the initial contact.
8    Q.  Okay.  Did you personally ever have any
9 contact with anyone from Hardy Aviation Insurance about
10 the crash?
11   A.  Not that I recall.
12   Q.  At any time before the accident did you tell
13 anyone from Hardy Aviation Insurance that you wanted
14 insurance coverage to do turbine transition training on
15 the AT-503?
16   A.  Yes, when they originally bound it and they
17 specified that I had to have additional training in the
18 airplane.
19   Q.  Other than that conversation that you've
20 already described, do you recall any other contact that
21 you had with Hardy Aviation Insurance about getting
22 insurance for turbine transition training in the AT-503?
23   A.  Not after the initial.

## 48

1    Q.  So that was the only contact that you recall?
2    A.  That's the only conversation that Randy and I
3 had regarding that.
4    Q.  Okay.
5       (Off the record discussion.)
6    Q.  (Ms. Baron continuing.)  Did you ever ask --
7 strike that.
8       Did you ever discuss with anyone from Hardy
9 Aviation Insurance anything about having passenger
10 coverage for the AT-503?
11   A.  The only conversation I recall is the initial
12 with Randy when I told him that we would -- had Rick
13 Lucente as the instructor pilot on the airplane.
14   Q.  For purposes of training?
15   A.  Instruction.
16   Q.  Instruction for yourself?
17   A.  Anyone, is the way I understood it.
18   Q.  Did Randy tell you that?
19   A.  Tell me?
20   Q.  That Rick Lucente could train anybody in the
21 AT-503 and he'd be covered?
22   A.  He never said we couldn't.
23   Q.  Did he ever say you could?

## 49

1    A.  No.
2    Q.  Did you ever talk to Randy Hardy about --
3 strike that.
4       Did you ever tell anyone from Hardy Aviation
5 Insurance that you were running a flight school with the
6 AT-503?
7       MR. MUELLER:  Objection; I think that's a
8 mischaracterization.
9    Q.  You can answer.
10      MR. MUELLER:  A flight school?
11   Q.  You can answer.
12   A.  Say that again, Diane.
13   Q.  Did you ever tell anyone from Hardy Aviation
14 Insurance that you were running a flight school with the
15 AT-503?
16   A.  The conversation I recall with Randy again
17 was back to that original conversation when they insisted
18 that I receive additional training and I told them that
19 was fine, and that I would have Rick Lucente do it and
20 that we would add him as the instructor pilot on the
21 aircraft.  If that answers your question.
22   Q.  But you don't -- strike that.
23      It's your recollection Randy Hardy didn't say