```
                                                                1
                                                         12:42:54
 1   STATE OF ILLINOIS      )
                            )
 2   COUNTY OF COOK         )

 3           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                    COUNTY DEPARTMENT, LAW DIVISION
 4
     NATIONAL UNION FIRE INSURANCE  )
 5   COMPANY OF PITTSBURGH, PA.,    )
                                    )
 6            Plaintiff,            )
                                    )
 7        vs.                       )  No. 03-1288
                                    )
 8   PONTIAC FLYING SERVICE, INC.,  )
     Et al.,                        )
 9                                  )
              Defendants.           )
10                                  )
              And                   )
11                                  )
     PONTIAC FLYING SERVICE, INC.,  )
12                                  )
              Third Party Plaintiff,)
13                                  )
          vs.                       )
14                                  )
     HARDY AVIATION INSURANCE, INC.,)
15                                  )
              Third Party Defendant.)
16

17
             The discovery deposition of SARAH PETERSEN
18   called for examination pursuant to the provisions of the
     Civil Practice Act and Rules of the Supreme Court as they
19   apply to the taking of discovery depositions, taken
     before Laura J. Amberg, CSR, State of Illinois, on the
20   22nd day of February, 2005, at the hour of 12:50 p.m., at
     416 Main Street in the City of Peoria, County of Peoria,
21   State of Illinois.

22

23
```

Page 6

```
 1    A.   I was a bookkeeper/secretary for the trucking
 2  business that we owned and operated.
 3    Q.   That was in Nebraska?
 4    A.   In Nebraska.
 5    Q.   Okay.
 6    A.   I've done various secretarial stints. I
 7  filled in for a gal who was pregnant one time, just
 8  general things of that nature.
 9    Q.   And you are not a licensed pilot; correct?
10    A.   No, I'm not.
11    Q.   You are a co-owner of Pontiac Flying Service;
12  correct?
13    A.   Uh-huh.
14    Q.   As well --
15         MR. MUELLER: You have to say yes.
16    A.   Yes.
17    Q.   Yes. I'm sorry, I should have caught it.
18  And you're also an owner of Pontiac Flying Service, Inc.;
19  is that correct?
20    A.   Yes.
21    Q.   Have you had contact with an insurance broker
22  regarding your insurance for Pontiac?
23    A.   Pontiac what?
```

Page 7

```
 1    Q.   Either. Take them separately. Did you have
 2  contact with an insurance broker regarding your insurance
 3  for Pontiac Flying Service, Inc.?
 4    A.   Yes.
 5    Q.   And was that Hardy Aviation Insurance?
 6    A.   Yes.
 7    Q.   When did you first start using Hardy as your
 8  broker?
 9    A.   January of --
10         MR. MUELLER: Again, this is Inc.? Pontiac
11  Flying Service, Inc.?
12    Q.   Yes, yes.
13    A.   I thought you said both.
14    Q.   Why don't we distinguish them just so I'm
15  clear.
16    A.   Pontiac Flying Service would have been in
17  July of 1997 --
18    Q.   Okay.
19    A.   -- to previous -- to present. Pontiac Flying
20  Service, Inc., would have been in February of 2002 when
21  we purchased the assets of Harold Miller.
22    Q.   Now, Pontiac Flying Service owned some
23  planes; correct?
```

Page 8

```
 1    A.   Yes. Owned?
 2    Q.   Yes.
 3    A.   Or owns?
 4    Q.   Well, let's -- I'm just saying owned at any
 5  particular time.
 6    A.   Yes.
 7    Q.   And were any of these planes used for
 8  instructional flying?
 9    A.   Yes.
10    Q.   And were you involved in obtaining insurance
11  for the instructional flying?
12    A.   Yes.
13    Q.   And did you do that by contacting Hardy
14  Aviation Insurance?
15    A.   Yes.
16    Q.   Did you request the insurance for the
17  instructional flying?
18    A.   Yes.
19    Q.   And did he obtain that for you?
20    A.   Yes.
21    Q.   Pontiac Flying Service, Inc., purchased an
22  AT-305 plane; correct?
23    A.   Yes.
```

