# In The Matter Of:

*National Union Fire Company* v.
*Pontiac Flying Services, Inc.*



### JAMES RANDALL HARDY
*July 15, 2004*

**RECEIVED**

AUG – 2 2004

**CASSIDY & MUELLER**

*Court Reporting Service*

*Litigation Support*

*Midcity Place*

*115 East Douglas*

*Wichita, KS  67202*

*(316) 267-1201*    *FAX: (316) 267-1203*

*Original File JG2047.TXT, 144 Pages*
*Min-U-Script® File ID: 0675104689*

**Word Index included with this Min-U-Script®**

Page 5

[1] reporter here is taking this down on a little
[2] machine —
[3]    A: I understand.
[4]    Q: — and uh-huhs, huh-uhs, okays, yeps and nopes,
[5] not to mention nods of the head don't come
[6] through very well.
[7]    A: I understand.
[8]    Q: Also, we're trying to since the three lawyers
[9] are from out of town to get out of here as
[10] quickly and expeditiously as possible, so if
[11] you would listen to the question and just
[12] answer that question as opposed to giving us
[13] your life's story, we'll get out of here
[14] faster.
[15]    A: Okay.
[16]    Q: We'll get rid of you and we'll bring Angie in.
[17]    A: Very good.
[18]    Q: Would you give us your full name, please.
[19]    A: My name is James Randall Hardy.
[20]    Q: Where do you live?
[21]    A: Wichita — excuse me. Goddard, Kansas.
[22]    Q: And where is Goddard, Kansas?
[23]    A: It's about 10 miles west of Wichita.
[24]    Q: How long have you lived in the Wichita area?
[25]    A: All my life.

Page 6

[1]    Q: What is your educational background?
[2]    A: I have a high school degree. Have about three
[3] years of college.
[4]    Q: And where?
[5]    A: Wichita State.
[6]    Q: And in what?
[7]    A: Journalism.
[8]    Q: And during what period of time?
[9]    A: Seventy-three through '76.
[10]    Q: What is your age?
[11]    A: Forty-eight.
[12]    Q: What is your occupation or profession?
[13]    A: I'm an aviation insurance broker for my own
[14] company.
[15]    Q: What is the name of the company?
[16]    A: Hardy Aviation Insurance, Incorporated.
[17]    Q: And what is your interest in Hardy Aviation
[18] Insurance, Inc., the corporation?
[19]    A: I am the owner and the president.
[20]    Q: When you say owner, do you own all of the
[21] stock?
[22]    A: Yes, I do.
[23]    Q: Is that a Kansas corporation?
[24]    A: Yes, it is.
[25]    Q: And who are your board of directors? Who are

Page 7

[1] members of your board of directors?
[2]    A: Me. Myself. We have no board. We're an
[3] S corporation. I am the president, vice
[4] president, secretary, treasurer.
[5]    Q: You beat me to it. Now you broke the rule
[6] there. You volunteered some stuff. I was
[7] going to ask about the officers. So you are
[8] the only director — only member of the board
[9] of directors.
[10]    A: I am it, yes.
[11]    Q: Now tell us who the officers are.
[12]    A: Myself all four positions.
[13]    Q: So you are the president, the secretary, the
[14] treasurer and the vice president?
[15]    A: Yes.
[16]    Q: Does anyone else have an office? Assistant
[17] secretary, assistant treasurer, anything of
[18] that sort?
[19]    A: I don't understand the question.
[20]    Q: Are there any other offices other than
[21] president, vice president, secretary and
[22] treasurer?
[23]    A: No.
[24]    Q: When was the corporation formed?
[25]    A: 1995.

Page 8

[1]    Q: When did you start into the business of being
[2] an aviation insurance broker?
[3]    A: 1987.
[4]    Q: What did you do before 1987? What was your
[5] occupation?
[6]    A: I was in the aviation parts, wholesale parts
[7] business.
[8]    Q: And during what period of time were you in the
[9] aviation and wholesale parts business?
[10]    A: 1978 through 1987.
[11]    Q: And you had three years of college finishing up
[12] in 1976. What did you do between '76 and '78?
[13]    A: Excuse me. I did work for Kitt (sp)
[14] Manufacturing was the company. I acted as a
[15] manufacturer's representative for travel
[16] trailers.
[17]    Q: And during what period of time? Was that '76
[18] to '78?
[19]    A: Yes.
[20]    Q: So do we now have your entire employment career
[21] other than part-time jobs?
[22]    A: Yes.
[23]    Q: So you were a Kitt salesman from '76 to '78.
[24] From '78 to 1987 then you were involved in
[25] wholesale —

Page 13

[1] putting out crop protection products to the
[2] industry. As a pilot —
[3]     **Q:** Are there any other uses of an airplane for
[4] agricultural purposes other than what you've
[5] described?
[6]     **A:** An ag plane will be ferried to and maintained
[7] and test flown in those areas. That would be
[8] the other uses that they would have as the
[9] standard use for an ag plane.
[10]     **Q:** When you say ferried and test flown —
[11]     **A:** After maintenance they test fly an airplane.
[12] To deliver an airplane from one location to
[13] another, they have to fly it there. Our common
[14] term for that is ferry the airplane.
[15]     **Q:** Let's go back to 1987. You're starting out in
[16] the specialty field of aviation insurance —
[17]     **A:** Okay.
[18]     **Q:** — as a broker you said?
[19]     **A:** Yes.
[20]     **Q:** What is as you understand the term a broker?
[21]     **A:** Kansas defines any insurance as broker/agent.
[22] As a broker, my understanding of the
[23] broker/agent relationship is that we work on
[24] behalf of our client procuring coverages for
[25] that client.

Page 14

[1]     **Q:** Now by client, for instance in this case would
[2] Pontiac Flying Service be the client?
[3]     **A:** Yes.
[4]     **Q:** Another term for that would be the insured?
[5]     **A:** Yes.
[6]     **Q:** Would it be accurate to say then that you would
[7] be — as a broker you would be the agent of the
[8] client or insured as opposed to being the
[9] agent, let us say, of the company that is
[10] writing the policy?
[11]     **A:** Correct.
[12]     **Q:** Does Kansas require a license to be involved in
[13] the business of a broker/agent?
[14]     **A:** Yes.
[15]     **Q:** Do you have a license?
[16]     **A:** Yes.
[17]     **Q:** And when did you get your license?
[18]     **A:** 1987.
[19]     **Q:** Is that a personal license then?
[20]     **A:** Yes.
[21]     **Q:** Does the corporation itself have to have a
[22] license?
[23]     **A:** Yes.
[24]     **Q:** And when did the corporation get a license?
[25]     **A:** 1995.

Page 15

[1]     **Q:** Is anybody else who is employed by the
[2] corporation —
[3]     **MS. BARON:** Did you want to change
[4] that?
[5]     **A:** I need to strike that if I can — correct that
[6] if I can. The agency has a corporation
[7] license. Our licensing — the agency does not
[8] have to get a property and casualty license
[9] similar to I. We have to license the agency in
[10] various states to do business in that state.
[11]         **BY MR. MUELLER:**
[12]     **Q:** So in Kansas, the corporation is operating
[13] under your license; is that correct?
[14]     **A:** Correct.
[15]     **Q:** And in other states you have to have
[16] implementing licenses to sell insurance
[17] products in those states?
[18]     **A:** For — as a non-resident agent and some states
[19] the Kansas corporation — the company has to
[20] have a non-resident agency license as well.
[21]     **Q:** Let's take the State of Illinois since that's
[22] where we're coming from in this case. Do you
[23] individually have any type of a license in the
[24] State of Illinois?
[25]     **A:** I have a non-residence license.

Page 16

[1]     **Q:** And when did you get that?
[2]     **A:** I don't know.
[3]     **Q:** And what did you have to do to get that?
[4]     **A:** You apply with the state and pay their fee.
[5]     **Q:** And is that in good standing?
[6]     **A:** Yes.
[7]     **Q:** Does the corporation have a license —
[8]     **A:** I don't remember.
[9]     **Q:** — in Illinois?
[10]     **A:** I don't remember.
[11]     **Q:** Are any employees of the corporation other than
[12] yourself licensed as brokers in any state?
[13]     **A:** All of my employees that represent insurance or
[14] speak about insurance are licensed in the State
[15] of Kansas.
[16]     **Q:** I take it that would include Angie Banz who is
[17] here?
[18]     **A:** Yes, it does.
[19]     **Q:** And when did she start with you?
[20]     **A:** 1995.
[21]     **Q:** And when did she get her license, if you know?
[22]     **A:** I don't know.
[23]     **Q:** Now there's been some confusion in this case
[24] down to this point as to whether you or the
[25] corporation are an agent or have an agency

Page 29

[1] MR. BANOVETZ: I'm just going to pose
[2] an objection to the line of questioning on
[3] the basis that this witness cannot
[4] possibly know all of the factual scenarios
[5] that can occur in the context of a loss
[6] and, therefore, I don't think it's a fair
[7] question and I don't think any answer
[8] thereto is going to be a useful and
[9] relevant answer. That is my objection.
[10] MR. MUELLER: Counsel, if you would
[11] limit your objection to the purely legal
[12] objections whatever it may be, whether it
[13] is relevance, materiality or what not.
[14] MR. BANOVETZ: I'll make my
[15] objections as I see fit, Counsel. Thank
[16] you.
[17] BY MR. MUELLER:
[18] Q: Am I to understand your testimony then that you
[19] have sold policies to clients without knowing
[20] what the meaning of the policy that you sold
[21] was?
[22] A: No.
[23] Q: Have you ever sold a policy to a client whether
[24] it is Scott and Sarah Petersen or Harry Smith
[25] from Buffalo that you did not understand what

Page 30

[1] the meaning of the terms in that policy were?
[2] A: No.
[3] Q: That no is, yes, you have sold some policies?
[4] A: That no is that the form of your question is
[5] have I ever sold policies that I don't
[6] understand the meaning and the answer is no.
[7] Do I understand all and hold myself out to
[8] understand all the legal ramifications of every
[9] aspect of the policy? I can't do that. I
[10] don't know.
[11] Q: As I understand it, the number of carriers in
[12] the field of aviation insurance is relatively
[13] small.
[14] A: Yes.
[15] Q: Going back to in 1987 when you started, would
[16] you tell us whether the number of carriers in
[17] that specialty field have increased or
[18] decreased down to the present time?
[19] A: They have decreased.
[20] Q: At the present time, how many carriers are
[21] there in the field?
[22] A: I represent eight carriers.
[23] Q: And which carriers are those?
[24] A: AIG, USAIG, Global, Phoenix Aviation, London
[25] Aviation, William Brown, USSIC.

Page 31

[1] Q: There's two S's in that?
[2] A: Yes, sir, and Aerospace. Those are the
[3] aviation MGA writers.
[4] Q: And I've had some question in this case that
[5] you didn't name the plaintiff in this case
[6] National Union Fire Insurance Company of
[7] Pittsburgh.
[8] A: National Union is the insurance company. We
[9] deal and have our conversations with the MGA
[10] which in this case is AIG.
[11] Q: You're using an acronym there, MGA. What is
[12] that?
[13] A: Managing general agent.
[14] Q: So the managing general agent for National
[15] Union, as you put it, is AIG?
[16] A: Yes, sir.
[17] Q: Now I've gone through this file and I've been
[18] very confused because it seems that in the case
[19] of Scott and Sarah you were always dealing with
[20] them — by you I'm referring to the agency,
[21] always dealing with a Mary Beth Schwaegel. Is
[22] that accurate?
[23] A: Yes. There are other agents within the
[24] corporation, but we favor — like all of us, we
[25] all favor certain agents.

