E-FILED
Thursday, 14 April, 2005  01:45:54 PM
Clerk, U.S. District Court, ILCD
31

1    Harold's flight school in the summer of 1996

2    when I went through his initial ag pilot

3    training course and he had gone through that

4    that prior season.

5        Q.    So were you and Rick Lucente both

6    doing some independent contract work for

7    Harold Miller, if you will?

8        SCOTT PETERSEN:  Yes.

9        Q.    Do you have any idea how much time

10   Mr. Lucente had in this specific aircraft at

11   issue, the 503?

12       SCOTT PETERSEN:  Not exact numbers.

13   I know he trained quite a few individuals.

14   Harold had numerous contacts throughout the

15   industry.

16       Q.    Did you ever have an opportunity at

17   some point before you elected to use Mr.

18   Lucente to do flight training for you to

19   review his logbooks and his personal logbooks

20   and look at his flight experience?

21       A.    Yes, I did.

22       Q.    This day of the accident, was this

23   the first in-the-air training session with

24   this particular student?

1          SCOTT PETERSEN:  Yes.

2       Q.   Did you have an opportunity to meet

3    Mr. Webster?

4          SCOTT PETERSEN:  Yes, we did.  The

5    accident happened on Monday.  The day before

6    on Sunday, the weather was inclement, and

7    they spent a little over two hours in the

8    classroom, Rick and Mr. Webster, going over

9    turbine operations, emergency procedures,

10   starts and those types of things, and things

11   that were related to the transition course,

12   and that is documented in Mr. Webster's

13   logbook.

14      Q.   Okay.  Did you have any type of

15   contract with Mr. Lucente, a written

16   agreement of any kind?

17         SCOTT PETERSEN:  No.

18      Q.   So it was a verbal contract by the

19   job basis?

20         SCOTT PETERSEN:  Verbal as needed.

21      Q.   Okay.  So your intention would be

22   that when you had a student referred to you,

23   you would call Mr. Lucente and tell him you

24   had a new student?

1    SCOTT PETERSEN:  And see when he was

2    available to work with them.

3    Q.   Did you check with Mr. Webster to

4    see if he carried any type of renter's or

5    non-owned insurance?

6    SCOTT PETERSEN:  No.

7    Q.   Did Mr. Webster make any inquiries

8    concerning insurance coverage for the

9    aircraft during his training?

10    SCOTT PETERSEN:  No.

11    Q.   How did you happen to come into

12    contact with Mr. Webster as a student pilot?

13    SCOTT PETERSEN:  He was referred by

14    a man by the name of Del Finup, F-i-n-u-p, in

15    Lakeview, Michigan; and Neil was looking for

16    work up in Michigan.  He had grown up, I

17    think, in the Detroit area, had spent the

18    last several seasons flying out of Wyoming.

19    And Mr. Finup had, I believe, a 402 Air

20    Tractor, turbine Air Tractor, that he was

21    looking to put him in for that season.

22    Q.   So Mr. Finup was looking for

23    somebody to train Mr. Webster to fly for Mr.

24    Finup, correct?

34

1      A.    That's correct.

2      Q.    There was never any intention, as

3  far as you recall, to have Mr. Webster do any

4  aerial application flights for Pontiac Flying

5  Service?

6           SCOTT PETERSEN:  No.

7      Q.    And were you furnishing any type of

8  training materials for Mr. Lucente?

9           SCOTT PETERSEN:  Yes, we had a

10  current POH that included all the procedures

11  for the aircraft as well as a current weight

12  and balance.

13     Q.    Okay.  In terms of instructional

14  materials, the syllabus or textbooks,

15  anything like that that you provided?

16          SCOTT PETERSEN:  No.  He had all

17  that with him.

18     Q.    Okay.  Was Mr. Webster required to

19  purchase any training materials?

20          SCOTT PETERSEN:  No.

21     Q.    What was the rate of compensation

22  for Mr. Lucente for his training?

23          SCOTT PETERSEN:  I believe he was

24  paid $100 per flight hour.  Was that the

35

1    arrangement?

