```
                UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF ILLINOIS


NATIONAL UNION FIRE INSURANCE  )
COMPANY OF PITTSBURG, PA.,     )  Docket No.
                               )  03-CV-01288
     Plaintiff,                )
                               )
vs.                            )  Peoria, Illinois
                               )  March 1, 2005
PONTIAC FLYING SERVICE, INC.,  )
ET AL,                         )
                               )
     Defendant.                )
_____)
```

RECEIVED
MAR 2 2 2005
CASSIDY & MUELLER

TRANSCRIPT OF
MOTION HEARING
BEFORE THE HONORABLE JOE BILLY MCDADE
UNITED STATES DISTRICT JUDGE


THE APPEARANCES

JEFFREY B. ROCK, ESQ.
Hasselberg, Rock, Bell & Kuppler
Associated Bank Bldg., Suite 200
4600 N. Brandywind Dr.
Peoria, IL  61614-5591
On behalf of the Plaintiff


DAVID M. MUELLER, ESQ.
JENNIFER WOLFE, ESQ.
Cassidy & Miller
323 Commerce Bank Bldg.
416 Main St.
Peoria, IL  61602
On behalf of Pontian Flying Service, Inc.


GEORGE K. FLYNN, ESQ.
Clausen Miller, P.C.
10 N. LaSalle St., Suite 1500
Chicago, IL  60603-1098
On behalf of Hardy Aviation Insurance, Inc.

```
 1                 Nancy Mersot, CSR, RPR
             United States District Court Reporter
 2                   100 N.E. Monroe Street
                       Peoria, IL  61602
 3
          Proceedings recorded by mechanical stenography,
 4        transcript produced by computer-aided transcription.
                              * * * * *
 5              (Proceedings were held in open court.)
 6         THE COURT:  Call the case of the National
 7  Union Fire Insurance Company of Pittsburgh v.
 8  Defendant Pontiac Flying Service, Justyn Webster,
 9  Caren Lucente -- I'm sorry, she is no longer with
10  the case -- and Hardy Aviation Insurance Company;
11  civil case 03-1288.
12         Will counsel please enter their appearances.
13         MR. ROCK:  Jeffrey Rock with National Union
14  Fire Insurance.
15         MR. MUELLER:  David Mueller for Pontiac
16  Flying Service.
17         MR. FLYNN:  George Flynn by telephone on
18  behalf of Hardy Aviation, Your Honor.
19         THE COURT:  This is a hearing in connection
20  with the motion filed by National Union Fire
21  Insurance Company objecting to the defendant's
22  proposed expert, a Marshall Reavis, and also
23  apparently to certain other affidavits that were
24  relied upon by Mr. Reavis.
25         Mr. Rock, did you wish to argue the motion
```

1 or did you wish to present any evidence or what?
2          MR. ROCK:  No, I'm just here to argue the
3 motion, Your Honor, apparently set by the Court last
4 week that the Court wanted some oral argument.
5          THE COURT:  Let me share with everyone the
6 Court's concern.  To me the first question is
7 whether or not the provision at issue which is the
8 definition of aerial application.  The policy
9 language says it means the application by aircraft
10 of seeds, fertilizer or chemicals and includes
11 flights required in direct support thereof.
12          Now does either side believe that language
13 is ambiguous?  Anyone believe that language is
14 ambiguous?
15          MR. ROCK:  Your Honor, for plaintiff we
16 think it is not.  The parties may disagree with the
17 meaning of a term but it does not make it ambiguous.
18 I think that is not ambiguous, and I think it is the
19 Court's decision to determine whether it is
20 ambiguous and not Marshall Reavis to say, well, I
21 think this is ambiguous and should be interpreted
22 certain ways.  And that is really the heart of the
23 motion in that we are saying that it is the Court's
24 determination and not a hired expert for the
25 defendant to determine whether the contract language

1  is ambiguous.
2           THE COURT:  What do you say, Mr. Mueller?
3           MR. MUELLER:  It is our position that the
4  term is not ambiguous unless National Union is
5  taking the position as it relates to a turbine
6  transition training that it is or it may be
7  ambiguous.  In other words, we have the activity
8  that was ongoing at the time of the loss that has to
9  be read against the policy language.  And we do not
10 believe it is ambiguous, but at the same time if
11 there is a question as to what turbine transition
12 training is as it relates to the aerial application
13 of the seeds, chemicals, and fertilizers, and
14 flights required in direct support thereof, then an
15 explanation of that ambiguity, we have the opinions
16 of Marshall Reavis and we also have the affidavits
17 of those in the industry establishing the custom and
18 usage upon which he bases his opinions.
19          So I guess that I'm saying that we've
20 perceived their approach to the case of being one in
21 which they say there is a latent ambiguity.  A
22 latent ambiguity being one that does not appear on
23 the face of the policy but rather one which becomes
24 manifested when you understand or look at the
25 specialized type of coverage which is afforded by

