SKS 357585                                                                    3917-8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) ) |
| Plaintiff, | ) Case No. 03-CV-01288 ) |
| v. | ) ) |
| PONTIAC FLYING SERVICE, INC., JUSTYN WEBSTER, As Special Administrator of the Estate of NEIL WEBSTER, Deceased, and CAREN S. LUCENTE, as Independent Executor of the Estate of RICHARD P. LUCENTE, Deceased, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| And | ) ) |
| PONTIAC FLYING SERVICE, INC. | ) ) |
| v. | ) ) |
| HARDY AVIATION INSURANCE, INC., | ) ) |
| Third Party Defendant. | ) ) |
| . | ) |

### NATIONAL UNION'S  REPLY IN SUPPORT
### OF MOTION FOR SUMMARY JUDGMENT

Plaintiff, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. ("National Union"), by its attorneys, HASSELBERG, ROCK, BELL & KUPPLER and TRESSLER, SODERSTROM, MALONEY & PRIESS, submits the following Reply In Support of Its Motion For Summary Judgment against Defendant, PONTIAC FLYING SERVICE, INC. ("Pontiac"), JUSTYN WEBSTER, and CAREN S. LUCENTE, pursuant to Federal Rule of Civil Procedure 56:

## I.    INTRODUCTION

Pontiac searches in vain for a foothold upon which to support its claim for coverage under its aerial applicator policy for a loss which resulted during Pontiac's unauthorized operation of a nationally advertised flight school with its turbine powered agricultural aircraft – an aircraft insured by a standard aerial applicator policy.  However, neither the facts nor the law support Pontiac's belated effort to manufacture coverage where none was purchased nor intended.  Moreover, the rules of reasonable interpretation and common sense preclude the conclusion that Pontiac understandably desires.  The National Union policy simply does not apply to the loss of Pontiac's Air Tractor during commercial flight training activity – an activity that clearly was not the "approved use" under the policy.

## II.    "UNDISPUTED FACTS"

Herein, National Union replies to certain of Pontiac's responses to National Union's "Statement of Undisputed Facts."  National Union also takes issue with certain of Pontiac's purported "Additional" facts.

### *Replies To Selected Responses Of Pontiac To National Union's Undisputed Facts*

National Union cannot, within the constraints of time and space, make point-by-point replies to all of Pontiac's "disputes" on the facts because Pontiac makes numerous conclusory statements, followed by citations to a record that does not support such conclusions, either directly or indirectly.  However, National Union herein replies as follows to certain of Pontiac's disputes as to the facts stated by National Union:

NATIONAL UNION FACT:

3.      The aircraft was added to the policy for the purpose of aerial application. (Hardy, p. 74).

REPLY:

Pontiac takes the position that the aircraft was also added to the policy for turbine transition training.  Pontiac's citation to the record is absolutely, 100% devoid of anything to support this.  The Court will note that **both** Randy Hardy (the broker) <u>and</u> Scott Petersen specifically deny having any conversation about turbine transition training.  The closest that Pontiac can come to anything even approaching this is Scott Petersen's carefully crafted testimony that he "understood" that he would be covered for his own additional flight training. The record itself does not support this, however, as it is undisputed that the aircraft was added to the policy with Scott already identified as a <u>named</u>, approved pilot.

Pontiac repeatedly references the fact that the prior owner of the subject aircraft – Harold Miller's Flying Service – used the aircraft for training.  With no evidence regarding the type of insurance Harold Miller's Flying Service purchased, Pontiac loosely suggests that the National Union policy should apply to turbine transition training because the prior owner was using it for the same purpose.  This obviously does not make sense.  To the extent that Pontiac is suggesting the agent – Hardy – should have known of the intended use, and should have procured the proper insurance therefore, Pontiac is both wrong and off-point.  What Hardy knew or did not know, or what it should have done or not done, is irrelevant.  The instant motion is brought by National Union – not Hardy.  Moreover, the record contains no information to suggest that Hardy knew of any intended use of the aircraft other than aerial application.

NATIONAL UNION FACT:

4.     Hardy's notes from the time coverage was bound…indicate that Scott Petersen had already obtained…turbine transition training…" (Hardy dep., p. 127-128).

