1   STATE OF ILLINOIS        )                                    12:42:54
                             )
2   COUNTY OF COOK           )

3           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                 COUNTY DEPARTMENT, LAW DIVISION
4
    NATIONAL UNION FIRE INSURANCE  )
5   COMPANY OF PITTSBURGH, PA.,     )
                                    )
6           Plaintiff,              )
                                    )
7           vs.                     ) No. 03-1288
                                    )
8   PONTIAC FLYING SERVICE, INC.,   )
    Et al.,                         )
9                                   )
            Defendants.             )
10                                  )
                 And                )
11                                  )
    PONTIAC FLYING SERVICE, INC.,   )
12                                  )
            Third Party Plaintiff,  )
13                                  )
            vs.                     )
14                                  )
    HARDY AVIATION INSURANCE, INC., )
15                                  )
            Third Party Defendant.  )
16

17

            The discovery deposition of SARAH PETERSEN
18  called for examination pursuant to the provisions of the
    Civil Practice Act and Rules of the Supreme Court as they
19  apply to the taking of discovery depositions, taken
    before Laura J. Amberg, CSR, State of Illinois, on the
20  22nd day of February, 2005, at the hour of 12:50 p.m., at
    416 Main Street in the City of Peoria, County of Peoria,
21  State of Illinois.

22

23

**EXHIBIT**

tabbies

B

2

```
1   PRESENT:    TRESSLER, SODERSTROM, MALONEY & PRIESS
               BY: MARK T. BANOVETZ, ESQ.
2              Sears Tower, 22nd Floor
               233 S. Wacker Drive
3              Chicago, IL 60606-6308
                   Attorney for the Plaintiff;
4

5          CASSIDY & MUELLER
               BY: DAVID B. MUELLER, ESQ.
6              416 Main Street, Suite 323
               Peoria, IL 61602
7                  Attorney for Defendant/Third Party
                   Plaintiff Pontiac Flying Service;
8
               CLAUSEN MILLER, P.C.
9              BY: DIANE M. BARON, ESQ.
               10 South LaSalle Street
10             Chicago, IL 60603-1098
                   Attorney for Third Party Defendant
11                 Hardy Aviation Insurance;

12  PRESENT
    VIA PHONE:  CLIFFORD LAW OFFICES
13             BY: MICHAEL KRZAK, ESQ.
               120 North LaSalle Street, Suite 3100
14             Chicago, IL 60602

15  ALSO PRESENT: SCOTT PETERSEN
16
17
18
19
20
21
22
23
```

3

```
1                   SARAH PETERSEN

2          After being first duly sworn upon her oath

3              Testified as follows in response to

4                      EXAMINATION

5   BY MS. BARON:

6       Q.   Would you state your name for the record,

7   please?

8       A.   Sarah Petersen.

9            MS. BARON:  For the record, this is the

10  deposition of Sarah Petersen taken pursuant to notice and

11  by agreement of the parties.

12      Q.   (Ms. Baron continuing.)  Sarah, my name is

13  Diane Baron and -- do you mind if I call you Sarah?  Is

14  that --

15      A.   That's fine.

16      Q.   I represent Hardy Aviation Insurance and I

17  will be asking you some questions.  You sat in your

18  husband's deposition so you have some idea of what that

19  would be.  Okay?

20      A.   Yeah.

21      Q.   Have you given a deposition before?

22      A.   No.

23      Q.   As I instructed your husband, just keep your
```

4

```
1   responses verbal so the court reporter can take them down

2   and if you don't understand me or don't hear me, let me

3   know and we'll repeat the question.  Okay?

4       A.   Okay.

5       Q.   Did you review anything in preparation for

6   your deposition today?

7       A.   Yes.

8       Q.   What did you review?

9       A.   Statements.

10      Q.   What sort of statements?

11      A.   General paperwork that -- you know, regarding

12  the case.

13      Q.   Okay.  Do you recall what that was?

14      A.   The depositions that were taken from Randy

15  Hardy.

16      Q.   The deposition of Randy Hardy?

17      A.   Of Randy Hardy.

18      Q.   Okay.

19      A.   And Joe Vance.

20      Q.   Anything else?

21      A.   Not in particular.  I mean, we went over

22  things with our attorney.

23      Q.   Okay.  Did you talk to anybody else about
```

5

```
1   your deposition other than your attorney?

2       A.   No.

3       Q.   What is your date of birth?

4       A.   3/15/64.

5       Q.   And where do you live?

6       A.   Specific address?

7       Q.   Yes.

8       A.   15801 East 2000 North Road in Pontiac,

9   Illinois.

10           (Off the record discussion.)

11      Q.   (Ms. Baron continuing.)  And you live there

12  with your husband Scott and three children; is that

13  correct?

14      A.   Yes.

15      Q.   Could you tell us briefly about your

16  education?

17      A.   Graduate -- high school graduate and no

18  further education.

19      Q.   When did you graduate and from where?

20      A.   1982, Central City High School in Central

21  City, Nebraska.

22      Q.   And what employment have you had since

23  finishing high school, besides being a mom?
```

6

1    A.    I was a bookkeeper/secretary for the trucking
2    business that we owned and operated.
3        Q.    That was in Nebraska?
4    A.    In Nebraska.
5        Q.    Okay.
6    A.    I've done various secretarial stints. I
7    filled in for a gal who was pregnant one time, just
8    general things of that nature.
9        Q.    And you are not a licensed pilot; correct?
10    A.    No, I'm not.
11        Q.    You are a co-owner of Pontiac Flying Service;
12    correct?
13    A.    Uh-huh.
14        Q.    As well --
15        MR. MUELLER:  You have to say yes.
16    A.    Yes.
17        Q.    Yes. I'm sorry, I should have caught it.
18    And you're also an owner of Pontiac Flying Service, Inc.;
19    is that correct?
20    A.    Yes.
21        Q.    Have you had contact with an insurance broker
22    regarding your insurance for Pontiac?
23    A.    Pontiac what?

