E-FILED
Friday, 01 September, 2006 02:09:19 PM
Clerk, U.S. District Court, ILCD

23 53 24 00 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PONTIAC FLYING SERVICES, INC., JUSTYN WEBSTER, as Special Administrator of the Estate of NEIL WEBSTER, Deceased, and CAREN S. LUCENTE, as Independent Executor of the Estate of RICHARD P. LUCENTE, Deceased, | ) ) ) ) ) ) | No.   03-1288 |
| Defendants/ Third-Party Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| HARDY AVIATION INSURANCE, INC., | ) ) | |
| Third-Party Defendant. | ) | |

## HARDY AVIATION INSURANCE, INC.'S
## MOTION FOR SUMMARY JUDGMENT

NOW COMES the Third-Party Defendant, HARDY AVIATION INSURANCE, INC. ("Hardy"), by its attorneys, DIANE M. BARON and CLAUSEN MILLER P.C., and pursuant to Fed. Rule of Civ. Proc. 56 and Local Rule 7.1, hereby moves for summary judgment herein with respect to the Third Party Complaint of PONTIAC FLYING SERVICES, INC. ("Pontiac"), and in support hereof states as follows:

(a)   **Introduction**

This case arises out of a plane crash on May 5, 2003 in Pontiac, Illinois which occurred while instructor-pilot Richard Lucente ("Lucente") was giving student-pilot Neil Webster ("Webster") turbine transition flight training in Pontiac Flying Service, Inc.'s Air Tractor 503 (AT-503). The aircraft was destroyed and both men were killed in the crash.

National Union Fire Insurance Co. of Pittsburgh, PA ("National Union") filed this declaratory judgment action against Pontiac seeking a declaration that National Union was not obligated under its aerial applicator (crop duster) insurance policy in effect at the time to pay for the $350,000 aircraft because Lucente and Webster were using the AT-503 for something other than aerial application when it crashed.

Pontiac filed its Answer denying that National Union could decline coverage for the loss of the plane. Pontiac also filed a Third Party Complaint against Hardy Aviation Insurance, Inc., its insurance broker, alleging that in the event there is no coverage under the National Union policy, then Hardy was negligent in failing to procure such coverage and Pontiac should be allowed to recover damages in the amount of the policy coverage from Hardy. Hardy filed an Answer to the Third Party Complaint, denying any knowledge that Pontiac would use the AT503 for training and denying any negligence.

Thereafter, a representative of Webster's Estate sued Pontiac and the Lucente Estate for Webster's death in the crash. National Union's aerial applicator policy also provided liability insurance, but National Union declined to defend the Webster suit and filed an Amended Complaint in this case seeking a declaration that there was no coverage for that claim and no defense obligation.

National Union then filed a Motion for Judgment on the Pleadings which was decided as a motion for summary judgment. On August 19, 2005, this Court granted National Union's motion, holding that National Union was not obligated under its aerial application policy to indemnify Pontiac for its loss of the AT-503 and was not obligated to defend or indemnify Pontiac or the representative of Lucente's estate in the Webster litigation. This Court stated that

National Union's aerial applicator policy insured risks related to Pontiac's aerial application business, and stated:

> It would not be reasonable to assume that the purpose of the primary definition of aerial application ("application by aircraft of seeds, fertilizers or chemicals") was to shift the focus from Pontiac's aerial application business to Finup's aerial application business or the aerial application industry generally. The policy unambiguously required the use of the AT-503 to be "in direct support" of Pontiac's aerial application business, and Pontiac's training of someone else's pilot simply did not meet this standard.

(Order dated 8/19/05, p. 3, Ex. 1)

With respect to coverage for defense and indemnification of the Webster wrongful death claim, this Court held that the aerial applicator policy's bodily injury liability insurance excluded claims by "passengers." "Passenger" was defined as "any person in . . . the aircraft for the purpose of riding or flying therein . . . including crew." This Court stated Webster was a "passenger" and therefore National Union owed no duty to defend or indemnify Pontiac with respect to the Webster complaint. In addition, the liability policy had an exclusion which applied to allegations that bodily injury arose out of the ownership, use or entrustment to others of any aircraft owned by any insured.

The remaining claim in this case is Pontiac's Third Party Complaint against Hardy. Hardy is hereby moving for summary judgment on that claim.

