E-FILED
Friday, 01 September, 2006  02:31:18 PM
Clerk, U.S. District Court, ILCD

**THIRD PARTY DEFENDANT'S
EXHIBIT NO. 1**

E-FILED
Friday, 19 August, 2005 03:45:59 PM
Clerk, U.S. District Court, ILCD

FILED
AUG 1 9 2005
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

NATIONAL UNION FIRE INSURANCE )
CO. OF PITTSBURGH, PA, )
 )
    Plaintiff, )
 )
v. ) No. 03-1288
 )
PONTIAC FLYING SERVICE, INC., )
et al., )
 )
    Defendants. )

# ORDER

In May 2003, instructor-pilot Richard Lucente was giving student-pilot Neil Webster turbine-transition training in Pontiac Flying Service, Inc.'s, Air Tractor 503 (AT-503) when the plane went down, killing both men and destroying the aircraft.

This dispute over insurance coverage promptly ensued in September 2003 when National Union Fire Insurance Company (incorporated and principally doing business in Pennsylvania) brought a diversity action against Pontiac (incorporated and principally doing business in Illinois) seeking a declaration that National Union was not obligated to pay for the $350,000 aircraft under the aerial applicator (crop duster) policy in effect at the time of the crash because Lucente and Webster were using the AT-503 for something other than aerial application. National Union has moved for summary judgment on this issue. Fed. R. Civ. P. 56.

1

The claim turns on the interpretation of the aerial applicator policy and the parties agree that Illinois law applies. Under Illinois law, the court determines whether the policy unambiguously favors the insurer, or whether the policy is subject to equally reasonable interpretations, in which case the ambiguity must be resolved in favor of the insured. <u>Outboard Marine Corp. v. Liberty Mut. Ins. Co.</u>, 607 N.E.2d 1204, 1212 (Ill. 1992); <u>U.S. Fid. & Gty. Co. v. Wilkin Insulation Co.</u>, 578 N.E.2d 926, 931 (Ill. 1991).

By the terms of the aerial applicator policy in effect at the time of the crash, National Union agreed to pay Pontiac for physical damage to covered aircraft including the AT-503. Item six of the declarations page specified that the covered aircraft were only to be used for "aerial application." The very first exclusion also specified that the policy did not apply while a covered aircraft was being operated "for any purpose or use other than aerial application." "Aerial application" was defined as "application by aircraft of seeds, fertilizers or chemicals and include[d] flights required in direct support thereof."

Pontiac, and Scott and Sarah Petersen, the owners and officers of the corporation, had been advertising their turbine-transition-training course in trade magazines since December 2002. A man by the name of Del Finup from Michigan would give Pontiac and the Petersens their first and last customer. Finup had a turbine-powered Air Tractor 402 and was looking to put piston-engine pilot

2

Neil Webster in the cockpit. Finup agreed to pay Pontiac and the Petersens $5,200 for the training which the latter would provide through seasoned pilot Richard Lucente in the AT-503.

The core of Pontiac's argument is that, although Lucente and Webster were not using the AT-503 for "application by aircraft of seeds, fertilizers or chemicals" this was nonetheless a "flight[] required in direct support thereof" because Finup, or the aerial application industry generally, cannot fly crop dusting missions in turbine-powered aircraft without turbine-engine pilots.

This is an unreasonable interpretation. The aerial applicator policy insured risks related to *Pontiac's* aerial application business. Hence the emphasis in item six of the declarations and again in the first exclusion on whether the named insured was using its covered aircraft for aerial application. It would not be reasonable to assume that the purpose of the primary definition of aerial application ("application by aircraft of seeds, fertilizers or chemicals") was to shift the focus from Pontiac's aerial application business to Finup's aerial application business or the aerial application industry generally. The policy unambiguously required the use of the AT-503 to be "in direct support" of Pontiac's aerial application business, and Pontiac's training of someone else's pilot simply did not meet this standard.

Pontiac also relies on the argument that, in March 2002 when the AT-503 was added to a similar aerial applicator policy effective through April 10, 2002, someone from National Union told

3

Randy Hardy of Hardy Aviation Insurance, Inc. (the insurance broker)--and Hardy told Scott Petersen--that Scott needed more hours in the AT-503 before he could put it to work, and that he would be covered for additional turbine-transition training from Richard Lucente in the AT-503. Pontiac believes this means that, with respect to the subsequent aerial applicator policy effective May 19, 2002, through the time of the crash on May 5, 2003, National Union has waived or is estopped from asserting an interpretation of "aerial application" that would deny coverage.

