**E-FILED**
Friday, 01 September, 2006  02:33:18 PM
Clerk, U.S. District Court, ILCD

**THIRD PARTY DEFENDANT'S
EXHIBIT NO. 6**

1

1   STATE OF ILLINOIS      )
                           )
2   COUNTY OF COOK         )

3           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                 COUNTY DEPARTMENT, LAW DIVISION

4
    NATIONAL UNION FIRE INSURANCE  )
5   COMPANY OF PITTSBURGH, PA.,    )
                                   )
6           Plaintiff,             )
                                   )
7           vs.                    )  No. 03-1288
                                   )
8   PONTIAC FLYING SERVICE, INC.,  )
    Et al.,                        )
9                                  )
            Defendants.            )
10                                 )
                And                )
11                                 )
    PONTIAC FLYING SERVICE, INC.,  )
12                                 )
            Third Party Plaintiff, )
13                                 )
            vs.                    )
14                                 )
    HARDY AVIATION INSURANCE, INC.,)
15                                 )
            Third Party Defendant. )
16

17
            The discovery deposition of SCOTT PETERSEN
18  called for examination pursuant to the provisions of the
    Civil Practice Act and Rules of the Supreme Court as they
19  apply to the taking of discovery depositions, taken
    before Laura J. Amberg, CSR, State of Illinois, on the
20  22nd day of February, 2005, at the hour of 11:20 a.m., at
    416 Main Street in the City of Peoria, County of Peoria,
21  State of Illinois.

22

23

MERIT REPORTERS

**2**

1    PRESENT:    TRESSLER, SODERSTROM, MALONEY & PRIESS
2         BY:  MARK T. BANOVETZ, ESQ.
         Sears Tower, 22nd Floor
3         233 S. Wacker Drive
         Chicago, IL 60606-6308
4              Attorney for the Plaintiff;

5    CASSIDY & MUELLER
         BY:  DAVID B. MUELLER, ESQ.
6         416 Main Street, Suite 323
         Peoria, IL 61602
7              Attorney for Defendant/Third Party
              Plaintiff Pontiac Flying Service;
8
     CLAUSEN MILLER, P.C.
9         BY:  DIANE M. BARON, ESQ.
         10 South LaSalle Street
10        Chicago, IL 60603-1098
              Attorney for Third Party Defendant
11             Hardy Aviation Insurance;

12   PRESENT
     VIA PHONE:  CLIFFORD LAW OFFICES
13        BY:  MICHAEL KRZAK, ESQ.
         120 North LaSalle Street, Suite 3100
14        Chicago, IL 60602

15   ALSO PRESENT:  SARAH PETERSEN.

16

17        Deposition Exhibit #1   35
              Deposition Exhibit #2   36
18            Deposition Exhibit #3   38
              Deposition Exhibit #4   43
19            Deposition Exhibit #5   53
              Deposition Exhibit #6   53
20            Deposition Exhibit #7   53

21

22        Certificate       59-60
23

---

**3**

1              SCOTT PETERSEN
2         After being first duly sworn upon his oath
3         Testified as follows in response to
4              EXAMINATION
5    BY MS. BARON:
6         Q.    Just for the record, this is the deposition
7    of -- first of all, would you state your name?
8         A.    Scott Petersen.
9         MS. BARON:  This is the deposition of Scott
10   Petersen taken in accordance with the Federal Rules and
11   pursuant to notice and by agreement of the parties based
12   on inclement weather on several occasions.
13             Present at the deposition here is Sarah
14   Petersen as well and as I have indicated, I do object to
15   the fact that she is sitting in in Scott Petersen's
16   deposition since they both are apparently representatives
17   of the company and certainly both of them do not sit in
18   both depositions.
19        MR. MUELLER:  For the purposes of the record,
20   it is our position and representing Pontiac Flying
21   Services, while one of the officers is being deposed,
22   another officer may sit in the deposition as the company
23   representative in order to consult with counsel regarding

---

**4**

1    the interests of the corporation.
2         Q.    (Ms. Baron continuing.)  All right.  Mr.
3    Petersen, my name is Diane Baron.  I represent Hardy
4    Aviation Insurance.  I'm going to be asking you some
5    questions regarding the coverage litigation that is
6    pending regarding the crash of the AT-503.  Have you ever
7    given a deposition before?
8         A.    Yes.
9         Q.    How many times have you given depositions?
10        A.    Once, that I recall.
11        Q.    What was the nature of that?
12        A.    In regards to this loss.
13        Q.    And when was that given?
14        A.    I believe --
15        MR. MUELLER:  Are you referring to the sworn
16   statement or referring to a deposition?
17        A.    The sworn statement that was taken at Pontiac
18   Flying Service in July, I think, 14th of 2002.
19        MR. BANOVETZ:  2003.
20        A.    Yeah, 2003.  I stand corrected.  Thank you.
21        MR. MUELLER:  For the record, his deposition
22   has not been taken in this case.
23        Q.    (Ms. Baron continuing.)  Okay.

---

**5**

1         A.    I'm not an attorney, so these terms are a
2    little foreign to me.
3         Q.    No, I know that.  That's fine.  Well, just
4    for some instruction, I ask that you keep your responses
5    verbal and not say uh-huh or huh-uh, as we all tend to
6    do.  And if you have a problem hearing me or
7    understanding what I'm asking, please let me know and I
8    will --
9         A.    I will do that.
10        Q.    -- repeat it or have it read back, so when
11   you do answer the record will accurately show that you're
12   answering the question.  Okay?
13        A.    Okay.
14        Q.    Now, have you brought any documents with you,
15   because the notice of deposition that I served requested
16   all documents regarding Hardy Aviation Insurance.
17        MR. MUELLER:  Let the record show that,
18   Counsel, I have the records pursuant to the notice.
19        MS. BARON:  Okay.  Can I see them?
20        MR. MUELLER:  Sure.  There are separate sets
21   in there for the attorneys.
22        MR. BANOVETZ:  You said there are separate
23   sets there.  Could I have one, Diane?  I think there's

6

1  multiple sets, he said.

2          MS. BARON:  I'm not sure how they are sorted

3  out here.

4          MR. MUELLER:  There should be two separate --

5          MS. BARON:  This looks like one.

6          MR. MUELLER:  Diane, you also have the

7  stapled on top and those are separate sets.

8          MS. BARON:  These might be the originals.

9      Q.    (Ms. Baron continuing.)  All right.  The

10  documents that your counsel has provided me are all of

11  them that you have regarding the AT-503's insurance?

12      A.    **That's correct.  I think we lost someone.**

13  (Off the record discussion.)

14      Q.    All right.  Mr. Petersen, what is your date

15  of birth?

16      A.    **September 10th, 1960.**

17      Q.    And what is your address?

18      A.    **Home address is 15801 east 2000 North Road,**

19  **Pontiac, Illinois, 61764.**

20      Q.    And with whom do you live at that address?

21      A.    **With my wife and my children.**

22      Q.    What are your children's names?

23      A.    **Julie, Jamie, and Kristopher with a K.**

7

1      Q.    And what are there are ages?

2      A.    **Julie is 19, Jamie is 16 and Kristopher is**

3  **13.**

4      Q.    How long have you lived at that address?

5      A.    **We lived there since June of 1997.**

6      Q.    Prior to that where did you live?

7      A.    **West Central, Nebraska.**

8      Q.    Okay.  And why did you relocate to Pontiac,

9  Illinois?

10      A.    **To take over management of the airport and**

11  **set up an ag business.**

12      Q.    Okay.  Could you just tell us briefly about

13  your educational background, where you went to school,

14  when you finished?

