**E-FILED**
Friday, 01 September, 2006  02:33:47 PM
Clerk, U.S. District Court, ILCD

<u>**THIRD PARTY DEFENDANT'S
EXHIBIT NO. 7**</u>

1

ORIGINAL

```
 1            STATE OF ILLINOIS
              COUNTY OF LIVINGSTON
 2

 3

 4            Sworn statement taken of SCOTT and
      SARAH PETERSEN, on July 14, 2003, at Pontiac
 5    Flying Service, 15755 East 2000 North Road,
      Pontiac, Illinois, commencing at
 6    approximately 9:20 A.M., before Lynn J.
      Watson, a Certified Shorthand Reporter.

 7

 8            APPEARANCES:
 9            TRESSLER, SODERSTROM, MALONEY &
              PRIESS
10            BY:  MR. MARK T. BANOVETZ
              Sears Tower, 22nd Floor
11            233 South Wacker Drive
              Chicago, Illinois 60606-6308
12            Representing AIG Aviation (Illinois)
              Corporation.
13
              CAUGHEY, LEGNER & FREEHILL
14            BY:  MR. ROBERT R. CAUGHEY
              204 North Main Street
15            Pontiac, Illinois 61764
              Representing Scott and Sarah
16            Petersen.
17            ALSO PRESENT:
18            MR. PETER GUY
              Assistant Vice President, Claims
19            AIG Aviation (Illinois) Corporation
              500 West Madison Street - Suite 1790
20            Chicago, Illinois 60661-2511
21
22
23
24
```

2

```
 1                SCOTT and SARAH PETERSEN

 2    called as witnesses herein, after having been

 3    first duly sworn on their oaths, were

 4    examined and testified as follows, to-wit:

 5

 6                    EXAMINATION BY

 7                    MR. BANOVETZ:

 8

 9       Q.   Scott, could you just state and

10    spell your full name for the record?

11            SCOTT PETERSEN:  Scott Alan

12    Petersen.  Petersen is P-e-t-e-r-s-e-n.

13       Q.   Sarah, if you could state your name

14    for the record?

15            SARAH PETERSEN:  Sarah L. Petersen.

16       Q.   Scott, your position here with

17    Pontiac Flying Service?

18            SCOTT PETERSEN:  I'm the owner.

19       Q.   Is it set up as an LLC or a

20    corporation?

21            SCOTT PETERSEN:  Corporation.

22       Q.   And are you an officer in the

23    corporation?

24            SCOTT PETERSEN:  Yes, I am.
```

3

1      Q.   What is the title you hold in the

2   corporation?

3           SCOTT PETERSEN:  I am the president.

4      Q.   And Sarah, are you an officer of the

5   corporation?

6           SARAH PETERSEN:  Yes.

7      Q.   Okay.  What is your title?

8           SARAH PETERSEN:  Secretary.

9      Q.   Are there any other officers in the

10   company?

11           SCOTT PETERSEN:  No.

12      Q.   Are there any other partners or

13   operating individuals who have authority with

14   the company.

15           SARAH PETERSEN:  No.

16      Q.   How many employees do you have?

17           SCOTT PETERSEN:  Full-time?

18      Q.   Full-time.

19           SCOTT PETERSEN:  Two.

20      Q.   Okay.  What sort of positions are

21   those?

22           SCOTT PETERSEN:  I have a full-time

23   flight instructor and also, I guess,

24   apprentice mechanic helper.

4

1      Q.   Okay.  Are there any other employees

2  that are part-time like office help?

3          SARAH PETERSEN:  We have one

4  part-time kid that works through the summer

5  when he's home from college.

6      Q.   Okay.

7          SARAH PETERSEN:  Then we also --

8      Q.   I'm sorry.  Go ahead.  I broke my

9  own rule, see?

10         SARAH PETERSEN:  Then we also have

11 one part-time kid who works after school, but

12 he also works more hours in the summertime.

13     Q.   Let's start with the full-time

14 folks.  Can you give me their names?

15         SARAH PETERSEN:  John Delaney.  He's

16 the apprentice mechanic.

17     Q.   Okay.  And the other one?

18         SARAH PETERSEN:  Wayne Dornan.

19     Q.   That's D-o-r-m-a-n?

20         SARAH PETERSEN:   D-o-r-n-a-n.

21     Q.   What is Mr. Dornan?

22         SARAH PETERSEN:  He's the flight

23 instructor.

24     Q.   What sort of flight instruction is

5

1    he doing?  Primary training or --

2            SCOTT PETERSEN:  Primary and

3    instrument commercial.  Just general

4    aviation.

5        Q.    Does he do any ag flying training?

6            SCOTT PETERSEN:  No.

7        Q.    Is that flight training, is that

8    something new you are doing here?

9            SCOTT PETERSEN:  No.

10       Q.    How long have you guys been doing

11   flight training?

12           SCOTT PETERSEN:  Since December of

13   '97 when we started with our first aircraft

14   and our first instructor.

15       Q.    Again, that's primary training,

16   instrument training?

17           SCOTT PETERSEN:  That's correct.

18       Q.    But no ag training?

19           SCOTT PETERSEN:  No.

20       Q.    How long have you been in business

21   here?

22           SCOTT PETERSEN:  Since July of '97.

23   I think July 2nd is when we took over here.

24       Q.    And somebody owned it before you?

6

1          SCOTT PETERSEN:  There was another

2    party that, I guess, managed the airport and

3    operated a maintenance shop out of here prior

4    to us taking over.

5        Q.   No flight instruction at the time

6    you took over?

7          SCOTT PETERSEN:  No.  We weren't

8    doing any.

9        Q.   Okay.  Was there any crop dusting

10   business?

11         SCOTT PETERSEN:  No, not here.

12       Q.   When you purchased the business, did

13   you purchase any aircraft with the business?

14         SCOTT PETERSEN:  No.  This really

15   was not a purchase of an existing business.

16   The individuals that were here were removed.

17   Just, I guess, what --

18         SARAH PETERSEN:  Well, the City of

19   Pontiac owns the airport, and so they

20   contract a business to operate the FBO.

21       Q.   And they removed the prior business

22   and you were installed?

