E-FILED
Friday, 01 September, 2006 02:34:22 PM
Clerk, U.S. District Court, ILCD

**THIRD PARTY DEFENDANT'S
EXHIBIT NO. 8**

```
                                                                    1

1    STATE OF ILLINOIS      )
                            )
2    COUNTY OF COOK         )

3              IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                      COUNTY DEPARTMENT, LAW DIVISION
4
     NATIONAL UNION FIRE INSURANCE  )
5    COMPANY OF PITTSBURGH, PA.,    )
                                    )
6              Plaintiff,           )
                                    )
7              vs.                  ) No. 03-1288
                                    )
8    PONTIAC FLYING SERVICE, INC.,  )
     Et al.,                        )
9                                   )
               Defendants.          )
10                                  )
                     And            )
11                                  )
     PONTIAC FLYING SERVICE, INC.,  )
12                                  )
               Third Party Plaintiff,)
13                                  )
               vs.                  )
14                                  )
     HARDY AVIATION INSURANCE, INC.,)
15                                  )
               Third Party Defendant.)
16

17
               The discovery deposition of SARAH PETERSEN
18   called for examination pursuant to the provisions of the
     Civil Practice Act and Rules of the Supreme Court as they
19   apply to the taking of discovery depositions, taken
     before Laura J. Amberg, CSR, State of Illinois, on the
20   22nd day of February, 2005, at the hour of 12:50 p.m., at
     416 Main Street in the City of Peoria, County of Peoria,
21   State of Illinois.

22

23
```

```
                                          2
1  PRESENT:    TRESSLER, SODERSTROM, MALONEY & PRIESS
               BY: MARK T. BANOVETZ, ESQ.
2              Sears Tower, 22nd Floor
               233 S. Wacker Drive
3              Chicago, IL 60606-6308
                   Attorney for the Plaintiff;
4
5              CASSIDY & MUELLER
               BY: DAVID B. MUELLER, ESQ.
6              416 Main Street, Suite 323
               Peoria, IL 61602
7                  Attorney for Defendant/Third Party
                   Plaintiff Pontiac Flying Service;
8
               CLAUSEN MILLER, P.C.
9              BY: DIANE M. BARON, ESQ.
               10 South LaSalle Street
10             Chicago, IL 60603-1098
                   Attorney for Third Party Defendant
11                 Hardy Aviation Insurance;

12  PRESENT
    VIA PHONE: CLIFFORD LAW OFFICES
13             BY: MICHAEL KRZAK, ESQ.
               120 North LaSalle Street, Suite 3100
14             Chicago, IL 60602

15  ALSO PRESENT: SCOTT PETERSEN
16
17
18
19
20
21
22
23
```

---

**Page 3**

1   SARAH PETERSEN
2   After being first duly sworn upon her oath
3   Testified as follows in response to
4   EXAMINATION
5   BY MS. BARON:
6       Q.  Would you state your name for the record,
7   please?
8       A.  Sarah Petersen.
9       MS. BARON: For the record, this is the
10  deposition of Sarah Petersen taken pursuant to notice and
11  by agreement of the parties.
12      Q.  (Ms. Baron continuing.) Sarah, my name is
13  Diane Baron and -- do you mind if I call you Sarah? Is
14  that --
15      A.  That's fine.
16      Q.  I represent Hardy Aviation Insurance and I
17  will be asking you some questions. You sat in your
18  husband's deposition so you have some idea of what that
19  would be. Okay?
20      A.  Yeah.
21      Q.  Have you given a deposition before?
22      A.  No.
23      Q.  As I instructed your husband, just keep your

---

**Page 4**

1   responses verbal so the court reporter can take them down
2   and if you don't understand me or don't hear me, let me
3   know and we'll repeat the question. Okay?
4       A.  Okay.
5       Q.  Did you review anything in preparation for
6   your deposition today?
7       A.  Yes.
8       Q.  What did you review?
9       A.  Statements.
10      Q.  What sort of statements?
11      A.  General paperwork that -- you know, regarding
12  the case.
13      Q.  Okay. Do you recall what that was?
14      A.  The depositions that were taken from Randy
15  Hardy.
16      Q.  The deposition of Randy Hardy?
17      A.  Of Randy Hardy.
18      Q.  Okay.
19      A.  And Joe Vance.
20      Q.  Anything else?
21      A.  Not in particular. I mean, we went over
22  things with our attorney.
23      Q.  Okay. Did you talk to anybody else about

