**E-FILED**
Friday, 01 September, 2006  02:36:08 PM
Clerk, U.S. District Court, ILCD

<u>**THIRD PARTY DEFENDANT'S
EXHIBIT NO. 10**</u>

Page 61

[1] in the context of transition turbine training
[2] in support of the aerial application of seeds
[3] and chemicals?
[4] MS. BARON: I'm going to object to
[5] the form of the question. What do you
[6] mean has he defined it? Defined it where?
[7] MR. MUELLER: I'm asking him if he
[8] ever has, and then I will show him if he
[9] has any doubts in that regard.
[10] MS. BARON: Same objection. You can
[11] answer if you understand the question.
[12] A: I don't understand the question. I'm sorry.
[13]     BY MR. MUELLER:
[14] Q: Have you ever agreed that Harold Miller was
[15] using the Air Tractor in question for
[16] transition turbine training in support of the
[17] aerial application of seeds and chemicals?
[18] MS. BARON: Object to the form of the
[19] question. Agreed with who? Agreed with
[20] what. I think it's vague. If you
[21] understand it, you can answer.
[22] A: Again, I'm sorry, but I do understand that
[23] Harold Miller used the airplane in his business
[24] training other pilots by virtue of
[25] transitioning training into the Air Tractor

Page 62

[1] 503. The rest of the question is too broad and
[2] I won't respond to that.
[3]     BY MR. MUELLER:
[4] Q: Well, let's back it up just a little bit before
[5] we hit the nail on the head more squarely.
[6] Would you agree that Harold Miller was
[7] providing transition turbine training so that
[8] pilots receiving the training could apply seeds
[9] and chemicals agriculturally?
[10] A: Yes. In that regard, yes.
[11] Q: And would you agree that in receiving that
[12] training, that was then in support of the
[13] aerial application of seeds and chemicals by
[14] the pilots that were receiving it?
[15] A: His method and his training facility in that
[16] context was supporting the aerial application
[17] business.
[18] Q: So then would you agree that the plane, the Air
[19] Tractor was used by Harold Miller for
[20] transition turbine training in support of the
[21] aerial application of seeds and chemicals?
[22] A: In the definition of Harold Miller's business
[23] and what he was using the airplane for, that
[24] terminology would be correct.
[25] Q: And that would be consistent with —

Page 63

[1] MR. MUELLER: And. Counsel, if you
[2] would get Exhibits B and C and
[3] specifically paragraph nine in each.
[4]     BY MR. MUELLER:
[5] Q: You recall earlier, do you not, Randy, when you
[6] looked at Exhibits B and C and I asked whether
[7] they were true and correct?
[8] A: Yes.
[9] Q: And let me ask you as to Exhibits B and C
[10] whether the following appears paragraph nine on
[11] each. During the times that the Air Tractor
[12] was insured under policies which were procured
[13] by Hardy, the third party defendant, that's
[14] Hardy, knew that the plane contained two seats
[15] and was used intraaerially, which means among
[16] others, by Miller for transition turbine
[17] training in support of the aerial application
[18] of seeds and chemicals. And your answer was
[19] Hardy admits the admissions of paragraph nine.
[20] A: Yes.
[21] Q: When did you first learn that Scott and Sarah
[22] were purchasing any of Harold Miller's assets?
[23] MS. BARON: Should he refer to his
[24] file if that helps?
[25] MR. MUELLER: Sure.

Page 64

[1]     BY MR. MUELLER:
[2] Q: As a matter of fact, I'll tell you what. You
[3] can refer to Exhibit E — I would prefer if you
[4] would refer to Exhibit E which is what you have
[5] provided us in discovery because I have stamped
[6] page numbers on it and we can refer to the page
[7] numbers which each of us have. Do you have
[8] something else with you that you would refer
[9] to?
[10] A: Just notes that I made.
[11]     (Marked for identification
[12] Deposition Exhibit F.)
[13]     BY MR. MUELLER:
[14] Q: Going back on the record, do you recall the
[15] question?
[16] A: No.
[17] Q: It was when did you first learn that Scott and
[18] Sarah were thinking about purchasing some of
[19] the assets of Harold Miller's business?
[20] A: Just as a point of clarification, my assistant,
[21] Angie Banz, who is also a licensed agent
[22] handled and has handled 90 percent of the
[23] transactions between Scott and Sarah, so what
[24] I'm giving you information to is what I'm
[25] reading in the policy. She received all the

National Union Fire Company v. Page 3 of 23
Pontiac Flying Services, Inc.

1:03-cv-01288-JBM-BGC  # 109-12

JAMES RANDALL HARD
July 15, 200

Page 65

[1] phone calls and first learned, so my saying
[2] that I first learned is not an accurate
[3] statement.
[4] Q: Just so that we get this clarified, did you
[5] yourself play any role in getting coverage for
[6] Scott and Sarah —
[7] A: Yes.
[8] Q: — regarding the Air Tractor which is the
[9] subject of this lawsuit at the time that they
[10] purchased it from Harold Miller?
[11] A: I believe so.
[12] Q: Therefore, you would have had some personal
[13] knowledge yourself as opposed to what may
[14] appear from Angie Banz's records that they were
[15] doing that; correct?
[16] A: Limited knowledge, yes.
[17] Q: And when did you yourself first become involved
[18] in that transaction?
[19] A: I don't recall.
[20] Q: Do you recall when the policy providing
[21] coverage for the Air Tractor was bound?
[22] A: Looking over the notes in the policy I can tell
[23] you, yes.
[24] Q: When was that?
[25] A: When it was bound?

Page 66

[1] Q: Yes.
[2] A: On 3-1 per my notes.
[3] Q: I would ask —
[4] A: The 503 was purchased and we requested to the
[5] MGA, AIG, that coverage be added on that
[6] aircraft and they responded.
[7] Q: I would direct your attention to Page 51 of
[8] Exhibit E. Does that confirm your
[9] understanding in the matter?
[10] A: Yes.
[11] Q: So it is your testimony that coverage was added
[12] for the Air Tractor effective March 1, 2002,
[13] which was the same day they obtained the plane.
[14] A: I can testify that coverage was added to the
[15] policy for that airplane. What date they
[16] physically took the airplane, I don't know.
[17] Q: But in any event, there was coverage for that
[18] airplane as of March 1, 2002.
[19] A: The way I understand it, yes.
[20] Q: And what was your involvement, as you recall
[21] it, in obtaining that coverage?
[22] A: I'm sorry. Say it again.
[23] Q: Let me go back and ask it this way. The
[24] coverage was bound by AIG?
[25] A: All coverages are bound by the insurance

Page 6

[1] company, not us.
[2] Q: That would be Mary Beth Schwaegel?
[3] A: Yes, or her representative.
[4] Q: Did you have any discussions yourself with Mary
[5] Beth Schwaegel or her representative regarding
[6] coverage for that plane as of the effective
[7] date March 1, 2002?
[8] A: You'll have to let me look at the paperwork
[9] here for a second. The answer to your question
[10] would be I assisted — I can't recall how much
[11] assistance I gave to Angie to procure the
[12] original addition of this airplane to the
[13] policy, period.
[14] Q: Take a look at Exhibit D as in dog. What I
[15] want to do is to fix the time frame. We know
[16] that the coverage was bound effective March 1,
[17] 2002. Would you agree that the first efforts
[18] at obtaining coverage were in February,
[19] specifically February 8th of 2002?
[20] A: Per the notes in the file, yes.
[21] Q: So if we're encapsulating the period when you
[22] would have been involved on the initial
[23] coverage for that plane, it would be between
[24] February 8th, 2002, and March 1, 2002;
[25] correct?

Page 68

[1] A: If I had any involvement, correct.
[2] Q: And is it your testimony that you can recall no
[3] specific contacts between you, Randy Hardy, and
[4] Mary Beth Schwaegel or anyone working with her
[5] regarding that coverage?
[6] A: I don't recall. State the question again, I'm
[7] sorry.
[8] Q: Your answer was that you don't recall and my
[9] question was is it true that you don't recall
[10] so I guess the answer is yes, so let me ask it
[11] coming at it from the other side. Is it true
[12] that you don't recall any contacts with either
[13] Scott or Sarah Petersen regarding coverage for
[14] that plane between February 8th, 2002, and
[15] March 1, 2002?
[16] A: Correct. Yes.
[17] Q: So there may have been contacts but you don't
[18] recall what they were.
[19] A: Correct.
[20] Q: And that's true both ways, either with Mary
[21] Beth Schwaegel or with Scott and Sarah
[22] Petersen.
[23] A: Correct.
[24] Q: I have been curious as to the policy periods
[25] that are involved. When this plane was added

Page 69

[1] to the policy effective March 1, 2002, what
[2] policy was that?
[3]   A: It would have been the —
[4]   Q: What I would like for you to do when I say what
[5] policy was that, give me the carrier, the
[6] policy number and the policy period.
[7]   MS. BARON: And if you need to refer
[8] to your own file to do that, please do so.
[9]   MR. MUELLER: He's got his file.
[10]   A: On the Policy AV 3391999-03.
[11]          BY MR. MUELLER:
[12]   Q: That was the policy?
[13]   A: The endorsement number ten effective March 1,
[14] 2002, the Air Tractor 503 was added to the
[15] policy.
[16]   Q: You're referring to what page number on
[17] Exhibit E?
[18]   A: Page number 41.
[19]   Q: And the policy period?
[20]   A: The policy period of that policy is April 10,
[21] 2001, to April 10, 2002.
[22]   Q: So it would have been — that policy would have
[23] been up for renewal then as of April 10, 2002,
[24] for a policy period April 10, 2002, to
[25] April 10, 2003?

Page 70

[1]   A: It would have been, yes.
[2]   Q: And was the policy renewed?
[3]   A: I had limited involvement in this, but as per
[4] my notes —
[5]   Q: Let the record show he's referring to Exhibit F
[6] which are his typed notes.
[7]   A: The policy was moved to USAIG for the same
[8] period of time. The policy was moved to USAIG
[9] April 10, 2002 — coverage was moved, not the
[10] policy. The coverage was moved to USAIG, a
[11] different carrier.
[12]   Q: And did USAIG — does USAIG have anything to do
[13] with the plaintiff in this case, National Union
[14] Fire Insurance Company of Pittsburgh?
[15]   A: No.
[16]   Q: Were you dealing with Mary Beth Schwaegel at
[17] that time?
[18]   A: No.
[19]   Q: Do you have a copy in your file which you
[20] provided us, being Exhibit E, of the USAIG
[21] policy?
[22]   A: No.
[23]   Q: Well, at some point in time, would you agree
[24] then that the coverage went back to AIG?
[25]   A: Yes.

