E-FILED
Friday, 01 September, 2006  02:36:58 PM
Clerk, U.S. District Court, ILCD

**THIRD PARTY DEFENDANT'S**
**EXHIBIT NO. 12**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      CENTRAL DISTRICT OF ILLINOIS - PEORIA DIVISION
 3
 4
 5 NATIONAL UNION FIRE INSURANCE COMPANY   )
   OF PITTSBURGH, P.A.,                    )
 6            Plaintiff;                   )
                                           )
              vs.                          ) No. 03-1288
 7 PONTIAC FLYING SERVICE, INC., et al.,   )
              Defendants.                  )
 8 ----------------------------------------)
   PONTIAC FLYING SERVICE, INC.,           )
 9            Third Party Plaintiff; )
              vs.                          )
10 HARDY AVIATION INSURANCE, INC.,         )
              Third Party Defendant. )
11
12
13
14      The deposition of MARSHALL W. REAVIS, III,
15 Ph.D., called by the Third-Party Plaintiff for
16 examination, pursuant to notice and pursuant to the Rules
17 of Civil Procedure for the United States District Court,
18 on October 13th, 2005, at 1:00 o'clock p.m. at 10 South
19 LaSalle Street, Conference 15-1, Chicago, Illinois
20
21
22
23 Reported for
   LAKE SHORE REPORTING, by
24 Jodiana M. Stout, C.S.R., R.P.R.
                                                    Page 1
```

```
 1 APPEARANCES:
 2
 3
 4      CLAUSEN, MILLER, P.C.
        BY:  DIANE M. BARON
 5           10 South LaSalle Street
             Suite 1600
 6           Chicago, Illinois  60603
             On behalf of the Third Party
 7           Plaintiff, Pontiac Flying Service,
             Inc.;
 8
 9      CASSIDY & MUELLER
        BY:  DAVID B. MUELLER
10           323 Commerce Bank Building
             416 Main Street
11           Peoria, Illinois  61602
             On behalf of the Third Party
12           Defendant, Hardy Aviation Insurance,
             Inc.
13
14
15
16
17
18
19
20
21
22
23
24
                                                    Page 2
```

```
 1                      I N D E X
 2
 3 THE WITNESS              EXAMINATION BY COUNSEL
 4                              FOR
 5
 6 MARSHALL W. REAVIS, III, Ph.D.   THIRD PARTY   THIRD PARTY
 7                                  PLAINTIFF     DEFENDANT
 8
 9    Direct Examination
      By Ms. Baron                      4
10
11              E X H I B I T S
12
13 REAVIS DEPOSITION        FOR ID      IN EVID
14 EXHIBIT NO.
15
16       1                   6
         2                  21
17       3                  48
         4                  73
18       5                  73
         6                  75
19       7                  77
         8                  77
20       9                  77
   Group 10                 83
21
22
23
24
                                                    Page 3
```

```
 1            (Witness sworn.)
 2 WHEREUPON:
 3        MARSHALL W. REAVIS, III, Ph.D.,
 4 called as an expert witness herein on behalf of the Third
 5 Party Defendant, having been first duly sworn, was
 6 examined and testified as follows:
 7            EXAMINATION
 8         BY MS. BARON:
 9    Q. Would you state your name for the record,
10 please?
11    A. It's Marshall Wilson Reavis, III.
12       MS. BARON:  For the record this is the
13 deposition of Marshall Reavis, III, taken pursuant to all
14 of the applicable Federal and local Court Rules and by
15 agreement of the parties and pursuant to notice as well.
16 Can I refer to you as Mr. Reavis or how would you prefer
17 to be called?
18       THE WITNESS:  That's fine.
19       MS. BARON:  Mr. Reavis, my name is Diane Baron
20 and I represent Hardy Aviation Insurance in this case.
21 I'm going to be asking you some questions regarding your
22 work in the case.  You have been deposed before, correct?
23       THE WITNESS:  Yes.
24       MS. BARON:  All right.  So I just ask you to
                                                    Page 4
```

**Page 5**

1 keep your responses verbal and if you need to take a
2 break, just let me know, okay?
3 BY MS. BARON:
4    Q. Have you brought -- you brought some documents
5 with you today, correct?
6    A. Right.
7    Q. Could you tell us what they consist of on the
8 record, just generally?
9    A. Okay. The two binders are primarily the court
10 documents involved in the case. The deposition of
11 Mr. Hardy and Alexis --
12    MR. MUELLER: You can turn them around and refer
13 to them.
14 BY MS. BARON:
15    Q. Please do.
16    A. Trying to remember what her name is.
17    Q. Angie Banz?
18    A. Angie. And then my correspondence file and as I
19 understand it, that was the training manual used by the
20 Hardy Agency.
21    MR. MUELLER: For the record that's the one that
22 you provided me, with a copy, the day before yesterday, I
23 think.
24    MS. BARON: Right.

**Page 6**

1 BY MS. BARON:
2    Q. And it's entitled Aviation Insurance, An
3 Introduction to General Aviation Insurance in the United
4 States.
5       All right. And then the manila folder
6 here contains your file --
7    A. Yes.
8    Q. -- regarding this?
9       Do you have any other notes that you have
10 prepared regarding your work on this case?
11    A. No. I have seen the depositions of Sarah and
12 Scott Peterson.
13    Q. All right. What is your address?
14    A. 280 South Shore Lane, Lake Forest, Illinois.
15    Q. And what's your date of birth?
16    A. 2-19-33.
17    Q. Let me mark your CV here as our first exhibit.
18       (Reavis Deposition Exhibit No. 1 was
19       marked for identification.)
20 BY MS. BARON:
21    Q. All right. Showing you what's been marked as
22 Reavis Deposition Exhibit No. 1, is that an accurate and
23 up-to-date copy of your CV?
24    A. Basically it is. I think I -- this is 8 of

**Page 7**

1 2003. I think I brought one out in January of '05.
2    Q. Could you tell us what --
3    A. Just some minor editing I think is about all.
4    Q. Okay. I'll try to get through this as
5 efficiently as I can. With respect to your education
6 that you have listed at the top, when did you earn your
7 undergraduate degree from Indiana University?
8    A. In 1957.
9    Q. And what is an AB Degree?
10    A. Bachelor of Arts.
11    Q. Oh, okay. And when did you earn your MBA
12 Degree?
13    A. '58.
14    Q. And when did you earn your Ph.D. from University
15 of Georgia?
16    A. My degree was conferred in '75.
17    Q. Okay. And then you also list here that you have
18 your C.P.C.U., Charter Property and Casualty Underwriter.
19 What is that, a certificate?
20    A. Professional designation for.
21    Q. What does that mean, what is it?
22    A. It's a 10-part program of national examinations
23 of -- C.P.C.U. 1 was the sort of fundamentals. C.P.C.U.
24 2 was personal insurance. 3 was property -- commercial

**Page 8**

1 property; 4, commercial liability; 5, organization of
2 insurance companies; 6, legal environment of insurance;
3 7, economics; 8, accounting and finance. I know I'm
4 missing something in there. 9 was --
5    Q. Okay. When did you complete that?
6    A. 1961.
7    Q. And what does that designation allow you to do,
8 anything in addition to -- strike that.
9       Anything that you would not be able
10 to do without it?
11    A. No.
12    Q. All right. Then you also list that you have an
13 A.R.M., Associate Risk Management. What is that?
14    A. That's three exams on risk finance and risk
15 control.
16    Q. Uh-huh. And when did you receive that?
17    A. That one was in -- around 1970.
18    Q. Okay. And, again, is that an additional
19 designation as opposed to something --
20    A. Right.
21    Q. You also have down here C.L.U., Charter Life
22 Underwriter.
23    A. Right.
24    Q. What was that?

**Page 9**

1    A. That, again, is 10 parts. That's life and
2 health insurance primarily, similar to the C.P.C.U.
3    Q. All right. When did you earn that?
4    A. I think that was in '81, and then I have an
5 associate in claims which I completed last year and
6 that's a four-part program.
7    Q. Okay. Looking at your professional experience
8 and putting aside for now your expert work, after leaving
9 Baxter International in 1970, has all of your employment
10 been in the academic field?
11    A. Yes.
12    Q. And just running through it quickly, from 1974
13 to '78 you were Executive Director and Dean of the
14 Insurance School of Chicago. What is that entity?
15    A. It's a vocational school. Currently -- well,
16 back then we did primarily the C.P.C.U. program and some
17 of the associate programs, prelicense and continuing
18 education.
19    Q. Okay. As Executive Director and Dean what did
20 you do for them?
21    A. At that time we had about 2,000 students and 40
22 faculty members. We ran on a two semester basis.
23    Q. Moving on the next thing you have down here is
24 University Professor of Business Administration, Governor

**Page 10**

1 State, from '72 to '76?
2    A. Right.
3    Q. Did you teach a course there?
4    A. Well, I primarily was spending time working on
5 my dissertation but I was a University Professor of
6 Cooperative Education and then I did teach some insurance
7 courses. Governor State was under an experimental basis
8 at that time. We taught eight-week courses, no grades,
9 no tests. They just met objectives. I think I ran
10 probably 400, 500 people through the insurance program
11 down there.
12    Q. And what was the topic of your dissertation you
13 were working on?
14    A. Product liability in the furniture industry.
15    Q. All right. Then you have a number of other
16 universities listed here. From '76 to '82 you were
17 Associate Professor of Finance at Roosevelt University?
18    A. Yes.
19    Q. What did you do there?
20    A. Three or four courses of insurance and a couple
21 of finance courses, undergraduate.
22    Q. Okay. And then '82 to '86 again Associate
23 Professor of Finance at DePaul University. Was that
24 similar?

**Page 11**

1    A. Well, I had four undergraduate and two
2 undergraduate courses, all with insurance.
3    Q. And what was the nature of the insurance
4 courses? Was it just general?
5    A. Well, they have a principles course, had
6 property casualty, life and health, risk management.
7    Q. Okay.
8    A. The graduate courses, one was a business
9 insurance and the other was risk management.
10    Q. Then moving on, '86 to '89 you were the
11 Professor of Insurance and shareholder at insurance
12 studies program at Eastern Kentucky University. Can you
13 tell me what that's about?
14    A. We had a degree program in insurance so I was
15 involved with teaching those courses.
16    Q. Okay.
17    A. The insurance studies program was financed by
18 the Kentucky insurance industry and so I had the chair.
19 It was financed by them basically.
20    Q. And then from 1990 to '97 you were visiting
21 professor in the Department of Finance at University of
22 Chicago at Chicago. What did that involve?
23    A. I taught a principles course, not every semester
24 but at least once a year.

**Page 12**

1    Q. And then from '96 to '99 you were the chairman
2 and the Director of Education of the Insurance Institute
3 for Continuing Education. What is that institute?
