E-FILED
Friday, 01 September, 2006 02:37:56 PM
Clerk, U.S. District Court, ILCD

**THIRD PARTY DEFENDANT'S
EXHIBIT NO. 15**

## In The Matter Of:

*National Union Fire Company   v.*
*Pontiac Flying Services, Inc.*



ANGELA BANZ
July 15, 2004

*Court Reporting Service*
*Litigation Support*
*Midcity Place*
*115 East Douglas*
*Wichita, KS  67202*
*(316) 267-1201    FAX: (316) 267-1203*

Original File JG2048.TXT, 39 Pages
Min-U-Script® File ID: 2079722059

**Word Index included with this Min-U-Script®**

Page 1

[1]        UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
[2]
[3] NATIONAL UNION FIRE COMPANY    )
    OF PITTSBURGH, PA.,             )
[4]                                 )
            Plaintiff,              )
[5]                                 )
        vs.                         ) No. 03-1288
[6]                                 )
    PONTIAC FLYING SERVICES,        )
[7] INC.,                           )
[8]         Defendants and          )
        Third Party Plaintiff,      )
[9]                                 )
        vs.                         )
[10]                                )
    HARDY AVIATION INSURANCE, INC., )
[11]        Third Party Defendant.  )
[12]
[13]
[14]    Deposition of ANGELA BANZ, taken by the
[15] Defendant, Pontiac Flying Services, Inc. before me,
[16] Janelle E. Goddard, a Certified Shorthand Reporter
[17] within and for the State of Kansas, at 100 North
[18] Broadway, Suite 600, Wichita, Sedgwick County,
[19] Kansas, commencing at 2:30 p.m. on the 15th day of
[20] July, 2004.
[21]            APPEARANCES
[22]    Plaintiff, National Union Fire Company of
[23] Pittsburgh, PA., appears by its attorney, Mark T.
[24] Banovetz, Tressler, Soderstrom, Maloney & Priess,
[25] 233 South Wacker Drive, 22nd Floor, Chicago,

Page 2

[1]        APPEARANCES (cont.)
[2] Illinois 60606-6308.
[3]        Defendant and Third Party Plaintiff,
[4] Pontiac Flying Services, Inc. appears by its
[5] attorney, David Mueller, Cassidy & Mueller,
[6] 323 Commerce Bank Building, 416 Main Street, Peoria,
[7] Illinois 61602.
[8]        Third Party Defendant, Hardy Aviation
[9] Insurance, Inc. appears by its attorney, Diane M.
[10] Baron, Clausen Miller, P.C., 10 South LaSalle
[11] Street, Chicago, Illinois 60603-1098.

Page 3

[1]        INDEX OF EXAMINATION
[2] ANGELA BANZ
[3]        DIRECT
[4] by Mr. Mueller.....4
[5]
[6]
[7]
[8]
[9]
[10]
[11] SIGNATURE OF WITNESS................38
[12] CERTIFICATE OF REPORTER.............39

Page 4

[1] ANGELA BANZ,
[2] having been first duly sworn, was
[3] examined and testified as follows:
[4]
[5]        **DIRECT EXAMINATION**
[6]        **BY MR. MUELLER:**
[7]    **Q:** Let the record show that this is the deposition
[8] of Angie Banz taken pursuant to the federal
[9] rules and the notice.
[10]        Angie, I'm going to ask you a series
[11] of questions that you're under oath to answer.
[12] Possibly the other lawyers have some questions
[13] that they may want to ask you as well. In
[14] answering the questions, if they call for a yes
[15] or a no, then state yes or no because she can't
[16] pick up head nods and uh-huhs and huh-uhs.
[17] They don't come across very well. Okay?
[18]    **A:** I understand.
[19]    **Q:** And if you don't understand a question, let the
[20] person asking it know so that it can be
[21] rephrased. Otherwise, we will assume that you
[22] understood it and that your answer is
[23] responsive. All right?
[24]    **A:** Got it.
[25]    **Q:** Give us your full name, please.

Page 5

[1] A: Angela K. Banz.
[2] Q: I hate to ask a lady this, but what's your date
[3] of birth?
[4] A: 3-25-66.
[5] Q: And by whom are you employed?
[6] A: Hardy Aviation Insurance.
[7] Q: How long have you been employed by Hardy
[8] Aviation Insurance?
[9] A: Nine and a half years.
[10] Q: What is your address, residential?
[11] A: 134 South Third, Colwich, Kansas.
[12] Q: And you said nine years with Mr. Hardy?
[13] A: Yes.
[14] Q: That's Randy Hardy that just left this room?
[15] A: Yes.
[16] Q: And what is your job there with Hardy Aviation
[17] Insurance?
[18] A: My title is executive assistant. My job is
[19] customer service work, policy service, and I
[20] act as the office manager.
[21] Q: An assistant to whom?
[22] A: Randy.
[23] Q: Now policy service, does that mean that you're
[24] the person that interfaces with the
[25] policyholders?

