E-FILED
Friday, 06 October, 2006  11:50:12 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATIONAL UNION FIRE COMPANY OF PITTSBURGH, PA, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 03-CV-01288 |
| PONTIAC FLYING SERVICE, INC., JUSTYN WEBSTER, as Special Administrator Of the Estate of NEIL WEBSTER, Deceased, And CAREN S. LUCENTE, as Independent Executor of the Estate of RICHARD P. LUCENTE, Deceased, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| PONTIAC FLYING SERVICE, INC., | ) ) | |
| Third Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| HARDY AVIATION INSURANCE, INC., | ) ) ) | |
| Third Party Defendant. | ) | |

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Now comes the Defendant and Third Party Plaintiff, PONTIAC FLYING SERVICE, INC. ("PONTIAC FLYING"), by its attorney, DAVID B. MUELLER of the firm of CASSIDY & MUELLER, and makes the following RESPONSE to the MOTION FOR SUMMARY JUDGMENT of the Third Party Defendant, HARDY AVIATION INSURANCE, INC. ("HARDY"):

## INTRODUCTION

The present litigation comes in the aftermath of a tragic aviation accident which resulted in the deaths of Rick Lucente and Neil Webster on May 5, 2003. The aircraft which they occupied and were flying was an Air Tractor 503 (AT503) which was owned by PONTIAC FLYING. The AT503 was a dual cockpit dual control aircraft which was designed and manufactured for training purposes. Lucente was a certified turbine transition training instructor. The purpose of the flight was for Lucente to provide instruction to Webster in transitioning from piston driven aircraft to turbine powered planes, such as the AT503. Lucente was an independent contractor who was compensated by PONTIAC FLYING. PONTIAC FLYING provided Lucente and the AT503 for Webster's training pursuant to an agreement between PONTIAC FLYING and Webster's employer, Del Finup.

At the time of the accident PONTIAC FLYING had a property damage or "hull" loss and commercial liability policy with NATIONAL UNION FIRE COMPANY OF PITTSBURGH, PA ("NATIONAL UNION"), a subsidiary of AIG. NATIONAL UNION declined coverage under the policy for PONTIAC FLYING's hull loss and for the liability claims which were brought against PONTIAC FLYING by the Webster and Lucente estates. That declination was based upon **ITEM 6** of the **DECLARATIONS** page of the policy and EXCLUSION No. 1. a). These respectively provide:

> **ITEM 6**. The aircraft will be used only for the purposes of **Aerial Application**.

> EXCLUSIONS
>
> This policy does not apply:
>
> 1. a) while the **aircraft** is being operated with the knowledge and consent of the Insured or of any executive, officer or partner thereof, for any unlawful purpose, or for any purpose or use other than **aerial application**, *unless specifically endorsed on the policy*. (Italics supplied).

The policy defines aerial application as follows:

> **Aerial Application** means the application by aircraft of seeds, fertilizers or chemicals and includes flights required in direct support thereof.

NATIONAL UNION filed this action for declaratory judgment, seeking the adjudication that the flight in question did not involve "**aerial application**" as that term is defined in the policy and therefore there was neither first-party hull loss nor liability coverage. In addition to denying the material allegations of NATIONAL UNION's complaint, PONTIAC FLYING filed a **THIRD PARTY COMPLAINT** against HARDY AVIATION INSURANCE, INC., the insurance broker or "producer" that procured the NATIONAL UNION coverage for PONTIAC FLYING. A copy of that **THIRD PARTY COMPLAINT** is attached to HARDY's Motion for Summary Judgment as Exhibit No. 4. It contains the following allegations *inter alia*:

> 12.    In the event that it is determined that there is no property damage or casualty loss coverage under the NATIONAL UNION policy for the occurrence of May 5, 2003, then HARDY was guilty of one or more of the following negligent acts and omissions:
>
> (a)    Failing to procure property damage coverage for the use which was made of the plane at the time of the occurrence;
>
> (b)    Failing to seek property damage and casualty loss coverage for the use which was made of the plane at the time of the occurrence;
>
> (c)    Failing to tell PONTIAC that HARDY had been able to procure coverage for the use which was made of the plane at the time of the occurrence;
>
> (d)    Failing to tell PONTIAC that HARDY had not sought coverage for the use which was made of the plane at the time of the occurrence;
>
> (e)    Failing to inform PONTIAC that it was not covered for turbine transition training in support of aerial application when HARDY knew of that use;

(f)    Causing PONTIAC to rely upon having coverage which did not exist under the Policy which HARDY procured.

