31. PONTIAC FLYING SERVICE, INC. was not informed of any changes in the coverage for the AT503 from the time coverage was bound on March 1, 2002 until May 5, 2003. (Hardy dep. pp. 42, 73-76).

32. An insurance broker or producer has the duty to monitor the business of an insured for coverage purposes between the time the policy is issued and the time of renewal. (Hardy dep. pp. 77-79, 110-111, Banz dep. pp. 10-11).

33. From December, 2002 through May 5, 2003, PONTIAC FLYING SERVICE, INC. was offering turbine transition training by Rick Lucente as a certified instructor to pilots who were experienced in piston driven aircraft. (Petersen dep. p. 36, Petersen affidavit).

34. In offering turbine transition training by Rick Lucente in the AT503 PONTIAC FLYING SERVICE, INC. advertised on a monthly basis between December, 2002 and May 5, 2003, in a publication known as Ag Air Update. (Petersen dep. p. 36, Petersen affidavit). A copy of that advertisement is as follows:

Do not take someone else's word that the surrounding crops are "Roundup-Ready" or otherwise genetically engineered for the chemical that you plan to apply. Do not take the word of a tractor driver or some other employee. Ask the owner or owners of the surrounding crops.

occur with other crops where it is impossible to determine the extent of a drift, or to document that a drift did not occur. Get the situation documented while the symptoms are still present.

### Conclusion

I want to take this opportunity to wish you a safe and successful season. However, if you receive a complaint, even if you do not believe you are guilty or if you believe the acreage involved is very small, I urge you to get it documented by an "expert" who can testify in court as an expert witness, should it become necessary. For instance, after the corn is completely mature, it is hard to tell where the symptoms of Roundup stopped. The heavily dam-

or Vaporize Call
**AgAir**update
478-987-2250



## Turbine Transition Training

AT-503-34 w/Satloc M3
5 hour Ground Instruction
5 hour Dual Instruction w/CFII Ag Pilot
Turbine Sign-off • Lodging Provided

### Pontiac Flying Service
Pontiac, IL
815-844-2707



## Roy's Customized Trucks
*Building Trucks for 25 Years*

### Standard Features
- ✓ 12" tubes
- ✓ 12" folding augers
- ✓ 600 gal. fuel tank
- ✓ Onboard scales
- ✓ Hopper 11,000 lb.
- Urea capacity
- ✓ Rollover tarp
- ✓ 10' side-over-side hopper loading capability
- ✓ Dual chain drive
- ✓ Hydraulic controlled stainless slide gate

Many custom options available including 100% stainless steel version



*Mounted on 4700 or 4900 International trucks with DT 466 engines Or custom mounted to customer's truck*

Page 24 of 43

**Roy's Customized Trucks**



$32.50

Drips

AFS ON-OFF CHECK VALVE
*WITH PLASTIC SEAT*

...PROFIT
...DLY
...-BEFORE THE DIAPHRAGM !!

**Comments**
"No more leaks and drips. Excellent product."
Dan Foster, Farm and Forest Helicopters, WA

"They're trouble free"
Dale Patterson, Cedar Butte Air Inc., SD

013

**EXHIBIT A**
*Actual Size*

35.    HARDY AVIATION INSURANCE, INC. also subscribed to Ag Air Update during the period December, 2002 – May, 2003, and in that regard also advertised in the publication. (Hardy dep. pp. 79-85, Banz dep. pp. 16-19). A copy of HARDY's advertisement appears below.

ation have disappeared. ...have a complaint, let me urge you to have some-

## Upcoming Season

I am sure burndown is already

...oat, oats, barley or other small grains that are not sensitive to these materials. Also, there will probably be other sensative crops, such as flowers, trees, shrubs, etc.

## Temperature Inversions

A temperature inversion occurs when a warm layer of air forms above the cooler air. A gentle smoke column will rise to this inversion layer and level off just under it. If there is air movement, the smoke will go downwind. If the inversion occurs when winds are perfectly calm, the smoke will probably spread in more than one direction.

As most of you know, the





**Available Now!**
A forty-year history of Schweizer Aircraft Corpor... Ag-Cat agricultural airplane.

A perfect gift for an Ag-Cat owner or pilot....for an... interested in agricultural aviation...Or, even for you...

