whether the defendant is a doctor (*Thompson v. Webb*, 138 Ill.App.3d 629 (1985)), dentist (*St. Jemme v. Tomlin*, 118 Ill.App.3d 766 (1983)), attorney (*Brown v. Gitlin*, 19 Ill.App.3d 1018 (1974)), or accountant (*Serial Byproducts Co. v. Hall*, 16 Ill.App.2d 79 (1958)). (IPI Civil, 2005 Ed., Section 105). The duty of an insurance broker or "producer" is codified in the context of "ordinary care and skill". Section 2-2201 of the Code of Civil Procedure.

Unlike general negligence cases in which the duty arises from the common experiences of life, professional liability claims involve a specialized "standard of care", i.e. that of an "ordinarily careful professional" which is peculiar to the profession of the defendant. In the these cases expert testimony is required to identify and define the "standard of care" and to point out in what respects it was breached. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill.2d 278, 295 (2000). In the instant case there are three such "experts": (1) Randy Hardy, the president of HARDY AVIATION INSURANCE, INC.; (2) Marshall Reavis, III, PONTIAC FLYING's expert, and (3) Brendan Bolger, HARDY's expert. Each of them agrees that the standard of care requires:

(1) That the broker or "producer" must determine the use which is to be made of the aircraft for which insurance is sought;

(2) The insurance broker or "producer" must not mislead the insured into believing there is coverage when none exists;

(3) The insurance broker or producer should "monitor" or keep abreast of the business operations of the insured in the context of the coverage which the insured has and the coverage which is available to the insured, and

(4) That the insurance broker or "producer" must inform the insured of any uninsured activities of which the insurance broker or "producer" is aware.

These duties, their breach and the ramifications of each breach are discussed as follows in the context of this case.

## 1.

### An Insurance Broker Or Producer Has An Affirmative Duty To Determine The Uses Which An Insured Intends To Make Of The Instrumentality, i.e. Aircraft For Which Coverage Is Sought

Only by making the inquiry can the broker ascertain what coverages are available and, thereby procure those coverages for the insured. As a corollary, if the question is not asked the broker will also be unable to inform the insured that insurance is not available or is available for some uses but not others. In this respect the testimony of Hardy, Bolger and Reavis is as follows:

#### Randy Hardy

Q.    And I'm not sure if we hit on this point or not so forgive me, I'll ask it possibly the second time. But certainly as far as your responsibility in knowing where they're at is to find out what they want to do with the planes.

A.    Yes. The use of the aircraft is vital. The use of the aircraft would determine the availability and the cost of the policy.

Q.    So you would have the responsibility of finding that out.

A.    Absolutely. (Hardy dep. p. 37).

#### Brendan Bolger

Q.    Now, in this case, we've come to the point where you have testified that the standard of care requires that a broker absolutely has the responsibility of finding out what use is to be made of an aircraft before insuring it?

MS. BARON: I'll just object to the form of the question.

BY MR. MUELLER:

Q.    You recall that testimony?

A.    I recall the testimony, yes. (Bolger dep. p. 84).

#### Marshall Reavis, III

Q.    Okay. And, in your opinion, was this breach of the standard of care by Hardy not to inquire of the Petersons into the use of the aircraft?

A.    Yeah.

Q.    And do you hold that opinion to a reasonable degree of insurance professional certainty?

A.    Right. And even Mr. Hardy, in his deposition, addresses that.

Q.    And what do you mean?

A.    He says – in a response to a question he said, yes, the use of the aircraft is vital. The use of the aircraft will determine the availability and the cost to the policy. Question, so you would have the

responsibility of finding that out? His answer was, absolutely. Page 37.

Here HARDY made no inquiry whatsoever regarding the use which the Petersens and PONTIAC FLYING intended to make of the AT503. The subject was not discussed on either side. HARDY was aware that PONTIAC FLYING was purchasing the assets of Harold Miller's business including the AT503. Scott Petersen assumed that he would be getting the same coverage which Harold Miller had on the plane and which included turbine transition training by Rick Lucente. Without asking, Randy Hardy apparently assumed that use of the plane would be limited to crop dusting. In not asking: "What use or uses do you intend to make of the plane?" Hardy breached the standard of care. As stated by Bolger:

> Q.     Assuming they didn't have that conversation before the policy – or before the March date –
> A.     Okay. They did not have this conversation.
> Q.     Right. Assume they did not have that conversation before then.
> A.     Okay.
> Q.     Did he then, Randy Hardy, breach his duty to understand the risk to be insured?
> A.     He didn't know, that's right. He didn't know if he didn't have the conversation. (Bolger dep. p. 115).

Incidental to the affirmative duty to inquire are considerations of the type of information and knowledge which the insurance broker or producer is deemed to have. Where, as here, he is selling a specialty line of coverage he must be cognizant of the customs and usages of the specialized business for which the insurance is sought. In addition, where the subject of the policy is an aircraft he must know the type of plane and the uses for which that plane was designed and manufactured. That knowledge both triggers and focuses the inquiry which the producer is obligated to make of the insured regarding the use of the aircraft.

