1   STATE OF ILLINOIS        )
                            )
2   COUNTY OF COOK          )
                            )

3           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
4                   COUNTY DEPARTMENT, LAW DIVISION

5   NATIONAL UNION FIRE INSURANCE   )
    COMPANY OF PITTSBURGH, PA.,      )
6                                    )
              Plaintiff,             )
7                                    )
              vs.                    )  No. 03-1288
8                                    )
    PONTIAC FLYING SERVICE, INC.,    )
9   Et al.,                          )
                                     )
10            Defendants.            )
                                     )
11               And                 )
                                     )
12  PONTIAC FLYING SERVICE, INC.,    )
                                     )
13            Third Party Plaintiff,)
                                     )
14            vs.                    )
                                     )
15  HARDY AVIATION INSURANCE, INC.,)
                                     )
16            Third Party Defendant.)

17

18          The discovery deposition of SCOTT PETERSEN
    called for examination pursuant to the provisions of the
19  Civil Practice Act and Rules of the Supreme Court as they
    apply to the taking of discovery depositions, taken
20  before Laura J. Amberg, CSR, State of Illinois, on the
    22nd day of February, 2005, at the hour of 11:20 a.m., at
21  416 Main Street in the City of Peoria, County of Peoria,
    State of Illinois.

22

23

**2**

PRESENT: KESSLER, FORREST TOM, MARDEN & ESTES?

```
 2        BY:  MARK T. BANOVETZ, ESQ.
          Sears Tower, 22nd Floor
 3        233 S. Wacker Drive
          Chicago, IL 60606-6308
 4            Attorney for the Plaintiff;

 5        CASSIDY & MUELLER
          BY:  DAVID B. MUELLER, ESQ.
 6        416 Main Street, Suite 323
          Peoria, IL 61602
 7            Attorney for Defendant/Third Party
              Plaintiff Pontiac Flying Service;
 8
          CLAUSEN MILLER, P.C.
 9        BY:  DIANE M. BARON, ESQ.
          10 South LaSalle Street
10        Chicago, IL 60603-1098
              Attorney for Third Party Defendant
11            Hardy Aviation Insurance;

12      PRESENT
        VIA PHONE:  CLIFFORD LAW OFFICES
13        BY:  MICHAEL KRZAK, ESQ.
          120 North LaSalle Street, Suite 3100
14        Chicago, IL 60602

15      ALSO PRESENT:  SARAH PETERSEN.

16

17        Deposition Exhibit #1   35
              Deposition Exhibit #2   36
18            Deposition Exhibit #3   38
              Deposition Exhibit #4   43
19            Deposition Exhibit #5   53
              Deposition Exhibit #6   53
20            Deposition Exhibit #7   53

21

22        Certificate       59-60
23
```

**3**

```
 1                SCOTT PETERSEN

 2        After being first duly sworn upon his oath

 3        Testified as follows in response to

 4                EXAMINATION

 5      BY MS. BARON:

 6        Q.   Just for the record, this is the deposition

 7      of -- first of all, would you state your name?

 8        A.   Scott Petersen.

 9        MS. BARON:  This is the deposition of Scott

10      Petersen taken in accordance with the Federal Rules and

11      pursuant to notice and by agreement of the parties based

12      on inclement weather on several occasions.

13        Present at the deposition here is Sarah

14      Petersen as well and as I have indicated, I do object to

15      the fact that she is sitting in in Scott Petersen's

16      deposition since they both are apparently representatives

17      of the company and certainly both of them do not sit in

18      both depositions.

19        MR. MUELLER:  For the purposes of the record,

20      it is our position and representing Pontiac Flying

21      Services, while one of the officers is being deposed,

22      another officer may sit in the deposition as the company

23      representative in order to consult with counsel regarding
```

**4**

```
 1      the interests of the corporation.

 2        Q.   (Ms. Baron continuing.)  All right.  Mr.

 3      Petersen, my name is Diane Baron.  I represent Hardy

 4      Aviation Insurance.  I'm going to be asking you some

 5      questions regarding the coverage litigation that is

 6      pending regarding the crash of the AT-503.  Have you ever

 7      given a deposition before?

 8        A.   Yes.

 9        Q.   How many times have you given depositions?

10        A.   Once, that I recall.

11        Q.   What was the nature of that?

12        A.   In regards to this loss.

13        Q.   And when was that given?

14        A.   I believe --

15        MR. MUELLER:  Are you referring to the sworn

16      statement or referring to a deposition?

17        A.   The sworn statement that was taken at Pontiac

18      Flying Service in July, I think, 14th of 2002.

19        MR. BANOVETZ:  2003.

20        A.   Yeah, 2003.  I stand corrected.  Thank you.

21        MR. MUELLER:  For the record, his deposition

22      has not been taken in this case.

23        Q.   (Ms. Baron continuing.)  Okay.
```

**5**

```
 1        A.   I'm not an attorney, so these terms are a

 2      little foreign to me.

 3        Q.   No, I know that.  That's fine.  Well, just

 4      for some instruction, I ask that you keep your responses

 5      verbal and not say uh-huh or huh-uh, as we all tend to

 6      do.  And if you have a problem hearing me or

 7      understanding what I'm asking, please let me know and I

 8      will --

 9        A.   I will do that.

10        Q.   -- repeat it or have it read back, so when

11      you do answer the record will accurately show that you're

12      answering the question.  Okay?

13        A.   Okay.

14        Q.   Now, have you brought any documents with you,

15      because the notice of deposition that I served requested

16      all documents regarding Hardy Aviation Insurance.

17        MR. MUELLER:  Let the record show that,

18      Counsel, I have the records pursuant to the notice.

19        MS. BARON:  Okay.  Can I see them?

20        MR. MUELLER:  Sure.  There are separate sets

21      in there for the attorneys.

22        MR. BANOVETZ:  You said there are separate

23      sets there.  Could I have one, Diane?  I think there's
```

multiple sets, he said.

MS. BARON: I'm not sure how they are sorted out here.

MR. MUELLER: There should be two separate --

MS. BARON: This looks like one.

MR. MUELLER: Diane, you also have the stapled on top and those are separate sets.

MS. BARON: These might be the originals.

Q. (Ms. Baron continuing.) All right. The documents that your counsel has provided me are all of them that you have regarding the AT-503's insurance?

A. That's correct. I think we lost someone.

(Off the record discussion.)

Q. All right. Mr. Petersen, what is your date of birth?

A. September 10th, 1960.

Q. And what is your address?

A. Home address is 15801 east 2000 North Road, Pontiac, Illinois, 61764.

Q. And with whom do you live at that address?

A. With my wife and my children.

Q. What are your children's names?

A. Julie, Jamie, and Kristopher with a K.

---

7

Q. And what are there are ages?

A. Julie is 19, Jamie is 16 and Kristopher is 13.

Q. How long have you lived at that address?

A. We lived there since June of 1997.

Q. Prior to that where did you live?

A. West Central, Nebraska.

Q. Okay. And why did you relocate to Pontiac, Illinois?

A. To take over management of the airport and set up an ag business.

Q. Okay. Could you just tell us briefly about your educational background, where you went to school, when you finished?

A. High school graduate, Hershey High School, graduated 1978; graduated with an Associate's Degree in Aircraft Maintenance Technology from Western Nebraska Technical College in Sidney, Nebraska, 1981. I also graduated from the Sheppard Air Force Base Technical School, I believe that was in 1983.

Q. Okay. Does that cover your formal education pretty much?

A. Well, I'm a commercial pilot.

---

8

Q. Okay. When did you get your license?

A. That I don't remember. It's been quite a few years ago. I'm also an instrument rated certified flight instructor. I'm a licensed airframe and power plant mechanic through the FAA and also hold an inspection authorization.

Q. Do you recall when you received any of these certifications?

A. Not right off the top of my head.

Q. Could you tell us about your employment since you finished school?

A. Since high school?

Q. Yeah.

A. Worked for Hershey Flying Service after I graduated from high school.

Q. What did you do for them?

A. I was general help; aircraft maintenance helper apprentice, I guess you could call it.

Q. Okay. How long did you do that?

A. About a year and a half off and on.

Q. When would that have been?

A. 1978.

Q. Okay. After that where did you work?

---

9

A. I worked for a company that was building a coal-fired power plant in our hometown, worked the summer there in, I believe, 1979.

Q. Okay. And then?

A. And then I worked the next summer for a friend of mine, Medicine Valley Aircraft in Curtis, Nebraska.

Q. What did you do there?

A. Aircraft mechanic.

Q. Okay. And what summer would that have been?

A. That would have been the summer of 1980.

Q. And then after that where did you work?

A. I worked some odd jobs around home, and I was enlisted in the United States Air Force.

Q. And where were you when you were enlisted, where did you serve?

A. I was stationed in Nellis Air Force Base, Nevada.

Q. During what period of time?

A. That would have been '82 through, I think, May of '84.

Q. And what did you do there?

A. I was F16 crew chief maintenance technician.

10

1    Q.    And then what did you do after that?

2    A.    When I was out of the Air Force I got into

3    the trucking industry with my father, owned and operated

4    his own trucking business.

5    Q.    What did you do for that business?

6    A.    I was the owner of my part of the business,

7    we bought and sold grain and feed and fertilizer and

8    delivered it to various places across central U.S.

9    Q.    Okay. And over what period of time did you

10   do that?