Page 9

```
 1    Q.   And do you recall when that was purchased?
 2    A.   Yes.
 3    Q.   When was it purchased?
 4    A.   We signed the papers on the 28th of February,
 5  2002.
 6    Q.   Okay. And that was purchased from Miller?
 7    A.   Harold Miller.
 8    Q.   And did you contact anyone at Hardy Aviation
 9  Insurance regarding obtaining coverage for the AT-305?
10    A.   I don't recall.
11    Q.   Do you know if your husband did?
12    A.   Yes.
13    Q.   And how is it that you learned that, other
14  than sitting in the deposition today?
15    A.   Yeah, well, in the course of our business
16  there are times he does things, I do things. I do recall
17  that he contacted them to check on the insurance for --
18  it was a part of the process of the purchase.
19    Q.   Do you know when the coverage for the AT-305
20  became effective?
21    A.   It's my understanding it became effective
22  the -- March 1st of -- when Scott called to tell him
23  that, yes, the purchase had gone through, we had signed
```

**Page 10**

1 the papers and that we were the owners.
2    Q.  Okay.  Did you have any contact with Hardy
3 Aviation Insurance regarding that policy covering the
4 AT-305?
5    A.  Not that I recall.
6    Q.  Okay.  Do you recall receiving a quote for
7 coverage of the AT-305 or is that something that your
8 husband handled?
9    A.  I don't recall.
10   Q.  To your knowledge, what was the AT-305 to be
11 used for by Pontiac?  What were you going to use it for?
12   A.  For what it was designed, agricultural
13 aircraft; it was also a training aircraft with the two
14 seats.
15   Q.  Did you ever tell anyone at Hardy Aviation
16 Insurance that you were going to be using the AT-305 for
17 training?
18   A.  Ask me that again.
19       MS. BARON:  Sure.  Could you read it.
20   (Whereupon the question was read.)
21   A.  Not that I recall.
22   Q.  (Ms. Baron continuing.)  Did you use the
23 AT-305 for training?

**Page 11**

1        MR. MUELLER:  You're talking about the
2 corporation, Inc.?
3    Q.  Right, right.
4    A.  Well, Scott was given training in it when we
5 first acquired it.
6    Q.  And when was he given training in it, your
7 recollection, do you recall?
8    A.  I don't recall the specific dates.
9    Q.  Do you recall who trained him?
10   A.  Yes.
11   Q.  Who trained him?
12   A.  Rick Lucente.
13   Q.  And who's Rick Lucente?
14   A.  I guess I'm not sure exactly what you're
15 asking me.  Who is he?
16   Q.  Who was he?  Did you know him before --
17   A.  Oh, yes.
18   Q.  -- he gave this training to your husband?
19   A.  Yes.
20   Q.  How did you know him?
21   A.  First had met him in -- when Scott was at
22 Harold's working with him; he was an acquaintance,
23 friends.

**Page 12**

1    Q.  Okay.  Other than this training that Lucente
2 did for your husband, do you recall the AT-305 being used
3 for any other training for anybody else?
4    A.  Specifically when we owned it, that's what
5 you're asking me?
6    Q.  Yes.
7    A.  No.  Prior to the crash, is that what.
8 You're --
9    Q.  Right, right, at that point.
10   A.  Yeah.
11   Q.  Okay.  Did Pontiac advertise providing
12 training with the AT-305?
13   A.  Turbine transition training, yes.
14   Q.  And I will show you what we looked at before.
15 Showing you what was previously marked as Exhibit Two,
16 Deposition Exhibit Two, I don't know if you have a copy
17 there.
18   A.  Uh-huh.
19   Q.  Is that a copy of one of the ads that was
20 placed by Pontiac for the turbine transition training?
21   A.  Yes.
22   Q.  And do you know over what period of time
23 these ads ran?