Page 32

[1] Q: And she is an employee, as I understand it, of
[2] AIG Aviation Texas, Inc. Is that right?
[3] MS. BARON: I'm going to object on
[4] foundation. I don't know if he knows who
[5] she's an employee of.
[6] MR. MUELLER: I'm asking him on the
[7] supposition that he knows.
[8] A: I can't answer that with a yes or no but she's
[9] an employee of AIG. What division, branch,
[10] where the corporation headquarters, I don't
[11] know exactly where her paycheck comes from.
[12] BY MR. MUELLER:
[13] Q: As far as binding coverage on any of the
[14] policies that were actually sold to Scott and
[15] Sarah Petersen, that was done, as I understand
[16] it, by Mary Beth Schwaegel on behalf of AIG.
[17] A: Yes.
[18] Q: That's true with respect to the National Union
[19] Fire Insurance Company policy that we're
[20] talking about in this case as well as the
[21] predecessor USAIG policy; is that right?
[22] A: I don't know how she procures coverage through
[23] National Union.
[24] Q: But as far as telling you, yeah, there's
[25] coverage under this policy binding the policy,

1:03-cv-01308-JTM-DWB v. Page 5 of 24
National Union Fire Company
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 33

[1] she was the person who did that for both of
[2] these policies as far as you know.
[3]    A: Just AIG, not USAIG. USAIG is a separate
[4] company.
[5]    Q: Did you deal with Mary Beth Schwaegel on the
[6] USAIG policy?
[7]    A: No.
[8]    Q: Who did you deal with the USAIG office?
[9]    A: The local office here in Wichita, Frank Ryberg
[10] (sp).
[11]    Q: Have you been through — and I will show you
[12] Exhibit E which is a complete copy of the
[13] written discovery responses that you provided
[14] pursuant to our request.
[15]    A: If these have not changed from what I sent to
[16] my attorney then they are correct. Do you want
[17] me to go over it by page and review them?
[18]    MR. MUELLER: Counsel, just so the
[19] record will show, I've diligently tried to
[20] have all of the pages copied in the same
[21] order that I received them.
[22]    MS. BARON: That's fine.
[23]    MR. MUELLER: If one of them fell out
[24] of the copy machine, I don't know about
[25] it.

Page 34

[1]    A: Okay.
[2]       BY MR. MUELLER:
[3]    Q: As far as the Air Tractor AT503 which we're
[4] involved with in this case and getting coverage
[5] for that plane for Scott and Sarah, you dealt
[6] with Mary Beth Schwaegel and AIG; is that
[7] correct?
[8]    A: Yes.
[9]    Q: Now I'd like — because I don't understand
[10] exactly how you relate to clients like Scott
[11] and Sarah Petersen, I'd like you to assume that
[12] I am getting into the agricultural aviation
[13] business and I've got some planes and I say,
[14] gee, I need some insurance and I see your ads
[15] and I say, well, I'll go to Randy Hardy, it
[16] seems he knows what it's all about.
[17]    A: Okay.
[18]    Q: If I came to you, how would you interrelate to
[19] me as far as providing property and liability
[20] insurance for my planes in operation?
[21]    MS. BARON: I'm just going to object
[22] to the hypothetical nature of the
[23] question, but with that, you can go ahead.
[24]       BY MR. MUELLER:
[25]    Q: I'm coming in as green as the grass.

Page 35

[1]    THE WITNESS: Answer that?
[2]    MS. BARON: Yes.
[3]    A: It's a loaded question.
[4]       BY MR. MUELLER:
[5]    Q: Well, I hoped that it would have at least some
[6] buckshot with it.
[7]    A: Don't make me laugh.
[8]    Q: What I'm getting at is what is the role and
[9] responsibility of a broker to the insured who
[10] is coming in and wants coverage for his
[11] aviation business.
[12]    A: Well, back to the buckshot answer, my role as
[13] the agent is to determine where they're at and
[14] then work with the insurance company on
[15] procuring a quote if I can. Assuming your
[16] question includes that you have some experience
[17] or no experience, you have to have the right
[18] airplanes. You have to have the right licenses
[19] as a pilot to do this. You have to be licensed
[20] with the state to be an ag pilot, which is a
[21] part 137 certificate, or work for somebody who
[22] has that. All these things preclude you ever
[23] getting a quote.
[24]    Q: So when you say the first responsibility you
[25] would have would be to determine where they're

Page 36

[1] at, that's what you're referring to.
[2]    A: Correct.
[3]    Q: You want to know what kind of planes we have.
[4]    A: Right.
[5]    Q: What kind of training we have for the pilots or
[6] the qualifications of the pilots.
[7]    A: Right, and to determine as best as I know the
[8] business what else they need before they could
[9] even get an insurance quote.
[10]    Q: And you would also want to know, wouldn't you,
[11] what use we were going to make of the planes.
[12]    A: Sure. Getting into the ag business as you
[13] formed the question is very difficult and it
[14] may require a number of things. Assuming that
[15] everything else is the same, the airplanes are
[16] correct, the type of operation, so forth, is
[17] correct, it requires training, it requires
[18] schooling if they have it available, it
[19] requires on-the-job training by current people
[20] that are doing the same business. It varies in
[21] every business and every operation that calls
[22] me about this question is different. My job is
[23] to determine where they're at and to see if a
[24] quote is even available for that type of a
[25] deal.

Page 53

[1] fixed-wing turbine aircraft?

[2] **A:** Yes.

[3] **Q:** I assume fixed-wing jets, too?

[4] **A:** No.

[5] **Q:** Not for aerial application?

[6] **A:** No.

[7] **Q:** As far as piston-driven planes, in this case

[8] I've heard about Air Cats. Are Air Cats —

[9] **A:** Ag Cats.

[10] **Q:** Ag Cat's a piston-driven plane?

[11] **A:** It can be both.

[12] **Q:** And what is the difference between the

[13] application — aerial application by a

[14] piston-driven and aerial application by a

[15] turbine-driven?

[16] **A:** Are you looking for an expert definition of

[17] that?

[18] **Q:** I would like one.

[19] **A:** Well, I can't give you that.

[20] **Q:** I didn't think I'd get one. What's your

[21] understanding?

[22] **A:** Well, a turbine aircraft typically is a larger

[23] aircraft that can haul more of a load and

[24] typically faster speeds versus a piston. There

[25] are numerous variations as to why you'd buy a

Page 54

[1] piston over a turbine or turbine over a piston,

[2] but a typical turbine aircraft by accident

[3] ratios and studies is a more — has less of a

[4] chance of losing an engine, better loss ratio,

[5] so to speak. I can't testify to that but it's

[6] more a reliable airplane versus a piston. So

[7] companies will purchase turbine aircraft or

[8] will take a piston aircraft and put a turbine

[9] conversion on that same piston airplane making

[10] it a turbine airplane for the load, the speed

[11] and the reliability.

[12] **Q:** So if I understand this correctly, a pilot —

[13] there is something you need to know about

[14] flying a turbine-driven plane versus flying a

[15] piston-driven plane?

[16] **A:** Yes.

[17] **Q:** So someone involved in aerial application would

[18] learn the aerial application most generally by

[19] flying a piston-driven plane and then would

[20] take over — then would move to a turbine?

[21] **A:** They don't all, but, yes, that would be —

[22] **Q:** That's the general —

[23] **A:** That would be the general rule.

[24] **Q:** So for someone who knew how to make aerial

[25] application in a piston-driven plane, if he

Page 55

[1] wanted to do a turbine application, he would

[2] have to be trained in the operation of the

[3] turbine aircraft.

[4] **A:** He will have to be transitioned into a turbine

[5] aircraft.

[6] **Q:** Transitioning means gradually shifted over to a

[7] different type of engine plane?

[8] **A:** Yes.

[9] **Q:** So for someone receiving turbine transition

[10] training for aerial application, he would know

[11] how to apply with a piston-driven plane and the

[12] transition then would be to a turbine-powered

[13] aircraft as you understand it.

[14] **A:** Typically, yes.

[15] **Q:** Do you know a fellow by the name of Harold

[16] Miller?

[17] **A:** Yes.

[18] **Q:** And he spells his name differently than I do

[19] and that's M-i-l-l-e-r.

[20] **A:** Yes.

[21] **Q:** And he's out of where?

[22] **A:** I don't remember the town. He's from Illinois.

[23] **Q:** And was he one of your insureds?

[24] **A:** Yes.

[25] **Q:** And during what period was he one of your

Page 56

[1] insureds?

[2] **A:** I don't remember.

[3] **Q:** Well, I asked you to bring with you the

[4] documents that we had requested in our request

[5] for production of documents and those included

[6] the Harold Miller file. Do you have that with

[7] you?

[8] **MS. BARON:** No, and as we indicated

[9] in our written response to the production

[10] request, we objected to that based on the

[11] fact that that information is

[12] confidential. We don't have any

[13] authorization from Mr. Miller to be

[14] turning over his financial information on

[15] insurance policies, so we objected to the

[16] production of that, so he does not have it

[17] with him today.

[18] **MR. MUELLER:** Counsel, can we obtain

[19] a copy of that file redacted as to the

[20] numbers because I'm not interested in

[21] Harold Miller's financial wherewithal, but

[22] I am interested in knowing what coverages

[23] were afforded to him.

[24] **MS. BARON:** I don't know that that

[25] information is something that can be

National Union Fire Company #67.40 v.
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

1:03-Natio.mld-JRA-ECC #67.40 v.    Page 7 of 24

Page 57

[1] disclosed regarding other clients of an
[2] insurance broker who are not involved in
[3] this litigation at all. I would have to
[4] say I would still object to that.
[5]     MR. MUELLER: Let us say that we have
[6] had a conference on the matter and we can
[7] bring it to the attention of the Court
[8] because I'm not aware of any confidences
[9] or privileges that might exist as they
[10] would relate to business transactions with
[11] third parties that might otherwise be
[12] relevant.
[13]     BY MR. MUELLER:
[14]     Q: But moving on with the matter, do you recall
[15] what types of coverages were afforded to Harold
[16] Miller let us say in the year 2001?
[17]     MS. BARON: I think I'm going to have
[18] to make the same objection to the extent
[19] it's asking for another insured's coverage
[20] information.
[21]     MR. MUELLER: You've stated the
[22] objection. I don't know that you would be
[23] well advised to instruct the witness not
[24] to answer it because I'm not going into
[25] the details, but I want to know what types

Page 58

[1] of coverage because it is very important
[2] to the interests of my client in this
[3] case.
[4]     MS. BARON: Well, I don't understand
[5] why that's the case that someone else's
[6] insurance coverage is important to your
[7] client in this case. And you're asking
[8] what type of coverages did he have. Could
[9] you be a little more specific as to what
[10] you mean by that?
[11]     MR. MUELLER: I'm not interested in
[12] his life insurance or in his family auto
[13] policies. I'm talking about his aviation
[14] insurance coverage, property and casualty
[15] lines that were written through this
[16] agency.
[17]     MS. BARON: Well, we'll take a break.
[18]     (Thereupon, a recess was taken;
[19] whereupon, the following was
[20] had:)
[21]     BY MR. MUELLER:
[22]     Q: Do you recall in the year 2000 what property
[23] and casualty coverage Harold Miller had?
[24]     A: To the form of the question, no.
[25]     Q: Are you aware of any of the property and

Page 59

[1] casualty coverages Harold Miller had in the
[2] year 2000, 2001?
[3]     A: I do not remember the year of his coverages.
[4]     Q: Do you recall that Harold Miller before Scott
[5] and Sarah Petersen purchased it owned the Ag
[6] Tractor 503 which we're talking about in this
[7] case?
[8]     A: Yes.
[9]     Q: And are you aware of the coverages which Harold
[10] Miller had for that Ag Tractor?
[11]     A: Correction, it's Air Tractor.
[12]     Q: I'm sorry, Air Tractor.
[13]     A: And to answer the question, yes.
[14]     Q: And are you familiar with the uses that Harold
[15] Miller was making of that Air Tractor?
[16]     A: Yes.
[17]     Q: And that Air Tractor had a dual cockpit?
[18]     A: Yes.
[19]     Q: A dual cockpit plane — or that dual cockpit
[20] plane in the Air Tractor, could you describe
[21] that for us?
[22]     A: Well, dual meaning two, two seats.
[23]     Q: Side by side?
[24]     A: Tandem.
[25]     Q: That's one in front of the other?