2         SARAH PETERSEN:  No.

3         SCOTT PETERSEN:  No?

4         SARAH PETERSEN:  It was $100 per for

5    instruction hour whether it was classroom or

6    flight.

7         SCOTT PETERSEN:  Okay.  I stand

8    corrected.

9    Q.  So it was $100 per hour whether it

10   was ground or in the air, correct?

11        SARAH PETERSEN:  Yes.

12   Q.  And you would trust Mr. Lucente to

13   turn in his time.  Is that how you would do

14   that?

15        SCOTT PETERSEN:  Absolutely.

16   Q.  What were the terms of the deal with

17   Mr. Finup in terms of what you'd be

18   compensated for getting Mr. Webster trained?

19        SCOTT PETERSEN:  I believe it was

20   $5,200.

21   Q.  And what would Mr. Webster be

22   required to pay for his training?

23        SCOTT PETERSEN:  5,200.  I believe

24   Mr. Finup was going to pay that.

36

1    Q.    I'm sorry.  I misspoke.  Mr. Webster

2    was to pay how much for his training?

3         SCOTT PETERSEN:  Mr. Finup was going

4    to pay for him.

5    Q.    Oh, Mr. Finup was paying for him?

6    Okay.  So Mr. Webster doesn't pay anything on

7    this.

8         SARAH PETERSEN:  No.

9         SCOTT PETERSEN:  No.  I believe the

10   arrangement was he was going to work that

11   back off when he went to work for Del.

12   Q.    Okay.  Did you ultimately get any

13   payment from Finup?

14        SCOTT PETERSEN:  No.

15   Q.    Did you have any discussions with

16   Mr. Webster concerning what insurance

17   coverage he might carry through Finup's

18   operation?

19        SCOTT PETERSEN:  No.

20   Q.    He was presently flying some

21   aircraft for Mr. Finup at the time?

22        SCOTT PETERSEN:  No.

23   Q.    So he would be a new pilot for Mr.

24   Finup?

37

1    SCOTT PETERSEN:  That's correct.

2    Q.   Did you know Mr. Finup before he

3    called you about this referral?

4    SCOTT PETERSEN:  Yes.

5    Q.   Where do you know Mr. Finup from?

6    SCOTT PETERSEN:  I had previously

7    taken Mr. Miller's son who was working for

8    another operator on the Lakeview Airport, I

9    believe, back in '97 and had met Del at that

10   time, and then I'd also seen him at the

11   national conventions and at the NAAA, the

12   National Ag Aviation Association, their

13   spring meetings, the board meetings and

14   stuff.  I had seen him around different

15   places.

16   Q.   How did Mr. Finup know that you had

17   an Air Tractor?  How did he know that he

18   could send somebody here to get trained?

19   SCOTT PETERSEN:  The aerial

20   application business is a small entity; and

21   generally, if there's something going on,

22   everybody knows.  And Mr. Finup, him and

23   Harold had a long-standing relationship.  He

24   knew that I had purchased Harold's assets.

38

1    Q.    Did you pay any type of workers'

2    compensation or anything for Mr. Lucente, did

3    you?

4         SARAH PETERSEN:  What do you mean?

5    Q.    Like did you have a work comp policy

6    that he was included under?

7         SARAH PETERSEN:  Yes.

8    Q.    So he was a named employee for work

9    comp?

10        SARAH PETERSEN:  No, he was

11   considered a private contractor.

12   Q.    He would come under your work comp

13   in terms of what your work comp covered?

14        SARAH PETERSEN:  You know, that I

15   don't know.

16   Q.    Okay.

17        MR. GUY:  So you don't know if any

18   benefits have been paid to the Lucente family

19   on behalf of the workers' compensation

20   policy?

21        SARAH PETERSEN:  No, I do not know

22   that.

23        MR. GUY:  Do you know if there's any

24   discussions about paying it one way or the

39

1    other?

2         SARAH PETERSEN:  I know that they

3    have requested information from me which I

4    have submitted to them.

5         MR. GUY:  So it's under

6    investigation?