1 the policy, and it is to explain that type of
2 coverage in the context of the activity that was
3 ongoing that we have proffered Marshall Reavis and
4 his opinions as well as the custom and usage
5 affidavits of those in the aerial application
6 industry.
7      THE COURT: All right. In the Court's view
8 the definition is not ambiguous except in its
9 application to the facts of this case which requires
10 the Court to construe the language, flights required
11 in support thereof. As I understand it, plaintiff
12 believes that a flight by its employee Lucente
13 whereby he was training a third-party Webster in, I
14 guess, using a turbine powered plane. Is that
15 activity within the language, flights required, in
16 direct support thereof?
17      MR. ROCK: Excuse me, Judge, may I make one
18 clarification on what the Court just mentioned?
19      I think the pleadings are such that Lucente
20 was not an employee of Pontiac Flying Service.
21      THE COURT: Okay.
22      MR. ROCK: He was hired as an independent
23 contractor shown by the counter-claims against
24 Lucente's estate and Webster's estate. Pontiac
25 advertised across the nation in this national

1 publication that it would offer this training.  The
2 individuals who owned Pontiac did not offer that
3 training.  They hired Lucente as an independent
4 contractor to train third-party's pilots in the
5 turbine transition plane.  So I think it is
6 important in that it had nothing to do with the core
7 business of Pontiac which was application of seeds,
8 fertilizers, pesticides; that they were running a
9 training program on the side not for their employees
10 but other people's employees.  In fact, it wasn't
11 even an employee of Pontiac Flying Service that was
12 doing the training.  They were just using the plane.
13          THE COURT:  Thank you.  I think that is
14 important.
15          MR. MUELLER:  Your Honor, by way of
16 clarification in the context of what counsel just
17 said, Lucente was the same person that was approved
18 by the plaintiff as the instructor to give
19 transition training under this policy at the
20 inception of the policy and it was covered for that
21 purpose.
22          THE COURT:  Okay.  Without further
23 characterizing the language from the Court's
24 perspective, it seems to me a reasonable
25 construction of the provision that the insured was

told that flights by you in direct support of your aerial application is covered. That is the -- that is my initial view of what that language means. The facts of this case are that Pontiac is not training its own people in this turbine powered but they are doing it for third parties as an independent business activity.

That to me is not within, on the surface, the intent of the language. However, if that is -- if the language were meant to cover that, I'm prepared to hear that type of testimony and evidence because that is that ambiguity that I was talking about. Now, frankly, I'm not impressed with Mr. Reavis and his ability to assist the Court in making that determination.

In his report, it seems to me he offers various opinions on contract interpretation, and he talks about the agriculture aviation industry based on affidavits apparently from people who have some experience in that industry. But his expertise is not in the law or agriculture aviation. It is in the field of insurance. And where I think he could -- someone could be a help to the Court would be to tell the Court whether or not either any relationships between the insurance company and

Pontiac or the custom in the industry that that language is meant to cover situations such as the one presented in this case where the plane that is insured is being used by the insured not in its own business or training its own people but by training someone else's -- someone else.

Now if the language was meant to cover that or if that's the custom in the industry when these type policies are issued, that's something else. So, as I understand Mr. Reavis' report, nothing he says will help this Court make that decision.

And it would be my feeling that his report as relates to his opinions about how you interpret an insurance contract would not be admissible. And since he knows nothing about the agriculture aviation industry, his opinion about that would not be admissible. If it were relevant, I suspect the affidavits by the people who do have experience in the area of agriculture aviation industry would be competent to talk about something, but I'm not so sure it is relevant in terms of the issues as I see it because it seems to me the only avenue open for Pontiac is to put on evidence showing what the custom is or what the language was meant to be in terms of coverage. That would include the activity

1  involved in this case.
2        So at this point, I don't want to -- I'm
3  only saying based on what I understand now of what
4  Mr. Reavis is going to testify to, I find it
5  inadmissible.
6        Frankly, I'm not so sure expert testimony is
7  needed about this issue.  To me what's needed would
8  be testimony or a document that says here's what
9  this definition was meant to cover, some
10 contemporaneous documentation by some of the parties
11 involved here, or some testimony in this area,
12 agriculture aviation, this policy language is
13 typical, is meant to include any use of this
14 airplane for activities that may be associated with
15 aerial agriculture aviation whether its by the
16 insured or for the insured or by third parties who
17 are strangers to the insurance contract.
18       So I guess for purposes of moving ahead,
19 since there has been no desire to put on any
20 evidence here today, I've just been called upon to
21 decide Mr. Reavis' report as if it has been
22 presented.  So, I would grant the motions of
23 National Union to bar Mr. Reavis from testimony
24 consistent with his report.  I don't think it would
25 aid the Court.  I don't think he's a qualified

1  expert.