REPLY:

Pontiac's suggestion that coverage on the Air Tractor was to be conditioned upon Scott receiving additional training is absolutely contrary to the facts.   The notes and the policy endorsement speak for themselves.  When the Petersens first inquired about getting insurance on the aircraft, Scott was told he may need additional training.  By the time the aircraft was actually purchased and added to the policy, Scott had received the training (from Harold Miller's Flying Service) and was a named, approved pilot on the policy.  There was no discussion of additional training to take place after coverage was to be bound.  In any event, what on earth does this have to do with whether Mr. Petersen could open a turbine transition flight school under the policy?

NATIONAL UNION FACT:

5.   Hardy never had any discussions with Scott or Sarah Petersen about…using the Air Tractor for the purpose of operating a commercial turbine transition training program. (Hardy dep., p. 76).

REPLY:

How can Pontiac dispute this and in so doing cite to Scott Petersen's and Randy Hardy's testimony?  They both admit it was not discussed.  When asked whether he had conversations with the broker about operating a flight school with the airplane Petersen testified "not that I remember…" (Petersen Sworn Statement, p. 28).  When asked if he discussed turbine transition training with the agent, Mr. Petersen testified "Not for the transition training, just for the aerial application.") (Petersen Sworn Statement, p. 25).   Hardy, too, denied having any such

conversations.  Pontiac continually confuses Petersen's purported "understanding" of the scope of his coverage with the actual conversations that Scott and Hardy testified to having about the coverage.  Pontiac repeatedly attempts to blur this most obvious distinction.

NATIONAL UNION FACT:

8.  Hardy… recalls that Petersen already had the required training in the aircraft to be added as an approved pilot. (Hardy, p. 127).

REPLY:

Why is Pontiac so anxious to dispute this?  Even if it were true that Petersen "needed additional training" at the time the coverage were bound, it does not support Pontiac's position that operating a national flight school would be covered.  Moreover, the policy in effect at the time of the loss was not the policy in effect at the time the aircraft was first added to the policy. In any event, one wonders why Pontiac insists on citing Mr. Hardy's testimony in support of facts which do not appear there.  Hardy did not say that Petersen needed additional training as of the time the aircraft was actually added to the policy.  The references to training relate to the time when Scott Petersen first inquired about possibly purchasing the aircraft.

NATIONAL UNION FACT:

14.  At some point prior to the accident, …Scott and/or Sarah Petersen, had contacted Hardy to inquire about running an agricultural flight training program using their piston-powered "Ag Cat" airplanes [not the turbine Air Tractor] and Hardy discussed with them some of the required changes needed for a policy to include training activity with the ag airplanes. (Hardy dep., p. 113).

REPLY:

Finally, Pontiac admits a plain fact.  It also admits that Pontiac was turned down, <u>prior to</u>

<u>the accident in question</u>, for ag training coverage in its piston Ag Cat airplanes.  Those airplanes were already insured under the National Union policy for aerial application.  Thus, this pivotal, admitted fact establishes beyond question what is already known:  namely, that Pontiac was not confused about the issue of whether it needed specific coverage to run a flight school.  It knew. It had applied for similar coverage for a different airplane <u>within the prior year</u>.

NATIONAL UNION FACT:

19. Randy Hardy never had any conversations with the Petersens about their use of the Air Tractor for turbine transition training.

REPLY:

Pontiac disputes this fact by asserting that "Scott Petersen always understood that he had coverage for turbine transition training… [and] he discussed that with Randy Hardy. (Response, p. 9).  In fact, Scott Petersen's "understanding" is not a fact which could support coverage, even if he did discuss his "understanding" with Randy Hardy.  The instant motion involves National Union, not Randy Hardy.

### Responses to Certain of Pontiac's "Additional Material Undisputed Facts"

National Union responds herein only to certain of Pontiac's "additional facts" which National Union disputes:

PONTIAC FACT:

6.     At the time of the loss the plane was being used to provide turbine transition training to Neil Webster and for the flight of turbine powered aircraft in the application of seeds, fertilizers or chemicals, also known as "crop dusting."

RESPONSE:

There is not a shred of evidence in the record to suggest that the aircraft in question was being used in the "application of seeds, fertilizers, or chemicals at the time of the accident. The NTSB report on this accident (a matter of public record: www.ntsb.gov) itself establishes that this was a flight undertaken pursuant to a commercial turbine transition training program. The aircraft was not carrying or dispersing any agricultural products, nor was it en route to obtain fuel, maintenance or product.