7

1        Q.    Either. Take them separately. Did you have
2    contact with an insurance broker regarding your insurance
3    for Pontiac Flying Service, Inc.?
4    A.    Yes.
5        Q.    And was that Hardy Aviation Insurance?
6    A.    Yes.
7        Q.    When did you first start using Hardy as your
8    broker?
9    A.    January of --
10        MR. MUELLER:  Again, this is Inc.? Pontiac
11    Flying Service, Inc.?
12        Q.    Yes, yes.
13    A.    I thought you said both.
14        Q.    Why don't we distinguish them just so I'm
15    clear.
16    A.    Pontiac Flying Service would have been in
17    July of 1997 --
18        Q.    Okay.
19    A.    -- to previous -- to present. Pontiac Flying
20    Service, Inc., would have been in February of 2002 when
21    we purchased the assets of Harold Miller.
22        Q.    Now, Pontiac Flying Service owned some
23    planes; correct?

8

1    A.    Yes. Owned?
2        Q.    Yes.
3    A.    Or owns?
4        Q.    Well, let's -- I'm just saying owned at any
5    particular time.
6    A.    Yes.
7        Q.    And were any of these planes used for
8    instructional flying?
9    A.    Yes.
10        Q.    And were you involved in obtaining insurance
11    for the instructional flying?
12    A.    Yes.
13        Q.    And did you do that by contacting Hardy
14    Aviation Insurance?
15    A.    Yes.
16        Q.    Did you request the insurance for the
17    instructional flying?
18    A.    Yes.
19        Q.    And did he obtain that for you?
20    A.    Yes.
21        Q.    Pontiac Flying Service, Inc., purchased an
22    AT-305 plane; correct?
23    A.    Yes.

9

1        Q.    And do you recall when that was purchased?
2    A.    Yes.
3        Q.    When was it purchased?
4    A.    We signed the papers on the 28th of February,
5    2002.
6        Q.    Okay. And that was purchased from Miller?
7    A.    Harold Miller.
8        Q.    And did you contact anyone at Hardy Aviation
9    Insurance regarding obtaining coverage for the AT-305?
10    A.    I don't recall.
11        Q.    Do you know if your husband did?
12    A.    Yes.
13        Q.    And how is it that you learned that, other
14    than sitting in the deposition today?
15    A.    Yeah, well, in the course of our business
16    there are times he does things, I do things. I do recall
17    that he contacted them to check on the insurance for --
18    it was a part of the process of the purchase.
19        Q.    Do you know when the coverage for the AT-305
20    became effective?
21    A.    It's my understanding it became effective
22    the -- March 1st of -- when Scott called to tell him
23    that, yes, the purchase had gone through, we had signed

10

1   the papers and that we were the owners.

2       Q.   Okay. Did you have any contact with Hardy

3   Aviation Insurance regarding that policy covering the

4   AT-305?

5       A.   **Not that I recall.**

6       Q.   Okay. Do you recall receiving a quote for

7   coverage of the AT-305 or is that something that your

8   husband handled?

9       A.   **I don't recall.**

10      Q.   To your knowledge, what was the AT-305 to be

11  used for by Pontiac? What were you going to use it for?

12      A.   **For what it was designed, agricultural**

13  **aircraft; it was also a training aircraft with the two**

14  **seats.**

15      Q.   Did you ever tell anyone at Hardy Aviation

16  Insurance that you were going to be using the AT-305 for

17  training?

18      A.   **Ask me that again.**

19           MS. BARON: Sure. Could you read it.

20           (Whereupon the question was read.)

21      A.   **Not that I recall.**

22      Q.   (Ms. Baron continuing.) Did you use the

23  AT-305 for training?

11

1            MR. MUELLER: You're talking about the

2   corporation, Inc.?

3       Q.   Right, right.

4       A.   **Well, Scott was given training in it when we**

5   **first acquired it.**

6       Q.   And when was he given training in it, your

7   recollection, do you recall?

8       A.   **I don't recall the specific dates.**

9       Q.   Do you recall who trained him?

10      A.   **Yes.**

11      Q.   Who trained him?

12      A.   **Rick Lucente.**

13      Q.   And who's Rick Lucente?

14      A.   **I guess I'm not sure exactly what you're**

15  **asking me. Who is he?**

16      Q.   Who was he? Did you know him before --

17      A.   **Oh, yes.**

18      Q.   -- he gave this training to your husband?

19      A.   **Yes.**

20      Q.   How did you know him?

21      A.   **First had met him in -- when Scott was at**

22  **Harold's working with him; he was an acquaintance,**

23  **friends.**

12

1       Q.   Okay. Other than this training that Lucente

2   did for your husband, do you recall the AT-305 being used

3   for any other training for anybody else?

4       A.   **Specifically when we owned it, that's what**

5   **you're asking me?**

6       Q.   Yes.

7       A.   **No. Prior to the crash, is that what.**

8   You're --

9       Q.   Right, right, at that point.

10      A.   **Yeah.**

11      Q.   Okay. Did Pontiac advertise providing

12  training with the AT-305?

13      A.   **Turbine transition training, yes.**

14      Q.   And I will show you what we looked at before.

15  Showing you what was previously marked as Exhibit Two,

16  Deposition Exhibit Two, I don't know if you have a copy

17  there.

18      A.   **Uh-huh.**

19      Q.   Is that a copy of one of the ads that was

20  placed by Pontiac for the turbine transition training?

21      A.   **Yes.**

22      Q.   And do you know over what period of time

23  these ads ran?

13

1       A.   **I believe December of 2002 through April,**

2   **May. The ad was canceled once the crash occurred.**

3       Q.   Did you ever have anyone contact you to

4   request training or to ask about it in the AT-305 in

5   response to the ad or any other information?