Hardy, Pontiac's insurance broker, procured the National Union aerial application policy based on Pontiac's request and application for such coverage. Instead, Pontiac was using the AT-503 to operate a turbine transition training flight school, nationally advertised in a trade journal, at the time of the crash. The facts herein are undisputed that (1) Pontiac never requested from Hardy any insurance coverage to run a training school with the AT-503, (2) Hardy never

knew Pontiac was using its AT-503 for that purpose, and (3) Pontiac specifically purchased flight training coverage for its other planes, so it was aware that was a separate type of coverage.

In addition, prior to the crash, Scott Petersen, co-owner of Pontiac, admitted to Frank Kimmel, another aviation insurance broker, that he knew he did not have coverage for the AT-503 for training use or passenger liability.

Therefore, since Pontiac never requested insurance coverage for running a turbine transition training business and Hardy did not know Pontiac was using its AT-503 for that purpose, Hardy had no duty to obtain coverage for that unknown purpose and he was not negligent in procuring an aerial application policy pursuant to Pontiac's instructions.

### (b)    Undisputed Material Facts

1. The Air Tractor AT-503 crashed on May 5, 2003, resulting in the destruction of the aircraft and the deaths of the two individuals inside the plane, Richard P. Lucente and Neil P. Webster. (Pontiac's Answer, par. 6, 14, Ex. 3; Scott Petersen dep., p. 46, Ex. 6)

2. The AT-503 was an agricultural crop duster airplane, which Pontiac bought for use in gypsy moth abatement. (Scott Petersen dep., pp. 18-19, Ex. 6)

3. At the time of the crash, Pontiac was using the Air Tractor for turbine transition training. (Scott Petersen dep., p. 46, Ex. 6)

4. Scott Petersen and Sarah Petersen were and are the owners of Pontiac. (Scott Petersen dep., p. 15, Ex. 6)

5. Scott and Sarah Petersen have been in business at the same location since July 1997 (Scott and Sarah Petersen Sworn Statement, p. 5, Ex. 7)

6. In February 2002, Pontiac purchased certain assets of Harold Miller, including the AT-503. (Scott and Sarah Petersen Sworn Statement, p. 12, Ex. 7; Sarah Petersen dep., p. 7, Ex. 8; Scott Petersen dep., pp. 18-19, Ex. 6)

7. When the AT-503 was added to Pontiac's insurance policy in 2002, Scott Petersen was an approved pilot for him to use it for ag use. (Angie Banz dep., p. 32, Ex. 15)

8. At the time of the accident on May 5, 2003, Pontiac was operating a commercial agricultural flight training school, which included using the Air Tractor for turbine transition training. (Pontiac's Answer, par. 8, Ex. 3)

9. At the time of the crash, Rick Lucente, an independent contractor, was using the AT503 to provide turbine transition flight instruction to Neil Webster for an agreed-upon sum of $5,200. (Scott Petersen dep., pp. 30-31, Ex. 6; Pontiac Answer, par. 10, Ex. 3)

10. Pontiac advertised its turbine transition training course and its use of the Air Tractor for such instruction in a trade magazine known as "Ag Air Update." (Pontiac's Answer, par. 9, Ex. 3; Scott Petersen dep., p. 36, Ex. 6; Sarah Petersen dep., p. 12, Ex. 8)

11. A true and correct copy of one of Pontiac's ads in the "Ag Air Update" offering turbine transition training with the AT-503 is attached hereto as Ex. 9. (Scott Petersen dep., p.36, Ex. 2 to dep., Ex. 6; Sarah Petersen dep., pp. 12-13, Ex. 8)

12. Scott Petersen did not have any conversations with Hardy about operating a flight school for turbine transition training with his Air Tractor. (Scott Petersen Sworn Statement, p. 28, Ex. 7; Scott Petersen dep., p. 37, Ex. 6; Hardy dep., p. 76, Ex. 10)

13. Sarah Petersen never told Hardy that Pontiac was going to be using the Air Tractor for training. (Sarah Petersen dep., p. 10, Ex. 8)

14. The only use of the Air Tractor which Scott Petersen discussed with Hardy was aerial application. (Scott Petersen Sworn Statement, p. 25, Ex. 7)

15. Scott Petersen admitted to Frank Kimmel in the spring of 2002 that he knew he did not have coverage for using the Air Tractor to give turbine transition training to the public or for passengers. (Kimmel Affidavit, pars. 8-9; Ex. 11)