This would be a far better point if Lucente and Scott had crashed in April 2002 or May 2002 while Lucente was giving Scott additional turbine-transition training in the AT-503. But as it stands it is difficult to understand why National Union should be considered to have also waived the defense that Lucente's training of someone else a year later was not "aerial application." Pontiac does not seriously develop this argument. The estoppel argument would be that the insurance company represented coverage and that Pontiac reasonably relied on this representation to its detriment. E.g., Harr v. Allstate Ins. Co., 255 A.2d 208 (N.J. 1969). But Pontiac has not developed this argument either, and, in any event, it would be unreasonable to assume that clearance for Scott to receive additional turbine-transition training in 2002 meant clearance for student pilots generally to receive it in 2003.

National Union has no obligation to pay Pontiac for the loss

4

of the AT-503 under the physical damage coverage afforded under the aerial applicator policy in effect at the time of the crash.

This takes care of the original dispute between National Union and Pontiac. But the case became more complicated when the representative of Webster's estate sued Pontiac and the representative of Lucente's estate in April 2004 in the Illinois Circuit Court for Livingston County on the theory that they owed a duty of care in maintaining the AT-503 and in providing flight instruction and that Pontiac through its agents including Lucente negligently maintained the AT-503 and negligently instructed and supervised Webster. National Union's aerial applicator policy also provided liability insurance, but the company refused to defend the suit and instead filed a June 2004 amended complaint in this case.

National Union's complaint now named Pontiac as well as Lucente's representative (an Illinois citizen) and Webster's representative (a Michigan citizen). National Union sought a declaration that it owed no defense or indemnity obligation in the Webster litigation under the aerial applicator policy because the AT-503 was not being used for "aerial application" and because the liability insurance for a suit for damages for bodily injury did not apply because Webster was a "passenger." National Union also sought a declaration that it owed Lucente's representative no defense or indemnity obligation in the Webster litigation under the aerial applicator policy because Lucente was not an "insured."

5

This last theory really only affects Lucente's representative and (with respect to the indemnity obligation) Webster's representative. By November 2004, Lucente's representative had not pled or otherwise defended and the Court granted National Union a declaration that it owed Lucente's representative no defense or indemnity obligation in the Webster action because Lucente was not an "insured." Webster's representative did not object at the time. And, although National Union's summary judgment motion again raises the issue of Lucente's "insured" status, Webster's representative again declines to contest the point. National Union's motion for summary judgment will be granted on this claim.

This leaves National Union's request for a declaration that it owes no defense or indemnity obligation to Pontiac in the Webster litigation under the aerial applicator policy.

Two distinct duties are involved--the duty to defend and to indemnify. The duty to defend is more demanding. The insurer must defend the insured if the allegations of the underlying complaint potentially fall within the scope of the policy. <u>Outboard Marine Corp. v. Liberty Mut. Ins. Co.</u>, 607 N.E.2d 1204, 1212 (Ill. 1992).

The April 2004 Webster complaint is a suit for damages for bodily injury. But the aerial applicator policy's bodily injury liability insurance excluded claims by "passengers." The policy defined "passenger" as "any person in . . . the aircraft for the purpose of riding or flying therein . . . including crew." "Crew"

6

was defined as "the pilot[-]in-command, co-pilot, flight engineer, flight attendant or anyone else who is in . . . the aircraft for assisting in the operation of the aircraft."

National Union moves for summary judgment on this point. Pontiac has responded and Webster's representative has adopted that response. Pontiac contends that the complaint leaves open the possibility that Webster was piloting the plane when it crashed and that the person actively piloting the plane is not a "passenger." The reasoning is that the person piloting the plane would be a "passenger" only because he is "crew." But "crew" only consists of persons "assisting in the operation of the aircraft," and the person actively piloting the plane is not "assisting in the operation of the aircraft" he *is* operating the aircraft.