15      A.    **High school graduate, Hershey High School,**

16  **graduated 1978; graduated with an Associate's Degree in**

17  **Aircraft Maintenance Technology from Western Nebraska**

18  **Technical College in Sidney, Nebraska, 1981.  I also**

19  **graduated from the Sheppard Air Force Base Technical**

20  **School, I believe that was in 1983.**

21      Q.    Okay.  Does that cover your formal education

22  pretty much?

23      A.    **Well, I'm a commercial pilot.**

8

1      Q.    Okay.  When did you get your license?

2      A.    **That I don't remember.  It's been quite a few**

3  **years ago.  I'm also an instrument rated certified flight**

4  **instructor.  I'm a licensed airframe and power plant**

5  **mechanic through the FAA and also hold an inspection**

6  **authorization.**

7      Q.    Do you recall when you received any of these

8  certifications?

9      A.    **Not right off the top of my head.**

10      Q.    Could you tell us about your employment since

11  you finished school?

12      A.    **Since high school?**

13      Q.    Yeah.

14      A.    **Worked for Hershey Flying Service after I**

15  **graduated from high school.**

16      Q.    What did you do for them?

17      A.    **I was general help; aircraft maintenance**

18  **helper apprentice, I guess you could call it.**

19      Q.    Okay.  How long did you do that?

20      A.    **About a year and a half off and on.**

21      Q.    When would that have been?

22      A.    **1978.**

23      Q.    Okay.  After that where did you work?

9

1      A.    **I worked for a company that was building a**

2  **coal-fired power plant in our hometown, worked the summer**

3  **there in, I believe, 1979.**

4      Q.    Okay.  And then?

5      A.    **And then I worked the next summer for a**

6  **friend of mine, Medicine Valley Aircraft in Curtis,**

7  **Nebraska.**

8      Q.    What did you do there?

9      A.    **Aircraft mechanic.**

10      Q.    Okay.  And what summer would that have been?

11      A.    **That would have been the summer of 1980.**

12      Q.    And then after that where did you work?

13      A.    **I worked some odd jobs around home, and I was**

14  **enlisted in the United States Air Force.**

15      Q.    And where were you when you were enlisted,

16  where did you serve?

17      A.    **I was stationed in Nellis Air Force Base,**

18  **Nevada.**

19      Q.    During what period of time?

20      A.    **That would have been '82 through, I think,**

21  **May of '84.**

22      Q.    And what did you do there?

23      A.    **I was F16 crew chief maintenance technician.**

**10**

1    Q.    And then what did you do after that?

2    A.    When I was out of the Air Force I got into

3    the trucking industry with my father, owned and operated

4    his own trucking business.

5    Q.    What did you do for that business?

6    A.    I was the owner of my part of the business,

7    we bought and sold grain and feed and fertilizer and

8    delivered it to various places across central U.S.

9    Q.    Okay. And over what period of time did you

10   do that?

11   A.    That would have been from late 1984 through,

12   I'm going to say, late 1996 I guess when I quit driving a

13   truck.

14   Q.    And what did you do after that?

15   A.    In 1996, the summer of, I came to Illinois

16   and was enrolled at Harold's Flying Service in Leland,

17   Illinois, in his ag pilot program.

18   Q.    And what did you do for that program? Were

19   you --

20   A.    I went through his school and then I ended up

21   staying the summer as a pilot and also as a mechanic for

22   Mr. Miller.

23   Q.    And how long did you stay there?

**11**

1    A.    I stayed there 'til late August of 1996

2    before returning to western Nebraska.

3    Q.    And why did you return to Nebraska?

4    A.    Flying work was seasonal and we had completed

5    the flying season.

6    Q.    What did you do when you returned to

7    Nebraska?

8    A.    Got back in the truck and continued that

9    until, I believe, January of 1997.

10   Q.    Okay. And what did you do at that time?

11   A.    At that time I had purchased a derelict

12   aircraft and was in the process of restoring that.

13   Q.    And what do you mean by derelict aircraft for

14   those of us not in the business? One that doesn't fly?

15   A.    Yeah, a non-flying.

16        MR. MUELLER: Drinks a lot.

17   A.    It was a fixer-upper.

18   Q.    Okay. And what did you do for purposes of

19   employment while you were fixing up the plane?

20   A.    That.

21   Q.    That was it?

22   A.    That was it.

23   Q.    And were you able to get it running?

**12**

1    A.    Oh, yeah.

2    Q.    And did you -- then what did you do?

3    A.    I still own the aircraft.

4    Q.    What did you do for employment then? Did you

5    use that for -- use the aircraft for something?

6    A.    No, no.

7    Q.    What did you do?

8    A.    I -- in April of 1997 I returned to Illinois

9    to help out at Harold's Flying Service in Leland.

10   Q.    And what did you do there to help out?

11   A.    Maintenance and flying.

12   Q.    And what sort of flying did you do?

13   A.    Agricultural.

14   Q.    And what do you mean by agricultural flying?

15   A.    Loose term, crop-dusting.

16   Q.    And what types of planes were you flying for

17   that at Harold's?

18   A.    I believe at that time Harold had several Ag

19   Cats, a couple of Pawnees, a 210 Cessna that we used for

20   agricultural operations.

21   Q.    How long did you do that

22   A.    I was there at his place until the middle of

23   June of '97.

**13**

1    Q.    And what did you do at that time?

2    A.    We then took over operation of the Pontiac

3    Municipal Airport.

4    Q.    And what did you do when you took over the

5    operation of the airport?

6    A.    I was named as manager. We managed the

7    airport, sold fuel and basically started FBO, fixed base

8    operation, there on the field.

9    Q.    And what do you mean by a fixed base

10   operation?

11   A.    We sold fuel, performed maintenance, met the

12   customers' needs as they traveled in and out.

13   Q.    And how long did you do that?

14   A.    We're still doing that.

15   Q.    Still. Okay. Do you also own a company

16   called Pontiac Flying Service?

17   A.    That's correct.

18   Q.    And when did you get involved in that

19   company?

20   A.    Pontiac Flying Service was started when we

21   initially started our business there in 1997.

22   Q.    And when you started that in 1997 what was

23   the nature of that business?