23         SARAH PETERSEN:  And then we took

24   over.

7

1      Q.   And since starting the company or

2   since being installed here at Pontiac, have

3   you purchased various aircraft for your

4   business?

5         SARAH PETERSEN:  Yes.

6      Q.   What would you say is the primary

7   focus of your business at the present time?

8         SCOTT PETERSEN:  Well, I guess

9   probably the ag spraying is probably primary,

10  and then the FBO flight school and shop would

11  be secondary.  That was the original intent,

12  I guess, when we moved here.

13     Q.   Okay.  What type of aircraft do you

14  presently own?

15        SCOTT PETERSEN:  We've got a Grumman

16  Traveler which was our first airplane, we've

17  got a Piper Warrior that we purchased last

18  year, and a Turbo Arrow that was purchased

19  last September.  I also have an Ag Cat that I

20  restored and flew the first time in '98.

21  I've got another Air Tractor, a 502, and then

22  I also have a project Ag Cat that we are

23  restoring that is currently in the hangar.

24     Q.   Okay.  And who presently writes the

8

```
 1    coverage for the Grumman and the Warrior and

 2    the Turbo Arrow?  What company insures those?

 3            SARAH PETERSEN:  Now?

 4    Q.   Now.

 5            SARAH PETERSEN:  US AIG.

 6    Q.   Did somebody insure those planes

 7    previously?

 8            SCOTT PETERSEN:  US AIG.

 9            SARAH PETERSEN:  AIG.

10            SCOTT PETERSEN:  AIG previously had

11    them.

12    Q.   Is there a reason that you recall

13    that you switched from US AIG to AIG

14    Aviation?

15            SARAH PETERSEN:  AIG sent us a

16    letter of non-renewal immediately following

17    the crash.

18    Q.   Okay.  So is the Ag Cat and the Air

19    Tractor 502 now insured through US AIG?

20            SCOTT PETERSEN:  Yes.

21    Q.   Have you ever carried any separate

22    insurance policy prior to the accident other

23    than the coverage through AIG?

24            SCOTT PETERSEN:  Not that I'm aware
```

9

1    of.

2            SARAH PETERSEN:  No.

3        Q.  Okay.

4            SARAH PETERSEN:  Do you mean on the

5    equipment itself or --

6        Q.  Either haul or liability insurance

7    for the aircraft.

8            SARAH PETERSEN:  With any other

9    company, no.

10       Q.  So you have had AIG Aviation since

11   1987.

12           SARAH PETERSEN:  No.  We had AIG

13   until May of last year when -- we had AIG

14   until we bought the 503, which would have

15   been in March.  Then at renewal in May of

16   2002, we switched to US AIG.  And then in --

17   a month later or so, I'd have to look at

18   something to know the exact times, it was

19   switched back to AIG because of gypsy moth

20   concerns.  We do work in the gypsy moth.  So

21   there was a time period there where the

22   insurance went from AIG to US AIG and then

23   back to AIG because US AIG did not cover the

24   gypsy moth stipulations that were needed.  So

10

1    it was a very short amount of time.

2        Q.    You switched the coverage entirely

3    as opposed to just getting a supplemental

4    policy?

5            SARAH PETERSEN:  Yes.

6        Q.    Are you a pilot, Sarah?

7            SARAH PETERSEN:  No.

8        Q.    Scott, you are a pilot, correct?

9            SCOTT PETERSEN:  That's correct.

10        Q.    What type of aircraft are you rated

11    to fly?

12            SCOTT PETERSEN:  I currently hold

13    commercial license instrument rating, CFI,

14    single engine land and turbine endorsement.

15        Q.    When did you get your turbine

16    endorsement?

17            SCOTT PETERSEN:  I believe that was

18    two years ago.

19            SARAH PETERSEN:  September of 2000.

20            SCOTT PETERSEN:  September of 2000.

21        Q.    Do you carry any insurance as a

22    pilot, any non-owned aircraft insurance of

23    any type other than through AIG?

24            SCOTT PETERSEN:  Not to my

11

1    knowledge.

2        Q.    Okay.   Where did you do your turbine

3    training?

4              SCOTT PETERSEN:   Harold Miller's at

5    Harold's Flying Service in Leland, Illinois.

6        Q.    Leland, Illinois?

7              SCOTT PETERSEN:   Yeah.

8        Q.    Okay.   And when you were doing your

9    training, were you insured as part of your

10   tuition to the flight school?

11             SCOTT PETERSEN:   I don't recall.

12       Q.    Did you have to fill anything out

13   with respect to insurance when you applied at

14   the flight school?

15             SCOTT PETERSEN:   No.   This was

16   actually -- I didn't apply.   I had applied

17   for a turbine transition scholarship offered

18   through Air Tractor and was named as one of

19   the recipients, and they picked up part of

20   that as far as the cost.   The Air Tractor

21   dealers and Air Tractor sponsored that.

22       Q.    Did you look into the issue or study

23   the issue of insurance coverage to cover your

24   turbine training at that time?

12

1          SCOTT PETERSEN:  No.

2      Q.   Okay.  At some point after that

3   training, I assume you made a decision to

4   purchase an Air Tractor, correct?

5          SCOTT PETERSEN:  I purchased the

6   assets of Harold Miller --

7      Q.   Okay.

8          SCOTT PETERSEN:  -- last year, and

9   within those assets was the 503.

10     Q.   What else did you purchase besides

11  the 503?

12         SCOTT PETERSEN:  Oh, there was a

13  pickup and a couple trailers and all of his

14  parts inventory and his business contacts, I

15  guess, that he had.

16     Q.   And when you say business

17  contacts -- well, let me back up for a

18  moment.  Other than flight training, is there

19  any other type of business that Harold Miller

20  was doing?

21         SCOTT PETERSEN:  He was an aerial

22  applicator that had been in the business for,

23  gosh, I don't know, 20, 30 years, I guess.

24     Q.   Were there any other -- were there

13

1    any other business pursuits that he was

2    involved in as part of that business other

3    than aerial application?

4         SCOTT PETERSEN:  No.  Everything

5    that we purchased was all related directly to

6    aerial application.