---

**Page 5**

1   your deposition other than your attorney?
2       A.  No.
3       Q.  What is your date of birth?
4       A.  3/15/64.
5       Q.  And where do you live?
6       A.  Specific address?
7       Q.  Yes.
8       A.  15801 East 2000 North Road in Pontiac,
9   Illinois.
10      (Off the record discussion.)
11      Q.  (Ms. Baron continuing.) And you live there
12  with your husband Scott and three children; is that
13  correct?
14      A.  Yes.
15      Q.  Could you tell us briefly about your
16  education?
17      A.  Graduate -- high school graduate and no
18  further education.
19      Q.  When did you graduate and from where?
20      A.  1982, Central City High School in Central
21  City, Nebraska.
22      Q.  And what employment have you had since
23  finishing high school, besides being a mom?

**6**

1  A.  I was a bookkeeper/secretary for the trucking
2  business that we owned and operated.
3  Q.  That was in Nebraska?
4  A.  In Nebraska.
5  Q.  Okay.
6  A.  I've done various secretarial stints. I
7  filled in for a gal who was pregnant one time, just
8  general things of that nature.
9  Q.  And you are not a licensed pilot; correct?
10 A.  No, I'm not.
11 Q.  You are a co-owner of Pontiac Flying Service;
12 correct?
13 A.  Uh-huh.
14 Q.  As well --
15    MR. MUELLER:  You have to say yes.
16 A.  Yes.
17 Q.  Yes. I'm sorry, I should have caught it.
18 And you're also an owner of Pontiac Flying Service, Inc.;
19 is that correct?
20 A.  Yes.
21 Q.  Have you had contact with an insurance broker
22 regarding your insurance for Pontiac?
23 A.  Pontiac what?

**7**

1  Q.  Either. Take them separately. Did you have
2  contact with an insurance broker regarding your insurance
3  for Pontiac Flying Service, Inc.?
4  A.  Yes.
5  Q.  And was that Harcy Aviation Insurance?
6  A.  Yes.
7  Q.  When did you first start using Hardy as your
8  broker?
9  A.  January of --
10    MR. MUELLER:  Again, this is Inc.? Pontiac
11 Flying Service, Inc.?
12 Q.  Yes, yes.
13 A.  I thought you said both.
14 Q.  Why don't we distinguish them just so I'm
15 clear.
16 A.  Pontiac Flying Service would have been in
17 July of 1997 --
18 Q.  Okay.
19 A.  -- to previous -- to present. Pontiac Flying
20 Service, Inc., would have been in February of 2002 when
21 we purchased the assets of Harold Miller.
22 Q.  Now, Pontiac Flying Service owned some
23 planes; correct?

**8**

1  A.  Yes. Owned?
2  Q.  Yes.
3  A.  Or owns?
4  Q.  Well, let's -- I'm just saying owned at any
5  particular time.
6  A.  Yes.
7  Q.  And were any of these planes used for
8  instructional flying?
9  A.  Yes.
10 Q.  And were you involved in obtaining insurance
11 for the instructional flying?
12 A.  Yes.
13 Q.  And did you do that by contacting Hardy
14 Aviation Insurance?
15 A.  Yes.
16 Q.  Did you request the insurance for the
17 instructional flying?
18 A.  Yes.
19 Q.  And did he obtain that for you?
20 A.  Yes.
21 Q.  Pontiac Flying Service, Inc., purchased an
22 AT-305 plane; correct?
23 A.  Yes.

**9**

1  Q.  And do you recall when that was purchased?
2  A.  Yes.
3  Q.  When was it purchased?
4  A.  We signed the papers on the 28th of February,
5  2002.
6  Q.  Okay. And that was purchased from Miller?
7  A.  Harold Miller.
8  Q.  And did you contact anyone at Hardy Aviation
9  Insurance regarding obtaining coverage for the AT-305?
10 A.  I don't recall.
11 Q.  Do you know if your husband did?
12 A.  Yes.
13 Q.  And how is it that you learned that, other
14 than sitting in the deposition today?
15 A.  Yeah, well, in the course of our business
16 there are times he does things, I do things. I do recall
17 that he contacted them to check on the insurance for --
18 it was a part of the process of the purchase.
19 Q.  Do you know when the coverage for the AT-305
20 became effective?
21 A.  It's my understanding it became effective
22 the -- March 1st of -- when Scott called to tell him
23 that, yes, the purchase had gone through, we had signed