Page 71

[1]   Q: And when would that have been? I take it that
[2] would have been April 10th of 2003 thereafter?
[3]   A: No. We replaced the coverage from USAIG back
[4] to AIG May 19th, 2002.
[5]       (Discussion held off the record.)
[6]          BY MR. MUELLER:
[7]   Q: Why was the coverage switched in the first
[8] instance from an AIG policy to a USAIG policy
[9] and when did that take place?
[10]   A: Are we back on the record?
[11]   Q: We're back on the record?
[12]   A: The renewal of the policy for 4-10 of — the
[13] renewal policy for 4-10-2002 we had procured a
[14] better quote through USAIG which is a separate
[15] carrier saving our client money.
[16]   Q: So you got a policy for what period from USAIG?
[17]   A: We bound the policy with USAIG from 4-10 to
[18] 5-19 of '02, putting the coverage back with AIG
[19] because our client was requiring the ability to
[20] do gypsy moth contracts which requires
[21] coverages that USAIG was unable to provide, so
[22] we had to cancel the USAIG policy and put it
[23] back with AIG as of 4-19-02.
[24]   Q: Exhibit A that you have before you then is the
[25] AIG policy that you're referring to that ran

Page 72

[1] for the policy period May 19, 2002, to May 19,
[2] 2003, that took the place of the USAIG policy.
[3]   A: Yes.
[4]   MS. BARON: Just for clarification,
[5] it is a National Union policy. It's not
[6] an AIG policy.
[7]   MR. MUELLER: Well, I think we've
[8] gotten the clarification here that he
[9] deals with AIG on it, and I don't want to
[10] go there and spend all the time mucking
[11] that swamp out.
[12]   MS. BARON: We're glad.
[13]   MR. MUELLER: Which not in the
[14] deposition, but if at some point in time
[15] it becomes an issue, then we're going to
[16] put on our alligator boots and go down
[17] there and pump the swamp out.
[18]   MS. BARON: That's fine.
[19]          BY MR. MUELLER:
[20]   Q: Is the policy which is Exhibit A the same
[21] policy that the Petersens and Pontiac Flying
[22] had with AIG for the policy period that ended
[23] April the 10th?
[24]   MS. BARON: Of what year? Object to
[25] the form of the question.

1:03-cv-... National Union Fire Company v. Page 5 of 23
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 200-

Page 73

BY MR. MUELLER:

[2] Q: Of 2002. In other words, are we looking at the
[3] same policy, that this is simply a renewal of
[4] the old policy?

[5] A: Yes.

[6] Q: So are the coverages and endorsements and
[7] policy provisions the same with the exception
[8] of the premiums on the declarations page and
[9] the policy period?

[10] A: No.

[11] Q: What changes are there between the two
[12] policies?

[13] A: The beginning of the policy April 10, 2001/2002
[14] did not have the Air Tractor 503. It was later
[15] endorsed onto that policy.

[16] Q: So we had a separate endorsement for the Air
[17] Tractor which is now included on the
[18] declarations page of the May 19th policy —

[19] A: Yes.

[20] Q: — correct? Any other changes?

[21] MS. BARON: Do you want him to put
[22] the policies side by side and go through
[23] them word for word?

BY MR. MUELLER:

[25] Q: Not word for word, but I want to know of any

Page 74

[1] significant changes.

[2] MS. BARON: If you know.

[3] A: Significant changes, I don't believe so. There
[4] could have been some endorsements differently
[5] due to activity required. I don't know.

BY MR. MUELLER:

[7] Q: Well, do you have both policies here because I
[8] don't want to be surprised later when I don't
[9] have the chance to ask the question. You can
[10] make a brief comparison between the two for us.

[11] A: I don't have the full April 10th policy but
[12] I'll do the best I can.

[13] Q: Let me limit my question also to try to
[14] short-circuit this, any changes that related to
[15] the Air Tractor other than what you've
[16] described?

[17] A: The Air Tractor upon being endorsed to the
[18] policy April 10 was added for the purposes of
[19] aerial application application. That
[20] endorsement or the conditions of the
[21] endorsement was that Scott Petersen would fly
[22] the aircraft — let me strike that if I could
[23] and back up. I don't have anything to define
[24] that.

[25] Q: I want the policy forms, the endorsements, the

Page 75

[1] language in the policy itself, the document.

[2] A: The Air Tractor 503 was added to the policy
[3] wherein the May 19th policy, 2002, ending up
[4] with a dash 04 on the policy number, the Air
[5] Tractor was a part of the policy at the
[6] beginning of the policy.

[7] Q: On the declarations page.

[8] A: Correct. That's the difference.

[9] Q: So it would be your testimony that whatever
[10] coverage there was within the four corners of
[11] that policy as of April 10, 2002, carried
[12] forward into the policy which is Exhibit A
[13] starting May 19th, 2002.

[14] A: No.

[15] Q: Where then is the contract different or are the
[16] forms different?

[17] A: April 10, 2002, policy was a USAIG policy.

[18] Q: I'm saying the last AIG policy that ended as of
[19] April 10th, between those two what would your
[20] answer be?

[21] A: To my knowledge, those are similar in policy.

[22] Q: As you sit here today, can you think of any
[23] differences between them other than those
[24] you've already described?

[25] A: I don't recall any differences, no.

Page 76

[1] Q: Is your testimony now the gypsy moth coverage
[2] was added to Exhibit A which had not existed in
[3] the policy which ended on April 9th of 2002;
[4] is that correct?

[5] A: I don't recall if it was in the earlier policy,
[6] but it would be a definite addition to if not
[7] already there in the May 19th, 2002, policy.

[8] Q: Does that now encompass all of the changes that
[9] you're aware of?

[10] A: That I'm aware of at this time.

[11] Q: And that's your aware of at this time based
[12] upon having reviewed the file that you have
[13] with you today.

[14] A: Yes.

[15] Q: When did you first become aware that Scott and
[16] Sarah Petersen were using the Air Tractor for
[17] transition turbine training?

[18] A: I never had direct conversations with Scott or
[19] Sarah regarding transition training that they
[20] are providing with the Air Tractor 503.
[21] However, the day of the loss I was reading a
[22] trade publication magazine and in that
[23] publication was a comment to the editor looking
[24] for transitioning training. He had indicated
[25] that he had heard that Pontiac Flying Service

[1] was going to provide that. That same day I
[2] took that trade publication back to my
[3] assistant, Angie, who had just hung up on the
[4] phone with our client Scott or Sarah Petersen
[5] indicating that she had had the loss that
[6] morning.

[7] **Q:** So making a long story short since I asked for
[8] the date, it was May 5th of 2003; correct?

[9] **A:** The loss occurred 5-5-2003, yes, and that was
[10] when I was aware of the possibility that they
[11] were using this airplane for that training.

[12] **Q:** So prior to that time you were not aware of
[13] that.

[14] **A:** No.

[15] **Q:** When do you become involved in the renewal of
[16] policies?

[17] **A:** Depends on the —

[18] **Q:** By you I'm referring to the agency.

[19] **A:** The agency we generally try and get involved —
[20] with every agency things will vary depending on
[21] weekends, days and things of that nature, but
[22] generally 120 days out we start the renewal
[23] process.

[24] **Q:** And as I understand your role or relationship
[25] to your clients, you want to find out in their

[1] operations in setting up for a renewal what it
[2] is that they're doing and what they need
[3] coverage for, in other words, monitoring their
[4] businesses.

[5] **A:** Yes, and upon renewal seeking information that
[6] might have changed.

[7] **Q:** So when you're going to them for renewal, you
[8] want to get an update on their business so you
[9] can counsel with them and advise them as to
[10] what coverages they should have.

[11] **A:** We get an update based on what they tell us
[12] alone.

[13] **Q:** If you knew as of the time that you were
[14] setting up for renewal — and you said how many
[15] days, 120?

[16] **A:** Generally.

[17] **Q:** So if this is May 19th would be the date
[18] you've got to replace that policy, we go back
[19] April, March, February, January. So the
[20] renewal process would start in approximately
[21] January for that policy?

[22] **A:** In our notes, January 30th of '03 the renewal
[23] update was sent to the insured which we clearly
[24] marked the airplanes were for ag uses only.

[25] **Q:** And if you had known that they were using the

[1] plane for turbine transition training, is that
[2] something that you would have brought to their
[3] attention regarding coverage for that use?

[4] **A:** Yes.

[5] **Q:** And would that be a part of the monitoring
[6] responsibility that you have?

[7] **A:** Yes.

[8] **Q:** So it is your testimony that you didn't know
[9] that they were using it for transition training
[10] and that, therefore, didn't bring it to their
[11] attention prior to May 5th of 2003?

[12] **A:** Yes.

[13] **Q:** What publication was it that you were reading?

[14] **A:** It's called the Ag Air Update.

[15] **Q:** What is that publication?

[16] **A:** It's a newspaper that's published by a
[17] gentleman out of Georgia that just does a
[18] general publication for ag pilots and ag
[19] operations. He publishes it monthly.

[20] **Q:** And is that something that you subscribe to?

[21] **A:** I get it because I'm an advertiser.

[22] **Q:** So you put ads in that?

[23] **A:** Yes.

[24] **Q:** And were you putting ads in that magazine back
[25] in 2002?

[1] **A:** Yes.

[2] **Q:** How frequently would you have an ad in the
[3] magazine?

[4] **A:** Every month.

[5] **Q:** Would you then read the magazine on a monthly
[6] basis and see your ad?

[7] **A:** Not in total, but I read bits and pieces of it,
[8] yes.

[9] **Q:** I take it you would certainly look for your ad
[10] to make sure they put it in there, wouldn't
[11] you?

[12] **A:** Yes. Can I extend that comment?

[13] **Q:** Not at the moment. If you want to, your
[14] counsel can bring it out. Now I have a couple
[15] of issues here. For instance, is this one of
[16] the Ag Air Updates? Is that the magazine or
[17] paper that you're referring to?

[18] **A:** Yes.

[19] **Q:** And which volume and issue is that?

[20] **A:** This is the November 27th issue, 2002.

[21] **Q:** And does that have something on it, a
[22] post-it —

[23] **A:** Yes, it does.

[24] **Q:** — on the cover? And what does that post-it
[25] say?

Page 81

[1] **A:** PFS ad 7A.

[2] **Q:** Let's turn to 7A and what do we have?

[3] **A:** We have a turbine transition ad by Pontiac
[4] Flying Service.

[5] **Q:** This is the same magazine that you've referred
[6] to in which you advertise?

[7] **A:** Yes.

[8] **Q:** Is it your testimony then that you didn't read
[9] that issue?

[10] **A:** I didn't see that issue. I didn't see that ad.
[11] That is my testimony.