4    A. Well, that was the year that the continuing
5 education requirement came into being in Illinois so
6 we -- I wrote a number of continuing education courses,
7 and my partner was the marketing guy and we ran it for
8 three years -- three or four years.
9    Q. Okay. And was that here in Chicago?
10    A. Yes.
11    Q. All right. Then from October, '99, to
12 September, 2000, you were Acting Executive Director of
13 the Insurance School of Chicago. What did you do in that
14 position?
15    A. Well, the director quit suddenly and asked me if
16 I'd come down for a couple weeks to help them out and I
17 was there nearly a year so it was much the same as it was
18 before.
19    Q. And then you list from 1976 to the present that
20 you've been the Chairman of the Insurance Education
21 Specialists. What is that?
22    A. We publish training materials. We used to do
23 C.P.C.U., some of the associate programs. We do
24 prelicensing and right now most of the things we do are

**Page 13**

```
 1  continuing education courses.
 2     Q. Okay.  And, approximately, how much time do you
 3  spend on that per year or however you can break it down?
 4     A. Very little, very little.
 5     Q. And then you also list from the year 2000 to the
 6  present that you've been instructor at the Insurance
 7  School of Chicago.  What has that involved?
 8     A. Oh, again once or twice a year I'll teach one of
 9  their courses on -- in the general insurance program or
10  property or casualty course.
11     Q. Okay.  And then you also list during the same
12  time frame that you've been an Adjunct Professor at the
13  Department of Risk Management, Insurance and Finance at
14  Roosevelt University.  What does that involve?
15     A. That's a principles of insurance course that I
16  do once or twice a year.
17     Q. When you say you do the course once or twice a
18  year, how long is the course?
19     A. They're semester courses, junior level
20  electives.  I have done a couple graduate courses out
21  there too in finance.
22     Q. Okay.  Did any of these academic positions
23  involve your teaching a course on aviation insurance?
24     A. Only what would be included in a text which
```

**Page 14**

```
 1  would probably be no more than a few pages.
 2     Q. Okay.  When you say included in a text, what
 3  text are you referring to?
 4     A. Any basic insurance college text.
 5     Q. Okay.
 6     A. It's included in the C.P.C.U. program, either in
 7  3 or 4.  I don't know which.
 8     Q. Sections 3 or 4?
 9     A. Yeah.
10     Q. All right.  And then just briefly covering your
11  employment prior to being in the academic area, you've
12  listed from 1953 to '54 that you were a Claims Examiner
13  with Grain Dealers Mutual Insurance Company.  What did
14  you do for them?
15     A. I was inside or in-house auto claims examiner.
16     Q. Okay.  And then the next position you have
17  listed is from 1958 to '61.  What did you do from '54 to
18  '58?
19     A. I started college in the fall of '50 and then in
20  '55 and '56 I was in the navy and I came out and finished
21  in '57.  The work at Grain Dealers was while I was in
22  school.
23     Q. Okay.  Then from '58 to '61 you worked for
24  Kemper Insurance?
```

**Page 15**

```
 1     A. Right.
 2     Q. What did you do for them?
 3     A. Well, I started out in the claim department in
 4  auto and liability claims.  Then I moved to -- it was
 5  part of the Advertising Department and did technical
 6  writing and edited the magazines.  Then I went through
 7  all the underwriting chairs at the branch and then I was
 8  a district manager or a field man my last year there.
 9     Q. Okay.  And then from '61 to '62 you were with
10  G. Shannon Grover & Company?
11     A. Right.
12     Q. What was that entity?
13     A. Grover was an old timer.  He had designed some
14  accident health insurance policies, high limit accidental
15  policies and when I went there, he was moving his book of
16  business from one company to another.  We did all of the
17  underwriting and claims and processing of the policies
18  except we didn't have our name on them or financially
19  backed them so Old Republic name was on the policy but we
20  did everything else, and one of his specialties was we
21  did high limit accidental death and disability policies
22  for pilots.
23     Q. Okay.  And then from '63 to '66 you were with
24  Wurlitzer Company.  What did you do for them?
```

**Page 16**

```
 1     A. No, Consolidated Underwriters first.
 2     Q. I missed one.  Okay.
 3     A. I was regional sales manager for a property and
 4  casualty reciprocal and we also wrote Montgomery, Coca
 5  Cola, Pepsi Cola, 7-Up on a special program.
 6     Q. Okay.  Then after that was it the Wurlitzer
 7  position?
 8     A. Right.
 9     Q. What did you do there?
10     A. I was corporate insurance manager there and
11  handled the insurance for the retail and manufacturing.
12     Q. And Wurlitzer's business is musical instruments?
13     A. Musical instruments, pianos, organs and juke
14  boxes.
15     Q. And then from '69 to '70 you were with Baxter.
16  What did you do for them?
17     A. Same thing, corporate insurance manager.
18  Different there.  We were medical supplies,
19  pharmaceuticals and we operated in 26 countries and had
20  manufacturing here and abroad.
21     Q. Why did you leave Baxter?
22     A. That's when I went back to school.
23     Q. Did any of these positions involve you in
24  aviation insurance?
```

1   A. Only to the extent in the underwriting of the
2   accidental death policies with Grover, we had an
3   application for the pilots that involved history, the
4   types of planes and locations, geographic.
5       Q. Okay. And you've listed on your CV a number of
6   publications and presentations, and I'm not going to go
7   through each one of them, but could you tell me do any of
8   these have anything to do with the topic of aviation
9   insurance?
10      MR. MUELLER: Directly or indirectly or does it
11  make a difference?
12      MS. BARON: Well, both ways.
13      MR. MUELLER: It's insurance so aviation
14  insurance is under the ambit of insurance.
15      MS. BARON: Well, I'll let him answer the
16  question, please. Aviation insurance.
17  BY THE WITNESS:
18      A. Not specifically.
19      Q. Okay. Have you ever been sued in a professional
20  capacity?
21      A. No.
22      Q. All right. Let's talk a little bit about your
23  expert work. You have listed on your CV that you've
24  worked with M. Reavis & Associates. Could you tell me

Page 17

1   what that is?
2       A. That's a d/b/a that I operate under.
3       Q. Okay. And it's been in existence since 1977, is
4   that correct?
5       A. Actually we had it before that but as far as the
6   consulting -- litigation consulting, '77.
7       Q. Okay. What was the nature of its business
8   before that?
9       A. I was under contract with Consolidated and I
10  couldn't sell insurance but I had some accounts so the M.
11  stood for Margie, my wife, and then we had some real
12  estate but then later it just became me again.
13      Q. Just happened to have the same first initial?
14      A. Yes.
15      Q. Now does M. Reavis Associates have any employees
16  other than yourself?
17      A. No.
18      Q. What types of matters does Reavis Associates get
19  involved in?
20      A. We get involved with all types of insurance
21  litigation, coverage matters, bad faith, fraud,
22  financial.
23      Q. How many active files would you say you have at
24  the current time? You meaning Reavis Associates.

Page 18

1       A. Yeah, I probably see 12 to 15 a year and I
2   probably have 25 that I'll call open.
3       Q. Okay. And what do you typically do on these
4   files? I mean what is the nature of what you're
5   providing?
6       A. Review the materials. I may do some research.
7   Generally, there's a report and sometimes depositions and
8   rarely trials.
9       Q. Okay. What percent of your time have you spent
10  on this expert consulting work over the years or however
11  you can best tell us?
12      A. Well, when I was teaching full time, we were
13  limited what we could do. I guess it really depends on
14  the year itself. I would suppose if I was trying to
15  figure on a 9:00 to 5:00 day, that over the year I might
16  put in a couple days a week, maybe three.
17      Q. So based on a five-day workweek this would be
18  about three-fifths of your time?
19      A. Yeah, yeah.
20      Q. And would you say that's been consistent say
21  over the last 10 years or has it increased?
22      A. It's cyclical. I would say probably on average
23  that's probably half to -- two and a half to three days
24  is probably average. I mean there's been a couple years

Page 19

1   where I spent most of the year on one case.
2       Q. Okay. Have there been times -- when you say
3   that you mean you spent pretty much full time on a
4   particular case?
5       A. Well, once a month I'd go to the other cities on
6   the same case.
7       Q. What percentage of your income currently comes
8   from your expert work?
9       A. Oh, probably half.
10      Q. Okay. Has that been the case for the last 10
11  years?
12      A. Probably.
13      Q. What about before that, 10 years before that?
14      A. Oh, before that maybe 20, 25 percent.
15      Q. Okay. And you would estimate that you've had
16  about 25 active files every year for the last 10 years?
17  Just trying to get a sense of the volume over the years.
18  Well, say from 2000 to 2005, the last five years, has it
19  been about the same, 25 active files?
20      A. No. I've had about 50 or 60 over the last five
21  years.