Page 6

[1] A: That's a good way to put it.
[2] Q: And would that be the case with Scott and Sarah
[3] Petersen on the policy that brings us here?
[4] A: Yes.
[5] Q: Are you a licensed real estate broker agent in
[6] the State of Kansas?
[7] A: I hold a property and casualty license in the
[8] State of Kansas.
[9] Q: And that allows you to solicit for and to
[10] procure property and casualty policies for
[11] insureds?
[12] A: Yes.
[13] Q: And do you handle any kind of property and
[14] casualty lines other than aviation insurance?
[15] A: We have begun to handle some actual property
[16] and casualty physical damage policies on
[17] hangars.
[18] Q: But it's all under the umbrella one way or
[19] another of flight.
[20] A: It's all aviated related.
[21] Q: Did you have to take a test or examination in
[22] order to get your Kansas license?
[23] A: Yes.
[24] Q: And when did you take that?
[25] A: 1987.

Page 7

[1] Q: Is that a written test or an oral test or
[2] combination?
[3] A: That is a written test.
[4] Q: And where do you take that? Where did you take
[5] that?
[6] A: I believe I took it at the Kansas Insurance
[7] Department office here in Wichita.
[8] Q: And I take it you passed it first time around?
[9] A: Yes, sir.
[10] Q: Congratulations.
[11] A: Thank you.
[12] Q: And since that time you have been acting as a
[13] broker for property and casualty insurance in
[14] the aviation field; correct?
[15] A: Yes. Using the term broker or agent, yes.
[16] Q: Did you study various materials regarding what
[17] it means to be a broker/agent in the State of
[18] Kansas and what your responsibilities are prior
[19] to taking the test?
[20] A: Prior to taking the test, I attended a
[21] three-day course at an office here in Wichita
[22] that prepares you to pass the Kansas Insurance
[23] Department property and casualty agent test.
[24] Q: And tell us where that office is. What's the
[25] name of it?

Page 8

[1] A: It's called Norris Training Systems here in
[2] Wichita.
[3] Q: And did you also have any books or materials?
[4] A: No, only their course study material.
[5] Q: Did you save the course study material?
[6] A: For awhile.
[7] Q: Earlier, Randy testified that the preparation
[8] for the test and the training at least as far
[9] as the new hires are concerned is something
[10] that is done in the office. Do you know
[11] anything about that?
[12] MS. BARON: I'm going to object as
[13] mischaracterizing. Are we talking about
[14] training to get a license or training in
[15] how to work in the particular office?
[16] MR. MUELLER: I think that's a fair
[17] enough.
[18]                BY MR. MUELLER:
[19] Q: I've been assuming that back in the beginning
[20] we were talking about training to get a license
[21] because you had to understand what it was you
[22] were doing, but are you aware of any training
[23] to understand what the terms and provisions of
[24] the policies that you sell is that is done in
[25] the office?

Page 9

[1]  A: Training on the policies that we sell is done
[2] in-house. Regretfully, the training to obtain
[3] your insurance agent license in the State of
[4] Kansas has relatively — a relatively small
[5] amount of information that pertains to
[6] aviation.
[7]  Q: Do you learn in studying for your license what
[8] your responsibilities and obligations are to
[9] the clients to whom you sell the policy?
[10]  A: Yes.
[11]  Q: And have you heard the term that you are a
[12] fiduciary in that context?
[13]  A: No, I don't recall having heard that term.
[14]  Q: Do you understand that you have — that your
[15] obligation as a broker/agent in the State of
[16] Kansas is to always act in the best interests
[17] of the person for whom you are procuring the
[18] policy as opposed to the insurance company?
[19]  A: That is my understanding, although the training
[20] that we receive for our agency license will
[21] actually tell you it's the other way around.
[22]  Q: Do you agree that for the policies that you
[23] sell that it is your responsibility to
[24] understand what the coverages are and what
[25] those policies mean?

Page 10

[1]  A: That is my understanding.
[2]  Q: And would you ever sell a policy or recommend a
[3] policy to an insured that had provisions that
[4] you didn't understand?
[5]  A: I would attempt not to. I would hope that I
[6] would have a full understanding before I passed
[7] on the policy to an insured.
[8]  Q: And that would be true of the policy —
[9] policies we're talking about here that relate
[10] to Scott and Sarah Petersen?
[11]  A: Yes.
[12]  Q: So would you agree that indeed in your dealings
[13] with Scott and Sarah Petersen that you owed
[14] them the obligation to look out for their best
[15] interests and to see to it that the policies
[16] that you sold to them were policies that you
[17] understood?
[18]  A: Yes.
[19]  Q: And before you came in, we were talking to
[20] Randy about Exhibit H which is the web page for
[21] Hardy Aviation Insurance. Have you seen that
[22] before?
[23]  A: Not until I walked into this room.
[24]  Q: Would you agree that as it's stated here on the
[25] web page that Hardy will monitor the total