13.    In the event that it is determined there is no coverage under the NATIONAL UNION policy for the occurrence of May 5, 2003, then one or more of the foregoing negligent acts and omissions on the part of HARDY will be a proximate cause of the uninsured loss and damages suffered by PONTIAC.

This court allowed NATIONAL UNION's **MOTION FOR SUMMARY JUDGMENT**

and in so doing entered the following declarations against PONTIAC FLYING:

It is DECLARED that: (1) National Union Fire Insurance Co. is not obligated to indemnify Pontiac Flying Service, Inc., for the loss of its Air Tractor 503 under aerial applicator policy AV-3391999-04. (2) National Union Fire Insurance Co. is not obligated to defend or indemnify the representative of Richard Lucente's estate in the Webster litigation under aerial applicator policy AV-3391999-04. (3) National Union Fire Insurance Co. is not obligated to defend or indemnify Pontiac Flying Service, Inc., in the Webster litigation under aerial applicator policy AV-3391999-04. National Union's motion for judgment on the pleadings (docket no. 81) is GRANTED. Pontiac's third-party complaint against Hardy Aviation, Inc., is referred to the magistrate judge for further proceedings.

The present Rule 56 motion is brought by HARDY seeking summary judgment on PONTIAC

FLYING's professional negligence claims against it. The following discussion sets forth in

summary fashion the legal and factual bases which support the third party complaint and

demonstrate why the motion for summary judgment should be denied.

This is a professional negligence case against an insurance broker or producer. HARDY's

legal duty to PONTIAC FLYING, as its insured is that of "ordinary" care under the

circumstances. (735 ILCS 5/2-2201). In turn, what a reasonable insurance broker or producer

would do under like circumstances is defined by the "standard of care" which applies to those

who are in that profession. Therefore, issues of duty, i.e. standard of care and breach require the

opinions of expert witnesses. PONTIAC FLYING submits that the standard of care was breached

in each of the respects which are set forth in its complaint and that breach resulted in the uninsured loss for which recovery is sought. The following facts support these claims.

Before February 28, 2002, the AT503 was owned by Harold Miller, d/b/a Harold Miller's Flight Service ("Miller"). Miller used the plane for turbine transition training and in that regard used Rick Lucente as an instructor. Scott Petersen had received five hours of training from Lucente in the AT503 while it was owned by Miller. Miller was also insured through and by HARDY.

In early February, 2002, Scott and Sarah Petersen started negotiating to purchase Miller's assets and business, including the AT503. During the course of those negotiations Sarah Petersen sought a "quote" for coverage on the AT503 from Angie Banz at the Hardy Agency. The Petersens intended to use the plane for the same purposes for which it was designed, manufactured and used by Miller. Those uses were known to and understood by HARDY in February, 2002. Neither Angie Banz, nor Randy Hardy, nor anyone employed by the Hardy Agency ever asked the Petersens what use or uses they intended to make of the plane.

On February 28, 2002, the plane was purchased by PONTIAC FLYING SERVICE, INC., a corporation formed by the Petersens to acquire Miller's assets and business. That day Scott Petersen had a telephone conversation with Randy Hardy regarding coverage for the AT503. In that conversation Hardy told Petersen that coverage would be "bound" by AIG effective March 1, 2002. However, he also told Petersen that Petersen had to have additional turbine transition training in the plane. Petersen agreed and asked Hardy to add Rick Lucente as turbine transition training instructor on the policy. Hardy assured Petersen that Lucente was or would be covered in that capacity. Hardy never qualified the inclusion of Lucente as a training instructor. Nor did he inform Petersen that Lucente's inclusion on the policy as a training instructor was limited to

additional training for Petersen. At the conclusion of the conversation Petersen understood: (1)

that the AT503 was covered as of March 1, 2002; (2) he was to receive additional turbine

transition training in the plane by Rick Lucente as a training instructor, and (3) Lucente was

included and covered under the policy as a training instructor.