The Ag-Cat, a tough, all-business biplane, a leader i... agricultural aviation. It played a major role in the revolution of farming that began after World War II. Written by William Schweizer, the book contains numerous pictures, charts and design drawings, ide... istorical aircraft buffs and model builders.

**EXHIBIT B**
*Actual Size*

36. In the November, 2002 issue of Ag Air Update the two ads appeared directly opposite to one another. (Hardy dep. pp. 83-84).

37. Randy Hardy regularly read portions of Ag Air Update and looked for his ads. (Hardy dep. pp. 80-81, 92). He has no idea whether he read or looked for his ad in the November issue. (Hardy dep. p. 83).

38. If an insurance broker or producer becomes aware that an aircraft is being used by an insured for a non-covered use he has the duty to bring the lack of coverage to the attention of the insured. (Hardy dep. pp. 78-79, Banz dep. p. 13, Bolger dep. p. 100).

39. Neither Randy Hardy, Angie Banz or anyone employed by HARDY AVIATION INSURANCE, INC. ever told PONTIAC FLYING SERVICE, INC., Scott Petersen or Sarah Petersen that there was no coverage for turbine transition training in the AT503, even if that training was done by Rick Lucente. (Petersen affidavit, Hardy dep. p. 76, Banz dep. p. 20).

40. Neither on February 28, 2002, nor thereafter, did Randy Hardy or anyone employed by HARDY AVIATION INSURANCE, INC. inform Scott Petersen or Sarah Petersen that the training instruction for which he agreed to include Rick Lucente as the training instructor was limited to providing turbine transition training to Scott Petersen or in any other respect. (Petersen affidavit, Hardy dep. p. 76, Banz dep. p. 20).

41. An insurance broker or producer has the duty not to mislead persons for whom the insurance producer or broker is procuring, placing, binding or renewing insurance coverage. (Bolger dep. p. 104).

42. HARDY's expert witness, Brendan Bolger, agrees and testified that:

   (a) An insurance broker or producer has the duty to determine the use which an insured intends to make of an aircraft for which coverage is sought. (Bolger dep. pp. 68, 69, 84, 95-96, 112, 114-116).

    (b) An insurance broker or producer has the duty not to mislead an insured in believing that there is coverage under a policy when none exists. (Bolger dep. p. 104).

    (c) An insurance broker or producer has the duty to inform an insured of any non-covered uses which the broker or producer understands that the insured is making of an insured instrumentality. (Bolger dep. p. 100).

43.    Bolger also rendered the opinion that there was limited transition training coverage on the plane following its purchase by PONTIAC FLYING. (Bolger dep. p. 76).

44.    Bolger testified that the insuring agreement provided both hull and pilot liability coverage for transition training by Rick Lucente. (Bolger dep. pp. 77-82).

45.    Bolger testified that there was no exclusion for the turbine transition training coverage which was afforded to some pilots of the AT503. (Bolger dep. pp. 80-83).

46.    Bolger further testified that any limitation on any otherwise covered use must be expressed and written in the policy. (Bolger dep. pp. 83-84).

47.    Applying the preceding principles to the NATIONAL UNION policy and the circumstances of this case Bolger agreed that the policy did not limit or restrict the persons to whom covered transition training might be given. In this regard he testified:

>     Rick -- pardon me. Yes. Rick Lucente did train Scott Peterson in that aircraft after it was purchased by Pontiac, and the underwriter knew it.
> Q.    And so did Hardy, correct?
> A.    And so did Hardy. But they knew he was training Scott Peterson. We're not offering to train anybody else. Nobody said we are going to use this plane for training anybody other than Scott Peterson.
> When you -- when you leave that particular type of training, Scott Peterson, and go elsewhere, you've walked away from the policy.
> Q.    Okay. And my question to you, if we assume that turbine transition training is a covered use of the aircraft, is there anywhere within the four corners of the policy itself that says that training is limited to Scott Peterson by Rick Lucente?
> A.    No.
> Q.    And isn't one of the cardinal rules of policy interpretation and construction – and I may be getting into the law here, so I'm asking you based upon your knowledge and experience – that an exclusion or limitation on the coverage must be expressed and written into the policy?