Contrary to the nuances of HARDY's argument, the duty to determine the uses which the insured intends to make of the instrumentality, i.e. aircraft arises when the coverage is sought.

While the obligation to inquire extends to "renewals" once coverage exists the broker must

advise the insured of any changes before it can be altered or diminished. Thus, Hardy testified:

**Randy Hardy**

Q.      Now as an agent when you've got an endorsement on a policy and the
        policy comes up for a renewal, is it your responsibility to the client to
        confirm that the client wants the same coverage that existed under the
        policy at the – under the expiring policy?
A.      If your question is assuming that the policy is with the same company,
        the company being Pontiac Flying Service, yes.
Q.      So if the endorsements are going to change on the policy, bring that to
        the attention of the insured?
A.      Yes. (Hardy dep. p. 42).

Also, in this case, according to Hardy, coverage on the renewed policy was identical to that on

the original. (Hardy dep. pp. 73-76).

## 2.

## Duty To Not Mislead

As Randy Hardy admitted, if an insured wants confusion he should read his policy. That

confusion explains why it is a broker's obligation to understand the product which he sells or

procures and in that regard to tailor the coverages to the needs of the insured. On that point it

goes without saying that the producer has a duty not to mislead the insured into believing that

coverage exists where there is none. In that regard Brendan Bolger testified:

Q.      Would you agree that in insurance, the broker should not mislead the
        insured as to the coverage that he has under a policy?
A.      An insurance broker should never mislead. (Bolger dep. p. 104).

Both Hardy and Bolger agreed that coverage under an insurance policy must be

determined from the declarations page, the insuring agreement, the exclusions, the conditions,

and any endorsements. Endorsements serve to vary the coverage which is provided by the

standard form of the insurance contract. Endorsements are the province of the insurer, whose

sole decision it is to expand or contract the terms of the policy. If there is coverage beyond the

standard form it is because the carrier endorsed that coverage. As discussed *supra*, once coverage exists, whether under the standard form or by endorsement it cannot be changed without informing the insured.

The preceding summary of fundamental insurance law principles provides a technical context for the assurances which Randy Hardy gave to Scott Petersen on February 28, 2002. However, they apply only to the conduct of AIG and the manner in which the NATIONAL UNION policy should be construed under the circumstances. They have nothing to do with the exposure of the HARDY AVIATION INSURANCE, INC. for leading Scott Petersen to believe that he had coverage which did not exist.

Assuming *arguendo* and as contended by NATIONAL UNION, that the standard form policy in question either did not cover or excluded "turbine transition training" Hardy misled Scott Petersen in that regard when he informed him that: (1) coverage was bound on the AT503 effective March 1, 2002 and (2) Petersen required additional turbine transition training in the aircraft which would take place thereafter. If that training were excluded then either: (1) AIG endorsed that activity and thereafter it was covered under the policy or (2) HARDY misled Scott Petersen.

The same reasoning applies to the "passenger" exclusion which is raised by HARDY. If there was coverage for Scott Petersen to have transition training in the AT503 the exclusion was endorsed away as either: (1) he would have to be a "passenger" during that training or (2) as the plane had dual controls, thereby presupposing two pilots, neither was a passenger or (3) HARDY misled Petersen in that respect as well.

The potential for HARDY's representations to mislead do not stop with the extension of training coverage to Scott Petersen after the effective date of the policy. During the course of the

February 28, 2002 conversation Petersen specifically requested that Rick Lucente be "included on the policy" as a *training instructor*. Without equivocation, qualification or explanation HARDY either agreed to do so or assured Petersen that such was the case.[2] Thereafter, Petersen logically believed that he had the same coverage for turbine transition training in the aircraft using Rick Lucente as he understood Harold Miller had.

In its motion HARDY AVIATION INSURANCE, INC. does not discuss Randy Hardy's representations regarding turbine transition training which either: (1) amounted to endorsements for that purpose or (2) misled Scott Petersen into believing that coverage existed for training. Nor does HARDY address the agreement to include Rick Lucente as a training instructor under the policy. Instead, the contention is made that PONTIAC FLYING simply and knowingly chose to take its chances in providing turbine transition training without coverage. That facile approach is easy to understand given the hindsight exigencies borne of this litigation. However, Hardy's view of the matter was entirely different while the "tears were still hot". The day following the fatal occurrence he acknowledged to AIG that the Petersens were sincere in their belief that the plane was covered for the turbine transition training which Rick Lucente was conducting. He also agreed that their reliance was understandable given his coverage discussion with Scott Petersen. On that point his communication to Mary Beth Schweigel of AIG states:

> As I stated over the phone I believe Sara when she tells me they assumed or presumed they had this since they transitioned Scott and they bought the aircraft Harold was using for training. (Hardy dep. Ex. E – AIG e-mail).