11   A.    That would have been from late 1984 through,

12   I'm going to say, late 1996 I guess when I quit driving a

13   truck.

14   Q.    And what did you do after that?

15   A.    In 1996, the summer of, I came to Illinois

16   and was enrolled at Harold's Flying Service in Leland,

17   Illinois, in his ag pilot program.

18   Q.    And what did you do for that program? Were

19   you --

20   A.    I went through his school and then I ended up

21   staying the summer as a pilot and also as a mechanic for

22   Mr. Miller.

23   Q.    And how long did you stay there?

11

1    A.    I stayed there 'til late August of 1996

2    before returning to western Nebraska.

3    Q.    And why did you return to Nebraska?

4    A.    Flying work was seasonal and we had completed

5    the flying season.

6    Q.    What did you do when you returned to

7    Nebraska?

8    A.    Got back in the truck and continued that

9    until, I believe, January of 1997.

10   Q.    Okay. And what did you do at that time?

11   A.    At that time I had purchased a derelict

12   aircraft and was in the process of restoring that.

13   Q.    And what do you mean by derelict aircraft for

14   those of us not in the business? One that doesn't fly?

15   A.    Yeah, a non-flying.

16         MR. MUELLER: Drinks a lot.

17   A.    It was a fixer-upper.

18   Q.    Okay. And what did you do for purposes of

19   employment while you were fixing up the plane?

20   A.    That.

21   Q.    That was it?

22   A.    That was it.

23   Q.    And were you able to get it running?

12

1    A.    Oh, yeah.

2    Q.    And did you -- then what did you do?

3    A.    I still own the aircraft.

4    Q.    What did you do for employment then? Did you

5    use that for -- use the aircraft for something?

6    A.    No, no.

7    Q.    What did you do?

8    A.    I -- in April of 1997 I returned to Illinois

9    to help out at Harold's Flying Service in Leland.

10   Q.    And what did you do there to help out?

11   A.    Maintenance and flying.

12   Q.    And what sort of flying did you do?

13   A.    Agricultural.

14   Q.    And what do you mean by agricultural flying?

15   A.    Loose term, crop-dusting.

16   Q.    And what types of planes were you flying for

17   that at Harold's?

18   A.    I believe at that time Harold had several Ag

19   Cats, a couple of Pawnees, a 210 Cessna that we used for

20   agricultural operations.

21   Q.    How long did you do that

22   A.    I was there at his place until the middle of

23   June of '97.

13

1    Q.    And what did you do at that time?

2    A.    We then took over operation of the Pontiac

3    Municipal Airport.

4    Q.    And what did you do when you took over the

5    operation of the airport?

6    A.    I was named as manager. We managed the

7    airport, sold fuel and basically started FBO, fixed base

8    operation, there on the field.

9    Q.    And what do you mean by a fixed base

10   operation?

11   A.    We sold fuel, performed maintenance, met the

12   customers' needs as they traveled in and out.

13   Q.    And how long did you do that?

14   A.    We're still doing that.

15   Q.    Still. Okay. Do you also own a company

16   called Pontiac Flying Service?

17   A.    That's correct.

18   Q.    And when did you get involved in that

19   company?

20   A.    Pontiac Flying Service was started when we

21   initially started our business there in 1997.

22   Q.    And when you started that in 1997 what was

23   the nature of that business?

14

1    A.    Airport management, maintenance and
2  agricultural flying.
3        Q.    And you are an owner of Pontiac Flying
4  Services?
5        A.    Co-owner with my wife.
6        Q.    Is it a corporation?
7        A.    Pontiac Flying Service is not.  Pontiac
8  Flying Service, Inc., is incorporated.  There's two
9  separate entities within that business.
10       Q.    Okay.  And what is the distinction between
11 the two entities besides the fact one is a corporation,
12 one isn't; what do they do?
13       A.    When we purchased the 503 we put those assets
14 into Pontiac Flying Service, Inc., formed the corporation
15 at that time.
16       Q.    So that was the only asset of the Inc.,
17 Pontiac Flying Services, Inc.?
18       A.    That, a pickup truck, one enclosed trailer,
19 one small flat open trailer, and some numerous parts and
20 pieces.
21       Q.    And why is it that you did it that way, put
22 that into a separate company?
23       A.    We just decided to put that into the

15

1  corporation.  I don't recall.
2        Q.    And who are the shareholders of that
3  corporation?
4        A.    Sarah Petersen and myself.
5        Q.    And how is that split?  50/50?
6        A.    51/49.
7        Q.    Who has 51?
8        A.    Myself.
9        Q.    Does Pontiac Flying Services, Inc., have any
10 other employees -- have any employees?
11       A.    At this time Inc. has no employees.
12       Q.    Did it ever?
13       A.    Yes.  We had myself, my wife.  I think we
14 were the only, I guess, employees of the corporation.
15       Q.    And were you officers of the corporation as
16 well?
17       A.    Yes.
18       Q.    What offices did you hold?
19       A.    President.
20       Q.    And your wife?
21       A.    She's, I believe, the secretary.
22       Q.    Okay.  Is that corporation still in
23 existence?

16

1        A.    Yes.
2        Q.    What does it currently own?
3        A.    The pickup truck that was originally included
4  and the two trailers and some miscellaneous parts and
5  pieces.
6        Q.    Now, the other entity, Pontiac Flying Service
7  -- Services?
8        A.    Service.
9        Q.    Service, Pontiac Flying Service, does it own
10 any planes?
11       A.    Yes.
12       Q.    Could you tell me what planes it owns
13 currently?
14       A.    Under that there's a 502 Air Tractor; there
15 are two G164A Ag Cats, there's a Piper Turbo Arrow, a
16 Piper Warrior.
17       Q.    Now, when was the 502 Air Tractor acquired?
18       A.    It was acquired in late May of 2003.
19       Q.    And what is that used for?
20       A.    Agricultural flying.
21       Q.    And what about the two G164A Ag Cats, when
22 were they acquired?
23       A.    One is the original derelict airplane that I

17

1  mentioned earlier that we still own.  It's used for
2  agricultural operations.  The second one we just
3  completed a restoration on it and it has yet to have
4  performed any aerial application at this time.
5        Q.    And what about the Pipers, the Turbo Arrow --
6        A.    They're used for flight instruction and
7  rental.
8        Q.    And that would be the Warrior and the Arrow?
9        A.    That's correct.
10       Q.    And when were they acquired?
11       A.    The Warrior was purchased I believe in July,
12 2002; and the Arrow was purchased I think in September of
13 2002.
14       Q.    And do you have a separate insurance policy
15 that covers the instruction, flight instruction that's
16 done with those planes?
17       A.    That I don't recall.
18       Q.    Okay.  Who is your insurance broker?
19       A.    Randy Hardy, Hardy Aviation Insurance.
20       Q.    And when did you start doing business with
21 him as your broker?
22       A.    I believe in 1997.
23       Q.    And what types of insurance policies has

20

1    Hardy Aviation Insurance obtained for you over the years?
2        A.    Agricultural and also for our rental
3    instruction airplanes.
4        Q.    And he is still your insurance broker;
5    correct?
6        A.    That's correct.
7        Q.    All right.  At some point Pontiac Flying
8    Services, Inc., purchased the AT-503; correct?
9        A.    That's correct.
10        Q.    When was that?
11        A.    That purchase was finalized the last day of
12    February, 2002.
13        Q.    And when did Pontiac take possession of it?
14        A.    It would have been probably in April of that
15    same year.
16        Q.    And what is an AT-503 plane?
17        A.    It's an agricultural crop duster airplane,
18    turboprop powered with two seats.
19        Q.    And when did you buy it?
20        A.    When?
21        Q.    I'm sorry.  From whom did you buy it?
22        A.    Harold Miller.
23        Q.    And for what -- what was the price?

1    and costs would be if this all worked out.
2        Q.    And what did she say?
3        A.    She said she would work up a quote and get
4    back to us.
5        Q.    And did you describe for her just exactly
6    what it is that you were purchasing?  You said you were
7    purchasing the assets and the AT-503?
8        A.    I told her most -- I guess basically is the
9    AT-503 is basically what I was seeking insurance coverage
10    for.
11        Q.    Did you tell her what you planned to use the
12    AT-503 for?
13        A.    No.
14        Q.    Did she get back to you with a quote?
15        A.    Yes.
16        Q.    How soon after that conversation?
17        A.    I -- it was within a week or ten days, I
18    believe.
19        Q.    And did she call you?
20        A.    I think there was a call and a fax, if I
21    remember.
22        Q.    And do you recall first of all from the phone
23    call that you're referring to what was said?