**Page 13**

1    A.  I believe December of 2002 through April,
2 May.  The ad was canceled once the crash occurred.
3    Q.  Did you ever have anyone contact you to
4 request training or to ask about it in the AT-305 in
5 response to the ad or any other information?
6    A.  I do not specifically to the ad.  I mean, I
7 don't remember someone calling and saying, hey, I seen
8 your ad in this particular thing.
9    Q.  Do you recall them calling and asking?
10   A.  Yeah, there were people who called that I
11 always referred them to Scott.  He was -- visited with
12 them about that.
13   Q.  Did you ever tell anyone at Hardy Aviation
14 Insurance that you were advertising for turbine
15 transition training as indicated in Exhibit Two?
16   A.  No.
17   Q.  Showing you what's previously been marked
18 Deposition Exhibit Three?
19       MR. BANOVETZ:  These aren't numbered.
20       MR. MUELLER:  What's the date on it?
21   Q.  It's the aircraft -- it's the insurance
22 application coverage effective April 10, '02, to April
23 10, '03.

**Page 22**

1 information?
2   A. No.
3   Q. Do you recall who you spoke to about that? You say you spoke to Angie?
5   A. Angie.
6   Q. And what do you recall about those conversations? Did you ask her for a quote?
8   A. Just -- yes.
9   Q. And did she get you a quote?
10  A. I don't recall.
11  Q. I have some notes here from Hardy and there is a note dated 9/4/02. I can mark this. That states in Angie's writing, gave quote to Sarah. She was ecstatic. Will let us know when ready.
15     Does that bring back any recollection to you as to whether you got a quote for instructional flying in the Ag Cat?
18  A. No.
19  Q. Okay. How -- the AT-305 crashed on May 5th of 2003; correct?
21  A. Yes.
22  Q. And how did you learn about it?
23  A. Phone call.

**Page 23**

1   Q. Who called you?
2   A. I don't recall.
3   Q. And who was in the plane when it crashed?
4   A. Rick Lucente and Neal Webster.
5   Q. And was Lucente providing training, turbine transition training --
7   A. Yes.
8   Q. -- to Webster?
9   A. Yes.
10  Q. Did you contact Hardy Aviation Insurance after you learned --
12  A. Yes.
13  Q. -- of the crash? And who did you talk to?
14  A. Angie.
15  Q. And what did you say to her and what did she say to you?
17  A. I told her that the 503 had went down and that there were fatalities.
19  Q. Did you have any other -- strike that.
20     What did Angie say?
21  A. I don't recall.
22  Q. Did you have any other contact with Hardy Aviation Insurance after that regarding the crash?

**Page 24**

1   A. Yes, the next day.
2   Q. Who did you speak to then? Was it Angie again or --
4   A. I believe -- I don't recall.
5   Q. And do you recall what was discussed in that conversation?
7   A. Yes.
8   Q. And what was that?
9   A. I had received in the mail that day the renewal, I'm not sure exactly what it was, but I was concerned because I did not see Rick's name as -- listed as a pilot and I was wondering why that was, not realizing that it was because he -- it was an open pilot warranty that he was covered under.
15  Q. And so who told you that? Was it in that conversation?
17  A. Yes.
18  Q. Did you have any other contacts with Hardy Aviation Insurance after the crash regarding the loss?
20  A. Not to my knowledge.
21  Q. At any time before the loss did you tell anybody from Hardy Aviation Insurance that you wanted coverage for turbine transition training on the AT-305?

**Page 25**

1   A. Say that again, please.
2      MS. BARON: Could you read that back?
3      (Whereupon the question was read.)
4   A. No.
5   Q. (Ms. Baron continuing.) At any time before the loss did you ask anyone from Hardy Aviation insurance whether you had turbine transition training coverage for the AT-305?
9   A. No.
10  Q. Did anyone from Hardy Aviation Insurance ever tell you that you had coverage for turbine transition training with the AT-305?
13  A. No.
14  Q. Do you know Frank Kimmel?
15  A. Yes.
16  Q. Have you ever had any discussions with him regarding insurance coverage for the AT-305?
18  A. No.
19  Q. Were there ever times in your -- the operation of the business that -- where you thought that Scott, your husband Scott, had taken care of something and he hadn't in running the business?
23  A. Ask me that again.