Page 60

[1]     A: Yes.
[2]     Q: And it had the controls for each?
[3]     A: Yes.
[4]     Q: And that was something that you knew before the
[5] plane was sold to Scott and Sarah?
[6]     A: Yes.
[7]     Q: And you also knew that the plane was used among
[8] other things by Harold Miller for transition
[9] turbine training in support of the aerial
[10] application of seasonal chemicals?
[11]     A: In the complete form of the question, the first
[12] part of the question I can say yes.
[13]     Q: Did you know that the plane was used by Harold
[14] Miller for transition turbine training in
[15] support of the aerial application of seeds and
[16] chemicals?
[17]     A: Again, the first part of the question, used for
[18] transition training, yes.
[19]     Q: And that it was used for transition turbine
[20] training in support of the aerial application
[21] of seeds and chemicals?
[22]     A: I object to the support portion because that
[23] can be defined differently.
[24]     Q: Well, let me ask you this. Have you ever
[25] defined the use of the plane by Harold Miller

Page 61

[1] in the context of transition turbine training
[2] in support of the aerial application of seeds
[3] and chemicals?

[4]    MS. BARON: I'm going to object to
[5] the form of the question. What do you
[6] mean has he defined it? Defined it where?

[7]    MR. MUELLER: I'm asking him if he
[8] ever has, and then I will show him if he
[9] has any doubts in that regard.

[10]    MS. BARON: Same objection. You can
[11] answer if you understand the question.

[12]    A: I don't understand the question. I'm sorry.

[13]    BY MR. MUELLER:
[14]    Q: Have you ever agreed that Harold Miller was
[15] using the Air Tractor in question for
[16] transition turbine training in support of the
[17] aerial application of seeds and chemicals?

[18]    MS. BARON: Object to the form of the
[19] question. Agreed with who? Agreed with
[20] what. I think it's vague. If you
[21] understand it, you can answer.

[22]    A: Again, I'm sorry, but I do understand that
[23] Harold Miller used the airplane in his business
[24] training other pilots by virtue of
[25] transitioning training into the Air Tractor

Page 62

[1] 503. The rest of the question is too broad and
[2] I won't respond to that.

[3]    BY MR. MUELLER:
[4]    Q: Well, let's back it up just a little bit before
[5] we hit the nail on the head more squarely.
[6] Would you agree that Harold Miller was
[7] providing transition turbine training so that
[8] pilots receiving the training could apply seeds
[9] and chemicals agriculturally?

[10]    A: Yes. In that regard, yes.

[11]    Q: And would you agree that in receiving that
[12] training, that was then in support of the
[13] aerial application of seeds and chemicals by
[14] the pilots that were receiving it?

[15]    A: His method and his training facility in that
[16] context was supporting the aerial application
[17] business.

[18]    Q: So then would you agree that the plane, the Air
[19] Tractor was used by Harold Miller for
[20] transition turbine training in support of the
[21] aerial application of seeds and chemicals?

[22]    A: In the definition of Harold Miller's business
[23] and what he was using the airplane for, that
[24] terminology would be correct.

[25]    Q: And that would be consistent with —

Page 63

[1]    MR. MUELLER: And, Counsel, if you
[2] would get Exhibits B and C and
[3] specifically paragraph nine in each.

[4]    BY MR. MUELLER:
[5]    Q: You recall earlier, do you not, Randy, when you
[6] looked at Exhibits B and C and I asked whether
[7] they were true and correct?

[8]    A: Yes.

[9]    Q: And let me ask you as to Exhibits B and C
[10] whether the following appears paragraph nine on
[11] each. During the times that the Air Tractor
[12] was insured under policies which were procured
[13] by Hardy, the third party defendant, that's
[14] Hardy, knew that the plane contained two seats
[15] and was used intraaerially, which means among
[16] others, by Miller for transition turbine
[17] training in support of the aerial application
[18] of seeds and chemicals. And your answer was
[19] Hardy admits the admissions of paragraph nine.

[20]    A: Yes.

[21]    Q: When did you first learn that Scott and Sarah
[22] were purchasing any of Harold Miller's assets?

[23]    MS. BARON: Should he refer to his
[24] file if that helps?

[25]    MR. MUELLER: Sure.

Page 64

[1]    BY MR. MUELLER:
[2]    Q: As a matter of fact, I'll tell you what. You
[3] can refer to Exhibit E — I would prefer if you
[4] would refer to Exhibit E which is what you have
[5] provided us in discovery because I have stamped
[6] page numbers on it and we can refer to the page
[7] numbers which each of us have. Do you have
[8] something else with you that you would refer
[9] to?

[10]    A: Just notes that I made.

[11]    (Marked for identification
[12] Deposition Exhibit F.)

[13]    BY MR. MUELLER:
[14]    Q: Going back on the record, do you recall the
[15] question?

[16]    A: No.

[17]    Q: It was when did you first learn that Scott and
[18] Sarah were thinking about purchasing some of
[19] the assets of Harold Miller's business?

[20]    A: Just as a point of clarification, my assistant,
[21] Angie Banz, who is also a licensed agent
[22] handled and has handled 90 percent of the
[23] transactions between Scott and Sarah, so what
[24] I'm giving you information to is what I'm
[25] reading in the policy. She received all the

Page 65

[1] phone calls and first learned, so my saying
[2] that I first learned is not an accurate
[3] statement.
[4] **Q:** Just so that we get this clarified, did you
[5] yourself play any role in getting coverage for
[6] Scott and Sarah —
[7] **A:** Yes.
[8] **Q:** — regarding the Air Tractor which is the
[9] subject of this lawsuit at the time that they
[10] purchased it from Harold Miller?
[11] **A:** I believe so.
[12] **Q:** Therefore, you would have had some personal
[13] knowledge yourself as opposed to what may
[14] appear from Angie Banz's records that they were
[15] doing that; correct?
[16] **A:** Limited knowledge, yes.
[17] **Q:** And when did you yourself first become involved
[18] in that transaction?
[19] **A:** I don't recall.
[20] **Q:** Do you recall when the policy providing
[21] coverage for the Air Tractor was bound?
[22] **A:** Looking over the notes in the policy I can tell
[23] you, yes.
[24] **Q:** When was that?
[25] **A:** When it was bound?

Page 66

[1] **Q:** Yes.
[2] **A:** On 3-1 per my notes.
[3] **Q:** I would ask —
[4] **A:** The 503 was purchased and we requested to the
[5] MGA, AIG, that coverage be added on that
[6] aircraft and they responded.
[7] **Q:** I would direct your attention to Page 51 of
[8] Exhibit E. Does that confirm your
[9] understanding in the matter?
[10] **A:** Yes.
[11] **Q:** So it is your testimony that coverage was added
[12] for the Air Tractor effective March 1, 2002,
[13] which was the same day they obtained the plane.
[14] **A:** I can testify that coverage was added to the
[15] policy for that airplane. What date they
[16] physically took the airplane, I don't know.
[17] **Q:** But in any event, there was coverage for that
[18] airplane as of March 1, 2002.
[19] **A:** The way I understand it, yes.
[20] **Q:** And what was your involvement, as you recall
[21] it, in obtaining that coverage?
[22] **A:** I'm sorry. Say it again.
[23] **Q:** Let me go back and ask it this way. The
[24] coverage was bound by AIG?
[25] **A:** All coverages are bound by the insurance

Page 67

[1] company, not us.
[2] **Q:** That would be Mary Beth Schwaegel?
[3] **A:** Yes, or her representative.
[4] **Q:** Did you have any discussions yourself with Mary
[5] Beth Schwaegel or her representative regarding
[6] coverage for that plane as of the effective
[7] date March 1, 2002?
[8] **A:** You'll have to let me look at the paperwork
[9] here for a second. The answer to your question
[10] would be I assisted — I can't recall how much
[11] assistance I gave to Angie to procure the
[12] original addition of this airplane to the
[13] policy, period.
[14] **Q:** Take a look at Exhibit D as in dog. What I
[15] want to do is to fix the time frame. We know
[16] that the coverage was bound effective March 1,
[17] 2002. Would you agree that the first efforts
[18] at obtaining coverage were in February,
[19] specifically February 8th of 2002?
[20] **A:** Per the notes in the file, yes.
[21] → **Q:** So if we're encapsulating the period when you
[22] would have been involved on the initial
[23] coverage for that plane, it would be between
[24] February 8th, 2002, and March 1, 2002;
[25] correct?

Page 68

[1] **A:** If I had any involvement, correct.
[2] **Q:** And is it your testimony that you can recall no
[3] specific contacts between you, Randy Hardy, and
[4] Mary Beth Schwaegel or anyone working with her
[5] regarding that coverage?
[6] **A:** I don't recall. State the question again, I'm
[7] sorry.
[8] **Q:** Your answer was that you don't recall and my
[9] question was is it true that you don't recall
[10] so I guess the answer is yes, so let me ask it
[11] coming at it from the other side. Is it true
[12] that you don't recall any contacts with either
[13] Scott or Sarah Petersen regarding coverage for
[14] that plane between February 8th, 2002, and
[15] March 1, 2002?
[16] **A:** Correct. Yes.
[17] **Q:** So there may have been contacts but you don't
[18] recall what they were.
[19] **A:** Correct.
[20] **Q:** And that's true both ways, either with Mary
[21] Beth Schwaegel or with Scott and Sarah
[22] Petersen.
[23] **A:** Correct.
[24] **Q:** I have been curious as to the policy periods
[25] that are involved. When this plane was added

Page 69

[1] to the policy effective March 1, 2002, what
[2] policy was that?
[3]    A: It would have been the —
[4]    Q: What I would like for you to do when I say what
[5] policy was that, give me the carrier, the
[6] policy number and the policy period.
[7]    MS. BARON: And if you need to refer
[8] to your own file to do that, please do so.
[9]    MR. MUELLER: He's got his file.
[10]    A: On the Policy AV 3391999-03.
[11]    BY MR. MUELLER:
[12]    Q: That was the policy?
[13]    A: The endorsement number ten effective March 1,
[14] 2002, the Air Tractor 503 was added to the
[15] policy.
[16]    Q: You're referring to what page number on
[17] Exhibit E?
[18]    A: Page number 41.
[19]    Q: And the policy period?
[20]    A: The policy period of that policy is April 10,
[21] 2001, to April 10, 2002.
[22]    Q: So it would have been — that policy would have
[23] been up for renewal then as of April 10, 2002,
[24] for a policy period April 10, 2002, to
[25] April 10, 2003?

Page 70

[1]    A: It would have been, yes.
[2]    Q: And was the policy renewed?
[3]    A: I had limited involvement in this, but as per
[4] my notes —
[5]    Q: Let the record show he's referring to Exhibit F
[6] which are his typed notes.
[7]    A: The policy was moved to USAIG for the same
[8] period of time. The policy was moved to USAIG
[9] April 10, 2002 — coverage was moved, not the
[10] policy. The coverage was moved to USAIG, a
[11] different carrier.
[12]    Q: And did USAIG — does USAIG have anything to do
[13] with the plaintiff in this case, National Union
[14] Fire Insurance Company of Pittsburgh?
[15]    A: No.
[16]    Q: Were you dealing with Mary Beth Schwaegel at
[17] that time?
[18]    A: No.
[19]    Q: Do you have a copy in your file which you
[20] provided us, being Exhibit E, of the USAIG
[21] policy?
[22]    A: No.
[23]    Q: Well, at some point in time, would you agree
[24] then that the coverage went back to AIG?
[25]    A: Yes.