7         MR. CAUGHEY:  I don't think she said

8    that.

9         MR. GUY:  Okay.

10        SARAH PETERSEN:  I don't know.  They

11   have requested information from me, I sent it

12   to them, and I have not had any contact with

13   them.

14        MR. GUY:  And who is they?

15        SARAH PETERSEN:  That would be

16   Travelers, the insurance company.

17        MR. GUY:  Okay.  Do you have a

18   contact at Travelers?

19        SARAH PETERSEN:  Yes, there would be

20   something on that sheet of paper.

21        MR. GUY:  Okay.

22

23   BY MR. BANOVETZ:

24        Q.   Did you have a plan or did you

1    anticipate in terms of percentage of use what

2    percentage of use would be aircraft flight

3    training and what percentage of use would be

4    anticipated to be aerial application?

5        SCOTT PETERSEN:  I never calculated

6    that.

7        Q.   Can you estimate the number of hours

8    it was used for aerial application at the

9    time of the accident on behalf of your

10   business?

11       SCOTT PETERSEN:  No.

12       Q.   Okay.  Did you have any other

13   student signed up for training at the time of

14   the accident?

15       SCOTT PETERSEN:   No.

16       Q.   Did you meet with Mr. Webster for

17   the purpose of training him or going over

18   flight logs, syllabus, flight books or

19   logbooks, anything at all?

20       SCOTT PETERSEN:  No, I did not.  Mr.

21   Lucente went through his logbook.

22       Q.   Was your contact with Mr. Webster

23   pretty much, hello, nice to meet you?

24       SCOTT PETERSEN:   I had had phone

41

1  conversations with him when the initial was

2  set up, and I had FAXed to him directions on

3  how to get here, when to meet, what to

4  expect.

5      Q.   Were you generally aware of what

6  flight maneuvers Mr. Lucente would be

7  performing as part of the training process?

8      SCOTT PETERSEN:  Yes.

9      Q.   What sort of maneuvers are required,

10  just off the top of your head, for turbine

11  transition training?

12      SCOTT PETERSEN:  There's a large

13  emphasis on engine starts.  That's one of the

14  most critical things in the turbine industry.

15  If you don't pay attention, you can cook an

16  engine.  As far as the flying, we went over

17  emergency procedures, stall awareness, steep

18  turns.  I think those things stick out in my

19  mind the most.

20      Q.   Was there a minimum altitude that

21  Mr. Lucente would require for steep turns?

22      SCOTT PETERSEN:  If I recall when I

23  went through the training course, we were

24  1,500, 2,000 AGL.

42

1    Q.    Do you know who owns the property

2    where the aircraft crashed?

3        SCOTT PETERSEN:   City of Pontiac.

4    Q.    City of Pontiac.  Has the City of

5    Pontiac made any sort of claim with respect

6    to remediation of the land or environmental

7    cleanup?  No?  You have to answer out loud.

8    I'm sorry.

9        SCOTT PETERSEN:  No.

10    Q.    Okay.  Have you heard from the EPA

11    or has the NTSB talked to you about remedial

12    environmental remediation at the site?

13        SCOTT PETERSEN:  No.

14        SARAH PETERSEN:  No.

15    Q.    Did Mr. Lucente complete any

16    paperwork with respect to Neil Webster that

17    he provided to you about Mr. Neil Webster's

18    background or experience or anything?

19        SARAH PETERSEN:  The only thing that

20    we have is we got a copy of his current

21    medical and a copy of his pilot's license.

22    Q.    Have you heard from an attorney or

23    someone else from either Webster or Lucente's

24    estates concerning any possible liability

43

1    claim?

2         SCOTT PETERSEN:  The estate of Mr.

3    Webster, I believe, we did receive --

4         SARAH PETERSEN:  We received a

5    letter stating that they had retained

6    counsel.  There was nothing further

7    indicated.

8      Q.   Okay.  Nothing with respect to Mr.

9    Lucente?

10        SARAH PETERSEN:  No.

11     A.   No.

12     Q.   Have you had any communications with

13   anybody from Mr. Lucente's family?