2  Now speaking sort of candid, is there any
3  evidence out there as to what the parties thought
4  the language would cover?

5  MR. MUELLER: Yes, Your Honor, there is.

6  THE COURT: Could you give me a hint?

7  MR. MUELLER: Certainly, certainly. At the
8  time that the policy was sold, and this took place
9  from, say, the 15th of February, I believe, 2002 to
10 March 1st, 2002 when the policy was actually bound
11 and there was coverage, Pontiac Flying Service went
12 to the agent Hardy and asked for coverage on the
13 turbine plane which was a two seater with dual
14 controls that had been used by the previous owner,
15 Harold Miller, for turbine transition training, and
16 Peterson wanted coverage on the plane intending to
17 use Lucente. When coverage was bound on the plane,
18 and the coverage applies to the plane itself,
19 Peterson of Pontiac Flying Service was informed that
20 there was coverage on the plane but that Peterson
21 required additional turbine transition training in
22 the plane with Lucente as the instructor. So it was
23 his understanding from the beginning that he had the
24 same coverage that Harold Miller had and that there
25 was turbine transition training included within the

1  coverage on the plane provided that it was done by
2  Lucente who was the same person that did it for
3  Harold Miller and who was the same person that was
4  to do it for Peterson in the same plane.
5      So there was an oral agreement or an oral
6  endorsement interpretation by National Union that
7  turbine transition training was covered on this
8  plane with the instructor being Lucente.  Based upon
9  that understanding, the plane was purchased and the
10 Petersons in Pontiac Flying Service then proceeded
11 to use the plane the same way as it had been used by
12 the person that they bought it from, Harold Miller.
13 All of these facts being known by the agent Hardy,
14 and I believe according to Hardy in his testimony by
15 the underwriter for National Union who was the one
16 that said that there would be transition, turbine
17 transition training coverage on this plane to be
18 provided by Lucente.
19      THE COURT:  Okay.  Unfortunately, I don't
20 have any more time right now.  I have another
21 telephone conference to take at 2:00 and it is 2:00
22 now.  But I anticipate that there will be summary
23 judgment motions at some point in the near future.
24      MR. ROCK:  Yes, Your Honor.
25      THE COURT:  Now you have learned that

1  Mr. Reavis' report is not going to be in its present
2  form -- well, his report is not going to be part of
3  that mix, but you also know that the position that
4  I've taken as to what type of information the Court
5  believes could assist it, so I guess that issue may
6  surface again in connection with summary judgment
7  motions.
8      So, if there is not anything else, I will
9  adjourn the hearing.
10     MR. ROCK: I have nothing further, Your
11 Honor.
12     MR. MUELLER: The only point that I would
13 make in addition, Your Honor, was there was one
14 facet of the Reavis report, I don't know whether a
15 supplemental report will be filed or not, but that
16 was the opinion of Reavis in the insurance industry
17 that an underwriter of policies dealing with
18 specialized coverage takes into account and is
19 deemed to know the custom and usage within the
20 industry that is specialized for which the policy is
21 written. That's not the bottom line opinion
22 interpreting the language in this policy but that is
23 background as to what the understanding would be of
24 an insurance underwriter. And I believe he is
25 competent to give that kind of opinion assuming

1  there is also the corollary that in this instance
2  that would include turbine transition training
3  instruction for third party.
4       THE COURT:  I guess what I'm saying is I
5  don't need Reavis to help me understand that type of
6  opinion from that type of person.  I don't need a
7  middle man, which is what I consider Reavis, to
8  parrot back to me what he understands this person
9  that you're talking about is going to say.  If there
10 is someone out there who has knowledge about the
11 custom and the -- this particular insurance industry
12 and his coverage of planes making this type of work,
13 that may be admissible but I don't need Mr. Reavis
14 to interpret it for me which is what I think he is
15 doing in this report.
16      So I guess with that qualification, I am not
17 saying that you can't use your person.  What I'm
18 saying is that I don't need Reavis to interpret that
19 for me.  He is not equipped to do that.  Okay.
20 Hearing is adjourned.
21      (Which were all of the proceedings had in
22       this case on this date.)
23          *          *          *          *          *
24      I certify that the foregoing is a correct
25 transcript from the record of proceedings in the

above-entitled matter.

_____    3-22-05
NANCY MERSOT                        DATE