PONTIAC FACT:

7.    The plane was an Air Tractor 503 which contained two seats and dual controls. It was of a type which was specifically designed and manufactured for turbine flight training.

RESPONSE:

Like nearly all airplanes, the Air Tractor 503 contained two seats and dual controls. The aircraft was obviously designed for aerial application. Pontiac's assertion that this aircraft was somehow "designed…for turbine training" is untrue and unsupported in the record, notwithstanding the string of deposition citations included with the statement.

PONTIAC FACT:

7-11.  In the agricultural aviation industry, it is commonly understood and accepted that…

RESPONSE:

Pontiac has apparently misunderstood this Court's inquiry, as set forth in the hearing transcript of the hearing at which this Court barred Pontiac's expert and struck Pontiac's "industry affidavits." (Language cited in Pontiac's response, p. 23). This Court advised counsel that, while it did not view the operation of a flight school as being in direct support of aerial

application, it would take note of evidence that, in the industry, the policy language "flights in direct support thereof" includes such activities. Instead of providing such evidence (which does not exist in any event), Pontiac has provided, by affidavit of industry operators, the opinion that, in essence, flight training is required, and is therefore in direct support, of aerial application operations. However, the Court can reasonably assume that flight training is required to fly a crop dusting airplane. That is not an issue. Everyone knows this. This does not suggest that, in the industry, an aerial applicator policy covers the insured for its operation of a commercial flight training program. The additional affidavits provided by Pontiac offer no assistance to the Court but instead state self-evident facts couched in conclusory language that is designed to suggest that the affidavits are in reference to the interpretation of insurance policy language – which they clearly are not.

PONTIAC FACT:

24.    Scott Petersen on behalf of Pontiac sought coverage on the plane for the same uses which Harold's Flying Service had made of it, including transition training instruction by Lucente.

RESPONSE:

This appears to be a continuation of Pontiac's use of Scott Petersen's "understanding" versus the actual discussions which took place with the broker. The record is devoid of any indication that Scott Petersen and Randy hardy discussed Pontiac operating the same business as Harold Miller's Flying Service. Pontiac's citations refer only to evidence in the record that the parties knew that Pontiac had purchased the Air Tractor from Harold Miller. In fact, Pontiac even admits that it purchased certain <u>assets</u>, not that it purchased Harold Miller's <u>business</u>. (Pontiac's Additional Fact No. 20). Even if Pontiac could show that it told Hardy that it wanted

8

to have the exact insurance program carried by Harold Miller (which the record clearly does not show), this would be irrelevant to the motion before this Court.  The scope of National Union's policy does not get broadened simply because of Pontiac's claim that Hardy should have known it needed different or additional coverages than were procured.

PONTIAC FACT:

26.    At the time the endorsement was issued [adding the aircraft] Scott Petersen was told by Randy Hardy that coverage was in effect as of March 1, 2002, but that he was to have additional turbine training in the plane…

RESPONSE:

It is notable that Pontiac cites a post-accident memo from Randy Hardy in very indirect support of this proposition. (The "Houston, we have a problem" E-Mail).  First, who would issue a policy approving a specific pilot contingent upon some vague promise to do more training? This would never happen and the record does not support the conclusion that it happened here. Second, taken in context, Hardy's post-accident memo clearly demonstrates that Hardy was confused because Petersen was told during his initial inquiry about purchasing the plane that he would need additional training (which he in fact received from Harold Miller's Flying Service before purchasing the plane).  In fact, Hardy's deposition testimony is consistent with the records in the case, which establish that Petersen had already been trained when the policy was endorsed and he was named as a pilot to fly the Air Tractor.  In any event, once again, what would additional training of Scott Petersen have to do with running a commercial flight school?  Is this Court being asked to conclude that if Scott were entitled to do additional training in the aircraft he could then also operate a flight school and train third parties to fly his airplane in exchange for compensation?  Such a conclusion is beyond reason.