6       A.   **I do not specifically to the ad. I mean, I**

7   **don't remember someone calling and saying, hey, I seen**

8   **your ad in this particular thing.**

9       Q.   Do you recall them calling and asking?

10      A.   **Yeah, there were people who called that I**

11  **always referred them to Scott. He was -- visited with**

12  **them about that.**

13      Q.   Did you ever tell anyone at Hardy Aviation

14  Insurance that you were advertising for turbine

15  transition training as indicated in Exhibit Two?

16      A.   **No.**

17      Q.   Showing you what's previously been marked

18  Deposition Exhibit Three?

19           MR. BANOVETZ: These aren't numbered.

20           MR. MUELLER: What's the date on it?

21      Q.   It's the aircraft -- it's the insurance

22  application coverage effective April 10, '02, to April

23  10, '03.

14

1      MR. MUELLER: Got it.

2      Q.   If you take a look at that and tell us if you

3   have seen that before?

4      A.   Yes.

5      Q.   Is this the application that was completed by

6   Pontiac with respect to coverage from April 10th of '02

7   to April 10th of '03 which included the AT-305?

8      A.   Yes, actually when the application arrives it

9   has already been filled out by Hardy. I mean, there's --

10  if you're -- these are not things that we filled in.

11  This is sent.

12     Q.   Did you read it when you received it from

13  Hardy?

14     A.   Yeah, I generally give it to Scott for

15  signature, and I don't do his logbook, he does all that

16  information. So even if he looked at it, I would not

17  know.

18     Q.   And it's his signature on the bottom of page

19  two?

20     A.   Uh-huh.

21     Q.   Is that a yes?

22         MR. MUELLER: You have to say yes.

23     A.   Yes, sorry.

15

1      Q.   And then at the top there on the left-hand

2   corner of page two it indicates the box that says

3   passengers excluded; correct?

4      A.   Yes.

5      Q.   Is it your understanding there was no

6   passenger coverage for the Air Tractor 503?

7      A.   I had no understanding of any of that prior

8   to the crash.

9      Q.   Did you ever talk to anyone from Hardy

10  Aviation prior to the crash about passenger coverage for

11  the AT-305?

12     A.   No.

13     Q.   Is it your understanding then that the

14  coverage was placed with USAIG for the AT-305, or do you

15  even know?

16         MR. MUELLER: AT what point in time?

17     Q.   I'm just trying to -- chronologically, when

18  they owned it. Did you have any knowledge as to what

19  insurance company was providing coverage for the AT-305?

20     A.   At the time I paid no attention. Those

21  things were left to Hardy as the expert in the insurance.

22     Q.   Did you ever ask him questions about your

23  coverage?

16

1      A.   I'm sure maybe there were times I did. I

2   can't think of anything specifically that I would have

3   asked. But I honestly left a lot of that to them.

4      Q.   Let me show you what's been marked as

5   Deposition Exhibit One. It's the policy. Do you have

6   that?

7          MR. BANOVETZ: You can borrow that one.

8      A.   Okay.

9      Q.   Have you ever seen this before?

10     A.   Yes.

11     Q.   When did you see it? Did you receive it

12  prior to the loss?

13     A.   I don't recall.

14     Q.   Do you know whether you read it at any time?

15     A.   I wouldn't -- no, I did not read it.

16     Q.   If you could take a look at what's marked

17  Deposition Exhibit Four, that is the application for the

18  coverage May 19th, '02, to MAY 19th, '03. Take a look at

19  that. Have you seen this document before?

20     A.   Yes.

21     Q.   Is that your signature at the bottom of page

22  two?

23     A.   Yes.

17

1      Q.   Why is it that you signed this one, do you

2   know, as opposed to your husband?

3      A.   I'm speculating that at the time --

4          MR. MUELLER: Don't guess.

5      A.   Well --

6      Q.   I don't want you to guess. If you don't

7   know, you don't know.

8      A.   Scott -- this date here --

9      Q.   June 28th of '02.

10     A.   -- yeah, Scott, would not have been in the

11  office then. That's when we do gypsy moth contracts and

12  he would have been gone. I'm guessing that I either seen

13  it hadn't been done or Angie called and I signed it.

14     Q.   And you reviewed it before you signed it; is

15  that correct?

16     A.   I don't recall.

17     Q.   If you look at the top of page two in the

18  left-hand corner it also, as in the other one, the --

19  where it says passengers excluded, that box is checked;

20  correct?

21     A.   Yes.

22     Q.   Is it your understanding that there was no

23  passenger coverage for the Air Tractor 503?

18

1    A.    Ask me that again.

2    Q.    Was it your understanding that there was no

3    passenger coverage for the AT-503 based upon this

4    application that you signed?

5    A.    At the time that I signed it?.

6    Q.    At any time prior to the loss.

7    A.    Ask me that again.

8          MS. BARON: Could you read it back?

9    (Whereupon the question was read.)

10         MR. MUELLER: Objection; calls for a legal

11   conclusion.

12         MS. BARON: Just asking for her --

13         MR. MUELLER: Coverage, that would be under

14   the policy itself.

15         MS. BARON: Just asking for your

16   understanding.

17         MR. MUELLER: If you had an understanding.

18   A.    If I had an understanding, I would say yes.

19   I guess I'm -- I'm confused as to what you're asking me

20   in reference to that. You've already asked that

21   question, although it'd be a different time frame.

22         MR. MUELLER: Is your answer the same or is

23   it different than it was with the other application?

19

1    A.    My answer would be the same and I guess

2    that's what I'm --

3    Q.    (Ms. Baron continuing.) When you signed that

4    application it's your understanding there was no

5    passenger coverage for the planes listed; right?

6          MR. MUELLER: I don't know that that was her

7    answer.

8          MS. BARON: Well, I'm trying to get an

9    answer.

10         MR. MUELLER: Well, that's understood. But

11   she's tried to be consistent with what she's said before.