16. At some point prior to the crash, Scott and/or Sarah Petersen contacted Hardy to inquire about running an agricultural flight training program using their piston-powered "Ag Cat" airplanes (not the turbine Air Tractor) and Hardy discussed with them some of the required changes needed for an insurance policy to include training activity with the Ag Cat planes. (Hardy dep., p. 113, Ex. 10; Scott Petersen dep., pp. 44-45, Ex. 6)

17. Pontiac was turned down, prior to the crash, for insurance coverage for the use of a piston Ag Cat plane for agricultural flight training. (Scott Petersen dep., pp. 45-46, Ex. 6)

18. Scott Petersen does not recall Hardy ever telling him that transition training would be covered under his existing insurance policy. (Scott and Sarah Petersen Sworn Statement, p. 27, Ex. 7)

19. Scott Petersen never had any intention to have Mr. Webster, who was being trained in the Air Tractor when it crashed, do any aerial application flights for Pontiac. (Scott and Sarah Petersen Sworn Statement, p. 34, Ex. 7)

20. Scott Petersen never told Angie Banz of Hardy Insurance that he was going to use the AT 503 for turbine transition training. (Scott Petersen dep., p. 20, Ex. 6)

21. Scott Petersen signed the insurance application to USAIG for coverage effective April 10, 2002 to April 10, 2003, which includes the AT-503. (Scott Petersen dep., p. 38-39, Ex. 6)

22. A true and correct copy of said application to USAIG is attached hereto as Ex. 13. (Scott Petersen dep., pp. 38-39, Ex. 6)

23. This application states that the use of the Air Tractor was "chemical, seed, fertilizer application." (Ex. 13; Reavis dep., pp. 77-81, Ex. 12)

24. The application also indicates that passengers are excluded. (Ex. 13; Scott Petersen dep., p. 39, Ex. 6)

25. When it was determined that USAIG would not meet Pontiac's coverage needs for gypsy moth application, Hardy had the coverage transferred back to AIG. (Scott Petersen dep., p. 44, Ex. 6)

26. Sarah Petersen signed the application to AIG for coverage effective May 19, 2002 to May 19, 2003. (Scott Petersen dep., pp. 43-44, Ex. 6; Sarah Petersen dep., pp. 16-17, Ex. 8)

27. A true and correct copy of said application to AIG is attached hereto as Ex. 14. (Scott Petersen dep., p. 43-44, Ex. 6)

28. This application includes the AT-503 and states the use of the aircraft is "chemical, seed, fertilizer application." (Ex. 14; Reavis dep., pp. 77-81, Ex. 12)

29. This application also indicates that passengers are excluded. (Ex. 14; Scott Petersen dep., p. 44, Ex. 6)

30. Pontiac Flying Service purchased flight insurance for their other planes which were used for instructional flying/training. (Scott Petersen dep., pp. 44-45, Ex. 6)

31. The only conversation Scott Petersen had with Randy Hardy about the AT-503 plane was in early 2002 when Scott was purchasing it and Hardy told him he would need some additional training in it. (Scott Petersen dep., pp. 47-48, Ex. 6)

32. Scott Petersen admits Randy Hardy never told him that Rick Lucente could train anyone else in the AT-503 and the plane would be covered. (Scott Petersen dep., pp. 48-49, Ex. 6)

33. Scott Petersen never called anyone at Hardy Aviation Insurance with any questions regarding the policy on the AT-503. (Scott Petersen dep., p. 57, Ex. 6)

34. The Petersens' other company, Pontiac Flying Service, (not "Inc.") owned planes used for flight instruction and rental. (Scott Petersen dep., pp. 16-17, Ex. 6)

35. Sarah Petersen specifically obtained insurance from Hardy Aviation Insurance for the instructional flying done with those planes. (Sarah Petersen dep., pp. 7-8, Ex. 8)

36. Sarah Petersen does not recall having any contact with Hardy Aviation Insurance regarding the AT-503. (Sarah Petersen dep., p. 10, Ex. 8)

37. Neither Scott nor Sarah Petersen ever told anyone at Hardy Aviation Insurance that Pontiac was offering or advertising turbine transition training to the public. (Scott Petersen dep., p. 37, Ex. 6; Sarah Petersen dep., p. 13, Ex. 8)

38. Sarah Petersen requested a quote from Angie Banz at Hardy Aviation Insurance specifically for insurance to cover instructional training with a piston Ag Cat plane which Pontiac was considering purchasing. (Sarah Petersen dep., p. 21, Ex. 8)