This is an unreasonable interpretation. "Passenger" is clearly defined as anyone on the plane including "crew." And "crew" is clearly defined as the persons flying the plane (the "pilot[-]in-command" and "co-pilot") as well as anyone else with a job to do on the aircraft. The only non-"passengers" would be persons outside of the plane. It is clear from the complaint that Webster was inside the plane and was therefore a "passenger." National Union therefore owed no duty to defend Pontiac from the Webster complaint under the aerial applicator policy. And, for essentially the same reason, it owes no duty to indemnify.

This completely addresses National Union's September 2003

7

complaint and June 2004 amended complaint and leaves the claims which the defendants have brought. The first of these is the third-party complaint which Pontiac has brought against Hardy Aviation Insurance, Inc., a citizen of Kansas. This is a damages claim alleging negligent procurement of inadequate insurance. Neither party has a motion pending with respect to this claim.

The second set of claims followed a development in the underlying state-court litigation, namely an amended complaint of April 2005 by Webster's representatives naming Pontiac and Lucente's representative as well as Scott and Sarah Petersen and Air Tractor, Inc. This prompted Pontiac to file a counterclaim in May 2005 in this case against National Union based on another policy--a commercial general liability aviation policy (CGLA policy)--which was also in effect at the time of the accident.

Pontiac sought a declaration that National Union owed it a defense in the Webster litigation, and that, by failing to defend, it also owed an indemnity obligation. The Petersens were in substance co-counter-plaintiffs in this pleading relying on the same theory and seeking the same relief. It is obvious enough from the record that the Petersens are Illinois citizens though this is not mentioned in the counterclaim. Webster's representatives filed a similar if not identical counterclaim against National Union.

National Union has moved for judgment on the pleadings, Fed. R. Civ. P. 12(c), contending that the CGLA policy's vehicle exclusion applies and that it therefore owes no duty to defend

8

Pontiac or the Petersens in the Webster litigation.

The CGLA policy's bodily injury and property damage liability insurance stated that it would "pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies resulting from [Pontiac's] [a]viation operations" and that it would "defend any suit seeking those damages." This insurance did not, however, cover "[b]odily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft . . . owned . . . by . . . any insured."

The duty to defend turns on whether the complaint potentially falls within the scope of the policy, Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, 1220 (Ill. 1992), and it arises as to the entire complaint so long as one claim is potentially covered, Bedoya v. Ill. Founders Ins. Co., 688 N.E.2d 757, 761-62 (Ill. App. Ct. 1997); JG Industries, Inc., v. National Union Fire Ins. Co., 578 N.E.2d 1259, 1262 (Ill. App. Ct. 1991).

Pontiac and the Petersens are "insureds" and the Webster case is a suit seeking damages against them. The claims are for bodily injury including pain and suffering and resulting in death. National Union raises no issue as to whether the bodily injury "result[ed] from" Pontiac's "[a]viation operations."

Everything turns on the application of the CGLA policy's vehicle exclusion. The complaint alleges that Pontiac and the Petersens owed a duty of care in maintaining the AT-503 and that

9

they (through agents) negligently failed to do so thereby causing the crash and Webster's injuries. This is clearly an allegation that bodily injury arose out of the maintenance of an aircraft owned by Pontiac, and the exclusion applies to it.

But the complaint also alleges that Pontiac and the Petersens owed a duty of care in providing flight instruction, and that they (through agents including Lucente) failed to provide proper instruction and in-cockpit supervision to Webster, and that this caused the crash and Webster's injuries. Literally, of course, that makes no sense. Planes do not go down because a poorly trained or supervised student pilot is sitting inside of them. This theory must be based on the notion that Webster, due to faulty training, made some sort of mistake while piloting the AT-503, which Lucente failed to foresee or remedy by properly communicating to Webster or promptly taking control of the aircraft.

Several cases deal with the issue of whether a vehicle exclusion applies to allegations such as the negligent instruction and supervision claim against Pontiac and the Petersens.

One is <u>United States Fidelity & Guaranty Co. v. State Farm Mut. Auto. Ins. Co.</u>, 437 N.E.2d 663 (Ill. App. Ct. 1982). In this case, USFG had issued a multi-peril insurance policy with an automobile exclusion to a daycare center. The underlying complaint alleged that a child fell out of the daycare center's car which was being driven by a daycare center employee. The complaint named the daycare center and the employee and sued for negligent operation of a daycare center and negligent operation of the car. The first

10

theory avoided the automobile exclusion because it alleged separate and distinct non-auto-related conduct as a cause of the injury.