14

1    A.    Airport management, maintenance and
2    agricultural flying.
3        Q.    And you are an owner of Pontiac Flying
4    Services?
5    A.    Co-owner with my wife.
6        Q.    Is it a corporation?
7    A.    Pontiac Flying Service is not. Pontiac
8    Flying Service, Inc., is incorporated. There's two
9    separate entities within that business.
10       Q.    Okay. And what is the distinction between
11   the two entities besides the fact one is a corporation,
12   one isn't; what do they do?
13   A.    When we purchased the 503 we put those assets
14   into Pontiac Flying Service, Inc., formed the corporation
15   at that time.
16       Q.    So that was the only asset of the Inc.,
17   Pontiac Flying Services, Inc.?
18   A.    That, a pickup truck, one enclosed trailer,
19   one small flat open trailer, and some numerous parts and
20   pieces.
21       Q.    And why is it that you did it that way, put
22   that into a separate company?
23   A.    We just decided to put that into the

15

1    corporation. I don't recall.
2        Q.    And who are the shareholders of that
3    corporation?
4    A.    Sarah Petersen and myself.
5        Q.    And how is that split? 50/50?
6    A.    51/49.
7        Q.    Who has 51?
8    A.    Myself.
9        Q.    Does Pontiac Flying Services, Inc., have any
10   other employees -- have any employees?
11   A.    At this time Inc. has no employees.
12       Q.    Did it ever?
13   A.    Yes. We had myself, my wife. I think we
14   were the only, I guess, employees of the corporation.
15       Q.    And were you officers of the corporation as
16   well?
17   A.    Yes.
18       Q.    What offices did you hold?
19   A.    President.
20       Q.    And your wife?
21   A.    She's, I believe, the secretary.
22       Q.    Okay. Is that corporation still in
23   existence?

16

1    A.    Yes.
2        Q.    What does it currently own?
3    A.    The pickup truck that was originally included
4    and the two trailers and some miscellaneous parts and
5    pieces.
6        Q.    Now, the other entity, Pontiac Flying Service
7    -- Services?
8    A.    Service.
9        Q.    Service, Pontiac Flying Service, does it own
10   any planes?
11   A.    Yes.
12       Q.    Could you tell me what planes it owns
13   currently?
14   A.    Under that there's a 502 Air Tractor; there
15   are two G164A Ag Cats, there's a Piper Turbo Arrow, a
16   Piper Warrior.
17       Q.    Now, when was the 502 Air Tractor acquired?
18   A.    It was acquired in late May of 2003.
19       Q.    And what is that used for?
20   A.    Agricultural flying.
21       Q.    And what about the two G164A Ag Cats, when
22   were they acquired?
23   A.    One is the original derelict airplane that I

17

1    mentioned earlier that we still own. It's used for
2    agricultural operations. The second one we just
3    completed a restoration on it and it has yet to have
4    performed any aerial application at this time.
5        Q.    And what about the Pipers, the Turbo Arrow --
6    A.    They're used for flight instruction and
7    rental.
8        Q.    And that would be the Warrior and the Arrow?
9    A.    That's correct.
10       Q.    And when were they acquired?
11   A.    The Warrior was purchased I believe in July,
12   2002; and the Arrow was purchased I think in September of
13   2002.
14       Q.    And do you have a separate insurance policy
15   that covers the instruction, flight instruction that's
16   done with those planes?
17   A.    That I don't recall.
18       Q.    Okay. Who is your insurance broker?
19   A.    Randy Hardy, Hardy Aviation Insurance.
20       Q.    And when did you start doing business with
21   him as your broker?
22   A.    I believe in 1997.
23       Q.    And what types of insurance policies has

18

1    Hardy Aviation Insurance obtained for you over the years?

2        A.    **Agricultural and also for our rental**

3    **instruction airplanes.**

4        Q.    And he is still your insurance broker;

5    correct?

6        A.    **That's correct.**

7        Q.    All right.  At some point Pontiac Flying

8    Services, Inc., purchased the AT-503; correct?

9        A.    **That's correct.**

10        Q.    When was that?

11        A.    **That purchase was finalized the last day of**

12    **February, 2002.**

13        Q.    And when did Pontiac take possession of it?

14        A.    **It would have been probably in April of that**

15    **same year.**

16        Q.    And what is an AT-503 plane?

17        A.    **It's an agricultural crop duster airplane,**

18    **turboprop powered with two seats.**

19        Q.    And when did you buy it?

20        A.    **When?**

21        Q.    I'm sorry.  From whom did you buy it?

22        A.    **Harold Miller.**

23        Q.    And for what -- what was the price?

19

1        A.    **That I don't recall.**

2        Q.    Okay.  And why did you purchase that plane?

3        A.    **So that we could become involved in the gypsy**

4    **moth abatement programs.**

5        Q.    Did you tell anyone from Hardy Insurance that

6    you were buying that plane?

7        A.    **Yes.**

8        Q.    Who did you tell?

9        A.    **I spoke with Angie and I spoke with Randy.**

10        Q.    And Angie is Angie Banz?

11        A.    **That's correct.**

12        Q.    When did you speak with Angie Banz about it?

13        A.    **To my recollection, early February.**

14        Q.    Of '02?

15        A.    **Of '02.**

16        Q.    Okay.  And did you call her or how was it

17    that you spoke to her?

18        A.    **Yes, I phoned her.**

19        Q.    And what did you say to her and what did she

20    say to you?

21        A.    **If I recall, I told her that we were pursuing**

22    **purchasing the assets of Harold Miller, which included**

23    **the 503, and wanted to know what the insurance premiums**

20

1    and costs would be if this all worked out.

2        Q.    And what did she say?

3        A.    **She said she would work up a quote and get**

4    **back to us.**

5        Q.    And did you describe for her just exactly

6    what it is that you were purchasing?  You said you were

7    purchasing the assets and the AT-503?

8        A.    **I told her most -- I guess basically is the**

9    **AT-503 is basically what I was seeking insurance coverage**

10    **for.**

11        Q.    Did you tell her what you planned to use the

12    AT-503 for?

13        A.    **No.**

14        Q.    Did she get back to you with a quote?

15        A.    **Yes.**

16        Q.    How soon after that conversation?

17        A.    **I -- it was within a week or ten days, I**

18    **believe.**

19        Q.    And did she call you?

20        A.    **I think there was a call and a fax, if I**

21    **remember.**

22        Q.    And do you recall first of all from the phone

23    call that you're referring to what was said?

21

1        A.    **No.**

2        Q.    And then you said you received a fax.  Do you

3    recall what was on the fax?

4        A.    **I believe a quote.**

5        Q.    And do you recall who it was from, what

6    company?

7        A.    **Company?**

8        Q.    Yeah, the insurance company.

9        A.    **Not the exact insurance company, but it was**

10    **from Hardy.**

11        Q.    Okay.  And did you approve the quote?

12        A.    **Not at that time.**

13        Q.    Why not?

14        A.    **The finalization of the purchase of the Air**

15    **Tractor had not taken place as of then.**

16        Q.    So what did you do in response to receiving

17    the fax?  Just hold off or what?

18        A.    **I told them that we had not yet gone through**

19    **with the purchase.**

20        Q.    Did you then contact anyone from Hardy

21    Aviation Insurance again after you did go through with

22    the purchase?

23        A.    **Yes.**

22

1    Q.    And who did you contact?

2    A.    I believe I spoke with Randy.

3    Q.    Randy Hardy?

4    A.    Randy Hardy.

5    Q.    And did you call him?

6    A.    Yes.

7    Q.    Do you recall when that took place?

8    A.    Probably the 28th of February when we -- when

9    we signed the deal.