7         Q.   Harold Miller is a CFI, correct?

8         SCOTT PETERSEN:  Yes, he is.

9         Q.   And he did your turbine training?

10        SCOTT PETERSEN:  No.  Rick Lucente

11   did my training.

12        Q.   Rick Lucente did your training.  Was

13   Mr. Lucente an employee of Harold Miller's?

14        SCOTT PETERSEN:  He was a

15   contractor.

16        Q.   Did Harold Miller advertise flight

17   training services as part of his business?

18        SCOTT PETERSEN:  Yes, he did.

19        Q.   Do you know where he advertised or

20   what publications?

21        SCOTT PETERSEN:  I think mostly in

22   "The Ag Air Update" is where I seen his

23   article or his ads.  I don't believe he used

24   "The Trader Plane".

14

1    Q.    Did he have a customer base for

2    training that he could give you like a

3    customer list or repeat?

4        SCOTT PETERSEN:  Not that I'm aware

5    of.

6    Q.    Okay.  Did he have any advertising

7    rights, pre-purchased advertising rights or

8    anything that you got with your purchase?

9        SCOTT PETERSEN:  No.

10    Q.    So your purchase was an asset

11    purchase, purely an asset purchase, or were

12    you also purchasing a business, a going

13    concern, a client base?

14        SCOTT PETERSEN:  Within the

15    purchase, there was two years left on a gypsy

16    moth contract that he was partners in with

17    Maurice Quesnel, and I flew on that last

18    year.  There was another year to be this

19    spring, but the gypsy moth populations back

20    in West Virginia had dropped to almost

21    nothing.  I don't think they hardly did

22    enough work to warrant taking one airplane

23    out, let alone several like they did last

24    year.

1      Q.    Would it be fair to say at the time

2    you purchased the assets of Harold Miller's

3    business that you weren't purchasing any

4    amount of business that you couldn't service

5    with the airplanes that you presently had

6    here?  In other words, what I'm asking is:

7    Was your business picking up such that you

8    needed additional aerial application

9    equipment?

10           SCOTT PETERSEN:   In order to become

11   involved in the gypsy moth treatment program,

12   the contract specified turbine airplanes.

13   And so to be a part of that, we decided to

14   make the move.

15      Q.    Okay.  And you said you have a 502?

16           SCOTT PETERSEN:   Currently, yes, we

17   have a 502.

18      Q.    And when did you get the 502?

19           SCOTT PETERSEN:   When did we pick

20   that up?  In June?  Late May or early June.

21   I'd have to look back.

22      Q.    This year?

23           SCOTT PETERSEN:   Yes.

24      Q.    So at the time you purchased Harold

16

1    Miller's business, you didn't have any

2    turbine equipment.  Is that correct?

3         SCOTT PETERSEN:  No, we did not.

4    Q.   Were you doing any gypsy moth work

5    prior to purchasing Harold Miller's business?

6         SCOTT PETERSEN:  Yes.  I had worked

7    with Harold Miller as a pilot.  From '97 I

8    flew for him every year except in 2001, but

9    it was all piston engine at that time before

10   they changed the requirements of the

11   contract.

12   Q.   When were the contract requirements

13   changed to require turbine equipment?

14        SCOTT PETERSEN:  I think in 2001 is

15   the first year that they specified all

16   turbine aircraft.

17   Q.   Why did Harold Miller sell his

18   business, if you know?

19        SCOTT PETERSEN:  I think he was just

20   ready to retire.  He had done well at it, and

21   I think he had some other things, I guess, he

22   wanted to do.

23   Q.   Is it fair to say you were pretty

24   familiar with that 503 Air Tractor by the

17

1    time you purchased his business?

2            SCOTT PETERSEN:  Yes.

3        Q.   You had logged quite a few hours in

4    it?

5            SCOTT PETERSEN:  Not logged so many

6    hours, but I did at times go up and help with

7    the maintenance on it.

8        Q.   You have any idea how many hours you

9    may have logged in it?  Strike that.  Is that

10    the plane you trained in?

11            SCOTT PETERSEN:  Yes.

12        Q.   Okay.  Do you have any idea how many

13    hours you may have logged in it at the time

14    you purchased the aircraft?

15            SCOTT PETERSEN:  At purchase time,

16    probably five hours.  And I believe that when

17    we purchased it, there was a stipulation that

18    I receive some additional training with a CFI

19    before we went to work, which I did do.

20        Q.   When did you purchase the aircraft?

21    You probably told me this.

22            SCOTT PETERSEN:  I think we signed

23    the papers on the 28th of February.  So

24    between then and May, I guess, I spent some

18

1    more time with Mr. Lucente in that particular

2    aircraft.

3        Q.   Can you estimate how much time you

4    had spent?

5            SCOTT PETERSEN:  I'm thinking

6    another five hours.

7        Q.   You considered Mr. Lucente a

8    competent pilot, I assume?

9            SCOTT PETERSEN:  Yes.

10       Q.   Were you aware of any mechanical

11   problems with this Air Tractor at any time

12   before you purchased it or after?

13           SCOTT PETERSEN:  No.

14       Q.   And had you performed the annual on

15   that aircraft?

16           SCOTT PETERSEN:  Yes, I did.

17       Q.   When was that done?

18           SCOTT PETERSEN:  I believe in March.

19   I can get the logbooks if you want me to.

20   They are sitting here.  I can give you an

21   exact date.

22       Q.   That's okay.  But at some point

23   after you purchased it, you did the annual,

24   correct?

19

1          SCOTT PETERSEN:  It was annualed

2    prior to myself purchasing it.  I think I did

3    a hundred hour inspection when I got it from

4    him just to check it over.

5        Q.   Okay.

6        A.   We ran all this year until the

7    annual came due, and then I signed off

8    another annual this spring.

9        Q.   Were you aware of whether Mr.

10   Lucente was carrying any non-owned aircraft

11   insurance?

12         SCOTT PETERSEN:  I don't know much

13   about that.

14       Q.   You've got the logbook for the

15   aircraft here, correct?