**Page 10**

1 the papers and that we were the owners.
2    Q.  Okay. Did you have any contact with Hardy
3 Aviation Insurance regarding that policy covering the
4 AT-305?
5    A.  Not that I recall.
6    Q.  Okay. Do you recall receiving a quote for
7 coverage of the AT-305 or is that something that your
8 husband handled?
9    A.  I don't recall.
10    Q.  To your knowledge, what was the AT-305 to be
11 used for by Pontiac? What were you going to use it for?
12    A.  For what it was designed, agricultural
13 aircraft; it was also a training aircraft with the two
14 seats.
15    Q.  Did you ever tell anyone at Hardy Aviation
16 Insurance that you were going to be using the AT-305 for
17 training?
18    A.  Ask me that again.
19    MS. BARON: Sure. Could you read it.
20    (Whereupon the question was read.)
21    A.  Not that I recall.
22    Q.  (Ms. Baron continuing.) Did you use the
23 AT-305 for training?

**Page 11**

1    MR. MUELLER: You're talking about the
2 corporation, Inc.?
3    Q.  Right, right.
4    A.  Well, Scott was given training in it when we
5 first acquired it.
6    Q.  And when was he given training in it, your
7 recollection, do you recall?
8    A.  I don't recall the specific dates.
9    Q.  Do you recall who trained him?
10    A.  Yes.
11    Q.  Who trained him?
12    A.  Rick Lucente.
13    Q.  And who's Rick Lucente?
14    A.  I guess I'm not sure exactly what you're
15 asking me. Who is he?
16    Q.  Who was he? Did you know him before --
17    A.  Oh, yes.
18    Q.  -- he gave this training to your husband?
19    A.  Yes.
20    Q.  How did you know him?
21    A.  First had met him in -- when Scott was at
22 Harold's working with him; he was an acquaintance,
23 friends.

**Page 12**

1    Q.  Okay. Other than this training that Lucente
2 did for your husband, do you recall the AT-305 being used
3 for any other training for anybody else?
4    A.  Specifically when we owned it, that's what
5 you're asking me?
6    Q.  Yes.
7    A.  No. Prior to the crash, is that what.
8 You're --
9    Q.  Right, right, at that point.
10    A.  Yeah.
11    Q.  Okay. Did Pontiac advertise providing
12 training with the AT-305?
13    A.  Turbine transition training, yes.
14    Q.  And I will show you what we looked at before.
15 Showing you what was previously marked as Exhibit Two,
16 Deposition Exhibit Two, I don't know if you have a copy
17 there.
18    A.  Uh-huh.
19    Q.  Is that a copy of one of the ads that was
20 placed by Pontiac for the turbine transition training?
21    A.  Yes.
22    Q.  And do you know over what period of time
23 these ads ran?

**Page 13**

1    A.  I believe December of 2002 through April,
2 May. The ad was canceled once the crash occurred.
3    Q.  Did you ever have anyone contact you to
4 request training or to ask about it in the AT-305 in
5 response to the ad or any other information?
6    A.  I do not specifically to the ad. I mean, I
7 don't remember someone calling and saying, hey, I seen
8 your ad in this particular thing.
9    Q.  Do you recall them calling and asking?
10    A.  Yeah, there were people who called that I
11 always referred them to Scott. He was -- visited with
12 them about that.
13    Q.  Did you ever tell anyone at Hardy Aviation
14 Insurance that you were advertising for turbine
15 transition training as indicated in Exhibit Two?
16    A.  No.
17    Q.  Showing you what's previously been marked
18 Deposition Exhibit Three?
19    MR. BANOVETZ: These aren't numbered.
20    MR. MUELLER: What's the date on it?
21    Q.  It's the aircraft -- it's the insurance
22 application coverage effective April 10, '02, to April
23 10, '03.