[12] **Q:** Now I will show you —

[13] **MR. BANOVETZ:** What's the date on
[14] that one?

[15] **A:** 27 November, 2002.

[16] **BY MR. MUELLER:**

[17] **Q:** Do you have an ad in there as well?

[18] **A:** I do.

[19] **Q:** And you're proud of that add?

[20] **A:** Do I have to answer that?

[21] **Q:** No. At what page is your ad?

[22] **A:** 16A.

[23] **Q:** And what page is the Petersen ad?

[24] **A:** 7A.

[25] **Q:** Now I'll show you another issue of Ag Air

Page 82

[1] update. What is the publication date on that
[2] one?

[3] **A:** April, 2003.

[4] **Q:** And is that the same magazine that you review?

[5] **A:** Yes.

[6] **Q:** Is that the same magazine that you have ads in?

[7] **A:** Yes.

[8] (Marked for identification
[9] Deposition Exhibit G.)

[10] **BY MR. MUELLER:**

[11] **Q:** Randy, I'll show you Exhibit G. I'm going to
[12] short-circuit this. Is that a copy of your ad
[13] from the magazine?

[14] **A:** Yes.

[15] **Q:** And that's the April, 2003, volume?

[16] **A:** Yes.

[17] (Marked for identification
[18] Deposition Exhibit G-1.)

[19] **BY MR. MUELLER:**

[20] **Q:** On Page 3A, and I'm referring you to
[21] Exhibit G-1, what do we have?

[22] **A:** We have a lot of advertisement and some script
[23] on the next page.

[24] **Q:** And is among the advertisements on Page 3A
[25] directly opposite your ad one for turbine

Page 8

[1] transition training for Pontiac Flying Service?

[2] **A:** Yes.

[3] **Q:** And is it your testimony then that you never
[4] read this Ag Air Update either?

[5] **A:** I have no idea.

[6] **Q:** Well, if you read the Ag Air Update April,
[7] 2003, would you agree that in opening the
[8] magazine up you would have on your right-hand
[9] side the turbine transition training ad of
[10] Pontiac Flying Service and directly opposite
[11] that your own ad for Hardy Insurance on the
[12] left-hand side?

[13] **A:** Is your question if I read it?

[14] **Q:** No. My question is if you opened it up
[15] assuming that you read it, you would have
[16] before you on the right-hand side the
[17] Petersens' ad and directly opposite that on the
[18] left-hand side your ad; correct?

[19] **MS. BARON:** Object to the for him of
[20] the question. Directly opposite? That's
[21] vague.

[22] **BY MR. MUELLER:**

[23] **Q:** Tell you what I'm going to do. I'm going to
[24] take a straight edge here and run it across
[25] from the Hardy — from the Petersen ad on the

Page 84

[1] right-hand side to the Hardy ad on the
[2] left-hand side. Would you agree that they're
[3] directly opposite each other?

[4] **MS. BARON:** On different pages.

[5] **BY MR. MUELLER:**

[6] **Q:** On different pages.

[7] **A:** Would I agree to that, yes. Eleven inches to
[8] be exact.

[9] **Q:** Is it still your testimony as you sit here
[10] today that while you were getting this policy
[11] ready for renewal you did not know that the
[12] Petersens were using this plane for turbine
[13] transition training?

[14] **A:** That is true.

[15] **Q:** Did you ever become aware of the fact that
[16] Scott and Sarah Petersen believed that they had
[17] coverage for the turbine transition training
[18] before the accident?

[19] **A:** Restate the question, please.

[20] **MR. MUELLER:** Want to read it back?

[21] (At this time the reporter read
[22] the pending question.)

[23] **A:** No.

[24] **BY MR. MUELLER:**

[25] **Q:** Did you ever become aware after the accident

Page 85

[1] that Scott and Sarah Petersen believed that
[2] they had turbine transition training throughout
[3] the time that they owned the Air Tractor?
[4]    A: No.
[5]    Q: How did you find out that the accident had
[6] occurred?
[7]    A: They called our office.
[8]    Q: By they, who are you referring to?
[9]    A: I believe Sarah called Angie.
[10]    Q: And reported the accident?
[11]    A: Yes.
[12]    Q: And did you then report the accident back to
[13] AIG?
[14]    A: Yes.
[15]    Q: And to whom did you report the accident?
[16]    A: When you are saying did I report, you mean our
[17] office.
[18]    Q: Your office.
[19]    A: On 5-5 of '03 Angie by virtue of her
[20] handwriting took the call from Sarah that Rick
[21] and a turbine student crashed and totalled this
[22] afternoon just outside of Pontiac. Rick and
[23] his passenger were killed. The aircraft was
[24] probably totalled.
[25]    Q: You're referring to what page, 119?

Page 86

[1]    A: 119.
[2]    Q: And my question dealt with notifying AIG.
[3]    MR. BANOVETZ: Page 121?
[4]    MR. MUELLER: That's a hint.
[5]    Counsel, please don't tip the witness.
[6]    A: No, that's not the original.
[7]    BY MR. MUELLER:
[8]    Q: I'm not looking for the original. Let's focus
[9] on page 121. I was assuming we would get
[10] there. Did you yourself communicate by e-mail
[11] with Mary Beth Schwaegel regarding the
[12] accident?
[13]    A: Yes.
[14]    Q: And was that on May 6, the day after?
[15]    A: It is.
[16]    Q: Does that communication appear on pages 121 and
[17] 122 and 123 of Exhibit E?
[18]    MS. BARON: I just want to interject.
[19] Your question was when he first notified
[20] them of the loss and he has now found the
[21] document that responds to that question.
[22]    A: Page 127. The initial loss report was sent to
[23] the company, the company being AIG, page 107
[24] and the report is dated loss report.
[25]    BY MR. MUELLER:

Page 87

[1]    Q: And when was it sent?
[2]    A: Same date.
[3]    Q: And was that sent by ordinary mail or was that
[4] faxed?
[5]    A: We fax.
[6]    Q: Now we'll get to pages 121 to 123. After that
[7] communication, did you receive a response, and
[8] I'm talking about you Randy, in particular from
[9] Mary Beth Schwaegel?
[10]    A: 121, 122.
[11]    Q: And 123.
[12]    A: 123 I think is the same thing just all in one
[13] page.
[14]    Q: It is.
[15]    A: But 121 gives the dates.
[16]    Q: Let's work with 121, 122, okay?
[17]    A: After this communique that I sent to Mary Beth,
[18] I don't recall any conversation — if I had a
[19] conversation I don't recall what it was and I
[20] do not believe I had any response via e-mail
[21] responding back on this.
[22]    Q: Well, looking at 121, is that an e-mail to
[23] Randy, being you, from Mary Beth Schwaegel at
[24] the top dated Tuesday, May 6, 2003?
[25]    A: Yes, it is.

Page 88

[1]    Q: And I take it from that her reaction or AIG's
[2] reaction was to cancel the policy.
[3]    A: Yes, you're correct. I now see that. She did
[4] respond on the next day that they're going to
[5] non-renew the risk.
[6]    Q: Then you responded back to her by e-mail.
[7]    A: No.
[8]    Q: From Randy to Mary Schwaegel at AIG dot com?
[9]    A: My initial conversation to her was at 2:40 on
[10] May 6 on this form and she responded to me on
[11] May 6 at 4:43 p.m.
[12]    Q: So at the bottom of the form chronologically is
[13] an e-mail from you to her at 2:40 p.m. on May
[14] the 6th.
[15]    A: Correct.
[16]    Q: You had notified her of the loss previously.
[17]    A: The day before.
[18]    Q: Yes.
[19]    A: We had notified AIG. Whether it went to her or
[20] the claims department, I do not know. I'm
[21] assuming that she was made aware of it.
[22]    Q: I want to spend a little bit of time on pages
[23] 121 and 122.
[24]    A: I figured you would.
[25]    Q: You got me right. Is this something that you

1:03-cv-... National Union Fire Company v. Page 9 of 23
Pontiac Flying Services, Inc.

JAMES RANDALL HARD
July 15, 200

Page 89

[1] typed yourself?

[2]   A: Yes.

[3]   Q: And were these your — was this a sincere
[4] expression of your understanding of the events
[5] that had taken place as of May 6, 2003?

[6]   A: It was my attempt to put as best a light on a
[7] bad situation to the underwriter because I knew
[8] that there was going to be a problem based on
[9] our knowledge of what was in the policy at the
[10] time of the loss as my attempt to act as an
[11] agent for my client to try and get the company
[12] to work with us on paying the loss.

[13]   Q: And also a sincere expression of your
[14] understanding of the events that led to May 6,
[15] 2003; correct?

[16]   A: Well, I don't understand the sincere but —

[17]   Q: Well, your understanding of the events that led
[18] to May 6, 2003.

[19]   A: Yes.

[20]   Q: And it starts out, we're going to take this
[21] piece by piece: Well, as in the movie,
[22] Houston, we have a problem. You're referring
[23] to Apollo 14?

[24]   A: Thirteen.

[25]   Q: Thirteen. Thank you.

Page 90

[1]   A: I have a bad sense of humor.

[2]   Q: It's understandable. When you say we have a
[3] problem, the "we" is a collective pronoun,
[4] you're referring to yourself and to AIG?

[5]   A: No, I'm referring to my client in that verbiage
[6] that we being my client and assuming that would
[7] include us if there was any question as to
[8] coverage.

[9]   Q: Is it your testimony you were not including
[10] Mary Beth Schwaegel and AIG as part of the we?

[11]   A: Any time you have a loss that involves the
[12] death of two people, we, meaning all parties
[13] involved, it's always a problem. But in the
[14] text of what you're trying to say, I think, I
[15] would not include AIG in that statement, no.

[16]   Q: And the next sentence: Yesterday we turned in
[17] a loss for Pontiac Flying Service on their
[18] AT503 which you've testified to.

[19]   A: Yes.

[20]   Q: Then you go on: At the time we were unaware of
[21] the use during the loss. Is it your testimony
[22] that you were unaware what they were doing with
[23] the plane that day or is it your testimony that
[24] you were unaware that they had ever been using
[25] that plane for turbine transition training in

Page 9

[1] direct support of aerial application?

[2]   A: At the time that the loss was turned in, which
[3] was the day before, we were unaware of any use
[4] of that airplane being for turbine transition
[5] training or training of any kind.

[6]   Q: I'll ask you are you the only one in your
[7] office that reads the Ag Air Update?

[8]   A: Different people may appear to look at it from
[9] time to time, but I don't know to the extent of
[10] what they read on the periodicals.

[11]   Q: It's available in the office, in any event, for
[12] them to read.

[13]   A: If I give them a copy.

[14]   Q: So it comes to you directly?

[15]   A: Yes.