22      Q. Meaning at any given time?
23      A. No.
24      Q. Oh, all together?

Page 20

| | |
|---|---|
| 1   A. Over that period of time. | 1   Q. All right. The Waller case? |
| 2   Q. Okay. What about the five years before that, | 2   A. This was a excess of policy verdict against the |
| 3 say from '95 to 2000, was it about the same? | 3 medical inner exchange. |
| 4   A. Probably. | 4   Q. And what was your role in that? Because you |
| 5   Q. Okay. Who typically retains you as a | 5 were testifying against ISMIS, right? |
| 6 consultant, attorneys? | 6   A. Yeah. Waller had won an $8.5 million verdict |
| 7   A. Oh, yeah. | 7 and I forget how it was. One of the hospitals lost their |
| 8    MS. BARON: All right. Let's mark another one, | 8 reinsurance. Anyway the suit was that he wasn't defended |
| 9 here. | 9 properly by the exchange. |
| 10       (Reavis Deposition Exhibit No. 2 was | 10   Q. Okay. And that one went to trial? |
| 11       marked for identification.) | 11   A. Yeah. |
| 12 BY MS. BARON: | 12   Q. Menard? |
| 13   Q. Showing you what's been marked Reavis Deposition | 13   A. Oh, I remember this one. I think I represented |
| 14 Exhibit 2, this was provided to me by Mr. Mueller's | 14 the western states. Menard had a building that |
| 15 office and appears to be a report of depositions and | 15 collapsed, I believe it was, so he was suing the agent |
| 16 trials from 2001 through 2004 that you prepared, is that | 16 and the insurance company. I think that thing finally |
| 17 correct? | 17 settled. |
| 18   A. Right. | 18   Q. Okay. All right. ANR -- these are 2002. |
| 19   Q. Is this a list of all of the depositions and | 19 ANR vs. I guess the Bankers, ANR Advance Transportation? |
| 20 trial testimony you gave during that period of time? | 20   A. Yes. This also involved some kind of Worker's |
| 21   A. Yes. | 21 Compensation for Ohio. Ohio is a state fund case for |
| 22   Q. All right. I just want to run through quickly | 22 Worker's Comp and they were trying to collect under the |
| 23 to get a sense of the nature of some of these cases. | 23 debtor, from the debtor. |
| 24 Looking at what you've listed on the Page 2001 -- | 24   Q. Okay. All right. Then Champaign County vs. |
| Page 21 | Page 23 |

| | |
|---|---|
| 1   A. Right. | 1 King? |
| 2   Q. -- could you just give us kind of a brief | 2   A. Right. Champaign County had been buying |
| 3 description of what this litigation was? | 3 insurance from King and his agency for a number of years |
| 4   A. The Hanover case was a Worker's Compensation | 4 and when they wanted to put it up for bids, he suddenly |
| 5 assigned risk plan, collection matter. | 5 came with a tremendously reduced premium and so they were |
| 6   Q. Okay. And you were retained by Hanover | 6 suing him for overcharging them I guess for a number of |
| 7 Insurance? | 7 years. |
| 8   A. Right. | 8   Q. And then Williams? |
| 9   Q. Okay. The next one, Platinum Enterprises? | 9   A. That was a credit life case. Williams' husband |
| 10   A. Yeah. Platinum had leased some cars that was -- | 10 had bought a car and died during contestable period and |
| 11 I could say stolen. They leased them to people and the | 11 they rescinded the policy so we were trying to collect |
| 12 people took off with the car and didn't pay them so we | 12 the policy. |
| 13 were looking at whether there was coverage under their | 13   Q. And then the Spindler 1992 trust? |
| 14 business auto policy. | 14   A. He had a trust set up with American Express and |
| 15   Q. Okay. | 15 it went sour and he was suing them for poor advice, I |
| 16   A. The Sippel case, this was another one of these | 16 believe. |
| 17 Worker's Compensation assigned risk plan and in this case | 17   Q. Okay. All right. And then continuing to the |
| 18 the plaintiffs were suing the agency saying it was the | 18 next page, MA. Lourdes Calalang? |
| 19 agency's fault because they had already been sued by the | 19   A. Yes. The husband and father was a Philippine |
| 20 insurance company. | 20 citizen but had lived here for 14 or 15 years and Bankers |
| 21   Q. Okay. And just so that I'm clear, the party | 21 tried to rescind the policy saying he was a noncitizen |
| 22 underlined on each of these would be the side that you | 22 and hadn't filled out some form. |
| 23 were retained by? | 23   Q. And you were retained on behalf of the |
| 24   A. Right. | 24 plaintiffs there, correct? |
| Page 22 | Page 24 |

1  A. Right. That was handled by the Northwestern Law
2  School, whatever that --
3  Q. Clinic?
4  A. Yeah, it's a clinic. It was a pro bono case.
5  Q. Okay. The Indian Community School of Milwaukee
6  vs. National Union?
7  A. Yeah, they were trying to -- I guess it must
8  have been a fire or something that they were trying to
9  collect from National Union. I really can't remember.
10  There was something hanky panky among the school board.
11  Q. And you were retained by National Union, I
12  guess?
13  A. Right.
14  Q. The next was Westfield Insurance?
15  A. Yeah, this was a case where the mother owned a
16  company and her 17-year-old son had a truck which they
17  insured as a company vehicle leased back to him and while
18  intoxicated, he drove off and killed three people.
19  Westfield was trying to deny coverage on the basis -- I
20  believe the agency was involved in there too -- because
21  it was improperly written on the lease back. Last time I
22  left, I heard of it, it was back up in the Appellate
23  Court. It had been there a couple times.
24  Q. All right. Then 2003, Iowa Mutual?

Page 25

1  A. Yeah, this was a litigation against a law firm
2  that had represented Iowa Mutual in a case that went
3  excess verdict and they were trying that one.
4  Q. And then Dill vs. Northwest?
5  A. That's the hog farm. The hog farm burned down
6  and we were suing the insurance company and the agency.
7  Q. Hanover Insurance?
8  A. There's a Wausau tucked in there.
9  Q. Oh, yeah.
10  A. Wausau vs. Titan. That's another Work Comp
11  collection case.
12  Q. Okay.
13  A. What those cases is the companies keep
14  changing names so they can avoid their experience
15  modification, so you're really tracing the history of all
16  of the different policies.
17  Q. When you say experience modification, the
18  history of Comp claims?
19  A. Yeah, for the Worker's Comp, right.
20  Q. Okay.
21  MR. MUELLER: In other words, you have one
22  contractor A that builds up a loss record and has
23  difficulty getting anything comped so they go to the
24  assign risk pool and it's costing them a bundle so they

Page 26

1  simply form a new corporation, start off fresh with no
2  loss of record and go out and buy the policy with no
3  loss.
4  MS. BARON: Very nice. Okay.
5  BY THE WITNESS:
6  A. And the Hanover case is another one of those.
7  Q. And then Mitchell?
8  A. Mitchell owned nursing homes and Travelers --
9  the argument was on vacancy and on occupancy so we were
10  suing both Travelers and the agency.
11  Q. And what do you mean vacancy and occupancy?
12  A. Well, we had a nursing home that was sitting
13  there.
14  Q. Vacant?
15  A. Well, that's the argument, was it vacant or not,
16  and they had transferred the patients out and sort of let
17  it sit there and it burned down so they were saying that
18  it was unoccupied.
19  MR. MUELLER: I'm just curious -- this doesn't
20  have to be on the record.
21  (Discussion was held off the record.)
22  BY MS. BARON:
23  Q. Going to the next page, an arbitration between
24  National Union and Bridgestone/Firestone?

Page 27

1  A. Yeah.
2  Q. What was that about?
3  A. That was a bond case. Bridgestone/Firestone had
4  a surety bond on covering their funds. You have
5  companies that will process your freight bills. So the
6  company processing their freight bills then once a week
7  or once a month they wire a couple billion dollars down
8  there and it went -- well, it went into bankruptcy
9  because of some other reasons and we were trying to get
10  the $10 million bond paid.
11  Q. Okay. Guideone Insurance?
12  A. Guideone Insurance, that was a church that
13  burned and they were -- it was a building the church had
14  bought and so the insurance company was suing the agency
15  for either including or not including the building that
16  burned. I can't remember.
17  Q. All right. Now 2004, Stringfellow?
18  A. This is I think the final case. There was a man
19  who had an insurance operation where he sold policies to
20  high school athletic associations so if an athlete got
21  hurt, he'd pay all the catastrophic -- kid breaks his
22  neck. Well, he had a fine scheme going and he didn't
23  pay. That's another case we had against him on the
24  National Association. This was a high school association

Page 28

who's being sued by the mother of one of the kids that
was injured.
  Q. Okay.
  A. I guess she had sued the school district and now
she's suing the association.
  Q. And you represented?
  A. Represented the association.
  Q. The next one, Gorion?
  A. Gorion?  Oh, this was a -- she claimed she paid
her premium and they claimed that they never got it or
never sent it in so it was between the insurance company
and the agent.
        And the DuPage Biofluids, one of the four
principles of the company was killed in an accident and
had a life insurance policy.  He had applied for life
insurance policy but he had never completed all he was
supposed to.  And so --
  Q. Okay.
  A. There were two policies on the two brothers and
he was the brother.  The beneficiary was suing saying
even though he didn't complete the application, all he
was supposed to do, he should still get the money.
  Q. And next page, Nettleton vs. Campbell?
  A. See, I see a variety of things.

Page 29

  Q. Yes, you do.
  A. This was a big old $350,000 machine that cut
down logs and chopped them up and it caught fire.
  Q. Okay.
  A. And Northern Finish wasn't going to pay and so
Nettleton, who owned the machine, was suing the agent and
Northern Finish.
  Q. And you were retained by Northern Finish?
  A. Northern Finish which operates in three
counties.
    MR. MUELLER:  I was going to say never ceases to
be amazed.
BY MS. BARON:
  Q. The next one is Brockelsby?
  A. Yeah, that's still open.
  Q. Okay.
  A. It's, again, a health insurance company who's
denying coverage based on the application.
  Q. Okay.  And then the next one is Injured Workers'
Insurance Fund?
  A. Yeah, that's an assigned risk plan in Maryland
and Henry's Auto Auctions changed names about four times
too.
  Q. So it's the same type of --

Page 30

  A. Same thing and that just settled.
  Q. Okay.  Are there any that you would add to this
after September 13 of '04, the date of it?
  A. Oh, yeah, there's the '05s?
  Q. Why don't you tell me briefly about those?  Are
there a lot of them?
  A. I think I've got about six on there.  I can send
you a copy.
  Q. Yeah, if you could get me it?
  A. You probably would need it because the Court
wants up to date.
  Q. All right.  Have you ever been retained as an
expert in a case involving aviation insurance?
  A. Yes.
  Q. Tell me about that case.  What did it involve,
what was your role?
  A. One was a fellow had upgraded to twin engine and
he was in Fort Myer, I think, training, learning to fly
the twin engine plane and coming in for a landing.  They
popped an engine on him and he crashed and was killed.
And the insurance company claimed that the instructor
didn't meet the open pilot warranty, and our position was
that there was an exception to the exclusion which said
the plane could be flown by any FAA certified instructor,

Page 31

so we got coverage.
  Q. Okay.  And where was this pending, out in
Florida?
  A. Trial was in Indianapolis.
  Q. I thought you said Fort Myers?
  A. That's where he was killed but he was from
Indianapolis.  I think American States was the company.
  Q. Okay.  Did you testify in deposition or trial?
  A. Trial.
  Q. Who was the attorney who retained you?
  A. I think his name was Harry Wilson out in
Indianapolis.
  Q. Okay.  Do you remember the name of the firm?
  A. No, I don't.  His firm.
  Q. Okay.
  A. Then I had one, a helicopter situation down in
Texas.
  Q. And what happened there?
  A. They were going back and forth to the oil rigs
and somebody crashed and there was an air/sea recovery
and that's about all I can remember.  I'd have to look it
up, what it was, but it was a question about the one that
went down, I think.
  Q. And what was your involvement in that?

Page 32

1  A. That's what I can't remember exactly. I know I
2  was -- I think we represented the guy that went down,
3  that was killed. I'd have to look it up. It's been a
4  long time.
5  Q. Okay. That was my next question. Do you recall
6  what year that was?
7  A. I don't.
8  Q. What about the one prior to that?
9  A. That's a long time ago too.
10  Q. A long time ago as well?
11  A. Yeah.
12  Q. Do you have any transcripts of any of your
13  testimony in any of these cases?
14  A. No. And then I had one up in Wisconsin.
15  Q. Okay.
16  A. And that was they declined coverage on the basis
17  that he flew outside of the territorial limit. He was up
18  in Alaska and he crashed up there, but it was complicated
19  because he also would lease his plane, let a leasing
20  company use his plane. They had coverage. He had
21  coverage and the insurance company went into receivership
22  so I think we were the last -- we were -- the last
23  argument that I remember was about the guaranty fund.