Page 11

[1] insurance program of its clients?
[2]  A: We try to do that.
[3]  Q: And that Hardy keeps up-to-date with changes
[4] that may affect the insured risk of the
[5] clients?
[6]  A: We try to do that.
[7]  Q: And is that something you tried to do with
[8] Scott and Sarah Petersen?
[9]  A: I believe so.
[10]  Q: We have in Exhibit E, if you could get that, a
[11] number of memoranda, notes and letters that you
[12] prepared regarding the policy in question.
[13] Just take a second to familiarize yourself with
[14] the file. Would it be accurate to say that you
[15] were the middle person — started to say middle
[16] man, but you were the middle person between
[17] Mary Beth Schwaegel of AIG and Scott and Sarah
[18] Petersen regarding this coverage?
[19]  A: Yes.
[20]  Q: Did you ever make any policy interpretations or
[21] promise any coverage yourself to the Petersens
[22] that was not backed up by the authority of Mary
[23] Beth Schwaegel?
[24]  A: No.
[25]  Q: So if the Petersens wanted certain coverage,

Page 12

[1] you would go to Mary Beth Schwaegel and find
[2] out if that coverage was authorized under the
[3] policy.
[4]  A: Yes.
[5]  Q: Do you have a recollection of procuring
[6] coverage for Scott and Sarah for the Air
[7] Tractor at the time it was purchased?
[8]  A: Yes.
[9]  Q: And would you agree that the coverage for that
[10] plane was bound and became effective on
[11] March 1, 2002? And to short-circuit things,
[12] I'll direct you I believe to Page 51.
[13]  A: In looking at the paperwork, I've lost track of
[14] your question.
[15]  Q: My question was would you agree that the policy
[16] became effective on that Air Tractor as of
[17] March 1, 2002?
[18]  A: Yes.
[19]  Q: Are you aware of any discussions after March 1,
[20] 2002, with Mary Beth Schwaegel regarding
[21] turbine transition training coverage for that
[22] plane involving Scott Petersen?
[23]  A: No.
[24]  Q: Did you have any discussions with either Scott
[25] or Sarah Petersen regarding additional

Page 13

[1] transition turbine training for Scott Petersen
[2] and coverage for that training on the plane
[3] after March 1, 2002?
[4]   A: No.
[5]   Q: Just so it's clear for the record, do you
[6] recall discussions at any time discussion with
[7] Mary Beth Schwaegel with regard to turbine
[8] training for Scott Petersen after he acquired
[9] the plane?
[10]   A: No.
[11]   Q: Do you know whether Randy Hardy had any
[12] discussions with Mary Beth Schwaegel on that
[13] subject?
[14]   A: Not to my knowledge.
[15]   Q: Do you know whether Randy Hardy had any
[16] discussions with Scott or Sarah Petersen on
[17] that subject?
[18]   A: Not to my knowledge.
[19]   Q: Now as a part of the monitoring process if you
[20] became aware that Scott Petersen was using the
[21] plane for turbine transition training, would
[22] you have had the responsibility to question
[23] whether or not he had coverage?
[24]   A: Yes.
[25]   Q: Were you ever aware that Scott and Sarah

Page 14

[1] Petersen were using the plane for transition
[2] turbine training prior to the accident?
[3]   A: No.
[4]   Q: Are you familiar with a publication, and by
[5] golly, I got one right here called Ag Air
[6] Update?
[7]   A: I am familiar with that publication, yes.
[8]   Q: And is that one of the publications to which
[9] Hardy subscribes?
[10]   A: Yes.
[11]   Q: And would that be true back in 2002 and 2003?
[12]   A: I believe we held a subscription at that time.
[13]   Q: And as Randy's personal assistant and did you
[14] say business manager?
[15]   A: Office manager.
[16]   Q: Office manager, are you the one that prepares
[17] the checks to pay for the ads in Ag Air Update?
[18]   A: No, sir. I don't handle money.
[19]   Q: As office manager, do you play any role in the
[20] advertising that Hardy puts out in various
[21] trade publications?
[22]   A: No. Actually Mr. Hardy handles all of that
[23] himself.
[24]   Q: Do you read the Ag Air Update to keep
[25] up-to-date with agricultural aviation?