Aerial application or "crop dusting" is a specialized and close knit field with its own

customs and usages. Correspondingly, aerial application coverage is a specialized "line". The

Hardy Insurance Agency is one of the brokers who specialize in selling that type of coverage. Ag

Air Update is a monthly publication which is sold to crop dusters. Both HARDY and PONTIAC

FLYING subscribe to that publication and regularly advertise in it. Commencing in December,

2002, and continuing through May, 2003, the month of the accident, PONTIAC FLYING ran an

ad in which it offered turbine transition training by a certified flight instructor. During those

same months HARDY ran an ad of comparable size. Both Randy Hardy and Angie Banz read the

publication or portions of it.

Both Randy Hardy and his expert witness, Brendan Bolger, agree that the standard of

care which applied to the Hardy Agency as of March 1, 2002, when coverage was bound

required that a broker or producer must:

(1)    Before seeking coverage determine the uses to be made of the aircraft by the proposed insured;

(2)    Call the insured's attention to any non-covered uses which come to the broker or producer's attention after the policy is issued, and

(3)    Not mislead the insured into believing that there is coverage for a non-covered use.

Randy Hardy and Angie Banz also both agree that the standard of care requires that a

broker or producer "monitor" the insured's business during the term of the policy to see whether

additional or different coverage may be required. In other words, as a specialist in a specialty line

of insurance HARDY had the duty: (1) to ask what uses were to be made of the AT503; (2) to

monitor the business of PONTIAC FLYING and in that regard to keep abreast of what it reasonably could have known regarding non-covered uses, and (3) *not* mislead PONTIAC FLYING into believing coverage existed when there was none.

In the instant case HARDY failed in each of these respects. First, no effort was made to determine the uses for which PONTIAC FLYING was purchasing the AT503. The pregnant question was never asked. Nor was any attempt made to qualify or distinguish between the known uses which Harold Miller made of the aircraft and those to which it would be put by PONTIAC FLYING. Moreover, HARDY mislead Scott Petersen and PONTIAC FLYING into believing that they had coverage for turbine transition training instruction by Rick Lucente. In that regard Petersen specifically asked that Lucente be included as a training instructor on the policy and received the assurance that there was or would be coverage. Lucente provided that training when the plane was owned by Harold Miller and Petersen assumed that his inclusion as a "training instructor" under the PONTIAC FLYING policy extended the same coverage to Lucente and PONTIAC FLYING. Third, in fulfilling its duty to monitor the insured's activities following issuance of the policy HARDY either knew or should have known of PONTIAC FLYING's advertisements in Ag Air Update. With that knowledge it had a duty to inform PONTIAC FLYING that turbine transition training by Rick Lucente was *not* covered under the policy. All of these concerns and considerations are borne out in a post-accident e-mail of Randy Hardy to Mary Beth Schweigel, the AIG underwriter for the policy

Randy Hardy is candid in admitting that he does not expect his insureds to understand the contents of the policies which he sells. In that regard both he and Angie Banz acknowledged the accuracy of the following admonition which the Hardy Agency provided to its insureds:

> Well, I think it's enough for now. If I don't have you confused yet then read your policy, that's enough to confuse anyone.

Moreover, and as admitted by Hardy and Bolger, coverage under an insurance policy must be discerned from its four corners, including the insuring agreement, exclusions, conditions and endorsements. Endorsements are a part of the policy and qualify or change the coverage which is otherwise afforded. In this regard the instant policy specifically stated that the "**aerial application**" exclusion was subject to qualification by endorsement.

Assuming *arguendo* either: (1) that "**aerial application**" under the policy did not include turbine transition training flights by a qualified instructor such as Rick Lucente or (2) training flights were otherwise precluded from coverage by the passenger exclusion *then* neither AIG nor HARDY could have authorized coverage for Petersen to obtain training from Lucente *without an endorsement*. Thus, the authorization for that training, together with the inclusion of coverage for Lucente as an instructor, embodies or implies to the insured an endorsement for that purpose.

## RESPONSE TO UNDISPUTED MATERIAL FACTS

## UNDISPUTED MATERIAL FACTS

PONTIAC FLYING agrees that the following facts which appear in HARDY's <u>MOTION FOR SUMMARY JUDGMENT</u> are undisputed and material.