cat

      A.      That's true. (Bolger dep. pp. 83-84).

48.    Upon becoming aware of the loss Randy Hardy understood that Scott Petersen may have been mislead into believing that there was coverage when none existed. (Hardy dep. pp. 86-90, 100, Hardy dep. Ex. E - AIG e-mail). In that regard Randy Hardy informed Mary Beth Schweigel of AIG on May 7, 2003:

> Well, as in the movie, Houston, we have a problem. . .
>
> I let it go yesterday and was able to speak with the Sara Peterson today. She was concerned because one of their pilots wasn't named to the file which was this Rick Lucente who was killed. We indicated to her that when she called about using him he met the OPW and didn't need to be named. It gave me the opportunity to ask her about the way she called in the loss as training. Much to her surprise I had to break the news that we have never been given a request to add transition training to the file and we did not cover this aircraft for that use. Sara and Scott of course are very upset about the loss and might not be thinking straight yet however I did tell her I would look into this for now. She told me over the phone she was under the understanding or they assumed that since we added Scott back in the beginning for transition training by Harold Miller, who they bought this aircraft from that this gave them transition training coverage just like the school they bought the aircraft from. Scott and Sara bought this aircraft from Harold Miller who was selling out his aircraft and as I just found out, his school as well. She isn't holding us responsible yet however who knows how these deals will fall. As I stated over the phone I believe Sara when she tells me they assumed or presumed they had this since they transitioned Scott and they bought the aircraft Harold was using for training. (Hardy dep. Ex. E - AIG e-mail).

49.    Following the loss Randy Hardy agreed that there was coverage for Rick Lucente under the OPW (open pilot warranty) endorsement to the policy. (Hardy dep. p. 98). He never informed the Petersens that the coverage for Lucente did not include the training instruction which was sought by Scott Petersen. (Petersen affidavit, Hardy dep. p. 76, Banz dep. p. 20).

# ARGUMENT

## A.

## THE STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matshushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1016 (7th Cir. 2000) and *Cox v. Acme Health Serv.*, 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, *Erdman v. City of Ft. Atkinson*, 84 F.3d 960, 961 (7th Cir. 1996); *Vukadinovich v. Bd. Of Sch. Trustees*, 987 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir. 1990); *DeValk Lincoln-Mercury, Inc. v. Ford Motor Co.*, 911 F.2d 326, 329 (7th Cir. 19087); *Bartman v. Allis Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479

U.S. 1092 (1987), and construing any doubts against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Trotter v. Anderson*, 417 F.2d 1191 (7th Cir. 1969); *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999). The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. *Piscione v. Ernest & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999). The proper inquiry is whether a rationale trier of fact could reasonably find for the party opposing the motion with respect to the particular issues. *Jordan v. Summers*, 205 F.3d 337, 342 (7th Cir. 2000).

PONTIAC FLYING SERVICE, INC. submits that there are abundant facts which support each element of its claim against HARDY. In large part those facts derive from the testimony and admissions of Randy Hardy, Angie Banz, and their "expert" witness, Brendan Bolger. When compared with and applied to the consistent testimony of Scott Petersen and Sarah Petersen those admissions, and the inferences which they compel, demonstrate why the motion should be denied.

**B.**

**ELEMENTS OF THE THIRD PARTY PLAINTIFF'S CASE**

PONTIAC FLYING SERVICE, INC. is not unmindful of this court's reasoning and opinion in entering summary judgment in favor of the insurer, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. That decision had to do with the interpretation of NATIONAL UNION's property and casualty policy in the context of what the court perceived to be PONTIAC FLYING's operation of a flight "school". Thus, the court reasoned that while the phrase "in direct support" of **"aerial application"** of seeds, fertilizers

and chemicals might include some instruction of the insured's employees it did not extend to training third parties.

This aspect of the case delves into the relationship between PONTIAC FLYING and the insurance broker or "producer" who procured the policy. In particular, it explores the communications, understandings, and assumptions of each based upon facts which were known by both parties before the plane was purchased by PONTIAC FLYING and discussions which took place between Randy Hardy and Scott Petersen in seeking and procuring coverage for the AT503 under the existing NATIONAL UNION policy.