### 3.

### Duty To Monitor And Advise

---

[2] Coverage for Lucente as a pilot existed under the OPW (open pilot warranty) endorsement.

Randy Hardy testified that an insurance broker or "producer" has the obligation to monitor the operations of his insureds to see that they have the coverage which they need. (Hardy dep. pp. 110-111). Angie Banz agrees stating:

Q.    Would you agree that as it's stated here on the web page that Hardy will monitor the total insurance program of its clients?
A.    We try to do that.
Q.    And that Hardy keeps up-to-date with changes that may affect the insured risk of the clients?
A.    We try to do that.
Q.    And is that something you tried to do with Scott and Sarah Petersen?
A.    I believe so. (Banz dep. pp. 10-11).

*Sub judice* PONTIAC FLYING was offering turbine transition instruction through Rick Lucente from November, 2002 through May, 2003. That training was advertised in Ag Air Update, a publication to which HARDY AVIATION INSURANCE, INC. subscribed and in which it also advertised. Randy Hardy testified that he regularly read Ag Air Update, or at least portions of it. It is circumstantially inconceivable that neither he nor Angie Banz nor any other employee ever saw the PONTIAC FLYING ad. In at least one issue it was directly opposite HARDY's own advertisement.

While Randy Hardy and Angie Banz admit reading Ag Air Update but deny seeing the PONTIAC FLYING ad, in considering a motion for summary judgment the court is constrained to draw all reasonable inferences favorably toward the non-movant. PONTIAC FLYING submits that the fiction of the unseeing eye is no more credible to support HARDY's professions of ignorance than would justify his conduct if he stepped in the path of an oncoming bus.

Evidence in support of or in opposition to an issue may be either direct or circumstantial. The latter, where supported by logical inference, is as effective in defeating a motion for summary judgment as the former. *Coffey v. Cox*, 234 F.2d 884, 890 (C.D. Ill. 2002). Here not

only is the inference of knowledge by Hardy and his employees logical, for the purposes of the motion it should be indulged. *Erdman v. City of Ft. Atkinson*, 84 F.3d 960, 961 (7th Cir. 1996).

## CONCLUSION

This is a case of assumptions and inferences. PONTIAC FLYING assumed that it would have coverage for the same uses of the dual cockpit, dual control training plane as were made of that aircraft by the seller. HARDY assumed that the only coverage which was sought was for single pilot crop dusting. Despite the fact that HARDY covered the seller and knew that the AT503 was a training plane and used for that purpose, he never asked Scott Petersen the pregnant question: "What use or uses do you intend to make of the aircraft?" Nor was the subject of use ever discussed until after the plane had been purchased and the policy had been bound.

On February 28, 2002, and while Petersen's assumptions could have been rebutted, Hardy (1) informed him that additional turbine transition training was required for Petersen in the plane and (2) affirmatively acknowledged that Rick Lucente would be on the policy as a training instructor. The extent of training coverage was not discussed. Nor did Hardy limit Lucente's inclusion as a training instructor to training or instruction to be given to Petersen.

In both of the preceding respects HARDY breached the standard of care which he owed PONTIAC FLYING and was negligent. The same is circumstantially true of his failure to tell PONTIAC FLYING that turbine transition training was not covered after becoming aware of PONTIAC FLYING's ad in Ag Air Update. PONTIAC FLYING submits that the preceding evidence not only preponderates in its favor but is compelling. At a bare minimum the issue of whether or not HARDY breached its standard of care in the following respects is reserved for trial.

PONTIAC FLYING also points out that the issues in this case involve the acts and omissions of HARDY AVIATION INSURANCE, INC. Those issues are formed by the pleadings. No question has been raised concerning contributory negligence on the part of PONTIAC FLYING.

PONTIAC FLYING SERVICE, INC. respectfully submits that the MOTION FOR SUMMARY JUDGMENT should be DENIED.

Respectfully submitted,

CASSIDY & MUELLER

By: s/  DAVID B. MUELLER
        Attorneys for Defendant,
        PONTIAC FLYING SERVICE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Mr. Jeffrey B. Rock | jrock@hrbklaw.com, cpoehlman@hrbklaw.com |
| Ms. Diane M. Baron | dbaron@clausen.com, pkebr@clausen.com |
| Mr. Michael S. Krzak | msk@cliffordlaw.com, jmg@cliffordlaw.com |
| Mr. Kevin P. Durkin | kpd@cliffordlaw.com; jg@cliffordlaw.com |
| Mr. Mark T. Banovetz | mbanovetz@tsmp.com |

And I hereby certify that I have mailed by United States Postal Service the document to the foregoing non CM/ECF participants:

s/DAVID B. MUELLER
David B. Mueller - #01980661
CASSIDY & MUELLER
416 Main Street, Suite 323
Peoria, IL 61602
Telephone: 309/676-0591
Fax: 309/676-8036
E-mail: dmueller@cassidymueller.com