19

1        A.    That I don't recall.
2        Q.    Okay.  And why did you purchase that plane?
3        A.    So that we could become involved in the gypsy
4    moth abatement programs.
5        Q.    Did you tell anyone from Hardy Insurance that
6    you were buying that plane?
7        A.    Yes.
8        Q.    Who did you tell?
9        A.    I spoke with Angie and I spoke with Randy.
10        Q.    And Angie is Angie Banz?
11        A.    That's correct.
12        Q.    When did you speak with Angie Banz about it?
13        A.    To my recollection, early February.
14        Q.    Of '02?
15        A.    Of '02.
16        Q.    Okay.  And did you call her or how was it
17    that you spoke to her?
18        A.    Yes, I phoned her.
19        Q.    And what did you say to her and what did she
20    say to you?
21        A.    If I recall, I told her that we were pursuing
22    purchasing the assets of Harold Miller, which included
23    the 503, and wanted to know what the insurance premiums

21

1        A.    No.
2        Q.    And then you said you received a fax.  Do you
3    recall what was on the fax?
4        A.    I believe a quote.
5        Q.    And do you recall who it was from, what
6    company?
7        A.    Company?
8        Q.    Yeah, the insurance company.
9        A.    Not the exact insurance company, but it was
10    from Hardy.
11        Q.    Okay.  And did you approve the quote?
12        A.    Not at that time.
13        Q.    Why not?
14        A.    The finalization of the purchase of the Air
15    Tractor had not taken place as of then.
16        Q.    So what did you do in response to receiving
17    the fax?  Just hold off or what?
18        A.    I told them that we had not yet gone through
19    with the purchase.
20        Q.    Did you then contact anyone from Hardy
21    Aviation Insurance again after you did go through with
22    the purchase?
23        A.    Yes.

22

1    Q.    And who did you contact?

2    A.    I believe I spoke with Randy.

3    Q.    Randy Hardy?

4    A.    Randy Hardy.

5    Q.    And did you call him?

6    A.    Yes.

7    Q.    Do you recall when that took place?

8    A.    Probably the 28th of February when we -- when

9    we signed the deal.

10   Q.    Okay. That's of '02?

11   A.    That's correct.

12   Q.    And what did you tell Randy at that time?

13   A.    I don't remember exactly.

14   Q.    Do you recall generally?

15   A.    No.

16   Q.    Do you recall anything Randy said to you in

17   that conversation?

18   A.    I recall that Randy said that before I put

19   the airplane to work I was going to have to have some

20   additional training in the airplane because the insurance

21   company required it.

22   Q.    How much training had you had at that point?

23   A.    I had gone through the initial turbine

23

1    transition training and I believe that was all.

2    Q.    And what is initial turbine transmission

3    training? Can you describe it?

4    A.    It's transition from piston-powered airplanes

5    into turboprop operations.

6    Q.    And how much time does that involve, that

7    type of training?

8    A.    My initial was a little over five hours.

9    Q.    And who provided you that training?

10   A.    Company or individual?

11   Q.    Both.

12   A.    It was through Harold's Flying Service and

13   the instructor pilot was Rick Lucente.

14   Q.    In what plane was that training done?

15   A.    The Air Tractor 503.

16   Q.    Do you recall anything else Randy said in

17   that conversation?

18   A.    No.

19   Q.    Did he tell you how much more additional

20   training you needed?

21   A.    No; not specified.

22   Q.    Did you ask him?

23   A.    No.

24

1    Q.    Okay. What was your next contact with anyone

2    from Hardy Aviation Insurance regarding the insurance on

3    that AT-503?

4    A.    I don't recall. I believe there was a change

5    because they had found some cheaper insurance, but I

6    don't recall the date.

7    Q.    Was it after you had possession of the

8    AT-503?

9    A.    I think so.

10   Q.    Was there -- is it your understanding there

11   was already coverage for it and then there was a change

12   being made to another policy? I'm not sure I know what

13   you mean when you say there was a change.

14   A.    There was a change, to my knowledge, in the

15   insurance underwriter.

16   Q.    Meaning a change in companies? I'm still not

17   quite sure I'm following what you're saying.

18   A.    I believe originally we were with AIG.

19   Q.    Okay.

20   A.    And I think at that time it was switched to

21   USAIG and then after that it was switched back to AIG.

22   Q.    Okay. When you say AIG, was it your

23   understanding the policy was issued by National Union

25

1    Insurance Company?

2    A.    I -- I don't know who it was issued by.

3    Q.    You don't know. Okay. What did you use the

4    AT-503 plane for when you acquired it?

5    A.    When we first acquired it I received training

6    in it and then we put it to work doing agricultural

7    operations.

8    MR. BANOVETZ: Diane, could I just interject?

9    MS. BARON: Sure.

10   MR. BANOVETZ: Keep the --

11   MS. BARON: Sure.

12   EXAMINATION

13   BY MR. BANOVETZ:

14   Q.    At the time, Scott, that you acquired the 503

15   do you recall how many hours you had in the airplane at

16   that time?

17   A.    No, not total.

18   Q.    Can you estimate the total time?

19   MR. MUELLER: Show my objection. When we're

20   talking about acquiring, what are we -- when are we

21   talking about the acquisition? If we're talking about

22   February 28th, I think he said he had five hours.

23   MR. BANOVETZ: Initial training.

27

1    MR. MUELLER: Initial training with Lucente.
2  Are we talking about the acquisition taking place after
3  that?
4    MR. BANOVETZ: No, no. I was talking about
5  at the time of the purchase.
6    MR. MUELLER: Okay. Would that be the five
7  hours?
8    Q. (Mr. Banovetz continuing.) Is that all the
9  hours that you had in that airplane at that time?
10    A. At the time we inked the deal, yes.
11    Q. So the flying that you did for Harold
12  Miller's Flying Service was all in piston aircraft, other
13  than the training?
14    A. That's correct.
15    MR. BANOVETZ: Okay. Thanks.
16
17    Q. (Ms. Baron continuing.) Just so that I'm
18  clear, you're saying that the purchase was the last day
19  of February of '02; correct?
20    A. That's correct.
21    Q. And then you mentioned a date of April of
22  '02. Is that when you -- I'm just trying to figure out
23  why the difference in dates. What happened?

28

1  move it off of the mud --
2    A. Right.
3    Q. -- and then started using it as your own
4  property, Pontiac's property, what was it used for at
5  that time?
6    A. Well, the first day that we were able to fly
7  it I received training in it with Rick Lucente.
8    Q. And how much training did you receive with
9  Rick Lucente overall in that plane?
10    A. In that particular plane?
11    Q. Yeah.
12    A. When -- after we purchased it?
13    Q. Uh-huh, yes.
14    A. I'm going to say approximately three more
15  hours.
16    Q. And then did you then have contact with
17  someone from Hardy Aviation Insurance regarding coverage
18  for the AT-503 while you were having this training?
19    A. Not at that time that I remember.
20    Q. Do you recall when the coverage for the
21  AT-503 was changed from AIG to USAIG?
22    A. No.
23    Q. Do you know why it was changed back from

27

1    A. The difference in dates is that Harold's
2  place, he had a grass strip and in the springtime when
3  the snow melted it got muddy and soft and we could not
4  physically remove the airplane at that time.
5    Q. Okay. So it basically sat there until April?
6    A. It sat in his hangar, yes.
7    MR. MUELLER: Just so we're on the same
8  wavelength, we lawyers have a tendency to talk about
9  possession in the context of a real estate closing, so I
10  guess, Scott, you had the right to the plane, it was your
11  plane as of February 28th, but you simply couldn't take
12  it and fly it away --
13    A. Right.
14    MR. MUELLER: -- until April.
15    A. It was ours, but it stayed in Harold's
16  hangar.
17    Q. (Ms. Baron continuing.) Okay. That helps.
18  And as of when it became yours February 28th, did you
19  have insurance coverage on it?
20    A. Yes.
21    Q. And what coverage did you have?
22    A. I don't know. I -- I don't recall.
23    Q. And then when you first then were able to

29

1  USAIG to AIG?
2    A. Yes.
3    Q. Why?
4    A. USAIG would not underwrite gypsy moth
5  application.
6    Q. When did you receive these few hours of
7  training with Rick Lucente in the AT-503?
8    A. I don't have an exact date. It was after the
9  purchase and the time when the grass strip dried up and
10  we could get the airplane, but I don't have the exact
11  date.
12    MR. MUELLER: I believe we do have records
13  that would show that.
14    Q. Okay. Did you use the AT-503 for training
15  anyone else?
16    A. Not at that time, no.
17    Q. At any time.
18    A. In -- would you repeat the question? I'm not
19  understanding what you're looking for.
20    Q. Sure. I wanted to know if you used the
21  AT-503 for turbine transition training for anyone else?
22    MR. MUELLER: When you're using the term
23  "you" are you referring to him individually or to the

30

1   corporation?

2        Q.   Corporation.

3        A.   Corporation, yes.

4        Q.   Okay.  Tell me about that.  When did you

5   start doing that?

6        A.   That would have been in May of 2003.

7        Q.   And who did that training?

8        A.   Mr. Rick Lucente.

9        Q.   And who received the training?

10       A.   Neal Webster.

11       Q.   Did anyone else receive the training?

12       A.   No.

13       Q.   Was Rick Lucente an employee of Pontiac?

14       A.   No.

15       Q.   What was his arrangement then?  Why was he

16  flying that plane?

17       A.   Private contractor.

18       Q.   And what were the financial arrangements

19  then?

20       A.   He was paid $100 per hour of instruction time

21  whether it was in the classroom or in the air.

22       Q.   And did he provide instruction in other

23  planes of Pontiac as well?

31

1        A.   No.

2        Q.   Just the AT-503?

3        A.   Just the 503.

4        Q.   And what was charged to Neal Webster to

5   receive this training?

6        A.   Ultimately there was no -- no payment for any

7   services rendered.

8        Q.   Okay.  What was the initial arrangement to

9   be?

10       A.   Five thousand two hundred dollars.

11       Q.   And what was this training to consist of?

12  You mentioned classroom and air.  Could you describe that

13  training?