Page 71

[1]    Q: And when would that have been? I take it that
[2] would have been April 10th of 2003 thereafter?
[3]    A: No. We replaced the coverage from USAIG back
[4] to AIG May 19th, 2002.
[5]    (Discussion held off the record.)
[6]    BY MR. MUELLER:
[7]    Q: Why was the coverage switched in the first
[8] instance from an AIG policy to a USAIG policy
[9] and when did that take place?
[10]    A: Are we back on the record?
[11]    A: We're back on the record?
[12]    A: The renewal of the policy for 4-10 of — the
[13] renewal policy for 4-10-2002 we had procured a
[14] better quote through USAIG which is a separate
[15] carrier saving our client money.
[16]    Q: So you got a policy for what period from USAIG?
[17]    A: We bound the policy with USAIG from 4-10 to
[18] 5-19 of '02, putting the coverage back with AIG
[19] because our client was requiring the ability to
[20] do gypsy moth contracts which requires
[21] coverages that USAIG was unable to provide, so
[22] we had to cancel the USAIG policy and put it
[23] back with AIG as of 4-19-02.
[24]    Q: Exhibit A that you have before you then is the
[25] AIG policy that you're referring to that ran

Page 72

[1] for the policy period May 19, 2002, to May 19,
[2] 2003, that took the place of the USAIG policy.
[3]    A: Yes.
[4]    MS. BARON: Just for clarification,
[5] it is a National Union policy. It's not
[6] an AIG policy.
[7]    MR. MUELLER: Well, I think we've
[8] gotten the clarification here that he
[9] deals with AIG on it, and I don't want to
[10] go there and spend all the time mucking
[11] that swamp out.
[12]    MS. BARON: We're glad.
[13]    MR. MUELLER: Which not in the
[14] deposition, but if at some point in time
[15] it becomes an issue, then we're going to
[16] put on our alligator boots and go down
[17] there and pump the swamp out.
[18]    MS. BARON: That's fine.
[19]    BY MR. MUELLER:
[20]    Q: Is the policy which is Exhibit A the same
[21] policy that the Petersens and Pontiac Flying
[22] had with AIG for the policy period that ended
[23] April the 10th?
[24]    MS. BARON: Of what year? Object to
[25] the form of the question.

1:03-cv-02358-JTM-DJW   v.   Page 11 of 24
National Union Fire Company
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 73

**BY MR. MUELLER:**

[2] **Q:** Of 2002. In other words, are we looking at the
[3] same policy, that this is simply a renewal of
[4] the old policy?

[5] **A:** Yes.

[6] **Q:** So are the coverages and endorsements and
[7] policy provisions the same with the exception
[8] of the premiums on the declarations page and
[9] the policy period?

[10] **A:** No.

[11] **Q:** What changes are there between the two
[12] policies?

[13] **A:** The beginning of the policy April 10, 2001/2002
[14] did not have the Air Tractor 503. It was later
[15] endorsed onto that policy.

[16] **Q:** So we had a separate endorsement for the Air
[17] Tractor which is now included on the
[18] declarations page of the May 19th policy —

[19] **A:** Yes.

[20] **Q:** — correct? Any other changes?

[21] **MS. BARON:** Do you want him to put
[22] the policies side by side and go through
[23] them word for word?

[24] **BY MR. MUELLER:**

[25] **Q:** Not word for word, but I want to know of any

Page 74

[1] significant changes.

[2] **MS. BARON:** If you know.

[3] **A:** Significant changes, I don't believe so. There
[4] could have been some endorsements differently
[5] due to activity required. I don't know.

[6] **BY MR. MUELLER:**

[7] **Q:** Well, do you have both policies here because I
[8] don't want to be surprised later when I don't
[9] have the chance to ask the question. You can
[10] make a brief comparison between the two for us.

[11] **A:** I don't have the full April 10th policy but
[12] I'll do the best I can.

[13] **Q:** Let me limit my question also to try to
[14] short-circuit this, any changes that related to
[15] the Air Tractor other than what you've
[16] described?

[17] **A:** The Air Tractor upon being endorsed to the
[18] policy April 10 was added for the purposes of
[19] aerial application application. That
[20] endorsement or the conditions of the
[21] endorsement was that Scott Petersen would fly
[22] the aircraft — let me strike that if I could
[23] and back up. I don't have anything to define
[24] that.

[25] **Q:** I want the policy forms, the endorsements, the

Page 75

[1] language in the policy itself, the document.

[2] **A:** The Air Tractor 503 was added to the policy
[3] wherein the May 19th policy, 2002, ending up
[4] with a dash 04 on the policy number, the Air
[5] Tractor was a part of the policy at the
[6] beginning of the policy.

[7] **Q:** On the declarations page.

[8] **A:** Correct. That's the difference.

[9] **Q:** So it would be your testimony that whatever
[10] coverage there was within the four corners of
[11] that policy as of April 10, 2002, carried
[12] forward into the policy which is Exhibit A
[13] starting May 19th, 2002.

[14] **A:** No.

[15] **Q:** Where then is the contract different or are the
[16] forms different?

[17] **A:** April 10, 2002, policy was a USAIG policy.

[18] **Q:** I'm saying the last AIG policy that ended as of
[19] April 10th, between those two what would your
[20] answer be?

[21] **A:** To my knowledge, those are similar in policy.

[22] **Q:** As you sit here today, can you think of any
[23] differences between them other than those
[24] you've already described?

[25] **A:** I don't recall any differences, no.

Page 76

[1] **Q:** Is your testimony now the gypsy moth coverage
[2] was added to Exhibit A which had not existed in
[3] the policy which ended on April 9th of 2002;
[4] is that correct?

[5] **A:** I don't recall if it was in the earlier policy,
[6] but it would be a definite addition to if not
[7] already there in the May 19th, 2002, policy.

[8] **Q:** Does that now encompass all of the changes that
[9] you're aware of?

[10] **A:** That I'm aware of at this time.

[11] **Q:** And that's your aware of at this time based
[12] upon having reviewed the file that you have
[13] with you today.

[14] **A:** Yes.

[15] **Q:** When did you first become aware that Scott and
[16] Sarah Petersen were using the Air Tractor for
[17] transition turbine training?

[18] **A:** I never had direct conversations with Scott or
[19] Sarah regarding transition training that they
[20] are providing with the Air Tractor 503.
[21] However, the day of the loss I was reading a
[22] trade publication magazine and in that
[23] publication was a comment to the editor looking
[24] for transitioning training. He had indicated
[25] that he had heard that Pontiac Flying Service

Page 77

[1] was going to provide that. That same day I
[2] took that trade publication back to my
[3] assistant, Angie, who had just hung up on the
[4] phone with our client Scott or Sarah Petersen
[5] indicating that she had had the loss that
[6] morning.
[7]    Q: So making a long story short since I asked for
[8] the date, it was May 5th of 2003; correct?
[9]    A: The loss occurred 5-5-2003, yes, and that was
[10] when I was aware of the possibility that they
[11] were using this airplane for that training.
[12]    Q: So prior to that time you were not aware of
[13] that.
[14]    A: No.
[15]    Q: When do you become involved in the renewal of
[16] policies?
[17]    A: Depends on the —
[18]    Q: By you I'm referring to the agency.
[19]    A: The agency we generally try and get involved —
[20] with every agency things will vary depending on
[21] weekends, days and things of that nature, but
[22] generally 120 days out we start the renewal
[23] process.
[24]    Q: And as I understand your role or relationship
[25] to your clients, you want to find out in their

Page 78

[1] operations in setting up for a renewal what it
[2] is that they're doing and what they need
[3] coverage for, in other words, monitoring their
[4] businesses.
[5]    A: Yes, and upon renewal seeking information that
[6] might have changed.
[7]    Q: So when you're going to them for renewal, you
[8] want to get an update on their business so you
[9] can counsel with them and advise them as to
[10] what coverages they should have.
[11]    A: We get an update based on what they tell us
[12] alone.
[13]    Q: If you knew as of the time that you were
[14] setting up for renewal — and you said how many
[15] days, 120?
[16]    A: Generally.
[17]    Q: So if this is May 19th would be the date
[18] you've got to replace that policy, we go back
[19] April, March, February, January. So the
[20] renewal process would start in approximately
[21] January for that policy?
[22]    A: In our notes, January 30th of '03 the renewal
[23] update was sent to the insured which we clearly
[24] marked the airplanes were for ag uses only.
[25]    Q: And if you had known that they were using the

Page 79

[1] plane for turbine transition training, is that
[2] something that you would have brought to their
[3] attention regarding coverage for that use?
[4]    A: Yes.
[5]    Q: And would that be a part of the monitoring
[6] responsibility that you have?
[7]    A: Yes.
[8]    Q: So it is your testimony that you didn't know
[9] that they were using it for transition training
[10] and that, therefore, didn't bring it to their
[11] attention prior to May 5th of 2003?
[12]    A: Yes.
[13]    Q: What publication was it that you were reading?
[14]    A: It's called the Ag Air Update.
[15]    Q: What is that publication?
[16]    A: It's a newspaper that's published by a
[17] gentleman out of Georgia that just does a
[18] general publication for ag pilots and ag
[19] operations. He publishes it monthly.
[20]    Q: And is that something that you subscribe to?
[21]    A: I get it because I'm an advertiser.
[22]    Q: So you put ads in that?
[23]    A: Yes.
[24]    Q: And were you putting ads in that magazine back
[25] in 2002?

Page 80

[1]    A: Yes.
[2]    Q: How frequently would you have an ad in the
[3] magazine?
[4]    A: Every month.
[5]    Q: Would you then read the magazine on a monthly
[6] basis and see your ad?
[7]    A: Not in total, but I read bits and pieces of it,
[8] yes.
[9]    Q: I take it you would certainly look for your ad
[10] to make sure they put it in there, wouldn't
[11] you?
[12]    A: Yes. Can I extend that comment?
[13]    Q: Not at the moment. If you want to, your
[14] counsel can bring it out. Now I have a couple
[15] of issues here. For instance, is this one of
[16] the Ag Air Updates? Is that the magazine or
[17] paper that you're referring to?
[18]    A: Yes.
[19]    Q: And which volume and issue is that?
[20]    A: This is the November 27th issue, 2002.
[21]    Q: And does that have something on it, a
[22] post-it —
[23]    A: Yes, it does.
[24]    Q: — on the cover? And what does that post-it
[25] say?

1:03-cv-01238-JTM-DJW Document #: 67-10 v.
National Union Fire Company v.
Pontiac Flying Services, Inc.
Page 13 of 24

JAMES RANDALL HARDY
July 15, 2004

Page 81

[1] **A:** PFS ad Page 7A.

[2] **Q:** Let's turn to 7A and what do we have?

[3] **A:** We have a turbine transition ad by Pontiac
[4] Flying Service.

[5] **Q:** This is the same magazine that you've referred
[6] to in which you advertise?

[7] **A:** Yes.

[8] **Q:** Is it your testimony then that you didn't read
[9] that issue?

[10] **A:** I didn't see that issue. I didn't see that ad.
[11] That is my testimony.

[12] **Q:** Now I will show you —

[13] **MR. BANOVETZ:** What's the date on
[14] that one?

[15] **A:** 27 November, 2002.

[16] **BY MR. MUELLER:**

[17] **Q:** Do you have an ad in there as well?

[18] **A:** I do.

[19] **Q:** And you're proud of that add?

[20] **A:** Do I have to answer that?

[21] **Q:** No. At what page is your ad?

[22] **A:** 16A.

[23] **Q:** And what page is the Petersen ad?

[24] **A:** 7A.

[25] **Q:** Now I'll show you another issue of Ag Air

Page 82

[1] update. What is the publication date on that
[2] one?

[3] **A:** April, 2003.

[4] **Q:** And is that the same magazine that you review?

[5] **A:** Yes.

[6] **Q:** Is that the same magazine that you have ads in?

[7] **A:** Yes.

[8] (Marked for identification
[9] Deposition Exhibit G.)

[10] **BY MR. MUELLER:**

[11] **Q:** Randy, I'll show you Exhibit G. I'm going to
[12] short-circuit this. Is that a copy of your ad
[13] from the magazine?

[14] **A:** Yes.

[15] **Q:** And that's the April, 2003, volume?