14        SARAH PETERSEN:  We are very close

15   to his wife.

16     Q.   And you have talked to Mr. Lucente's

17   wife?

18        SARAH PETERSEN:  Many times.

19        SCOTT PETERSEN:  Yes.

20     Q.   And she hasn't said anything at this

21   point about a claim?

22        SCOTT PETERSEN:  No, not that I'm

23   aware of.

24     Q.   Do you have a copy of what you got

44

1    from Mr. Webster's attorney?

2        SARAH PETERSEN:  Yeah.

3    Q.    You kept a copy of that, okay.  Have

4    you had any communications at all with the

5    bank where the loan on the aircraft was

6    taken?

7        SARAH PETERSEN:  No.

8        SCOTT PETERSEN:  No.

9    Q.    What bank is that?

10       SCOTT PETERSEN:  That's the Bank of

11   Pontiac.

12   Q.    Okay.  Are you making some sort of

13   payments on the aircraft at the present time?

14       SARAH PETERSEN:  No.  There is a

15   scheduled yearly annual payment that's due

16   in --

17       SCOTT PETERSEN:  November.

18       SARAH PETERSEN:  -- November.

19   Q.    Has the bank been put on notice of

20   the loss?

21       SCOTT PETERSEN:  Yes.

22       SARAH PETERSEN:  Oh, yeah.

23   Q.    Is there a specific person that you

24   deal with at the bank?

1      SCOTT PETERSEN:  Yes, Adam Ingles.

2      Q.    Okay.  Has Adam made inquiry

3  concerning insurance coverage on the

4  aircraft?

5      SCOTT PETERSEN:  No.

6      Q.    Has the NTSB made any order or

7  entered any order requiring that the aircraft

8  be maintained at its present location and

9  that it not be destroyed?

10      SARAH PETERSEN:  No.

11      SCOTT PETERSEN:  No.

12      Q.    As far as you know, are you free to

13  do with the airplane whatever you want at

14  this point?

15      SCOTT PETERSEN:  I don't believe

16  that is the case.  The last I was under the

17  understanding that it was to be stored and

18  not disturbed until it was released.

19      Q.    Okay.  Just so I'm clear, other than

20  Mr. Hardy, did you have any discussion with

21  any other insurance agents or anyone else for

22  that matter about insurance requirements for

23  operating flight school?

24      SCOTT PETERSEN:  No.

1    Q.    And you have been operating a flight

2    school in some capacity since 1987.  Is that

3    correct?

4         SCOTT PETERSEN:  That's correct.

5    Q.    But no turbine transition training

6    until the incident at issue?

7         SCOTT PETERSEN:  That's correct.

8    Q.    Okay.  And the only policy you've

9    carried is either the AIG policy or the

10   US AIG policy?

11        SCOTT PETERSEN:  That's also

12   correct.

13   Q.    Okay.

14        SCOTT PETERSEN:  Right?

15        SARAH PETERSEN:  I am not clear

16   about the company that has the policies for

17   the other rental aircraft.  I don't believe

18   that's AIG or US AIG.  I hate to appear -- I

19   don't know that that company covers our other

20   aircraft.  I think that's just the ag

21   aircraft.  I would have to look at the

22   policies to see who it is.

23   Q.    You think you might have another

24   policy with another company?

1      SARAH PETERSEN:  Not for this

2  aircraft, no.  But you are asking if

3  everything is covered by US AIG.  I don't

4  believe so.  I think our rental planes, the

5  Grumman, the Warrior, the Arrow, I believe

6  they are covered by a different company.  I

7  think the only thing that is covered with the

8  US AIG or AIG, whoever, is the ag items.

9      Q.   Okay.  That's what I was thinking

10 because I don't recall seeing these other

11 airplanes:  the Grumman, Arrow, Warrior, I

12 don't remember seeing those on this policy.

13      SARAH PETERSEN:  No, I believe those

14 are covered by a different company, but I

15 don't recall which company that is.

16      Q.   Okay.  Do you have any means of

17 finding out what company that is?