PONTIAC FACT:

28.        It was and is Scott Petersen's **understanding** that Harold Miller's Flying

Service had coverage on the plane for turbine transition training…

29.        It was and is Scott Petersen's **understanding** that he received the same

coverage…

30.        It was and is Scott Petersen's **understanding** that there was coverage…

(Emphasis added)

RESPONSE:

Scott Petersen's purported "understandings" were wrong.  His "understandings" are not

facts.  To the extent that his "understandings" have any relevance at all, it would relate to his

relationship with his broker – Hardy – not to the fact of what coverage was purchased and what

was or was not covered under the policy.  Moreover, Mr. Petersen's negotiation of potential

terms for coverage to perform ag training in an Ag Cat airplane, as well as his purchase of

insurance to cover training in Pontiac's general aviation airplanes, belies any claim that he

actually understood his coverage to include the operation of a turbine transition training flight

school.  Finally, one should not lose sight of the fact that Mr. Petersen was free to read his

insurance policy.  If he has no obligation to review his coverage, and his "understandings" as to

what coverage applies control the scope of coverage, then what purpose does the policy serve?

PONTIAC FACT:

34.      At no time was Scott Petersen told by Randy Hardy that Pontiac did not have

coverage…for turbine transition training…

RESPONSE:

Nor, doubtless, was he told that he had no coverage to use the airplane for amusement

rides at the local county fair. It is no less obvious that he had no such coverage. Pontiac apparently fails to consider that reading the policy is an option, as it defines the coverage provided, not the broker.

36.    The Policy contains no exclusion for business related uses of the plane, including its use in Pontiac's turbine transition training instruction program.

RESPONSE:

The policy included an exclusion for use of the plane for any use not approved under the policy. The specified use under the policy was "aerial application." If the policy included a "business related use" exclusion, then Pontiac could not have used it for aerial application, insofar as aerial application is a business use. Finally, if Pontiac had bothered to mention to anyone that it intended to use its aerial application airplane to run a nationally advertised turbine transition flight school, National Union would then have known to include an exclusion for turbine transition training programs. As it was, the coverage agreement did not afford coverage for such use of the aircraft so National Union no doubt never considered it necessary to add such an exclusion. National Union also did not include an exclusion for the use of the aircraft for amusement rides at the local county fair or for any number of other unforeseeable uses that do not relate to crop dusting operations. Its failure to include these exclusions is similarly irrelevant to the analysis of whether this crop dusting policy covered Pontiac's turbine transition flight school.

37.    No one knows who was piloting the plane at the time of the loss.

RESPONSE:

Although irrelevant, this is also untrue from a legal perspective. Rick Lucente was the only person on board the aircraft who was qualified to fly it as Pilot in Command (PIC). Pontiac

itself would have no trouble obtaining affidavits from experienced pilots offering the firm opinion that the PIC was at the controls attempting to recover control at the time of the accident. Can one imagine Mr. Lucente NOT attempting to regain control? Since the definition of "passenger" in the National Union policy includes anyone on board the aircraft, including crew, and liability coverage for "passengers" is excluded, it does not matter who was flying. That has no bearing at all on the instant motion for summary judgment.

### III.    ARGUMENT

This matter is not about case law interpreting auto policies. There is little guidance from the courts with regard to the interpretation of the specific insurance policy provision at issue. This case is one which calls for the Court to apply its judgment in reviewing the record and policy language in order to come to a conclusion as to what makes sense under the circumstances. It does not make sense that operating a nationally-advertised turbine transition agricultural flight school would be deemed by an insured to come within his aerial applicator insurance policy. Nor could the insured here have been confused. Pontiac had recently requested and had been turned down for similar coverage. Given the facts of this case, there can be no reasonable finding of any ambiguity in the relevant policy language as a matter of law.

Pontiac placed itself in an unenviable position. It elected to take the risk of embarking upon a new business venture (commercial flight training) without purchasing the proper insurance to protect its interests in connection therewith. Pontiac is an experienced fixed base operator with a general aviation and an agricultural aviation business. It knew better. It should not be allowed to extricate itself by turning common sense and the English language on end. Nor should National Union be asked to underwrite a new risk in hindsight that was not covered by its

policy – particularly here, where the record establishes that National Union specifically declined to insure Pontiac for flight training activity in its <u>less complex</u> piston agricultural aircraft prior to the accident.