12   A.    Yeah, I guess I'm --

13         MR. MUELLER: You can say simply that you are

14   standing on your previous answer --

15   A.    Yeah.

16         MR. MUELLER: -- whatever it was.

17   A.    Yeah, I stand on my previous answer, whatever

18   it was.

19   Q.    (Ms. Baron continuing.) Which was what?

20         MR. MUELLER: Let's read it back.

21         MS. BARON: Let's read it back.

22   A.    Let's read it back.

23         MR. BANOVETZ: If I recall, I don't want to

20

1    offer testimony in the record --

2

3    Q.    (Ms. Baron continuing.) I believe you

4    testified you did not know whether there was passenger

5    coverage or not; is that what your said?

6          MR. MUELLER: That's what you said.

7    A.    Yeah.

8    Q.    Is that your answer? You didn't know one way

9    or the other; correct? I'm just trying to find out what

10   it is you're citing back to as your previous answer.

11   A.    Well, I guess I'm trying to figure out -- I

12   feel that it was the same question, so, yes, I want to be

13   consistent and I don't exactly think that it was in the

14   same -- I -- I would stand on what I previously said.

15   Q.    Which was that you didn't know one way or the

16   other whether there was passenger coverage?

17   A.    Yes.

18   Q.    Okay. Now, when you were involved in

19   obtaining coverage for instructional flying with the

20   other planes that Pontiac Flying Service had, did you pay

21   additional for the instructional coverage?

22   A.    I'm not aware of that.

23   Q.    Did you ever contact Hardy Aviation to

21

1    request coverage for instructional flying in the Ag Cat

2    plane owned by Pontiac Flying Service?

3          MR. MUELLER: You're referring to her

4    individually at this time?

5    Q.    Yes, yes.

6    A.    Okay. And I need you to ask that again. You

7    specified an Ag Cat that was owned by Pontiac Flying

8    Service?

9    Q.    Right.

10   A.    No, the Ag Cats that are owned by Pontiac

11   Flying Service, there's no way of doing training in those

12   aircraft.

13   Q.    Did you ever contact Hardy Aviation Insurance

14   for coverage for instructional flying in any planes?

15   A.    Yes.

16   Q.    Could you tell us which planes?

17   A.    Well, the ones that Pontiac Flying Service

18   has owned and used for flight instruction, and at one

19   time we speculated of purchasing a two-place Ag Cat and

20   we requested information on it.

21   Q.    Who did you request it from?

22   A.    Angie.

23   Q.    Do you recall when you requested that

22

1  information?

2    A.   **No.**

3    Q.   Do you recall who you spoke to about that?

4  You say you spoke to Angie?

5    A.   **Angie.**

6    Q.   And what do you recall about those

7  conversations?  Did you ask her for a quote?

8    A.   **Just -- yes.**

9    Q.   And did she get you a quote?

10   A.   **I don't recall.**

11   Q.   I have some notes here from Hardy and there

12  is a note dated 9/4/02.  I can mark this.  That states in

13  Angie's writing, gave quote to Sarah.  She was ecstatic.

14  Will let us know when ready.

15       Does that bring back any recollection to you

16  as to whether you got a quote for instructional flying in

17  the Ag Cat?

18   A.   **No.**

19   Q.   Okay.  How -- the AT-305 crashed on May 5th

20  of 2003; correct?

21   A.   **Yes.**

22   Q.   And how did you learn about it?

23   A.   **Phone call.**

23

1    Q.   Who called you?

2    A.   **I don't recall.**

3    Q.   And who was in the plane when it crashed?

4    A.   **Rick Lucente and Neal Webster.**

5    Q.   And was Lucente providing training, turbine

6  transition training --

7    A.   **Yes.**

8    Q.   -- to Webster?

9    A.   **Yes.**

10   Q.   Did you contact Hardy Aviation Insurance

11  after you learned --

12   A.   **Yes.**

13   Q.   -- of the crash?  And who did you talk to?

14   A.   **Angie.**

15   Q.   And what did you say to her and what did she

16  say to you?

17   A.   **I told her that the 503 had went down and**

18  **that there were fatalities.**

19   Q.   Did you have any other -- strike that.

20       What did Angie say?

21   A.   **I don't recall.**

22   Q.   Did you have any other contact with Hardy

23  Aviation Insurance after that regarding the crash?

24

1    A.   **Yes, the next day.**

2    Q.   Who did you speak to then?  Was it Angie

3  again or --

4    A.   **I believe -- I don't recall.**

5    Q.   And do you recall what was discussed in that

6  conversation?

7    A.   **Yes.**

8    Q.   And what was that?

9    A.   **I had received in the mail that day the**

10  **renewal, I'm not sure exactly what it was, but I was**

11  **concerned because I did not see Rick's name as -- listed**

12  **as a pilot and I was wondering why that was, not**

13  **realizing that it was because he -- it was an open pilot**

14  **warranty that he was covered under.**

15   Q.   And so who told you that?  Was it in that

16  conversation?

17   A.   **Yes.**

18   Q.   Did you have any other contacts with Hardy

19  Aviation Insurance after the crash regarding the loss?

20   A.   **Not to my knowledge.**

21   Q.   At any time before the loss did you tell

22  anybody from Hardy Aviation Insurance that you wanted

23  coverage for turbine transition training on the AT-305?

25

1    A.   **Say that again, please.**

2        MS. BARON:  Could you read that back?

3        (Whereupon the question was read.)

4    A.   **No.**

5    Q.   (Ms. Baron continuing.)  At any time before

6  the loss did you ask anyone from Hardy Aviation insurance

7  whether you had turbine transition training coverage for

8  the AT-305?

9    A.   **No.**

10   Q.   Did anyone from Hardy Aviation Insurance ever

11  tell you that you had coverage for turbine transition

12  training with the AT-305?

13   A.   **No.**

14   Q.   Do you know Frank Kimmel?

15   A.   **Yes.**

16   Q.   Have you ever had any discussions with him

17  regarding insurance coverage for the AT-305?