39. At no time before the crash did Sarah Petersen tell anyone from Hardy Aviation Insurance that she wanted coverage for turbine transition training with the AT-503. (Sarah Petersen dep., pp. 24-26, Ex. 8)

40. At no time before the crash did Sarah Petersen ask anyone from Hardy Aviation Insurance whether Pontiac had turbine transition training coverage for the AT-503, and at no time did anyone from Hardy ever tell her Pontiac had such coverage. (Sarah Petersen dep., pp. 24-26, Ex. 8)

41. Prior to the crash, Angie Banz of Hardy Aviation Insurance was never aware that Scott and Sarah Petersen were using the AT-503 for turbine transition training. (Angie Banz dep., pp. 13-14, Ex. 15)

42. Neither Randy Hardy nor Angie Banz saw Pontiac's turbine transition training ad in the "Ag Air Update" magazine until after the crash. (Randy Hardy dep., pp. 76-77, Ex. 10; Angie Banz dep., p. 17, Ex. 15)

(c) **Argument**

1. **Legal Standard**

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Once a motion has been filed for summary judgment, the burden shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2458 (1986). The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence. *Id.*

2. **Hardy had no duty to procure flight training coverage for Pontiac's AT-503 when it was never requested by Pontiac and Hardy had no knowledge of that use of the aircraft by Pontiac.**

Under Illinois law, insureds have primary responsibility to determine their own insurable needs and know the contents of their insurance policies. *Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 949, (7th Cir. 1997) on remand 1998 WL 173303. As a general rule, an insurance broker is bound to exercise only reasonable skill and diligence in the transaction of the business entrusted to him. *Cincinnati Ins. Co. v. Guccione*, 308 Ill. App. 3d 220, 719 N.E.2d 787, *reh. den., app.*

*den.*, 188 Ill. 2d 562, 729 N.E.2d 495 (2d Dist. 1999). In order to recover for the loss sustained, an insured alleging negligence by an agent must prove the agent negligently performed his duty to secure the type of coverage <u>requested</u> by the insured. *Id.*

It is well-established under Illinois law that an insurance broker, who acts as an insured's agent, is not liable to the insured if he acts in good faith and with reasonable care, skill and diligence to place insurance <u>in compliance with the insured's instructions</u>. *Plumb v. Fluid Pump Service, supra. Connelly v. Robert J. Riordan & Co.*, 246 Ill. App. 3d 898, 617 N.E. 2d 76 (1st Dist. 1993); *Omni Overseas Freighting Co., Inc. v. Cardell Insurance Agency*, 78 Ill. App. 3d 639, 397 N.E.2d 112 (1st Dist. 1979); *Faulkner v. Gilmore*, 251 Ill. App. 3d 34, 621 N.E.2d 908 (3d Dist. 1993); *Shultz v. Griffin-Rahn Ins. Agency, Inc.*, 193 Ill. App. 3d 453, 550 N.E.2d 232, *app. den.* 132 Ill. 2d 554, 555 N.E.2d 385 (3d Dist. 1990); *Pugh v. Bershad*, 133 Ill. App. 2d 174, 272 N.E.2d 745 (1st Dist. 1971).

In *Connelly v. Riordan & Co., supra,* a homeowner sued his insurance broker for not procuring adequate insurance coverage on his home. The court granted a directed verdict for the broker, holding that the broker acted in good faith and exercised reasonable diligence in procuring insurance in compliance with the homeowner's request. The court further said there was no evidence to support the homeowner's assertion that the broker had agreed to obtain insurance other than that which was requested and which the broker procured.

In *Shults v. Griffin-Rahn Insurance Agency, Inc., supra*, an insured brought a negligence and breach of contract action against his insurance broker, alleging the broker should have recommended a higher amount of uninsured motorist coverage. The court held the broker had no such duty and dismissed the action.

In *Faulkner v. Gilmore, supra*, a construction company and its owners brought an action against an insurance broker and agent for breach of fiduciary duty and breach of contract. The plaintiffs alleged they contacted the insurance broker to procure a bond indemnification agreement for them. The broker procured such a bond, entitled "Master Surety Agreement." Plaintiffs alleged in their Complaint that they informed the broker they had terminated their business relationship with the other entities that were parties to the "Master Surety Agreement", but did not allege that they requested the broker to take any steps to terminate the business relationship between the plaintiffs and the other parties to the agreement. Instead, the Complaint alleged only that they sought future bonding for the company, and that the broker took immediate action in furtherance of that request. The trial court dismissed the Complaint, holding that it shows the broker and agent acted in good faith and reasonable diligence to obtain insurance in accordance with the Plaintiff's instructions. The appellate court affirmed.