Another is Louis Marsch, Inc., v. Pekin Ins. Co., 491 N.E.2d 432 (Ill. App. Ct. 1985), a case in which Aetna had issued a comprehensive general liability policy with a vehicle exclusion to Marsch. The underlying complaint alleged that a child was run over by Marsch's truck, which was being driven by its employee. One count of the complaint alleged that Marsch, which was doing roadwork, negligently placed flagmen and signs. This theory avoided the vehicle exclusion. The court reasoned that this negligence exposed the victim to harm in a number of different ways, only one of which (being struck by Marsch's truck) was a cause of harm excluded under the policy. The result was different with respect to the count of the complaint alleging that Marsch had negligently hired the driver of the truck. This would necessarily require proof that the driver negligently or incompetently operated Marsch's truck, which was an excluded instrumentality.

The court in Oakley Transport, Inc., v. Zurich Ins. Co., 648 N.E.2d 1099 (Ill. App. Ct. 1995) reached this same result with respect to a negligent supervision claim. The underlying complaints alleged that the employee truck driver negligently drove his truck and caused injury and damage. This was within the scope of a vehicle exclusion for bodily injury or property damage arising out of use of an auto. The negligent supervision claim against the employer was also within the exclusion because it was derivative of and dependent upon the employee's negligent use of the truck.

11

A similar result was reached in <u>Massachusetts Bay Ins. Co. v. Unique Presort Serv's, Inc.</u>, 679 N.E.2d 476 (Ill. App. Ct. 1997). Here, the trucking firm allegedly negligently failed to comply with drug testing regulations. But the regulations dealt with the problem of intoxicated commercial drivers, and so the fact that the untested employee was "using" an "auto" was important.

Also informative are the Illinois Appellate Court and Illinois Supreme Court's decisions in <u>Northbrook Property and Casualty Ins. Co. v. Transp. Joint Agreement</u>, 722 N.E.2d 280 (Ill. App. Ct. 1999), <u>rev'd</u>, 741 N.E.2d 253 (Ill. 2000). In this case, two school districts employed a bus driver who was involved in a collision with a train. The complaint alleged improper driving against the bus driver and that the school districts improperly trained, instructed, and supervised the driver, failed to inspect the routes, and failed to warn the public about the driver. The Appellate Court concluded that the school district's alleged failure to inspect, plan, and instruct its drivers regarding routes were independent of the driver's negligent operation of the bus. The Illinois Supreme Court summarily reversed the Appellate Court, thinking it obvious that these allegations were "nothing more than rephrasings of the fact that the students' injuries arose from the school districts' use or operation of a motor vehicle."

In this case, the Webster complaint alleges that Pontiac and the Petersens (through Lucente) negligently instructed and supervised Webster. Clearly implicit is the notion that Webster crashed and was injured because he made a mistake while piloting

12

the AT-503. The aircraft exclusion applies to precisely this situation. The negligence claims against Pontiac and the Petersens are clearly derivative of Webster's piloting because if Webster had never touched the controls then the quality of his instruction and supervision would be irrelevant. National Union therefore owed no duty to defend the Webster complaint under the CGLA policy.

IT IS THEREFORE ORDERED as follows. National Union's motion for summary judgment (docket no. 63) is GRANTED. Webster's representative's motion to adopt Pontiac's response (docket no. 68) is GRANTED. It is DECLARED that: (1) National Union Fire Insurance Co. is not obligated to indemnify Pontiac Flying Service, Inc., for the loss of its Air Tractor 503 under aerial applicator policy AV-3391999-04. (2) National Union Fire Insurance Co. is not obligated to defend or indemnify the representative of Richard Lucente's estate in the Webster litigation under aerial applicator policy AV-3391999-04. (3) National Union Fire Insurance Co. is not obligated to defend or indemnify Pontiac Flying Service, Inc., in the Webster litigation under aerial applicator policy AV-3391999-04. National Union's motion for judgment on the pleadings (docket no. 81) is GRANTED. Pontiac's third-party complaint against Hardy Aviation, Inc., is referred to the magistrate judge for further proceedings.

Signed this 19th day of August 2005.

s/Joe B. McDade
JOE BILLY McDADE
United States District Judge

13