10    Q.    Okay.  That's of '02?

11    A.    That's correct.

12    Q.    And what did you tell Randy at that time?

13    A.    I don't remember exactly.

14    Q.    Do you recall generally?

15    A.    No.

16    Q.    Do you recall anything Randy said to you in

17    that conversation?

18    A.    I recall that Randy said that before I put

19    the airplane to work I was going to have to have some

20    additional training in the airplane because the insurance

21    company required it.

22    Q.    How much training had you had at that point?

23    A.    I had gone through the initial turbine

23

1    transition training and I believe that was all.

2    Q.    And what is initial turbine transmission

3    training?  Can you describe it?

4    A.    It's transition from piston-powered airplanes

5    into turboprop operations.

6    Q.    And how much time does that involve, that

7    type of training?

8    A.    My initial was a little over five hours.

9    Q.    And who provided you that training?

10    A.    Company or individual?

11    Q.    Both.

12    A.    It was through Harold's Flying Service and

13    the instructor pilot was Rick Lucente.

14    Q.    In what plane was that training done?

15    A.    The Air Tractor 503.

16    Q.    Do you recall anything else Randy said in

17    that conversation?

18    A.    No.

19    Q.    Did he tell you how much more additional

20    training you needed?

21    A.    No; not specified.

22    Q.    Did you ask him?

23    A.    No.

24

1    Q.    Okay.  What was your next contact with anyone

2    from Hardy Aviation Insurance regarding the insurance on

3    that AT-503?

4    A.    I don't recall.  I believe there was a change

5    because they had found some cheaper insurance, but I

6    don't recall the date.

7    Q.    Was it after you had possession of the

8    AT-503?

9    A.    I think so.

10    Q.    Was there -- is it your understanding there

11    was already coverage for it and then there was a change

12    being made to another policy?  I'm not sure I know what

13    you mean when you say there was a change.

14    A.    There was a change, to my knowledge, in the

15    insurance underwriter.

16    Q.    Meaning a change in companies?  I'm still not

17    quite sure I'm following what you're saying.

18    A.    I believe originally we were with AIG.

19    Q.    Okay.

20    A.    And I think at that time it was switched to

21    USAIG and then after that it was switched back to AIG.

22    Q.    Okay.  When you say AIG, was it your

23    understanding the policy was issued by National Union

25

1    Insurance Company?

2    A.    I -- I don't know who it was issued by.

3    Q.    You don't know.  Okay.  What did you use the

4    AT-503 plane for when you acquired it?

5    A.    When we first acquired it I received training

6    in it and then we put it to work doing agricultural

7    operations.

8    MR. BANOVETZ:  Diane, could I just interject?

9    MS. BARON:  Sure.

10    MR. BANOVETZ:  Keep the --

11    MS. BARON:  Sure.

12    EXAMINATION

13    BY MR. BANOVETZ:

14    Q.    At the time, Scott, that you acquired the 503

15    do you recall how many hours you had in the airplane at

16    that time?

17    A.    No, not total.

18    Q.    Can you estimate the total time?

19    MR. MUELLER:  Show my objection.  When we're

20    talking about acquiring, what are we -- when are we

21    talking about the acquisition?  If we're talking about

22    February 28th, I think he said he had five hours.

23    MR. BANOVETZ:  Initial training.

26

1        MR. MUELLER:  Initial training with Lucente.

2  Are we talking about the acquisition taking place after

3  that?

4        MR. BANOVETZ:  No, no.  I was talking about

5  at the time of the purchase.

6        MR. MUELLER:  Okay.  Would that be the five

7  hours?

8      **Q.**  (Mr. Banovetz continuing.)  Is that all the

9  hours that you had in that airplane at that time?

10     **A.  At the time we inked the deal, yes.**

11     **Q.**  So the flying that you did for Harold

12  Miller's Flying Service was all in piston aircraft, other

13  than the training?

14     **A.  That's correct.**

15       MR. BANOVETZ:  Okay.  Thanks.

16

17     **Q.**  (Ms. Baron continuing.)  Just so that I'm

18  clear, you're saying that the purchase was the last day

19  of February of '02; correct?

20     **A.  That's correct.**

21     **Q.**  And then you mentioned a date of April of

22  '02.  Is that when you -- I'm just trying to figure out

23  why the difference in dates.  What happened?

27

1     **A.  The difference in dates is that Harold's**

2  **place, he had a grass strip and in the springtime when**

3  **the snow melted it got muddy and soft and we could not**

4  **physically remove the airplane at that time.**

5     **Q.**  Okay.  So it basically sat there until April?

6     **A.  It sat in his hangar, yes.**

7       MR. MUELLER:  Just so we're on the same

8  wavelength, we lawyers have a tendency to talk about

9  possession in the context of a real estate closing, so I

10  guess, Scott, you had the right to the plane, it was your

11  plane as of February 28th, but you simply couldn't take

12  it and fly it away --

13     **A.  Right.**

14       MR. MUELLER:  -- until April.

15     **A.  It was ours, but it stayed in Harold's**

16  **hangar.**

17     **Q.**  (Ms. Baron continuing.)  Okay.  That helps.

18  And as of when it became yours February 28th, did you

19  have insurance coverage on it?

20     **A.  Yes.**

21     **Q.**  And what coverage did you have?

22     **A.  I don't know.  I -- I don't recall.**

23     **Q.**  And then when you first then were able to

28

1  move it off of the mud --

2     **A.  Right.**

3     **Q.**  -- and then started using it as your own

4  property, Pontiac's property, what was it used for at

5  that time?

6     **A.  Well, the first day that we were able to fly**

7  **it I received training in it with Rick Lucente.**

8     **Q.**  And how much training did you receive with

9  Rick Lucente overall in that plane?

10     **A.  In that particular plane?**

11     **Q.**  Yeah.

12     **A.  When -- after we purchased it?**

13     **Q.**  Uh-huh, yes.

14     **A.  I'm going to say approximately three more**

15  **hours.**

16     **Q.**  And then did you then have contact with

17  someone from Hardy Aviation Insurance regarding coverage

18  for the AT-503 while you were having this training?

19     **A.  Not at that time that I remember.**

20     **Q.**  Do you recall when the coverage for the

21  AT-503 was changed from AIG to USAIG?

22     **A.  No.**

23     **Q.**  Do you know why it was changed back from

29

1  USAIG to AIG?

2     **A.  Yes.**

3     **Q.**  Why?

4     **A.  USAIG would not underwrite gypsy moth**

5  **application.**

6     **Q.**  When did you receive these few hours of

7  training with Rick Lucente in the AT-503?

8     **A.  I don't have an exact date.  It was after the**

9  **purchase and the time when the grass strip dried up and**

10  **we could get the airplane, but I don't have the exact**

11  **date.**

12       MR. MUELLER:  I believe we do have records

13  that would show that.

14     **Q.**  Okay.  Did you use the AT-503 for training

15  anyone else?

16     **A.  Not at that time, no.**

17     **Q.**  At any time.

18     **A.  In -- would you repeat the question?  I'm not**

19  **understanding what you're looking for.**

20     **Q.**  Sure.  I wanted to know if you used the

21  AT-503 for turbine transition training for anyone else?

22       MR. MUELLER:  When you're using the term

23  "you" are you referring to him individually or to the

30

1  corporation?