16         SCOTT PETERSEN:  That's correct.

17       Q.   Where is the aircraft?

18         SCOTT PETERSEN:  It is located here

19   on the airport property, one of the two

20   hangars.

21       Q.   Is there anyone who flew the

22   aircraft while you had it other than you and

23   Mr. Lucente?

24         SCOTT PETERSEN:  No.

20

1      Q.    Did you ever do any aerial

2    application with that aircraft after you

3    purchased it?

4         SCOTT PETERSEN:    Yes.

5      Q.    Okay.  How many times did you do

6    aerial application with the aircraft?

7         SCOTT PETERSEN:   With the 503?

8      Q.   Right.

9         SCOTT PETERSEN:    We flew it last

10   year between 350 and 400 hours last year of

11   aerial application in the 2002 season, and

12   that would run May through September.

13     Q.    Would you say that the primary --

14   well, strike that.  What was the primary goal

15   that you had in mind in purchasing the Air

16   Tractor?  Was it for training or was it for

17   aerial application?

18     A.    For aerial application.

19     Q.    And the 502 that you purchased, was

20   that simply to replace the 503?

21         SCOTT PETERSEN:   That's correct.

22     Q.    Is there anybody who does aerial

23   application for your company other than you?

24         SCOTT PETERSEN:   Just myself.

21

```
 1      Q.   Okay.  At any time in the past, have

 2   you had any other pilots doing aerial

 3   application for you?

 4          SCOTT PETERSEN:  Rick Lucente did it

 5   in the past.

 6      Q.   When you hired him to do aerial

 7   application work for you, was he hired as an

 8   employee or independent contractor, do you

 9   recall?

10          SARAH PETERSEN:   Independent

11   contractor.

12          SCOTT PETERSEN:  He would have just

13   been a contractor.

14      Q.   Did he fill out any W-4s, or did you

15   guys submit income tax for him?

16          SARAH PETERSEN:  Yes, the 1099.

17      Q.   1099?

18          SARAH PETERSEN:  He was paid by the

19   acre that he did.

20      Q.   Did you have a health benefits plan

21   that he was covered under?

22          SARAH PETERSEN:  No.

23          SCOTT PETERSEN:  No.

24      Q.   At the time of the accident, was he
```

22

```
 1   employed part-time, full-time, in some

 2   capacity with respect to aerial application?

 3           SARAH PETERSEN:  Not that I'm aware

 4   of.

 5       Q.   But he had flown for you doing

 6   aerial application in the past?

 7           SARAH PETERSEN:  Yes.

 8       Q.   And you'd pay him on an acre --

 9           SCOTT PETERSEN:  Per acre basis.

10       Q.   And you would submit the tax

11   information for him, correct?

12           SARAH PETERSEN:  Yes.

13       Q.   Okay.  And presumably you were

14   intending to use the aircraft for flight

15   training as well.  Is that correct?

16           SARAH PETERSEN:  Yes.

17           SCOTT PETERSEN:  Yes.

18       Q.   Okay.  And that would be turbine

19   training?

20           SCOTT PETERSEN:  Yes, turbine

21   transition training.

22       Q.   Is that training similar to what

23   Harold Miller would use that aircraft for?

24           SCOTT PETERSEN:  Yes.  That was
```

1    taking aerial applicators that had been

2    flying piston engine airplanes that were

3    moving up into the turbine aircraft.

4        Q.    And how did you intend to go about

5    getting your customers for turbine transition

6    training?

7            SCOTT PETERSEN:  We advertised in

8    "The Ag Air Update."

9        Q.    And did you get any customers

10    referred to you from Harold Miller, or did

11    you get your customers from other sources?

12            SCOTT PETERSEN:  No.  Harold -- even

13    after Harold sold his business, he got a lot

14    of phone calls with inquiries, and then he

15    would forward those on to us.

16        Q.    At the time you lost the aircraft,

17    how many students had been trained in it?

18            SCOTT PETERSEN:  Since we started

19    it?

20        Q.    Right.

21            SCOTT PETERSEN:  This was the first

22    one.

23        Q.    First student?

24            SCOTT PETERSEN:  Yes.

24

1    Q.   And when you hired Mr. Lucente to do

2    flight training work, was that, again, on a

3    situation-by-situation basis as opposed to

4    full-time?

5         SCOTT PETERSEN:  Yes.

6         SARAH PETERSEN:  Yes.

7    Q.   Would you classify him as an

8    independent contractor or part-time employee?

9         SARAH PETERSEN:  Independent

10   contractor.

11   Q.   I may have asked you this, but are

12   you aware of whether Mr. Lucente carried any

13   of his own insurance like non-owned aircraft

14   insurance?

15        SCOTT PETERSEN:  I have no idea.

16   Q.   When you purchased the business from

17   Harold Miller, did you have any discussions

18   with him concerning the insurance that he was

19   presently carrying to run his operation?

20        SCOTT PETERSEN:  No.

21   Q.   No insurance discussion at all with

22   Mr. Miller as far as you recall?

23        SCOTT PETERSEN:  Not that I'm aware

24   of.

25

1     Q.   Okay.  When you -- after you

2    purchased the Air Tractor, did you yourself

3    do any research or take any steps to see

4    about what the insurance requirements would

5    be for the aerial application or the turbine

6    transition training?

7         SCOTT PETERSEN:  Not for the

8    transition training, just for the aerial

9    application.

10    Q.   Okay.  So you don't recall talking

11   to any insurance agents or brokers about the

12   possibility of purchasing insurance to cover

13   transition training as part of your business?

14        SCOTT PETERSEN:  On our initial

15   contact, I believe I talked with Randy Hardy

16   about adding Rick as an instructor pilot and

17   as an open policy pilot to fly the aircraft.

18    Q.   And Randy Hardy is with who?

19        SCOTT PETERSEN:  Hardy Aviation

20   Insurance.

21    Q.   And did you ultimately purchase

22   additional insurance with respect to Mr.

23   Lucente's work as a transition pilot?

24        SCOTT PETERSEN:  As I recall in our

26

1  conversation with Randy, we were covered

2  because he was going to have to give me

3  additional time in the aircraft.  And as I

4  remember it, we did talk about adding him as

5  an open policy pilot to fly the airplane if

6  we needed him to do aerial application.