**Page 14**

1  MR. MUELLER: Got it.
2  Q. If you take a look at that and tell us if you
3  have seen that before?
4  A. Yes.
5  Q. Is this the application that was completed by
6  Pontiac with respect to coverage from April 10th of '02
7  to April 10th of '03 which included the AT-305?
8  A. Yes, actually when the application arrives it
9  has already been filled out by Hardy. I mean, there's --
10  if you're -- these are not things that we filled in.
11  This is sent.
12  Q. Did you read it when you received it from
13  Hardy?
14  A. Yeah, I generally give it to Scott for
15  signature, and I don't do his logbook, he does all that
16  information. So even if he looked at it, I would not
17  know.
18  Q. And it's his signature on the bottom of page
19  two?
20  A. Uh-huh.
21  Q. Is that a yes?
22  MR. MUELLER: You have to say yes.
23  A. Yes, sorry.

**Page 15**

1  Q. And then at the top there on the left-hand
2  corner of page two it indicates the box that says
3  passengers excluded; correct?
4  A. Yes.
5  Q. Is it your understanding there was no
6  passenger coverage for the Air Tractor 503?
7  A. I had no understanding of any of that prior
8  to the crash.
9  Q. Did you ever talk to anyone from Hardy
10  Aviation prior to the crash about passenger coverage for
11  the AT-305?
12  A. No.
13  Q. Is it your understanding then that the
14  coverage was placed with USAIG for the AT-305, or do you
15  even know?
16  MR. MUELLER: AT what point in time?
17  Q. I'm just trying to -- chronologically, when
18  they owned it. Did you have any knowledge as to what
19  insurance company was providing coverage for the AT-305?
20  A. At the time I paid no attention. Those
21  things were left to Hardy as the expert in the insurance.
22  Q. Did you ever ask him questions about your
23  coverage?

**Page 16**

1  A. I'm sure maybe there were times I did. I
2  can't think of anything specifically that I would have
3  asked. But I honestly left a lot of that to them.
4  Q. Let me show you what's been marked as
5  Deposition Exhibit One. It's the policy. Do you have
6  that?
7  MR. BANOVETZ: You can borrow that one.
8  A. Okay.
9  Q. Have you ever seen this before?
10  A. Yes.
11  Q. When did you see it? Did you receive it
12  prior to the loss?
13  A. I don't recall.
14  Q. Do you know whether you read it at any time?
15  A. I wouldn't -- no, I did not read it.
16  Q. If you could take a look at what's marked
17  Deposition Exhibit Four, that is the application for the
18  coverage May 19th, '02, to MAY 19th, '03. Take a look at
19  that. Have you seen this document before?
20  A. Yes.
21  Q. Is that your signature at the bottom of page
22  two?
23  A. Yes.

**Page 17**

1  Q. Why is it that you signed this one, do you
2  know, as opposed to your husband?
3  A. I'm speculating that at the time --
4  MR. MUELLER: Don't guess.
5  A. Well --
6  Q. I don't want you to guess. If you don't
7  know, you don't know.
8  A. Scott -- this date here --
9  Q. June 28th of '02.
10  A. -- yeah, Scott, would not have been in the
11  office then. That's when we do gypsy moth contracts and
12  he would have been gone. I'm guessing that I either seen
13  it hadn't been done or Angie called and I signed it.
14  Q. And you reviewed it before you signed it; is
15  that correct?
16  A. I don't recall.
17  Q. If you look at the top of page two in the
18  left-hand corner it also, as in the other one, the --
19  where it says passengers excluded, that box is checked;
20  correct?
21  A. Yes.
22  Q. Is it your understanding that there was no
23  passenger coverage for the Air Tractor 503?

18

1    A.   Ask me that again.
2    Q.   Was it your understanding that there was no
3  passenger coverage for the AT-503 based upon this
4  application that you signed?
5    A.   At the time that I signed it?.
6    Q.   At any time prior to the loss.
7    A.   Ask me that again.
8         MS. BARON: Could you read it back?
9         (Whereupon the question was read.)
10        MR. MUELLER: Objection; calls for a legal
11 conclusion.
12        MS. BARON: Just asking for her --
13        MR. MUELLER: Coverage, that would be under
14 the policy itself.
15        MS. BARON: Just asking for your
16 understanding.
17        MR. MUELLER: If you had an understanding.
18    A.   If I had an understanding, I would say yes.
19 I guess I'm -- I'm confused as to what you're asking me
20 in reference to that. You've already asked that
21 question, although it'd be a different time frame.
22        MR. MUELLER: Is your answer the same or is
23 it different than it was with the other application?