[16]   Q: And do you ever hold it out from them?

[17]   A: Holding out would be the improper term but do I
[18] ever —

[19]   Q: Do you ever make it unavailable to them?

[20]   A: Make it unavailable, no.

[21]   Q: In fact, the Ag Air Update is somewhat the
[22] Bible of what's going on in the aerial
[23] application or agricultural application, is it
[24] not?

[25]   A: No.

Page 92

[1]   Q: What other publication is?

[2]   A: The National Agricultural Aviation Association
[3] publishes a bi-monthly magazine which I also
[4] advertise in.

[5]   Q: Who in your office is responsible for the
[6] advertising?

[7]   A: I am responsible for seeking the advertising.
[8] I usually have my bookkeeper handle the
[9] details.

[10]   Q: Do you use an advertising agency or do you
[11] advertise directly with Ag Air Update?

[12]   A: I have an advertising specialist that procures
[13] and puts together my ads and depending on
[14] the — quite honestly the time frame it's going
[15] to take whether I feel like it or not, either
[16] have him send it directly or I do it myself.

[17]   Q: Who has the responsibility of verifying that
[18] the ads whether they're in Ag Air Update or
[19] whether they're in the other publication are
[20] actually being printed?

[21]   A: No one. No one has responsibility.

[22]   Q: So you could be getting took and you wouldn't
[23] know it.

[24]   A: Could be. We try to look at every one of them
[25] but don't know if we do or not.

National Union Fire Company    v.
Pontiac Flying Services, Inc.

Page 93

[1]    Q: Going on with page 121: It now appears the
[2] aircraft was being used for turbine transition
[3] training, thus the reason for an additional
[4] person being on board. You were aware as you
[5] have testified prior to this time that it was a
[6] dual cockpit; correct?
[7]    A: Yes.
[8]    Q: And that it had been used for turbine
[9] transition training in direct support of aerial
[10] application by Harold Miller before; correct?
[11]    A: Yes.
[12]    Q: Did you ever tell Scott Petersen that he was
[13] not covered for turbine transition training in
[14] that plane? Did you ever tell him that?
[15]    A: Yes.
[16]    Q: And when did that conversation take place?
[17]    A: It would vary, but my recollection of all of
[18] our paperwork clearly states for ag use only,
[19] and whether or not I have had conversations
[20] with him I don't recall, but there have been —
[21] prior to this loss there was a request for
[22] training on a different airplane which we
[23] sought coverage for and were able finally to
[24] get after a period of time only because when he
[25] originally called during the policy period

Page 94

[1] after he bought the 503 he did not have enough
[2] time to be considered someone that would be
[3] able to train and our records will show that
[4] originally the companies — all companies
[5] denied coverage for training in a separate
[6] aircraft only to continue working with the
[7] underwriter to finally get her to agree to it
[8] after he had some more time. So conversations
[9] about training had taken place throughout the
[10] policy period and I'm sure — not having
[11] anything in front of me, I'm sure that the
[12] conversation came up that we don't have
[13] training at this time, we don't have training
[14] in anything and he knew that.
[15]    Q: When I'm dealing with conversations, as I
[16] understand it, you recall no specific
[17] conversations with Scott Petersen in which the
[18] term turbine transition training was used with
[19] respect to this plane prior to the accident; is
[20] that correct?
[21]    A: The ability to put that on paper and show it to
[22] you, no.
[23]    Q: Is what I'm saying correct, that you know of no
[24] conversations with him in which the term
[25] turbine transition training was used prior to

Page 95

[1] the accident?
[2]    A: I'm sorry. Part of your question I understood
[3] but the second part say again, please.
[4]    Q: Is it true that you recall no conversations
[5] with Scott Petersen in which the term turbine
[6] transition training was used prior to the
[7] accident?
[8]    A: No, that's not true because I don't recall
[9] whether we discussed it or not in its form that
[10] you have indicated.
[11]    Q: That's a fairly straightforward question. Can
[12] you think of any conversations in which the
[13] term turbine transition training was used with
[14] Scott Petersen prior to this accident?
[15]    A: No.
[16]    Q: And would the same be true for Sarah Petersen?
[17]    A: I don't know. No, I don't know.
[18]    Q: Do you know of any conversations with Sarah
[19] Petersen?
[20]    A: Again, the conversations we had about
[21] transition training whether it be turbine or
[22] piston or just training in ag airplanes took
[23] place. The exact content of those
[24] conversations I can't testify to because I
[25] don't remember.

Page 96

[1]    Q: Now getting back to my question because I'm
[2] going to stay with it, the question used the
[3] term turbine transition training. We've gotten
[4] past that with Scott Petersen. My question is
[5] are you aware of any conversations with Sarah
[6] Petersen in which the term turbine transition
[7] training was used before the accident?
[8]    A: No.
[9]    Q: And you have testified previously that turbine
[10] transition is exactly that, that it is
[11] transitioning from a piston-driven plane to a
[12] turbine-driven plane for an aerial application.
[13]    A: Yes.
[14]    Q: And that instruction in aerial application is
[15] the instruction on how to fly the planes for
[16] the purpose of applying the chemical, seeds and
[17] fertilizers; correct?
[18]    A: Generally, yes.
[19]    Q: And having reviewed your file, would it be
[20] accurate to say that the subject of turbine
[21] transition training for this plane after it was
[22] acquired by Scott and Sarah Petersen does not
[23] appear before the accident?
[24]    A: Restate that again. I'm sorry.
[25]    Q: Does the term turbine transition training as it

Page 97

[1] relates to this plane appear in your file to
[2] your knowledge any place before the accident?
[3]   **A:** No.
[4]   **Q:** And you go on to say on page 121: I let it go
[5] yesterday and was able to speak with Sarah
[6] Petersen today. The I being yourself?
[7]   **A:** Yes.
[8]   **Q:** And had you known Scott or Sarah Petersen
[9] before?
[10]   **A:** Yes.
[11]   **Q:** And did you consider them nice people?
[12]   **A:** Yes.
[13]   **Q:** And in talking to Sarah Petersen that day on
[14] the 5th, she was devastated by this, wasn't
[15] she?
[16]   **A:** Yes.
[17]   **Q:** When you say you let it go, what did you have
[18] that you let go of?
[19]   **A:** I wasn't going to discuss coverages with her on
[20] the day of the accident because she was already
[21] upset.
[22]   **Q:** And so had you talked to Sarah Petersen
[23] yourself the day before when you said I let it
[24] go yesterday?
[25]   **A:** I don't recall.

Page 98

[1]   **Q:** Had you talked to Scott Petersen when you say I
[2] let it go?
[3]   **A:** When I say I let it go, I don't recall — I
[4] don't think I talked to either one of them that
[5] day. I think it was the next day. But when I
[6] say I let it go yesterday, I meant that I did
[7] not call them back to advise them that they had
[8] never called us or advised us to add transition
[9] training — turbine transition training to the
[10] policy, so I did not address it that day.
[11]   **Q:** She was concerned because one of the pilots
[12] wasn't named to the file which was this Rick
[13] Lucente who was killed. We indicated to her
[14] that when she called about using him, he met
[15] the OPW and did not need to be named. What
[16] does that mean? What's the OPW?
[17]   **A:** OPW is open pilot warranty. With various
[18] policies depending on how they write it, they
[19] can put what's called an open pilot warranty on
[20] the policy. If a pilot meets an open pilot
[21] requirement which maybe — and it varies from
[22] company to company, instead of physically
[23] naming each pilot on the policy, if they meet
[24] that requirement, we don't have to name them on
[25] the policy.

Page 9

[1]   **Q:** So in this conversation with Sarah Petersen,
[2] her concern as you understand it was that there
[3] might not be coverage because Rick Lucente was
[4] not specifically named.
[5]   **A:** I don't know what her concerns were.
[6]   **Q:** Was that your understanding —
[7]   **A:** I don't know.
[8]   **Q:** — when you typed in the words she was
[9] concerned because one of the pilots, Rick
[10] Lucente wasn't named? Does that refresh your
[11] recollection of her concern regarding the
[12] coverage?
[13]   **A:** Well, I'm not going to speak on behalf of
[14] Sarah, but my conversation led me to believe
[15] that they might be concerned that one of their
[16] pilots who wasn't named to the file, there
[17] might be a problem probably. I don't know. I
[18] indicated to her that since he met the open
[19] pilot warranty, naming him or not naming him
[20] did not matter. Whether I went on to explain
[21] that the use of the policy is what's the main
[22] issue, I don't know.
[23]   **Q:** Well, isn't that exactly what you did starting
[24] with the next sentence? It gave me the
[25] opportunity to ask her about the way she called

Page 100

[1] in the loss as training.
[2]   **A:** Yes.
[3]   **Q:** So you're getting into that.
[4]   **A:** Yeah.
[5]   **Q:** Now you previously testified that you didn't
[6] understand that the Petersens believed that
[7] they had coverage for transition turbine
[8] training before the accident. Do you recall
[9] that testimony?
[10]   **A:** Yes.
[11]   **Q:** The next sentence says: Much to her surprise,
[12] I had to break the news. So now in reading
[13] this, is it your understanding that the
[14] Petersens did in fact believe that they had
[15] coverage for that use?
[16]   **A:** Well, I can't testify to what they did or did
[17] not believe, but I was under the assumption
[18] that they thought they had coverage.
[19]   **Q:** And do you believe that Sarah Petersen was
[20] sincere in that conversation?
[21]   **A:** I think Sarah Petersen was hoping that she had
[22] coverage, not knowing whether she did or not.
[23]   **Q:** Well, do you believe that she was sincere in
[24] being surprised?
[25]   **A:** I don't know. I do not know. Can't testify to

Page 101

[1] her state at that time.

[2] Q: Well, was it your opinion at that time as it
[3] appears here, much to her surprise is your
[4] term, isn't it?

[5] A: That's my term.

[6] Q: And she didn't say much to my surprise, did
[7] she? That's your interpretation of the
[8] conversation, isn't it?

[9] A: Yeah. That is my interpretation, yes.

[10] Q: Then you go on to say: I had to break the news
[11] that we had never been given a request to add
[12] transition training to the file and we did not
[13] cover this aircraft for that use.

[14] A: Correct.

[15] Q: When you told her that, the next sentence says
[16] that they were very upset; would that be an
[17] accurate —

[18] A: Well, they're upset in general because of the
[19] accident, and I felt she was upset that there
[20] may not be coverage for that accident. That's
[21] why I said they may not be thinking straight.