24  Q. You were representing the individual?

Page 33

1  A. The deceased pilot, yeah.
2  Q. Okay. And do you recall when this took place,
3  when was your involvement?
4  A. Coverage, yeah.
5  Q. But was it recently?
6  A. Oh, it's been in the last five years, I think,
7  or better.
8  Q. And do you recall the name of the attorney who
9  retained you?
10  A. I think his last name was Aaron, A-a-r-o-n.
11  Q. And do you recall what city he was in?
12  A. He's in Milwaukee.
13  Q. And did you give a deposition or do you recall
14  what you did?
15  A. I remember I sat in on a deposition and then I
16  think, I want to say, an affidavit. Again, I'd have to
17  look. I don't think I -- well, over a period of time was
18  different parties and I'm hard pressed to remember what
19  all did happen.
20  Q. I don't think I asked you when was that? Do you
21  recall?
22  MR. MUELLER: Said about five years.
23  BY MS. BARON:
24  Q. Is that the one that was about five years?

Page 34

1  Okay. All right. Any others that you recall involving
2  aviation insurance?
3  A. Not that I can remember offhand.
4  Q. Okay. And have you ever been retained as an
5  expert in a case involving agricultural aviation
6  insurance?
7  A. No.
8  Q. And have you ever been retained in a case
9  involving the alleged professional negligence of an
10  insurance broker?
11  A. Yes.
12  Q. And what types of cases have you been involved
13  in in that regard?
14  A. I think some of these.
15  Q. Ones that we've talked about?
16  A. And others that didn't get that far.
17  Q. Okay. Have you ever sold or purchased aviation
18  insurance?
19  A. I've never sold it, per se. I know at Baxter we
20  looked into some but we didn't go and buy a plane. I
21  know that.
22  Q. Okay. So your answer is no then?
23  A. Right.
24  Q. Are you aware of any texts that you believe are

Page 35

1  authoritative regarding aviation insurance?
2  A. No. Very limited.
3  Q. Do you have any experience in the agricultural
4  aviation industry?
5  A. No.
6  Q. Have you ever had a pilot's license?
7  A. No.
8  Q. Did you ever handle a claim involving aviation
9  insurance policy other than those pilot's health policies
10  you mentioned?
11  MR. MUELLER: By handle a claim, you mean other
12  than as he's already described, being involved in
13  litigation?
14  MS. BARON: Right. I mean handling a claim in
15  the claims handling capacity, I guess.
16  BY THE WITNESS:
17  A. The only one that comes close is we had a guy
18  blown up in an airplane, an employee, commercial flight,
19  other than whatever participation we had with our
20  coverage.
21  Q. What do you mean by our coverage, with his
22  company?
23  A. His comp, his accident, his disability, those
24  kinds of things, getting him back or what was left of

Page 36

him.

Q. Right. And was that Baxter?

A. Yeah.

Q. Do you know the difference between a piston driven and a turbine driven aircraft?

A. Yes.

Q. What is the difference?

A. A piston driven is a combustion engine. Turbine is -- well, you have the turbo props and your jets. So it's a type of jet engine and if it's turbo.prop, it has a propeller.

Q. Okay. Have you ever been a member of the National Agricultural Aviation Association or any state Aviation Agricultural Association? ·

A. No.

Q. When were you first contacted regarding your work on this case?

A. August 27th, '04.

Q. And who contacted you?

A. I talked to Mr. Mueller.

Q. And did he call you?

A. Yes.

Q. Okay. What did he say?

A. Well, I think he explained a little bit about

Page 37

what the case involved, that it was a flying service. It had a crash -- fatal crash and that there was a coverage question.

Q. Okay. Do you know how he found you?

A. Through TASA.

Q. That's an expert referral service?

A. Right.

Q. And I think you have in your file there, which we'll make a copy of, a form from TASA?

A. Yeah, right.

Q. Let me just take a look at it for a second. It indicates on here as far as hourly rates, $250 an hour plus expenses and then court time, 275 an hour plus expenses. Is that what your charges are in this case?

A. Right.

Q. How much have you charged so far for your work in this case?

A. About 3,300.

Q. Is that for the time you've put in -- let me ask you this. How much time have you put in, approximately?

A. Looks like 13 hours.

Q. And have you been paid?

A. Yes. Now that's up through November. I haven't billed anything as far as this preparation.

Page 38

Q. Okay. And how much time have you spent that you have not billed him for yet?

A. Oh, probably four, five hours.

Q. Had you ever worked with David Mueller or anyone in his firm prior to this case?

A. No.

Q. During your first conversation with Mr. Mueller, what did you tell him?

A. Well, I think I alerted him the fact that I had some knowledge of the aviation industry through these cases I've been on and I had experience in depositions, trials.

Q. Okay. Did he then send you some materials to look at?

A. Right.

Q. What did he send you?

A. The complaint and answer, third party complaint against Hardy.

Q. Okay.

A. Plaintiff's motion for judgment, his response to the motion, plaintiff's response to request to admit, the depositions of Hardy and Banz, B-a-n-z.

Q. Okay.

A. That was the first.

Page 39

Q. And did you then review all those materials?

A. Right.

Q. What did you do next after you reviewed them? Did you talk to Mr. Mueller again?

A. Yeah, I worked on the report during September.

Q. That's of '04?

A. Right.

Q. Okay.

A. And then I had some discussions with him and then I did do a supplement to the report in November.

Q. Okay.

A. Then I have read -- in September I also got copies of the National Union underwriting and claim files. Also in September I got a copy of the sworn statement of Scott and Sarah Peterson.

Q. Okay.

A. And then later I have read the deposition of Scott and Sarah Peterson.

Q. Now did Mr. Miller ask you to prepare a report?

A. Yes.

Q. Did you ever talk to Sarah or Scott Peterson?

A. No.

Q. Did you ever talk to anyone else regarding your work on this case other than Mr. Mueller?

Page 40

1  A. I did talk to some pilots who were active in ag
2  aviation.
3  Q. Okay.
4  A. And also to someone who was involved with the
5  certification of the air tractor.
6  Q. Okay. And why did you talk to pilots active in
7  ag aviation?
8  A. Really to find out a little bit about the
9  difference in the aircrafts that they were using and how
10 they were using it.
11 Q. And who did you talk to? Do you know their
12 names?
13 A. There was a Frank Ousley, O-u-s-l-e-y.
14 Q. And where's he located?
15 A. Morrison, Illinois.
16 Q. And how did you find him?
17 A. I believe Mr. Mueller gave me some names but
18 from one name I'd ask for another so I don't know
19 exactly. I haven't got them in any order.
20 Q. And when did you talk to Frank Ousley?
21 A. Sometime in November.
22 Q. November of '04?
23 A. Right.
24 Q. And what did he have to say?

Page 41

1  A. I don't have any notes of the conversation.
2  Q. Was he just describing the differences between
3  aircraft?
4  A. Yeah, he flies ag cats which are a biplane that
5  Drummond built.
6  Q. Okay.
7  A. And a Cora Gorsuch, G-o-r-s-u-c-h, who operates
8  an ag spray service.
9  Q. What was the first name?
10 A. Cora.
11 Q. Cora, C-o-r-a?
12 A. Right.
13 Q. Gorusch, G-o-r-u-s-c-h?
14 A. G-o-r-s-u-c-h.
15 Q. S-u-c-h?
16    And what did Cora say, what was the nature
17 of that conversation?
18 A. I think all I got from her was information about
19 spraying services.
20 Q. And what sort of information about spraying
21 services?
22 A. Types of operations I think.
23 Q. I'm sorry. What did you say the entity name
24 was, what was her business name?

Page 42

1  A. Pearl's Spray Service.
2  Q. Any other pilots that you spoke to?
3  A. Yeah, Harley Curles, C-u-r-l-e-s, Curles Flying
4  Service.
5  Q. Okay.
6  A. He was the prior owner of the 503 before Miller
7  had it.
8  Q. And what was the nature of your conversation
9  with Curles?
10 A. He was also past president of one of the
11 associations. Probably about the plane.
12 Q. Do you know what in particular about the plane?
13 A. Yeah, the plane was originally kept at the
14 factory for demonstration purposes.
15 Q. Okay.
16 A. That was an '89, '90. Someone purchased it then
17 from Arizona and then this fellow had it for '97, flew
18 about a thousand hours on it, that you could fly it
19 either from the first seat or the second seat and that
20 what Scott was doing was in the realm of capability in
21 the aircraft.
22 Q. Okay. Anything else you learned from Curles?
23 A. No.
24 Q. Did you speak with any other pilots?

Page 43

1  A. Cary Rucker, R-u-c-k-e-r, Rucker's Brothers
2  Flying Service.
3  Q. And where are they located?
4  A. Burdette, B-u-r-d-e-t-t-e, Kansas. He's the
5  current vice president of the National Ag Association.
6  Q. Okay. And what was the nature of your
7  discussion with Rucker?
8  A. Probably just general information about the
9  aircraft and the operations.
10 Q. Okay.
11 A. Another one was a Denny Stokes, S-t-o-k-e-s,
12 Stokes Flying Service.
13 Q. Where was that located?
14 A. Parkin, P-a-r-k-i-n, Arkansas. And he was past
15 president of the national association.
16 Q. And what was the nature of your discussion with
17 Stokes?
18 A. Again I think probably just general information.
19 I may have gotten names of other people from them.
20 Q. Okay.
21 A. Stokes said this air application -- air ag
22 application is a small industry. All participants know
23 their type and use of the ag airplane. He believes that
24 only 8 or 10 two-seat 503s were ever built.