Page 15

[1]   A: Occasionally, but not regularly.
[2]   Q: Do you ever notice whether or not Hardy's ads
[3] appear in the magazine?
[4]   A: When I pick it up I look for it, but it's not
[5] on a regular basis.
[6]   Q: Going back to, and I'm trying to short-circuit
[7] this, January of 2003, the policy in question
[8] expired on I believe May 19th of 2003 so
[9] according to Randy you were in the process of
[10] working up the renewal for that policy starting
[11] in January of 2003.
[12]   MR. BANOVETZ: I think you were
[13] referring to the expiration in the wrong
[14] year. It was going to expire in '02.
[15]   MR. MUELLER: No, it was going to
[16] expire in '03 because he had the policy
[17] May 19th of '02 to May 19th of '03.
[18]   MR. BANOVETZ: But the accident
[19] happened by then; right?
[20]   MR. MUELLER: Well, the accident
[21] happened before the policy expired because
[22] May 5th, '03, was the accident.
[23]   MR. BANOVETZ: I thought you were
[24] talking about the renewal of the earlier
[25] policy. I'm sorry.

Page 16

[1]   MR. MUELLER: I'm talking about the
[2] renewal of the policy that was in force
[3] and effect.
[4]       BY MR. MUELLER:
[5]   Q: So do you recall — Randy said you start the
[6] renewal process about 120 days before the
[7] policy expires.
[8]   A: That is correct.
[9]   Q: So we kind of backed that back to January and
[10] he looked in the file and said, yeah, we were
[11] working on the renewal back in January of '03.
[12] Would that be consistent with the way you do
[13] business?
[14]   A: Yes.
[15]   Q: Notice I'm not going to have her go through and
[16] try to find that and verify it.
[17]   A: Sounds about right.
[18]   Q: Now I'm going to show you the April, 2003,
[19] issue of Ag Air Update, specifically pages 2A
[20] which appear on the left-hand side of the
[21] tabloid and Page 3A which appears on the
[22] right-hand side of the tabloid and I would ask
[23] you if there is an ad on the left-hand side for
[24] Hardy Aviation Insurance.
[25]   A: Yes, there is.

Page 17

[1] Q: Have you ever seen that format of ad before?
[2] A: Yes.
[3] Q: And is this — when you've picked the magazine
[4] up, is this what you have looked for to see
[5] your ad in there?
[6] A: Yes.
[7] Q: And then if you look on the right-hand side and
[8] watch this, directly opposite the ad for Hardy
[9] appears an ad, does it not, for Pontiac Flying
[10] Service?
[11] MS. BARON: Object to the extent it's
[12] vague in that it's not directly opposite
[13] on the same page, but go ahead.
[14] A: Yes, there is an ad for Pontiac Flying Service
[15] on the opposing page.
[16] BY MR. MUELLER:
[17] Q: And if you were sitting there holding this
[18] tabloid as we hold tabloids opening them up
[19] right and left-hand side and you glanced
[20] directly across from the Hardy ad, what does
[21] that ad for Pontiac Flying Service say?
[22] A: It is advertising turbine transition training
[23] in an AT503.
[24] Q: Is it your testimony that you never saw the
[25] turbine transition ad in the Ag Air Update?

Page 18

[1] A: That is correct.
[2] Q: Just so happens I got another one here. I
[3] would ask you to turn to Page 7A on that and is
[4] there an ad on Page 7A same thing for Pontiac
[5] Flying Service for transition training?
[6] A: Yes.
[7] Q: And is it your testimony that you did not see
[8] that ad in the December, 2002, volume of Ag Air
[9] Update?
[10] MS. BARON: I'm just going to — is
[11] it December or is it November, 2002?
[12] MR. MUELLER: It says December up
[13] there.
[14] MS. BARON: My mistake.
[15] MR. MUELLER: No, it says mailed
[16] November 27th, 2002. I was wondering
[17] myself.
[18] BY MR. MUELLER:
[19] Q: Is it your testimony that you didn't see that
[20] ad either?
[21] A: Yes. At the risk of sounding sarcastic, I'd
[22] have to read the magazine to see the ad and I
[23] don't read them on a regular basis.
[24] Q: And would you agree with Randy that if you had
[25] seen that and knew that Scott and Sarah were

Page 19

[1] doing turbine transition training that you
[2] would have gotten in touch with them regarding
[3] coverage?
[4] A: Most certainly.
[5] Q: That's your responsibility as their agent, is
[6] it not?
[7] A: Correct.
[8] Q: Going back to December, 2002, and April, 2003,
[9] who else was employed by Hardy as agents?
[10] A: During those dates I believe Melinda Green was
[11] working for us at the time.
[12] Q: She's still employed?
[13] A: Yes. And Rita Etheridge.
[14] Q: And is she still employed?
[15] A: Yes.
[16] Q: And what are their positions?
[17] A: Customer service representatives. We don't
[18] have a clear title. They also do policy
[19] service.
[20] Q: What's the difference between being a customer
[21] service representative and doing policy
[22] service?
[23] A: No real difference in the tasks. We've just
[24] never been able to put a clear title or
[25] definition to that particular position.