### 1.

## PARAGRAPHS WHICH CONTAIN NOTHING
## BUT UNDISPUTED AND MATERIAL FACTS

PONTIAC FLYING agrees that the following paragraphs contain nothing but undisputed material facts: 1, 3, 4, 5, 6, 9, 10, 11, 13, 19, 20, 33, 37, 39, 40. PONTIAC FLYING also agrees that one of the uses of the AT503 was as an "agricultural crop duster airplane" as set forth in paragraph 2. PONTIAC FLYING also agrees that one of the reasons for which the AT503 was purchased was for use in "Gypsy moth abatement" as set forth in paragraph 2.

**2.**

**DISPUTED MATERIAL FACTS**

PONTIAC FLYING disputes the following facts which are represented as undisputed:

2.      PONTIAC FLYING disputes the inferences that the AT503 was only "an agricultural crop duster airplane". To the contrary, it was designed and manufactured with two cockpits and dual controls as a training plane. (Petersen affidavit and Elkins Manual produced by HARDY, p. 11). PONTIAC FLYING also disputes the inference that the AT503 was bought only for "use in Gypsy moth abatement". It was purchased for the same uses which were made of it by the seller, Harold Miller's Flight Service. (Petersen affidavit and Petersen dep. p. 48). Those uses included turbine transition training using Rick Lucente as the instructor. (Petersen affidavit, Petersen statement pp. 29-30, Petersen dep. p. 48, Hardy dep. pp. 59-62)

7.      PONTIAC FLYING disputes the facts which are set forth in paragraph 7. Effective March 1, 2002, when coverage was bound on the AT503 approval of Scott Petersen as a pilot was conditioned by AIG and/or HARDY upon further turbine transition training in the plane in the future. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - E-mail to AIG, Petersen affidavit, Petersen dep. pp. 22, 47-50). Rick Lucente was approved as the training instructor for that training and was added to the policy as a training flight instructor. (Petersen affidavit, Petersen dep. pp. 47, 47-50, Hardy dep. pp. 98-99, Hardy dep. Ex. E - AIG e-mail).

8.      PONTIAC FLYING disputes the matters which are set forth in paragraph 8. PONTIAC FLYING was not operating a commercial agricultural flight training school on May 5, 2003 or at any time before. The only training provided by PONTIAC FLYING was the 10 hour course in turbine transition flight instruction, five hours on the ground and five hours in the

air, using Rick Lucente as a certified instructor. (See advertisement attached to Petersen affidavit).

12.     PONTIAC FLYING disputes paragraph 12. PONTIAC FLYING did not operate a "flight school". It offered the 10 hour course in turbine transition flight instruction, five hours on the ground and five hours in the air, using Rick Lucente as a certified instructor. (See advertisement attached to Petersen affidavit.) Further, HARDY and AIG (NATIONAL UNION) conditioned coverage for Scott Petersen as a pilot of the AT503 upon further turbine transition training in the plane after coverage was bound. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. p. 88, Petersen dep. pp. 22, 34, 37, 47-50, Petersen affidavit). Scott Petersen asked that Rick Lucente be included on the policy as a training instructor. (Petersen affidavit, Petersen dep. pp. 34, 37, 47-50). HARDY agreed. (Petersen affidavit, Hardy dep. pp. 98-99, Hardy dep. Ex. E – AIG e-mail). Petersens understood that that turbine transition training in the plane by Rick Lucente was covered under the policy. (Petersen affidavit, Hardy dep. pp. 121-122, Hardy dep. Ex. E - AIG e-mail).

14.     PONTIAC FLYING disputes the matters which are set forth in paragraph 14. Scott Petersen and Randy Hardy discussed turbine transition training in the plane to be conducted after coverage was bound on March 1, 2002. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. p. 88, Petersen dep. pp. 37, 47-50, Petersen affidavit). At that time Scott Petersen requested the inclusion of Rick Lucente as a training pilot and Randy Hardy agreed. (Petersen affidavit, Hardy dep. pp. 98-99, Hardy dep. Ex. E - AIG e-mail, Petersen dep. pp. 37, 47-50).

15.     PONTIAC FLYING disputes the matters which are set forth in paragraph 15. Scott Petersen does not recall a conversation with Frank Kimmel in which the subject of

coverage was discussed. Moreover, Petersen denies that he ever had the belief that the AT503 was not covered for turbine transition training by Rick Lucente and he therefore denies making that representation to Frank Kimmel or anyone else. (Petersen affidavit).