As discussed *infra*, this is a professional negligence case. PONTIAC FLYING does not claim that Randy Hardy intentionally mislead PONTIAC FLYING regarding the coverage which he sought and ultimately procured. Nor does the litigation involve claims that PONTIAC FLYING intentionally operated a flying school when it knew that there was no coverage for that operation. Instead, it is a case of misunderstanding as a consequence of preconceived assumptions on both sides, pregnant questions which were not asked, and logical inferences which were drawn from assurances which were made.

From the top of the world looking down the compelling facts are few and sharply focused. Prior to February, 2002, Harold Miller owned the dual cockpit, dual control AT503 which was designed and manufactured for the turbine transition training instruction of agricultural pilots. Harold Miller used it for that purpose, offering instruction by Rick Lucente, a certified turbine training instructor. Those facts were known to both HARDY and PONTIAC FLYING. The former was Harold Miller's insurance producer. HARDY also knew that Scott Petersen had received five hours of turbine transition training instruction from Rick Lucente in the AT503.

Scott Petersen purchased the plane intending to use it for the purposes for which it was designed and manufactured and for which it was used by Harold Miller. As was the case with Harold Miller, he intended to use Rick Lucente as the turbine transition training instructor. Randy Hardy apparently assumed that PONTIAC FLYING intended to use the AT503 solely for crop dusting. Neither he nor any agency employee asked what use or uses would be made of the aircraft. Neither he nor any agency employee sought to determine that information. Before February 28, 2002, when the plane was purchased, the subject of its use never came up on either side.

On February 28, 2002, the day PONTIAC FLYING purchased the plane, there was a telephone conversation between Randy Hardy and Scott Petersen regarding coverage for it. Hardy told Petersen that coverage was "bound" effective March 1, 2002. He also told Petersen that AIG[1] required that Petersen have additional turbine training instruction in the aircraft thereafter. Petersen agreed. Petersen also specifically requested that Rick Lucente be added to the policy as a "training instructor" for the AT503. Hardy agreed.

AIG's insistence upon additional turbine training in the aircraft after it was insured was consistent with Petersen's understanding that the plane was covered for the use for which it was designed and manufactured, the use which Miller currently made of it, and the use for which he was purchasing it. The assurance that Rick Lucente would be included on the policy as a training instructor for the plane confirmed that understanding. Hardy's agreement to include Lucente as a training instructor was neither qualified nor conditional.

The preceding facts, as well as those which involve the acts and omissions of HARDY after coverage was bound, fit readily into the matrix of elements which make up the third party claim for professional negligence. As the motion focuses solely upon the issue of "duty", the

---

[1] AIG is the "parent" of NATIONAL UNION.

following portions of the argument address and emphasize that component of the claim. However, in the analysis it is important to remember that: (1) the theory of the case is *negligence*, (2) the standard is "ordinary care" (735 ILCS 5/2-2201), and (3) proof of both the standard and its breach requires expert testimony. Nor can one lose sight of the fact that, if pleaded, contributory negligence on the part of PONTIAC FLYING may be a total defense, if more than 50% of the total causative fault, and a damage mitigating defense if less than 50%. (735 ILCS 5/2-1116). Here it is not pleaded and the time for amending is long past.

## B.

## FUNDAMENTAL ELEMENTS AND ASPECTS OF A PROFESSIONAL NEGLIGENCE CLAIM

In a professional negligence claim the plaintiff must plead and prove that (1) the defendant professional owed the plaintiff a duty of care arising from the nature of their relationship; (2) that the defendant breached that duty under the circumstances; (3) the plaintiff was injured and incurred damages, and (4) the plaintiff's injury was the proximate result of the defendant's breach. *Sexton v. Smith*, 112 Ill.2d 187, 193 (1986). Those same elements apply whether the case involves a physician, an attorney, an accountant, an architect, or, as here, an insurance broker or "producer".

## C.

## DUTY

Unlike cases in which a defendant's duty is measured by concepts of "ordinary care" which are familiar to the general public, professional negligence cases involve the possession and exercise of specialized skills. Consequently, the defendant's obligations to the plaintiff are determined by the degree of knowledge, skill and ability that an ordinarily careful professional in the same field would exercise under similar circumstances. The same general standard applies