14       A.   That would have been up to Mr. Lucente.

15       Q.   Did you advertise this training?

16       A.   Yes.

17       Q.   Let me find that.

18       MR. BANOVETZ:  Can I ask a question while

19  you're looking?

20       MS. BARON:  Sure, go ahead.

21            EXAMINATION

22  BY MR. BANOVETZ:

23       Q.   Scott, in the documents that you brought with

32

1   you today I notice that there's an Aircraft Endorsement

2   which has a date of issue of March 5, 2002, that lists

3   the Air Tractor 503.  Is that consistent with your

4   recollection of when your insurance became effective on

5   this aircraft after you purchased it?

6        A.   No.  It's my understanding coverage was bound

7   on the 1st of March.

8        Q.   Okay.  March 1st?

9        A.   Yes.

10       Q.   Okay.  Did you receive something in writing

11  from Hardy Aviation or from National Union evidencing the

12  fact that the 503 was now covered?

13       A.   I don't recall.  That would have been --

14  Sarah took care of the insurance stuff that came in in

15  the office.

16       Q.   Are the documents that you brought with you

17  today from your files as opposed to something that your

18  attorney provided?

19       A.   I think that is -- to my knowledge it's all

20  from our files.

21       Q.   Okay.  But you don't --

22       MR. MUELLER:  He provided the files to me and

23  I then gathered the materials, so --

33

1        MR. BANOVETZ:  Fair enough.  I'm just trying

2   to get -- I'm not trying to be tricky.  I'm just trying

3   to get at what documentation you folks might have

4   received evidencing the coverage.

5        Q.   (Mr. Banovetz continuing.)  Is it a fair

6   assumption, if your lawyer will let me ask the question

7   that way, that the documents that I have that you have

8   provided your lawyer today are documents that you

9   received from Hardy, the policy documents?

10       MR. MUELLER:  You might show them to him.  I

11  -- I think the notice was a little bit broader than just

12  documents received from Hardy.

13       Q.   Fair enough.  The document entitled Aircraft

14  Endorsement, which is endorsement ten, dated March 5th,

15  2002.

16       A.   Endorsement becomes effective March, 2002.

17       Q.   Is that a document you recall receiving from

18  Hardy?

19       A.   I don't recall it, but Sarah may.

20       Q.   Okay, thanks.  Just a couple more, if I

21  could, Diane.

22       MS. BARON:  Certainly.

23       Q.   (Mr. Banovetz continuing.)  Do you recall

34

1  receiving a pilot warranty endorsement from Hardy that
2  indicated who could fly the AT-503 when you purchased it?
3      A.  No, I don't remember seeing that.
4      Q.  Did you have an understanding as to who was
5  going to be allowed to fly the AT-503 once you began
6  operations in the spring?
7      A.  Yes, yes.
8      Q.  Who would be allowed to fly that aircraft as
9  you understood it?
10     A.  Myself, Rick Lucente as an instructor pilot,
11  and then anyone that met the open pilot warranty.
12     Q.  Is it fair to say that your understanding was
13  that you were approved to fly the airplane immediately
14  without any further instruction?
15     A.  No.
16     Q.  Was it your understanding at the time you
17  purchased the aircraft that you would be required to
18  undergo additional training in order to fly the aircraft?
19     A.  Yes.
20     Q.  Do you recall receiving a pilot warranty
21  endorsement document you have just referred to which
22  indicated without restriction that you were approved to
23  fly the aircraft, do you recall receiving that document

35

1  in or about March of 2002.
2      A.  No.
3          MR. BANOVETZ:  Thank you.
4          MS. BARON:  Let's mark this.
5      (Whereupon Deposition Exhibit #1 was
6          Marked for identification.)
7      Q.  (Ms. Baron continuing.)  Showing you what's
8  been marked as Deposition Exhibit Number One, could you
9  take a look at that and tell us if you recall seeing that
10  before?
11         MR. MUELLER:  Do you have extra copies?
12         MS. BARON:  Sure.  For the record, it's a
13  copy of the policy that was attached to the complaint.
14         MR. MUELLER:  I assumed as much.
15     (Off the record.)
16         MR. KRZAK:  What's the exhibit?
17         MR. MUELLER:  It's the policy that's attached
18  to the complaint.
19         MR. KRZAK:  Okay.
20     A.  I don't recall specifically seeing it.
21     Q.  (Ms. Baron continuing.)  Do you recall
22  receiving any of your insurance policies and seeing them?
23     A.  Oh, I know there was stuff that come from

36

1  Hardy all the time, but that normally was handled by
2  Sarah.
3          MS. BARON:  Okay.  Let's mark that.
4      (Whereupon Deposition Exhibit #2 was
5          Marked for identification.)
6      Q.  (Ms. Baron continuing.)  All right.  Showing
7  you what's been marked as Deposition Exhibit Number Two,
8  is that a copy of one of the ads that you ran for the
9  turbine transition training with the AT-503?
10     A.  Yes, that's correct.
11     Q.  And when did you run these ads, for what
12  period of time?
13     A.  If I recall, it started in December of 2002
14  and it ran up through the time of the accident, I
15  believe.  At that time we canceled those particular
16  advertising.
17     Q.  And did -- but you're saying that no one else
18  came for training until May of '03?
19     A.  We had several inquiries.
20     Q.  But no one took the training?
21     A.  No.
22     Q.  Did you tell anyone at Hardy Insurance that
23  you were using the AT-503 for turbine transition

37

1  training?
2      A.  Yes.  Randy specified that when we originally
3  bought the aircraft, that I was to have additional
4  training in it and I told him that we would add Rick
5  Lucente as the instructor pilot on that aircraft.
6      Q.  Did you request coverage, insurance coverage
7  for using the plane for training, transition training at
8  that time?
9      A.  I believe it was all covered in what we had
10  discussed.
11     Q.  And what do you mean by that?  Do you recall
12  asking him for coverage for that use?
13     A.  Randy specified that we had to have
14  additional training and I told him that was fine, that I
15  would do it with Rick Lucente and we would add him as the
16  instructor pilot on the aircraft.
17     Q.  Did you ever tell Hardy Insurance that you
18  were advertising to do transition training on that
19  aircraft?
20     A.  I never told them that I was advertising.
21     Q.  Did you tell them that you were offering to
22  do it for other people?
23     A.  No.

38

1    Q.    Now, when the AT-503 was added to your
2    aviation insurance policy it was initially done by
3    endorsement, correct, to your knowledge or --
4    A.    I don't know.
5    Q.    Okay. Do you know what policy that plane was
6    added to?
7    A.    Not off the top of my head I don't, but I
8    know it was added.
9    Q.    Do you know what policy period it was added
10    to?
11    A.    No.
12    MS. BARON: Mark this.
13    (Whereupon Deposition Exhibit #3 was
14    Marked for identification.)
15    Q.    (Ms. Baron continuing.) Showing you what's
16    been marked as Deposition Exhibit Three, do you recognize
17    that document?
18    A.    Yes.
19    Q.    Is this an insurance application regarding
20    Pontiac Flying Service, Inc.?
21    A.    I believe it is.
22    Q.    And is it for -- an application for coverage
23    effective April 10th of '02 to April 10th of '03?

39

1    A.    Yes.
2    Q.    Is that your signature at the bottom of the
3    second page?
4    A.    Yes, that is.
5    Q.    Did you read this application before you
6    signed it?
7    A.    Yes, I did.
8    Q.    And it includes the Air Tractor, AT-503;
9    correct?
10    A.    Yes, it does.
11    Q.    If you look at the second page up at the top
12    where -- under the aircraft liability coverages, the box
13    passengers excluded is checked, correct, up in the
14    left-hand corner?
15    A.    On the second page?
16    Q.    Yes.
17    A.    Oh, yes, it is.
18    Q.    So that indicated that passenger coverage was
19    excluded under the policy?
20    A.    We never carried any passengers in the
21    airplane.
22    Q.    When you were using the Air Tractor 503 for
23    your own training weren't there two of you in the plane?

40

1    A.    That's correct.
2    Q.    Just a second here.
3    MR. BANOVETZ: Can I interject a question
4    again?
5    MS. BARON: Sure, go ahead.
6    EXAMINATION
7    BY MR. BANOVETZ:
8    Q.    Scott, did you ever have an opportunity to
9    review your policy definition of passenger?
10    A.    Say that again, Mark.
11    Q.    Sure. Before the date of the loss had you
12    ever had an opportunity to read any of the insurance
13    policy issued on these agricultural airplanes?
14    A.    I don't recall.
15    Q.    As you sit here today, not at the time, but
16    as you sit here today do you understand both occupants in
17    that airplane would be passengers as defined by the
18    policy?
19    A.    No, that aircraft was never certified as
20    having a passenger seat in the rear.
21    Q.    Okay. Are you aware as you sit here today
22    that this -- the insurance policy that was in effect at
23    the time of the loss defines a passenger as anyone in the

41

1    airplane including crew?
2    MR. MUELLER: Objection; asks for a legal
3    conclusion.
4    MR. BANOVETZ: I'm just trying to avoid
5    forcing him to read the policy here. He can do that.
6    I'm just trying, Scott, to get an understanding.
7    A.    Sure.
8    Q.    (Mr. Banovetz continuing.) You understood
9    passengers would not be covered under your liability
10    policy in that aircraft?
11    A.    In your -- response to your question, we
12    never carried passengers. Anybody that was in the
13    aircraft was considered crew members because that's how
14    that airplane was certified. It doesn't have a passenger
15    seat; it has a crew member seat.
16    Q.    Okay. For the sake of expediency -- well,
17    let me just refer you to Exhibit One, which is the
18    policy, and the definition of passenger. If I could just
19    ask you to read that into the record.
20    A.    Sure passenger --
21    MR. MUELLER: Counsel, I think that you have
22    his understanding, then you have the policy, which is
23    obviously a part of the record in the case.