[16] **A:** Yes.

[17] (Marked for identification
[18] Deposition Exhibit G-1.)

[19] **BY MR. MUELLER:**

[20] **Q:** On Page 3A, and I'm referring you to
[21] Exhibit G-1, what do we have?

[22] **A:** We have a lot of advertisement and some script
[23] on the next page.

[24] **Q:** And is among the advertisements on Page 3A
[25] directly opposite your ad one for turbine

Page 83

[1] transition training for Pontiac Flying Service?

[2] **A:** Yes.

[3] **Q:** And is it your testimony then that you never
[4] read this Ag Air Update either?

[5] **A:** I have no idea.

[6] **Q:** Well, if you read the Ag Air Update April,
[7] 2003, would you agree that in opening the
[8] magazine up you would have on your right-hand
[9] side the turbine transition training ad of
[10] Pontiac Flying Service and directly opposite
[11] that your own ad for Hardy Insurance on the
[12] left-hand side?

[13] **A:** Is your question if I read it?

[14] **Q:** No. My question is if you opened it up
[15] assuming that you read it, you would have
[16] before you on the right-hand side the
[17] Petersens' ad and directly opposite that on the
[18] left-hand side your ad; correct?

[19] **MS. BARON:** Object to the for him of
[20] the question. Directly opposite? That's
[21] vague.

[22] **BY MR. MUELLER:**

[23] **Q:** Tell you what I'm going to do. I'm going to
[24] take a straight edge here and run it across
[25] from the Hardy — from the Petersen ad on the

Page 84

[1] right-hand side to the Hardy ad on the
[2] left-hand side. Would you agree that they're
[3] directly opposite each other?

[4] **MS. BARON:** On different pages.

[5] **BY MR. MUELLER:**

[6] **Q:** On different pages.

[7] **A:** Would I agree to that, yes. Eleven inches to
[8] be exact.

[9] **Q:** Is it still your testimony as you sit here
[10] today that while you were getting this policy
[11] ready for renewal you did not know that the
[12] Petersens were using this plane for turbine
[13] transition training?

[14] **A:** That is true.

[15] **Q:** Did you ever become aware of the fact that
[16] Scott and Sarah Petersen believed that they had
[17] coverage for the turbine transition training
[18] before the accident?

[19] **A:** Restate the question, please.

[20] **MR. MUELLER:** Want to read it back?

[21] (At this time the reporter read
[22] the pending question.)

[23] **A:** No.

[24] **BY MR. MUELLER:**

[25] **Q:** Did you ever become aware after the accident

JAMES RANDALL HARDY
July 15, 2004

National Union Fire Company    v.
Pontiac Flying Services, Inc.

Page 85

[1] that Scott and Sarah Petersen believed that
[2] they had turbine transition training throughout
[3] the time that they owned the Air Tractor?
[4] A: No.
[5] Q: How did you find out that the accident had
[6] occurred?
[7] A: They called our office.
[8] Q: By they, who are you referring to?
[9] A: I believe Sarah called Angie.
[10] Q: And reported the accident?
[11] A: Yes.
[12] Q: And did you then report the accident back to
[13] AIG?
[14] A: Yes.
[15] Q: And to whom did you report the accident?
[16] A: When you are saying did I report, you mean our
[17] office.
[18] Q: Your office.
[19] A: On 5-5 of '03 Angie by virtue of her
[20] handwriting took the call from Sarah that Rick
[21] and a turbine student crashed and totalled this
[22] afternoon just outside of Pontiac. Rick and
[23] his passenger were killed. The aircraft was
[24] probably totalled.
[25] Q: You're referring to what page, 119?

Page 86

[1] A: 119.
[2] Q: And my question dealt with notifying AIG.
[3] MR. BANOVETZ: Page 121?
[4] MR. MUELLER: That's a hint.
[5] Counsel, please don't tip the witness.
[6] A: No, that's not the original.
[7] BY MR. MUELLER:
[8] Q: I'm not looking for the original. Let's focus
[9] on page 121. I was assuming we would get
[10] there. Did you yourself communicate by e-mail
[11] with Mary Beth Schwaegel regarding the
[12] accident?
[13] A: Yes.
[14] Q: And was that on May 6, the day after?
[15] A: It is.
[16] Q: Does that communication appear on pages 121 and
[17] 122 and 123 of Exhibit E?
[18] MS. BARON: I just want to interject.
[19] Your question was when he first notified
[20] them of the loss and he has now found the
[21] document that responds to that question.
[22] A: Page 127. The initial loss report was sent to
[23] the company, the company being AIG, page 107
[24] and the report is dated loss report.
[25] BY MR. MUELLER:

Page 87

[1] Q: And when was it sent?
[2] A: Same date.
[3] Q: And was that sent by ordinary mail or was that
[4] faxed?
[5] A: We fax.
[6] Q: Now we'll get to pages 121 to 123. After that
[7] communication, did you receive a response, and
[8] I'm talking about you Randy, in particular from
[9] Mary Beth Schwaegel?
[10] A: 121, 122.
[11] Q: And 123.
[12] A: 123 I think is the same thing just all in one
[13] page.
[14] Q: It is.
[15] A: But 121 gives the dates.
[16] Q: Let's work with 121, 122, okay?
[17] A: After this communique that I sent to Mary Beth,
[18] I don't recall any conversation — if I had a
[19] conversation I don't recall what it was and I
[20] do not believe I had any response via e-mail
[21] responding back on this.
[22] Q: Well, looking at 121, is that an e-mail to
[23] Randy, being you, from Mary Beth Schwaegel at
[24] the top dated Tuesday, May 6, 2003?
[25] A: Yes, it is.

Page 88

[1] Q: And I take it from that her reaction or AIG's
[2] reaction was to cancel the policy.
[3] A: Yes, you're correct, I now see that. She did
[4] respond on the next day that they're going to
[5] non-renew the risk.
[6] Q: Then you responded back to her by e-mail.
[7] A: No.
[8] Q: From Randy to Mary Schwaegel at AIG dot com?
[9] A: My initial conversation to her was at 2:40 on
[10] May 6 on this form and she responded to me on
[11] May 6 at 4:43 p.m.
[12] Q: So at the bottom of the form chronologically is
[13] an e-mail from you to her at 2:40 p.m. on May
[14] the 6th.
[15] A: Correct.
[16] Q: You had notified her of the loss previously.
[17] A: The day before.
[18] Q: Yes.
[19] A: We had notified AIG. Whether it went to her or
[20] the claims department, I do not know. I'm
[21] assuming that she was made aware of it.
[22] Q: I want to spend a little bit of time on pages
[23] 121 and 122.
[24] A: I figured you would.
[25] Q: You got me right. Is this something that you

Page 89

[1] typed yourself?

[2]    A: Yes.

[3]    Q: And were these your — was this a sincere

[4] expression of your understanding of the events

[5] that had taken place as of May 6, 2003?

[6]    A: It was my attempt to put as best a light on a

[7] bad situation to the underwriter because I knew

[8] that there was going to be a problem based on

[9] our knowledge of what was in the policy at the

[10] time of the loss as my attempt to act as an

[11] agent for my client to try and get the company

[12] to work with us on paying the loss.

[13]    Q: And also a sincere expression of your

[14] understanding of the events that led to May 6,

[15] 2003; correct?

[16]    A: Well, I don't understand the sincere but —

[17]    Q: Well, your understanding of the events that led

[18] to May 6, 2003.

[19]    A: Yes.

[20]    Q: And it starts out, we're going to take this

[21] piece by piece: Well, as in the movie,

[22] Houston, we have a problem. You're referring

[23] to Apollo 14?

[24]    A: Thirteen.

[25]    Q: Thirteen. Thank you.

Page 90

[1]    A: I have a bad sense of humor.

[2]    Q: It's understandable. When you say we have a

[3] problem, the "we" is a collective pronoun,

[4] you're referring to yourself and to AIG?

[5]    A: No, I'm referring to my client in that verbiage

[6] that we being my client and assuming that would

[7] include us if there was any question as to

[8] coverage.

[9]    Q: Is it your testimony you were not including

[10] Mary Beth Schwaegel and AIG as part of the we?

[11]    A: Any time you have a loss that involves the

[12] death of two people, we, meaning all parties

[13] involved, it's always a problem. But in the

[14] text of what you're trying to say, I think, I

[15] would not include AIG in that statement, no.

[16]    Q: And the next sentence: Yesterday we turned in

[17] a loss for Pontiac Flying Service on their

[18] AT503 which you've testified to.

[19]    A: Yes.

[20]    Q: Then you go on: At the time we were unaware of

[21] the use during the loss. Is it your testimony

[22] that you were unaware what they were doing with

[23] the plane that day or is it your testimony that

[24] you were unaware that they had ever been using

[25] that plane for turbine transition training in

Page 91

[1] direct support of aerial application?

[2]    A: At the time that the loss was turned in, which

[3] was the day before, we were unaware of any use

[4] of that airplane being for turbine transition

[5] training or training of any kind.

[6]    Q: I'll ask you are you the only one in your

[7] office that reads the Ag Air Update?

[8]    A: Different people may appear to look at it from

[9] time to time, but I don't know to the extent of

[10] what they read on the periodicals.

[11]    Q: It's available in the office, in any event, for

[12] them to read.

[13]    A: If I give them a copy.

[14]    Q: So it comes to you directly?

[15]    A: Yes.

[16]    Q: And do you ever hold it out from them?

[17]    A: Holding out would be the improper term but do I

[18] ever —

[19]    Q: Do you ever make it unavailable to them?

[20]    A: Make it unavailable, no.

[21]    Q: In fact, the Ag Air Update is somewhat the

[22] Bible of what's going on in the aerial

[23] application or agricultural application, is it

[24] not?

[25]    A: No.

Page 92

[1]    Q: What other publication is?

[2]    A: The National Agricultural Aviation Association

[3] publishes a bi-monthly magazine which I also

[4] advertise in.

[5]    Q: Who in your office is responsible for the

[6] advertising?

[7]    A: I am responsible for seeking the advertising.

[8] I usually have my bookkeeper handle the

[9] details.

[10]    Q: Do you use an advertising agency or do you

[11] advertise directly with Ag Air Update?

[12]    A: I have an advertising specialist that procures

[13] and puts together my ads and depending on

[14] the — quite honestly the time frame it's going

[15] to take whether I feel like it or not, either

[16] have him send it directly or I do it myself.

[17]    Q: Who has the responsibility of verifying that

[18] the ads whether they're in Ag Air Update or

[19] whether they're in the other publication are

[20] actually being printed?

[21]    A: No one. No one has responsibility.

[22]    Q: So you could be getting took and you wouldn't

[23] know it.

[24]    A: Could be. We try to look at every one of them

[25] but don't know if we do or not.