18      SARAH PETERSEN:  Yes, that's in the

19 file.

20      Q.   Is that something you could do now?

21 Can we take a break and do that?

22      SCOTT PETERSEN:  Yeah, we can take a

23 break and do that.

24      MR. CAUGHEY:  Or we can send it to

48

1    you.

2              MR. GUY:   Whatever is convenient for

3    you.  Did you have at the time or do you now

4    have a file that you kept on Mr. Lucente, any

5    paperwork on him, medical or pilot

6    certificate?

7              SARAH PETERSEN:   Yes, I have a copy

8    of his -- I don't recall exactly what's in

9    the file; but I know that in the past I've

10   had his medical, and I've had -- and I always

11   have a copy of his Illinois license, his

12   applicator license.

13

14   BY MR. BANOVETZ:

15       Q.   Did you have an opportunity to meet

16   Mr. Coker when he was out here?

17             SCOTT PETERSEN:   Yes.

18       Q.   The investigator, Dave Coker?

19             SARAH PETERSEN:   Yes.

20       Q.   Did you give him everything you had

21   on Mr. Lucente?

22             SARAH PETERSEN:   I gave him

23   everything that he asked for.  I don't recall

24   what those items would have been.

49

1          MR. GUY:  Do you have any excess

2     insurance which may apply to this incident?

3          MR. BANOVETZ:   Umbrella coverage?

4          SARAH PETERSEN:  Not that I'm aware

5     of.

6          MR. GUY:  Okay.

7

8     BY MR. BANOVETZ:

9     Q.   Well, Peter, I think I'm just about

10    through my questions.  If you want to take a

11    minute and I'll take a minute and we'll see

12    if we've got anything else here.

13         MR. GUY:  Do you know where Mr.

14    Lucente's logbooks are, his pilot logbooks?

15         SARAH PETERSEN:  I'm not aware of

16    where they are.

17         MR. GUY:  Okay.

18         MR. BANOVETZ:  Peter, is that about

19    it for you?

20         MR. GUY:  I don't think I have

21    anything else.

22         MR. BANOVETZ:  I don't think we have

23    anything further.  Counsel?  Okay.  We'll go

24    off the record then.

50

1          (WHEREUPON THERE WAS A DISCUSSION

2     OFF THE RECORD.)

3

4          (FURTHER THE WITNESSES SAYETH NOT.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

51

1    STATE OF ILLINOIS    )

                          )   SS.

2    COUNTY OF LIVINGSTON)

3         I, LYNN J. WATSON, a Certified

4    Shorthand Reporter in and for the County of

5    Livingston and State of Illinois, do hereby

6    certify that the witnesses herein, prior to

7    the taking of said sworn statement, were by

8    me duly sworn to testify the truth insofar as

9    they might be interrogated concerning the

10   same; and that the said sworn statement was

11   on that date taken stenographically and

12   afterwards transcribed by me, and that the

13   foregoing is a true and accurate transcript

14   of the testimony so given on said date.

15        Dated July 16, 2003.

16

17

18

19

20        _Lynn J. Watson_
          C.S.R., R.P.R.
          C.S.R. License No. 84-1744

21

22

23

24

STATE OF ILLINOIS
COUNTY OF LIVINGSTON

IN RE: PONTIAC FLYING SERVICE
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

I, Sarah Petersen, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken July 14, 2003, that I have read the foregoing transcript of the deposition, consisting of pages 1 to 51 inclusive, and affix my signature to same.

_____
Sarah Petersen

Subscribed and sworn to
Before me this _____ day of
_____, 2003

_____
Notary Public

STATE OF ILLINOIS
COUNTY OF LIVINGSTON

)
)
)
)
)
)
)
IN RE: PONTIAC FLYING SERVICE                )
)
)
)
)
)
)
)
_____ )

I, Scott Petersen, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken July 14, 2003, that I have read the foregoing transcript of the deposition, consisting of pages 1 to 51 inclusive, and affix my signature to same.

_____
                                              Scott Petersen

Subscribed and sworn to
Before me this _____ day of
_____, 2003

_____
Notary Public