Pontiac's response is both artful and creative, and indeed impressive for what it attempts to do - but it is no less transparent, and is perhaps made more transparent through its very ingenuity. First, Pontiac disputes many of the facts in the record asserted by National Union and asserts contrary, conclusory facts with purported citations to the record that do not support the facts and conclusions which Pontiac suggests. The record speaks for itself.

Second, recognizing that the appearance of ambiguity is its salvation, Pontiac leads the Court down a winding path of interpretation and reinterpretation of plain English, twisting and turning the meaning of plain words – suggesting that definitions require definitions, and the definitions of those definitions, apparently, require still further definitions. Indeed, in Pontiac's view, its aviation policy would cover nearly anything that could be even tangentially associated with aerial application. But this is not the case. We know that. Some things are too far removed to be related to aerial application. Operating a nationally-advertised turbine transition flight school is certainly one of them.

Nor should this Court be led to sympathize with an apparently confused insured. First, Pontiac was not confused. It had already been denied coverage for the use of its piston airplanes for agricultural flight training. Moreover, Pontiac knew that it had specific coverage under a separate policy for flight training activity in its general aviation airplanes. Pontiac knew full well that specific coverage is required in order to run a flight school. Scott Petersen's carefully couched testimony, in which he purports to have believed that training was to be permitted in the aircraft so that he could receive additional training, is not credible under the circumstances and in

any event does not explain why he would then conclude that he had coverage to start an agricultural flight school.   Nobody involved in the aviation business would be this naïve and the record establishes that, in fact, Scott Petersen was not this naïve.   To the contrary, he is an experienced Fixed Base Operator, business person and pilot, who took a calculated risk with regard to his business and insurance coverage.

### A.  Pontiac's Affirmative Defenses Cannot Defeat Summary Judgment

Pontiac continues to throw up a roadblock to a disposition on National Union's request for judgment as to coverage under the policy by raising its affirmative defenses.   However, the record is now sufficiently developed that no disputed issue of material fact exists which could support those defenses.

By way of background, National Union filed a motion for judgment on the pleadings in this case at the onset, and Pontiac responded in large part by asserting that it was entitled to take the deposition of the insurance agent in order to determine whether its affirmative defenses of waiver and estoppel might have merit. In short, Pontiac's affirmative defenses assert that National Union is bound by the alleged words or actions of the insurance broker – Hardy Aviation.[1] While maintaining its position that interpretation of the insurance policy is a matter of law for the Court, National Union agreed to, in essence, convert its motion to a Rule 56 motion for summary judgment to allow for limited discovery to satisfy Pontiac that the agent (Hardy) has no agency agreement with National Union, has no binding authority, and did nothing to cause any waiver or estoppel.   National Union produced documents establishing that no agency

---

[1]   It will be assumed for purposes of this discussion that Hardy actually did or said something that could create waiver or estoppel, although this is disproven by the deposition testimony of Scott Petersen and that of Randy Hardy, both of whom confirm that no discussions took place re coverage for turbine training.

relationship existed and Pontiac took Randy Hardy's deposition and elicited no testimony to the contrary. Despite the fact that not a single fact exists which could support a claim of waiver or estoppel, Pontiac nonetheless seeks to buy additional time for itself by raising its affirmative defenses.

National Union produced the "premium payment agreement" between AIG Aviation (under which the National Union coverage is issued) and Hardy. This agreement specifically states that no agency relationship exists but instead business is handled on a "brokerage basis." (See Exhibit A, attached hereto). Hardy had no independent binding authority but had to get authority to bind from AIG Aviation (Hardy, p. 136). More important, Pontiac – in its own pleadings, admits to a relationship of many years with Hardy (it continues to use Hardy as its broker to this day) and its affirmatively states in its response brief that Hardy is Pontiac's broker ("At the time the endorsement providing coverage on the Air Tractor 503 was issued the Hardy Insurance Agency was acting as the agent/broker for Pontiac Flying Service"; Response, p. 12, par. 18).

How then, in light of this, can Pontiac continue to assert that National Union somehow may have waived its rights or is otherwise estopped to deny coverage because of the alleged representations (even though there is no evidence of any representations) of Hardy? There is no evidence that National Union had any direct contact whatsoever with Pontiac nor is there any evidence that National Union made any representations suggesting that Pontiac could use the airplane to operate a flight school. National Union approved the issuance of an endorsement adding the Air Tractor to the policy and identifying Scott Petersen as an approved pilot. That's all. National Union did nothing to suggest that the coverage afforded was anything other than what was in black-and-white in the policy. No possibility for waiver or estoppel exists. Pontiac

cannot continue to use its purported affirmative defenses as a means of warding off a judgment in this case.  National Union's request to be heard on its motion for summary judgment is long overdue.  Judgment should be entered in its favor on the pending motion for summary judgment.