18   A.   **No.**

19   Q.   Were there ever times in your -- the

20  operation of the business that -- where you thought that

21  Scott, your husband Scott, had taken care of something

22  and he hadn't in running the business?

23   A.   **Ask me that again.**

26

1      MS. BARON: Could you read it back?

2      (Whereupon the question was read.)

3      MR. MUELLER: Objection; overbroad and

4  irrelevant.

5      MS. BARON: You can answer.

6      MR. MUELLER: You may answer.

7  **A.  Yeah.**

8  **Q.**  (Ms. Baron continuing.) Okay.

9  **A.  Yes.**

10  **Q.**  Have you had -- strike that.

11      Prior to the loss did you have any

12  conversations with anyone from Hardy Aviation Insurance

13  regarding coverage for the AT-305?

14  **A.  Not to my knowledge.**

15      MS. BARON: Okay. I think that's all I have.

16      MR. BANOVETZ: I don't have anything.

17  Thanks.

18

19

20

21      FURTHER DEPONENT SAYETH NOT;

22      SIGNATURE RESERVED.

23

28

1      In testimony thereof, I have hereunto set my

2  hand this 28th day of February, 2005.

3

4

5

6

7

8  _____ _CSR

9  NOTARY PUBLIC

10

11

12

13  Illinois CSR License No. 084-001542.

14

15

16

17

18

19

20

21

22

23

27

1  STATE OF ILLINOIS   )

2                      )

3  COUNTY OF PEORIA    )

4

5      I, LAURA J. AMBERG, C.S.R., do hereby certify

6  that heretofore, to-wit, on the 22nd day of February,

7  2005, at the hour of 12:50 p.m., personally appeared

8  before me at 416 Main Street in the City of Peoria,

9  County of Peoria, State of Illinois, SARAH PETERSEN.

10      I further certify that the said witness was

11  by me first duly sworn to testify to the truth, the whole

12  truth and nothing but the truth in the cause aforesaid,

13  that the testimony then given by said witness was

14  reported stenographically by me in the presence of said

15  witness and afterwards reduced to typewriting, and the

16  foregoing is a true and correct transcript of the

17  testimony so given by said witness as aforesaid.

18      I further certify that the signature of the

19  witness to the deposition was RESERVED by agreement of

20  counsel.

21      I further certify that I am not counsel for nor

22  in any way related to any of the parties to this suit,

23  nor am I in any way interested in the outcome thereof.

**.**
'02 - 13:22, 14:6, 16:18, 17:9
'03 - 13:23, 14:7, 16:18

**0**

03-1288 - 1:7
084-001542 - 28:13

**1**

10 - 2:9, 13:22, 13:23
10th - 14:6, 14:7
120 - 2:13
12:50 - 1:20, 27:7
15801 - 5:8
1982 - 5:20
1997 - 7:17
19th - 16:18
1st - 9:22

**2**

2000 - 5:8
2002 - 7:20, 9:5, 13:1
2003 - 22:20
2005 - 1:20, 27:7, 28:2
22nd - 1:20, 2:2, 27:6
233 - 2:2
28th - 9:4, 17:9, 28:2

**3**

3/15/64 - 5:4
3100 - 2:13
323 - 2:6

**4**

416 - 1:20, 2:6, 27:8

**5**

503 - 15:6, 17:23, 23:17
5th - 22:19

**6**

60602 - 2:14
60603-1098 - 2:10
60606-6308 - 2:3
61602 - 2:6

**9**

9/4/02 - 22:12

**A**

acquaintance - 11:22
acquired - 11:5
Act - 1:18
ad - 13:2, 13:5, 13:6, 13:8
additional - 20:21
address - 5:6
ads - 12:19, 12:23
advertise - 12:11
advertising - 13:14
aforesaid - 27:12, 27:17
afterwards - 27:15
Ag - 21:1, 21:7, 21:10, 21:19, 22:17
agreement - 3:11, 27:19
agricultural - 10:12
Air - 15:6, 17:23
aircraft - 10:13, 13:21, 21:12
al - 1:8
Amberg - 1:19, 27:5
Angie - 17:13, 21:22, 22:4, 22:5, 23:14, 23:20, 24:2
Angie's - 22:13
answer - 18:22, 19:1, 19:7, 19:9, 19:14, 19:17, 20:8, 20:10, 26:5, 26:6
appeared - 27:7
application - 13:22, 14:5, 14:8, 16:17, 18:4, 18:23, 19:4
apply - 1:19
April - 13:1, 13:22, 14:6, 14:7
arrives - 14:8
assets - 7:21
At-305 - 8:22, 9:9, 9:19, 10:4, 10:7, 10:10, 10:16, 10:23, 12:2, 12:12, 13:4, 14:7, 15:11, 15:14, 15:19, 22:19, 24:23, 25:8, 25:12, 25:17, 26:13
At-503 - 18:3
attention - 15:20
Attorney - 2:3, 2:7, 2:10
attorney - 4:22, 5:1
Aviation - 1:14, 2:11, 3:16, 7:5, 8:14, 9:8, 10:3, 10:15, 13:13, 15:10, 20:23, 21:13, 23:10, 23:23, 24:19, 24:22, 25:6, 25:10, 26:12
aware - 20:22

**B**

Banovetz - 2:1, 13:19, 16:7, 19:23, 26:16
Baron - 2:9, 3:5, 3:9, 3 12, 3:13, 5:11, 10:19, 10:22, 18:8, 18:12, 18:15, 19:3, 19:8, 19:19, 19:21, 20:3, 25:2, 25:5, 26:1, 26:5, 26:8, 26:15
based - 18:3
became - 9:20, 9:21
birth - 5:3
bookkeeper/ secretary - 6:1
borrow - 16:7
bottom - 14:18, 16:21
box - 15:2, 17:19
briefly - 5:15
bring - 22:15
broker - 6:21, 7:2, 7:8
business - 6:2, 9:15, 25:20, 25:22