While in *Economy Fire & Casualty v. Bassett*, 170 Ill. App. 3d 765, 525 N.E.2d 539 (5th Dist. 1988) the court found the broker had a duty to procure coverage for plaintiff's operation of a babysitting business in her home, the court noted the broker not only knew plaintiff ran the babysitting business, but had actually referred a family member who needed babysitting services to her. In the instant case, there is no evidence that Hardy knew that Pontiac was using the AT-503 for a flight training business.

It is factually undisputed that Hardy acted in good faith and exercised reasonable care, skill and diligence in procuring the aerial application policy in compliance with Pontiac's request. Pontiac's own expert, Marshall Reavis III, admits:

> (a)   Pontiac did not instruct Hardy to procure insurance coverage for its AT-503 for running a turbine transition training business. (Reavis dep., p. 56; Ex. 12)

(b) Hardy followed the specific instructions of Pontiac in obtaining the policy for the AT-503. (Reavis dep., p. 58; Ex. 12)

(c) The insurance applications signed by Pontiac regarding the AT-503 state the aircraft's uses as "chemical, seed and fertilizer application" and there is nothing on these applications stating that Pontiac was applying for coverage to run a turbine transition training business. (Reavis dep., pp. 77-81; Ex. 12)

(d) Reavis never saw anything to indicate the Petersens ever told Hardy they were taking over Harold Miller's business. (Reavis dep., p. 84; Ex. 12)

(e) Reavis saw nothing in all of the materials he reviewed which shows that either Randy Hardy or Angie Banz of Hardy Aviation Insurance, Inc. knew before the crash that Pontiac was running a turbine transition training business. (Reavis dep., 86; Ex. 12)

(f) He does not know if Scott ever made known to Hardy his purported "expectation" that the policy covered offering turbine transition training to the public. (Reavis dep., p. 58; Ex. 12)

(g) If an insurance broker is not aware of a particular client's possible exposure, he would not be required to get a letter from that client stating they don't want particular coverage for it. (Reavis dep., p. 56; Ex. 12)

(h) If the client receives the policy, he should look at it and if he can't understand it, he should ask. (Reavis dep., p. 61, Ex. 12)

(i) To his knowledge the Petersens never asked Hardy if their policy covered the AT-503 for its use in turbine transition training, and Hardy never told the Petersens that Pontiac was covered for running a turbine transition training business with that aircraft. (Reavis dep., p. 70, Ex. 12)

(j) A client must provide essential information to the insurance broker as much as he can. (Reavis dep., p. 67, Ex. 12)

Pontiac obviously knew it was using the AT-503 for a turbine transition training business which it had admittedly been advertising since December 2002, yet never provided this information to Hardy and never instructed Hardy to obtain insurance for the AT-503 that would cover its use for providing turbine transition training to the public. The record contains absolutely no evidence that indicates Hardy knew of any intended use of the AT-503 by Pontiac

1076145.1

other than aerial application or that Scott or Sarah Petersen and Hardy ever discussed Pontiac operating the same business as Harold Miller's Flying Service. In fact, both Scott and Sarah testified that Pontiac purchased the <u>assets</u> (not the business) of Harold Miller. The record is also devoid of any indication that Hardy ever told the Petersens they had coverage to use the AT-503 to offer turbine transition training to the public.

While Scott Petersen claims Hardy told him he needed some additional training himself in the AT-503 before using it for aerial application, that was when Scott first told Hardy in early 2002 that he was planning to acquire the plane. It is undisputed that the aircraft was added to the policy with Scott Petersen already identified as a named, approved pilot. Moreover, the accident occurred in May 2003, and as this Court stated:

> [I]t would be unreasonable to assume that clearance for Scott to receive additional turbine transition training in 2002 meant clearance for student pilots generally to receive it in 2003.