2      Q.    Corporation.

3      A.    **Corporation, yes.**

4      Q.    Okay. Tell me about that. When did you

5  start doing that?

6      A.    **That would have been in May of 2003.**

7      Q.    And who did that training?

8      A.    **Mr. Rick Lucente.**

9      Q.    And who received the training?

10     A.    **Neal Webster.**

11     Q.    Did anyone else receive the training?

12     A.    **No.**

13     Q.    Was Rick Lucente an employee of Pontiac?

14     A.    **No.**

15     Q.    What was his arrangement then? Why was he

16  flying that plane?

17     A.    **Private contractor.**

18     Q.    And what were the financial arrangements

19  then?

20     A.    **He was paid $100 per hour of instruction time**

21  **whether it was in the classroom or in the air.**

22     Q.    And did he provide instruction in other

23  planes of Pontiac as well?

31

1      A.    **No.**

2      Q.    Just the AT-503?

3      A.    **Just the 503.**

4      Q.    And what was charged to Neal Webster to

5  receive this training?

6      A.    **Ultimately there was no -- no payment for any**

7  **services rendered.**

8      Q.    Okay. What was the initial arrangement to

9  be?

10     A.    **Five thousand two hundred dollars.**

11     Q.    And what was this training to consist of?

12  You mentioned classroom and air. Could you describe that

13  training?

14     A.    **That would have been up to Mr. Lucente.**

15     Q.    Did you advertise this training?

16     A.    **Yes.**

17     Q.    Let me find that.

18          MR. BANOVETZ: Can I ask a question while

19  you're looking?

20          MS. BARON: Sure go ahead.

21          EXAMINATION

22  BY MR. BANOVETZ:

23     Q.    Scott, in the documents that you brought with

32

1  you today I notice that there's an Aircraft Endorsement

2  which has a date of issue of March 5, 2002, that lists

3  the Air Tractor 503. Is that consistent with your

4  recollection of when your insurance became effective on

5  this aircraft after you purchased it?

6      A.    **No. It's my understanding coverage was bound**

7  **on the 1st of March.**

8      Q.    Okay. March 1st?

9      A.    **Yes.**

10     Q.    Okay. Did you receive something in writing

11  from Hardy Aviation or from National Union evidencing the

12  fact that the 503 was now covered?

13     A.    **I don't recall. That would have been --**

14  **Sarah took care of the insurance stuff that came in in**

15  **the office.**

16     Q.    Are the documents that you brought with you

17  today from your files as opposed to something that your

18  attorney provided?

19     A.    **I think that is -- to my knowledge it's all**

20  **from our files.**

21     Q.    Okay. But you don't --

22          MR. MUELLER: He provided the files to me and

23  I then gathered the materials, so --

33

1          MR. BANOVETZ: Fair enough. I'm just trying

2  to get -- I'm not trying to be tricky. I'm just trying

3  to get at what documentation you folks might have

4  received evidencing the coverage.

5      Q.    (Mr. Banovetz continuing.) Is it a fair

6  assumption, if your lawyer will let me ask the question

7  that way, that the documents that I have that you have

8  provided your lawyer today are documents that you

9  received from Hardy, the policy documents?

10          MR. MUELLER: You might show them to him. I

11  -- I think the notice was a little bit broader than just

12  documents received from Hardy.

13     Q.    Fair enough. The document entitled Aircraft

14  Endorsement, which is endorsement ten, dated March 5th,

15  2002.

16     A.    **Endorsement becomes effective March, 2002.**

17     Q.    Is that a document you recall receiving from

18  Hardy?

19     A.    **I don't recall it, but Sarah may.**

20     Q.    Okay, thanks. Just a couple more, if I

21  could, Diane.

22          MS. BARON: Certainly.

23     Q.    (Mr. Banovetz continuing.) Do you recall

**34**

1   receiving a pilot warranty endorsement from Hardy that

2   indicated who could fly the AT-503 when you purchased it?

3       A.   No, I don't remember seeing that.

4       Q.   Did you have an understanding as to who was

5   going to be allowed to fly the AT-503 once you began

6   operations in the spring?

7       A.   Yes, yes.

8       Q.   Who would be allowed to fly that aircraft as

9   you understood it?

10      A.   Myself, Rick Lucente as an instructor pilot,

11  and then anyone that met the open pilot warranty.

12      Q.   Is it fair to say that your understanding was

13  that you were approved to fly the airplane immediately

14  without any further instruction?

15      A.   No.

16      Q.   Was it your understanding at the time you

17  purchased the aircraft that you would be required to

18  undergo additional training in order to fly the aircraft?

19      A.   Yes.

20      Q.   Do you recall receiving a pilot warranty

21  endorsement document you have just referred to which

22  indicated without restriction that you were approved to

23  fly the aircraft, do you recall receiving that document

**35**

1   in or about March of 2002.

2       A.   No.

3       MR. BANOVETZ:  Thank you.

4       MS. BARON:  Let's mark this.

5       (Whereupon Deposition Exhibit #1 was

6       Marked for identification.)

7       Q.   (Ms. Baron continuing.)  Showing you what's

8   been marked as Deposition Exhibit Number One, could you

9   take a look at that and tell us if you recall seeing that

10  before?

11      MR. MUELLER:  Do you have extra copies?

12      MS. BARON:  Sure  For the record, it's a

13  copy of the policy that was attached to the complaint.

14      MR. MUELLER:  I assumed as much.

15      (Off the record.)

16      MR. KRZAK:  What's the exhibit?

17      MR. MUELLER:  It's the policy that's attached

18  to the complaint.

19      MR. KRZAK:  Okay.

20      A.   I don't recall specifically seeing it.

21      Q.   (Ms. Baron continuing.)  Do you recall

22  receiving any of your insurance policies and seeing them?

23      A.   Oh, I know there was stuff that come from

**36**

1   Hardy all the time, but that normally was handled by

2   Sarah.

3       MS. BARON:  Okay.  Let's mark that.

4       (Whereupon Deposition Exhibit #2 was

5       Marked for identification.)

6       Q.   (Ms. Baron continuing.)  All right.  Showing

7   you what's been marked as Deposition Exhibit Number Two,

8   is that a copy of one of the ads that you ran for the

9   turbine transition training with the AT-503?

10      A.   Yes, that's correct.

11      Q.   And when did you run these ads, for what

12  period of time?

13      A.   If I recall, it started in December of 2002

14  and it ran up through the time of the accident, I

15  believe.  At that time we canceled those particular

16  advertising.

17      Q.   And did -- but you're saying that no one else

18  came for training until May of '03?

19      A.   We had several inquiries.

20      Q.   But no one took the training?

21      A.   No.

22      Q.   Did you tell anyone at Hardy Insurance that

23  you were using the AT-503 for turbine transition

**37**

1   training?

2       A.   Yes.  Randy specified that when we originally

3   bought the aircraft, that I was to have additional

4   training in it and I told him that we would add Rick

5   Lucente as the instructor pilot on that aircraft.

6       Q.   Did you request coverage, insurance coverage

7   for using the plane for training, transition training at

8   that time?