7      Q.   But did you have any specific

8  discussions with Randy Hardy about insurance

9  requirements for flight training operations

10  as opposed to aerial application operations?

11      SCOTT PETERSEN:  Just the initial

12  naming Rick as an instructor pilot on the

13  policy when we bought the aircraft.

14      Q.   Naming him as an instructor pilot?

15      SCOTT PETERSEN:  That's correct.

16      Q.   Or just an additional pilot?

17      SCOTT PETERSEN:  No, instruction

18  because he was going to give me instruction

19  in that particular aircraft.

20      Q.   Okay.  Would he be named -- as your

21  recollection of this, would he be named as an

22  instructor pilot only for the limited purpose

23  of instructing you, the owner of the

24  aircraft, or generally as an instructor pilot

27

1   on the aircraft?

2        SCOTT PETERSEN:  To my knowledge, it

3   was as an instructor pilot in the aircraft.

4        Q.   Okay.  Did Randy Hardy advise you

5   that transition training would be covered

6   under your current policy?

7        SCOTT PETERSEN:  That I don't

8   recall.

9        Q.   Okay.  Do you recall whether you

10  were ever denied insurance coverage from

11  anyone with respect to the 503?

12       SCOTT PETERSEN:  No.

13       Q.   Do you recall whether any insurance

14  company ever denied coverage for you with

15  respect to turbine transition training or

16  flight training generally?

17       SCOTT PETERSEN:  No.

18       Q.   At the time of this incident, was it

19  your understanding that flight training was

20  covered under your current insurance policy?

21       SCOTT PETERSEN:  Yes, that's

22  correct.

23       Q.   Was it your understanding that all

24  flight training, regardless of whether it

28

1    related to aerial application, was covered?

2           SCOTT PETERSEN:   To my knowledge,

3    yeah, it was all covered.

4       Q.   And that would be true whether it

5    was in the Arrow or the Warrior or an Air

6    Tractor, correct?

7           SCOTT PETERSEN:   Yes.

8       Q.   Do you recall whether you ever at

9    any time had any specific discussions with

10   Hardy or any other insurance agent concerning

11   insurance requirements for operating a flight

12   school?

13          SCOTT PETERSEN:   Not that I

14   remember.  I mean we were -- we were covered

15   on the aircraft when we purchased them, and

16   those were set up accordingly for what we

17   were using them for.

18      Q.   Did you ever have any correspondence

19   back and forth from Hardy Aviation concerning

20   your coverage?

21          SCOTT PETERSEN:   Other than the

22   policy.

23      Q.   Okay.  So you didn't write him a

24   memorandum saying here is the operations we

29

1    intend to engage in in our airport and --

2         SCOTT PETERSEN:  No.

3    Q.   Okay.  Is there anywhere else you

4    can think of that you advertised for turbine

5    transition training?

6         SCOTT PETERSEN:  I think "The Ag Air

7    Update" was the only publication and just the

8    referrals that Harold had.

9    Q.   And since this accident, have you

10   trained any other pilots for turbine

11   transition?

12        SCOTT PETERSEN:  Nope.

13   Q.   Okay.  So when you talked earlier

14   about pilots that were referred from Harold

15   Miller, what have you done with respect to

16   those referrals?

17        SCOTT PETERSEN:  We told them that

18   we are no longer offering turbine transition

19   training.

20   Q.   Is Rick Lucente the only person you

21   were using or intending to use for turbine

22   transition training?

23        SCOTT PETERSEN:  Yes.

24   Q.   Were you involved in any respect

1    with regard to preparing the syllabus or the

2    flight training course?

3        SCOTT PETERSEN:  No.  I think Rick

4    used what he had used when he had worked with

5    Harold when Harold did the turbine transition

6    training.

7      Q.   Did you ever sit down and go over

8    those requirements with him, or did you leave

9    that to him as the person maybe more

10   qualified?

11       SCOTT PETERSEN:  No.  I looked at

12   his syllabus as far as what he wanted to

13   accomplish.  As far as checking somebody out

14   in the turbine operations and having been

15   through it with him as a pilot, I was pretty

16   confident that he had covered all the bases

17   well.

18     Q.   How did you first come to meet Mr.

19   Lucente?  Was that through Harold Miller?

20       SCOTT PETERSEN:   That's correct.

21     Q.   Were you already doing some

22   subcontracting aerial application for Harold

23   Miller before you met Mr. Lucente?

24       SCOTT PETERSEN:  I met Rick at

1    Harold's flight school in the summer of 1996

2    when I went through his initial ag pilot

3    training course and he had gone through that

4    that prior season.

5        Q.    So were you and Rick Lucente both

6    doing some independent contract work for

7    Harold Miller, if you will?

8            SCOTT PETERSEN:    Yes.

9        Q.    Do you have any idea how much time

10   Mr. Lucente had in this specific aircraft at

11   issue, the 503?

12           SCOTT PETERSEN:    Not exact numbers.

13   I know he trained quite a few individuals.

14   Harold had numerous contacts throughout the

15   industry.

16       Q.    Did you ever have an opportunity at

17   some point before you elected to use Mr.

18   Lucente to do flight training for you to

19   review his logbooks and his personal logbooks

20   and look at his flight experience?

21       A.    Yes, I did.

22       Q.    This day of the accident, was this

23   the first in-the-air training session with

24   this particular student?

32

1          SCOTT PETERSEN:  Yes.

2      Q.    Did you have an opportunity to meet

3    Mr. Webster?

4          SCOTT PETERSEN:  Yes, we did.  The

5    accident happened on Monday.  The day before

6    on Sunday, the weather was inclement, and

7    they spent a little over two hours in the

8    classroom, Rick and Mr. Webster, going over

9    turbine operations, emergency procedures,

10    starts and those types of things, and things

11    that were related to the transition course,

12    and that is documented in Mr. Webster's

13    logbook.

14      Q.    Okay.  Did you have any type of

15    contract with Mr. Lucente, a written

16    agreement of any kind?

17          SCOTT PETERSEN:  No.

18      Q.    So it was a verbal contract by the

19    job basis?