19

1    A.   My answer would be the same and I guess
2  that's what I'm --
3    Q.   (Ms. Baron continuing.) When you signed that
4  application it's your understanding there was no
5  passenger coverage for the planes listed; right?
6         MR. MUELLER: I don't know that that was her
7  answer.
8         MS. BARON: Well, I'm trying to get an
9  answer.
10        MR. MUELLER: Well, that's understood. But
11 she's tried to be consistent with what she's said before.
12   A.   Yeah, I guess I'm --
13        MR. MUELLER: You can say simply that you are
14 standing on your previous answer --
15   A.   Yeah.
16        MR. MUELLER: -- whatever it was.
17   A.   Yeah, I stand on my previous answer, whatever
18 it was.
19   Q.   (Ms. Baron continuing.) Which was what?
20        MR. MUELLER: Let's read it back.
21        MS. BARON: Let's read it back.
22   A.   Let's read it back.
23        MR. BANOVETZ: If I recall, I don't want to

20

1  offer testimony in the record --
2
3    Q.   (Ms. Baron continuing.) I believe you
4  testified you did not know whether there was passenger
5  coverage or not; is that what your said?
6         MR. MUELLER: That's what you said.
7    A.   Yeah.
8    Q.   Is that your answer? You didn't know one way
9  or the other; correct? I'm just trying to find out what
10 it is you're citing back to as your previous answer.
11   A.   Well, I guess I'm trying to figure out -- I
12 feel that it was the same question, so, yes, I want to be
13 consistent and I don't exactly think that it was in the
14 same -- I -- I would stand on what I previously said.
15   Q.   Which was that you didn't know one way or the
16 other whether there was passenger coverage?
17   A.   Yes.
18   Q.   Okay. Now, when you were involved in
19 obtaining coverage for instructional flying with the
20 other planes that Pontiac Flying Service had, did you pay
21 additional for the instructional coverage?
22   A.   I'm not aware of that.
23   Q.   Did you ever contact Hardy Aviation to

21

1  request coverage for instructional flying in the Ag Cat
2  plane owned by Pontiac Flying Service?
3         MR. MUELLER: You're referring to her
4  individually at this time?
5    Q.   Yes, yes.
6    A.   Okay. And I need you to ask that again. You
7  specified an Ag Cat that was owned by Pontiac Flying
8  Service?
9    Q.   Right.
10   A.   No, the Ag Cats that are owned by Pontiac
11 Flying Service, there's no way of doing training in those
12 aircraft.
13   Q.   Did you ever contact Hardy Aviation Insurance
14 for coverage for instructional flying in any planes?
15   A.   Yes.
16   Q.   Could you tell us which planes?
17   A.   Well, the ones that Pontiac Flying Service
18 has owned and used for flight instruction, and at one
19 time we speculated of purchasing a two-place Ag Cat and
20 we requested information on it.
21   Q.   Who did you request it from?
22   A.   Angie.
23   Q.   Do you recall when you requested that

```
                                              22                                                    24
 1   information?                                      1       A.   Yes, the next day.
 2       A.   No.                                      2       Q.   Who did you speak to then?  Was it Angie
 3       Q.   Do you recall who you spoke to about that?  3   again or --
 4   You say you spoke to Angie?                       4       A.   I believe -- I don't recall.
 5       A.   Angie.                                   5       Q.   And do you recall what was discussed in that
 6       Q.   And what do you recall about those       6   conversation?
 7   conversations?  Did you ask her for a quote?      7       A.   Yes.
 8       A.   Just -- yes.                             8       Q.   And what was that?
 9       Q.   And did she get you a quote?             9       A.   I had received in the mail that day the
10       A.   I don't recall.                        10   renewal, I'm not sure exactly what it was, but I was
11       Q.   I have some notes here from Hardy and there  11   concerned because I did not see Rick's name as -- listed
12   is a note dated 9/4/02.  I can mark this.  That states in  12   as a pilot and I was wondering why that was, not
13   Angie's writing, gave quote to Sarah.  She was ecstatic.  13   realizing that it was because he -- it was an open pilot
14   Will let us know when ready.                    14   warranty that he was covered under.
15            Does that bring back any recollection to you  15       Q.   And so who told you that?  Was it in that
16   as to whether you got a quote for instructional flying in  16   conversation?
17   the Ag Cat?                                     17       A.   Yes.
18       A.   No.                                    18       Q.   Did you have any other contacts with Hardy
19       Q.   Okay.  How -- the AT-305 crashed on May 5th  19   Aviation Insurance after the crash regarding the loss?
20   of 2003; correct?                               20       A.   Not to my knowledge.
21       A.   Yes.                                   21       Q.   At any time before the loss did you tell
22       Q.   And how did you learn about it?        22   anybody from Hardy Aviation Insurance that you wanted
23       A.   Phone call.                            23   coverage for turbine transition training on the AT-305?
                                              23                                                    25
 1       Q.   Who called you?                          1       A.   Say that again, please.
 2       A.   I don't recall.                          2            MS. BARON:  Could you read that back?
 3       Q.   And who was in the plane when it crashed?  3            (Whereupon the question was read.)
 4       A.   Rick Lucente and Neal Webster.          4       A.   No.
 5       Q.   And was Lucente providing training, turbine  5       Q.   (Ms. Baron continuing.)  At any time before
 6   transition training --                           6   the loss did you ask anyone from Hardy Aviation insurance
 7       A.   Yes.                                    7   whether you had turbine transition training coverage for
 8       Q.   -- to Webster?                          8   the AT-305?
 9       A.   Yes.                                    9       A.   No.
10       Q.   Did you contact Hardy Aviation Insurance  10       Q.   Did anyone from Hardy Aviation Insurance ever
11   after you learned --                           11   tell you that you had coverage for turbine transition
12       A.   Yes.                                  12   training with the AT-305?
13       Q.   -- of the crash?  And who did you talk to?  13       A.   No.
14       A.   Angie.                                14       Q.   Do you know Frank Kimmel?
15       Q.   And what did you say to her and what did she  15       A.   Yes.
16   say to you?                                    16       Q.   Have you ever had any discussions with him
17       A.   I told her that the 503 had went down and  17   regarding insurance coverage for the AT-305?
18   that there were fatalities.                    18       A.   No.
19       Q.   Did you have any other -- strike that.  19       Q.   Were there ever times in your -- the
20            What did Angie say?                   20   operation of the business that -- where you thought that
21       A.   I don't recall.                       21   Scott, your husband Scott, had taken care of something
22       Q.   Did you have any other contact with Hardy  22   and he hadn't in running the business?
23   Aviation Insurance after that regarding the crash?  23       A.   Ask me that again.
```