[22] Q: It's a fact, is it not, and I'm directing your
[23] attention to Exhibit D, you were never provided
[24] with a definition of the term, quote, flights
[25] required in direct support thereof, end of

Page 102

[1] quote, as it is used in the following policy
[2] provision? And I will direct you jointly to
[3] Exhibit A, page 10, which is the policy
[4] definition which is set forth. Quote, aerial
[5] application means the application by aircraft
[6] of seeds, fertilizers or chemicals and includes
[7] flights required in direct support thereof by
[8] National Union or anyone else. That appears as
[9] Interrogatory No. 6 at the bottom of page five
[10] and your answer being at the top of page six:
[11] No.

[12] A: Correct.

[13] Q: And you have testified that your answer would
[14] be the same today as it was then, so we
[15] understand that nobody has ever defined the
[16] term for you, flights required in direct
[17] support thereof as it applies to aerial
[18] application; is that correct?

[19] A: The definition is in the policy.

[20] Q: Is that correct, no one has ever defined the
[21] term flights required in direct support thereof
[22] for you?

[23] A: This is the definition. That is the
[24] definition.

[25] Q: I would like for you to take however much time

Page 103

[1] you want or need in Exhibit A to find among the
[2] definitions one for flights required in direct
[3] support thereof.

[4] A: I can't. I don't have that, no.

[5] Q: Would you agree with me if I represented as
[6] opposed to having you go page for page through
[7] the policy that the policy does not any place
[8] define the term, flights required in direct
[9] support thereof?

[10] MR. BANOVETZ: Objection to the use
[11] of the word term as opposed to phrase.

[12] MR. MUELLER: Your objection is
[13] noted.

[14] A: Are you asking me if there's any place in the
[15] policy that further defines flights required in
[16] direct support thereof?

[17] BY MR. MUELLER:

[18] Q: That's right.

[19] A: No.

[20] Q: Doesn't appear in there.

[21] A: No.

[22] Q: Never has been defined for you by an AIG or
[23] anyone else; correct?

[24] A: We all —

[25] Q: Is that correct or not? Never has been defined

Page 104

[1] for you.

[2] A: Not in that form, no. That is not correct the
[3] way you're stating it, no.

[4] Q: Tell me because I note here, I say set forth
[5] the definition and you don't set forth the
[6] definition. You say, no, that it's never been
[7] defined for you; is that correct? Look at
[8] Exhibit D.

[9] A: My statement is correct.

[10] Q: So you don't set forth the definition.

[11] A: No.

[12] Q: And you don't identify any person or persons
[13] from whom that definition was received, do you?

[14] A: No.

[15] Q: And you don't identify any documents that
[16] evidence that definition, do you?

[17] A: No.

[18] Q: And do you understand in this case that AIG in
[19] response to our requests has no definition for
[20] that term either?

[21] A: I don't know what their statement is on that.

[22] MR. BANOVETZ: Same objection as to
[23] the form of the question, the use of the
[24] word term.

[25] BY MR. MUELLER:

1:03-cv-01308 National Union Fire Company v. Page 13 of 23
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 200-

Page 105

[1] **Q:** Well, I would suggest that you might benefit
[2] from obtaining a copy of AIG's responses when
[3] we asked them for the definition of the term.
[4] Now you go on and state: Please state whether
[5] or not Hardy ever defined the term, quote,
[6] flights in direct support thereof, this is
[7] Interrogatory No. 7, as it is used in the
[8] following policy provision, quote, aerial
[9] application means the application by aircraft
[10] of seeds, fertilizers or chemicals and includes
[11] flights required in direct support thereof for
[12] Pontiac Flying, and if your answer is in the
[13] affirmative then please identify the person and
[14] any documents which provide that definition.
[15] And your answer to that is: Hardy gave Pontiac
[16] the policy.
[17] **A:** Yep. Yes.
[18] **Q:** And is that your answer as you sit there today?
[19] **A:** Yes.
[20] **Q:** And is that consistent with your obligation and
[21] responsibility as you have described it to
[22] review the policy with your insureds to see
[23] that they understand the terms of the policy?
[24] **MR. BANOVETZ:** Objection. Misstates
[25] his prior testimony.

Page 106

[1] **MS. BARON:** I'll join in that. You
[2] can answer it. I just don't know that it
[3] correctly states what you testified to
[4] already, mischaracterizes. Go ahead.
[5] **A:** Well, it is mischaracterization in that all of
[6] us being in the business understand quite a bit
[7] about different things and we understand the
[8] policy as best we can, but at all times the
[9] policy is the final wording and it goes to the
[10] customer and it's the customer's responsibility
[11] to read and understand the policy. If they
[12] have any questions about that, they contact us
[13] to see seek advice from the insurance company
[14] as to the what the response to their question
[15] is.
[16] **BY MR. MUELLER:**
[17] **Q:** Would you agree that there are few things that
[18] are more confusing than the language of one of
[19] these policies?
[20] **A:** Depends on who you ask.
[21] **Q:** Well, I'm asking you.
[22] **A:** Would I agree to the fact that policies are
[23] written —
[24] **Q:** In a confusing fashion as far as the
[25] policyholders are concerned.

Page 107

[1] **A:** Yeah, I'll have to agree to that, sure. You
[2] guys wrote them. Excuse my comment. Strike
[3] that.
[4] **MR. BANOVETZ:** I'm not sure I
[5] understand the answer.
[6]     (Discussion held off the record.)
[7]     (Thereupon, a recess was taken;
[8] whereupon, the following was
[9] had:)
[10] **BY MR. MUELLER:**
[11] **Q:** When we left off, you were talking about or had
[12] just answered a question which discussed the
[13] fact than — if I recall it that nothing's more
[14] confusing than reading one of these insurance
[15] policies. Do you recall that?
[16] **A:** I do and I agree.
[17] **Q:** And, therefore, as the expert or at least as an
[18] expert in comparison with the insureds, would
[19] you agree that it's your responsibility to
[20] clarify the confusing matters to make sure that
[21] they understand what the coverage they're
[22] purchasing is?
[23] **A:** Not in that form, no.
[24] **Q:** Where does your obligation to relieve the
[25] confusion leave off?

Page 108

[1] **A:** I believe our responsibility as the agent is to
[2] help the client understand things as best as
[3] possible, but I think there is a prudent
[4] responsibility upon the client to understand
[5] and learn and read about his own policy as
[6] confusing as it may be as we've indicated, and
[7] if there's any questions regarding any
[8] particular thing that they bring it to us
[9] because I don't think I could be held
[10] responsible for trying to determine what all
[11] their questions might be.
[12] **Q:** But if you read a policy as you have testified,
[13] you want to be sure that in selling it you
[14] understand what it means; correct?
[15] **A:** As best we can, yes.
[16] **Q:** I mean certainly since you're the guy who is
[17] selling them, you have to assume that you can
[18] read and understand them better than the
[19] policyholders; is that right?
[20] **A:** Yes.
[21] **Q:** Let's mark this as Exhibit H.
[22]     (Marked for identification
[23] Deposition Exhibit H.)
[24]     **BY MR. MUELLER:**
[25] **Q:** Have you ever seen that before?

Page 109

[1] A: I have seen the website. I haven't seen it on
[2] paper.

[3] Q: And would you agree that this is the Hardy
[4] Aviation website as of Tuesday, July 13th,
[5] 2004, two days before?

[6] MS. BARON: Two days ago you mean?
[7] Just before what?

[8] MR. MUELLER: That's a legitimate
[9] complaint.

[10]      BY MR. MUELLER:

[11] Q: On the front page —

[12] A: You're just talking about the front page?

[13] Q: I'm talking about this being your website as of
[14] the date, Tuesday, July 13th, 2004.

[15] A: Yes.

[16] Q: And who prepared the newsletter there in June
[17] of — is that 2004 or 2003? When was that
[18] newsletter prepared?

[19] A: I have no idea where you got this. I have no
[20] idea.

[21] Q: Let me represent for the record that if we were
[22] to go to your website today and print it out,
[23] this would be what would come off because I did
[24] that on Tuesday and this is exactly what we
[25] got.

Page 110

[1] A: Well, I recognize the information. I recognize
[2] what you're saying. To be honest with you, I
[3] didn't realize that my website guy had put my
[4] newsletter on there, but that's fine.

[5] Q: Was that newsletter June 11, 2003, or was that
[6] 2004 and it's just —

[7] A: It appears I wrote this newsletter to our
[8] clients and future customers on June 5, 2003.

[9] Q: And when you say you, you're talking about
[10] Randy Hardy. These are your words?

[11] A: Yes.

[12] Q: And on the first page above the little bracket
[13] on the bottom, Get a Quote, you say also we
[14] will monitor your total insurance program
[15] keeping you up-to-date with changes that may
[16] affect your insured risk.

[17] A: Yes.

[18] Q: And is that the responsibility that you have to
[19] your current insureds?

[20] A: That's our desire that we have to our current
[21] insureds.

[22] Q: So, for instance, Scott and Sarah Petersen, is
[23] this part of the monitoring that you had
[24] ongoing at the time they were seeking a renewal
[25] of their policy in the January, 2003?

Page 111

[1] A: That would be correct.

[2] Q: And you have testified that you were unaware
[3] that they were using this Air Tractor for
[4] turbine transition training as of that time
[5] frame when you were working on the renewal;
[6] correct?

[7] A: The time frame leading up to the accident?

[8] Q: Yeah, talking about January, 2003, when you
[9] were working on a renewal of the policy that
[10] was going to expire on May 19.

[11] A: That's correct.

[12] MR. BANOVETZ: I'm sorry. I'm not
[13] sure if I understood the answer. You said
[14] he was unaware or aware?

[15] A: We were aware.

[16] MR. MUELLER: Excuse me just a
[17] second.

[18] A: We were unaware of the use of the airplane at
[19] that time.

[20]      BY MR. MUELLER:

[21] Q: And it is also your testimony that that would
[22] be something that would affect the insured
[23] risk?

[24] A: Yes.

[25] Q: Now I'll direct you to page two of three.

Page 112

[1] A: I don't have two of three. Okay.

[2] Q: Got that?

[3] A: Yes.

[4] Q: And what you're saying then in June of 2003
[5] that you don't want your insureds to have any
[6] surprises.

[7] A: I now remember why I wrote this. Okay.

[8] Q: That's what you say at the bottom, you have no
[9] surprises?

[10] A: We prefer no surprises, correct.

[11] Q: And Sarah Petersen based upon page 121
[12] expressed surprise, did she not, that there was
[13] no coverage for a turbine transition training?

[14] A: My word was surprised, and as I stated earlier,
[15] I think her true feeling was that she was in
[16] hopes but I assume was meaning surprised.

[17] Q: This newsletter if the date is accurate, June,
[18] 2003, was written approximately a month after
[19] your e-mail which appears on page 121?

[20] A: Yes.