Page 44

| | |
|---|---|
| 1  And then the last one is Jim Hirsch, | 1  Q. For training? |
| 2  H-i-r-s-c-h. He was involved in the certification of the | 2  A. I assume that's what she meant. |
| 3  air tractor. | 3  Q. Okay. So we've covered everybody that you've |
| 4  Q. And where is he located? | 4  spoken to then? |
| 5  A. They're in Olney, Texas. | 5  A. Right. |
| 6  Q. And what is the entity he's with? | 6  Q. Did you do any kind of research regarding your |
| 7  A. I'm sorry? | 7  work on this case? |
| 8  Q. Who is he with, the government? | 8  A. Nothing specific that I can think of other than |
| 9  A. He's the air tractor company. | 9  my general knowledge. |
| 10  Q. Okay. And what was the nature of your | 10  Q. Have you relied on any books or articles or |
| 11  conversation with Jim Hirsch? | 11  publications regarding your opinions in this case? |
| 12  A. There's one 503 two seat left. Rydell owned it | 12  A. No. |
| 13  and Wyndell has it for sale. They were built under a DEA | 13  Q. All right. Are the materials that you've |
| 14  contract, four units to be used in the drug war. Air | 14  described for us that you have with you today, is that |
| 15  tractor did not get -- they apparently built four units | 15  everything that you have reviewed regarding your work on |
| 16  to try to get the contract. They did not get the | 16  this case? |
| 17  contract. It went to thrust. AIG and US-AIG all require | 17  A. No. I also had looked at this manual. |
| 18  turbo transition training. | 18  Q. Okay. You're referring to the book that I sent |
| 19  Q. Okay. And you're referring to some typewritten | 19  you -- I sent to Mr. Mueller? |
| 20  notes. Is that something you prepared? | 20  A. I glanced through that. |
| 21  A. Notes of my notes. | 21  Q. And is that everything then that you reviewed? |
| 22  Q. Notes of your notes? | 22  A. As far as I recall. |
| 23  A. Yeah. | 23  Q. Let me mark your report and we'll go through |
| 24  Q. Do you have any other notes of any of these | 24  that. |
| Page 45 | Page 47 |

| | |
|---|---|
| 1  conversations? | 1  (Reavis Deposition Exhibit No. 3 was |
| 2  A. No, no. | 2  marked for identification.) |
| 3  Q. Anyone else that you spoke to regarding -- | 3  BY MS. BARON: |
| 4  strike that. | 4  Q. Showing you what's been marked as Reavis |
| 5  Any other pilots you spoke to regarding | 5  Deposition Exhibit No. 3, could you tell us what this is? |
| 6  this case? | 6  A. This is my basic report analysis dated |
| 7  A. No. | 7  September 13th, 2004. |
| 8  Q. Where was Curles Flying Service located? | 8  Q. Okay. Were there any drafts or earlier versions |
| 9  A. Astoria, Illinois. | 9  of this report that you prepared? |
| 10  Q. Okay. Did you speak to anyone else regarding | 10  A. Well, I edit on the computer so what is there is |
| 11  your work on this case? | 11  there. |
| 12  A. I'm sorry. I do have a note from Gorsuch I | 12  Q. Okay. Did you make any significant changes to |
| 13  didn't read to you. | 13  it that you recall? |
| 14  Q. What does that say? | 14  A. No, I don't think so. |
| 15  A. She says she has used her planes in, quote, | 15  Q. Okay. Did you review it with Mr. Mueller before |
| 16  direct support, closed quote; assumed coverage was there. | 16  you finalized it? |
| 17  Now is concerned. Wondered how Miller's policy was | 17  A. I did talk to him about it. |
| 18  written. | 18  Q. Okay. And what do you recall about that |
| 19  Q. So you discussed with her the coverage issues in | 19  conversation? |
| 20  this case? | 20  A. Just general, what I was doing, what I was |
| 21  A. Must have. | 21  using. |
| 22  Q. Okay. Do you have any idea what she meant when | 22  Q. Did he make any comments or ask for anything |
| 23  she said she had used her planes in direct support? | 23  else? |
| 24  A. That's as far as the training. | 24  A. Not that I can recall. |
| Page 46 | Page 48 |

1    Q. All right. What is your understanding of the
2  circumstances that gave rise to this litigation
3  generally?
4    A. Pontiac Flying Service, Scott Peterson and his
5  wife, had purchased this turbo aircraft and they had
6  had -- prior to that time had insurance with Hardy
7  Aviation Insurance. And when they bought this plane,
8  they added it onto the policy. At the time Scott did not
9  have too many hours in the plane and so one of the
10  conditions of getting it insured was he had to have more
11  hours in the aircraft, which he did with an instructor.
12  Then as time passed, they wanted to -- Scott wanted to
13  get the -- use the aircraft to train other experienced
14  pilots in the transition to turbo planes. In fact, he
15  advertised that he was -- had the ability to do so. When
16  they finally got a client and they hired an instructor,
17  when the two took off on a training flight, the plane
18  crashed and both of them were killed. And upon the
19  filing of the claim, it was denied by National Union on
20  the basis that there was no coverage for training
21  flights.
22    Q. Okay. Now it's your opinion, isn't it, that
23  there was coverage under the National Union aerial
24  application policy that was issued by Pontiac for this

Page 49

1  loss, correct?
2    A. As I interpret the policy and -- based on my
3  interpretation and also on that history of the
4  underwriter, knowing he was flying it for training, yes,
5  I do think there's coverage.
6    Q. And you're aware the Court in this case has
7  found that there was not?
8    A. Right.
9    Q. What is your understanding of the nature of
10  Pontiac Flying Services' business?
11    A. Well, they have, I guess, two operations. One,
12  they're a manager of the airport and have a fixed base
13  operation which provides fuel, repair. I think they even
14  rent planes and then the other operation was to establish
15  a school for turbo transition.
16    Q. And what is your understanding of the meaning of
17  turbo transition?
18    A. Well, you're taking an experienced aviator who's
19  spent his time in prop planes, piston driven planes and
20  you're teaching him basically how to fly a jet airplane
21  or a turbo pop. They're faster, carry a heavier load and
22  I'm assuming would be more difficult to -- or not more
23  difficult but more skilled to do the operating.
24    Q. Okay. Do you know how long Pontiac had been in

Page 50

1  business?
2    A. I think he said '97 was when he went to take
3  O'Hare field. I think that's right.
4    Q. Do you know how many planes Pontiac had?
5    A. How many what?
6    Q. How many planes they had?
7    A. I think they had four planes besides the 503.
8    Q. And do you recall what the other -- what types
9  of planes the other four were?
10    A. I call them crop dusters but ag application
11  planes, piston driven.
12    Q. Okay. Is it your understanding that Pontiac had
13  purchased insurance policies for flight training with
14  some of its other general aviation planes over the years?
15    A. Well, they had gone through -- they had
16  requested quotes on it through Hardy. I wasn't clear
17  whether they actually ever purchased it because I thought
18  Scott said he wasn't interested in doing piston training.
19    Q. Okay. Are you familiar with the types of
20  policies that would be issued for doing training?
21    A. It would be the endorsement to your basic
22  policy, I believe.
23    Q. Okay. And do you know whether that endorsement
24  would have provisions regarding the amount of hours the

Page 51

1  instructors needed to have or something like that?
2    A. Well, you've got your open pilot warranty on
3  there, on the plane itself.
4    Q. And what does that mean just so we have that out
5  there?
6    A. Open pilot warranty is an endorsement or a
7  section of the policy which states that anyone who flies
8  this airplane -- insured airplane must have a total of
9  "x" number of hours experience plus "x" number of hours
10  in this type of aircraft.
11    Q. Okay. And is it your understanding with respect
12  to a policy that's allowing instruction training that
13  there would be a separate section that would specify how
14  much -- how many hours were necessary for anyone
15  providing that?
16    A. I would think there would be something,
17  particularly if you were -- depending on the type -- for
18  an instrument card or for a commercial card, that they
19  might not want -- they might not want anyone who's, say,
20  a beginning pilot with no hours. They might be
21  restricted to somebody who's had "X" number of hours
22  because particularly if the training was for ag
23  application, you don't want somebody who's too junior.
24    Q. Okay. What is your understanding of the nature

Page 52

1 of Hardy Aviation Insurance business?
2     A. Well, they're an insurance agency that
3 specializes in writing aircraft insurance and associated
4 coverages.
5     Q. All right. Is it your understanding that Hardy
6 was acting as Pontiac's broker?
7     A. Well, yeah, he was representing Pontiac.
8     Q. Okay. And is it your understanding he was not
9 acting as agent of National Union?
10     A. I don't believe he was.
11     Q. Was it also your understanding that he could not
12 bind coverage for National Union?
13     A. Right.
14     Q. All right. I'm going to take a look at your
15 report. Now the earlier sections of your report relate
16 to your opinions as to National Union, correct, and the
17 policy?
18     A. Right.
19     Q. So I'm going to look at Page 7 where you've
20 listed there a number of duties that you believe Hardy
21 had, correct?
22     A. Right.
23     Q. Now you cite to a book there entitled The Legal
24 Environment of Insurance, Volume 2. Do you believe that

Page 53

1 producer's interpretation of the customer or client's
2 directions was reasonable, that he then complied with
3 that duty?
4     A. If he's provided all that he feels they need. A
5 caveat there is if there's something that he thinks they
6 need that they don't want, that he makes sure that they
7 are aware of its availability. We even ask them to sign
8 a letter that they don't want it.
9     Q. Is it your opinion that it would be -- strike
10 that.
11         Is it your opinion that it is the standard
12 of care for an insurance broker to have a client sign a
13 letter if they don't want particular coverage?
14     A. That's been the practice the last few years.
15     Q. When you say the practice, what do you mean?
16     A. Well, a recommendation to the agents that they
17 do that is pretty common today.
18     Q. And who recommends that?
19     A. Oftentimes their E & O carrier. We do that in
20 prelicensing classes.
21     Q. Is it your opinion that in the year 2002, 2003,
22 if a broker did not provide such a letter, that it's a
23 breach of the standard of care?
24     A. If there's a coverage he feels they should have

Page 55

1 that is an authoritative text?
2     A. Yes.
3     Q. All right. The first one you've listed here in
4 the five categories of duties you state there's a duty to
5 follow instructions of his or her insurance client.
6 Could you explain what you mean by that?
7     A. Well, the idea is really when you talk to the
8 client and they say I want you to cover everything, well,
9 you've got to narrow it down and develop information from
10 the client to narrow it down to specifics so you'll know
11 what it is that you want -- that you need to go out and
12 get.
13     Q. Okay. Would you agree that the client has the
14 duty to provide clear instructions to the insurance
15 producer or broker?
16     A. To the best of his ability. I think when we get
17 into some coverages, even a simple homeowner's,
18 there's -- the applicant may not know all of the things
19 that are available or all of the loss exposures that he
20 or she has so it's sort of a two-way street at this point
21 of them asking or, you know, telling him what he wants
22 and making sure what it is because, yeah, there's a
23 responsibility on both parties here.
24     Q. And would you agree that as long as the

Page 54

1 and he doesn't and they don't take it, he doesn't do
2 that, yeah.
3     Q. And when I use the word insurance producer, I'm
4 using that kind of -- interspersing that with insurance
5 broker. Just so we're clear what is your understanding
6 of insurance producer?
7     A. Today we use producer.
8     Q. It basically means the same thing?
9     A. Yeah.
10     Q. If an insurance broker is not aware of a
11 particular client's possible exposure, then they would
12 not be required by standard of care to get a letter from
13 them saying they don't want particular coverage for that,
14 correct?
15     A. Right.
16     Q. Did Pontiac instruct Hardy Aviation Insurance to
17 procure insurance coverage for the AT-503 air tractor for
18 running a turbine transition training business?