Page 20

[1] Q: Did you ever have any discussions at all that
[2] you can recall with either Scott Petersen or
[3] Sarah Petersen regarding the use of the Air
[4] Tractor for turbine transition training?
[5] A: No.
[6] Q: Did anyone else with Hardy handle or work on
[7] the account other than you and possibly Randy?
[8] A: Only if for some reason I would have been gone
[9] and some service needed to be done on the
[10] policy, in my absence Rita is also proficient
[11] in ag insurance and I believe there was one
[12] note in the file that she had taken at one
[13] point in time in my absence.
[14] Q: Showing you Exhibit H again — before we get
[15] there, directing you to page 104 of Exhibit E,
[16] is that a copy of a letter dated June 18, 2002,
[17] from you to Pontiac Flying Service, Inc.?
[18] A: Yes.
[19] Q: And did you say in that letter addressed to
[20] Dear Scott and Sarah: Remember that in the
[21] event of a loss, the wording of the policy
[22] determines exact coverage?
[23] A: The letter does state that.
[24] Q: What did you mean by that? That they should
[25] read their policies and try to understand them?

Page 21

[1] **A:** This is a form letter within our system. This
[2] same letter is sent to all of our insureds when
[3] insurance is renewed and that particular
[4] verbiage is on all of these letters, yes,
[5] reminding our insureds that the wording of
[6] their policy determines their exact coverage.
[7] **Q:** Are you admonishing them then to sit down by
[8] the fire of a night and pull the policy out and
[9] read through it?
[10] **A:** The intent of this comment is to urge the
[11] insureds to look through their policy.
[12] **Q:** And would you agree with Randy that you ain't
[13] been confused until you've read one of these
[14] policies?
[15] **MS. BARON:** I'll just object as
[16] misstating his exact testimony, but go
[17] ahead.
[18] **MR. MUELLER:** We're going to circle
[19] up on that.
[20] **A:** Insurance policies can be confusing for those
[21] not in the industry.
[22]               **BY MR. MUELLER:**
[23] **Q:** So when you tell the policyholder that his
[24] coverage is controlled by the policy,
[25] therefore, to read it, at the same time you

Page 22

[1] don't really expect them to understand it, do
[2] you?
[3] **A:** I would expect that if they read it and have
[4] questions they would call and discuss those
[5] questions with us.
[6] **Q:** And how much training have you had from the
[7] time you started down to the present time
[8] trying to understand what these policies mean
[9] yourself?
[10] **A:** Twenty years.
[11] **Q:** And would you agree — and I'll show you from
[12] nothing other than the web page the language of
[13] Randy saying: If I don't have you confused yet
[14] then read your policy. That's enough to
[15] confuse anyone. Do you agree with that?
[16] **A:** That's a Randy comment. I will agree to that.
[17] **Q:** I don't know that it's salacious. You mean
[18] it's a comment made by Randy. It's not a randy
[19] comment.
[20] **A:** Yeah.
[21] **Q:** Well, do you agree with that that if you really
[22] want to get confused, sit down and read one of
[23] these policies?
[24] **A:** If you really want to get confused, sit down
[25] and read any insurance policy.

Page 23

[1] **Q:** So with that in mind, do you try to talk to the
[2] insureds when they purchase a policy to tell
[3] them what coverages they have and what the
[4] terms of the policy mean?
[5] **A:** We try to determine the insured's needs and
[6] requirements for coverage and then make sure
[7] that the policy does provide those coverages.
[8] **Q:** And then do you take it to the next step and
[9] point out to them the language in the policy
[10] that provides that coverage so they can
[11] understand it?
[12] **A:** Trying to decide how to properly answer that
[13] question. No, we don't make it a standard
[14] practice of following up with insureds after
[15] we've sent them their policy to see if they
[16] have any questions on it.
[17] **Q:** Let's make the assumption as you've said that
[18] if they sit down and read the policy and they
[19] can't understand it and it confuses them, then
[20] it doesn't do them any good to sit down and
[21] read the policy, so if they're going to have
[22] any understanding of it at all, you have to
[23] explain it to them, don't you?
[24] **A:** Most of our insureds who have questions
[25] regarding their coverage will call us if they

Page 24

[1] have a question.
[2] **Q:** How many calls have you received before there
[3] was a loss saying that we've read our policy
[4] and we want you to tell us what this means?
[5] **MS. BARON:** From the beginning of her
[6] work in the business?
[7]               **BY MR. MUELLER:**
[8] **Q:** In the 20 years without being done in the
[9] context of a loss, how many people have read
[10] the policy and said, hey, I don't understand
[11] this term, what does it mean?
[12] **A:** I couldn't put a number forth to you.
[13] **Q:** Can you number it over the number of fingers
[14] you have on one hand?
[15] **A:** Yeah, I could attest to that.
[16] **Q:** How about two hands? Have you had more than
[17] ten phone calls in 20 years from people that
[18] have actually read their policies?
[19] **A:** I will state that it is not a large percentage.
[20] **Q:** Did you ever explain to Scott and Sarah
[21] Petersen what is meant in the term aerial
[22] application in the policy in question which is
[23] Exhibit A?
[24] **A:** And your question was did I explain to them
[25] what was —