16.     PONTIAC FLYING disputes the matters which are set forth in paragraph 16. The only inquiry which was made was on a hypothetical basis regarding an aircraft which they never "purchased" or "located" and it was for Scott Petersen to provide the instruction. No quote was received because of Petersen's "limited time as a pilot". (Petersen dep. pp. 45-46).

17.     PONTIAC FLYING disputes the matters which are set forth in paragraph 17. The only inquiry which was made was on a hypothetical basis regarding an aircraft which they never "purchased" or "located" and it was for Scott Petersen to provide the instruction. No quote was received because of Petersen's "limited time as a pilot". (Petersen dep. pp. 45-46).

18.     PONTIAC FLYING disputes the matters which are set forth in paragraph 18. HARDY specifically told Petersen that there was coverage for transition training in the AT503 after coverage was bound on March 1, 2002. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. p. 88, Petersen dep. pp. 37, 47-50, Petersen affidavit). Moreover, Scott Petersen requested coverage for Rick Lucente as a training instructor for the plane and that was approved by HARDY. (Petersen affidavit, Petersen dep. pp. 37, 47-50, Hardy dep. pp. 98-99 and Hardy Ex. E - AIG e-mail).

31.     PONTIAC FLYING disputes the matters which are set forth in paragraph 31. Randy Hardy informed Scott Petersen that coverage on the AT503 was bound effective March 1, 2002. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. p. 88, Petersen dep. pp. 37, 47-50, Petersen affidavit). Hardy also told Scott Petersen that coverage under the policy for Petersen as a pilot required additional turbine transition training in the plane thereafter.

Petersen asked for the inclusion of coverage for Rick Lucente as a training instructor. HARDY

agreed. (Petersen affidavit, Petersen dep. pp. 37, 47-50, Hardy dep. pp. 98-99 and Hardy Ex. E -

AIG e-mail).

      32.    PONTIAC FLYING disputes the matters which are set forth in paragraph 32.

Randy Hardy told Scott Petersen that Rick Lucente would be included as a training instructor for

the AT503 without informing him of any limitation or qualification upon that inclusion or

activity. (Petersen affidavit, Petersen dep. pp. 37, 47-50, Hardy dep. pp. 98-99 and Hardy Ex. E -

AIG e-mail).

      36.    PONTIAC FLYING disputes the matters which are set forth in paragraph 36.

Sarah Petersen contacted Angie Banz regarding coverage on February 8, 2002. (See attached Ex.

9, page from Hardy file produced in discovery. Note reference:

> AT503 @ $350,000. 2 pl. check out by Harold Miller's turbine transition
> course 40 hrs. turbine.

      38.    PONTIAC FLYING disputes the matters which are set forth in paragraph 38. The

contact in question relates to the hypothetical request for a quote on a plane which might be

purchased and used by Scott Petersen for flight instruction. (Petersen dep. pp. 45-46).

      41.    PONTIAC FLYING denies the matters which are set forth in paragraph 41. Angie

Banz and Hardy read issues of Ag Air Update in which HARDY had an ad. (Banz dep. pp. 16-

19, Hardy dep. pp. 79-85). Hardy testified that he "had no idea" whether he read the April, 2003

issue in which the PONTIAC FLYING ad was directly opposite his. (Hardy dep. p. 83).

PONTIAC FLYING's ad was contained in that publication every month between December,

2002 and May, 2003. (Petersen affidavit).

      42.    PONTIAC FLYING denies the matters which are set forth in paragraph 42. As to

Angie Banz, see disputed facts above. Randy Hardy testified that every month he reads bits and

pieces of Ag Air Update. He advertises in that publication and looks for his ad. The April, 2003,

issue of that publication contained the HARDY ad directly opposite and 11 inches from the

PONTIAC FLYING turbine transition training ad. (Hardy dep. pp. 79-85). Also, the PONTIAC

FLYING ad appeared in every monthly issue of the publication through May, 2003. (Petersen

affidavit).

### 3.

### IMMATERIAL FACTS

PONTIAC FLYING submits that the following facts, including a number of those which

are disputed, are immaterial to the case.