42

1    MR. BANOVETZ: I'm just --

2        MR. MUELLER: I'm not going to, you know,

3    prohibit him from doing it, but as far as shortening it

4    up, it is -- it says what it says.

5        MR. BANOVETZ: Okay. I just want to be on

6    the same page with Scott so that I can ask my follow-up

7    question --

8        MR. MUELLER: Okay.

9        MR. BANOVETZ: -- so we are both on the same

10   page, if I could.

11       A.   Okay.  Passenger means any person in, on or

12   boarding the aircraft for the purpose of riding or flying

13   therein or alighting therefrom after a flight or

14   attempted flight therein, including crew members.

15       Q.   (Mr. Banovetz continuing.) Did you have an

16   understanding as of the date of this loss as to whether

17   there would be liability coverage for anyone in that

18   airplane?

19       A.   I assumed that it would be covered.

20       Q.   Now, I'm not talking about coverage

21   for the aircraft hull. I'm talking about third party

22   liability for claims against you by the pilot -- or I'm

23   sorry, by a crew member or their family.  Did you have an

43

1    understanding as of the date of this loss as to whether

2    you had coverage for a liability claim against you by

3    someone in that aircraft?

4        A.   My understanding, it would be covered.

5        Q.   Did you have an understanding as to what the

6    passenger exclusion or noninclusion of passenger coverage

7    meant?  What was your understanding of the significance

8    of that?

9        A.   I -- I couldn't tell you at this point, Mark.

10   I don't remember.

11       MR. BANOVETZ: Okay. Thanks, Diane.

12       MS. BARON: Sure. Let's mark this one.

13   (Whereupon Deposition Exhibit #4 was

14       Marked for identification.)

15       Q.   (Ms. Baron continuing.)  Showing you what's

16   been marked Deposition Exhibit Number Four, are you

17   familiar with this?

18       A.   Familiar, I have seen it.

19       Q.   Is that an application, insurance application

20   for Pontiac Flying Service for coverage effective May

21   19th, 2002, to May 19th, 2003?

22       A.   Yes, it is.

23       Q.   And do you recognize your wife's signature at

44

1    the bottom of the second page?

2        A.   Yes, I do.

3        Q.   And do you understand this to be the

4    application that was submitted when the insurance was

5    then being transferred, as you say, back to AIG?

6        A.   Yes.

7        Q.   And that also indicates on page two, as the

8    other application did, that passengers are excluded;

9    correct?

10       A.   Yes, it does.

11       Q.   And is it your understanding that the policy

12   that I have previously marked as, I believe, Exhibit One,

13   was the policy that was then provided to you?

14       A.   Yes, the dates would match up.

15       Q.   Okay. Now, has Pontiac Flying Service, Inc.,

16   had -- strike that.

17       Has Pontiac Flying Service had any planes

18   they had used for instructional flying?

19       A.   Any planes?

20       Q.   Yes.

21       A.   Yes.

22       Q.   And did you purchase instruction insurance

23   for those?

45

1        A.   Yes, we did.

2        Q.   Did you ever contact Hardy Aviation Insurance

3    to request coverage for instructional flying in the -- in

4    an Ag Cat plane?

5        A.   We, I guess, explored that possibility. It

6    was a hypothetical; we never purchased or located an

7    aircraft. It was -- just was something that we were

8    maybe looking to do.

9        Q.   Do you recall when you were looking to do

10   that?

11       A.   It would have been probably in 2002, 2003. I

12   don't remember right off the top of my head.

13       Q.   What do you recall about your discussions

14   with anyone from Hardy Aviation Insurance about that?

15       A.   If I remember it was if we move forward with

16   this and we purchase this type of aircraft, what would

17   coverage potentially cost, what kind of a ballpark

18   figure?

19       Q.   And did he get some quotes for you, Hardy

20   Aviation?

21       A.   Randy didn't.

22       Q.   Did Angie get some quotes for you?

23       A.   I believe she finally did -- or they didn't

46

1  get a quote, nobody would quote it, if I remember.

2      Q.   Okay.

3      A.   Because of my, I guess, interpretation of my

4  limited time as a pilot.

5      Q.   So it was your recollection that they never

6  got a quote for you for training with the Ag Cat?

7      A.   That's what I recall.

8      Q.   The AT-503 crashed on May 5th of 2003;

9  correct?

10     A.   That's correct.

11     Q.   Who was in the plane at the time?

12     A.   Rick Lucente and Neal Webster.

13     Q.   And was it being used for turbine transition

14  training at that time?

15     A.   Yes, it was.

16     Q.   And they were both killed; correct?

17     A.   That's correct.

18     Q.   How did you learn about the crash?

19     A.   I was notified by cell phone from one of my

20  employees that someone had called the airport saying that

21  an aircraft had gone down.

22     (Off the record discussion.)

23     Q.   (Ms. Baron continuing.)  Did you then have

47

1  any contact with Hardy Aviation Insurance about it?

2      A.   Say that again.

3      Q.   Did you have any contact with Hardy Aviation

4  Insurance about the crash?

5      A.   I didn't on that day, no.

6      Q.   What about on any other day?

7      A.   I think Sarah made the initial contact.

8      Q.   Okay.  Did you personally ever have any

9  contact with anyone from Hardy Aviation Insurance about

10  the crash?

11     A.   Not that I recall.

12     Q.   At any time before the accident did you tell

13  anyone from Hardy Aviation Insurance that you wanted

14  insurance coverage to do turbine transition training on

15  the AT-503?

16     A.   Yes, when they originally bound it and they

17  specified that I had to have additional training in the

18  airplane.

19     Q.   Other than that conversation that you've

20  already described, do you recall any other contact that

21  you had with Hardy Aviation Insurance about getting

22  insurance for turbine transition training in the AT-503?

23     A.   Not after the initial.

48

1      Q.   So that was the only contact that you recall?

2      A.   That's the only conversation that Randy and I

3  had regarding that.

4      Q.   Okay.

5      (Off the record discussion.)

6      Q.   (Ms. Baron continuing.)  Did you ever ask --

7  strike that.

8          Did you ever discuss with anyone from Hardy

9  Aviation Insurance anything about having passenger

10  coverage for the AT-503?

11     A.   The only conversation I recall is the initial

12  with Randy when I told him that we would -- had Rick

13  Lucente as the instructor pilot on the airplane.

14     Q.   For purposes of training?

15     A.   Instruction.

16     Q.   Instruction for yourself?

17     A.   Anyone, is the way I understood it.

18     Q.   Did Randy tell you that?

19     A.   Tell me?

20     Q.   That Rick Lucente could train anybody in the

21  AT-503 and he'd be covered?

22     A.   He never said we couldn't.

23     Q.   Did he ever say you could?

49

1      A.   No.

2      Q.   Did you ever talk to Randy Hardy about --

3  strike that.

4          Did you ever tell anyone from Hardy Aviation

5  Insurance that you were running a flight school with the

6  AT-503?

7      MR. MUELLER:  Objection; I think that's a

8  mischaracterization.

9      Q.   You can answer.

10     MR. MUELLER:  A flight school?

11     Q.   You can answer.

12     A.   Say that again, Diane.

13     Q.   Did you ever tell anyone from Hardy Aviation

14  Insurance that you were running a flight school with the

15  AT-503?

16     A.   The conversation I recall with Randy again

17  was back to that original conversation when they insisted

18  that I receive additional training and I told them that

19  was fine, and that I would have Rick Lucente do it and

20  that we would add him as the instructor pilot on the

21  aircraft.  If that answers your question.

22     Q.   But you don't -- strike that.

23          It's your recollection Randy Hardy didn't say

50

1 how many additional hours you needed or what they were
2 supposed to consist of?
3      A.   No.
4      Q.   And you didn't ask him?
5      A.   No.
6      Q.   Okay.
7           MR. BANOVETZ: Can I ask a question?
8           MS. BARON: Sure, go ahead.
9                EXAMINATION
10 BY MR. BANOVETZ:
11      Q.   Did you ever check to see if you received
12 anything from Hardy evidencing the fact that Rick was
13 added as an instructor pilot under this policy?
14      A.   Did I see anything?
15      Q.   Correct.
16      A.   Not that I recall.
17           MR. BANOVETZ: Okay. Thanks.
18      Q.   (Ms. Baron continuing.) Are you familiar
19 with an individual named Frank Kimmel?
20      A.   Yes.
21      Q.   And do you know him?
22      A.   Yes.
23      Q.   How do you know him?

51

1      A.   Frank and I have worked in the past on some
2 spray projects.
3      Q.   Did you ever tell him you knew you did not
4 have insurance coverage for training with the AT-503?
5      A.   Not that I remember.
6      Q.   Did you and your wife have different job
7 responsibilities for Pontiac? I'm trying to get an idea
8 who handled what as far as the business.
9      A.   That would be a fair and accurate statement,
10 yes.
11      Q.   Who would have been more involved with the
12 insurance, you or Sarah?
13      A.   The handling of the paperwork, probably her.
14 But we both looked through things when it came in. If I
15 needed, like on an application to verify hours and stuff
16 like that, I would read through it.
17      Q.   Were there ever occasions when you thought
18 she had handled something and found out she hadn't?
19      A.   Not that I can recall.
20      Q.   Do you recall any other conversations you had
21 with anyone from Hardy Aviation Insurance regarding the
22 AT-503?
23      A.   Any conversations?