Page 93

[1] **Q:** Going on with page 121: It now appears the
[2] aircraft was being used for turbine transition
[3] training, thus the reason for an additional
[4] person being on board. You were aware as you
[5] have testified prior to this time that it was a
[6] dual cockpit; correct?
[7] **A:** Yes.
[8] **Q:** And that it had been used for turbine
[9] transition training in direct support of aerial
[10] application by Harold Miller before; correct?
[11] **A:** Yes.
[12] **Q:** Did you ever tell Scott Petersen that he was
[13] not covered for turbine transition training in
[14] that plane? Did you ever tell him that?
[15] **A:** Yes.
[16] **Q:** And when did that conversation take place?
[17] **A:** It would vary, but my recollection of all of
[18] our paperwork clearly states for ag use only,
[19] and whether or not I have had conversations
[20] with him I don't recall, but there have been —
[21] prior to this loss there was a request for
[22] training on a different airplane which we
[23] sought coverage for and were able finally to
[24] get after a period of time only because when he
[25] originally called during the policy period

Page 94

[1] after he bought the 503 he did not have enough
[2] time to be considered someone that would be
[3] able to train and our records will show that
[4] originally the companies — all companies
[5] denied coverage for training in a separate
[6] aircraft only to continue working with the
[7] underwriter to finally get her to agree to it
[8] after he had some more time. So conversations
[9] about training had taken place throughout the
[10] policy period and I'm sure — not having
[11] anything in front of me, I'm sure that the
[12] conversation came up that we don't have
[13] training at this time, we don't have training
[14] in anything and he knew that.
[15] **Q:** When I'm dealing with conversations, as I
[16] understand it, you recall no specific
[17] conversations with Scott Petersen in which the
[18] term turbine transition training was used with
[19] respect to this plane prior to the accident; is
[20] that correct?
[21] **A:** The ability to put that on paper and show it to
[22] you, no.
[23] **Q:** Is what I'm saying correct, that you know of no
[24] conversations with him in which the term
[25] turbine transition training was used prior to

Page 95

[1] the accident?
[2] **A:** I'm sorry. Part of your question I understood
[3] but the second part say again, please.
[4] **Q:** Is it true that you recall no conversations
[5] with Scott Petersen in which the term turbine
[6] transition training was used prior to the
[7] accident?
[8] **A:** No, that's not true because I don't recall
[9] whether we discussed it or not in its form that
[10] you have indicated.
[11] **Q:** That's a fairly straightforward question. Can
[12] you think of any conversations in which the
[13] term turbine transition training was used with
[14] Scott Petersen prior to this accident?
[15] **A:** No.
[16] **Q:** And would the same be true for Sarah Petersen?
[17] **A:** I don't know. No, I don't know.
[18] **Q:** Do you know of any conversations with Sarah
[19] Petersen?
[20] **A:** Again, the conversations we had about
[21] transition training whether it be turbine or
[22] piston or just training in ag airplanes took
[23] place. The exact content of those
[24] conversations I can't testify to because I
[25] don't remember.

Page 96

[1] **Q:** Now getting back to my question because I'm
[2] going to stay with it, the question used the
[3] term turbine transition training. We've gotten
[4] past that with Scott Petersen. My question is
[5] are you aware of any conversations with Sarah
[6] Petersen in which the term turbine transition
[7] training was used before the accident?
[8] **A:** No.
[9] **Q:** And you have testified previously that turbine
[10] transition is exactly that, that it is
[11] transitioning from a piston-driven plane to a
[12] turbine-driven plane for an aerial application.
[13] **A:** Yes.
[14] **Q:** And that instruction in aerial application is
[15] the instruction on how to fly the planes for
[16] the purpose of applying the chemical, seeds and
[17] fertilizers; correct?
[18] **A:** Generally, yes.
[19] **Q:** And having reviewed your file, would it be
[20] accurate to say that the subject of turbine
[21] transition training for this plane after it was
[22] acquired by Scott and Sarah Petersen does not
[23] appear before the accident?
[24] **A:** Restate that again. I'm sorry.
[25] **Q:** Does the term turbine transition training as it

1:03-National Union Fire Company v.     Page 17 of 24
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 97

[1] relates to this plane appear in your file to
[2] your knowledge any place before the accident?
[3]     **A:** No.
[4]     **Q:** And you go on to say on page 121: I let it go
[5] yesterday and was able to speak with Sarah
[6] Petersen today. The I being yourself?
[7]     **A:** Yes.
[8]     **Q:** And had you known Scott or Sarah Petersen
[9] before?
[10]     **A:** Yes.
[11]     **Q:** And did you consider them nice people?
[12]     **A:** Yes.
[13]     **Q:** And in talking to Sarah Petersen that day on
[14] the 5th, she was devastated by this, wasn't
[15] she?
[16]     **A:** Yes.
[17]     **Q:** When you say you let it go, what did you have
[18] that you let go of?
[19]     **A:** I wasn't going to discuss coverages with her on
[20] the day of the accident because she was already
[21] upset.
[22]     **Q:** And so had you talked to Sarah Petersen
[23] yourself the day before when you said I let it
[24] go yesterday?
[25]     **A:** I don't recall.

Page 98

[1]     **Q:** Had you talked to Scott Petersen when you say I
[2] let it go?
[3]     **A:** When I say I let it go, I don't recall — I
[4] don't think I talked to either one of them that
[5] day. I think it was the next day. But when I
[6] say I let it go yesterday, I meant that I did
[7] not call them back to advise them that they had
[8] never called us or advised us to add transition
[9] training — turbine transition training to the
[10] policy, so I did not address it that day.
[11]     **Q:** She was concerned because one of the pilots
[12] wasn't named to the file which was this Rick
[13] Lucente who was killed. We indicated to her
[14] that when she called about using him, he met
[15] the OPW and did not need to be named. What
[16] does that mean? What's the OPW?
[17]     **A:** OPW is open pilot warranty. With various
[18] policies depending on how they write it, they
[19] can put what's called an open pilot warranty on
[20] the policy. If a pilot meets an open pilot
[21] requirement which maybe — and it varies from
[22] company to company, instead of physically
[23] naming each pilot on the policy, if they meet
[24] that requirement, we don't have to name them on
[25] the policy.

Page 99

[1]     **Q:** So in this conversation with Sarah Petersen,
[2] her concern as you understand it was that there
[3] might not be coverage because Rick Lucente was
[4] not specifically named.
[5]     **A:** I don't know what her concerns were.
[6]     **Q:** Was that your understanding —
[7]     **A:** I don't know.
[8]     **Q:** — when you typed in the words she was
[9] concerned because one of the pilots, Rick
[10] Lucente wasn't named? Does that refresh your
[11] recollection of her concern regarding the
[12] coverage?
[13]     **A:** Well, I'm not going to speak on behalf of
[14] Sarah, but my conversation led me to believe
[15] that they might be concerned that one of their
[16] pilots who wasn't named to the file, there
[17] might be a problem probably. I don't know. I
[18] indicated to her that since he met the open
[19] pilot warranty, naming him or not naming him
[20] did not matter. Whether I went on to explain
[21] that the use of the policy is what's the main
[22] issue, I don't know.
[23]     **Q:** Well, isn't that exactly what you did starting
[24] with the next sentence? It gave me the
[25] opportunity to ask her about the way she called

Page 100

[1] in the loss as training.
[2]     **A:** Yes.
[3]     **Q:** So you're getting into that.
[4]     **A:** Yeah.
[5]     **Q:** Now you previously testified that you didn't
[6] understand that the Petersens believed that
[7] they had coverage for transition turbine
[8] training before the accident. Do you recall
[9] that testimony?
[10]     **A:** Yes.
[11]     **Q:** The next sentence says: Much to her surprise,
[12] I had to break the news. So now in reading
[13] this, is it your understanding that the
[14] Petersens did in fact believe that they had
[15] coverage for that use?
[16]     **A:** Well, I can't testify to what they did or did
[17] not believe, but I was under the assumption
[18] that they thought they had coverage.
[19]     **Q:** And do you believe that Sarah Petersen was
[20] sincere in that conversation?
[21]     **A:** I think Sarah Petersen was hoping that she had
[22] coverage, not knowing whether she did or not.
[23]     **Q:** Well, do you believe that she was sincere in
[24] being surprised?
[25]     **A:** I don't know. I do not know. Can't testify to

**JAMES RANDALL HARDY**
**July 15, 2004**

National Union Fire Company    v.
Pontiac Flying Services, Inc.

---

Page 101

[1] her state at that time.

[2]    Q: Well, was it your opinion at that time as it
[3] appears here, much to her surprise is your
[4] term, isn't it?

[5]    A: That's my term.

[6]    Q: And she didn't say much to my surprise, did
[7] she? That's your interpretation of the
[8] conversation, isn't it?

[9]    A: Yeah. That is my interpretation, yes.

[10]    Q: Then you go on to say: I had to break the news
[11] that we had never been given a request to add
[12] transition training to the file and we did not
[13] cover this aircraft for that use.

[14]    A: Correct.

[15]    Q: When you told her that, the next sentence says
[16] that they were very upset; would that be an
[17] accurate —

[18]    A: Well, they're upset in general because of the
[19] accident, and I felt she was upset that there
[20] may not be coverage for that accident. That's
[21] why I said they may not be thinking straight.

[22]    Q: It's a fact, is it not, and I'm directing your
[23] attention to Exhibit D, you were never provided
[24] with a definition of the term, quote, flights
[25] required in direct support thereof, end of

Page 102

[1] quote, as it is used in the following policy
[2] provision? And I will direct you jointly to
[3] Exhibit A, page 10, which is the policy
[4] definition which is set forth. Quote, aerial
[5] application means the application by aircraft
[6] of seeds, fertilizers or chemicals and includes
[7] flights required in direct support thereof by
[8] National Union or anyone else. That appears as
[9] Interrogatory No. 6 at the bottom of page five
[10] and your answer being at the top of page six:
[11] No.

[12]    A: Correct.

[13]    Q: And you have testified that your answer would
[14] be the same today as it was then, so we
[15] understand that nobody has ever defined the
[16] term for you, flights required in direct
[17] support thereof as it applies to aerial
[18] application; is that correct?

[19]    A: The definition is in the policy.

[20]    Q: Is that correct, no one has ever defined the
[21] term flights required in direct support thereof
[22] for you?

[23]    A: This is the definition. That is the
[24] definition.

[25]    Q: I would like for you to take however much time

Page 103

[1] you want or need in Exhibit A to find among the
[2] definitions one for flights required in direct
[3] support thereof.

[4]    A: I can't. I don't have that, no.

[5]    Q: Would you agree with me if I represented as
[6] opposed to having you go page for page through
[7] the policy that the policy does not any place
[8] define the term, flights required in direct
[9] support thereof?

[10]    MR. BANOVETZ: Objection to the use
[11] of the word term as opposed to phrase.

[12]    MR. MUELLER: Your objection is
[13] noted.

[14]    A: Are you asking me if there's any place in the
[15] policy that further defines flights required in
[16] direct support thereof?

[17]    BY MR. MUELLER:

[18]    Q: That's right.

[19]    A: No.

[20]    Q: Doesn't appear in there.

[21]    A: No.

[22]    Q: Never has been defined for you by an AIG or
[23] anyone else; correct?

[24]    A: We all —

[25]    Q: Is that correct or not? Never has been defined

Page 104

[1] for you.

[2]    A: Not in that form, no. That is not correct the
[3] way you're stating it, no.

[4]    Q: Tell me because I note here, I say set forth
[5] the definition and you don't set forth the
[6] definition. You say, no, that it's never been
[7] defined for you; is that correct? Look at
[8] Exhibit D.

[9]    A: My statement is correct.

[10]    Q: So you don't set forth the definition.

[11]    A: No.

[12]    Q: And you don't identify any person or persons
[13] from whom that definition was received, do you?

[14]    A: No.

[15]    Q: And you don't identify any documents that
[16] evidence that definition, do you?

[17]    A: No.

[18]    Q: And do you understand in this case that AIG in
[19] response to our requests has no definition for
[20] that term either?

[21]    A: I don't know what their statement is on that.

[22]    MR. BANOVETZ: Same objection as to
[23] the form of the question, the use of the
[24] word term.