### B. Operating A Flight Training Program Does Not Come Within The Reasonable Interpretation Of The Definition Of "Aerial Application."

As an initial matter, this Court should reject Pontiac's suggestion that every word or phrase in an insurance policy needs to be defined.  Pontiac expends much energy explaining, and indeed proving that National Union has not defined the phrase "in direct support" and therefore, according to Pontiac, any conceivable activity with the Air Tractor could come within the ambit of Aerial Application.  This simply does not wash.  At some point, the definitions stop and common sense combined with plain English prevails. An insurer is not obligated to provide definitions of definitions.

Pontiac neglects to consider the reality that it would be impossible to define every conceivable activity that is arguably in direct support of aerial application. Therefore, some room must be left in the definition for good faith and reasonable interpretation of what is related.  If the parties cannot agree in good faith on the scope of the definition, it is up to the Court to determine what is reasonable and what is consistent with the purpose of the policy, the intent of the parties, and the reasonable expectations of the insured.  This case does not even involve a close question on the matter.  Operating a flight school with the airplane is so clearly not within a good faith understanding of the definition of "aerial application" that it stretches credibility for Pontiac to suggest otherwise.

### C. Pontiac's New "Affidavits" Do Not Provide This Court With Any Evidence That The Industry Considers The Operation Of A Flight School To Come Within An Insurance Policy Definition Of "Aerial Application."

Pontiac's new "Affidavits" obviously do not provide any indication as to how the language in the National Union policy is typically interpreted in the agricultural aviation industry. This is the standard that was set by this Court when it struck Pontiac's "expert" and prior affidavits of aerial applicators. Pontiac's new affidavits fall far short of the standard. It is self evident that any aerial applicator is going to agree that, in the most general sense, flight training in an agricultural airplane is required in order to fly such an airplane. This does not translate into the conclusion that aerial applicator policies have traditionally been interpreted as covering aerial applicators for their independent pursuit of an agricultural aviation school to train third party pilots commercially. In any event, such a conclusion would be nonsense. Pontiac has not and cannot provide evidence of even a single incidence where such a policy has been deemed to cover such activities. It would be inconceivable, as Pontiac well knows. The new affidavits should be stricken and, more important, they should be ignored as irrelevant.

### D. The Absence Of A Purported "Business Exclusion" Is Irrelevant

Pontiac's strategy is to set up rows of straw men that it can knock down. Its "business risk" exclusion argument is yet another example of this. First, Pontiac invents a new exclusion. Then, it claims that it is entitled to coverage because the exclusion is not included in the policy – as though some underwriter simply forgot to add it. Pontiac neglects to consider the basic rule that the insuring agreement defines the scope of coverage, not the exclusions. In this case, the operation of a commercial flight school does not come within the coverage agreement in the first place so there would be no basis to include any such "business use or pursuit" exclusion

(whatever that is).  Nor would there be any need for a host of other potential, irrelevant exclusions regarding all manners of bizarre and unforeseeable uses of the airplane.  Finally, it is notable that a "business use" exclusion, if one were included, would actually preclude Pontiac from using the aircraft even for aerial application, since such use is obviously a business pursuit. Pontiac's argument on this point simply makes no sense.

It is interesting to note that Pontiac points to exclusion c in the <u>liability</u> coverage (which excludes coverage for use of the airplane in a paid flight training program) as support for the proposition that such coverage therefore exists under the <u>aircraft hull</u> coverage.  First, does this not fly in the face of Pontiac's claim that it is entitled to a defense in connection with the underlying <u>liability</u> claim? It does not dispute that it was being paid to provide flight training so the exclusion obviously applies. Moreover, is it really conceivable that an insurance policy with flight training <u>exclusions</u> in the liability coverage (not to mention a passenger exclusion set forth right in the Declarations) anticipates an interpretation of the hull coverage that includes use of the airplane for operating a flight training program?  Obviously not.  Pontiac's effort to make every conceivable argument is counterproductive and only underscores that no reasonable person reading the National Union policy could possibly conclude that Pontiac was entitled to start up a nationally advertised commercial turbine transition training program under its crop dusting policy.