**C**

canceled - 13:2
care - 25:21
case - 4:12
Cassidy - 2:5
Cat - 21:1, 21:7, 21:19, 22:17
Cats - 21:10
caught - 6:17
Central - 5:20
certify - 27:5, 27:10, 27:18, 27:21
check - 9:17
checked - 17:19
Chicago - 2:3, 2:10, 2:14
children - 5:12
chronologically - 15:17
Circuit - 1:3
citing - 20:10
City - 1:20, 5:20, 5:21, 27:8
Civil - 1:18
Clausen - 2:8
clear - 7:15
Clifford - 2:12
co - 6:11
co-owner - 6:11
Company - 1:5
company - 15:19
completed - 14:5
concerned - 24:11
conclusion - 18:11
confused - 18:19
consistent - 19:11, 20:13
contact - 6:21, 7:2, 9:8, 10:2, 13:3, 20:23, 21:13, 23:10, 23:22
contacted - 9:17
contacting - 8:13
contacts - 24:18
continuing - 3:12, 5:11, 10:22, 19:3, 19:19, 20:3, 25:5, 26:8
contracts - 17:11
conversation - 24:6, 24:16
conversations - 22:7, 26:12
Cook - 1:2, 1:3
copy - 12:16, 12:19
corner - 15:2, 17:18
corporation - 11:2
correct - 5:13, 6:9, 6:12, 6:19, 7:23, 8:22, 15:3, 17:15, 17:20, 20:9, 22:20, 27:16
counsel - 27:20, 27:21
County - 1:2, 1:3, 1:20, 27:3, 27:9
course - 9:15
court - 4:1
Court - 1:3, 1:18
coverage - 9:9, 9:19, 10:7, 13:22, 14:6, 15:6, 15:10, 15:14, 15:19, 15:23, 16:18, 17:23, 18:3, 19:5, 20:5, 20:16, 20:19, 20:21, 21:1, 21:14, 24:23, 25:7, 25:11, 25:17, 26:13
Coverage - 18:13
covered - 24:14
covering - 10:3
crash - 12:7, 13:2, 15:8, 15:10, 23:13, 23:23, 24:19
crashed - 22:19, 23:3
Csr - 1:19, 27:5, 28:8, 28:13

**D**

date - 5:3, 13:20, 17:8
dated - 22:12
dates - 11:8
David - 2:5
December - 13:1
Defendant - 1:15, 2:10
Defendant/third - 2:7
Defendants - 1:9
Department - 1:3
Deponent - 26:21
Deposition - 12:16, 13:18, 16:5, 16:17
deposition - 1:17, 3:10, 3:18, 3:21, 4:6, 4:16, 5:1, 9:14, 27:19
depositions - 1:19, 4:14
designed - 10:12
Diane - 2:9, 3:13
different - 18:21, 18:23
discovery - 1:17, 1:19
discussed - 24:5
discussion - 5:10
discussions - 25:16
distinguish - 7:14
Division - 1:3
document - 16:19
done - 6:6, 17:13
down - 4:1, 23:17
Drive - 2:2
duly - 3:2, 27:11

**E**

East - 5:8
ecstatic - 22:13
education - 5:16, 5:18
effective - 9:20, 9:21, 13:22
either - 17:12
Either - 7:1
employment - 5:22
Esq - 2:1, 2:5, 2:9, 2:13
Et - 1:8
exactly - 11:14, 20:13, 24:10
Examination - 3:4
examination - 11:14
excluded - 15:3, 17:19
Exhibit - 12:15, 12:16, 13:15, 13:18, 16:5, 16:17
expert - 15:21

**F**

fatalities - 23:18
February - 1:20, 7:20, 9:4, 27:6, 28:2
figure - 20:11
filled - 6:7, 14:9, 14:10
fine - 3:15
finishing - 5:23
Fire- 1:4
First- 11:21
first - 3:2, 7:7, 11:5, 27:11
flight - 21:18
Floor- 2:2
Flying - 1:8, 1:11, 2:7, 6:11, 6:18, 7:3, 7:11, 7:16, 7:19, 7:22, 8:21, 20:20, 21:2, 21:7, 21:11, 21:17
flying - 8:8, 8:11, 8:17, 20:19, 21:1, 21:14, 22:16
follows - 3:3
foregoing - 27:16
Four- 16:17
frame - 18:21
Frank- 25:14
friends - 11:23

**G**

gal - 6:7
general - 6:8
General - 4:11
generally - 14:14
given - 3:21, 11:4, 11:6, 27:13, 27:17
Graduate - 5:17
graduate - 5:17, 5:19
guess - 11:14, 17:4, 17:6, 18:19, 19:1, 19:12, 20:11
guessing - 17:12
gypsy - 17:11

**H**

hand - 15:1, 17:18, 28:2
handled - 10:8
Hardy - 1:14, 2:11, 3:16, 4:15, 4:16, 4:17, 7:5, 7:7, 8:13, 9:8, 10:2, 10:15, 13:13, 14:9, 14:13, 15:9, 15:21, 20:23, 21:13, 22:11, 23:10, 23:22, 24:18, 24:22, 25:6, 25:10, 26:12
Harold - 7:21, 9:7
Harold's - 11:22
hear - 4:2
hereby - 27:5
heretofore - 27:6
hereunto - 28:1
high - 5:17, 5:23
High - 5:20
honestly - 16:3
hour - 1:20, 27:7
husband - 3:23, 5:12, 9:11, 10:8, 11:18, 12:2, 17:2, 25:21
husband's - 3:18

**I**

idea - 3:18
Il - 2:3, 2:6, 2:10, 2:14
Illinois - 1:1, 1:3, 1:19, 1:21, 5:9, 27:1, 27:9, 28:13
Inc - 1:8, 1:11, 1:14,