(Order of 8/19/05, p. 4, Ex. 1)

The policy in effect at the time of the loss in 2003 was not the policy in effect in 2002 when the aircraft was first added to the policy. In fact, Scott Petersen admitted to Frank Kimmel, another aviation insurance broker, in spring 2002 that he <u>knew</u> he did not have insurance coverage to use the AT-503 for turbine transition training, that the cost of insurance was a barrier and that he was first going to see if there was a demand for such training. (Kimmel Affidavit, Ex. 11)

Additionally, at some point prior to the crash Scott and/or Sarah Petersen had contacted Hardy about possibly running an agricultural flight training program using a piston-powered Ag Cat plane (not the turbine AT-503). Hardy discussed with the Petersens some of the changes required for an insurance policy to include training activity with those Ag Cat planes. (Hardy dep., p. 113, Ex. 10)

Pontiac admits that it was rejected prior to the crash for Ag training coverage in its piston Ag Cat planes. Those planes were already insured under the National Union policy for aerial application. Therefore, Pontiac admits it was not confused about whether it needed specific coverage to run a flight training business. It had applied for such coverage in the past for different planes.

Pontiac is an experienced fixed base operator with an agricultural aviation and a general aviation business in operation since 1997. It knew that specific insurance coverage is required to run a flight school. It had specific coverage under a separate policy for flight training activity with its general aviation planes. The Petersens also negotiated potential terms with Hardy for insurance coverage to perform ag training in an Ag Cat piston plane and were denied coverage.

The existence of a duty, a legal obligation to conform one's conduct to a certain standard for the benefit or protection of another, is a matter of law to be decided by the court. *Kanter v. Deitelbaum*, 271 Ill. App. 3d 750, 648 N.E.2d 1137 (1st Dist. 1995); *Shultz v. Griffin-Rahn Insurance Agency, Inc.*, 193 Ill. App. 3d 453, 550 N.E.2d 232 (3d Dist. 1990). Hardy simply did not have a duty under Illinois law to procure coverage for Pontiac to run a nationally advertised turbine transition training flight school with the AT-503 when he was never informed by Pontiac of such use, was not aware of it and was never asked to obtain such coverage. In fact, Scott Petersen admitted to Frank Kimmel prior to the crash that he knew he did not have such coverage.

Scott Petersen is an experienced pilot, fixed base operator and businessman who decided knowingly to take a risk regarding insurance coverage and unfortunately lost. That does not establish any breach of duty or negligence by Hardy. This Court should properly find that there is no genuine issue of fact and the undisputed facts show that Hardy did not breach any duty as Pontiac's insurance broker.

WHEREFORE, Third Party Defendant, HARDY AVIATION INSURANCE, INC., hereby prays for the entry of summary judgment in its favor and against Third Party Plaintiff, PONTIAC FLYING SERVICES, INC.

/s/    Diane M. Baron
DIANE M. BARON - Bar No. 6187430
Attorney for Third-Party Defendant
CLAUSEN MILLER P.C.
10 South LaSalle Street
Chicago, IL  60603
Telephone: (312) 606-7580
Fax: (312) 606-7777
E-Mail: dbaron@clausen.com

1076145.1

15

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jeffrey B. Rock
HASSELBERG ROCK BELL & KUPPLER
Suite 200 - Associated Bank Building
4600 N. Brandywine Drive
Peoria, Illinois  61614
Tel. No.: 309-688-9400
Fax No.: 309-688-9430
jrock@hrbklaw.com
cpoehlman@hrbklaw.com

Kevin P. Durkin
CLIFFORD LAW OFFICES
120 N. La Salle Street
31st Floor
Chicago, Illinois  60602
Tel. No.: 312-899-9090
Fax No.: 312-251-1160
kpd@cliffordlaw.com

Mark T. Banovetz
TRESSLER SODERSTROM MALONEY & PRIESS
Sears Tower - 22nd Floor
233 South Wacker Drive
Chicago, Illinois 60606
mbanovetz@tsmp.com

David B. Mueller
CASSIDY & MUELLER
323 Commerce Bank Building
416 Main Street
Peoria, IL  61602
Tel. No.: 309-676-0591
Fax No.: 309-676-8036
dmueller@cassidymueller.com
jstieghorst@cassidymueller.com

Michael S. Krzak
CLIFFORD LAW OFFICES
120 N. La Salle Street
31st Floor
Tel. No.: 312-899-9090
Fax No.: 312-251-1160
msk@cliffordlaw.com
jmg@cliffordlaw.com

/s/   Diane M. Baron
DIANE M. BARON - Bar No. 6187430
Attorney for Third-Party Defendant
CLAUSEN MILLER P.C.
10 South LaSalle Street
Chicago, IL  60603
Telephone:  (312) 606-7580
Fax:  (312) 606-7777
E-Mail:  dbaron@clausen.com