9       A.   I believe it was all covered in what we had

10  discussed.

11      Q.   And what do you mean by that?  Do you recall

12  asking him for coverage for that use?

13      A.   Randy specified that we had to have

14  additional training and I told him that was fine, that I

15  would do it with Rick Lucente and we would add him as the

16  instructor pilot on the aircraft.

17      Q.   Did you ever tell Hardy Insurance that you

18  were advertising to do transition training on that

19  aircraft?

20      A.   I never told them that I was advertising.

21      Q.   Did you tell them that you were offering to

22  do it for other people?

23      A.   No.

38

1    Q.    Now, when the AT-503 was added to your
2    aviation insurance policy it was initially done by
3    endorsement, correct, to your knowledge or --
4    A.    I don't know.
5    Q.    Okay.  Do you know what policy that plane was
6    added to?
7    A.    **Not off the top of my head I don't, but I**
8    **know it was added.**
9    Q.    Do you know what policy period it was added
10   to?
11   A.    **No.**
12   MS. BARON:  Mark this.
13   (Whereupon Deposition Exhibit #3 was
14   Marked for identification.)
15   Q.    (Ms. Baron continuing.)  Showing you what's
16   been marked as Deposition Exhibit Three, do you recognize
17   that document?
18   A.    **Yes.**
19   Q.    Is this an insurance application regarding
20   Pontiac Flying Service, Inc.?
21   A.    **I believe it is.**
22   Q.    And is it for -- an application for coverage
23   effective April 10th of '02 to April 10th of '03?

39

1    A.    **Yes.**
2    Q.    Is that your signature at the bottom of the
3    second page?
4    A.    **Yes, that is.**
5    Q.    Did you read this application before you
6    signed it?
7    A.    **Yes, I did.**
8    Q.    And it includes the Air Tractor, AT-503;
9    correct?
10   A.    **Yes, it does.**
11   Q.    If you look at the second page up at the top
12   where -- under the aircraft liability coverages, the box
13   passengers excluded is checked, correct, up in the
14   left-hand corner?
15   A.    **On the second page?**
16   Q.    Yes.
17   A.    **Oh, yes, it is.**
18   Q.    So that indicated that passenger coverage was
19   excluded under the policy?
20   A.    **We never carried any passengers in the**
21   **airplane.**
22   Q.    When you were using the Air Tractor 503 for
23   your own training weren't there two of you in the plane?

40

1    A.    **That's correct.**
2    Q.    Just a second here.
3    MR. BANOVETZ:  Can I interject a question
4    again?
5    MS. BARON:  Sure, go ahead.
6    EXAMINATION
7    BY MR. BANOVETZ:
8    Q.    Scott, did you ever have an opportunity to
9    review your policy definition of passenger?
10   A.    **Say that again, Mark.**
11   Q.    Sure.  Before the date of the loss had you
12   ever had an opportunity to read any of the insurance
13   policy issued on these agricultural airplanes?
14   A.    **I don't recall.**
15   Q.    As you sit here today, not at the time, but
16   as you sit here today do you understand both occupants in
17   that airplane would be passengers as defined by the
18   policy?
19   A.    **No, that aircraft was never certified as**
20   **having a passenger seat in the rear.**
21   Q.    Okay.  Are you aware as you sit here today
22   that this -- the insurance policy that was in effect at
23   the time of the loss defines a passenger as anyone in the

41

1    airplane including crew?
2    MR. MUELLER:  Objection; asks for a legal
3    conclusion.
4    MR. BANOVETZ:  I'm just trying to avoid
5    forcing him to read the policy here.  He can do that.
6    I'm just trying, Scott, to get an understanding.
7    A.    **Sure.**
8    Q.    (Mr. Banovetz continuing.)  You understood
9    passengers would not be covered under your liability
10   policy in that aircraft?
11   A.    **In your -- response to your question, we**
12   **never carried passengers.  Anybody that was in the**
13   **aircraft was considered crew members because that's how**
14   **that airplane was certified.  It doesn't have a passenger**
15   **seat; it has a crew member seat.**
16   Q.    Okay.  For the sake of expediency -- well,
17   let me just refer you to Exhibit One, which is the
18   policy, and the definition of passenger.  If I could just
19   ask you to read that into the record.
20   A.    **Sure passenger --**
21   MR. MUELLER:  Counsel, I think that you have
22   his understanding, then you have the policy, which is
23   obviously a part of the record in the case.

42

1       MR. BANOVETZ: I'm just --

2       MR. MUELLER: I'm not going to, you know,

3   prohibit him from doing it, but as far as shortening it

4   up, it is -- it says what it says.

5       MR. BANOVETZ: Okay. I just want to be on

6   the same page with Scott so that I can ask my follow-up

7   question --

8       MR. MUELLER: Okay.

9       MR. BANOVETZ: -- so we are both on the same

10  page, if I could.

11      A.   **Okay. Passenger means any person in, on or**

12  **boarding the aircraft for the purpose of riding or flying**

13  **therein or alighting therefrom after a flight or**

14  **attempted flight therein, including crew members.**

15      Q.   (Mr. Banovetz continuing.) Did you have an

16  understanding as of the date of this loss as to whether

17  there would be liability coverage for anyone in that

18  airplane?

19      A.   **I assumed that it would be covered.**

20      Q.   Okay. Now, I'm not talking about coverage

21  for the aircraft hull. I'm talking about third party

22  liability for claims against you by the pilot -- or I'm

23  sorry, by a crew member or their family. Did you have an

43

1   understanding as of the date of this loss as to whether

2   you had coverage for a liability claim against you by

3   someone in that aircraft?

4       A.   **My understanding, it would be covered.**

5       Q.   Did you have an understanding as to what the

6   passenger exclusion or noninclusion of passenger coverage

7   meant? What was your understanding of the significance

8   of that?

9       A.   **I -- I couldn't tell you at this point, Mark.**

10  **I don't remember.**

11      MR. BANOVETZ: Okay. Thanks, Diane.

12      MS. BARON: Sure. Let's mark this one.

13      (Whereupon Deposition Exhibit #4 was

14      Marked for identification.)

15      Q.   (Ms. Baron continuing.) Showing you what's

16  been marked Deposition Exhibit Number Four, are you

17  familiar with this?

18      A.   **Familiar, I have seen it.**

19      Q.   Is that an application, insurance application

20  for Pontiac Flying Service for coverage effective May

21  19th, 2002, to May 19th, 2003?

22      A.   **Yes, it is.**

23      Q.   And do you recognize your wife's signature at

44

1   the bottom of the second page?

2       A.   **Yes, I do.**

3       Q.   And do you understand this to be the

4   application that was submitted when the insurance was

5   then being transferred, as you say, back to AIG?

6       A.   **Yes.**

7       Q.   And that also indicates on page two, as the

8   other application did, that passengers are excluded;

9   correct?

10      A.   **Yes, it does.**

11      Q.   And is it your understanding that the policy

12  that I have previously marked as, I believe, Exhibit One,

13  was the policy that was then provided to you?

14      A.   **Yes, the dates would match up.**

15      Q.   Okay. Now, has Pontiac Flying Service, Inc.,

16  had -- strike that.