20          SCOTT PETERSEN:  Verbal as needed.

21      Q.    Okay.  So your intention would be

22    that when you had a student referred to you,

23    you would call Mr. Lucente and tell him you

24    had a new student?

33

1          SCOTT PETERSEN:  And see when he was

2    available to work with them.

3      Q.   Did you check with Mr. Webster to

4    see if he carried any type of renter's or

5    non-owned insurance?

6          SCOTT PETERSEN:  No.

7      Q.   Did Mr. Webster make any inquiries

8    concerning insurance coverage for the

9    aircraft during his training?

10         SCOTT PETERSEN:  No.

11     Q.   How did you happen to come into

12   contact with Mr. Webster as a student pilot?

13         SCOTT PETERSEN:  He was referred by

14   a man by the name of Del Finup, F-i-n-u-p, in

15   Lakeview, Michigan; and Neil was looking for

16   work up in Michigan.  He had grown up, I

17   think, in the Detroit area, had spent the

18   last several seasons flying out of Wyoming.

19   And Mr. Finup had, I believe, a 402 Air

20   Tractor, turbine Air Tractor, that he was

21   looking to put him in for that season.

22     Q.   So Mr. Finup was looking for

23   somebody to train Mr. Webster to fly for Mr.

24   Finup, correct?

34

1      A.   That's correct.

2      Q.   There was never any intention, as

3  far as you recall, to have Mr. Webster do any

4  aerial application flights for Pontiac Flying

5  Service?

6           SCOTT PETERSEN:  No.

7      Q.   And were you furnishing any type of

8  training materials for Mr. Lucente?

9           SCOTT PETERSEN:  Yes, we had a

10  current POH that included all the procedures

11  for the aircraft as well as a current weight

12  and balance.

13     Q.   Okay.  In terms of instructional

14  materials, the syllabus or textbooks,

15  anything like that that you provided?

16          SCOTT PETERSEN:  No.  He had all

17  that with him.

18     Q.   Okay.  Was Mr. Webster required to

19  purchase any training materials?

20          SCOTT PETERSEN:  No.

21     Q.   What was the rate of compensation

22  for Mr. Lucente for his training?

23          SCOTT PETERSEN:  I believe he was

24  paid $100 per flight hour.  Was that the

35

 1   arrangement?

 2          SARAH PETERSEN:  No.

 3          SCOTT PETERSEN:  No?

 4          SARAH PETERSEN:  It was $100 per for

 5   instruction hour whether it was classroom or

 6   flight.

 7          SCOTT PETERSEN:  Okay.  I stand

 8   corrected.

 9      Q.   So it was $100 per hour whether it

10   was ground or in the air, correct?

11          SARAH PETERSEN:  Yes.

12      Q.   And you would trust Mr. Lucente to

13   turn in his time.  Is that how you would do

14   that?

15          SCOTT PETERSEN:  Absolutely.

16      Q.   What were the terms of the deal with

17   Mr. Finup in terms of what you'd be

18   compensated for getting Mr. Webster trained?

19          SCOTT PETERSEN:  I believe it was

20   $5,200.

21      Q.   And what would Mr. Webster be

22   required to pay for his training?

23          SCOTT PETERSEN:  5,200.  I believe

24   Mr. Finup was going to pay that.

36

1      Q.   I'm sorry.  I misspoke.  Mr. Webster

2   was to pay how much for his training?

3           SCOTT PETERSEN:  Mr. Finup was going

4   to pay for him.

5      Q.   Oh, Mr. Finup was paying for him?

6   Okay.  So Mr. Webster doesn't pay anything on

7   this.

8           SARAH PETERSEN:  No.

9           SCOTT PETERSEN:  No.  I believe the

10  arrangement was he was going to work that

11  back off when he went to work for Del.

12     Q.   Okay.  Did you ultimately get any

13  payment from Finup?

14          SCOTT PETERSEN:  No.

15     Q.   Did you have any discussions with

16  Mr. Webster concerning what insurance

17  coverage he might carry through Finup's

18  operation?

19          SCOTT PETERSEN:  No.

20     Q.   He was presently flying some

21  aircraft for Mr. Finup at the time?

22          SCOTT PETERSEN:  No.

23     Q.   So he would be a new pilot for Mr.

24  Finup?

37

1          SCOTT PETERSEN:  That's correct.

2     Q.   Did you know Mr. Finup before he

3  called you about this referral?

4          SCOTT PETERSEN:  Yes.

5     Q.   Where do you know Mr. Finup from?

6          SCOTT PETERSEN:  I had previously

7  taken Mr. Miller's son who was working for

8  another operator on the Lakeview Airport, I

9  believe, back in '97 and had met Del at that

10  time, and then I'd also seen him at the

11  national conventions and at the NAAA, the

12  National Ag Aviation Association, their

13  spring meetings, the board meetings and

14  stuff.  I had seen him around different

15  places.

16     Q.   How did Mr. Finup know that you had

17  an Air Tractor?  How did he know that he

18  could send somebody here to get trained?

19          SCOTT PETERSEN:  The aerial

20  application business is a small entity; and

21  generally, if there's something going on,

22  everybody knows.  And Mr. Finup, him and

23  Harold had a long-standing relationship.  He

24  knew that I had purchased Harold's assets.

38

```
1        Q.   Did you pay any type of workers'

2   compensation or anything for Mr. Lucente, did

3   you?

4            SARAH PETERSEN:  What do you mean?

5        Q.   Like did you have a work comp policy

6   that he was included under?

7            SARAH PETERSEN:  Yes.

8        Q.   So he was a named employee for work

9   comp?

10            SARAH PETERSEN:  No, he was

11   considered a private contractor.

12        Q.   He would come under your work comp

13   in terms of what your work comp covered?

14            SARAH PETERSEN:  You know, that I

15   don't know.

16        Q.   Okay.

17            MR. GUY:  So you don't know if any

18   benefits have been paid to the Lucente family

19   on behalf of the workers' compensation

20   policy?

21            SARAH PETERSEN:  No, I do not know

22   that.

23            MR. GUY:  Do you know if there's any

24   discussions about paying it one way or the
```

39

1    other?