26

1  MS. BARON: Could you read it back?
2  (Whereupon the question was read.)
3  MR. MUELLER: Objection; overbroad and
4  irrelevant.
5  MS. BARON: You can answer.
6  MR. MUELLER: You may answer.
7  A. Yeah.
8  Q. (Ms. Baron continuing.) Okay.
9  A. Yes.
10 Q. Have you had -- strike that.
11    Prior to the loss did you have any
12 conversations with anyone from Hardy Aviation Insurance
13 regarding coverage for the AT-305?
14 A. Not to my knowledge.
15 MS. BARON: Okay. I think that's all I have.
16 MR. BANOVETZ: I don't have anything.
17 Thanks.
18
19
20
21    FURTHER DEPONENT SAYETH NOT;
22    SIGNATURE RESERVED.
23

28

1  In testimony thereof, I have hereunto set my
2  hand this 28th day of February, 2005.
3
4
5
6
7
8  _____ CSR
9  NOTARY PUBLIC
10
11
12
13 Illinois CSR License No. 084-001542.

27

1  STATE OF ILLINOIS   )
2                      )
3  COUNTY OF PEORIA    )
4
5     I, LAURA J. AMBERG, C.S.R., do hereby certify
6  that heretofore, to-wit, on the 22nd day of February,
7  2005, at the hour of 12:50 p.m., personally appeared
8  before me at 416 Main Street in the City of Peoria,
9  County of Peoria, State of Illinois, SARAH PETERSEN.
10    I further certify that the said witness was
11 by me first duly sworn to testify to the truth, the whole
12 truth and nothing but the truth in the cause aforesaid,
13 that the testimony then given by said witness was
14 reported stenographically by me in the presence of said
15 witness and afterwards reduced to typewriting, and the
16 foregoing is a true and correct transcript of the
17 testimony so given by said witness as aforesaid.
18    I further certify that the signature of the
19 witness to the deposition was RESERVED by agreement of
20 counsel.
21    I further certify that I am not counsel for nor
22 in any way related to any of the parties to this suit,
23 nor am I in any way interested in the outcome thereof.