[21] Q: And do you also state that — this is on page
[22] two of three above "fly safe", if I don't have
[23] you confused yet then read your policy. That's
[24] enough to confuse anyone.

[25] A: Yes.

Page 113

[1] MR. MUELLER: And at this point we'll
[2] take half an hour break.
[3] (Thereupon, a noon recess was taken;
[4] whereupon, the following:)
[5] BY MR. MUELLER:
[6] Q: We're back on the record after a break and we
[7] left off, as I recall, with a discussion of the
[8] exhibit that was your web page and the last
[9] portion of that. Let's come back to page 121
[10] where we left off. Do you recall ever
[11] explaining any portions of the policy in
[12] question to Scott and Sarah?
[13] A: Yes.
[14] Q: And do you recall explaining any portions of
[15] the policy to Scott and Sarah before the
[16] accident?
[17] A: Yes.
[18] Q: And when would that have taken place?
[19] A: The exact date I don't have, but prior to the
[20] accident when they called me about doing
[21] training in their aircraft, we talked over the
[22] phone in general conversations about the policy
[23] and what is required, the changes in the policy
[24] to do training coverage.
[25] Q: When you're talking about training coverage,

Page 114

[1] you're talking about training coverage using an
[2] Air Cat?
[3] A: Any airplane, for that matter, but in this
[4] particular case the Ag Cat that he called
[5] about, but it's a general question about
[6] changing your policy to include training.
[7] Q: With whom did you talk?
[8] A: Scott.
[9] Q: And was he talking to you then about the
[10] turbine aircraft or was it limited to the Air
[11] Cat or do you remember?
[12] A: My recollection that we only talked about the
[13] possibility of getting the Ag Cat, a piston
[14] aircraft to do training in.
[15] Q: And that would be training, per se, for aerial
[16] application as you've described it. In other
[17] words, knowing how to fly the plane so that you
[18] could actually put out chemicals, seeds and
[19] fertilizer.
[20] A: Yes.
[21] Q: Now coming back on page 121, picking up again
[22] with the conversation between you and Sarah.
[23] A: Okay.
[24] Q: Was that conversation that you're referring to
[25] on the 5th or was that on the 6th, the same day

Page 115

[1] as the memorandum?
[2] A: I believe it's on the 6th, the conversation I
[3] had that day with him.
[4] Q: The next sentence: She told me over the phone
[5] she was under the understanding or they assumed
[6] that since we added Scott back in the beginning
[7] for transition training by Harold Miller who
[8] they bought this aircraft from, that gave them
[9] transition training coverage just like the
[10] school they bought the aircraft from. Do you
[11] recall that discussion?
[12] A: Yes.
[13] Q: Now you have previously testified that you
[14] don't recall any discussions with Scott and you
[15] don't have any memoranda of discussions with
[16] Scott or Sarah either regarding — just between
[17] you and them regarding a coverage for the Air
[18] Tractor. Do you recall that?
[19] A: I recall the conversation, but when you say
[20] coverage for the Air Tractor —
[21] Q: Yes. You had testified previously that you had
[22] no memory of specific conversations with either
[23] Scott or Sarah regarding coverage for the Air
[24] Tractor at the time it was purchased.
[25] A: Correct.

Page 116

[1] Q: And you looked through the file and you were
[2] unable to find any memoranda or anything else
[3] regarding conversations of that type.
[4] A: That I had, but I found —
[5] Q: That you had.
[6] A: That I had personally, no, I did not find any
[7] conversations.
[8] Q: Did you find any memoranda of any sort
[9] regarding transition training coverage on that
[10] plane at the time it was acquired?
[11] A: Just the notes that Angie had in the file.
[12] Q: And could you find those notes?
[13] A: Okay. Here's the note.
[14] Q: Have you located a page?
[15] A: Page 118. I'm sorry. That was about the Ag
[16] Cat.
[17] Q: That's 6-19. We're talking about in the time
[18] frame February 8th to March 1st.
[19] A: When she originally handled the airplane
[20] policy.
[21] Q: That's right. We're talking about transition
[22] training having been discussed under that
[23] policy. Her letter to them is Page 51 if that
[24] gives you any frame of reference telling them
[25] that they got the coverage.

**Page 117**

[1] **A:** Here it is.

[2] **Q:** What page?

[3] **A:** Page 109. You understand that the various

[4] committees that I'm on —

[5] **Q:** Wait a minute. I'm the one who asks the

[6] questions and I don't believe there's one

[7] pending other than asking you to find the page

[8] which you've identified as page 109.

[9] **A:** Correct.

[10] **Q:** And the notation on page 109 is made 2-8-09, so

[11] that's the first record of trying to get

[12] coverage for this plane?

[13] **MS. BARON:** I believe it's 2-8-02,

[14] not 2-8-09.

[15] **BY MR. MUELLER:**

[16] **Q:** I'm sorry. I read it instead of remembering

[17] it. 2-8-02.

[18] **A:** Yes, this is the first contact that Angie had

[19] with them regarding getting an actual quote for

[20] this airplane.

[21] **Q:** And as far as there being turbine transition

[22] coverage for that plane as part of the quote,

[23] is there any reference to that?

[24] **A:** Scott before he can fly this plane would have

[25] to have a turbine transition check out —

**Page 118**

[1] **Q:** Does that appear here?

[2] **A:** Yes.

[3] **Q:** Where does that appear?

[4] **A:** Check out by Harold Miller's turbine transition

[5] course 40 hours in the turbine. He's also been

[6] to the Covington PT-6 course.

[7] **Q:** That was the training that he had received as

[8] of that point in time.

[9] **A:** This is the training for Scott, yes.

[10] **Q:** That's his history of training.

[11] **A:** Yes.

[12] **Q:** Down to that point in time.

[13] **A:** Yes.

[14] **Q:** Is there any other notation or record regarding

[15] turbine transition training in that plane?

[16] **A:** Any other record, no. Not on this memo.

[17] **Q:** Is there any other memo that makes reference to

[18] the subject matter we were discussing, adding

[19] Scott back in the beginning for transition

[20] training by Harold Miller? Is there any record

[21] of that?

[22] **A:** We reference at least on page 106, I don't have

[23] the date of this memo, but it was at the time

[24] that Scott was looking at starting an ag school

[25] on the piston airplanes, re to Mary Beth

**Page 119**

[1] **Schwaegel:** As I stated over the phone, this

[2] client went through school himself at Harold's

[3] Flying Service, going on to explain that Harold

[4] is not the lead person any more and that

[5] Harold's going to help Scott set this up and

[6] help oversee it meaning the school.

[7] **Q:** But do you know whether that relates to the

[8] piston aircraft or the turbine?

[9] **A:** No, I don't know.

[10] **Q:** Looks like the piston, doesn't it, when they're

[11] talking about dual instruction in the Cat?

[12] **A:** Well, per what's written, yes.

[13] **Q:** Getting back to the question, would it be

[14] accurate now that you've looked through the

[15] file that there are not any documents in that

[16] file that show or relate to transition training

[17] by Harold Miller on this particular plane?

[18] Just so it's clear in the record, I'm referring

[19] to the Air Tractor.

[20] **A:** Well, the 109 note, the way we wrote the

[21] memo —

[22] **Q:** You're talking about the one on page 109, the

[23] 2-8-02.

[24] **A:** Yes.

[25] **Q:** That makes no reference to future turbine

**Page 120**

[1] transition training, does it?

[2] **A:** No, it does not.

[3] **Q:** Does it make any reference to turbine

[4] transition training in this particular plane?

[5] **A:** It refers to the fact that to get Scott

[6] approved on this airplane, he already has gone

[7] through Harold Miller's course that Harold had

[8] when he owned the airplane.

[9] **Q:** But you don't know whether the turbine

[10] transition training with Harold was in this

[11] plane or some other turbine plane, do you?

[12] **A:** Well, he only had one.

[13] **Q:** Do you have any records of any sort that show

[14] turbine transition training in this plane

[15] involving Scott Petersen after March 1 — after

[16] the policy went into force and effect after

[17] March 1 of 2002?

[18] **A:** I don't understand the question.

[19] **Q:** Do you have any records in your file that show

[20] turbine transition training received by Scott

[21] Petersen in this plane after it was covered on

[22] March 1, 2002?

[23] **A:** I'd have to look at my files. Unless there was

[24] a certificate put together or not, I don't

[25] know.

Page 121

[1] **Q:** As far as Exhibit E, the documents you produced
[2] for us and that you've gone through here today,
[3] you don't find any such materials, do you?
[4] **A:** Correct.
[5] **Q:** What I refer to as the, Houston, we have a
[6] problem memo, it continues on: Scott and Sarah
[7] bought this aircraft from Harold Miller who was
[8] selling out his aircraft, and as I just found
[9] out, his school as well. She isn't holding us
[10] responsible yet, however, who knows how these
[11] deals will fall. What are you referring to
[12] when you say deals and fall?
[13] **A:** Well, just exactly what it says. You never
[14] know what — peoples' attitudes change and
[15] their memories change a lot of times after a
[16] loss and what I was referring to there was that
[17] we had no knowledge of the school, we had no
[18] knowledge of the training, we had no knowledge
[19] that they had bought Harold's Flying Service.
[20] However, sometimes in my business after an
[21] accident depending on how it's going to
[22] financially affect somebody, their memory
[23] changes.
[24] **Q:** But at the same time then you continue on that
[25] you believed Sarah when she told you that they

Page 122

[1] assumed or presumed that they had this,
[2] referring to coverage, since they transitioned
[3] Scott and they bought the aircraft Harold was
[4] using for training. Does that appear there?
[5] **A:** Yes.
[6] **Q:** At that point in time, it was your belief that
[7] Sarah was being sincere.
[8] **A:** My comment there —
[9] **Q:** Did you believe she was being sincere?
[10] **MS. BARON:** I'm going to object to
[11] the form of the question as being too
[12] broad. Sincere about what?
[13] **MR. MUELLER:** He can say that he
[14] doesn't recall that she was sincere when
[15] she said that she assumed that they had
[16] the coverage since they transitioned Scott
[17] and bought the aircraft Harold was using
[18] for training.
[19] **A:** What I meant by that was I can believe that she
[20] believed that but not necessarily that that's
[21] what it was.
[22] **BY MR. MUELLER:**
[23] **Q:** So you believed that she was sincere in that
[24] belief whether it's accurate or not.
[25] **A:** I'm not using the term sincere.