19     A. Not specifically.
20     Q. In your opinion, did Hardy breach the duty to
21 follow the instructions of Pontiac?
22     A. Well, only to the extent there's a question
23 there I think about did he obtain the things that he was
24 specifically asked to obtain. I think that's true but

Page 56

1 did he --
2   Q. Let me just stop you there. When you say did he
3 obtain what he was asked to obtain, what do you mean?
4     A. Well, if he was told, I want you to insure my
5 503 for liability and hull damage, he did do that. Now
6 as far as making inquiry as to how the plane was going to
7 be used and things like that, I mean it was a two seater
8 plane. The two seater planes, according to his manual,
9 are used for training purposes. And I think there was
10 a -- and we're going beyond your question but I think
11 there was expectation on the part of Scott that he was
12 getting what he thought he was getting and there was a
13 failure on the part of Hardy to make sure he was
14 providing for him what he needed.
15   Q. To your knowledge, did Scott Peterson ever
16 convey this expectation you're referring to Hardy?
17     A. Well, when Hardy told him that the insurance
18 company said you have to have more hours in the plane and
19 Scott was going to use an instructor in his own plane, I
20 can see where Scott expected that he had coverage since
21 he was told to do it by the insurance company.
22   Q. But do you think that that then means that he had an
23 expectation that he would also have coverage for offering
24 turbine transition training to the public?

Page 57

1     A. Well, I think his expectation was that his
2 policy covered that.
3   Q. Did he ever make that expectation known to
4 Hardy, to your knowledge?
5     A. I don't know.
6   Q. Okay. So, again, getting back to this duty to
7 follow the instructions of a client, do you believe that
8 Hardy breached that duty to follow the instructions by
9 Pontiac?
10     A. The specific instructions of obtaining the
11 policy he did follow.
12   Q. Okay. Let's move on then to the second duty of
13 where it states there is a duty to procure insurance
14 which involves additional care, skill, effort and
15 diligence on the part of the insurance producer. Could
16 you explain what that means?
17     A. Well, that's the situation -- I believe that's
18 the area where his skill and care and efforts are to
19 determine -- based on the instructions he's gotten and
20 earlier information he's obtained, to come up with
21 coverages for all of the loss exposures that, based on
22 his skill, experience, knowledge, would be required to
23 provide protection to the insured. He has a
24 responsibility to know what it is they need and what

Page 58

1 they're going to -- in this case what they're going to do
2 with the airplane in order to fully cover his
3 responsibilities as a producer.
4     Q. If they don't tell him completely what they plan
5 to do with the airplane, how is he expected to know that?
6     A. Well, he's got to ask. In this business,
7 aircraft insurance business, most -- I would say 99
8 percent of the producers are pilots, the underwriters are
9 pilots. They know the difference between different kinds
10 of aircraft, their capabilities. In this case it's a two
11 seater airplane which was designed for training purposes.
12 To me it would have been a logical question to say are
13 you going to use this for training.
14     Q. Is it your opinion that Hardy had a duty to ask
15 him that?
16     A. Well, based on his supposed knowledge of
17 aircraft insurance, I think he has a duty to find out
18 what they're going to do, what they want to do, what they
19 plan to do with the aircraft. The same thing could be
20 true if it was buying a boat or anything. As an agent
21 you've got to -- you have a responsibility to find out
22 what they want to do with it. And since -- and to me the
23 fact it was -- you know, this was an obvious two seater,
24 you know, and it was designed for that, it's going to be

Page 59

1 used for that, the underwriter knows it's going to be
2 used for that, there's no exclusion on the policy. I can
3 see how Scott Peterson could have easily believed that he
4 was fully covered and he wasn't told that there were any
5 restrictions.
6     Q. Would you agree that the client has a duty to
7 review his insurance policy and verify the coverage
8 that's requested?
9     A. That's a tough one for me. I know the courts
10 say you're supposed to read the policy but in my years
11 most people don't and most people, if they do, don't
12 understand it. I mean look at us. We're all arguing
13 over the definition in the policy of Humpty Dumpty says
14 the words mean what I say they mean and in this case we
15 say they mean it's covered. National Union says it isn't
16 covered so how can you expect a lay person, even if they
17 do read the policy, to fully understand what's covered
18 and not covered, particularly since the word training is
19 never mentioned pro or con in the policy.
20     Q. So, in your opinion, do clients have some
21 responsibility to read their policy and to ask if they
22 don't understand something or can they just sit back and
23 say I don't know what any of this means, I'm not going to
24 look at it?

Page 60

A. Well, hopefully the producer, when he delivers
the policy, will sit down and go over it with them.
Q. Okay.
A. I think that's the fifth one, there's a duty to
provide sound and proper advice regarding the insurance
need. I think that -- but I guess in the purest sense if
the client receives the policy, he should look at it and
if he can't understand it, ask. But if he looks at it
and he believes it, that it covers what he wanted --
Q. Then it does?
A. -- then you can't blame him. He didn't write
the policy.
Q. Then who do you blame?
A. The insurance company for writing it.
Q. Okay. Just so we cover this, going back to No.
2 again, in your opinion, did Hardy breach the duty
listed as No. 2 in your report?
A. Yes, I think so.
Q. And what do you -- how did he breach it?
A. Well, I don't think that he got -- inquired as
to the use of the aircraft and how it's -- what it's
going to be -- how it's going to be used and particularly
since it's a two seater and it's one of only very few of
that model. It came from a school. I think there are a

Page 61

lot of questions there that had they been answered --
asked and answered, that we wouldn't be here today maybe.
Q. All right. So, in your opinion, Hardy should
have asked these questions of the Petersons?
A. Right.
Q. Okay. In your opinion, did the Petersons have
any responsibility to tell Hardy what they planned to use
the plane for?
A. Well, I think -- seemed to me it was obvious
when he bought the equipment from a school and was being
trained in it, that there was potential for -- again,
since it was designed as it was, that there was potential
for it being used for more than just ag application.
Q. Okay. So then is your answer that he did not
have a responsibility to tell Hardy what he planned to
use that plane for?
A. Beyond what -- I don't think he had any duty
beyond what he did do, which was, you know, get the
coverage and get the training that he was told to get.
Q. Do you believe he had a duty to tell Hardy that
he was going to use the plane for training school?
A. I don't know. I don't know 'cause it seems to
me that there was an implication there when the
underwriters said he could do training in it, that it

Page 62

appeared to him that he had -- probably didn't even think
about it, but he, I think, would have had to thought he
had coverage because they told him to use the plane in
such a fashion.
Q. And who told him that?
A. Well, the underwriter told Hardy and Hardy told
him that he had to get more hours in.
Q. And by that you mean that Scott Peterson himself
had to get more hours?
A. Right. I think he only had five hours when he
brought him in.
Q. Okay. And it's your opinion that by implication
that meant that he would have coverage for offering
turbine transition training to the public?
A. That he would be able to conduct turbo
transition --
Q. Training?
A. -- training.
Q. And by conducting that I mean offering to the
public as opposed to Pontiac for itself, its own
employees?
A. Yeah.
Q. Okay. And, in your opinion, was this breach of
the standard of care by Hardy not to inquire of the

Page 63

Petersons into the use of the aircraft?
        MR. MUELLER: Asked and answered.
BY MS. BARON:
A. Yeah.
Q. And do you hold that opinion to a reasonable
degree of insurance professional certainty?
A. Right. And even Mr. Hardy, in his deposition,
addresses that.
Q. And what do you mean?
A. He says -- in a response to a question he said,
yes, the use of the aircraft is vital. The use of the
aircraft will determine the availability and the cost to
the policy. Question, so you would have the
responsibility of finding that out? His answer was,
absolutely. Page 37.
Q. All right. Is there any other respect in which
you believe Hardy breached the duty that you've listed as
No. 2 in your report, duty to procure insurance or have
we covered that?
A. I don't think so -- I mean I think we covered
it.
Q. Let's go onto 3 which states, duty to maintain
insurance coverage. This duty arises out of the past
course of dealings or by arrangement between the producer

Page 64

1 and the client. Could you explain that duty?

2 A. Well, this is really more when you come to the
3 renewals or when you come -- it also addresses a little
4 bit in the fourth, as a producer you have obtained a
5 coverage and you place it with the company and
6 maintaining it, renewing it, reviewing it, things like
7 that which arises out of the past course of dealings.
8 Some states say a special relationship exists if you have
9 been with the same agent for a period of time and,
10 therefore, puts a greater duty on the agent.

11 Q. Do you know if Illinois is one of those or
12 Kansas?

13 A. I don't know. Michigan is. Or by arrangement
14 between the producer and the client. It ties in with 4
15 actually.

16 Q. Okay. Now this duty to maintain insurance
17 coverage, that doesn't mean that the broker should obtain
18 coverage that the client doesn't want, does it?

19 A. No, this is more making sure it's renewed. If
20 the company is going to cancel, you have to make sure you
21 try to get coverage for him elsewhere, things like that,
22 again based on relationship.

23 Q. Okay. Is it your opinion that Hardy breached
24 this duty, No. 3?

Page 65

1 A. No. In fact, he had the plane at AIG and then
2 he moved it to US-AIG for price and then he moved it back
3 to AIG because of the gypsy moth contract so he was
4 doing -- maintaining the coverage for Peterson.

5 Q. Going onto No. 4, you already touched on that,
6 it says, a duty to place insurance with a solvent
7 insurance company. There is no issue in this case, is
8 there, regarding any of the companies being insolvent?

9 A. No, no. There are only about five companies --
10 the one that I had the case in Wisconsin, they did go
11 under so even in a small group of companies, you've got
12 to be careful.

13 Q. All right. Let's move onto 5 which says a duty
14 to provide sound and proper advice regarding the client's
15 insurance needs. Could you explain that one?

16 A. That really, to me, that should be up closer to
17 the top.

18 Q. Okay.

19 A. That's where I think you, as a producer, you
20 examine what loss exposures there are and make
21 recommendations as to what loss exposures exist, what
22 coverages are available to protect them, what pricing you
23 can -- you know, things like add deductibles or lower
24 premiums, increase coverages, that kind of advice. And

Page 66

1 if it's -- if the agent or producer is really involved in
2 the case, then he would do such things.

3 Q. And is it your opinion that every insurance
4 broker has these duties?

5 A. Yeah. I dislike seeing them where they sell the
6 policy and disappear except on your birthday.

7 Q. Would you agree that the client must provide
8 essential information to the insurance producer in order
9 to get sound and proper advice?

10 A. As much as he can.

11 Q. Okay.

12 A. I mean the client isn't necessarily always aware
13 of what is available in the marketplace, what new
14 coverages might be out there, what company is selling
15 something different.