Page 25

[1] Q: What was meant by the term aerial application
[2] means the application by aircraft of seeds,
[3] fertilizers or chemicals. And then I'm going
[4] to ask did you ever explain what is meant by
[5] the term, and includes flights in direct
[6] support thereof? Did you ever tell them what
[7] flights in direct support thereof meant?
[8] A: No.
[9] Q: Has that term ever been defined for you by AIG?
[10] A: No.
[11] Q: Has that term ever been defined for you by
[12] Randy?
[13] A: Defined, no. We have discussed the matter over
[14] 20 years of being in the business.
[15] Q: Would you agree that before someone can apply
[16] seeds, fertilizers or chemicals by aircraft,
[17] they have to know how to fly the plane?
[18] A: Yes.
[19] Q: So would you agree that flight instruction is
[20] one of the things that is required in direct
[21] support of the application by aircraft of
[22] seeds, fertilizers or chemicals?
[23] MR. BANOVETZ: Objection as to form.
[24] What aircraft? Are we talking about
[25] any —

Page 26

[1] MR. MUELLER: Any aircraft. You have
[2] to know how to fly the plane, don't you,
[3] before you can apply seeds, fertilizers or
[4] chemicals. She agreed.
[5] BY MR. MUELLER:
[6] Q: Now I'm asking would you agree then that
[7] instruction on how to fly the plane is required
[8] for the application by aircraft of seeds,
[9] fertilizers or chemicals?
[10] A: It has been my understanding and my experience
[11] in the business that training in the aircraft
[12] is separate from.
[13] Q: Now that doesn't answer my question. My
[14] question was would you agree that flights for
[15] instruction to tell the pilot how to fly the
[16] plane are necessary for the application by
[17] aircraft of seeds, fertilizers or chemicals?
[18] Well, I'll simplify it. Can they apply — can
[19] anybody apply seeds, fertilizers or chemicals
[20] without knowing how to fly the plane?
[21] A: No.
[22] Q: So in order to apply the seeds, fertilizer or
[23] chemicals by aircraft, they've got to have
[24] training; correct?
[25] A: Yes.

Page 27

[1] Q: And, therefore, training is required in direct
[2] support of the application of seeds,
[3] fertilizers or chemicals, is it not?
[4] A: No, not in direct support thereof.
[5] Q: Do you know any way that seeds, fertilizers or
[6] chemicals can be applied by aircraft without
[7] training of the pilot to fly the plane?
[8] A: No.
[9] Q: Did you have any discussions with either Scott
[10] or Sarah Petersen after the accident?
[11] A: Yes.
[12] Q: How did you learn of the accident?
[13] A: Sarah called me to advise me that the accident
[14] had taken place on the afternoon that it did
[15] take place.
[16] Q: And I'm sure everyone will agree so we'll
[17] short-circuit it that that was May 5th of 2003.
[18] A: Yes.
[19] Q: And was that — when you say called, was that
[20] by telephone?
[21] A: Yes.
[22] Q: And what did she say to you at the time and
[23] what did you say to her in that conversation?
[24] A: She advised me that an accident had taken
[25] place, that they had lost their good friend,

Page 28

[1] Rick Lucente, and made a comment that there was
[2] a student on board the airplane.
[3] Q: And do you have any memo of that?
[4] A: Yes.
[5] Q: And what page does that appear on?
[6] A: Page 119.
[7] Q: And is this a notation that you made at the
[8] time of the phone call?
[9] A: Yes.
[10] Q: What is meant by 503D?
[11] A: If I recall, that is the registration number of
[12] the Air Tractor. That is its FAA registration
[13] number.
[14] Q: Did she tell you anything that is not noted on
[15] this memorandum and that you can recall
[16] independently from it?
[17] A: On the original phone call, no. This was
[18] basically the extent of the conversation. She
[19] was very, very shaken at the time and was not
[20] given to talk much more than that.
[21] Q: Was she crying?
[22] A: Yes.
[23] Q: Did you ever have any other conversations with
[24] either Sarah or Scott Petersen?
[25] MS. BARON: Are we talking about

Page 29

[1] after?
[2]         BY MR. MUELLER:
[3] **Q:** Afterward, yes.
[4] **A:** Yes.
[5] **Q:** And when did you have the next conversation?
[6] **A:** By the file notes, it was May the 5th of '03.
[7] **Q:** May the 8th?
[8] **A:** May the 8th, I'm sorry. May the 8th.
[9] **Q:** And who did you talk to?
[10] **A:** Sarah Petersen.
[11] **Q:** And what did she say to you and what did you
[12] say to her?
[13] **A:** This particular conversation was regarding the
[14] fact that the ex-wife of the passenger on board
[15] the 503 had called Pontiac inquiring about
[16] insurance on behalf of their minor child, and I
[17] told Sarah at that point in time she needed to
[18] refer all such questions to the adjustor that
[19] had been assigned to the loss.
[20] **Q:** And would that be the last contact that you had
[21] with either Scott or Sarah regarding this
[22] accident?
[23] **A:** I recall one other conversation which would
[24] have been more recently when AIG officially
[25] denied the claim.