16.    The matters which are set forth in paragraph 16 are not material to the issues of

the case. Contacts for coverage involving other uses, other persons and other planes are

immaterial to the issues of: (1) whether HARDY met the applicable standard of care in

ascertaining and attempting to procure the coverage which was desired by PONTIAC FLYING

at the time the plane was purchased; (2) whether HARDY met the standard of care by monitoring

the coverage needs of PONTIAC FLYING after the coverage became effective on March 1,

2002; (3) whether HARDY informed PONTIAC FLYING that it did not have coverage for

turbine transition training by Rick Lucente, and (4) whether HARDY satisfied the standard of

care not to mislead PONTIAC FLYING into believing that there was turbine transition training

coverage after March 1, 2002, when it informed Scott Petersen that he required additional

training in the plane and when Randy Hardy specifically agreed to include Rick Lucente as a

training instructor on the policy. The matters referred to in paragraph 16 relate to a different type

of aircraft, the future purchase of which PONTIAC FLYING was considering for a different type

of instruction by Scott Petersen. No quote was given. Petersen believes that was because of his limited hours as a pilot.

17.   PONTIAC FLYING submits that the matters contained in paragraph 17 are immaterial. In this regard the reasons are identical to those which are set forth regarding paragraph 16.

21.   PONTIAC FLYING submits that the matters set forth in paragraph 21 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the AT503 as of March 1, 2002. In fact he testified that the coverage was unchanged. (Hardy dep. pp. 73-76).

22.   PONTIAC FLYING submits that the matters set forth in paragraph 22 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the AT503 as of March 1, 2002. In fact, he testified that the coverage was unchanged. (Hardy dep. pp. 73-76).

23.   PONTIAC FLYING submits that the matters set forth in paragraph 23 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the

AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the AT503 as of March 1, 2002. In fact, he testified that the coverage was unchanged. (Hardy dep. pp. 73-76).

24.    PONTIAC FLYING submits that the matters set forth in paragraph 24 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the AT503 as of March 1, 2002. In fact, he testified that the coverage was unchanged. (Hardy dep. pp. 73-76). In this regard if one or the other of the two pilots in the cockpit were considered to be a passenger, the exclusion was waived by the endorsement for turbine transition training.

25.    PONTIAC FLYING submits that the matters contained in paragraph 25 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the AT503 as of March 1, 2002. In fact, he testified that the coverage was unchanged. (Hardy dep. pp. 73-76).

26.    PONTIAC FLYING submits that the matters contained in paragraph 26 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the AT503 as of March 1, 2002. In fact, he testified that the coverage was unchanged. (Hardy dep. pp. 73-76).

27.    PONTIAC FLYING submits that the matters contained in paragraph 27 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the AT503 as of March 1, 2002. In fact, he testified that the coverage was unchanged. (Hardy dep. pp. 73-76).

28.    PONTIAC FLYING submits that the matters set forth in paragraph 28 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the

AT503 as of March 1, 2002. In fact, he testified that the coverage was unchanged. (Hardy dep. pp. 73-76).

29.    PONTIAC FLYING submits that the matters set forth in paragraph 29 are immaterial. Issues which are material relate to the acts and omissions of HARDY at the time the AT503 was purchased and coverage for it was sought by PONTIAC FLYING. It was the responsibility of HARDY to inform its insureds, including PONTIAC FLYING, of any changes in coverage after the policy is issued, including at times of renewal. (Hardy dep. p. 42). HARDY never informed PONTIAC FLYING that coverage was any different than that which was on the AT503 as of March 1, 2002. In fact, he testified that the coverage was unchanged. (Hardy dep. pp. 73-76). In this regard if one or the other of the two pilots in the cockpit were considered to be a passenger, the exclusion was waived by the endorsement for turbine transition training.

30.    The matters contained in paragraph 30 are immaterial. Nor do they make sense in the context of the claim. PONTIAC FLYING purchased "flight insurance" for the AT503. The issue is whether coverage under the NATIONAL UNION policy extended to turbine transition training for the AT503. The posited "facts" do not identify the "other planes" or state whether the "flight insurance" for those planes included coverage for "instructional flying/training".

34.    The matters set forth in paragraph 34 are immaterial. It makes no difference whether another entity or PONTIAC FLYING itself owned non-agricultural planes which were used for teaching persons how to fly or for rental.

35.    The matters set forth in paragraph 34 are immaterial. It makes no difference whether another entity or PONTIAC FLYING itself owned non-agricultural planes which were used for teaching persons how to fly or for rental.