52

1      Q.   Yes. I want to cover them.
2      A.   There could have been, but, I mean -- I guess
3 not.
4           MS. BARON: You don't recall any. Okay. All
5 right. Why don't you -- I will let somebody else go for
6 awhile and see what else I have.
7           MR. BANOVETZ: Actually, we spoke yesterday
8 and for the record my understanding from our
9 conversation, but correct me if I'm wrong, was that the
10 sworn statement taken previously could be used or cited
11 to in the context of briefs filed with the Court, for
12 example, and that there's no privilege issue that's going
13 to attach to it. As I recall we didn't discuss anything
14 that could affect the liability case, but I wanted to
15 clarify that so that I don't have to ask all those
16 questions here.
17           MR. MUELLER: Our discussion is as indicated
18 regarding the procedural. You know, we don't know the
19 exact context, the specific questions or portions that
20 may be asked, so what we are doing is saying we are
21 waiving the confidentiality aspects of it.
22           MR. BANOVETZ: Very good. I think in light
23 of that then that I probably have no further questions,

53

1 unless additional questions cause me to think of
2 something.
3           MS. BARON: All right. Then I need a few
4 minutes because I don't think I have anything else.
5           MR. BANOVETZ: Should we take a break?
6           MS. BARON: Yes.
7      (Whereupon a brief recess was had.)
8           MS. BARON: There were just a few documents
9 that were part of your disclosures that I just wanted to
10 ask about.
11           MR. MUELLER: Yeah, there's the --
12           MS. BARON: Mark this.
13      (Whereupon Deposition Exhibits #5, #6, and
14       #7 were marked for identification.)
15      Q.   (Ms. Baron continuing.) Here's the marked
16 ones if you'll hand him those. If you will take a look
17 at what's been marked Deposition Exhibit Five?
18      A.   Okay, here's Five.
19      Q.   Okay. Take a look at Five. Could you tell
20 me what this is?
21      A.   It's a copy of a logbook.
22      Q.   And whose logbook is it, do you know?
23      A.   That I can't tell, not by this page.

**54**

1 And do you know why this was produced to us
2 in this case? What does it indicate?
3     A.    Yeah, here it is. It's a copy of Rick
4 Lucente's logbook.
5     Q.    Okay. And what -- do you have any idea why
6 it was -- do you have any idea why, what the significance
7 of this page, Exhibit Five, is?
8         (Off the record discussion.)
9     A.    On, let's say, one, two, three -- if we go
10 down to line five dated March 20th, Rick made another
11 flight with me in the 503, says, Scott Petersen, and a
12 notation under that, insurance requirements and the time
13 that we flew there.
14     Q.    Okay. You don't have any -- strike that.
15         This Exhibit Five was never provided to Randy
16 Hardy, correct, prior to --
17     A.    That I don't know.
18     Q.    You didn't send it to him?
19     A.    No, I did not.
20         MR. BANOVETZ: This probably came from the
21 accident investigation file, is my guess.
22     Q.    (Ms. Baron continuing.) Okay. And then
23 let's look at what's been marked Exhibit Six --

**55**

1     A.    Okay.
2     Q.    -- which appears to be a copy of a check.
3 Can you tell me what this is?
4     A.    That's a payment to Rick Lucente and it
5 appears to be three hours of instruction in the airplane.
6     Q.    And that's from Pontiac Flying Service signed
7 by your wife?
8     A.    That's from Pontiac Flying Service, Inc.
9     Q.    Inc., signed by your wife?
10     A.    That's correct.
11     Q.    And then Exhibit Seven, could you tell me if
12 you recognize what that is
13     A.    That looks like some personal notes that my
14 wife put together.
15     Q.    She prepared that?
16     A.    It looks like that's something that she did,
17 yes.
18     Q.    Do you know when or any details?
19         MR. MUELLER: I think this was correspondence
20 that was intended for me from her.
21     A.    I believe that's --
22     Q.    Okay.
23     A.    -- correct.

**56**

1         MS. BARON: All right. I think that in
2 addition to the sworn statement that you've already
3 discussed, that's all I have.
4         MR. BANOVETZ: One more question.
5     FURTHER EXAMINATION
6 BY MR. BANOVETZ:
7     Q.    I think I asked this before, but just in case
8 I didn't, is it the case that prior to the loss you had
9 not ever read the insurance policy that covered the
10 AT-503; is that the case?
11     A.    By read you mean line by line, picked it
12 apart?
13     Q.    Well, let's break it down.
14         MR. MUELLER: Counsel, I think we can all
15 agree there isn't any way that any of us read a policy
16 line by line picking it apart.
17     Q.    I know a bad question when I ask one.
18         Had you reviewed any of the insurance policy
19 prior to this loss?
20     A.    Reviewed, yes.
21     Q.    Had you read the -- strike that.
22         Are you familiar with what a coverage
23 agreement is as opposed to an endorsement?

**57**

1     A.    No.
2     Q.    Can you tell me what portions of the policy
3 you recall reviewing? That's Exhibit One if you'd like
4 to refer to it.
5         MR. MUELLER: Again, these are all in the
6 context before the loss?
7         MR. BANOVETZ: Correct.
8     A.    Probably the biggest thing is that the
9 insured value is what we had stated on it and second,
10 what it was going to cost me as far as premiums.
11     Q.    (Mr. Banovetz continuing.) Prior to the loss
12 had you ever reviewed the definition of aerial
13 application in the policy?
14     A.    No.
15         MR. BANOVETZ: That's all I have. Thanks.
16         MS. BARON: I do have another question.
17     FURTHER EXAMINATION
18 BY MS. BARON:
19     Q.    Do you recall ever calling anyone at Hardy
20 Aviation Insurance with questions regarding that policy?
21     A.    Do I recall calling anybody?
22     Q.    Yes.
23     A.    No, I don't.

58

1    MS. BARON:  That's all I have.

2    MR. BANOVETZ:  Thanks, Scott.

3

4

5

6         FURTHER DEPONENT SAYETH NOT;

7         SIGNATURE RESERVED.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

---

60

1    In testimony thereof, I have hereunto set my

2  hand this 28th day of   February, 2005.

3

4

5

6

7

8                                          CSR

9  NOTARY PUBLIC

10

11

12

13  Illinois CSR License No. 084-001542.

14

15

16

17

18

19

20

21

22

23

---

59

1  STATE OF ILLINOIS   )

2                      )

3  COUNTY OF PEORIA    )

4

5       I, LAURA J. AMBERG, C.S.R., do hereby certify

6  that heretofore, to-wit, on the 22nd day of February,

7  2005, at the hour of 11:20 a.m., personally appeared

8  before me at 416 Main Street in the City of Peoria,

9  County of Peoria, State of Illinois, SCOTT PETERSEN.

10       I further certify that the said witness was

11  by me first duly sworn to testify to the truth, the whole

12  truth and nothing but the truth in the cause aforesaid,

13  that the testimony then given by said witness was

14  reported stenographically by me in the presence of said

15  witness and afterwards reduced to typewriting, and the

16  foregoing is a true and correct transcript of the

17  testimony so given by said witness as aforesaid.

18       I further certify that the signature of the

19  witness to the deposition was RESERVED by agreement of

20  counsel.

21       I further certify that I am not counsel for nor

22  in any way related to any of the parties to this suit,

23  nor am I in any way interested in the outcome thereof.

   

AMERICAN HOME
A S S U R A N C E   C O M P A N Y

NATIONAL UNION
FIRE INSURANCE COMPANY
OF PITTSBURGH, PA

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

**PART 2**

Policy Number ___AV 3391999-04___

## DECLARATIONS

Previous Policy Number ___AV 3391999-03___

This page with "Policy Provisions -- Part 1" Form AG01(9/98) and all endorsements attached hereto completes this numbered aviation physical damage and liability policy, issued by the company as indicated by an "X" in the box to the left of the company's name (hereinafter called the Company).

**CERTIFIED COPY**

- ☐ AMERICAN HOME ASSURANCE COMPANY
- ☒ NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.
- ☐ THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

**ITEM 1.** PONTIAC FLYING SERVICE, INC.
NAMED INSURED
15755 E 2000 NORTH ROAD, PONTIAC, IL  61764
ADDRESS

**ITEM 2.** Policy Period: From ___MAY 19, 2002___ to ___MAY 19, 2003___ 12:01 A.M. Standard Time at the address in Item 1. The insurance afforded is only with respect to such and so many of the following coverages as are indicated by specified premium charge or charges. The limit of the Company's liability against such coverage shall be as stated herein, subject to all of the terms of this policy having reference thereto.

| ITEM 3. Liability Coverages | LIMITS OF LIABILITY | | | | LIABILITY PREMIUMS |
|---|---|---|---|---|---|
| | NON-CHEMICAL | | CHEMICAL | | |
| A. Bodily Injury -- excluding Passengers | $ 100,000. 300,000. | each person each occurrence aggregate | $ 100,000. 300,000. 300,000. | each person each occurrence aggregate | $ 3,407. |
| B. Property Damage | 100,000. | each occurrence aggregate | 100,000. 100,000. | each occurrence aggregate | 6,328. |
| C. Passenger Liability | | each person each occurrence | Not applicable Not applicable | | |
| D. Single Limit -- Property Damage & Bodily Injury, excluding Passengers | | each occurrence aggregate | | each occurrence aggregate | |
| E. Medical Expense -- cluding Crew | | each person each occurrence | Not applicable Not applicable | | |

Chemical Limits of Liability are part of and not in addition to the Non-chemical Limits of Liability.   LIAB. TOTAL $   9,735.
All liability arising from any one occurrence shall not exceed the Non-chemical Limits of Liability.