[25]    BY MR. MUELLER:

---

**Min-U-Script®**

1:03-cv-01238-JTM-DWB v.    Page 19 of 24
National Union Fire Company
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 113

[1] MR. MUELLER: And at this point we'll
[2] take half an hour break.
[3]    (Thereupon, a noon recess was taken;
[4] whereupon, the following:)
[5]          BY MR. MUELLER:
[6] Q: We're back on the record after a break and we
[7] left off, as I recall, with a discussion of the
[8] exhibit that was your web page and the last
[9] portion of that. Let's come back to page 121
[10] where we left off. Do you recall ever
[11] explaining any portions of the policy in
[12] question to Scott and Sarah?
[13] A: Yes.
[14] Q: And do you recall explaining any portions of
[15] the policy to Scott and Sarah before the
[16] accident?
[17] A: Yes.
[18] Q: And when would that have taken place?
[19] A: The exact date I don't have, but prior to the
[20] accident when they called me about doing
[21] training in their aircraft, we talked over the
[22] phone in general conversations about the policy
[23] and what is required, the changes in the policy
[24] to do training coverage.
[25] Q: When you're talking about training coverage,

Page 114

[1] you're talking about training coverage using an
[2] Air Cat?
[3] A: Any airplane, for that matter, but in this
[4] particular case the Ag Cat that he called
[5] about, but it's a general question about
[6] changing your policy to include training.
[7] Q: With whom did you talk?
[8] A: Scott.
[9] Q: And was he talking to you then about the
[10] turbine aircraft or was it limited to the Air
[11] Cat or do you remember?
[12] A: My recollection that we only talked about the
[13] possibility of getting the Ag Cat, a piston
[14] aircraft to do training in.
[15] Q: And that would be training, per se, for aerial
[16] application as you've described it. In other
[17] words, knowing how to fly the plane so that you
[18] could actually put out chemicals, seeds and
[19] fertilizer.
[20] A: Yes.
[21] Q: Now coming back on page 121, picking up again
[22] with the conversation between you and Sarah.
[23] A: Okay.
[24] Q: Was that conversation that you're referring to
[25] on the 5th or was that on the 6th, the same day

Page 115

[1] as the memorandum?
[2] A: I believe it's on the 6th, the conversation I
[3] had that day with him.
[4] Q: The next sentence: She told me over the phone
[5] she was under the understanding or they assumed
[6] that since we added Scott back in the beginning
[7] for transition training by Harold Miller who
[8] they bought this aircraft from, that gave them
[9] transition training coverage just like the
[10] school they bought the aircraft from. Do you
[11] recall that discussion?
[12] A: Yes.
[13] Q: Now you have previously testified that you
[14] don't recall any discussions with Scott and you
[15] don't have any memoranda of discussions with
[16] Scott or Sarah either regarding — just between
[17] you and them regarding a coverage for the Air
[18] Tractor. Do you recall that?
[19] A: I recall the conversation, but when you say
[20] coverage for the Air Tractor —
[21] Q: Yes. You had testified previously that you had
[22] no memory of specific conversations with either
[23] Scott or Sarah regarding coverage for the Air
[24] Tractor at the time it was purchased.
[25] A: Correct.

Page 116

[1] Q: And you looked through the file and you were
[2] unable to find any memoranda or anything else
[3] regarding conversations of that type.
[4] A: That I had, but I found —
[5] Q: That you had.
[6] A: That I had personally, no, I did not find any
[7] conversations.
[8] Q: Did you find any memoranda of any sort
[9] regarding transition training coverage on that
[10] plane at the time it was acquired?
[11] A: Just the notes that Angie had in the file.
[12] Q: And could you find those notes?
[13] A: Okay. Here's the note.
[14] Q: Have you located a page?
[15] A: Page 118. I'm sorry. That was about the Ag
[16] Cat.
[17] Q: That's 6-19. We're talking about in the time
[18] frame February 8th to March 1st.
[19] A: When she originally handled the airplane
[20] policy.
[21] Q: That's right. We're talking about transition
[22] training having been discussed under that
[23] policy. Her letter to them is Page 51 if that
[24] gives you any frame of reference telling them
[25] that they got the coverage.

1:03-cv-01283-JTM-DWB v. Page 20 of 24
National Union Fire Company
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 121

[1] Q: As far as Exhibit E, the documents you produced
[2] for us and that you've gone through here today,
[3] you don't find any such materials, do you?
[4] A: Correct.
[5] Q: What I refer to as the, Houston, we have a
[6] problem memo, it continues on: Scott and Sarah
[7] bought this aircraft from Harold Miller who was
[8] selling out his aircraft, and as I just found
[9] out, his school as well. She isn't holding us
[10] responsible yet, however, who knows how these
[11] deals will fall. What are you referring to
[12] when you say deals and fall?
[13] A: Well, just exactly what it says. You never
[14] know what — peoples' attitudes change and
[15] their memories change a lot of times after a
[16] loss and what I was referring to there was that
[17] we had no knowledge of the school, we had no
[18] knowledge of the training, we had no knowledge
[19] that they had bought Harold's Flying Service.
[20] However, sometimes in my business after an
[21] accident depending on how it's going to
[22] financially affect somebody, their memory
[23] changes.
[24] Q: But at the same time then you continue on that
[25] you believed Sarah when she told you that they

Page 122

[1] assumed or presumed that they had this,
[2] referring to coverage, since they transitioned
[3] Scott and they bought the aircraft Harold was
[4] using for training. Does that appear there?
[5] A: Yes.
[6] Q: At that point in time, it was your belief that
[7] Sarah was being sincere.
[8] A: My comment there —
[9] Q: Did you believe she was being sincere?
[10] MS. BARON: I'm going to object to
[11] the form of the question as being too
[12] broad. Sincere about what?
[13] MR. MUELLER: He can say that he
[14] doesn't recall that she was sincere when
[15] she said that she assumed that they had
[16] the coverage since they transitioned Scott
[17] and bought the aircraft Harold was using
[18] for training.
[19] A: What I meant by that was I can believe that she
[20] believed that but not necessarily that that's
[21] what it was.
[22] BY MR. MUELLER:
[23] Q: So you believed that she was sincere in that
[24] belief whether it's accurate or not.
[25] A: I'm not using the term sincere.

Page 123

[1] Q: Well, do you believe she was insincere then?
[2] A: I'm not going to use that term. I can't —
[3] Q: When you use the term you believe someone — if
[4] I were to say to you this is a wooden table and
[5] you say I believe you, what do you mean when
[6] you use the term believe? What are your
[7] beliefs founded on?
[8] A: If you'll allow me to expand on this, I'll
[9] explain it which is at the time we had and have
[10] always had with this account problems with the
[11] wife and the husband both thinking that they've
[12] done something when they hadn't, and so trying
[13] to be an agent to my client and trying to
[14] express to the insurance company that even
[15] though there was no coverage, I believe they
[16] thought they believed, however you want to put
[17] that, and I believe that they had hoped and
[18] wished that somebody had made this change in
[19] the policy. It wasn't there and that's evident
[20] from everything that we have and was never
[21] asked for, but I did not want to come across to
[22] AIG that I felt like she was trying to out and
[23] out lie because I didn't believe that she was
[24] trying to do just that.
[25] Q: Did you know or as you sit here today do you

Page 124

[1] know whether there was ever transition training
[2] coverage on that plane after it was purchased
[3] by Scott and Sarah?
[4] A: No.
[5] Q: You don't know?
[6] A: No, there is no transition coverage on that
[7] airplane except to put Scott in the airplane,
[8] whatever that was.
[9] Q: But you've testified there aren't any records
[10] of that and you weren't involved in talking —
[11] A: Any time you jump on another airplane you
[12] transition to another airplane so that's the
[13] definition of the term. He's transitioned in
[14] the airplane. Is he transitioning others or in
[15] the business of transitioning others, no, and
[16] I'll testify to the fact that that was never
[17] part of the policy nor part of any of the
[18] conversations.
[19] Q: Now going on, the sentence that appears in the
[20] next paragraph: They may have assumed since
[21] commercial and ag use, what difference is the
[22] training especially since transition for Scott
[23] was approved. Now, do you —
[24] A: I think you're taking that out of context.
[25] Q: I'm taking the sentence in its entirety, am I

**JAMES RANDALL HARDY**
**July 15, 2004**

**National Union Fire Company   v.**
**Pontiac Flying Services, Inc.**

---

Page 125

[1] not?

[2]   A: But the paragraph is what clearly sets that

[3] sentence up.

[4]   Q: Well, I'm going to ask the questions my way.

[5] It says transition for Scott was approved. Did

[6] you give that approval?

[7]   A: No, the insurance companies give the approval.

[8]   Q: Do you know that the insurance company talked

[9] directly to Scott?

[10]   A: No, they talked to us and we passed it on to

[11] our client.

[12]   Q: Did you give that approval to Scott acting as

[13] the agent for the insurance company?

[14]   A: I am not an agent for the insurance company.

[15] I'm an agent for my client.

[16]   Q: Did you give that approval to Scott?

[17]   A: I don't know.

[18]   Q: Do you know of anybody else who gave that

[19] approval to Scott?

[20]   A: I don't know.

[21]   Q: Do you know how that approval came into being

[22] then, whether it was an endorsement to the

[23] policy or whether it was an interpretation of

[24] the existing policy language?

[25]   A: No, I don't.

Page 126

[1]   Q: Now if — let's make the assumption that

[2] transition training for Scott was approved

[3] although it doesn't appear in the policy or in

[4] your file, would that be an interpretation of

[5] the policy by AIG?

[6]   A: I'm sorry. I was still thinking about this.

[7]   Q: We've previously been down the road of how we

[8] know what coverage there is under a policy.

[9] There is either going to be an endorsement in

[10] the policy or there is going to be language in

[11] the policy itself.

[12]   A: Correct.

[13]   Q: And since we know we don't have an endorsement

[14] on this policy for transition training for

[15] Scott and we also know that Scott was covered

[16] for transition training, that would have to be

[17] coverage under the existing policy, would it

[18] not?

[19]   A: Yes.

[20]   Q: And coverage under the existing policy for that

[21] purpose or that interpretation would have come

[22] from AIG? Well, did it come from you?

[23]   A: Restate it, please.

[24]   Q: Did you interpret the policy so that it

[25] provided turbine transition training for Scott?

Page 127

[1]   A: No.

[2]   Q: So the interpretation that the policy would

[3] include coverage for turbine transition

[4] training for Scott came from AIG; correct?

[5]   A: No, and I don't — I'm absolutely losing the

[6] track that you're trying to —

[7]   Q: I will ask you to assume as based upon your

[8] memo here and information I've received from

[9] Scott that there was turbine transition

[10] training for him under this policy after the

[11] plane was covered.

[12]   A: Under this policy after the plane was covered.

[13]   Q: That's right.

[14]   A: My understanding of the note as I saw it was he

[15] had already been through turbine transition

[16] training. I do not know whether that was prior

[17] to his picking up the airplane or he had been

[18] transitioned by Harold after he bought the

[19] airplane.

[20]   Q: If we assume that he was transitioned to by

[21] Harold after he bought the plane and that there

[22] was coverage for that transition and that that

[23] was the result of the interpretation of the

[24] policy since there are no endorsements, you

[25] have testified that you didn't give that

Page 128

[1] interpretation, therefore the interpretation

[2] could only come from AIG; is that right?

[3]   A: No. Page 42.

[4]   Q: Who else could have provided the interpretation

[5] for Scott that there would be coverage for

[6] transition training for him under this policy?

[7]   A: Well, you keep using the term interpretation.

[8] We don't use that term, interpretation. I can

[9] tell you based on Page 42 of Angie's note to

[10] Mary Beth —

[11]   Q: You're talking about February 12, 2002, page 42

[12] of Exhibit E.

[13]   A: The insured is thinking of purchasing a 503 for

[14] ag use only. Scott has been through Harold

[15] Miller's turbine transition course and has 40

[16] turbine hours now. In addition, he attended

[17] the Covington PT-6 course. So based on the

[18] information I'm seeing here, he had been

[19] through Harold Miller's course, had transition

[20] training and was purchasing the airplane for ag

[21] use only in his business.

[22]   Q: Now, do you know as appears in your memo page

[23] 121 and 122 whether there was specifically

[24] transition training coverage for Scott after he

[25] bought the aircraft?