### E.  There Can Be No Reasonable Claim That The National Union Policy Provides Third-Party Liability Coverage For Passengers.

Perhaps recognizing that it is an uphill battle to establish a case for liability coverage under a policy that excludes passenger liability right on the Declarations of the policy, Pontiac elects to exhibit its most fantastic creativity yet.  Pontiac seems to suggest that, while coverage

probably does not apply here, the duty to defend is so broad that perhaps National Union can be sucked into at least a defense obligation in the liability lawsuit through creative interpretation of the policy and pleadings.  This simply does not bear out.

Pontiac argues that, since we cannot know for certain who was flying the airplane at the time of the loss, perhaps one of the occupants – the one who was actually controlling the airplane – was not a "passenger" or "crew" and therefore not within the definition of "passenger," and therefore not within the "passenger" exclusion.  Pontiac makes this argument despite the fact that the policy definition of "passenger" includes <u>anyone</u> in the airplane, whether riding or flying, including crew.  Through some tortured, incomprehensible interpretation of this definition, Pontiac contends that the pilot actually flying the airplane might not be a passenger or crew, or, apparently, even a "person" riding in or flying the airplane.  What??

The National Union policy, like most aerial applicator policies that are issued, anticipates that the only person on board the aircraft is the insured's own employee (who is covered by workers compensation) flying the airplane for the purpose of applying seeds, chemicals or fertilizers or some flight in direct support thereof (e.g., fuel, maintenance, acquisition of product).  The policy on its face does not anticipate that any non-employee, third party will be flying or riding in the aircraft.  Therefore, there is no need for liability coverage to apply to anyone on board the aircraft.  Period.  Again, one may reasonably ask how Pontiac could have believed that it could invite third party pilots to board this aircraft for the purpose of offering them flight instruction when the policy <u>on its face</u> excludes liability coverage for <u>anyone</u> in the airplane.

### III.    CONCLUSION

For the reasons set forth above, Plaintiff National Union Fire Insurance Company of Pittsburgh, PA respectfully requests that this Court enter summary judgment in its favor and against all Defendants on Counts I, II and III of its Amended Complaint for Declaratory Judgment, and declare as follows:

A.    The loss of the Air Tractor and the Webster Complaint do not come within the coverage of NATIONAL UNION Policy No. AV 3391999-04, and are also expressly excluded from coverage under the policy, because the loss of the Air Tractor and the death of its occupants on May 5, 2003 resulted from a purpose of use of the aircraft other than "aerial application;"

B.    NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. owes no indemnity obligation to PONTIAC FLYING in connection with the loss of the Air Tractor and no defense or indemnity obligation to PONTIAC FLYING and/or LUCENTE in connection with the Webster Complaint under the terms of NATIONAL UNION Policy No. AV 3391999-04;

C.    NATIONAL UNION Policy No. AV 3391999-04 does not provide coverage for any damages arising out of "bodily injury" sustained by either LUCENTE or WEBSTER because they were "passengers" aboard the Air Tractor at the time of the loss on May 5, 2003 and therefore liability in connection with such claims is not included within, and is expressly excluded from, coverage;

D.    LUCENTE is not an "Insured" as defined by NATIONAL UNION Policy No. AV 3391999-04 with respect to the loss of the Air Tractor and the death of its occupants on May 5, 2003; and

E.    NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. owes no defense or indemnity obligation to PONTIAC FLYING and/or LUCENTE in connection with the Webster Complaint under the terms of NATIONAL UNION Policy No. AV 3391999-04.


NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.


_____s/    Mark T. Banovetz_____
One of Its Attorneys

Jeffrey B. Rock                              Mark T. Banovetz
Hasselberg Rock Bell & Kuppler              Tressler, Soderstrom, Maloney & Priess
4600 North Brandywine Drive                 Sears Tower, 22nd Floor
Suite 200                                   233 South Wacker Drive
Peoria, Illinois 61614                      Chicago, Illinois 60606-6308
(309) 688-9400                              (312) 627-4000

                                            Attorney for Plaintiff NATIONAL UNION