6:18, 7:3, 7:10, 7:11, 7:20, 8:21, 11:2
**included** - 14:7
**indicated** - 13:15
**indicates** - 15:2
**individually** - 21:4
**information** - 13:5, 14:16, 21:20, 22:1
**instructed** - 3:23
**instruction** - 21:18
**instructional** - 8:8, 8:11, 8:17, 20:19, 20:21, 21:1, 21:14, 22:16
**Insurance** - 1:4, 1:14, 2:11, 3:16, 7:5, 8:14, 9:9, 10:3, 10:16, 13:14, 21:13, 23:10, 23:23, 24:19, 24:22, 25:10, 26:12
**insurance** - 6:21, 6:22, 7:2, 8:10, 8:16, 9:17, 13:21, 15:19, 15:21, 25:6, 25:17
**interested** - 27:23
**involved** - 8:10, 20:18
**irrelevant** - 26:4
**it'd** - 18:21
**itself** - 18:14

## J

**January**- 7:9
**Joe**- 4:19
**July**- 7:17
**June**- 17:9

## K

**keep** - 3:23
**Kimmel**- 25:14
**knowledge** - 10:10, 15:18, 24:20, 26:14
**Krzak**- 2:13

## L

**Lasalle**- 2:9, 2:13
**Laura**- 1:19, 27:5
**Law**- 1:3, 2:12
**learn** - 22:22
**learned** - 9:13, 23:11
**left** - 15:1, 15:21, 16:3, 17:18
**left-hand** - 15:1, 17:18
**legal** - 18:10
**License**- 28:13
**licensed** - 6:9
**listed** - 19:5, 24:11
**live** - 5:5, 5:11
**logbook** - 14:15
**look** - 14:2, 16:16, 16:18, 17:17
**looked** - 12:14, 14:16
**loss** - 16:12, 18:6, 24:19, 24:21, 25:6, 26:11
**Lucente**- 11:12, 11:13, 12:1, 23:4, 23:5

## M

**mail** - 24:9
**Main** - 1:20, 2:6, 27:8

**Maloney** - 2:1
**March** - 9:22
**Mark** - 2:1
**mark** - 22:12
**marked** - 12:15, 13:17, 16:4, 16:16
**mean** - 4:21, 13:6, 14:9
**met** - 11:21
**Michael** - 2:13
**Miller** - 2:8, 7:21, 9:6, 9:7
**mind** - 3:13
**mom** - 5:23
**moth** - 17:11
**Mueller** - 2:5, 6:15, 7:10, 11:1, 13:20, 14:1, 14:22, 15:16, 17:4, 18:10, 18:13, 18:17, 18:22, 19:6, 19:10, 19:13, 19:16, 19:20, 20:6, 21:3, 26:3, 26:6

## N

**name** - 3:6, 3:12, 24:11
**National** - 1:4
**nature** - 6:8
**Neal** - 23:4
**Nebraska** - 5:21, 6:3, 6:4
**need** - 21:6
**next** - 24:1
**North** - 2:13, 5:8
**Notary** - 28:9
**note** - 22:12
**notes** - 22:11
**nothing** - 27:12
**notice** - 3:10
**numbered** - 13:19

## O

**oath** - 3:2
**Objection** - 18:10, 26:3
**obtain** - 8:19
**obtaining** - 8:10, 9:9, 20:19
**occurred** - 13:2
**offer** - 20:1
**office** - 17:11
**Offices** - 2:12
**once** - 13:2
**One** - 16:5
**one** - 6:7, 12:19, 16:7, 17:1, 17:18, 20:8, 20:15, 21:18
**ones** - 21:17
**open** - 24:13
**operated** - 6:2
**operation** - 25:20
**opposed** - 17:2
**outcome** - 27:23
**overboard** - 26:3
**owned** - 6:2, 7:22, 8:4, 12:4, 15:18, 21:2, 21:7, 21:10, 21:18
**Owned** - 8:1
**owner** - 6:11, 6:18
**owners** - 10:1
**owns** - 8:3

## P

**page** - 14:18, 15:2, 16:21, 17:17
**paid** - 15:20

**papers** - 9:4, 10:1
**paperwork** - 4:11
**part** - 9:18
**particular** - 4:21, 8:5, 13:8
**parties** - 3:11, 27:22
**Party** - 1:12, 1:15, 2:7, 2:10
**passenger** - 15:6, 15:10, 17:23, 18:3, 19:5, 20:4, 20:16
**passengers** - 15:3, 17:19
**pay** - 20:20
**Pc** - 2:8
**people** - 13:10
**Peoria** - 1:20, 2:6, 27:3, 27:8, 27:9
**period** - 12:22
**personally** - 27:7
**Petersen** - 1:17, 2:15, 3:1, 3:8, 3:10, 27:9
**Phone** - 2:12, 22:23
**pilot** - 6:9, 24:12, 24:13
**Pittsburgh** - 1:5
**place** - 21:19
**placed** - 12:20, 15:14
**Plaintiff** - 1:6, 1:12, 2:3, 2:7
**plane** - 8:22, 21:2, 23:3
**planes** - 7:23, 8:7, 19:5, 20:20, 21:14, 21:16
**Pm** - 1:20, 27:7
**point** - 12:9, 15:16
**policy** - 10:3, 16:5, 18:14
**Pontiac** - 1:8, 1:11, 2:7, 5:8, 6:11, 6:18, 6:22, 6:23, 7:3, 7:10, 7:16, 7:19, 7:22, 8:21, 10:11, 12:11, 12:20, 14:6, 20:20, 21:2, 21:7, 21:10, 21:17
**Practice** - 1:18
**pregnant** - 6:7
**preparation** - 4:5
**presence** - 27:14
**present** - 7:19
**Present** - 2:1, 2:12, 2:15
**previous** - 7:19, 19:14, 19:17, 20:10
**previously** - 12:15, 13:17, 20:14
**Priess** - 2:1
**process** - 9:18
**providing** - 12:11, 15:19, 23:5
**provisions** - 1:18
**Public** - 28:9
**purchase** - 9:18, 9:23
**purchased** - 7:21, 8:21, 9:1, 9:3, 9:6
**purchasing** - 21:19
**pursuant** - 1:18, 3:10