17      Has Pontiac Flying Service had any planes

18  they had used for instructional flying?

19      A.   **Any planes?**

20      Q.   Yes.

21      A.   **Yes.**

22      Q.   And did you purchase instruction insurance

23  for those?

45

1       A.   **Yes, we did.**

2       Q.   Did you ever contact Hardy Aviation Insurance

3   to request coverage for instructional flying in the -- in

4   an Ag Cat plane?

5       A.   **We, I guess, explored that possibility. It**

6   **was a hypothetical; we never purchased or located an**

7   **aircraft. It was -- just was something that we were**

8   **maybe looking to do.**

9       Q.   Do you recall when you were looking to do

10  that?

11      A.   **It would have been probably in 2002, 2003. I**

12  **don't remember right off the top of my head.**

13      Q.   What do you recall about your discussions

14  with anyone from Hardy Aviation Insurance about that?

15      A.   **If I remember it was if we move forward with**

16  **this and we purchase this type of aircraft, what would**

17  **coverage potentially cost, what kind of a ballpark**

18  **figure?**

19      Q.   And did he get some quotes for you, Hardy

20  Aviation?

21      A.   **Randy didn't.**

22      Q.   Did Angie get some quotes for you?

23      A.   **I believe she finally did -- or they didn't**

46

1  get a quote, nobody would quote it, if I remember.

2      Q.   Okay.

3      A.   Because of my, I guess, interpretation of my

4  limited time as a pilot.

5      Q.   So it was your recollection that they never

6  got a quote for you for training with the Ag Cat?

7      A.   That's what I recall.

8      Q.   The AT-503 crashed on May 5th of 2003;

9  correct?

10     A.   That's correct.

11     Q.   Who was in the plane at the time?

12     A.   Rick Lucente and Neal Webster.

13     Q.   And was it being used for turbine transition

14  training at that time?

15     A.   Yes, it was.

16     Q.   And they were both killed; correct?

17     A.   That's correct.

18     Q.   How did you learn about the crash?

19     A.   I was notified by cell phone from one of my

20  employees that someone had called the airport saying that

21  an aircraft had gone down.

22     (Off the record discussion.)

23     Q.   (Ms. Baron continuing.)  Did you then have

47

1  any contact with Hardy Aviation Insurance about it?

2      A.   Say that again.

3      Q.   Did you have any contact with Hardy Aviation

4  Insurance about the crash?

5      A.   I didn't on that day, no.

6      Q.   What about on any other day?

7      A.   I think Sarah made the initial contact.

8      Q.   Okay.  Did you personally ever have any

9  contact with anyone from Hardy Aviation Insurance about

10  the crash?

11     A.   Not that I recall.

12     Q.   At any time before the accident did you tell

13  anyone from Hardy Aviation Insurance that you wanted

14  insurance coverage to do turbine transition training on

15  the AT-503?

16     A.   Yes, when they originally bound it and they

17  specified that I had to have additional training in the

18  airplane.

19     Q.   Other than that conversation that you've

20  already described, do you recall any other contact that

21  you had with Hardy Aviation Insurance about getting

22  insurance for turbine transition training in the AT-503?

23     A.   Not after the initial.

48

1      Q.   So that was the only contact that you recall?

2      A.   That's the only conversation that Randy and I

3  had regarding that.

4      Q.   Okay.

5      (Off the record discussion.)

6      Q.   (Ms. Baron continuing.)  Did you ever ask --

7  strike that.

8          Did you ever discuss with anyone from Hardy

9  Aviation Insurance anything about having passenger

10  coverage for the AT-503?

11     A.   The only conversation I recall is the initial

12  with Randy when I told him that we would -- had Rick

13  Lucente as the instructor pilot on the airplane.

14     Q.   For purposes of training?

15     A.   Instruction.

16     Q.   Instruction for yourself?

17     A.   Anyone, is the way I understood it.

18     Q.   Did Randy tell you that?

19     A.   Tell me?

20     Q.   That Rick Lucente could train anybody in the

21  AT-503 and he'd be covered?

22     A.   He never said we couldn't.

23     Q.   Did he ever say you could?

49

1      A.   No.

2      Q.   Did you ever talk to Randy Hardy about --

3  strike that.

4          Did you ever tell anyone from Hardy Aviation

5  Insurance that you were running a flight school with the

6  AT-503?

7      MR. MUELLER:  Objection; I think that's a

8  mischaracterization.

9      Q.   You can answer.

10     MR. MUELLER:  A flight school?

11     Q.   You can answer.

12     A.   Say that again, Diane.

13     Q.   Did you ever tell anyone from Hardy Aviation

14  Insurance that you were running a flight school with the

15  AT-503?

16     A.   The conversation I recall with Randy again

17  was back to that original conversation when they insisted

18  that I receive additional training and I told them that

19  was fine, and that I would have Rick Lucente do it and

20  that we would add him as the instructor pilot on the

21  aircraft.  If that answers your question.

22     Q.   But you don't -- strike that.

23          It's your recollection Randy Hardy didn't say

50

1  how many additional hours you needed or what they were
2  supposed to consist of?
3      A.  No.
4      Q.  And you didn't ask him?
5      A.  No.
6      Q.  Okay.
7      MR. BANOVETZ:  Can I ask a question?
8      MS. BARON:  Sure, go ahead.
9          EXAMINATION
10 BY MR. BANOVETZ:
11     Q.  Did you ever check to see if you received
12 anything from Hardy evidencing the fact that Rick was
13 added as an instructor pilot under this policy?
14     A.  Did I see anything?
15     Q.  Correct.
16     A.  Not that I recall.
17     MR. BANOVETZ:  Okay.  Thanks.
18     Q.  (Ms. Baron continuing.)  Are you familiar
19 with an individual named Frank Kimmel?
20     A.  Yes.
21     Q.  And do you know him?
22     A.  Yes.
23     Q.  How do you know him?

51

1      A.  Frank and I have worked in the past on some
2  spray projects.
3      Q.  Did you ever tell him you knew you did not
4  have insurance coverage for training with the AT-503?
5      A.  Not that I remember.
6      Q.  Did you and your wife have different job
7  responsibilities for Pontiac?  I'm trying to get an idea
8  who handled what as far as the business.
9      A.  That would be a fair and accurate statement,
10 yes.
11     Q.  Who would have been more involved with the
12 insurance, you or Sarah?
13     A.  The handling of the paperwork, probably her.
14 But we both looked through things when it came in.  If I
15 needed, like on an application to verify hours and stuff
16 like that, I would read through it.
17     Q.  Were there ever occasions when you thought
18 she had handled something and found out she hadn't?
19     A.  Not that I can recall.
20     Q.  Do you recall any other conversations you had
21 with anyone from Hardy Aviation Insurance regarding the
22 AT-503?
23     A.  Any conversations?