2            SARAH PETERSEN:  I know that they

3    have requested information from me which I

4    have submitted to them.

5            MR. GUY:  So it's under

6    investigation?

7            MR. CAUGHEY:  I don't think she said

8    that.

9            MR. GUY:  Okay.

10           SARAH PETERSEN:  I don't know.  They

11   have requested information from me, I sent it

12   to them, and I have not had any contact with

13   them.

14           MR. GUY:  And who is they?

15           SARAH PETERSEN:  That would be

16   Travelers, the insurance company.

17           MR. GUY:  Okay.  Do you have a

18   contact at Travelers?

19           SARAH PETERSEN:  Yes, there would be

20   something on that sheet of paper.

21           MR. GUY:  Okay.

22

23   BY MR. BANOVETZ:

24       Q.   Did you have a plan or did you

40

1    anticipate in terms of percentage of use what

2    percentage of use would be aircraft flight

3    training and what percentage of use would be

4    anticipated to be aerial application?

5          SCOTT PETERSEN:  I never calculated

6    that.

7          Q.  Can you estimate the number of hours

8    it was used for aerial application at the

9    time of the accident on behalf of your

10   business?

11         SCOTT PETERSEN:  No.

12         Q.  Okay.  Did you have any other

13   student signed up for training at the time of

14   the accident?

15         SCOTT PETERSEN:   No.

16         Q.  Did you meet with Mr. Webster for

17   the purpose of training him or going over

18   flight logs, syllabus, flight books or

19   logbooks, anything at all?

20         SCOTT PETERSEN:  No, I did not.  Mr.

21   Lucente went through his logbook.

22         Q.  Was your contact with Mr. Webster

23   pretty much, hello, nice to meet you?

24         SCOTT PETERSEN:  I had had phone

41

1    conversations with him when the initial was

2    set up, and I had FAXed to him directions on

3    how to get here, when to meet, what to

4    expect.

5        Q.   Were you generally aware of what

6    flight maneuvers Mr. Lucente would be

7    performing as part of the training process?

8        SCOTT PETERSEN:  Yes.

9        Q.   What sort of maneuvers are required,

10   just off the top of your head, for turbine

11   transition training?

12       SCOTT PETERSEN:  There's a large

13   emphasis on engine starts.  That's one of the

14   most critical things in the turbine industry.

15   If you don't pay attention, you can cook an

16   engine.  As far as the flying, we went over

17   emergency procedures, stall awareness, steep

18   turns.  I think those things stick out in my

19   mind the most.

20       Q.   Was there a minimum altitude that

21   Mr. Lucente would require for steep turns?

22       SCOTT PETERSEN:  If I recall when I

23   went through the training course, we were

24   1,500, 2,000 AGL.

42

```
1        Q.    Do you know who owns the property

2   where the aircraft crashed?

3        SCOTT PETERSEN:   City of Pontiac.

4        Q.    City of Pontiac.  Has the City of

5   Pontiac made any sort of claim with respect

6   to remediation of the land or environmental

7   cleanup?  No?  You have to answer out loud.

8   I'm sorry.

9        SCOTT PETERSEN:   No.

10        Q.    Okay.  Have you heard from the EPA

11   or has the NTSB talked to you about remedial

12   environmental remediation at the site?

13        SCOTT PETERSEN:   No.

14        SARAH PETERSEN:   No.

15        Q.    Did Mr. Lucente complete any

16   paperwork with respect to Neil Webster that

17   he provided to you about Mr. Neil Webster's

18   background or experience or anything?

19        SARAH PETERSEN:   The only thing that

20   we have is we got a copy of his current

21   medical and a copy of his pilot's license.

22        Q.    Have you heard from an attorney or

23   someone else from either Webster or Lucente's

24   estates concerning any possible liability
```

1    claim?

2         SCOTT PETERSEN:  The estate of Mr.

3    Webster, I believe, we did receive --

4         SARAH PETERSEN:  We received a

5    letter stating that they had retained

6    counsel.  There was nothing further

7    indicated.

8      Q.    Okay.  Nothing with respect to Mr.

9    Lucente?

10         SARAH PETERSEN:  No.

11      A.    No.

12      Q.    Have you had any communications with

13    anybody from Mr. Lucente's family?

14         SARAH PETERSEN:  We are very close

15    to his wife.

16      Q.    And you have talked to Mr. Lucente's

17    wife?

18         SARAH PETERSEN:  Many times.

19         SCOTT PETERSEN:  Yes.

20      Q.    And she hasn't said anything at this

21    point about a claim?

22         SCOTT PETERSEN:  No, not that I'm

23    aware of.

24      Q.    Do you have a copy of what you got

44

1    from Mr. Webster's attorney?

2        SARAH PETERSEN:  Yeah.

3    Q.   You kept a copy of that, okay.  Have

4    you had any communications at all with the

5    bank where the loan on the aircraft was

6    taken?

7        SARAH PETERSEN:  No.

8        SCOTT PETERSEN:  No.

9    Q.   What bank is that?

10        SCOTT PETERSEN:  That's the Bank of

11    Pontiac.

12    Q.   Okay.  Are you making some sort of

13    payments on the aircraft at the present time?

14        SARAH PETERSEN:  No.  There is a

15    scheduled yearly annual payment that's due

16    in --

17        SCOTT PETERSEN:  November.

18        SARAH PETERSEN:  -- November.

19    Q.   Has the bank been put on notice of

20    the loss?

21        SCOTT PETERSEN:  Yes.

22        SARAH PETERSEN:  Oh, yeah.

23    Q.   Is there a specific person that you

24    deal with at the bank?

1          SCOTT PETERSEN:  Yes, Adam Ingles.

2      Q.   Okay.  Has Adam made inquiry

3  concerning insurance coverage on the

4  aircraft?

5          SCOTT PETERSEN:  No.

6      Q.   Has the NTSB made any order or

7  entered any order requiring that the aircraft

8  be maintained at its present location and

9  that it not be destroyed?

10         SARAH PETERSEN:  No.

11         SCOTT PETERSEN:  No.

12     Q.   As far as you know, are you free to

13  do with the airplane whatever you want at

14  this point?