Page 12

[1] **Q:** Well, do you believe she was insincere then?
[2] **A:** I'm not going to use that term. I can't —
[3] **Q:** When you use the term you believe someone — if
[4] I were to say to you this is a wooden table and
[5] you say I believe you, what do you mean when
[6] you use the term believe? What are your
[7] beliefs founded on?
[8] **A:** If you'll allow me to expand on this, I'll
[9] explain it which is at the time we had and have
[10] always had with this account problems with the
[11] wife and the husband both thinking that they've
[12] done something when they hadn't, and so trying
[13] to be an agent to my client and trying to
[14] express to the insurance company that even
[15] though there was no coverage, I believe they
[16] thought they believed, however you want to put
[17] that, and I believe that they had hoped and
[18] wished that somebody had made this change in
[19] the policy. It wasn't there and that's evident
[20] from everything that we have and was never
[21] asked for, but I did not want to come across to
[22] AIG that I felt like she was trying to out and
[23] out lie because I didn't believe that she was
[24] trying to do just that.
[25] **Q:** Did you know or as you sit here today do you

Page 124

[1] know whether there was ever transition training
[2] coverage on that plane after it was purchased
[3] by Scott and Sarah?
[4] **A:** No.
[5] **Q:** You don't know?
[6] **A:** No, there is no transition coverage on that
[7] airplane except to put Scott in the airplane,
[8] whatever that was.
[9] **Q:** But you've testified there aren't any records
[10] of that and you weren't involved in talking —
[11] **A:** Any time you jump on another airplane you
[12] transition to another airplane so that's the
[13] definition of the term. He's transitioned in
[14] the airplane. Is he transitioning others or in
[15] the business of transitioning others, no, and
[16] I'll testify to the fact that that was never
[17] part of the policy nor part of any of the
[18] conversations.
[19] **Q:** Now going on, the sentence that appears in the
[20] next paragraph: They may have assumed since
[21] commercial and ag use, what difference is the
[22] training especially since transition for Scott
[23] was approved. Now, do you —
[24] **A:** I think you're taking that out of context
[25] **Q:** I'm taking the sentence in its entirety, am I

Page 125

[1] not?

[2]    A: But the paragraph is what clearly sets that

[3] sentence up.

[4]    Q: Well, I'm going to ask the questions my way.

[5] It says transition for Scott was approved. Did

[6] you give that approval?

[7]    A: No, the insurance companies give the approval.

[8]    Q: Do you know that the insurance company talked

[9] directly to Scott?

[10]    A: No, they talked to us and we passed it on to

[11] our client.

[12]    Q: Did you give that approval to Scott acting as

[13] the agent for the insurance company?

[14]    A: I am not an agent for the insurance company.

[15] I'm an agent for my client.

[16]    Q: Did you give that approval to Scott?

[17]    A: I don't know.

[18]    Q: Do you know of anybody else who gave that

[19] approval to Scott?

[20]    A: I don't know.

[21]    Q: Do you know how that approval came into being

[22] then, whether it was an endorsement to the

[23] policy or whether it was an interpretation of

[24] the existing policy language?

[25]    A: No, I don't.

Page 126

[1]    Q: Now if — let's make the assumption that

[2] transition training for Scott was approved

[3] although it doesn't appear in the policy or in

[4] your file, would that be an interpretation of

[5] the policy by AIG?

[6]    A: I'm sorry. I was still thinking about this.

[7]    Q: We've previously been down the road of how we

[8] know what coverage there is under a policy.

[9] There is either going to be an endorsement in

[10] the policy or there is going to be language in

[11] the policy itself.

[12]    A: Correct.

[13]    Q: And since we know we don't have an endorsement

[14] on this policy for transition training for

[15] Scott and we also know that Scott was covered

[16] for transition training, that would have to be

[17] coverage under the existing policy, would it

[18] not?

[19]    A: Yes.

[20]    Q: And coverage under the existing policy for that

[21] purpose or that interpretation would have come

[22] from AIG? Well, did it come from you?

[23]    A: Restate it, please.

[24]    Q: Did you interpret the policy so that it

[25] provided turbine transition training for Scott?

Page 127

[1]    A: No.

[2]    Q: So the interpretation that the policy would

[3] include coverage for turbine transition

[4] training for Scott came from AIG; correct?

[5]    A: No, and I don't — I'm absolutely losing the

[6] track that you're trying to —

[7]    Q: I will ask you to assume as based upon your

[8] memo here and information I've received from

[9] Scott that there was turbine transition

[10] training for him under this policy after the

[11] plane was covered.

[12]    A: Under this policy after the plane was covered.

[13]    Q: That's right.

[14]    A: My understanding of the note as I saw it was he

[15] had already been through turbine transition

[16] training. I do not know whether that was prior

[17] to his picking up the airplane or he had been

[18] transitioned by Harold after he bought the

[19] airplane.

[20]    Q: If we assume that he was transitioned to by

[21] Harold after he bought the plane and that there

[22] was coverage for that transition and that that

[23] was the result of the interpretation of the

[24] policy since there are no endorsements, you

[25] have testified that you didn't give that

Page 128

[1] interpretation, therefore the interpretation

[2] could only come from AIG; is that right?

[3]    A: No. Page 42.

[4]    Q: Who else could have provided the interpretation

[5] for Scott that there would be coverage for

[6] transition training for him under this policy?

[7]    A: Well, you keep using the term interpretation.

[8] We don't use that term, interpretation. I can

[9] tell you based on Page 42 of Angie's note to

[10] Mary Beth —

[11]    Q: You're talking about February 12, 2002, page 42

[12] of Exhibit E.

[13]    A: The insured is thinking of purchasing a 503 for

[14] ag use only. Scott has been through Harold

[15] Miller's turbine transition course and has 40

[16] turbine hours now. In addition, he attended

[17] the Covington PT-6 course. So based on the

[18] information I'm seeing here, he had been

[19] through Harold Miller's course, had transition

[20] training and was purchasing the airplane for ag

[21] use only in his business.

[22]    Q: Now, do you know as appears in your memo page

[23] 121 and 122 whether there was specifically

[24] transition training coverage for Scott after he

[25] bought the aircraft?

1:03-cv-01308-JTC Fire Company National Union Fire Company v. Page 19 of 23
Pontiac Flying Services, Inc.

JAMES RANDALL HARD
July 15, 200

Page 129

[1] **A:** I do not know of any transition training for
[2] Scott after he bought the aircraft.
[3] **Q:** If the transition — I'm talking about
[4] transition training coverage. Do you know
[5] whether there was any transition training
[6] coverage for Scott after he bought the
[7] aircraft?
[8] **A:** Your question is not —
[9] **Q:** I mean you can answer yes or no, I do know or I
[10] don't know whether there was any transition
[11] training coverage for Scott.
[12] **A:** If I answer yes, it answers the question — it
[13] answers your question that's asked improperly.
[14] **MS. BARON:** If you don't understand
[15] his question or there's something about it
[16] that isn't clear, just let him know.
[17] **A:** Well, when you say that for Scott transition
[18] training, are you talking about for Scott to
[19] receive transition training or for Scott to be
[20] able to give transition training?
[21] **BY MR. MUELLER:**
[22] **Q:** I'm talking about for Scott to receive
[23] transition training. Come back and look at
[24] page 121.
[25] **A:** I understand. Any time an individual buys an

Page 130

[1] airplane, my understanding of the memo I read
[2] to you was that he had received this training
[3] prior to that. After he buys the airplane and
[4] we name him as a pilot on the policy based
[5] upon — we add the airplane to the policy
[6] with him being a pilot on that policy, so we
[7] added the airplane to the policy, Scott was an
[8] approved pilot on the policy already. Any
[9] transition training or any training
[10] additionally done after he buys the airplane
[11] could or could not have been done, I don't
[12] really know. I'm assuming that he wanted to go
[13] out and get comfortable in the airplane so he
[14] did some more training.
[15] **Q:** Would there have been the coverage then as you
[16] refer to on page 121, transition training
[17] coverage for Scott to receive additional
[18] training in the plane from another pilot?
[19] **A:** No.
[20] **Q:** So you don't know what Sarah is referring to
[21] there when she says —
[22] **A:** His transition training was to get
[23] transitioning himself. You're using the term
[24] transitioning. That would be in his case we
[25] added the airplane with one seat, if that's

Page 131

[1] what you're trying to get to, one seat. He
[2] knows it was one seat. We did not have
[3] additional seats in the airplane covered, so
[4] transitioning could be himself going up by
[5] himself getting comfortable in the airplane or
[6] it could just be additional training.
[7] **Q:** If — and I'm going to ask you to indulge in a
[8] couple of assumptions since you have no
[9] recollection of being involved specifically in
[10] the matter. If the coverage was issued to
[11] Scott for the plane conditioned upon his
[12] receiving additional turbine transition
[13] training in that plane by Harold Miller or by
[14] Rick Lucente, was there coverage for that
[15] additional training?
[16] **MS. BARON:** Object to the
[17] hypothetical nature of the question, but
[18] you can answer if you can.
[19] **A:** That's a loaded question again —
[20] **BY MR. MUELLER:**
[21] **Q:** I know.
[22] **A:** — in that there is coverage for the aircraft
[23] once it's added to the policy for a pilot to be
[24] in that aircraft. Is there coverage for an
[25] additional seat in that airplane, no.

Page 132

[1] **Q:** So it is your testimony that there would be no
[2] transition a turbine training coverage for
[3] Scott —
[4] **A:** No.
[5] **Q:** — after he purchased the plane —
[6] **A:** That is not my statement, no.
[7] **Q:** Where would there be turbine transition
[8] training coverage for Scott after the effective
[9] date of the policy, March 1, 2002?
[10] **MR. BANOVETZ:** I'm just going to
[11] object to the continued use of the term
[12] coverage for Scott. Form of the question
[13] because it misstates the way the coverage
[14] is written.
[15] **MR. MUELLER:** What you're saying is
[16] the coverage would be on the plane.
[17] **MR. BANOVETZ:** Yes.
[18] **BY MR. MUELLER:**
[19] **Q:** Now if there were transition training coverage
[20] on the plane that included training for Scott
[21] after the plane was purchased, are you aware of
[22] that?
[23] **A:** No. You asked me if I was aware of it. The
[24] answer to the question is no. I know exactly
[25] what the coverage was.

Page 133

[1]  Q: And there was none; correct?

[2]  A: There was coverage —

[3]  MS. BARON: None what? Object to the

[4]  form.

[5]      BY MR. MUELLER:

[6]  Q: Was there coverage for the aircraft when it was

[7]  being used to train Scott after it was

[8]  purchased and there were two people in the

[9]  cockpit, one of them giving transition training

[10]  coverage to Scott. Was there coverage on the

[11]  plane for that training?

[12]  MR. BANOVETZ: Wait. Object to form.

[13]  The question is assuming facts that

[14]  haven't been established.

[15]  MS. BARON: I again object to the

[16]  hypothetical nature.

[17]  MR. BANOVETZ: If you were going to

[18]  ask it as a hypothetical, I wouldn't

[19]  object.