16 Q. And, in your opinion, did Hardy breach this duty
17 with respect to Pontiac?

18 A. Yes.

19 Q. And in what respect did he breach it?

20 A. Well, I don't think he followed through as far
21 as finding out exact use, the exposures that could be
22 connected with this new airplane.

23 Q. And, again, that would -- in your opinion, this
24 follow-through would have been about asking the

Page 67

1 Petersons?

2 A. Right.

3 Q. And do you believe this is a breach of the
4 standard of care by Hardy?

5 A. Yes.

6 Q. Do you hold this opinion to a reasonable degree
7 of insurance professional certainty?

8 A. Yes.

9 Q. When we talk about standard of care, what's your
10 understanding of what that means?

11 A. Well, I think standard of care is what is
12 expected by the industry of people in the industry.

13 Q. And where do we find that, is it written
14 somewhere?

15 A. Well, there are ways of -- associations have
16 ethical standards. C.P.C.U. has a series of them. I
17 think custom and usage is another way that a standard
18 develops. Regulatory practices can effect it.

19 Q. If Pontiac never told Hardy that they were using
20 the 503 for turbine transition training, Hardy did not
21 know that, did Hardy have any duty to procure an
22 insurance policy that covered it?

23 A. Well, I think it goes back to his knowledge of
24 the industry. I think the question really would have

Page 68

1 been, you know, you've got a plane designed for training,
2 are you going to use it for training. And if you're not
3 going to, I want you to be sure -- if you are going to,
4 we've got to do something with your insurance policy or
5 if you're not going to, your policy provides you
6 coverage. This is assuming, of course, that Hardy, at
7 the time he sold the policy, knew that National Union
8 wouldn't provide coverage.
9    Q. If he didn't know that, does your opinion
10 change?
11    A. I think because of the type of aircraft, if he
12 would have found out what they were going to do, that he
13 had an obligation to go to the underwriter.
14    Q. And how is it that he would have found out?
15    A. Well, the first thing was knowing the type of
16 aircraft and the second would be just simply asking. You
17 know, you're going to get training in this plane.
18 They're going to let you do that, and then the next step
19 would be, are you going to do any more training in it and
20 let's find out if they're going to let you.
21    Q. So is it your opinion that Hardy should then
22 have gone to the insurance company and asked them whether
23 they would -- their policy would cover --
24    A. Yes.

Page 69

1    Q. -- Pontiac running a turbine transition training
2 business?
3    A. Right.
4    MR. MUELLER: Again, Counselor, I take it it
5 presupposes the other assumption which was implicit that
6 Hardy had asked what use they were going to make of the
7 plane and had found that out and then goes to the
8 underwriter?
9    MS. BARON: Right.
10    MR. MUELLER: Okay.
11    THE WITNESS: Do you want to take five?
12    MS. BARON: Sure, why don't you do that?
13    THE WITNESS: I think you're going to get worn
14 out over here.
15    (Break was taken.)
16 BY MS. BARON:
17    Q. To your knowledge, did the Petersons ever ask
18 Hardy if the policy they had covered the AT-503 for its
19 use in turbine transition training?
20    A. Not to my knowledge.
21    Q. To your knowledge, did Hardy ever tell the
22 Petersons or Pontiac that they were covered for running a
23 turbine transition training business with that plane?
24    A. Not that I know of.

Page 70

1    Q. You mentioned earlier that Pontiac had an ad in
2 a magazine for their turbine transition training?
3    A. Right.
4    Q. Are you aware that both Randy Hardy and Angie
5 Banz testified they did not see that ad?
6    A. Yes. Well, I think he said he saw it the day of
7 the loss.
8    Q. That they had not seen it prior to the loss?
9    A. Yes.
10    Q. Do you have any opinion as to whether Hardy had
11 any duty to read trade magazines to search for
12 information regarding his clients?
13    A. No, I don't think so.
14    Q. Okay. And I'm looking at Page 9 of your report
15 at the bottom --
16    A. Okay.
17    Q. -- where you state, in my professional opinion
18 the aircraft insurance producer, Hardy, failed to meet
19 the duty of an insurance producer in that the insured was
20 not made aware of the possibility that the National
21 Union, I assume you mean policy --
22    A. Policy.
23    Q. -- was to be interpreted in such a way that
24 coverage was severely limited. Now prior to your

Page 71

1 involvement in this case, did you have any knowledge that
2 the National Union policy would be interpreted in that
3 fashion, that coverage would not be available?
4    A. No.
5    Q. All right. Then going over to Page 10 of your
6 report, and there you state essentially that it's your
7 professional opinion that Hardy failed in his duty to
8 advise his client of the type of coverages needed to meet
9 the expected loss exposures. I think you already
10 explained that, correct?
11    A. Right.
12    Q. Okay. Now, again, if Hardy was not made aware
13 that Pontiac was using the plane for turbine transition
14 training, did he have a duty to advise his client that
15 they needed coverage for it?
16    A. Well, he had told him that he was covered for
17 his additional -- for Scott's additional training. If
18 there was not to be coverage for, say, paid customers'
19 training, then I think he -- at that point he would have
20 had a duty to tell Scott, you know, you're covered but
21 only while you're doing your training.
22    Q. Okay. Is it your understanding that Pontiac had
23 spoken to Hardy Aviation Insurance about getting quotes
24 for ag training insurance coverage for an ag cat piston

Page 72

**Page 73**

1 plane?

2 A. Yeah, at some point earlier they had asked Hardy

3 to look into coverage and then --

4 Q. For piston --

5 A. For piston. I think they did look into it. I'm

6 reasonably sure they never went through with it.

7 Q. Do you recall from your review of the materials

8 that several companies declined to provide a quote for

9 that request?

10 A. I think -- I think that's right.

11 MS. BARON: Let's mark this.

12 (Reavis Deposition Exhibit Nos. 4 and

13 5 were marked for identification.)

14 BY MS. BARON:

15 Q. Just briefly, showing you what's been marked as

16 Deposition Exhibit No. 4, does this letter look familiar

17 to you?

18 A. No, not really.

19 Q. Okay. You see on this document that it's a

20 letter on Hardy letterhead dated June 24, 2002, and

21 stamped at the bottom is, thanks, but Phoenix will

22 decline to quote?

23 A. Right.

24 Q. And then the reference in the letter is the

**Page 74**

1 proposed training aircraft would be a two seater ag cat,

2 correct?

3 A. Right.

4 Q. Okay. And then looking at Exhibit 5, do you

5 recall ever seeing that before?

6 A. No.

7 Q. No?

8 A. No.

9 Q. Okay. All right. If you look at the bottom of

10 this document which I'll tell you is a note from Hardy's

11 file, it states there, Maribeth at AIG not interested,

12 Scott is too low time to instruct?

13 A. Yeah.

14 Q. And, again, that's basically a note about AIG

15 declining on the cat, to your knowledge?

16 A. Right.

17 Q. Okay. Is it your understanding that Hardy

18 eventually did get a quote for Pontiac for flight

19 training coverage on the ag cat or do you know one way or

20 the other?

21 A. I thought they did but I don't recall. I

22 thought they did this search but whether they ever got

23 one. . .

24 Q. Okay.

**Page 75**

1 MS. BARON: One more.

2 (Reavis Deposition Exhibit No. 6 was

3 marked for identification.)

4 BY MS. BARON:

5 Q. Just showing you briefly what's been marked

6 Deposition Exhibit 6, which is some handwritten notes,

7 have you ever seen that before?

8 A. I don't recall.

9 Q. At the bottom you'll see it's written, 9-4-02,

10 gave quote to Sarah. She was ecstatic, would us let know

11 when ready. This, again, is a note from Hardy's file and

12 I believe the deposition testimony was that the quote was

13 given to her but you don't have any recollection one way

14 or the other?

15 A. I do remember the ecstatic back in one of the

16 summaries.

17 Q. Did you review Hardy's file as part of the

18 materials you reviewed in this case?

19 A. Yeah. Well, I had the underwriting file and the

20 claim file.

21 Q. I mean Hardy's file as opposed to National

22 Union's file?

23 A. Well, I had the exhibits to Hardy's.

24 Q. To his deposition?

**Page 76**

1 A. Yeah.

2 Q. Okay. Just so I'm clear, other than this quote

3 that we've just talked about for this ag cat, do you know

4 whether Pontiac had insurance coverage for training in

5 any of its other planes?

6 A. No.

7 Q. If the Petersons knew they had no insurance

8 coverage for running a turbine transition training

9 business with the 503 and decided to do it anyway, would

10 that change your opinion in any way regarding Hardy's

11 conduct?

12 MR. MUELLER: Objection. Improper hypothetical.

13 Facts not in evidence.

14 BY THE WITNESS:

15 A. No, I don't think so.

16 Q. In such a situation, what do you believe Hardy

17 should do if the client decides to go forward without the

18 coverage?

19 MR. MUELLER: Objection. Facts not in evidence.

20 Hypothetical.

21 BY THE WITNESS:

22 A. If he was aware of it, I think to protect

23 himself, it would be best to send him a letter saying I

24 see that you're going ahead with this and I do not --

1 according to underwriters, I have checked and you don't
2 have coverage, or something like that, do you want me to
3 get coverage.
4    Q. Uh-huh. Okay. And if there was no response to
5 that, then that would be the end of it or as much as he
6 could do?
7    A. Yeah, I would think so.
8    Q. Okay. Couple more things here.
9        MS. BARON: All right. Here's three more
10 exhibits that you can mark.
11            (Reavis Deposition Exhibit Nos. 7, 8
12            and 9 were marked for
13            identification.)
14 BY MS. BARON:
15    Q. Just briefly showing you a few more documents
16 here, the first one marked Exhibit 7 consisting of two
17 pages with Bates No. 70 and 71 at the bottom. Have you
18 ever seen this document before?
19    A. I don't recall.
20    Q. It appears to be a Hardy Aviation Insurance
21 document which is entitled, Agricultural Aircraft
22 Insurance Application, correct?
23    A. Right.
24    Q. And coverage effective dates are April 10, 2002,

Page 77

1 to April 10, 2003, correct?
2    A. Right.
3    Q. And then the underwriting manager listed there
4 is US-AIG, is that correct?
5    A. Uh-huh.
6    Q. Is that yes?
7    A. Right.
8    Q. And then among the aircraft listed is included
9 the AT-503, correct?
10    A. Right.
11    Q. And then applicant's name is Pontiac Flying
12 Service, Inc.?
13    A. Yes.
14    Q. Then at the bottom right-hand corner it states,
15 aircraft use and in there it states, chemical, seed,
16 fertilizer application, correct?