Page 30

[1] **Q:** Do you have any memorandum or notations
[2] regarding that conversation?
[3] **A:** Without going through the file, I don't know.
[4] I couldn't tell you.
[5] **Q:** Well, the file's been produced for us here
[6] which is Exhibit E. Do you see anything in
[7] Exhibit E?
[8] **A:** Not past that particular date.
[9] **Q:** Do you have any independent recollections as
[10] you sit here today of those conversations — or
[11] that conversation, I guess?
[12] **A:** I recall Sarah calling saying that they had
[13] received the official denial letter and I
[14] confirmed with her that we had also, and beyond
[15] that point I didn't speak with her any more
[16] regarding the loss.
[17] **Q:** And was that the sum and substance that you can
[18] recall of that conversation?
[19] **A:** Yes, sir.
[20] **Q:** And I don't want later to find out, oh, yeah,
[21] and she went on and said this and that and this
[22] and that. You've now told us all you can
[23] remember.
[24] **A:** That is all I recall about the conversation.
[25] **Q:** Now come to page 121 and 122 and just take a

Page 31

[1] moment to read those e-mails.
[2] **A:** Okay.
[3] **Q:** Based upon your experience, would you agree
[4] with the statement that if a policy is going to
[5] be changed, there needs to be an endorsement
[6] for that purpose?
[7] **A:** Yes, I agree with that.
[8] **Q:** And if there is no endorsement for that
[9] purpose, then you look to the language of the
[10] policy as it exists.
[11] **A:** Yes, I agree with that.
[12] **Q:** Now on page 121 down near the bottom, and I
[13] understand that this is Randy's e-mail so I'm
[14] using it to jar your recollection, it says in
[15] the last full sentence on the page: She,
[16] referring to Sarah, told me over the phone she
[17] was under the understanding or they assumed
[18] that since we added Scott back in the beginning
[19] for transition training by Harold Miller who
[20] they bought this aircraft from that this gave
[21] them transition training coverage just like the
[22] school they bought the aircraft from. Do you
[23] see that sentence?
[24] **A:** Yes, I do.
[25] **Q:** And it says assume that since we, do you

Page 32

[1] understand the we to be the Hardy Insurance
[2] Agency?
[3] **MR. BANOVETZ:** Object on the basis
[4] that this is third string down the line
[5] here interpreting what somebody else
[6] interpreted.
[7] **MS. BARON:** I'm going to join to the
[8] extent she didn't prepare this and it
[9] calls for speculation for her to testify
[10] what it meant, but go ahead. You can
[11] answer.
[12]         BY MR. MUELLER:
[13] **Q:** You understand the we he's referring to is the
[14] Hardy Insurance Agency?
[15] **A:** It is the Hardy Insurance Agency, and normally
[16] the insurance company, we in our office use the
[17] term collectively when we do something.
[18] **Q:** Now I'm going to ask does this refresh your
[19] recollection regarding whether there was
[20] turbine transition training coverage on that
[21] plane for transition training of Scott by
[22] Harold Miller? Do you recall anything about
[23] that?
[24] **A:** No. It is my recollection that when the
[25] airplane was originally added to Petersens'

Page 33

[1] policy, Scott had already received his training
[2] from Harold Miller. The airplane was added to
[3] the policy with Scott as an approved pilot for
[4] him to use it for ag use.
[5] **Q:** So you don't recall any requirement on the part
[6] of AIG or Mary Beth Schwaegel that you
[7] communicated to Scott — by you I'm saying the
[8] Hardy Agency communicated to Scott that they
[9] would bind the coverage but he had to have
[10] additional turbine transition training by
[11] Harold Miller as a condition to the coverage?
[12] **A:** I do not recall a requirement for any further
[13] training for Scott to be able to fly the
[14] airplane.
[15] **Q:** And if the records show that Scott in fact
[16] received that additional training, do you know
[17] whether he was covered — whether the plane was
[18] covered for that training or not?
[19] **MS. BARON:** I'll just object to the
[20] extent it's hypothetical.
[21] **BY MR. MUELLER:**
[22] **Q:** Did you understand the question?
[23] **A:** I do not recall there being a requirement of
[24] Scott having to have any more training in the
[25] airplane once it was added to the policy.