36.     It is immaterial whether Sarah Petersen had any contact with HARDY AVIATION INSURANCE regarding the AT503. Communications in that regard, including the inclusion of turbine transition training and future turbine transition training and coverage for Rick Lucente as a training instructor was between Scott Petersen and Randy Hardy.

38.     PONTIAC FLYING submits that the matters which are set forth in paragraph 38 are immaterial for the reasons set forth regarding paragraph 16.

## 4.

## ADDITIONAL MATERIAL FACTS

1.     HARDY AVIATION INSURANCE, INC. is a licensed corporate insurance broker or producer which has its principal offices in Wichita, Kansas. (Hardy dep. pp. 4-8).

2.     James "Randy" Hardy is and was the president of HARDY AVIATION INSURANCE, INC. He is also a licensed insurance broker or "producer". (Hardy dep. pp. 4-8, 15-16).

3.     Angela "Angie" Banz is an employee of HARDY AVIATION INSURANCE, INC. She is also a licensed insurance broker or "producer". (Banz dep. pp. 5-7).

4.     Aviation property and casualty insurance is a specialty line of insurance. Agricultural aviation insurance is a sub-specialized line. (Hardy dep. pp. 19-20, Bolger dep. pp. 45-50).

5.     HARDY AVIATION INSURANCE, INC., Randy Hardy and Angie Banz specialize in procuring, placing, binding and renewing aviation insurance. (Hardy dep. pp. 419-20). An insurance broker or producer must understand the insurance policies which he or she procures, places, binds or renews. (Hardy dep. pp. 28-30, Banz dep. p. 10, Bolger dep. pp. 20-21).

6.    Nothing is more confusing to an insured than reading an insurance policy. (Hardy dep. p. 107, Banz dep. p. 22).

7.    A standard form insurance contract, such as the National Union policy in this case consists of the insuring agreement, the exclusions and the conditions. (Hardy dep. p. 38, Bolger dep. pp. 72-76).

8.    Coverages afforded by a standard form policy may be altered or varied for endorsements to the policy. (Hardy dep. pp. 38, 43-44, 125-26, Bolger dep. p. 75). Endorsements are issued by the insurer. (Hardy dep. pp. 125-26).

9.    Absent an endorsement coverage is determined from the language of the standard form insurance contract. (Hardy dep. pp. 43-44, 125-26, Bolger dep. pp. 74-84).

10.    An insurance broker or producer who procures, places, binds or renews policies in the specialty line must understand the business, customs and usages for which he is asked to provide insurance. (Hardy dep. pp. 19-21, Bolger dep. pp. 45-50).

11.    In procuring, placing, binding or renewing aviation insurance policies it is important for an insurance broker or producer to understand the type of aircraft which he is asked to insure. (Bolger dep. p. 91, Elkins Manual p. 13).

12.    The AT503 was a dual cockpit dual control turbine powered agricultural aircraft. (Petersen dep. p. 18, Hardy dep. pp. 59-62). It was designed and manufactured by Air Tractor for training instruction. (Petersen affidavit, Elkins Manual p. 11, Bolger dep. p. 92).

13.    Prior to March 1, 2002, the AT503 was owned by Harold Miller's Flying Service where it was used for turbine transition training. (Bolger dep. pp. 61-63, Hardy dep. pp. 60-63, 93). Rick Lucente was a turbine transition training instructor for Harold Miller. (Bolger dep. p. 64, Petersen affidavit).

14.    Prior to March 1, 2002, HARDY AVIATION INSURANCE, INC. and Randy Hardy were the insurance brokers or producers for Harold Miller's Flying Service. (Hardy dep. pp. 54-63).

15.    Prior to March 1, 2002, Randy Hardy and HARDY AVIATION INSURANCE, INC. knew that the AT503 was a dual cockpit dual control aircraft which was used by Harold Miller for turbine transition training instruction. (Hardy dep. pp. 54-63).

16.    Prior to March 1, 2002, Scott Petersen received five hours of turbine transition training in the AT503 from Rick Lucente while the aircraft was owned by Harold Miller's Flying Service. (Petersen dep. p. 23, Petersen affidavit).

17.    An insurance broker or producer has the absolute obligation to determine the use which an insured intends to make of an aircraft for which insurance coverage is sought. (Hardy dep. p. 37, Reavis dep. pp. 63-64, Bolger dep. pp. 68, 69, 84, 95-96, 112, 114-116).