**ITEM 4.** Description of Aircraft and Physical Damage Coverage hereunder:

| F.A.A. CERT. NO. | MAKE AND MODEL | YEAR BUILT | SEATS PASS | INSURED VALUE | COVERAGE PHYSICAL DAMAGE | CHEM | PHYSICAL DAMAGE PREMIUMS | DEDUCTIBLES NOT IN MOTION | IN MOTION, INGESTION, OR MOORING |
|---|---|---|---|---|---|---|---|---|---|
| N503D | AIR TRACTOR 503 | 91 | 0 | $ 350,000. | F | CC | $ 21,030. | 500. | 35,000. |
| N48468 | AG CAT G164A | 76 | 0 | 90,000. | F | CC | 6,412. | 500. | 9,000. |
| N8762H | AG CAT G164A | 75 | 0 | 45,000. | H | N/A | 1,385. | 500. | N/A |

| PHYSICAL DAMAGE Coverage Identified: | CHEMICAL CATEGORY: | PHYSICAL DAMAGE TOTAL | POLICY PREMIUM |
|---|---|---|---|
| F. All Risks: Ground & Flight | CC Comprehensive Chemical | | |
| G. All Risks: Not In Flight | RC Restricted Chemical | $ 28,827. | $ 38,562. |
| H. All Risks: Not In Motion | XC Excluding Chemical N/A Not Applicable | | |

**ITEM 5.** When in flight the aircraft will be piloted only by SEE AG018

**ITEM 6.** The aircraft will be used only for the purpose Aerial Application.

**ITEM 7.** LOSS PAYABLE: Any loss under coverage F, G, and H is payable as interest may appear to the Named Insured and

**ITEM 8.** The aircraft will be principally based at ___PONTIAC MUNICIPAL___ Airport, ___PONTIAC___ City, ___IL___ State.

Producer ___HARDY AVIATION INSURANCE, INC___

Countersigned _____

At _____

By _____
        (Authorized Representative)

Approved By _____
              (Authorized Representative)

EXHIBIT
#1  2/22/05

AG04 (9/98)

CERTIFIED COPY

## DEDUCTIBLE LIABILITY INSURANCE ENDORSEMENT

In consideration of <u>Included</u> premium of $ <u>Included</u>, this policy is amended as follows:

SCHEDULE

COVERAGE                                    AMOUNT AND BASIS OF DEDUCTIBLE

Coverage B.
    Property Damage Liability
        Arising from Chemicals              $ 1,000._____  each occurrence
        Arising from other than Chemicals  $ 250._____  each occurrence

Coverage D.
    Property Damage Liability
        Arising from Chemicals              $ Not Covered____  each occurrence
        Arising from other than Chemicals  $ Not Covered____  each occurrence

APPLICATION OF ENDORSEMENT (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all **property damage**, however caused):

1.  The obligation of the Company under Coverage B or D to pay damages on behalf of the Insured applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages, and the limits of insurance applicable to each **occurrence** for such coverages will be reduced by the application of such deductible amount.

2.  The deductible amounts stated in the Schedule apply as follows:

    Per Occurrence Basis - if the deductible is on a per occurrence basis, the deductible amount applies under Coverage B or D to all damages because of **property damage** as the result of any one occurrence regardless of the number of persons or organizations who sustain damages because of that occurrence.

3.  The terms of this insurance, including those with respect to:

    A)  the Company's right and duty to defend any suits seeking those damages, and

    B)  the Named Insured's duties in the event of an **occurrence**, claim or suit

apply irrespective of the application of the deductible amount.

AG016 (2/00)                    Endorsement No. 1____ , page 1 of 2

4.  The Company may pay any part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the deductible amount as has been paid by the Company.

CERTIFIED COPY

All other provisions of this policy remain the same.

This endorsement becomes effective _____ MAY 19, 2002 _____ to be attached to and hereby made a part of Policy No. ___ AV 3391999-04 ___ issued to PONTIAC FLYING SERVICE, INC

By National Union Fire Insurance Company of Pittsburgh, PA

Endorsement No. ___ 1 ___ page 2 of 2

Date of Issue _____ 6-14-02   bp _____

By _____
(Authorized Representative)

AG016 (2/00)

PILOT WARRANTY ENDORSEMENT
(AERIAL APPLICATOR AIRCRAFT)

CERTIFIED COPY

This policy is amended as follows:

When in flight, the aircraft will only be operated by the pilot/s specified below who possess the logged hours, the current and valid ratings and certificates specified below, and a current and valid Medical Certificate.

As respects piston engine powered fixed-wing aircraft:
[X]   Named pilot(s) SCOTT PETERSEN
[X]   Any pilot maintaining a commercial or more advanced pilot certificate who has flown a minimum pilot in command time of __1,000__ (1,000 if nothing else is shown) hours in fixed-wing aircraft engaged in aerial application, including at least __100__ (100 if nothing else is shown) hours in aircraft of the same make and model being flown.

As respects piston engine powered rotorcraft:
[ ]   Named pilot(s) _____
[ ]   Any pilot maintaining a commercial or more advanced pilot certificate who has flown a minimum pilot in command time of _____ (1,000 if nothing else is shown) hours in rotorcraft engaged in aerial application, including at least _____ (100 if nothing else is shown) hours in aircraft of the same make and model being flown.

As respects turbine powered fixed-wing aircraft:
[X]   Named pilot(s) SCOTT PETERSEN
[X]   Any pilot maintaining a commercial or more advanced pilot certificate who has flown a minimum pilot in command time of __1,000__ (1,000 if nothing else is shown) hours in fixed-wing aircraft engaged in aerial application, including at least __100__ (100 if nothing else is shown) hours in aircraft of the same make and model being flown.

As respects turbine powered rotorcraft:
[ ]   Named pilot(s) _____
[ ]   Any pilot maintaining a commercial or more advanced pilot certificate who has flown a minimum pilot in command time of _____ (1,000 if nothing else is shown) hours in rotorcraft engaged in aerial application, including at least _____ (100 if nothing else is shown) hours in aircraft of the same make and model being flown.

As respects all turbine powered aircraft/rotorcraft:
[ ]   In addition to the above, the following pilots must also have successfully completed the aircraft manufacturer's ground and flight training program for the aircraft being flown or, if the aircraft has a turbine engine conversion, the pilot must have successfully completed formalized ground and flight training with the aircraft's conversion facility:

_____
_____
_____
_____

All other provisions of this policy remain the same.

This endorsement becomes effective _____ MAY 19, 2002 _____ to be attached to and hereby made a part of Policy No. __AV 3391999-04__ issued to PONTIAC FLYING SERVICE, INC

By National Union Fire Insurance Company of Pittsburgh, PA

Endorsement No. ____2____

Date of Issue ____6-14-02  bp____

By _____
                                  (Authorized Representative)

AG018 (6/98)

CERTIFIED COPY

## LIABILITY AMENDMENT ENDORSEMENT
### (AERIAL APPLICATOR)

In consideration of ___INCLUDED___ premium of $ ___INCLUDED___ , this policy is amended as follows:

Liability Coverages set forth in the Declarations are    completed   as follows with respect to the following:
N503D ONLY

| Liability Coverages | LIMITS OF LIABILITY | |
|---|---|---|
| | NON-CHEMICAL | CHEMICAL |
| D.  Single Limit - Property Damage & Bodily Injury Excluding Passengers | $1,000,000.  EACH OCCURRENCE | |

ANNUAL PREMIUMS

| Coverage | Premium |
|---|---|
| | |
| | |
| | |
| | |

Subject to the following:

CHEMICAL COVERAGES·A & B REMAIN AS SHOWN IN ITEM 3. OF THE DECLARATIONS.

THIS ENDOSEMENT APPLIES ONLY AS RESPECTS OPERATIONS UNDER THE NAMED INSURED'S GYPSY MOTH CONTRACTS.

All other provisions of this policy remain the same.

This endorsement becomes effective       MAY 19, 2002        to be attached to and hereby made a part of
Policy No.    AV 3391999-04        issued to  PONTIAC FLYING SERVICE, INC

By   National Union Fire Insurance Company of Pittsburgh, PA

Endorsement No.      3

Date of Issue        6-14-02  bp

By _____
(Authorized Representative)

AG427 (4/02)

## ADDITIONAL INSURED ENDORSEMENT

CERTIFIED COPY

In consideration of __INCLUDED__ premium of $ __INCLUDED__ , this policy is amended as follows:

The following is included as an additional Insured, but only with respect to the operation of the aircraft by the Named Insured:

THE FARMER, OWNER, AND/OR GROWER FOR WHOM AERIAL APPLICATION IS BEING PERFORMED. COVERAGE IS EXTENDED TO INCLUDE STATE AND COUNTY GOVERNMENT AGENCIES AND CONSTRACT HOLDERS REQUIRED FOR CONTRACT WORK TO BE DONE.