---

1:03-cv-01296-JTM-DWB v. Page 22 of 24
National Union Fire Company
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 129

[1] **A:** I do not know of any transition training for
[2] Scott after he bought the aircraft.
[3] **Q:** If the transition — I'm talking about
[4] transition training coverage. Do you know
[5] whether there was any transition training
[6] coverage for Scott after he bought the
[7] aircraft?
[8] **A:** Your question is not —
[9] **Q:** I mean you can answer yes or no, I do know or I
[10] don't know whether there was any transition
[11] training coverage for Scott.
[12] **A:** If I answer yes, it answers the question — it
[13] answers your question that's asked improperly.
[14] **MS. BARON:** If you don't understand
[15] his question or there's something about it
[16] that isn't clear, just let him know.
[17] **A:** Well, when you say that for Scott transition
[18] training, are you talking about for Scott to
[19] receive transition training or for Scott to be
[20] able to give transition training?
[21] **BY MR. MUELLER:**
[22] **Q:** I'm talking about for Scott to receive
[23] transition training. Come back and look at
[24] page 121.
[25] **A:** I understand. Any time an individual buys an

Page 130

[1] airplane, my understanding of the memo I read
[2] to you was that he had received this training
[3] prior to that. After he buys the airplane and
[4] we name him as a pilot on the policy based
[5] upon — or we add the airplane to the policy
[6] with him being a pilot on that policy, so we
[7] added the airplane to the policy, Scott was an
[8] approved pilot on the policy already. Any
[9] transition training or any training
[10] additionally done after he buys the airplane
[11] could or could not have been done, I don't
[12] really know. I'm assuming that he wanted to go
[13] out and get comfortable in the airplane so he
[14] did some more training.
[15] **Q:** Would there have been the coverage then as you
[16] refer to on page 121, transition training
[17] coverage for Scott to receive additional
[18] training in the plane from another pilot?
[19] **A:** No.
[20] **Q:** So you don't know what Sarah is referring to
[21] there when she says —
[22] **A:** His transition training was to get
[23] transitioning himself. You're using the term
[24] transitioning. That would be in his case we
[25] added the airplane with one seat — if that's

Page 131

[1] what you're trying to get to, one seat. He
[2] knows it was one seat. We did not have
[3] additional seats in the airplane covered, so
[4] transitioning could be himself going up by
[5] himself getting comfortable in the airplane or
[6] it could just be additional training.
[7] **Q:** If — and I'm going to ask you to indulge in a
[8] couple of assumptions since you have no
[9] recollection of being involved specifically in
[10] the matter. If the coverage was issued to
[11] Scott for the plane conditioned upon his
[12] receiving additional turbine transition
[13] training in that plane by Harold Miller or by
[14] Rick Lucente, was there coverage for that
[15] additional training?
[16] **MS. BARON:** Object to the
[17] hypothetical nature of the question, but
[18] you can answer if you can.
[19] **A:** That's a loaded question again —
[20] **BY MR. MUELLER:**
[21] **Q:** I know.
[22] **A:** — in that there is coverage for the aircraft
[23] once it's added to the policy for a pilot to be
[24] in that aircraft. Is there coverage for an
[25] additional seat in that airplane, no.

Page 132

[1] **Q:** So it is your testimony that there would be no
[2] transition a turbine training coverage for
[3] Scott —
[4] **A:** No.
[5] **Q:** — after he purchased the plane —
[6] **A:** That is not my statement, no.
[7] **Q:** Where would there be turbine transition
[8] training coverage for Scott after the effective
[9] date of the policy, March 1, 2002?
[10] **MR. BANOVETZ:** I'm just going to
[11] object to the continued use of the term
[12] coverage for Scott. Form of the question
[13] because it misstates the way the coverage
[14] is written.
[15] **MR. MUELLER:** What you're saying is5
[16] the coverage would be on the plane.
[17] **MR. BANOVETZ:** Yes.
[18] **BY MR. MUELLER:**
[19] **Q:** Now if there were transition training coverage
[20] on the plane that included training for Scott
[21] after the plane was purchased, are you aware of
[22] that?
[23] **A:** No. You asked me if I was aware of it. The
[24] answer to the question is no. I know exactly
[25] what the coverage was.

**JAMES RANDALL HARDY**
**July 15, 2004**

National Union Fire Company   v.
Pontiac Flying Services, Inc.

---

Page 133

[1]   **Q:** And there was none; correct?
[2]   **A:** There was coverage —
[3]   **MS. BARON:** None what? Object to the
[4] form.
[5]   **BY MR. MUELLER:**
[6]   **Q:** Was there coverage for the aircraft when it was
[7] being used to train Scott after it was
[8] purchased and there were two people in the
[9] cockpit, one of them giving transition training
[10] coverage to Scott. Was there coverage on the
[11] plane for that training?
[12]   **MR. BANOVETZ:** Wait. Object to form.
[13] The question is assuming facts that
[14] haven't been established.
[15]   **MS. BARON:** I again object to the
[16] hypothetical nature.
[17]   **MR. BANOVETZ:** If you were going to
[18] ask it as a hypothetical, I wouldn't
[19] object.
[20]   **BY MR. MUELLER:**
[21]   **Q:** Let me ask it as a hypothetical then. If you
[22] assume that Scott Petersen received additional
[23] transition training in that aircraft after
[24] March 1, 2002, which involved another pilot,
[25] were you aware that he was receiving that

Page 134

[1] training, first of all?
[2]   **MS. BARON:** Objection again to the
[3] hypothetical nature of the question. You
[4] can answer.
[5]   **BY MR. MUELLER:**
[6]   **Q:** Were you aware that he received that training?
[7]   **A:** No.
[8]   **Q:** Now if he received that training in that plane,
[9] was there coverage for that under this policy?
[10]   **MS. BARON:** Same objection to the
[11] hypothetical nature. You can answer.
[12]   **A:** Hypothetically speaking, as long as Scott was
[13] the person receiving the training, not turning
[14] around and doing training as a business, the
[15] airplane may have been covered. I don't
[16] interpret the policy completely and I'll have
[17] to let AIG interpret answer that. The airplane
[18] had it had an accident could have been covered
[19] maybe, however, the passenger that was in the
[20] airplane with him would not have had any
[21] insurance. There would have been no passenger
[22] coverage on that airplane, however, because it
[23] was in the scope of Scott flying the airplane
[24] and receiving his own training or update or
[25] getting — feeling better or at the beginning

Page 135

[1] of every season every ag pilot goes out and
[2] flies for a few hours before they start in
[3] again to get comfortable again in the airplane,
[4] but the difference is when you are receiving
[5] training for yourself versus you now as a
[6] business want to charge and give training to
[7] others.
[8]   **Q:** So my question is strictly limited to Scott
[9] Petersen receiving training in that plane. If
[10] you assume that after he purchased it and
[11] during the month of March, 2002, he received
[12] additional training in that plane, if the plane
[13] had gone down, was there property coverage for
[14] that plane? That's the question.
[15]   **A:** I would have to refer to AIG to see if their
[16] policy would cover that.
[17]   **Q:** And if Scott were told that there was coverage,
[18] would that have come from you or AIG or do you
[19] know?
[20]   **A:** Any conversations between the client regarding
[21] his coverage generally comes from us as the
[22] agency because we are an agent for that client.
[23]   **Q:** Since you don't recall it, would you agree that
[24] if you had said to Scott that he had that
[25] coverage, you would have received the

Page 136

[1] authorization from AIG?
[2]   **MS. BARON:** I'm just going to object
[3] to the hypothetical nature of the question
[4] again.
[5]   **A:** I don't want to answer that if I don't have to.
[6]   **BY MR. MUELLER:**
[7]   **Q:** Well, you got to. You got no choice.
[8]   **A:** Okay. State the question again, please.
[9]   **MR. MUELLER:** Would you read it back?
[10]   (At this time the reporter read
[11] the following: "Q Since you don't
[12] recall it, would you agree that if
[13] you had said to Scott that he had
[14] that coverage, you would have
[15] received the authorization from
[16] AIG?")
[17]   **A:** Yes.
[18]   **BY MR. MUELLER:**
[19]   **Q:** When you're communicating in your e-mail which
[20] was on pages 121 and 122 of Exhibit E with Mary
[21] Beth Schwaegel and you say to her: I would
[22] like to work on this in the effort to clear
[23] this up, were you trying to convince her that
[24] there was coverage?
[25]   **A:** My intent was to work on behalf of my client,

---

1:03-cv-01230-JTM-DWB v. Page 24 of 24
National Union Fire Company
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 137

[1] Petersens, to —

[2] Q: Convince her that there was coverage?

[3] A: No. No, not to convince her that there was

[4] coverage but to share with her that Sarah and

[5] Scott might have had confusion over this but —

[6] and again my attempt with the company was just

[7] to try and see if I can get them to pay for a

[8] policy and pay for a loss so that we didn't

[9] have to go to this extent that we're in right

[10] now.

[11] Q: And yet you've testified that your relationship

[12] is with the insured, in this case with Scott

[13] and Sarah —

[14] A: Yes.

[15] Q: — right? And you having studied in the area,

[16] are you aware that that is what is known as a

[17] fiduciary relationship?

[18] MS. BARON: Object to the extent it

[19] calls for a legal conclusion.

[20] MR. MUELLER: I'm going to ask for

[21] his understanding of that. I know as

[22] someone who has been involved in the

[23] brokerage business and has gone to the

[24] courses he has heard of that.

[25] A: I've heard the term. If you want to — I don't

Page 138

[1] think I could explain it to you right here.

[2] BY MR. MUELLER:

[3] Q: What is your understanding of the fiduciary

[4] relationship that you owed to Scott and Sarah

[5] regarding coverage under this policy?

[6] MS. BARON: Object because he just

[7] said he couldn't explain it right here.

[8] If he has anything further in response, he

[9] can certainly answer.

[10] A: No, I don't.

[11] BY MR. MUELLER:

[12] Q: Well, that's the darn'dest answer I've ever

[13] heard. I'm sorry, I can't explain it, but if

[14] you come back tomorrow or write me a week from

[15] Sunday I can tell you. What is it about the

[16] term fiduciary responsibility as you understand

[17] it that causes you to say you can't answer the

[18] question now?

[19] A: Well, explain fiduciary to me.

[20] Q: That was the question to you. What is your

[21] understanding of the fiduciary relationship

[22] that you owed Scott and Sarah?

[23] A: Well, quite honestly, at this moment in time

[24] I'm drawing a blank on it. That's why I'm

[25] saying that.

Page 139

[1] Q: The last sentence in your letter, would you

[2] read that? Last sentence in the last full

[3] paragraph.

[4] A: I felt that since I knew more information today

[5] regarding the loss, I need to advise you as

[6] well to date this is what we know.

[7] Q: I'm referring to the sentence in the paragraph

[8] immediately above it starting with "I don't

[9] know". Could you read that?

[10] A: I don't know what's in the best interests now

[11] for both AIG and Hardy should this become a

[12] situation.

[13] Q: And then addressing that, do you make any

[14] reference to what's in the best interests for

[15] Scott and Sarah?

[16] A: No.

[17] Q: Are you looking out for Scott and Sarah in that

[18] sentence when you're talking about the best

[19] interests for AIG?

[20] A: I guess you could view it as looking out for

[21] the best interests, that if I could get the

[22] insurance company to pay this we wouldn't have

[23] to go the extent we are today, so that would be

[24] in the best interests of my client.

[25] Q: Best interests of AIG.

Page 140

[1] A: And my client.

[2] Q: Does it say AIG and my client, Scott and Sarah?

[3] It says AIG and Hardy so it seems to me you

[4] were looking out for AIG and you were looking

[5] out for yourself.

[6] MS. BARON: Is that a question?

[7] BY MR. MUELLER:

[8] Q: It's a statement. Is that who you were looking

[9] out for, AIG and Hardy, when you were

[10] considering best interests?

[11] MR. BANOVETZ: Object to the form of

[12] the question because what we're doing is

[13] we're now asking — using part of that

[14] sentence and not the second half of the

[15] sentence which obviously I don't think you

[16] can isolate.

[17] MR. MUELLER: You mean should this

[18] become a situation?

[19] MR. BANOVETZ: That's correct.

[20] BY MR. MUELLER:

[21] Q: What did you mean when you said should this

[22] become a situation?

[23] A: Well, we're in the situation, so my —

[24] Q: You filed it. Made work for all of us.

[25] A: My meaning of this sentence, in best interests