## Q

**questions** - 3:17, 15:22
**quote** - 10:6, 22:7, 22:9, 22:13, 22:16

## R

**ran** - 12:23
**Randy**- 4:14, 4:16, 4:17
**read** - 10:19, 10:20, 14:12, 16:14, 16:15, 18:8, 18:9, 19:20, 19:21, 19:22, 25:2, 25:3, 26:1, 26:2
**ready** - 22:14
**realizing** - 24:13
**receive** - 16:11
**received** - 14:12, 24:9
**receiving** - 10:6
**recollection** - 11:7, 22:15
**record** - 3:6, 3:9, 5:10, 20:1
**reduced** - 27:15
**reference** - 18:20
**referred** - 13:11
**referring** - 21:3
**regarding** - 4:11, 6:22, 7:2, 9:9, 10:3, 23:23, 24:19, 25:17, 26:13
**related** - 27:22
**remember** - 13:7
**renewal** - 24:16
**repeat** - 4:3
**reported** - 27:14
**reporter** - 4:1
**represent** - 3:16
**request** - 8:16, 13:4, 21:1, 21:21
**requested** - 21:20, 21:23
**Reserved**- 26:22, 27:19
**respect** - 14:6
**response** - 3:3, 13:5
**responses** - 4:1
**review** - 4:5, 4:8
**reviewed** - 17:14
**Rick**- 11:12, 11:13, 23:4
**Rick's**- 24:11
**Road**- 5:8
**Rules**- 1:18
**running** - 25:22

## S

**Sarah** - 1:17, 3:1, 3:8, 3:10, 3:12, 3:13, 22:13, 27:9
**sat** - 3:17
**Sayeth** - 26:21
**school** - 5:17, 5:23
**School** - 5:20
**Scott** - 2:15, 5:12, 9:22, 11:4, 11:21, 13:11, 14:14, 17:8, 17:10, 25:21
**Sears** - 2:2
**seats** - 10:14
**secretarial** - 6:6
**see** - 16:11, 24:11
**sent** - 14:11
**separately** - 7:1
**Service** - 1:8, 1:11, 2:7, 6:11, 6:18, 7:3, 7:11, 7:16, 7:20, 7:22, 8:21, 20:20, 21:2, 21:8, 21:11, 21:17
**set** - 28:1
**show** - 12:14, 16:4

**Showing** - 12:15, 13:17
**signature** - 14:15, 14:18, 16:21, 27:18
**Signature** - 26:22
**signed** - 9:4, 9:23, 17:1, 17:13, 17:14, 18:4, 18:5, 19:3
**simply** - 19:13
**sitting** - 9:14
**Soderstrom** - 2:1
**someone** - 13:7
**sorry** - 6:17, 14:23
**sort** - 4:10
**South** - 2:9
**Specific**- 5:6
**specific** - 11:8
**Specifically** - 12:4
**specifically** - 13:6, 16:2
**specified** - 21:7
**speculated** - 21:19
**speculating** - 17:3
**stand** - 19:17, 20:14
**standing** - 19:14
**start** - 7:7
**State** - 1:1, 1:19, 1:21, 27:1, 27:9
**state** - 3:6
**Statements** - 4:9
**statements** - 4:10
**states** - 22:12
**stenographically** - 27:14
**stints** - 6:6
**Street** - 1:20, 2:6, 2:9, 2:13, 27:8
**strike** - 23:19, 26:10
**suit** - 27:22
**Suite** - 2:6, 2:13
**Supreme** - 1:18
**sworn** - 3:2, 27:11

## T

**testified** - 20:4
**Testified**- 3:3
**testify** - 27:11
**testimony** - 20:1, 27:13, 27:17, 28:1
**thereof** - 27:23, 28:1
**Third**- 1:12, 1:15, 2:10
**three** - 5:12
**Three**- 13:18
**to-wit** - 27:6
**today** - 4:6, 9:14
**top** - 15:1, 17:17
**Tower**- 2:2
**Tractor**- 15:6, 17:23
**trained** - 11:9, 11:11
**training** - 10:13, 10:17, 10:23, 11:4, 11:6, 11:18, 12:1, 12:3, 12:12, 12:13, 12:20, 13:4, 13:15, 21:11, 23:5, 23:6, 24:23, 25:7, 25:12
**transcript** - 27:16
**transition** - 12:13, 12:20, 13:15, 23:6, 24:23, 25:7, 25:11
**Tressler**- 2:1
**tried** - 19:11
**trucking** - 6:1
**true** - 27:16
**truth** - 27:11, 27:12
**trying** - 15:17, 19:8, 20:9, 20:11

**Turbine**- 12:13
  **turbine** - 12:20,
13:14, 23:5, 24:23,
25:7, 25:11
  **two** - 10:13, 14:19,
15:2, 16:22, 17:17,
21:19
  **Two**- 12:15, 12:16,
13:15
  **two-place** - 21:19
  **typewriting** - 27:15

# U

**under** - 18:13, 24:14
**understood** - 19:10
**Union** - 1:4
**Usaig** - 15:14

# V

**Vance** - 4:19
**various** - 6:6
**verbal** - 4:1
**Via** - 2:12
**visited** - 13:11
**vs** - 1:7, 1:13

# W

**Wacker**- 2:2
**warranty** - 24:14
**Webster**- 23:4, 23:8
**whole** - 27:11
**wit** - 27:6
**witness** - 27:10,
27:13, 27:15, 27:17,
27:19
  **wondering** - 24:12
  **writing** - 22:13