52

1      Q.  Yes.  I want to cover them.
2      A.  There could have been, but, I mean -- I guess
3  not.
4      MS. BARON:  You don't recall any.  Okay.  All
5  right.  Why don't you -- I will let somebody else go for
6  awhile and see what else I have.
7      MR. BANOVETZ:  Actually, we spoke yesterday
8  and for the record my understanding from our
9  conversation, but correct me if I'm wrong, was that the
10 sworn statement taken previously could be used or cited
11 to in the context of briefs filed with the Court, for
12 example, and that there's no privilege issue that's going
13 to attach to it.  As I recall we didn't discuss anything
14 that could affect the liability case, but I wanted to
15 clarify that so that I don't have to ask all those
16 questions here.
17     MR. MUELLER:  Our discussion is as indicated
18 regarding the procedural.  You know, we don't know the
19 exact context, the specific questions or portions that
20 may be asked, so what we are doing is saying we are
21 waiving the confidentiality aspects of it.
22     MR. BANOVETZ:  Very good.  I think in light
23 of that then that I probably have no further questions,

53

1  unless additional questions cause me to think of
2  something.
3      MS. BARON:  All right.  Then I need a few
4  minutes because I don't think I have anything else.
5      MR. BANOVETZ:  Should we take a break?
6      MS. BARON:  Yes.
7      (Whereupon a brief recess was had.)
8      MS. BARON:  There were just a few documents
9  that were part of your disclosures that I just wanted to
10 ask about.
11     MR. MUELLER:  Yeah, there's the --
12     MS. BARON:  Mark this.
13     (Whereupon Deposition Exhibits #5, #6, and
14 #7 were marked for identification.)
15     Q.  (Ms. Baron continuing.)  Here's the marked
16 ones if you'll hand him those.  If you will take a look
17 at what's been marked Deposition Exhibit Five?
18     A.  Okay, here's Five.
19     Q.  Okay.  Take a look at Five.  Could you tell
20 me what this is?
21     A.  It's a copy of a logbook.
22     Q.  And whose logbook is it, do you know?
23     A.  That I can't tell, not by this page.

54

1    Q.    And do you know why this was produced to us

2    in this case?  What does it indicate?

3    A.    Yeah, here it is.  It's a copy of Rick

4    Lucente's logbook.

5    Q.    Okay.  And what -- do you have any idea why

6    it was -- do you have any idea why, what the significance

7    of this page, Exhibit Five, is?

8    (Off the record discussion.)

9    A.    On, let's say, one, two, three -- if we go

10   down to line five dated March 20th, Rick made another

11   flight with me in the 503, says, Scott Petersen, and a

12   notation under that, insurance requirements and the time

13   that we flew there.

14   Q.    Okay.  You don't have any -- strike that.

15   This Exhibit Five was never provided to Randy

16   Hardy, correct, prior to --

17   A.    That I don't know.

18   Q.    You didn't send it to him?

19   A.    No, I did not.

20   MR. BANOVETZ:  This probably came from the

21   accident investigation file, is my guess.

22   Q.    (Ms. Baron continuing.)  Okay.  And then

23   let's look at what's been marked Exhibit Six --

55

1    A.    Okay.

2    Q.    -- which appears to be a copy of a check.

3    Can you tell me what this is?

4    A.    That's a payment to Rick Lucente and it

5    appears to be three hours of instruction in the airplane.

6    Q.    And that's from Pontiac Flying Service signed

7    by your wife?

8    A.    That's from Pontiac Flying Service, Inc.

9    Q.    Inc., signed by your wife?

10   A.    That's correct.

11   Q.    And then Exhibit Seven, could you tell me if

12   you recognize what that is

13   A.    That looks like some personal notes that my

14   wife put together.

15   Q.    She prepared that?

16   A.    It looks like that's something that she did,

17   yes.

18   Q.    Do you know when or any details?

19   MR. MUELLER:  I think this was correspondence

20   that was intended for me from her.

21   A.    I believe that's --

22   Q.    Okay.

23   A.    -- correct.

56

1    MS. BARON:  All right.  I think that in

2    addition to the sworn statement that you've already

3    discussed, that's all I have.

4    MR. BANOVETZ:  One more question.

5    FURTHER EXAMINATION

6    BY MR. BANOVETZ:

7    Q.    I think I asked this before, but just in case

8    I didn't, is it the case that prior to the loss you had

9    not ever read the insurance policy that covered the

10   AT-503; is that the case?

11   A.    By read you mean line by line, picked it

12   apart?

13   Q.    Well, let's break it down.

14   MR. MUELLER:  Counsel, I think we can all

15   agree there isn't any way that any of us read a policy

16   line by line picking it apart.

17   Q.    I know a bad question when I ask one.

18   Had you reviewed any of the insurance policy

19   prior to this loss?

20   A.    Reviewed, yes.

21   Q.    Had you read the -- strike that.

22   Are you familiar with what a coverage

23   agreement is as opposed to an endorsement?

57

1    A.    No.

2    Q.    Can you tell me what portions of the policy

3    you recall reviewing?  That's Exhibit One if you'd like

4    to refer to it.

5    MR. MUELLER:  Again, these are all in the

6    context before the loss?

7    MR. BANOVETZ:  Correct.

8    A.    Probably the biggest thing is that the

9    insured value is what we had stated on it and second,

10   what it was going to cost me as far as premiums.

11   Q.    (Mr. Banovetz continuing.)  Prior to the loss

12   had you ever reviewed the definition of aerial

13   application in the policy?

14   A.    No.

15   MR. BANOVETZ:  That's all I have.  Thanks.

16   MS. BARON:  I do have another question.

17   FURTHER EXAMINATION

18   BY MS. BARON:

19   Q.    Do you recall ever calling anyone at Hardy

20   Aviation Insurance with questions regarding that policy?

21   A.    Do I recall calling anybody?

22   Q.    Yes.

23   A.    No, I don't.

58

1        MS. BARON:  That's all I have.

2        MR. BANOVETZ:  Thanks, Scott.

3

4

5

6        FURTHER DEPONENT SAYETH NOT;

7        SIGNATURE RESERVED.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

59

1    STATE OF ILLINOIS   )

2                        )

3    COUNTY OF PEORIA    )

4

5        I, LAURA J. AMBERG, C.S.R., do hereby certify

6    that heretofore, to-wit, on the 22nd day of February,

7    2005, at the hour of 11:20 a.m., personally appeared

8    before me at 416 Main Street in the City of Peoria,

9    County of Peoria, State of Illinois, SCOTT PETERSEN.

10        I further certify that the said witness was

11    by me first duly sworn to testify to the truth, the whole

12    truth and nothing but the truth in the cause aforesaid,

13    that the testimony then given by said witness was

14    reported stenographically by me in the presence of said

15    witness and afterwards reduced to typewriting, and the

16    foregoing is a true and correct transcript of the

17    testimony so given by said witness as aforesaid.

18        I further certify that the signature of the

19    witness to the deposition was RESERVED by agreement of

20    counsel.

21        I further certify that I am not counsel for nor

22    in any way related to any of the parties to this suit,

23    nor am I in any way interested in the outcome thereof.

60

1        In testimony thereof, I have hereunto set my

2    hand this 28th day of   February, 2005.

3

4

5

6

7

8                                                        _____ CSR

9    NOTARY PUBLIC

10

11

12

13    Illinois CSR License No. 084-001542.

14

15

16

17

18

19

20

21

22

23