15         SCOTT PETERSEN:  I don't believe

16  that is the case.  The last I was under the

17  understanding that it was to be stored and

18  not disturbed until it was released.

19     Q.   Okay.  Just so I'm clear, other than

20  Mr. Hardy, did you have any discussion with

21  any other insurance agents or anyone else for

22  that matter about insurance requirements for

23  operating flight school?

24         SCOTT PETERSEN:  No.

46

```
1       Q.   And you have been operating a flight
2   school in some capacity since 1987.  Is that
3   correct?
4           SCOTT PETERSEN:  That's correct.
5       Q.   But no turbine transition training
6   until the incident at issue?
7           SCOTT PETERSEN:  That's correct.
8       Q.   Okay.  And the only policy you've
9   carried is either the AIG policy or the
10  US AIG policy?
11          SCOTT PETERSEN:  That's also
12  correct.
13      Q.   Okay.
14          SCOTT PETERSEN:  Right?
15          SARAH PETERSEN:  I am not clear
16  about the company that has the policies for
17  the other rental aircraft.  I don't believe
18  that's AIG or US AIG.  I hate to appear -- I
19  don't know that that company covers our other
20  aircraft.  I think that's just the ag
21  aircraft.  I would have to look at the
22  policies to see who it is.
23      Q.   You think you might have another
24  policy with another company?
```

47

```
 1              SARAH PETERSEN:  Not for this

 2    aircraft, no.  But you are asking if

 3    everything is covered by US AIG.  I don't

 4    believe so.  I think our rental planes, the

 5    Grumman, the Warrior, the Arrow, I believe

 6    they are covered by a different company.  I

 7    think the only thing that is covered with the

 8    US AIG or AIG, whoever, is the ag items.

 9       Q.   Okay.  That's what I was thinking

10    because I don't recall seeing these other

11    airplanes:  the Grumman, Arrow, Warrior, I

12    don't remember seeing those on this policy.

13              SARAH PETERSEN:  No, I believe those

14    are covered by a different company, but I

15    don't recall which company that is.

16       Q.   Okay.  Do you have any means of

17    finding out what company that is?

18              SARAH PETERSEN:  Yes, that's in the

19    file.

20       Q.   Is that something you could do now?

21    Can we take a break and do that?

22              SCOTT PETERSEN:  Yeah, we can take a

23    break and do that.

24              MR. CAUGHEY:  Or we can send it to
```

48

1    you.

2            MR. GUY:   Whatever is convenient for

3    you.   Did you have at the time or do you now

4    have a file that you kept on Mr. Lucente, any

5    paperwork on him, medical or pilot

6    certificate?

7            SARAH PETERSEN:   Yes, I have a copy

8    of his -- I don't recall exactly what's in

9    the file; but I know that in the past I've

10   had his medical, and I've had -- and I always

11   have a copy of his Illinois license, his

12   applicator license.

13

14   BY MR. BANOVETZ:

15       Q.   Did you have an opportunity to meet

16   Mr. Coker when he was out here?

17           SCOTT PETERSEN:   Yes.

18       Q.   The investigator, Dave Coker?

19           SARAH PETERSEN:   Yes.

20       Q.   Did you give him everything you had

21   on Mr. Lucente?

22           SARAH PETERSEN:   I gave him

23   everything that he asked for.   I don't recall

24   what those items would have been.

1          MR. GUY:  Do you have any excess

2  insurance which may apply to this incident?

3          MR. BANOVETZ:  Umbrella coverage?

4          SARAH PETERSEN:  Not that I'm aware

5  of.

6          MR. GUY:  Okay.

7

8  BY MR. BANOVETZ:

9     Q.  Well, Peter, I think I'm just about

10  through my questions.  If you want to take a

11  minute and I'll take a minute and we'll see

12  if we've got anything else here.

13          MR. GUY:  Do you know where Mr.

14  Lucente's logbooks are, his pilot logbooks?

15          SARAH PETERSEN:  I'm not aware of

16  where they are.

17          MR. GUY:  Okay.

18          MR. BANOVETZ:  Peter, is that about

19  it for you?

20          MR. GUY:  I don't think I have

21  anything else.

22          MR. BANOVETZ:  I don't think we have

23  anything further.  Counsel?  Okay.  We'll go

24  off the record then.

50

1                    (WHEREUPON THERE WAS A DISCUSSION

2    OFF THE RECORD.)

3

4                    (FURTHER THE WITNESSES SAYETH NOT.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

51

1    STATE OF ILLINOIS    )

                          )    SS.

2    COUNTY OF LIVINGSTON)

3            I, LYNN J. WATSON, a Certified

4    Shorthand Reporter in and for the County of

5    Livingston and State of Illinois, do hereby

6    certify that the witnesses herein, prior to

7    the taking of said sworn statement, were by

8    me duly sworn to testify the truth insofar as

9    they might be interrogated concerning the

10   same; and that the said sworn statement was

11   on that date taken stenographically and

12   afterwards transcribed by me, and that the

13   foregoing is a true and accurate transcript

14   of the testimony so given on said date.

15           Dated July 16, 2003.

16

17

18

19

20   _____
     C.S.R., R.P.R.
     C.S.R. License No. 84-1744

21

22

23

24

STATE OF ILLINOIS
COUNTY OF LIVINGSTON

IN RE: PONTIAC FLYING SERVICE

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

I, Sarah Petersen, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken July 14, 2003, that I have read the foregoing transcript of the deposition, consisting of pages 1 to 51 inclusive, and affix my signature to same.

_____
                                Sarah Petersen

Subscribed and sworn to
Before me this _____ day of
_____, 2003

_____
Notary Public

STATE OF ILLINOIS
COUNTY OF LIVINGSTON

IN RE: PONTIAC FLYING SERVICE

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

I, Scott Petersen, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken July 14, 2003, that I have read the foregoing transcript of the deposition, consisting of pages 1 to 51 inclusive, and affix my signature to same.

_____
                                        Scott Petersen

Subscribed and sworn to
Before me this _____ day of
_____, 2003

_____
Notary Public