[20]      BY MR. MUELLER:

[21]  Q: Let me ask it as a hypothetical then. If you

[22]  assume that Scott Petersen received additional

[23]  transition training in that aircraft after

[24]  March 1, 2002, which involved another pilot,

[25]  were you aware that he was receiving that

Page 134

[1]  training, first of all?

[2]  MS. BARON: Objection again to the

[3]  hypothetical nature of the question. You

[4]  can answer.

[5]      BY MR. MUELLER:

[6]  Q: Were you aware that he received that training?

[7]  A: No.

[8]  Q: Now if he received that training in that plane,

[9]  was there coverage for that under this policy?

[10]  MS. BARON: Same objection to the

[11]  hypothetical nature. You can answer.

[12]  A: Hypothetically speaking, as long as Scott was

[13]  the person receiving the training, not turning

[14]  around and doing training as a business, the

[15]  airplane may have been covered. I don't

[16]  interpret the policy completely and I'll have

[17]  to let AIG interpret answer that. The airplane

[18]  had it had an accident could have been covered

[19]  maybe, however, the passenger that was in the

[20]  airplane with him would not have had any

[21]  insurance. There would have been no passenger

[22]  coverage on that airplane, however, because it

[23]  was in the scope of Scott flying the airplane

[24]  and receiving his own training or update or

[25]  getting — feeling better or at the beginning

Page 135

[1]  of every season every ag pilot goes out and

[2]  flies for a few hours before they start in

[3]  again to get comfortable again in the airplane,

[4]  but the difference is when you are receiving

[5]  training for yourself versus you now as a

[6]  business want to charge and give training to

[7]  others.

[8]  Q: So my question is strictly limited to Scott

[9]  Petersen receiving training in that plane. If

[10]  you assume that after he purchased it and

[11]  during the month of March, 2002, he received

[12]  additional training in that plane, if the plane

[13]  had gone down, was there property coverage for

[14]  that plane? That's the question.

[15]  A: I would have to refer to AIG to see if their

[16]  policy would cover that.

[17]  Q: And if Scott were told that there was coverage,

[18]  would that have come from you or AIG or do you

[19]  know?

[20]  A: Any conversations between the client regarding

[21]  his coverage generally comes from us as the

[22]  agency because we are an agent for that client.

[23]  Q: Since you don't recall it, would you agree that

[24]  if you had said to Scott that he had that

[25]  coverage, you would have received the

Page 136

[1]  authorization from AIG?

[2]  MS. BARON: I'm just going to object

[3]  to the hypothetical nature of the question

[4]  again.

[5]  A: I don't want to answer that if I don't have to.

[6]      BY MR. MUELLER:

[7]  Q: Well, you got to. You got no choice.

[8]  A: Okay. State the question again, please.

[9]  MR. MUELLER: Would you read it back?

[10]  (At this time the reporter read

[11]  the following: "Q Since you don't

[12]  recall it, would you agree that if

[13]  you had said to Scott that he had

[14]  that coverage, you would have

[15]  received the authorization from

[16]  AIG?")

[17]  A: Yes.

[18]      BY MR. MUELLER:

[19]  Q: When you're communicating in your e-mail which

[20]  was on pages 121 and 122 of Exhibit E with Mary

[21]  Beth Schwaegel and you say to her: I would

[22]  like to work on this in the effort to clear

[23]  this up, were you trying to convince her that

[24]  there was coverage?

[25]  A: My intent was to work on behalf of my client,

Page 137

[1] Petersens, to —

[2] **Q:** Convince her that there was coverage?

[3] **A:** No. No, not to convince her that there was

[4] coverage but to share with her that Sarah and

[5] Scott might have had confusion over this but —

[6] and again my attempt with the company was just

[7] to try and see if I can get them to pay for a

[8] policy and pay for a loss so that we didn't

[9] have to go to this extent that we're in right

[10] now.

[11] **Q:** And yet you've testified that your relationship

[12] is with the insured, in this case with Scott

[13] and Sarah —

[14] **A:** Yes.

[15] **Q:** — right? And you having studied in the area,

[16] are you aware that that is what is known as a

[17] fiduciary relationship?

[18] **MS. BARON:** Object to the extent it

[19] calls for a legal conclusion.

[20] **MR. MUELLER:** I'm going to ask for

[21] his understanding of that. I know as

[22] someone who has been involved in the

[23] brokerage business and has gone to the

[24] courses he has heard of that.

[25] **A:** I've heard the term. If you want to — I don't

Page 138

[1] think I could explain it to you right here.

[2] **BY MR. MUELLER:**

[3] **Q:** What is your understanding of the fiduciary

[4] relationship that you owed to Scott and Sarah

[5] regarding coverage under this policy?

[6] **MS. BARON:** Object because he just

[7] said he couldn't explain it right here.

[8] If he has anything further in response, he

[9] can certainly answer.

[10] **A:** No, I don't.

[11] **BY MR. MUELLER:**

[12] **Q:** Well, that's the darn'dest answer I've ever

[13] heard. I'm sorry, I can't explain it, but if

[14] you come back tomorrow or write me a week from

[15] Sunday I can tell you. What is it about the

[16] term fiduciary responsibility as you understand

[17] it that causes you to say you can't answer the

[18] question now?

[19] **A:** Well, explain fiduciary to me.

[20] **Q:** That was the question to you. What is your

[21] understanding of the fiduciary relationship

[22] that you owed Scott and Sarah?

[23] **A:** Well, quite honestly, at this moment in time

[24] I'm drawing a blank on it. That's why I'm

[25] saying that.

Page 139

[1] **Q:** The last sentence in your letter, would you

[2] read that? Last sentence in the last full

[3] paragraph.

[4] **A:** I felt that since I knew more information today

[5] regarding the loss, and to advise you as

[6] well to date this is what we know.

[7] **Q:** I'm referring to the sentence in the paragraph

[8] immediately above it starting with "I don't

[9] know". Could you read that?

[10] **A:** I don't know what's in the best interests now

[11] for both AIG and Hardy should this become a

[12] situation.

[13] **Q:** And then addressing that, do you make any

[14] reference to what's in the best interests for

[15] Scott and Sarah?

[16] **A:** No.

[17] **Q:** Are you looking out for Scott and Sarah in that

[18] sentence when you're talking about the best

[19] interests for AIG?

[20] **A:** I guess you could view it as looking out for

[21] the best interests, that if I could get the

[22] insurance company to pay this we wouldn't have

[23] to go to the extent we are today, so that would be

[24] in the best interests of my client.

[25] **Q:** Best interests of AIG.

Page 140

[1] **A:** And my client.

[2] **Q:** Does it say AIG and my client, Scott and Sarah?

[3] It says AIG and Hardy so it seems to me you

[4] were looking out for AIG and you were looking

[5] out for yourself.

[6] **MS. BARON:** Is that a question?

[7] **BY MR. MUELLER:**

[8] **Q:** It's a statement. Is that who you were looking

[9] out for, AIG and Hardy, when you were

[10] considering best interests?

[11] **MR. BANOVETZ:** Object to the form of

[12] the question because what we're doing is

[13] we're now asking — using part of that

[14] sentence and not the second half of the

[15] sentence which obviously I don't think you

[16] can isolate.

[17] **MR. MUELLER:** You mean should this

[18] become a situation?

[19] **MR. BANOVETZ:** That's correct.

[20] **BY MR. MUELLER:**

[21] **Q:** What did you mean when you said should this

[22] become a situation?

[23] **A:** Well, we're in the situation, so my —

[24] **Q:** You filed it. Made work for all of us.

[25] **A:** My meaning of this sentence, in best interests

Page 141

[1] now for both Hardy and AIG should this become a
[2] situation, we all know that if life were
[3] perfect AIG would pay the claim, go on down the
[4] road even though Scott and Sarah made a mistake
[5] and did not bring the coverage forth to us and
[6] all that kind of stuff, that to simplify things
[7] if they just paid the coverage it would be in
[8] the best interests of both Mark who's having to
[9] come here, Diane and you as well as my clients
[10] not having to bring this to me. So even though
[11] I only mentioned AIG and Hardy, my interest was
[12] trying to alleviate any hassles for everybody
[13] and I guess in this case it means AIG pay it,
[14] but it was in no way trying to indicate that I
[15] felt like they had to pay it. I was just
[16] asking if they would.
[17]   **Q:** Would you agree that when you use the term best
[18] interests of AIG and referring to the situation
[19] as a potential lawsuit that you're saying they
[20] would be better off to own up and pay out under
[21] the policy than they would be to have this go
[22] to a lawsuit?
[23]   **A:** No.
[24]   (Discussion held off the record.)
[25]   **MR. MUELLER:** I think that's it.

Page 142

[1]   **MS. BARON:** I don't have any
[2] questions.
[3]   **MR. BANOVETZ:** I don't either.
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 143

[1]   I, JAMES RANDALL HARDY, the witness
[2] herein, have read the transcript of my testimony,
[3] and the same is true and correct to the best of my
[4] knowledge, with the exception of the changes noted
[5] on a separate page, together with notation of the
[6] reasons for making such corrections.
[7]
[8]
[9]   JAMES RANDALL HARDY
[10]
STATE OF KANSAS                    )
[11]                                ) ss:
SEDGWICK COUNTY                    )
[12]
[13]   Subscribed and sworn to before me, the
[14] undersigned authority, this the _____ day of
[15] _____, 2004.
[16]
[17]
[18]
[19]   Notary Public, _____ County
      State of Kansas
[20]
   My appointment expires:
[21]
[22]
[23] Janelle E. Goddard, C.S.R.
[24]
[25]

Page 144

[1]   CERTIFICATE
[2]
[3] STATE OF KANSAS                 )
                                   ) ss:
[4] SEDGWICK COUNTY                 )
[5]
[6]   I, Janelle E. Goddard, certify that the
[7] foregoing deposition was stenographically recorded
[8] by me as stated in the caption. The deponent was
[9] duly sworn to tell the truth, the whole truth, and
[10] nothing but the truth. The colloquies, statements,
[11] questions and answers thereto were reduced to
[12] typewriting under my direction and supervision and
[13] the deposition is a true and correct record of the
[14] testimony/evidence given by the deponent.
[15]   I further certify that I am not a relative
[16] or employee or attorney or counsel of any of the
[17] parties, nor am I a relative or employee of such
[18] attorney or counsel, nor am I financially interested
[19] in the action.
[20]   WITNESS my hand and official seal at
[21] Wichita, Sedgwick County, Kansas, this 20th day of
[22] July, 2004.
[23]
[24]   JANELLE E. GODDARD, C.S.R.
      Certified Shorthand Reporter
[25] Costs:_____

**Lawyer's Notes**