17    A. Right.
18    Q. And then on Page 2 of this exhibit the heading
19 is aircraft liability coverages and then to the left
20 there it indicates passengers excluded, correct?
21    A. Right.
22    Q. And then at the bottom there's a signature which
23 does it appear to you to be of Scott Peterson?
24    A. Yes.

Page 78

1    Q. Does this application indicate what the uses of
2 the aircraft would be of the AT-503?
3    A. On No. 7?
4    Q. Yeah.
5    A. Well, chemical, seed, fertilization --
6 fertilizer application.
7    Q. Okay. Then showing you the next exhibit,
8 Exhibit 8 --
9    A. Uh-huh.
10    Q. -- which is four pages, Bates 60 through 63.
11 Have you ever seen this before?
12    A. I don't recall. I think these are the shrunk
13 pages that are in there.
14    Q. So you think you saw them in a smaller version?
15    A. Right.
16    Q. And this appears to be an application as well
17 through Hardy for an aerial application insurance quote?
18    A. Right.
19    Q. And, again, is the air tractor 503 listed on
20 here?
21    A. Yes.
22    Q. And looking at Page 2 of this document, does it
23 also -- strike that.
24        The last page of this document, Bates 063,

Page 79

1 does that contain a description of the air tractor,
2 AT-503, with respect to the coverages?
3    A. Right.
4    Q. And, again, under aircraft use, what does it
5 indicate?
6        MR. MUELLER: We're we're on 9 now?
7        THE WITNESS: No.
8        MS. BARON: 8, 063 at the bottom.
9 BY THE WITNESS:
10    A. Application, chemical, seeds, fertilizer at the
11 bottom.
12    Q. And then lastly I'm looking at now -- again
13 going back to that exhibit, that appears to you to be an
14 application on behalf of Pontiac Flying Service, correct?
15    A. Right.
16    Q. And then going onto Exhibit 9, the last one
17 there, which consists of two pages with Bates 68 and 69
18 at the bottom, again this appears to be another insurance
19 application through Hardy, correct?
20    A. Yes.
21    Q. And what are the effective dates on that one?
22    A. May 19th, 202 -- or 2002.
23    Q. Through May 19th, 2003?
24    A. Right.

Page 80

Q. And that's through AIG Aviation, correct?

A. Right.

Q. Again is this an application on behalf of Pontiac Flying Service?

A. Looks that way.

Q. And is the AT-503 listed on it?

A. Yes.

Q. And what uses are indicated at the bottom of the first page under aircraft uses?

A. Chemical, seed, fertilizer application.

Q. And then going onto the second page, which contains a description of the liability coverages, is there also an indication there that passengers are excluded?

A. Right.

Q. And then is that application signed at the bottom by Sarah Peterson?

A. Right.

Q. On the date of 6-28-02, correct?

A. Uh-huh.

Q. Okay. Do you see anything on any of these three documents stating that Pontiac was applying for coverage to run a turbine transition training business?

A. No.

Page 81

---

MR. MUELLER: Okay.

MS. BARON: Okay. And then I think I'm pretty much done if I could just look over my notes, if we could take a little break?

(Reavis Deposition Group Exhibit No. 10 was marked for identification.)

BY MS. BARON:

Q. Showing you what's been marked as Group Exhibit 10, I made a copy of your file and that's been marked as Group 10, correct?

A. Right.

Q. And I just want to ask a couple questions. The first two pages of that exhibit are typewritten notes that you prepared regarding your discussions with the various pilots you told us about?

A. Yes.

Q. Okay. Let's see if there's anything else here. And contained in this exhibit are copies of your report?

A. Right

Q. And copies of the Petersons' statements?

A. Oh, yeah.

Q. And this exhibit also contains copies of all of your correspondence with David Mueller, is that correct?

A. Right.

Page 83

---

Q. Do you have any opinions regarding Hardy Aviation Insurance with respect to Pontiac's CGL policies?

A. No.

Q. Okay. Do you have any opinion as to whether Pontiac's CGL. and by that I mean commercial general liability policy issued by National Union provided any coverage for the plane crash?

A. I don't know.

Q. Okay. Do you have any other professional opinions regarding Hardy Aviation Insurance which we have not discussed?

A. I don't believe so.

Q. Do you plan to do any further work on this case?

A. Only if asked.

Q. Okay. Now you also prepared a supplemental report, correct?

A. Right.

Q. But that one was directed solely to National Union and not to Hardy, is that correct? And I could mark it if you need to review it?

A. No, I think that's right.

MS. BARON: Okay. What I want to do is make a copy of the file, just the manila folder.

Page 82

---

Q. And then I believe you also have in this exhibit copies of your invoices or statements for services?

A. Right.

Q. I just had two other questions. Did you ever see anything in the materials that you reviewed to indicate that the Petersons ever told Hardy Aviation Insurance that they were taking over Harold Miller's business?

A. Not that I recall.

Q. Okay. All right. And then, lastly, I asked you about any authoritative texts regarding aviation insurance. To your knowledge, are there authoritative texts regarding insurance producers or brokers that you deem to be important?

A. Yes, there's several probably.

Q. Could you tell us the names of any of them, books that you deem to be authoritative texts regarding those topics?

A. Yeah. I have a couple articles. One was in the big I magazine.

Q. Big I magazine?

A. Yeah, Independent Agents Association.

Q. Okay.

A. I can't tell you when it was but it's a

Page 84

---

1 discussion of producer practices basically to keep you
2 out of E & O problems.  There's another book by somebody
3 named Anderson which is a similar one.  Of course the
4 C.P.C.U. stuff.
5   Q. Stuff meaning --
6   A. That legal environment book.  Then they also
7 have I think -- they've changed the part numbers on me
8 but they have an ethics section.
9   Q. In the materials that are studied?
10   A. In the C.P.C.U., yeah.  Those are some that I
11 can think of offhand.
12   Q. Okay.  And this first one, the Independent
13 Agents Association, is that some sort of magazine or
14 journal?
15   A. That's a magazine.
16   Q. Okay.
17   A. And old what's his name wrote the article.  I
18 know him well.
19   Q. Old what's his name.  I know the feeling.  And
20 you're not sure what time frame that was prepared?
21   A. Yeah, it was done while I was still in Kentucky
22 which was, I'd say, around '85 it was done.
23   Q. All right.
24   A. And in the middle of the night I'll wake up and

Page 85

1 remember his name.
2   Q. And I'm sure you'll advise Mr. Mueller who will
3 pass that information onto me if he remembers it?
4   MR. MUELLER:  I was going to say don't call me
5 in the middle of the night with an epiphany.
6   MS. BARON:  All right.  Let me just look over my
7 notes.  I think I'm done.
8 BY MS. BARON:
9   Q. Let me just ask you this.  You gave a number of
10 opinions in your report and to me regarding what you
11 believed to be breaches of the standard of care by Hardy
12 and said you held those to a reasonable degree of
13 insurance professional certainty.  What would be the
14 bases of those opinions?
15   A. I suppose primarily my experience in the trade.
16   Q. Okay.  I apologize if this has been asked
17 already.  Did you see anything in the records that you
18 reviewed which shows that Randy Hardy or Angie Banz knew
19 knew that Pontiac was running a turbine transition
20 training business?
21   MR. MUELLER:  Objection.  Asked and answered.
22   MS. BARON:  Was it?
23 BY MS. BARON:
24   Q. You can answer it.

Page 86

1   A. I don't think so.
2   MS. BARON:  Okay.  That is all I have.  Thank
3 you very much.
4   MR. MUELLER:  Okay.  He'll read and sign.  I've
5 ordered my transcript.  I'm out of here.
6   MS. BARON:  All right.  I'll order it too.
7   (Deposition concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   IN THE UNITED STATES DISTRICT COURT

Page 87

1   CENTRAL DISTRICT OF ILLINOIS - PEORIA DIVISION
2
3 NATIONAL UNION FIRE INSURANCE COMPANY )
  OF PITTSBURGH, P.A.,                  )
4        Plaintiff,                     )
                                        )
     vs.                               ) No. 03-1288
5                                        )
  PONTIAC FLYING SERVICE, INC., et al., )
6        Defendants.                    )
  ------------------------------------  )
7 PONTIAC FLYING SERVICE, INC.,         )
        Third Party Plaintiff,          )
8     vs.                               )
  HARDY AVIATION INSURANCE, INC.,       )
9     Third Party Defendant.            )
10
11   I, MARSHALL W. REAVIS, III, Ph.D., do hereby
  state that I have read the foregoing transcript of the
12 testimony given by me at my deposition on the 13th day of
  October, 2005, and that the said transcript is a true and
13 correct record of the testimony given by me at said
  deposition except as may be indicated on the errata
14 sheets, if any, attached hereto.
15
16 ERRATA SHEET(S) ATTACHED:  _____ YES _____ NO
17
18 _____
     MARSHALL W. REAVIS, III, Ph.D.
19
  Subscribed and Sworn To
20 before me this _____ day
  of _____, 2005.
21
22 _____
23   NOTARY PUBLIC
24 STATE OF ILLINOIS )

Page 88

Lake Shore Reporting 312-782-9833

1   COUNTY OF C O O K  )

2

3         I, Jodiana M. Stout, CSR, RPR, and Notary

4   Public within and for the County of Cook, State of

5   Illinois, do hereby certify that, to-wit, on the 13th day

6   of October, 2005, personally appeared before me at

7   10 South LaSalle Street, in the City of Chicago and State

8   of Illinois, Marshall W. Reavis, III, Ph.D., witness

9   produced on behalf of the Third Party Plaintiff in a

10  certain cause now pending and undetermined in the United

11  States District Court wherein National Union is the

12  plaintiff and Pontiac Flying Services, Inc., is the

13  defendant.

14        I further certify that said witness was by

15  me first duly sworn to testify the truth, the whole truth

16  and nothing but the truth in the cause aforesaid; that

17  the testimony then given by said witness was reported

18  stenographically by me in the presence of the said

19  witness and afterwards transcribed, and the foregoing is

20  a true and correct transcript of the testimony so given

21  by said witness as aforesaid.

22        I further certify that I am not counsel

23  for nor in any way related to any of the parties to this

24  suit, nor am I in any way interested in the outcome

Page 89

1   thereof.

2         I further certify that signature was

3   reserved.

4         In testimony whereof I have hereunto set

5   my hand this 2nd day of November, A.D., 2005.

6

7

8   _____
    JODIANA M. STOUT, CSR, RPR
    Notary Public
9   Cook County

10          Illinois

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 90