Page 34

[1] **Q:** And my question was assuming that he had to
[2] have that training, do you understand that
[3] there was coverage for that training —
[4] **MS. BARON:** Same objection.
[5] **BY MR. MUELLER:**
[6] **Q:** — on the plane?
[7] **MS. BARON:** Same objection. Calls
[8] for a hypothetical to assume something.
[9] Go ahead.
[10] **A:** There was not a further requirement for any
[11] more training on Scott's part once that
[12] airplane was added to his policy.
[13] **BY MR. MUELLER:**
[14] **Q:** At least that you're aware of; is that true?
[15] **A:** At least that I am aware of.
[16] **Q:** And there's nothing that appears in your file
[17] to that effect.
[18] **A:** Correct.
[19] **Q:** So if there were to be coverage for that
[20] additional training, that would have to be
[21] under the original policy as there are no
[22] endorsements for that purpose; is that also
[23] correct?
[24] **MS. BARON:** Object to the form of the
[25] question. What original policy?

Page 35

[1] **MR. MUELLER:** The original policy
[2] that was in force and effect at the time
[3] that was bound on March 1, 2002.
[4] **MR. BANOVETZ:** When you say no
[5] endorsements available, it's not clear I
[6] guess to me at least whether you mean
[7] available from looking at that policy or
[8] available generally.
[9] **MR. MUELLER:** Available from looking
[10] at that policy that was on this policy.
[11] **MS. BARON:** Do you understand the
[12] question?
[13] **BY MR. MUELLER:**
[14] **Q:** Now that the lawyers have thoroughly gummed it
[15] up.
[16] **A:** The underwriters for us to add the airplane did
[17] not make any mention of any further training
[18] being acquired by Scott to be able to fly the
[19] airplane, and from the notes in the file and
[20] the faxes back and forth to the underwriter, no
[21] further mention of any further training was
[22] required of Scott in order to be able to fly
[23] the airplane for ag use on the policy.
[24] **Q:** So it would be your testimony that if he was
[25] receiving that additional training after

Page 36

[1] March 1, 2002, there wasn't any coverage for
[2] it; is that right?
[3] **A:** I'm saying that to my understanding no further
[4] training was required.
[5] **Q:** But if he received the training whether it was
[6] required or not, then it's your testimony there
[7] was no coverage for it.
[8] **MR. BANOVETZ:** Just object to her
[9] testifying as to whether there's coverage
[10] under our policy.
[11] **MR. MUELLER:** Well, she's the one who
[12] makes those decisions as to whether or not
[13] there's coverage under the policy. She's
[14] selling the policy.
[15] **MS. BARON:** I don't think that's the
[16] case.
[17] **MR. BANOVETZ:** But we get to make the
[18] decisions or a court.
[19] **MR. MUELLER:** It seems like a
[20] policyholder doesn't have a chance. The
[21] policies are too confusing when they sit
[22] down to read them, they're not allowed to
[23] trust the agents when they tell them what
[24] they mean, they've got to wait for the
[25] insurance company to deny the coverage in

Page 37

[1] the end, and then the lawyers sit down and
[2] ask the witnesses what's this all about.
[3]    MR. BANOVETZ: A lot of claims get
[4] paid, though. Most of them.
[5]    MR. MUELLER: That's all I have.
[6]    MS. BARON: No questions.
[7]    MR. BANOVETZ: No questions.
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 38

[1]    I, ANGELA BANZ, the witness herein, have
[2] read the transcript of my testimony, and the same is
[3] true and correct to the best of my knowledge, with
[4] the exception of the changes noted on a separate
[5] page, together with notation of the reasons for
[6] making such corrections.
[7]
[8]
[9]       ANGELA BANZ
[10]
   STATE OF KANSAS            )
[11]                          ) ss:
   SEDGWICK COUNTY            )
[12]
[13]    Subscribed and sworn to before me, the
[14] undersigned authority, this the _____ day of
[15] _____, 2004.
[16]
[17]
[18]
        Notary Public, _____ County
[19]       State of Kansas
[20]
   My appointment expires:
[21]
[22]
[23] Janelle E. Goddard, C.S.R.
[24]
[25]

Page 39

[1]           CERTIFICATE
[2]
[3] STATE OF KANSAS          )
                            ) ss:
[4] SEDGWICK COUNTY          )
[5]
[6]    I, Janelle E. Goddard, certify that the
[7] foregoing deposition was stenographically recorded
[8] by me as stated in the caption. The deponent was
[9] duly sworn to tell the truth, the whole truth, and
[10] nothing but the truth. The colloquies, statements,
[11] questions and answers thereto were reduced to
[12] typewriting under my direction and supervision and
[13] the deposition is a true and correct record of the
[14] testimony/evidence given by the deponent.
[15]    I further certify that I am not a relative
[16] or employee or attorney or counsel of any of the
[17] parties, nor am I a relative or employee of such
[18] attorney or counsel, nor am I financially interested
[19] in the action.
[20]    WITNESS my hand and official seal at
[21] Wichita, Sedgwick County, Kansas, this 23rd day of
[22] July, 2004.
[23]
        JANELLE E. GODDARD, C.S.R.
[24]    Certified Shorthand Reporter
[25] Costs:_____