18.    Randy Hardy made no effort to determine the use which PONTIAC FLYING SERVICE, INC. intended to make of the AT503. (Hardy dep. p. 68). In this regard he neither asked the question nor discussed the subject with either Scott Petersen or Sarah Petersen. (Hardy dep. p. 68). He recalls no contacts with either Scott Petersen or Sarah Petersen regarding coverage for the plane between February 8, 2002 and March 1, 2002. (Hardy dep. p. 68).

19.    If Randy Hardy did not have a conversation with Scott Petersen or Sarah Petersen about the use of the plane before it was added to the policy he breached the duty to determine and understand the risk to be insured. (Bolger dep. pp. 114-115).

20.    Angie Banz cannot recall any discussions with either Scott Petersen or Sarah Petersen regarding use of the AT503 for training before it was purchased by PONTIAC FLYING SERVICE, INC. on February 28, 2002. (Banz dep. p. 20).

21.      The AT503 was purchased by PONTIAC FLYING SERVICE, INC. on February 28, 2002. As of the time of that acquisition HARDY AVIATION INSURANCE, INC. and Randy Hardy had procured, placed, bound and renewed hull and liability insurance coverage for PONTIAC FLYING SERVICE, INC. on other planes. (Petersen affidavit).

22.      Prior to February 28, 2002, PONTIAC FLYING SERVICE, INC. had requested that HARDY AVIATION INSURANCE, INC. and Randy Hardy determine if hull and liability insurance would be available for the AT503 in the event that PONTIAC FLYING SERVICE, INC. purchased the plane. (Petersen dep. pp. 32, 36-37, 47, 49, Petersen affidavit).

23.      On February 28, 2002, Scott Petersen had a telephone conversation with Randy Hardy regarding the inclusion of the AT503 under the National Union policy which HARDY had previously procured for PONTIAC FLYING SERVICE, INC. In that conversation Randy Hardy informed Scott Petersen that coverage for the plane was "bound" effective March 1, 2002. (Petersen affidavit, Petersen dep. pp. 32, 34, 37, 47-49, Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail).

24.      In the same conversation Randy Hardy informed Scott Petersen that NATIONAL UNION required that Petersen have additional turbine transition training in the aircraft. Petersen agreed to the training which was to take place after March 1, 2002 when coverage was bound on the aircraft. (Petersen affidavit, Petersen dep. pp. 22, 32, 34, 37, 47-49, Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. pp. 63-64, 71-72).

25.      During the same conversation Scott Petersen asked Hardy to include Rick Lucente under the policy as an instructor for turbine transition training. Hardy agreed. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. p. 88, Petersen dep. pp. 37, 47-50, Petersen affidavit).

26.     After March 1, 2002, Scott Petersen understood and believed that there was coverage under the National Union policy for turbine transition training instruction to be given by Rick Lucente to third parties. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. p. 88, Petersen dep. pp. 37, 47-50, Petersen affidavit, Hardy dep. p. 100).

27.     At all times prior to May 5, 2003, Scott Petersen understood and believed that PONTIAC FLYING SERVICE, INC. was covered under the National Union policy procured by Randy Hardy and HARDY AVIATION INSURANCE, INC. for turbine transition training which was given in the AT503 by Rick Lucente as the instructor. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. p. 88, Petersen dep. pp. 37, 47-50, Petersen affidavit).

28.     At all times between March 1, 2002 and May 5, 2003, Scott Petersen understood and believed that Randy Hardy had obtained coverage under the National Union policy which included Rick Lucente as a turbine transition training instructor in the AT503. (Hardy dep. pp. 122-126, Hardy dep. Ex. E - AIG e-mail, Bolger dep. p. 88, Petersen dep. pp. 37, 47-50, Petersen affidavit).

29.     Following March 1, 2002, Scott Petersen received turbine transition training from Rick Lucente in the AT503. (Petersen dep. pp. 28, 54-55 and deposition Exs. 5 and 6). Petersen deposition Exhibit 5 is a log entry of 3/20/03 for a training flight with Lucente. It contains the notation that the flight was for "insurance requirements". Petersen deposition Exhibit 6 is a check to Lucente for the flight.

30.     In the event that coverage is changed from an existing policy when it is renewed the insurance broker or producer has the duty to inform the insured of any changes. (Hardy dep. p. 42).