AL'S AERIAL SPRAYING, INC

For the purposes of this endorsement only, coverage

1)  only applies with respect to such insurance as is afforded by coverages A, B, C, or D;
2)  does not apply to any liability arising from the selection or use of chemicals manufactured, sold, handled, or distributed by the additional Insured;
3)  is excess coverage only and applies only after all other coverage available to the Insured has been exhausted;
4)  is further subject to the following:
    THIS EXTENSION OF COVERAGE ONLY APPLIES WITH RESPECT TO THE VICARIOUS RESPONSIBILITY OF THE ADDITIONAL INSURED FOR THE CONDUCT OF AERIAL APPLICATION BY THE NAMED INSURED.

All other provisions of this policy remain the same.

~~This endorsement becomes effective~~ MAY 19, 2002 ~~to be attached to and hereby made a part of~~ Policy No. __AV 3391999-04__ issued to __PONTIAC FLYING SERVICE, INC__

By __National Union Fire Insurance Company of Pittsburgh, PA__

Endorsement No. ____4____

Date of Issue ____6-14-02  bp____

By _____
(Authorized Representative)

AG010 (9/98)

CERTIFIED COPY

## ADJACENT FIELDS LIABILITY

In consideration of  INCLUDED          premium of $  INCLUDED        , this policy is amended as follows:

Exclusion 7. c) is deleted, subject to the following:

NO CHANGE

All other provisions of this policy remain the same.

This endorsement becomes effective        MAY 19, 2002        to be attached to and hereby made a part of
Policy No.    AV 3391999-04      issued to  PONTIAC FLYING SERVICE, INC

By   National Union Fire Insurance Company of Pittsburgh, PA

Endorsement No.    5

Date of Issue         6-14-02  bp

By

(Authorized Representative)

AG013 (6/98)

CERTIFIED COPY

## ILLINOIS SPECIAL LIMITS ENDORSEMENT

In consideration of additional premium of $ __INCLUDED__ , this policy is amended as follows:

As respects aerial application within the State of Illinois, the Limits of Liability shall be the greater of:

a)    The amounts as shown on the Declarations; or

b)    The following limits if a premium is shown on the Declarations for the coverage(s):

|  |  |
|---|---|
| Coverage A | $  50,000. each person |
|  | $100,000. each occurrence |
|  | $500,000. aggregate |
| Coverage B | $  50,000. each occurrence |
|  | $  50,000. aggregate |
| Coverage D | $100,000. each occurrence |
|  | $500,000. aggregate |

All other provisions of this policy remain the same.

This endorsement becomes effective _____MAY 19, 2002_____ to be attached to and hereby made a part of Policy No. __AV 3391999-04__ issued to __PONTIAC FLYING SERVICE, INC__

By __National Union Fire Insurance Company of Pittsburgh, PA__

Endorsement No. _____7_____

Date of Issue _____6-14-02  bp_____

By _____

(Authorized Representative)

AG003 (6/99)

CERTIFIED COPY

## RESIDENTIAL AREAS ENDORSEMENT

In consideration of  INCLUDED_____  premium of $  INCLUDED_____ , this policy is amended as follows:

Exclusion 5. k) is deleted in its entirety and replaced with the following:

5.  k)  to claims arising from the aerial application to any residential area except with respect to aerial application of the following chemicals  THOSE REQUIRED FOR GYPSY MOTH CONTRACTS

to the village, town or city of  THOSE REQUIRED FOR GYPSY MOTH CONTRACTS

All other provisions of this policy remain the same.

This endorsement becomes effective _____MAY 19, 2002_____ to be attached to and hereby made a part of Policy No. \_\_AV 3391999-04\_\_ issued to  PONTIAC FLYING SERVICE, INC

By \_\_National Union Fire Insurance Company of Pittsburgh, PA

Endorsement No. \_\_\_\_\_6_____

Date of Issue _____6-14-02  bp_____

By _____
(Authorized Representative)

AG004 (5/99)

PURPOSE OF USE ENDORSEMENT         CERTIFIED COPY

This policy is amended as follows:

The Purpose of Use set forth in the Declarations is    completed    as follows:

AS RESPECTS ALL AIRCRAFT

    Purpose of Use shall be only as follows:

    THIS POLICY IS AMENDED AS FOLLOWS:

    THE PURPOSE OF USE SET FORTH IN THE DECLARATIONS IS AMENDED AS FOLLOWS:

    AS RESPECTS AIRCRAFT WHILE OPERATING WITHIN, ON OR ABOVE THE COMMONWEALTH OF KENTUCKY

    PURPOSE OF USE SHALL BE ONLY AS FOLLOWS:

    PLEASURE AND BUSINESS USE ONLY, AND EXCLUDING AERIAL APPLICATION

All other provisions of this policy remain the same.

This endorsement becomes effective _____ MAY 19, 2002 _____ to be attached to and hereby made a part of Policy No. ___ AV 3391999-04 ___ issued to _PONTIAC FLYING SERVICE, INC_

By _ National Union Fire Insurance Company of Pittsburgh, PA _

Endorsement No. ____ 8 ____

Date of Issue ____ 6-14-02   bp ____

By _____
                       (Authorized Representative)

AV122 (1/01)

CERTIFIED COPY

## TERRITORY AMENDMENT ENDORSEMENT

In consideration of __INCLUDED__ premium of $ __INCLUDED__, this policy is amended as follows:

Exclusion 5. f) shall not apply to the following states:

WEST VIRGINIA, VIRGINIA, OHIO, MICHIGAN, MARYLAND

All other provisions of this policy remain the same.

This endorsement becomes effective _____ MAY 19, 2002 _____ to be attached to and hereby made a part of Policy No. ___AV 3391999-04___ issued to PONTIAC FLYING SERVICE, INC

By National Union Fire Insurance Company of Pittsburgh, PA

Endorsement No. ___9___

Date of Issue ___6-14-02  bp___

By _____
(Authorized Representative)

AG019 (1/99)

## EQUIPMENT EXCLUSION                    CERTIFIED COPY

This policy is amended as follows:

The coverage afforded by this policy shall not apply to the following aircraft equipment:

EXCLUDES GLOBAL POSITIONING SYSTEM

All other provisions of this policy remain the same.

This endorsement becomes effective _____ MAY 19, 2002 _____ to be attached to and hereby made a part of
Policy No. ___ AV 3391999-04 ___ issued to  PONTIAC FLYING SERVICE, INC

By __ National Union Fire Insurance Company of Pittsburgh, PA

Endorsement No. ____ 10

Date of Issue _____ 6-14-02  bp

By _____
                                          (Authorized Representative)

LAD111 (9/99)

LOSS PAYABLE ENDORSEMENT        CERTIFIED COPY

In consideration of additional premium of $ _____INCLUDED_____ , this policy is amended as follows:

Any loss under Coverage F, G, and H is payable as interest may appear to the Named Insured and the following Loss Payable:

As respects   N48468 AND N8762H

PEOPLES BANK
PO BOX 460
GRIDLEY, IL   61744


AS RESPECTS N503D:


BANK OF PONTIAC
300 W WASHINGTON
PONTIAC, IL  67764


All other provisions of this policy remain the same.

This endorsement becomes effective          MAY 19, 2002          to be attached to and hereby made a part of
Policy No.   AV 3391999-04    issued to  PONTIAC FLYING SERVICE, INC

By   National Union Fire Insurance Company of Pittsburgh, PA


Endorsement No. ____11____

Date of Issue ____6-14-02  bp____                    By _____

AV83 (3/01)                                              (Authorized Representative)

## WAR, HI-JACKING AND OTHER PERILS EXCLUSION CLAUSE (AVIATION)

CERTIFIED COPY

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

This policy does not cover claims caused by:

(a)  War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

(b)  Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

(c)  Strikes, riots, civil commotions or labor disturbances;

(d)  Any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(e)  Any malicious act or act of sabotage;

(f)  Confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any Government (whether civil, military or de facto) or public or local authority;

(g)  Hi-jacking or any unlawful seizure or wrongful exercise of control of the aircraft or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the aircraft acting without the consent of the Insured.

Furthermore, this policy does not cover claims arising whilst the aircraft is outside the control of the Insured by reason of any of the above perils.

The aircraft shall be deemed to have been restored to the control of the Insured on the safe return of the aircraft to the Insured at an airfield not excluded by the geographical limits of this policy, and entirely suitable for the operation of the aircraft (such safe return shall require that the aircraft be parked with engines shut down and under no duress).

All other provisions of this policy remain the same.

This endorsement becomes effective _____ MAY 19, 2002 _____ to be attached to and hereby made a part of Policy No. ___ AV 3391999-04 ___ issued to ___ PONTIAC FLYING SERVICE, INC ___

By ___ National Union Fire Insurance Company of Pittsburgh, PA ___

Endorsement No. ___ 12 ___

Date of Issue ___ 6-14-02   bp ___

[X] AIG Aviation, Inc.
[ ] AIG Aviation Insurance Services
[ ] AIG Aviation (Canada), Inc.
[ ] AIG Aviation (Illinois) Corporation
[ ] AIG Aviation (Texas), Inc.
[ ] American International Aviation Agency, Inc.
[ ]

By _____
(Authorized Representative)

AVN48B (1/02)