E-FILED

Friday, 06 October, 2006  11:56:30 AM
Clerk, U.S. District Court, ILCD

# In The Matter Of:

*National Union Fire Company  v.*
*Pontiac Flying Services, Inc.*

---



*JAMES RANDALL HARDY*
*July 15, 2004*

RECEIVED

AUG - 2 2004

CASSIDY & MUELLER

---

*Court Reporting Service*
*Litigation Support*
*Midcity Place*
*115 East Douglas*
*Wichita, KS  67202*
*(316) 267-1201    FAX: (316) 267-1203*

*Original File JG2047.TXT, 144 Pages*
*Min-U-Script® File ID: 0675104689*

**Word Index included with this Min-U-Script®**

Page 1

[1]        UNITED STATES DISTRICT COURT
[2]        FOR THE CENTRAL DISTRICT OF ILLINOIS
[2]
[3] NATIONAL UNION FIRE COMPANY          )
[3] OF PITTSBURGH, PA.,                  )
[4]                                      )
[4]             Plaintiff,               )
[5]                                      )
[5]        vs.                        ) No. 03-1288
[6]                                      )
[6] PONTIAC FLYING SERVICES,             )
[7] INC.,                               )
[7]                                      )
[8]             Defendants and           )
[8]        Third Party Plaintiff,       )
[9]                                      )
[9]        vs.                           )
[10]                                     )
[10] HARDY AVIATION INSURANCE, INC.,     )
[11]        Third Party Defendant.       )
[12]
[13]
[14]        Deposition of JAMES RANDALL HARDY, taken
[15] by the Defendant, Pontiac Flying Services, Inc.
[16] before me, Janelle E. Goddard, a Certified Shorthand
[17] Reporter within and for the State of Kansas, at
[18] 100 North Broadway, Suite 600, Wichita, Sedgwick
[19] County, Kansas, commencing at 9:45 a.m. on the
[20] 15th day of July, 2004.
[21]        APPEARANCES
[22]    Plaintiff, National Union Fire Company of
[23] Pittsburgh, PA., appears by its attorney, Mark T.
[24] Banovetz, Tressler, Soderstrom, Maloney & Priess,
[25] 233 South Wacker Drive, 22nd Floor, Chicago,

Page 2

[1]        APPEARANCES (cont.)
[2] Illinois 60606-6308.
[3]        Defendant and Third Party Plaintiff,
[4] Pontiac Flying Services, Inc. appears by its
[5] attorney, David Mueller, Cassidy & Mueller,
[6] 323 Commerce Bank Building, 416 Main Street, Peoria,
[7] Illinois 61602.
[8]        Third Party Defendant, Hardy Aviation
[9] Insurance, Inc. appears by its attorney, Diane M.
[10] Baron, Clausen Miller, P.C., 10 South LaSalle
[11] Street, Chicago, Illinois 60603-1098.
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]        INDEX OF EXAMINATION
[2] JAMES RANDALL HARDY
[3]        DIRECT
[4] by Mr. Mueller.....4
[5]
[6]        INDEX OF EXHIBITS
[7] EXHIBIT                  MARKED
[8] A through E.........................4
[9]    A-Policy Number AV 3391999-04
[10]   B-Hardy's Answer to Third Party
[10]   Complaint
[10]   C-Hardy's Amended Answer to Third
[11]   Party Complaint
[11]   D-Hardy's Answers to Pontiac Flying
[12]   Service's Interrogatories
[12]   E-Hardy's Response to Pontiac Flying
[13]   Service's Request for Production
[13]   F...............................64
[14]   Time Line
[14]   G.............................83
[15]   Ag Air Update Page 2A excerpt
[15]   G-1..........................82
[16]   Ag Air Update Page 3A excerpt
[16]   H.............................108
[17]   Hardy Aviation Insurance website
[17]   printout
[18]
[19]
[20]
[21]
[22] SIGNATURE OF WITNESS................143
[23] CERTIFICATE OF REPORTER............144
[24]
[25]

Page 4

[1]        PROCEEDINGS
[2]    (Marked for identification
[3] Deposition Exhibits A through E.)
[4]
[5]    JAMES RANDALL HARDY,
[6] having been first duly sworn, was
[7] examined and testified as follows:
[8]
[9]        DIRECT EXAMINATION
[10]        BY MR. MUELLER:
[11]    Q: Let the record show that this is the deposition
[12] of James Randy Hardy taken pursuant to notice
[13] in the Federal Rules of Civil Procedure.
[14]    Randy, is it all right if we go on a
[15] first name basis?
[16]    A: That's fine.
[17]    Q: I'm going to ask you a series of questions.
[18] Some of the other lawyers may also want to ask
[19] you questions. Any time you don't understand a
[20] question, just let us know. Otherwise, we'll
[21] assume that your answers are in response to the
[22] question. All right?
[23]    A: Okay. Yes.
[24]    Q: And if a question can be answered with a yes or
[25] with a no, then please do so because the court

Page 5

[1] reporter here is taking this down on a little
[2] machine —
[3]     A: I understand.
[4]     Q: — and uh-huhs, huh-uhs, okays, yeps and nopes,
[5] not to mention nods of the head don't come
[6] through very well.
[7]     A: I understand.
[8]     Q: Also, we're trying to since the three lawyers
[9] are from out of town to get out of here as
[10] quickly and expeditiously as possible, so if
[11] you would listen to the question and just
[12] answer that question as opposed to giving us
[13] your life's story, we'll get out of here
[14] faster.
[15]     A: Okay.
[16]     Q: We'll get rid of you and we'll bring Angie in.
[17]     A: Very good.
[18]     Q: Would you give us your full name, please.
[19]     A: My name is James Randall Hardy.
[20]     Q: Where do you live?
[21]     A: Wichita — excuse me. Goddard, Kansas.
[22]     Q: And where is Goddard, Kansas?
[23]     A: It's about 10 miles west of Wichita.
[24]     Q: How long have you lived in the Wichita area?
[25]     A: All my life.

Page 6

[1]     Q: What is your educational background?
[2]     A: I have a high school degree. Have about three
[3] years of college.
[4]     Q: And where?
[5]     A: Wichita State.
[6]     Q: And in what?
[7]     A: Journalism.
[8]     Q: And during what period of time?
[9]     A: Seventy-three through '76.
[10]     Q: What is your age?
[11]     A: Forty-eight.
[12]     Q: What is your occupation or profession?
[13]     A: I'm an aviation insurance broker for my own
[14] company.
[15]     Q: What is the name of the company?
[16]     A: Hardy Aviation Insurance, Incorporated.
[17]     Q: And what is your interest in Hardy Aviation
[18] Insurance, Inc., the corporation?
[19]     A: I am the owner and the president.
[20]     Q: When you say owner, do you own all of the
[21] stock?
[22]     A: Yes, I do.
[23]     Q: Is that a Kansas corporation?
[24]     A: Yes, it is.
[25]     Q: And who are your board of directors? Who are

Page 7

[1] members of your board of directors?
[2]     A: Me. Myself. We have no board. We're an
[3] S corporation. I am the president, vice
[4] president, secretary, treasurer.
[5]     Q: You beat me to it. Now you broke the rule
[6] there. You volunteered some stuff. I was
[7] going to ask about the officers. So you are
[8] the only director — only member of the board
[9] of directors.
[10]     A: I am it, yes.
[11]     Q: Now tell us who the officers are.
[12]     A: Myself all four positions.
[13]     Q: So you are the president, the secretary, the
[14] treasurer and the vice president?
[15]     A: Yes.
[16]     Q: Does anyone else have an office? Assistant
[17] secretary, assistant treasurer, anything of
[18] that sort?
[19]     A: I don't understand the question.
[20]     Q: Are there any other offices other than
[21] president, vice president, secretary and
[22] treasurer?
[23]     A: No.
[24]     Q: When was the corporation formed?
[25]     A: 1995.

Page 8

[1]     Q: When did you start into the business of being
[2] an aviation insurance broker?
[3]     A: 1987.
[4]     Q: What did you do before 1987? What was your
[5] occupation?
[6]     A: I was in the aviation parts, wholesale parts
[7] business.
[8]     Q: And during what period of time were you in the
[9] aviation and wholesale parts business?
[10]     A: 1978 through 1987.
[11]     Q: And you had three years of college finishing up
[12] in 1976. What did you do between '76 and '78?
[13]     A: Excuse me. I did work for Kitt (sp)
[14] Manufacturing was the company. I acted as a
[15] manufacturer's representative for travel
[16] trailers.
[17]     Q: And during what period of time? Was that '76
[18] to '78?
[19]     A: Yes.
[20]     Q: So do we now have your entire employment career
[21] other than part-time jobs?
[22]     A: Yes.
[23]     Q: So you were a Kitt salesman from '76 to '78.
[24] From '78 to 1987 then you were involved in
[25] wholesale —

Page 9

[1]   A: Aircraft parts.

[2]   Q: — aircraft parts. And from 1987 to the
[3] present time you've been a broker.

[4]   A: Yes.

[5]   Q: Between 1987 and starting your own corporation
[6] in 1995, who did you work for?

[7]   A: Professional Insurance Management,
[8] Incorporated.

[9]   Q: And where are they located?

[10]   A: Mid-Continent Airport.

[11]   Q: Here in Wichita?

[12]   A: Yes.

[13]   Q: So the airport in Wichita is called
[14] Mid-Continent?

[15]   A: Yes, Wichita Mid-Continent Airport in Wichita,
[16] Kansas.

[17]   Q: And who owns or owned that business at the time
[18] you worked for them?

[19]   A: Timothy Bonnell (sp).

[20]   Q: Is he still in that business?

[21]   A: Yes, he is.

[22]   Q: And what kind of insurance business was
[23] Professional Insurance Management?

[24]   A: Aviation insurance.

[25]   Q: Any other lines?

Page 10

[1]   A: No.

[2]   Q: Have you ever been involved in the sale of any
[3] lines of insurance other than aviation?

[4]   A: Yes.

[5]   Q: And during what period?

[6]   A: Same period.

[7]   Q: From 1987 to the present?

[8]   A: Correct.

[9]   Q: So Professional Insurance Management, Inc. sold
[10] only aviation insurance but you were selling
[11] some other lines?

[12]   A: In aviation insurance we will also sell
[13] property insurance for aviation related matters
[14] only.

[15]   Q: I'm putting the whole thing under an umbrella
[16] for the moment of aviation.

[17]   A: In that case, it's just aviation as a whole.

[18]   Q: Yes. So your sole involvement in the insurance
[19] business has been in aviation insurance as we
[20] have described it.

[21]   A: Correct.

[22]   Q: You've never sold life insurance?

[23]   A: No.

[24]   Q: Or liability or property and casualty lines
[25] other than as they relate to aviation.

Page 11

[1]   A: Correct.

[2]   Q: What took you to aviation insurance as opposed
[3] to other lines?

[4]   A: Money.

[5]   Q: That's logical.

[6]   A: I was offered the job and I decided to give it
[7] a try.

[8]   Q: Maybe the better way of putting it is give us
[9] your background and interest in aviation
[10] itself.

[11]   A: I am a pilot. I have been flying since 1978.
[12] I've always had an interest in aviation. I've
[13] been in the aircraft parts business. The
[14] aircraft parts business that I worked for was
[15] being bought out by a major firm. There were
[16] going to be some layoffs. I sought another job
[17] and was offered the job at Professional
[18] Insurance to give aviation insurance a try
[19] which I did.

[20]   Q: And what licenses or certificates do you have
[21] that relate to flying an airplane?

[22]   A: I have a commercial, a multi-engine and an
[23] instrument rating.

[24]   Q: Have you kept those current?

[25]   A: Yes.

Page 12

[1]   Q: Now some of the other people involved in this
[2] case may have a greater breadth of knowledge
[3] regarding flying an airplane and different
[4] types of airplane businesses than I, so you'll
[5] have to forgive me when I ask what appear to be
[6] some fairly simple questions. In your
[7] experience as a pilot, have you ever been
[8] involved in agricultural flying?

[9]   A: No.

[10]   Q: You understand what I mean when I say
[11] agricultural flying?

[12]   A: As a pilot?

[13]   Q: As a pilot.

[14]   A: As a pilot, no.

[15]   Q: My question was do you understand what I mean
[16] when I say — use the term agricultural flying.

[17]   A: I'll have to say no and let you describe it.

[18]   Q: Well, since I'm trying to get a definition from
[19] you, what would be the frame of reference or
[20] term for someone who wants to fly a plane in
[21] the assistance of agricultural — agricultural
[22] application of flight?

[23]   A: I'm assuming when you say agricultural flying
[24] that you mean as a pilot doing the actual
[25] business of flying an airplane over crops and

Page 13

[1] putting out crop protection products to the
[2] industry. As a pilot —
[3]    Q: Are there any other uses of an airplane for
[4] agricultural purposes other than what you've
[5] described?
[6]    A: An ag plane will be ferried to and maintained
[7] and test flown in those areas. That would be
[8] the other uses that they would have as the
[9] standard use for an ag plane.
[10]    Q: When you say ferried and test flown —
[11]    A: After maintenance they test fly an airplane.
[12] To deliver an airplane from one location to
[13] another, they have to fly it there. Our common
[14] term for that is ferry the airplane.
[15]    Q: Let's go back to 1987. You're starting out in
[16] the specialty field of aviation insurance —
[17]    A: Okay.
[18]    Q: — as a broker you said?
[19]    A: Yes.
[20]    Q: What is as you understand the term a broker?
[21]    A: Kansas defines any insurance as broker/agent.
[22] As a broker, my understanding of the
[23] broker/agent relationship is that we work on
[24] behalf of our client procuring coverages for
[25] that client.

Page 14

[1]    Q: Now by client, for instance in this case would
[2] Pontiac Flying Service be the client?
[3]    A: Yes.
[4]    Q: Another term for that would be the insured?
[5]    A: Yes.
[6]    Q: Would it be accurate to say then that you would
[7] be — as a broker you would be the agent of the
[8] client or insured as opposed to being the
[9] agent, let us say, of the company that is
[10] writing the policy?
[11]    A: Correct.
[12]    Q: Does Kansas require a license to be involved in
[13] the business of a broker/agent?
[14]    A: Yes.
[15]    Q: Do you have a license?
[16]    A: Yes.
[17]    Q: And when did you get your license?
[18]    A: 1987.
[19]    Q: Is that a personal license then?
[20]    A: Yes.
[21]    Q: Does the corporation itself have to have a
[22] license?
[23]    A: Yes.
[24]    Q: And when did the corporation get a license?
[25]    A: 1995.

Page 15

[1]    Q: Is anybody else who is employed by the
[2] corporation —
[3]    MS. BARON: Did you want to change
[4] that?
[5]    A: I need to strike that if I can — correct that
[6] if I can. The agency has a corporation
[7] license. Our licensing — the agency does not
[8] have to get a property and casualty license
[9] similar to I. We have to license the agency in
[10] various states to do business in that state.
[11]       BY MR. MUELLER:
[12]    Q: So in Kansas, the corporation is operating
[13] under your license; is that correct?
[14]    A: Correct.
[15]    Q: And in other states you have to have
[16] implementing licenses to sell insurance
[17] products in those states?
[18]    A: For — as a non-resident agent and some states
[19] the Kansas corporation — the company has to
[20] have a non-resident agency license as well.
[21]    Q: Let's take the State of Illinois since that's
[22] where we're coming from in this case. Do you
[23] individually have any type of a license in the
[24] State of Illinois?
[25]    A: I have a non-residence license.

Page 16

[1]    Q: And when did you get that?
[2]    A: I don't know.
[3]    Q: And what did you have to do to get that?
[4]    A: You apply with the state and pay their fee.
[5]    Q: And is that in good standing?
[6]    A: Yes.
[7]    Q: Does the corporation have a license —
[8]    A: I don't remember.
[9]    Q: — in Illinois?
[10]    A: I don't remember.
[11]    Q: Are any employees of the corporation other than
[12] yourself licensed as brokers in any state?
[13]    A: All of my employees that represent insurance or
[14] speak about insurance are licensed in the State
[15] of Kansas.
[16]    Q: I take it that would include Angie Banz who is
[17] here?
[18]    A: Yes, it does.
[19]    Q: And when did she start with you?
[20]    A: 1995.
[21]    Q: And when did she get her license, if you know?
[22]    A: I don't know.
[23]    Q: Now there's been some confusion in this case
[24] down to this point as to whether you or the
[25] corporation are an agent or have an agency

1:03-cv-01225-JTM-DWB Company 7 v. Page 6 of 34
National Union Fire Insurance Company, or AIG,
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 17

[1] contract with the plaintiff in the case,
[2] National Union Fire Insurance Company, or AIG,
[3] and with that in mind, I want to show you
[4] Exhibit B. What I would ask you to do is —
[5] and I'll also show you Exhibit C. Exhibit B is
[6] the original answer that was filed to the
[7] allegations that we made in the complaint, and
[8] the Exhibit C is an amended answer to the
[9] allegations of the complaint. And in Exhibit B
[10] you admitted at first that there was an agency
[11] contract with the plaintiff in the case and
[12] then in the Exhibit C you denied that.
[13]     MS. BARON: Do you recall what
[14] paragraph that is?
[15]     MR. BANOVETZ: Paragraph six.
[16]     BY MR. MUELLER:
[17]     Q: What I'm going to ask you to do is to read
[18] through Exhibits B and C and take as much time
[19] as you need to. I'm asking you to read all the
[20] way through it because the questions I'm going
[21] to ask will be with the exception of that
[22] change, are the matters that are set forth in
[23] those answers true and accurate as of the
[24] present time, so that we make sure we're clear
[25] on the pleadings.

Page 18

[1]     A: Okay.
[2]     Q: And my question to you is now that you have
[3] read them with the exception, first of all, on
[4] Exhibit B, and we'll deal with it first, are
[5] the statements in that exhibit true and correct
[6] to your knowledge as of the present time?
[7]     A: No.
[8]     Q: I'll ask you as to Exhibit C being the amended
[9] answer, are the matters which are set forth in
[10] that exhibit true and correct?
[11]     A: Yes.
[12]     Q: And what is the difference then that you're
[13] pointing out between Exhibits B and C with the
[14] exception of paragraph six?
[15]     MS. BARON: I'm going to object to
[16] the form of the question. You're saying
[17] with the exception of paragraph six. That
[18] is the one change.
[19]     MR. MUELLER: I don't want to quibble
[20] over it.
[21]     BY MR. MUELLER:
[22]     Q: I think that my question said with the
[23] exception of the change that was made there is
[24] everything true and correct. So the only thing
[25] that is inaccurate as you look at it as of the

Page 19

[1] present time in Exhibit B is the answer to
[2] paragraph six.
[3]     A: Yes.
[4]     Q: I'll show you Exhibit D which is your answers
[5] to our interrogatories and it's going to be the
[6] same question, so look through them. I'm going
[7] to ask you whether the answers that you made
[8] under oath on June 30th of 2004 are true and
[9] correct as of the present time.
[10]     A: Okay.
[11]     Q: And the question is are those answers true and
[12] correct as of the present time?
[13]     A: Yes.
[14]     Q: Aviation insurance is a specialty line, is it
[15] not?
[16]     A: Yes.
[17]     Q: How many aviation insurance brokerages are
[18] there in the country?
[19]     A: I don't know.
[20]     Q: How many are there in Wichita?
[21]     A: Don't have an exact count. More than five.
[22]     Q: Prior to 1987, had you had any involvement in
[23] the sale of insurance of any sort?
[24]     A: No.
[25]     Q: Had you had any involvement with insurance of

Page 20

[1] any kind other than buying policies yourself?
[2]     A: No.
[3]     Q: So I take it that since this is a specialty
[4] line, there's a learning curve there before you
[5] can sell the policies.
[6]     A: Yes.
[7]     Q: And did you receive any type of training or
[8] instruction?
[9]     A: Yes.
[10]     Q: And when did you receive that training or
[11] instruction?
[12]     A: 1987.
[13]     Q: And where?
[14]     A: At Professional Insurance in-house training.
[15]     Q: And can you recall what materials, if any, were
[16] used?
[17]     A: Various materials, mostly books that had been
[18] written about aviation insurance, their
[19] interpretation of how to read policies,
[20] various — various methods, but understanding
[21] policies, understanding the books,
[22] understanding the terminology, understanding
[23] the definitions.
[24]     Q: Because would you agree that you're selling a
[25] product there and you can't very well sell the

Page 21

[1] product unless you know what it is.

[2]     A: Yeah. Yes.

[3]     Q: And that was the purpose of the training and

[4] the education back in 1987.

[5]     A: Yes.

[6]     Q: Since that was done in-house, were there any

[7] instructors, any persons that taught the

[8] course?

[9]     A: The owner of the business.

[10]    Q: And you gave us his name earlier.

[11]    A: Yes.

[12]    Q: And he's still around?

[13]    A: Yes.

[14]    Q: Are you in competition with him now?

[15]    A: Yes.

[16]    Q: So I take it then as far as the people that you

[17] have that have been licensed in Kansas after

[18] you started your business in 1995, you provided

[19] them with the instruction?

[20]    A: Yes, except in my case most of the people I

[21] hired had been previously instructed from other

[22] companies they worked for before me.

[23]    Q: Have you broken in anybody yourself and

[24] provided the instruction for any of your

[25] current employees?

Page 22

[1]     A: Yes.

[2]     Q: And who would that be?

[3]     A: Two employees, Melinda Green and Tim Wiebe.

[4]     Q: Now Melinda Green, when did she start with you?

[5]     A: Five years ago.

[6]     Q: And she came to the business cold, I take it?

[7]     A: Yes.

[8]     Q: Didn't have any background or experience in

[9] insurance of any sort as of that time?

[10]    A: Correct.

[11]    Q: And how about the other employee? When did he

[12] start?

[13]    A: About three months ago.

[14]    Q: And what is his name?

[15]    A: Tim Wiebe.

[16]    Q: And I take it you're giving him the instruction

[17] as of the present time.

[18]    A: Yes.

[19]    Q: And have you provided him with materials?

[20]    A: Yes.

[21]    Q: And could you tell us whether these are

[22] materials that you have on the premises of the

[23] business?

[24]    A: Yes.

[25]    Q: And what is the address of the business, by the

Page 23

[1] way?

[2]     A: The physical address is — I can't think right

[3] now.

[4]     Q: I told you I'd ask the tough questions.

[5]     A: 7016 West Harry, Wichita, Kansas.

[6]     Q: And would these materials that he is studying

[7] at the present time be the same materials that

[8] were provided five years ago to the other

[9] employee?

[10]    A: No. Part of them are, yes, but not all.

[11]    Q: So it's an evolving field?

[12]    A: Yes. There are some new books out.

[13]    Q: And what books — what are the titles of the

[14] educational training materials that tells

[15] someone what the specialty line product of

[16] aviation insurance is and how to read policies?

[17]    A: I don't remember the exact name, but it's

[18] Aviation Insurance by a gentleman by the name I

[19] think of Claibourn (sp). It's a new book.

[20]    Q: Are there any others?

[21]    A: There is an older book, but I don't remember

[22] the name or who wrote it.

[23]    Q: Would you say that the Aviation Insurance

[24] training book by Claibourn is applicable to

[25] policies that were written in the year 2000

Page 24

[1] down to policies that are written at the

[2] present time?

[3]     MS. BARON: Which book?

[4]     MR. MUELLER: We're talking about

[5] Claibourn.

[6]     A: The form of that question, no.

[7]             BY MR. MUELLER:

[8]     Q: Would you say that a great deal of that book

[9] would be pertinent to —

[10]    A: Yes.

[11]    Q: — understanding how to read policies today?

[12]    A: Yes.

[13]    Q: Now, do any of these courses deal with the

[14] broker's responsibilities to the client?

[15]    A: I do not remember.

[16]    Q: Do you teach or train your people as to what

[17] their responsibilities to the client are?

[18]    A: Yes.

[19]    Q: And do you use any materials for that purpose?

[20]    A: No.

[21]    Q: So the only training materials that you have

[22] deal with the interpretation and understanding

[23] of the policies that you sell in aviation

[24] insurance.

[25]    A: Yes.

Page 25

[1] MR. MUELLER: Counsel, we're going to
[2] request copies of those materials if they
[3] could be produced.
[4] MS. BARON: The two books?
[5] MR. MUELLER: Whatever materials —
[6] and I'm going to broadly cover it.
[7] Whatever materials he has used in training
[8] employees from 1995 to the present.
[9] MS. BARON: I imagine if there is
[10] anything else you could just send me a
[11] letter that lists what you request.
[12] MR. MUELLER: I'm going to ask him so
[13] we can try to get as much of that as
[14] possible because I don't know the
[15] bibliography.
[16]                    BY MR. MUELLER:
[17] Q: You told us that there are in addition to
[18] Claibourn some other materials that you have.
[19] What I'm going to ask you to do is to identify
[20] as best you can what training materials
[21] relating to the brokerage of aviation insurance
[22] you have —
[23] A: We use copies —
[24] Q: — and have had since you started the business.
[25] A: We use copies — specimen copies of all the

Page 26

[1] insurance carriers as a reference to learn the
[2] business, to define and see what each company
[3] defines as their definitions and materials.
[4] Q: Hold on just a second there. Do the different
[5] companies sometimes have definitions that are
[6] different for the same term?
[7] A: Yes.
[8] Q: So you want to look at each policy to make sure
[9] you've got the right definition in that policy
[10] for the term.
[11] A: Correct.
[12] Q: Go on.
[13] A: Any material that's provided to our clients we
[14] get specimen copies of. We review those. We
[15] understand them as best as we can. We train
[16] using that material. We all have forms that we
[17] have designed. We use those forms in training,
[18] explaining how to use them, how to fill them
[19] out and what questions to ask. The two books
[20] that I referred to are general books that can
[21] be bought by anybody.
[22] Q: Claibourn and you don't recall what the older
[23] one is but you've got it.
[24] A: It's called the green book but it's not the
[25] name of the book. That's what I call it. I

Page 27

[1] have a copy of that book. Those were within
[2] some time ago. Claibourn's book is a second
[3] edition which I have a copy of now that I just
[4] bought about a month ago.
[5] Q: Did you ever have the first edition?
[6] A: I had a copy to review in the last two months.
[7] When I hired my new employee, I was given
[8] knowledge of this book. A friend of mine with
[9] another company loaned me the book and since
[10] then I've bought that book. That's been within
[11] the last two to three months.
[12] Q: So are you saying that you now have the first
[13] and the second edition to the —
[14] A: The first edition I returned back to my friend.
[15] I have the second edition of that book.
[16] Q: And you testified that among the materials for
[17] training new hires in the brokerage business
[18] are various policy forms?
[19] A: Policy forms and policies, yes.
[20] Q: And you stated that you review those as best we
[21] can. What did you mean by the term "as best we
[22] can"?
[23] A: We are not the company, so we review and read
[24] and understand them in the best manner that we
[25] can not being the people that wrote the book.

Page 28

[1] Q: Would you agree that if you have any questions
[2] as to the meaning of the policy that before
[3] selling it you would have the responsibility to
[4] find out from the issuer?
[5] A: Yes.
[6] Q: So when you review as best you can, you make
[7] certain that you understand the product that
[8] you're selling before you sell it to the client
[9] and if you have any questions or anything you
[10] don't understand, you go back to the company
[11] and find out.
[12] A: Yes.
[13] Q: Because would you agree that you've got the
[14] responsibility to your clients to know what
[15] products you're recommending for their use?
[16] A: Yes, as best we can.
[17] Q: You use the term as best we can. If there's
[18] any doubt in your mind as to what policy
[19] language means, would you agree that you've got
[20] the responsibility not to sell it to the client
[21] until you do know?
[22] A: No.
[23] Q: Well, if you don't know what the policy means,
[24] how can you recommend it to the client for the
[25] client's business?

Page 29

[1]     MR. BANOVETZ: I'm just going to pose
[2] an objection to the line of questioning on
[3] the basis that this witness cannot
[4] possibly know all of the factual scenarios
[5] that can occur in the context of a loss
[6] and, therefore, I don't think it's a fair
[7] question and I don't think any answer
[8] thereto is going to be a useful and
[9] relevant answer. That is my objection.
[10]     MR. MUELLER: Counsel, if you would
[11] limit your objection to the purely legal
[12] objections whatever it may be, whether it
[13] is relevance, materiality or what not.
[14]     MR. BANOVETZ: I'll make my
[15] objections as I see fit, Counsel. Thank
[16] you.
[17]         BY MR. MUELLER:
[18]     Q: Am I to understand your testimony then that you
[19] have sold policies to clients without knowing
[20] what the meaning of the policy that you sold
[21] was?
[22]     A: No.
[23]     Q: Have you ever sold a policy to a client whether
[24] it is Scott and Sarah Petersen or Harry Smith
[25] from Buffalo that you did not understand what

Page 30

[1] the meaning of the terms in that policy were?
[2]     A: No.
[3]     Q: That no is, yes, you have sold some policies?
[4]     A: That no is that the form of your question is
[5] have I ever sold policies that I don't
[6] understand the meaning and the answer is no.
[7] Do I understand all and hold myself out to
[8] understand all the legal ramifications of every
[9] aspect of the policy? I can't do that. I
[10] don't know.
[11]     Q: As I understand it, the number of carriers in
[12] the field of aviation insurance is relatively
[13] small.
[14]     A: Yes.
[15]     Q: Going back to in 1987 when you started, would
[16] you tell us whether the number of carriers in
[17] that specialty field have increased or
[18] decreased down to the present time?
[19]     A: They have decreased.
[20]     Q: At the present time, how many carriers are
[21] there in the field?
[22]     A: I represent eight carriers.
[23]     Q: And which carriers are those?
[24]     A: AIG, USAIG, Global, Phoenix Aviation, London
[25] Aviation, William Brown, USSIC.

Page 31

[1]     Q: There's two S's in that?
[2]     A: Yes, sir, and Aerospace. Those are the
[3] aviation MGA writers.
[4]     Q: And I've had some question in this case that
[5] you didn't name the plaintiff in this case
[6] National Union Fire Insurance Company of
[7] Pittsburgh.
[8]     A: National Union is the insurance company. We
[9] deal and have our conversations with the MGA
[10] which in this case is AIG.
[11]     Q: You're using an acronym there, MGA. What is
[12] that?
[13]     A: Managing general agent.
[14]     Q: So the managing general agent for National
[15] Union, as you put it, is AIG?
[16]     A: Yes, sir.
[17]     Q: Now I've gone through this file and I've been
[18] very confused because it seems that in the case
[19] of Scott and Sarah you were always dealing with
[20] them — by you I'm referring to the agency,
[21] always dealing with a Mary Beth Schwaegel. Is
[22] that accurate?
[23]     A: Yes. There are other agents within the
[24] corporation, but we favor — like all of us, we
[25] all favor certain agents.

Page 32

[1]     Q: And she is an employee, as I understand it, of
[2] AIG Aviation Texas, Inc. Is that right?
[3]     MS. BARON: I'm going to object on
[4] foundation. I don't know if he knows who
[5] she's an employee of.
[6]     MR. MUELLER: I'm asking him on the
[7] supposition that he knows.
[8]     A: I can't answer that with a yes or no but she's
[9] an employee of AIG. What division, branch,
[10] where the corporation headquarters, I don't
[11] know exactly where her paycheck comes from.
[12]         BY MR. MUELLER:
[13]     Q: As far as binding coverage on any of the
[14] policies that were actually sold to Scott and
[15] Sarah Petersen, that was done, as I understand
[16] it, by Mary Beth Schwaegel on behalf of AIG.
[17]     A: Yes.
[18]     Q: That's true with respect to the National Union
[19] Fire Insurance Company policy that we're
[20] talking about in this case as well as the
[21] predecessor USAIG policy; is that right?
[22]     A: I don't know how she procures coverage through
[23] National Union.
[24]     Q: But as far as telling you, yeah, there's
[25] coverage under this policy binding the policy,

Page 33

[1] she was the person who did that for both of
[2] these policies as far as you know.

[3] A: Just AIG, not USAIG. USAIG is a separate
[4] company.

[5] Q: Did you deal with Mary Beth Schwaegel on the
[6] USAIG policy?

[7] A: No.

[8] Q: Who did you deal with the USAIG office?

[9] A: The local office here in Wichita, Frank Ryberg
[10] (sp).

[11] Q: Have you been through — and I will show you
[12] Exhibit E which is a complete copy of the
[13] written discovery responses that you provided
[14] pursuant to our request.

[15] A: If these have not changed from what I sent to
[16] my attorney then they are correct. Do you want
[17] me to go over it by page and review them?

[18] MR. MUELLER: Counsel, just so the
[19] record will show, I've diligently tried to
[20] have all of the pages copied in the same
[21] order that I received them.

[22] MS. BARON: That's fine.

[23] MR. MUELLER: If one of them fell out
[24] of the copy machine, I don't know about
[25] it.

Page 34

[1] A: Okay.

[2] BY MR. MUELLER:

[3] Q: As far as the Air Tractor AT503 which we're
[4] involved with in this case and getting coverage
[5] for that plane for Scott and Sarah, you dealt
[6] with Mary Beth Schwaegel and AIG; is that
[7] correct?

[8] A: Yes.

[9] Q: Now I'd like — because I don't understand
[10] exactly how you relate to clients like Scott
[11] and Sarah Petersen, I'd like you to assume that
[12] I am getting into the agricultural aviation
[13] business and I've got some planes and I say,
[14] gee, I need some insurance and I see your ads
[15] and I say, well, I'll go to Randy Hardy, it
[16] seems he knows what it's all about.

[17] A: Okay.

[18] Q: If I came to you, how would you interrelate to
[19] me as far as providing property and liability
[20] insurance for my planes in operation?

[21] MS. BARON: I'm just going to object
[22] to the hypothetical nature of the
[23] question, but with that, you can go ahead.

[24] BY MR. MUELLER:

[25] Q: I'm coming in as green as the grass.

Page 35

[1] THE WITNESS: Answer that?

[2] MS. BARON: Yes.

[3] A: It's a loaded question.

[4] BY MR. MUELLER:

[5] Q: Well, I hoped that it would have at least some
[6] buckshot with it.

[7] A: Don't make me laugh.

[8] Q: What I'm getting at is what is the role and
[9] responsibility of a broker to the insured who
[10] is coming in and wants coverage for his
[11] aviation business.

[12] A: Well, back to the buckshot answer, my role as
[13] the agent is to determine where they're at and
[14] then work with the insurance company on
[15] procuring a quote if I can. Assuming your
[16] question includes that you have some experience
[17] or no experience, you have to have the right
[18] airplanes. You have to have the right licenses
[19] as a pilot to do this. You have to be licensed
[20] with the state to be an ag pilot, which is a
[21] part 137 certificate, or work for somebody who
[22] has that. All these things preclude you ever
[23] getting a quote.

[24] Q: So when you say the first responsibility you
[25] would have would be to determine where they're

Page 36

[1] at, that's what you're referring to.

[2] A: Correct.

[3] Q: You want to know what kind of planes we have.

[4] A: Right.

[5] Q: What kind of training we have for the pilots or
[6] the qualifications of the pilots.

[7] A: Right, and to determine as best as I know the
[8] business what else they need before they could
[9] even get an insurance quote.

[10] Q: And you would also want to know, wouldn't you,
[11] what use we were going to make of the planes.

[12] A: Sure. Getting into the ag business as you
[13] formed the question is very difficult and it
[14] may require a number of things. Assuming that
[15] everything else is the same, the airplanes are
[16] correct, the type of operation, so forth, is
[17] correct, it requires training, it requires
[18] schooling if they have it available, it
[19] requires on-the-job training by current people
[20] that are doing the same business. It varies in
[21] every business and every operation that calls
[22] me about this question is different. My job is
[23] to determine where they're at and to see if a
[24] quote is even available for that type of a
[25] deal.

Page 37

[1] Q: So as you put it, your job is to get all of
[2] that information that may bear upon your
[3] ability to go to the companies and get a policy
[4] for the applicant.
[5] A: We get a quote for the applicant.
[6] Q: Quote for the applicant. And if the applicant
[7] likes the quote, then it turns out to be a
[8] policy; correct?
[9] A: If they bind the coverage with the carrier,
[10] yes.
[11] Q: And I'm not sure if we hit on this point or not
[12] so forgive me, I'll ask it possibly the second
[13] time. But certainly as far as your
[14] responsibility in knowing where they're at is
[15] to find out what they want to do with the
[16] planes.
[17] A: Yes. The use of the aircraft is vital. The
[18] use of the aircraft would determine the
[19] availability and the cost of the policy.
[20] Q: So you would have the responsibility of finding
[21] that out.
[22] A: Absolutely.
[23] Q: Now being a little green to the insurance
[24] business and these policies, in looking
[25] through — and I'll show you Exhibit A which is

Page 38

[1] the policy in this case, state for the
[2] record — at least it better be the policy
[3] because it's got your exhibit sticker on it and
[4] it's attached to the complaint. Let the record
[5] show that I've handed the witness Exhibit A
[6] consisting of a number of pages and insurance
[7] forms.
[8] A: I'm sorry. I'm ready.
[9] Q: If I understand policies such as this, there is
[10] what you refer to as the standard form of the
[11] policy consisting of the insuring agreement,
[12] the exclusions and the conditions, and then as
[13] coverages vary there are things called
[14] endorsements which are attached.
[15] A: Yes.
[16] Q: And for the record, would you state what an
[17] endorsement is.
[18] MS. BARON: I'm just going to object
[19] that it calls for a legal conclusion or
[20] some expertise in insurance.
[21] MR. MUELLER: Let me say I'm not
[22] asking for legal opinions and let me ask
[23] this.
[24]             BY MR. MUELLER:
[25] Q: Would you agree that in order to sell policies

Page 39

[1] to the public, you would consider yourself to
[2] be an expert in the type of product that you're
[3] selling?
[4] MS. BARON: I'm just going to object
[5] to the form of the question. I think it's
[6] vague. I don't know what you mean by an
[7] expert in the type of product. I don't
[8] know if the witness does.
[9] MR. MUELLER: I'm sure he does.
[10] MS. BARON: If you know, you can
[11] answer.
[12] A: I don't understand your determination of an
[13] expert.
[14]             BY MR. MUELLER:
[15] Q: An expert that is someone who has knowledge
[16] beyond that of the average individual regarding
[17] the product that you're selling.
[18] A: In that form, yes.
[19] Q: And that would be knowledge of a technical
[20] nature relating to the contents of the
[21] insurance policy itself; would that be correct?
[22] MS. BARON: Object to the form. I
[23] don't know what is meant by technical
[24] nature. I don't know if the witness does
[25] either.

Page 40

[1] A: I do not understand a technical question.
[2]             BY MR. MUELLER:
[3] Q: You do understand how to pick up on the
[4] objections, though. I'll give you that.
[5] MS. BARON: Is that a question?
[6] MR. MUELLER: No. That's a
[7] statement.
[8]             BY MR. MUELLER:
[9] Q: Would you agree that as far as what is meant by
[10] the various endorsements and forms of the
[11] insurance policy that your expertise is greater
[12] than that of the person purchasing the policy
[13] from you?
[14] A: Yes.
[15] Q: Now getting back to it, and I'm asking you this
[16] as an insurance expert, not as a legal expert,
[17] what does the term endorsement mean as it
[18] relates to the policies that you sell?
[19] MS. BARON: I'm going to object
[20] again. You're designating him as an
[21] insurance expert. I object to the form of
[22] the question.
[23] MR. MUELLER: Well, my people
[24] purchased the policy from him. They
[25] obviously relied on something. That's a

1:03-cv-00638-BTC Company 7 v. Page 12 of 34
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 41

[1] statement.

[2] THE WITNESS: Answer?

[3] MS. BARON: Sure.

[4] BY MR. MUELLER:

[5] Q: You may answer.

[6] A: An endorsement to the policy is part of the

[7] policy which also allows for any changes made

[8] to the policy done by endorsement.

[9] Q: And an endorsement then that becomes a part of

[10] the policy is co-extensive with the policy and

[11] runs through the policy term.

[12] A: Not always.

[13] Q: Unless it says on its face that it is limited.

[14] A: Correct.

[15] Q: And how are endorsements made?

[16] A: We request the change to the MGA, AIG in this

[17] case.

[18] Q: The MGA, you've already defined that term.

[19] That's —

[20] A: Managing general agent.

[21] Q: Managing general agent.

[22] A: We request a change to the managing general

[23] agent, AIG in this case, and they forward the

[24] endorsement to us.

[25] Q: And that endorsement unless it's limited by its

Page 42

[1] specific language, it remains with the policy

[2] for the policy term.

[3] A: Yes.

[4] Q: Now as an agent when you've got an endorsement

[5] on a policy and the policy comes up for a

[6] renewal, is it your responsibility to the

[7] client to confirm that the client wants the

[8] same coverage that existed under the policy at

[9] the — under the expiring policy?

[10] A: If your question is assuming that the policy is

[11] with the same company, the company being

[12] Pontiac Flying Service, yes.

[13] Q: So if the endorsements are going to change on

[14] the policy, bring that to the attention of the

[15] insured?

[16] A: Yes.

[17] Q: Now endorsements to a policy can be written or

[18] if bound by the agent they can be oral?

[19] A: Well, the agent does not bind anything.

[20] Q: I'm not talking about — I'm talking about the

[21] MGA.

[22] A: Restate the question, please.

[23] Q: If you get an endorsement that isn't on a

[24] written form attached to the policy, you get

[25] that endorsement from the MGA, those are oral

Page 43

[1] endorsements that the MGA binds; is that

[2] correct?

[3] A: No.

[4] Q: Do you know of any ways that a policy can be

[5] changed other than by an endorsement, either a

[6] written endorsement or an oral endorsement?

[7] A: You said simple answers, no. There's no such

[8] thing as oral endorsements to my knowledge.

[9] Q: If the company changes the policy then, there

[10] should actually be a written endorsement that

[11] accompanies that change?

[12] A: My understanding is the policies are filed with

[13] the state. They cannot change the policy other

[14] than by an endorsement amending the policy for

[15] whatever use or whatever need there is.

[16] Q: And it would be either a form endorsement or if

[17] it is tailored to a specific insurer what is

[18] known as a special endorsement?

[19] A: For every policy, yes.

[20] Q: So if coverage exists under a policy, based

[21] upon your knowledge and experience and

[22] expertise, it is going to either be under the

[23] policy as it is written originally or by an

[24] endorse — a written endorsement that is added

[25] later for that purpose.

Page 44

[1] A: Yes.

[2] Q: You testified that you're not involved in

[3] agricultural flying yourself.

[4] A: Correct.

[5] Q: Have you ever been up in an agricultural plane?

[6] A: Yes.

[7] Q: Have you ever been up in an agricultural plane

[8] that was applying either seeds, fertilizers or

[9] chemicals?

[10] A: No.

[11] Q: Do you yourself actually know what's involved

[12] in the application of seeds, fertilizers and

[13] chemicals?

[14] MS. BARON: Object to the form of the

[15] question as being pretty broad. You don't

[16] want him to tell his life's story.

[17] BY MR. MUELLER:

[18] Q: Let me tailor it on down. Assume that I had an

[19] agriculturally adapted plane out there with a

[20] bunch of chemicals on it and I said you're a

[21] pilot, here, Randy, take this up and here's a

[22] map, there's the field, put those chemicals out

[23] and bring the plane back —

[24] A: No.

[25] Q: — would you know how to do it?

National Union Fire Company   v.
Pontiac Flying Services, Inc.

Page 45

[1]   A: No.

[2]   Q: So would you agree that instruction is
[3] necessary to the aerial application of seeds,
[4] chemicals and fertilizers?

[5]   A: Yes.

[6]   Q: And, in fact, that's required before you can
[7] get coverage at least from you for that use,
[8] isn't it?

[9]   A: Not from me.

[10]   Q: Before you would even seek a quote, you would
[11] make certain as you had testified that they
[12] knew how — that they had received training and
[13] instruction, knew how to fly the plane; would
[14] that be accurate?

[15]   A: Well, that's a broad statement.

[16]   Q: Well, it's meant to be.

[17]   A: No to that question.

[18]   Q: Well, let me ask it this way. Would you go to
[19] AIG and say, hey, I want to get a quote from
[20] you for this company that wants to fly planes
[21] and put out seeds, chemicals and fertilizers
[22] without knowing any more?

[23]   MS. BARON: Object as being asked and
[24] answered. I think we already talked about
[25] that.

Page 46

[1]   MR. MUELLER: Well, that's why I was
[2] confused by his last answer.

[3]   THE WITNESS: Can I explain or not?

[4]   MS. BARON: Go right ahead.

[5]   A: The form of your question assumed that he had
[6] already done his training to get his quote. In
[7] many cases we have to get quotes —

[8]   BY MR. MUELLER:

[9]   Q: I didn't mean the form of that last question to
[10] assume that he had any training at all. He
[11] simply comes to you and says, hey, I bought a
[12] plane out here, I've got some seeds and
[13] chemicals and fertilizers and some farmers that
[14] want them, can you get me a quote?

[15]   A: We can get him a quote based on various things.
[16] Based on the fact that he will not be able to
[17] put out seeds, chemicals, fertilizer, any other
[18] nature, but to get to the point of learning how
[19] to do it he's got to have a quote to fly the
[20] airplane and to simulate or practice, and then
[21] there's the next stage of adding limited
[22] coverage and then beyond that.

[23]   Q: So would you agree that an actual instruction
[24] in the application of seeds, fertilizers and
[25] chemicals by air is required?

Page 47

[1]   MR. BANOVETZ: Object. Required for
[2] what?

[3]   MS. BARON: I agree. I'll join the
[4] objection.

[5]   BY MR. MUELLER:

[6]   Q: As an expert in the field, what type of an
[7] agricultural application instruction is
[8] required to obtain insurance to fly
[9] piston-driven, fixed-wing aircraft in the
[10] application of seeds, fertilizers and
[11] chemicals?

[12]   MR. BANOVETZ: Objection as to form,
[13] reference to expert in the field.

[14]   MS. BARON: I'll join.

[15]   A: The answer to your question is it varies. It
[16] varies on the operation, the status of the
[17] pilot at what stage he's at, and again, my job
[18] is to procure the information, take it to the
[19] insurance company. I don't make any judgment
[20] as to whether or not the guy's ready, not
[21] ready. All I'm trying to do is get him the
[22] insurance, and in most cases the initial
[23] insurance is to do — to work in the business
[24] as you would.

[25]   BY MR. MUELLER:

Page 48

[1]   Q: What type of instruction do you understand to
[2] be necessary for a pilot to do that?

[3]   A: Well, again, it depends. The form of the
[4] question, the person that's learning to fly an
[5] ag plane will assumably already have his
[6] license, will already have his commercial
[7] license which is required and it varies with
[8] pilots. Some pilots will already have their
[9] tail wheel.

[10]   Q: What is that?

[11]   A: Most ag planes are a tail wheel airplane, we
[12] refer to them commonly as a tail wheel versus a
[13] tricycle gear, it's a conventional tail wheel
[14] which is a different airplane than most people
[15] are flying today. The tail's down. They will
[16] need to — as I understand it, not being an
[17] expert in training pilots, they need to learn
[18] how to fly the airplane.

[19]   Q: By learn how to fly the airplane, learn how to
[20] fly the airplane that has been adapted for
[21] agricultural flying.

[22]   A: It's adapted. It's heavier. It's bigger.
[23] It's a tail wheel. It's a different engine,
[24] different than what they're used to, learning
[25] how to fly the airplane, then depending on the

National Union Fire Insurance Company v.
Pontiac Flying Services, Inc.

Page 14 of 34

JAMES RANDALL HARDY
July 15, 2004

Page 49

[1] pilot, his status, his currency, what stage and
[2] how quickly they put him into different
[3] variations of training. And I understand from
[4] being around the business for years what
[5] those — what most people ask for but I don't
[6] do it.
[7]    Q: What is your understanding?
[8]    A: Well, a typical — and again, so much of this
[9] depends, and I apologize for that but it
[10] depends on the situation. If you have a high
[11] time pilot — or it really doesn't matter, just
[12] depends on various things, but most companies
[13] will either seek a training facility, which are
[14] very limited in this country for ag pilots, or
[15] they will do on-the-job training where they
[16] will train the individual themself. Now prior
[17] to my getting insurance for that, if they want
[18] coverage and not everybody buys coverage to
[19] train somebody, they accept the risk
[20] themselves, but if they want that, then usually
[21] a company will ask me to provide a training
[22] syllabus or some form of how this guy's going
[23] to train that pilot, which could include
[24] flying, turns, turns about point, all the
[25] various things that we do in flying, doing it

Page 50

[1] with a different airplane, loading the airplane
[2] up in various stages of gallonage of water, and
[3] only past whatever stage that is depending on
[4] whatever operation it is because every
[5] operation is individual. Everything is
[6] different. Depends on the situation, depends
[7] on the operation. Every one is going to be
[8] different. There is no standardized format
[9] that's going to be perfect for everybody. Once
[10] that's done, then based on what the client
[11] needs and what this guy wants to do, we seek —
[12] based on their request to us, we seek
[13] additional coverages to be added to the policy
[14] similar to what you're talking about seeds,
[15] chemicals and fertilizers. That is a basic ag
[16] use. Beyond that, there are various things you
[17] can add to that. So I don't know if I've
[18] explained it well enough but that's —
[19]    Q: Well, it sounds to me as if there's a great
[20] deal that goes into training for an aerial
[21] application.
[22]    A: Varies with the original extent of the
[23] individual's abilities.
[24]    Q: And have you ever obtained a coverage for
[25] someone who wanted to provide aerial

Page 51

[1] application instruction to pilots?
[2]    A: Yes.
[3]    Q: How often have you done that?
[4]    A: I have no idea the numbers, but we have —
[5] throughout each year you will have individuals
[6] that want to hire an individual. You will have
[7] a company — owner of a company that wants to
[8] hire an individual and will either do
[9] on-the-job training which we've done many times
[10] with our policies. We have insured —
[11]    Q: Would that be something by an endorsement then
[12] if you've got a policy and somebody wants to do
[13] flight instruction for pilots for aerial
[14] application?
[15]    A: We won't add instruction coverage to a policy.
[16] We will add an individual pilot to the policy.
[17] The pilot will be added as a pilot for the
[18] owner to give instruction. It's not for
[19] remuneration for hire, it's not a business.
[20] He's doing it for one of his individual people.
[21] That's a different type of coverage.
[22]    Q: Have you ever written or procured coverages for
[23] someone who wants to provide aerial application
[24] instruction to a number of pilots who would
[25] come to him for that purpose?

Page 52

[1]    A: Yes.
[2]    Q: And in how many instances would you say you've
[3] done that?
[4]    A: In my career, three times with best
[5] recollection.
[6]    Q: There are different types I'm learning in this
[7] business, different types of aircraft that are
[8] used for aerial applications?
[9]    A: Yes.
[10]    Q: For instance, I've heard of something called
[11] fixed-wing. What is that? Are there loose
[12] wings?
[13]    MR. BANOVETZ: Helicopter.
[14]    A: For most of us that are fixed-wing, a
[15] helicopter would be considered a loose wing.
[16] But there is a fixed-wing aircraft which is
[17] your typical aircraft that I fly that you might
[18] fly on the airlines, then there would be a
[19] rotor wing which would be a helicopter.
[20]    BY MR. MUELLER:
[21]    Q: Do you know of any helicopters that are used
[22] for aerial application?
[23]    A: Yes.
[24]    Q: Just asked that one out of curiosity. And then
[25] there are fixed-wing, piston-driven and

Page 53

[1] fixed-wing turbine aircraft?
[2]    A: Yes.
[3]    Q: I assume fixed-wing jets, too?
[4]    A: No.
[5]    Q: Not for aerial application?
[6]    A: No.
[7]    Q: As far as piston-driven planes, in this case
[8] I've heard about Air Cats. Are Air Cats —
[9]    A: Ag Cats.
[10]    Q: Ag Cat's a piston-driven plane?
[11]    A: It can be both.
[12]    Q: And what is the difference between the
[13] application — aerial application by a
[14] piston-driven and aerial application by a
[15] turbine-driven?
[16]    A: Are you looking for an expert definition of
[17] that?
[18]    Q: I would like one.
[19]    A: Well, I can't give you that.
[20]    Q: I didn't think I'd get one. What's your
[21] understanding?
[22]    A: Well, a turbine aircraft typically is a larger
[23] aircraft that can haul more of a load and
[24] typically faster speeds versus a piston. There
[25] are numerous variations as to why you'd buy a

Page 54

[1] piston over a turbine or turbine over a piston,
[2] but a typical turbine aircraft by accident
[3] ratios and studies is a more — has less of a
[4] chance of losing an engine, better loss ratio,
[5] so to speak. I can't testify to that but it's
[6] more a reliable airplane versus a piston. So
[7] companies will purchase turbine aircraft or
[8] will take a piston aircraft and put a turbine
[9] conversion on that same piston airplane making
[10] it a turbine airplane for the load, the speed
[11] and the reliability.
[12]    Q: So if I understand this correctly, a pilot —
[13] there is something you need to know about
[14] flying a turbine-driven plane versus flying a
[15] piston-driven plane?
[16]    A: Yes.
[17]    Q: So someone involved in aerial application would
[18] learn the aerial application most generally by
[19] flying a piston-driven plane and then would
[20] take over — then would move to a turbine?
[21]    A: They don't all, but, yes, that would be —
[22]    Q: That's the general —
[23]    A: That would be the general rule.
[24]    Q: So for someone who knew how to make aerial
[25] application in a piston-driven plane, if he

Page 55

[1] wanted to do a turbine application, he would
[2] have to be trained in the operation of the
[3] turbine aircraft.
[4]    A: He will have to be transitioned into a turbine
[5] aircraft.
[6]    Q: Transitioning means gradually shifted over to a
[7] different type of engine plane?
[8]    A: Yes.
[9]    Q: So for someone receiving turbine transition
[10] training for aerial application, he would know
[11] how to apply with a piston-driven plane and the
[12] transition then would be to a turbine-powered
[13] aircraft as you understand it.
[14]    A: Typically, yes.
[15]    Q: Do you know a fellow by the name of Harold
[16] Miller?
[17]    A: Yes.
[18]    Q: And he spells his name differently than I do
[19] and that's M-i-l-l-e-r.
[20]    A: Yes.
[21]    Q: And he's out of where?
[22]    A: I don't remember the town. He's from Illinois.
[23]    Q: And was he one of your insureds?
[24]    A: Yes.
[25]    Q: And during what period was he one of your

Page 56

[1] insureds?
[2]    A: I don't remember.
[3]    Q: Well, I asked you to bring with you the
[4] documents that we had requested in our request
[5] for production of documents and those included
[6] the Harold Miller file. Do you have that with
[7] you?
[8]    MS. BARON: No, and as we indicated
[9] in our written response to the production
[10] request, we objected to that based on the
[11] fact that that information is
[12] confidential. We don't have any
[13] authorization from Mr. Miller to be
[14] turning over his financial information on
[15] insurance policies, so we objected to the
[16] production of that, so he does not have it
[17] with him today.
[18]    MR. MUELLER: Counsel, can we obtain
[19] a copy of that file redacted as to the
[20] numbers because I'm not interested in
[21] Harold Miller's financial wherewithal, but
[22] I am interested in knowing what coverages
[23] were afforded to him.
[24]    MS. BARON: I don't know that that
[25] information is something that can be

Page 57

[1] disclosed regarding other clients of an
[2] insurance broker who are not involved in
[3] this litigation at all. I would have to
[4] say I would still object to that.
[5]     MR. MUELLER: Let us say that we have
[6] had a conference on the matter and we can
[7] bring it to the attention of the Court
[8] because I'm not aware of any confidences
[9] or privileges that might exist as they
[10] would relate to business transactions with
[11] third parties that might otherwise be
[12] relevant.
[13]     BY MR. MUELLER:
[14]     Q: But moving on with the matter, do you recall
[15] what types of coverages were afforded to Harold
[16] Miller let us say in the year 2001?
[17]     MS. BARON: I think I'm going to have
[18] to make the same objection to the extent
[19] it's asking for another insured's coverage
[20] information.
[21]     MR. MUELLER: You've stated the
[22] objection. I don't know that you would be
[23] well advised to instruct the witness not
[24] to answer it because I'm not going into
[25] the details, but I want to know what types

Page 58

[1] of coverage because it is very important
[2] to the interests of my client in this
[3] case.
[4]     MS. BARON: Well, I don't understand
[5] why that's the case that someone else's
[6] insurance coverage is important to your
[7] client in this case. And you're asking
[8] what type of coverages did he have. Could
[9] you be a little more specific as to what
[10] you mean by that?
[11]     MR. MUELLER: I'm not interested in
[12] his life insurance or in his family auto
[13] policies. I'm talking about his aviation
[14] insurance coverage, property and casualty
[15] lines that were written through this
[16] agency.
[17]     MS. BARON: Well, we'll take a break.
[18]     (Thereupon, a recess was taken;
[19] whereupon, the following was
[20] had:)
[21]     BY MR. MUELLER:
[22]     Q: Do you recall in the year 2000 what property
[23] and casualty coverage Harold Miller had?
[24]     A: To the form of the question, no.
[25]     Q: Are you aware of any of the property and

Page 59

[1] casualty coverages Harold Miller had in the
[2] year 2000, 2001?
[3]     A: I do not remember the year of his coverages.
[4]     Q: Do you recall that Harold Miller before Scott
[5] and Sarah Petersen purchased it owned the Ag
[6] Tractor 503 which we're talking about in this
[7] case?
[8]     A: Yes.
[9]     Q: And are you aware of the coverages which Harold
[10] Miller had for that Ag Tractor?
[11]     A: Correction, it's Air Tractor.
[12]     Q: I'm sorry, Air Tractor.
[13]     A: And to answer the question, yes.
[14]     Q: And are you familiar with the uses that Harold
[15] Miller was making of that Air Tractor?
[16]     A: Yes.
[17]     Q: And that Air Tractor had a dual cockpit?
[18]     A: Yes.
[19]     Q: A dual cockpit plane — or that dual cockpit
[20] plane in the Air Tractor, could you describe
[21] that for us?
[22]     A: Well, dual meaning two, two seats.
[23]     Q: Side by side?
[24]     A: Tandem.
[25]     Q: That's one in front of the other?

Page 60

[1]     A: Yes.
[2]     Q: And it had the controls for each?
[3]     A: Yes.
[4]     Q: And that was something that you knew before the
[5] plane was sold to Scott and Sarah?
[6]     A: Yes.
[7]     Q: And you also knew that the plane was used among
[8] other things by Harold Miller for transition
[9] turbine training in support of the aerial
[10] application of seasonal chemicals?
[11]     A: In the complete form of the question, the first
[12] part of the question I can say yes.
[13]     Q: Did you know that the plane was used by Harold
[14] Miller for transition turbine training in
[15] support of the aerial application of seeds and
[16] chemicals?
[17]     A: Again, the first part of the question, used for
[18] transition training, yes.
[19]     Q: And that it was used for transition turbine
[20] training in support of the aerial application
[21] of seeds and chemicals?
[22]     A: I object to the support portion because that
[23] can be defined differently.
[24]     Q: Well, let me ask you this. Have you ever
[25] defined the use of the plane by Harold Miller

Page 61

[1] in the context of transition turbine training
[2] in support of the aerial application of seeds
[3] and chemicals?
[4]     MS. BARON: I'm going to object to
[5] the form of the question. What do you
[6] mean has he defined it? Defined it where?
[7]     MR. MUELLER: I'm asking him if he
[8] ever has, and then I will show him if he
[9] has any doubts in that regard.
[10]     MS. BARON: Same objection. You can
[11] answer if you understand the question.
[12]     A: I don't understand the question. I'm sorry.
[13]     BY MR. MUELLER:
[14]     Q: Have you ever agreed that Harold Miller was
[15] using the Air Tractor in question for
[16] transition turbine training in support of the
[17] aerial application of seeds and chemicals?
[18]     MS. BARON: Object to the form of the
[19] question. Agreed with who? Agreed with
[20] what. I think it's vague. If you
[21] understand it, you can answer.
[22]     A: Again, I'm sorry, but I do understand that
[23] Harold Miller used the airplane in his business
[24] training other pilots by virtue of
[25] transitioning training into the Air Tractor

Page 62

[1] 503. The rest of the question is too broad and
[2] I won't respond to that.
[3]     BY MR. MUELLER:
[4]     Q: Well, let's back it up just a little bit before
[5] we hit the nail on the head more squarely.
[6] Would you agree that Harold Miller was
[7] providing transition turbine training so that
[8] pilots receiving the training could apply seeds
[9] and chemicals agriculturally?
[10]     A: Yes. In that regard, yes.
[11]     Q: And would you agree that in receiving that
[12] training, that was then in support of the
[13] aerial application of seeds and chemicals by
[14] the pilots that were receiving it?
[15]     A: His method and his training facility in that
[16] context was supporting the aerial application
[17] business.
[18]     Q: So then would you agree that the plane, the Air
[19] Tractor was used by Harold Miller for
[20] transition turbine training in support of the
[21] aerial application of seeds and chemicals?
[22]     A: In the definition of Harold Miller's business
[23] and what he was using the airplane for, that
[24] terminology would be correct.
[25]     Q: And that would be consistent with —

Page 63

[1]     MR. MUELLER: And, Counsel, if you
[2] would get Exhibits B and C and
[3] specifically paragraph nine in each.
[4]     BY MR. MUELLER:
[5]     Q: You recall earlier, do you not, Randy, when you
[6] looked at Exhibits B and C and I asked whether
[7] they were true and correct?
[8]     A: Yes.
[9]     Q: And let me ask you as to Exhibits B and C
[10] whether the following appears paragraph nine on
[11] each. During the times that the Air Tractor
[12] was insured under policies which were procured
[13] by Hardy, the third party defendant, that's
[14] Hardy, knew that the plane contained two seats
[15] and was used intraaerially, which means among
[16] others, by Miller for transition turbine
[17] training in support of the aerial application
[18] of seeds and chemicals. And your answer was
[19] Hardy admits the admissions of paragraph nine.
[20]     A: Yes.
[21]     Q: When did you first learn that Scott and Sarah
[22] were purchasing any of Harold Miller's assets?
[23]     MS. BARON: Should he refer to his
[24] file if that helps?
[25]     MR. MUELLER: Sure.

Page 64

[1]     BY MR. MUELLER:
[2]     Q: As a matter of fact, I'll tell you what. You
[3] can refer to Exhibit E — I would prefer if you
[4] would refer to Exhibit E which is what you have
[5] provided us in discovery because I have stamped
[6] page numbers on it and we can refer to the page
[7] numbers which each of us have. Do you have
[8] something else with you that you would refer
[9] to?
[10]     A: Just notes that I made.
[11]     (Marked for identification
[12] Deposition Exhibit F.)
[13]     BY MR. MUELLER:
[14]     Q: Going back on the record, do you recall the
[15] question?
[16]     A: No.
[17]     Q: It was when did you first learn that Scott and
[18] Sarah were thinking about purchasing some of
[19] the assets of Harold Miller's business?
[20]     A: Just as a point of clarification, my assistant,
[21] Angie Banz, who is also a licensed agent
[22] handled and has handled 90 percent of the
[23] transactions between Scott and Sarah, so what
[24] I'm giving you information to is what I'm
[25] reading in the policy. She received all the

Page 65

[1] phone calls and first learned, so my saying
[2] that I first learned is not an accurate
[3] statement.
[4]    Q: Just so that we get this clarified, did you
[5] yourself play any role in getting coverage for
[6] Scott and Sarah —
[7]    A: Yes.
[8]    Q: — regarding the Air Tractor which is the
[9] subject of this lawsuit at the time that they
[10] purchased it from Harold Miller?
[11]    A: I believe so.
[12]    Q: Therefore, you would have had some personal
[13] knowledge yourself as opposed to what may
[14] appear from Angie Banz's records that they were
[15] doing that; correct?
[16]    A: Limited knowledge, yes.
[17]    Q: And when did you yourself first become involved
[18] in that transaction?
[19]    A: I don't recall.
[20]    Q: Do you recall when the policy providing
[21] coverage for the Air Tractor was bound?
[22]    A: Looking over the notes in the policy I can tell
[23] you, yes.
[24]    Q: When was that?
[25]    A: When it was bound.

Page 66

[1]    Q: Yes.
[2]    A: On 3-1 per my notes.
[3]    Q: I would ask —
[4]    A: The 503 was purchased and we requested to the
[5] MGA, AIG, that coverage be added on that
[6] aircraft and they responded.
[7]    Q: I would direct your attention to Page 51 of
[8] Exhibit E. Does that confirm your
[9] understanding in the matter?
[10]    A: Yes.
[11]    Q: So it is your testimony that coverage was added
[12] for the Air Tractor effective March 1, 2002,
[13] which was the same day they obtained the plane.
[14]    A: I can testify that coverage was added to the
[15] policy for that airplane. What date they
[16] physically took the airplane, I don't know.
[17]    Q: But in any event, there was coverage for that
[18] airplane as of March 1, 2002.
[19]    A: The way I understand it, yes.
[20]    Q: And what was your involvement, as you recall
[21] it, in obtaining that coverage?
[22]    A: I'm sorry. Say it again.
[23]    Q: Let me go back and ask it this way. The
[24] coverage was bound by AIG?
[25]    A: All coverages are bound by the insurance

Page 67

[1] company, not us.
[2]    Q: That would be Mary Beth Schwaegel?
[3]    A: Yes, or her representative.
[4]    Q: Did you have any discussions yourself with Mary
[5] Beth Schwaegel or her representative regarding
[6] coverage for that plane as of the effective
[7] date March 1, 2002?
[8]    A: You'll have to let me look at the paperwork
[9] here for a second. The answer to your question
[10] would be I assisted — I can't recall how much
[11] assistance I gave to Angie to procure the
[12] original addition of this airplane to the
[13] policy, period.
[14]    Q: Take a look at Exhibit D as in dog. What I
[15] want to do is to fix the time frame. We know
[16] that the coverage was bound effective March 1,
[17] 2002. Would you agree that the first efforts
[18] at obtaining coverage were in February,
[19] specifically February 8th of 2002?
[20]    A: Per the notes in the file, yes.
[21]    Q: So if we're encapsulating the period when you
[22] would have been involved on the initial
[23] coverage for that plane, it would be between
[24] February 8th, 2002, and March 1, 2002;
[25] correct?

Page 68

[1]    A: If I had any involvement, correct.
[2]    Q: And is it your testimony that you can recall no
[3] specific contacts between you, Randy Hardy, and
[4] Mary Beth Schwaegel or anyone working with her
[5] regarding that coverage?
[6]    A: I don't recall. State the question again, I'm
[7] sorry.
[8]    Q: Your answer was that you don't recall and my
[9] question was is it true that you don't recall
[10] so I guess the answer is yes, so let me ask it
[11] coming at it from the other side. Is it true
[12] that you don't recall any contacts with either
[13] Scott or Sarah Petersen regarding coverage for
[14] that plane between February 8th, 2002, and
[15] March 1, 2002?
[16]    A: Correct. Yes.
[17]    Q: So there may have been contacts but you don't
[18] recall what they were.
[19]    A: Correct.
[20]    Q: And that's true both ways, either with Mary
[21] Beth Schwaegel or with Scott and Sarah
[22] Petersen.
[23]    A: Correct.
[24]    Q: I have been curious as to the policy periods
[25] that are involved. When this plane was added

Page 69

[1] to the policy effective March 1, 2002, what
[2] policy was that?
[3]     A: It would have been the —
[4]     Q: What I would like for you to do when I say what
[5] policy was that, give me the carrier, the
[6] policy number and the policy period.
[7]     MS. BARON: And if you need to refer
[8] to your own file to do that, please do so.
[9]     MR. MUELLER: He's got his file.
[10]     A: On the Policy AV 3391999-03.
[11]             BY MR. MUELLER:
[12]     Q: That was the policy?
[13]     A: The endorsement number ten effective March 1,
[14] 2002, the Air Tractor 503 was added to the
[15] policy.
[16]     Q: You're referring to what page number on
[17] Exhibit E?
[18]     A: Page number 41.
[19]     Q: And the policy period?
[20]     A: The policy period of that policy is April 10,
[21] 2001, to April 10, 2002.
[22]     Q: So it would have been — that policy would have
[23] been up for renewal then as of April 10, 2002,
[24] for a policy period April 10, 2002, to
[25] April 10, 2003?

Page 70

[1]     A: It would have been, yes.
[2]     Q: And was the policy renewed?
[3]     A: I had limited involvement in this, but as per
[4] my notes —
[5]     Q: Let the record show he's referring to Exhibit F
[6] which are his typed notes.
[7]     A: The policy was moved to USAIG for the same
[8] period of time. The policy was moved to USAIG
[9] April 10, 2002 — coverage was moved, not the
[10] policy. The coverage was moved to USAIG, a
[11] different carrier.
[12]     Q: And did USAIG — does USAIG have anything to do
[13] with the plaintiff in this case, National Union
[14] Fire Insurance Company of Pittsburgh?
[15]     A: No.
[16]     Q: Were you dealing with Mary Beth Schwaegel at
[17] that time?
[18]     A: No.
[19]     Q: Do you have a copy in your file which you
[20] provided us, being Exhibit E, of the USAIG
[21] policy?
[22]     A: No.
[23]     Q: Well, at some point in time, would you agree
[24] then that the coverage went back to AIG?
[25]     A: Yes.

Page 71

[1]     Q: And when would that have been? I take it that
[2] would have been April 10th of 2003 thereafter?
[3]     A: No. We replaced the coverage from USAIG back
[4] to AIG May 19th, 2002.
[5]     (Discussion held off the record.)
[6]             BY MR. MUELLER:
[7]     Q: Why was the coverage switched in the first
[8] instance from an AIG policy to a USAIG policy
[9] and when did that take place?
[10]     A: Are we back on the record?
[11]     Q: We're back on the record.
[12]     A: The renewal of the policy for 4-10 of — the
[13] renewal policy for 4-10-2002 we had procured a
[14] better quote through USAIG which is a separate
[15] carrier saving our client money.
[16]     Q: So you got a policy for what period from USAIG?
[17]     A: We bound the policy with USAIG from 4-10 to
[18] 5-19 of '02, putting the coverage back with AIG
[19] because our client was requiring the ability to
[20] do gypsy moth contracts which requires
[21] coverages that USAIG was unable to provide, so
[22] we had to cancel the USAIG policy and put it
[23] back with AIG as of 4-19-02.
[24]     Q: Exhibit A that you have before you then is the
[25] AIG policy that you're referring to that ran

Page 72

[1] for the policy period May 19, 2002, to May 19,
[2] 2003, that took the place of the USAIG policy.
[3]     A: Yes.
[4]     MS. BARON: Just for clarification,
[5] it is a National Union policy. It's not
[6] an AIG policy.
[7]     MR. MUELLER: Well, I think we've
[8] gotten the clarification here that he
[9] deals with AIG on it, and I don't want to
[10] go there and spend all the time mucking
[11] that swamp out.
[12]     MS. BARON: We're glad.
[13]     MR. MUELLER: Which not in the
[14] deposition, but if at some point in time
[15] it becomes an issue, then we're going to
[16] put on our alligator boots and go down
[17] there and pump the swamp out.
[18]     MS. BARON: That's fine.
[19]             BY MR. MUELLER:
[20]     Q: Is the policy which is Exhibit A the same
[21] policy that the Petersens and Pontiac Flying
[22] had with AIG for the policy period that ended
[23] April the 10th?
[24]     MS. BARON: Of what year? Object to
[25] the form of the question.

1:03-cv-00001-JHM-BGC    National Union Fire Company   v.   Page 20 of 34
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 73

BY MR. MUELLER:

[2] **Q:** Of 2002. In other words, are we looking at the
[3] same policy, that this is simply a renewal of
[4] the old policy?

[5] **A:** Yes.

[6] **Q:** So are the coverages and endorsements and
[7] policy provisions the same with the exception
[8] of the premiums on the declarations page and
[9] the policy period?

[10] **A:** No.

[11] **Q:** What changes are there between the two
[12] policies?

[13] **A:** The beginning of the policy April 10, 2001/2002
[14] did not have the Air Tractor 503. It was later
[15] endorsed onto that policy.

[16] **Q:** So we had a separate endorsement for the Air
[17] Tractor which is now included on the
[18] declarations page of the May 19th policy —

[19] **A:** Yes.

[20] **Q:** — correct? Any other changes?

[21] **MS. BARON:** Do you want him to put
[22] the policies side by side and go through
[23] them word for word?

[24] BY MR. MUELLER:

[25] **Q:** Not word for word, but I want to know of any

Page 74

[1] significant changes.

[2] **MS. BARON:** If you know.

[3] **A:** Significant changes, I don't believe so. There
[4] could have been some endorsements differently
[5] due to activity required. I don't know.

[6] BY MR. MUELLER:

[7] **Q:** Well, do you have both policies here because I
[8] don't want to be surprised later when I don't
[9] have the chance to ask the question. You can
[10] make a brief comparison between the two for us.

[11] **A:** I don't have the full April 10th policy but
[12] I'll do the best I can.

[13] **Q:** Let me limit my question also to try to
[14] short-circuit this, any changes that related to
[15] the Air Tractor other than what you've
[16] described?

[17] **A:** The Air Tractor upon being endorsed to the
[18] policy April 10 was added for the purposes of
[19] aerial application application. That
[20] endorsement or the conditions of the
[21] endorsement was that Scott Petersen would fly
[22] the aircraft — let me strike that if I could
[23] and back up. I don't have anything to define
[24] that.

[25] **Q:** I want the policy forms, the endorsements, the

Page 75

[1] language in the policy itself, the document.

[2] **A:** The Air Tractor 503 was added to the policy
[3] wherein the May 19th policy, 2002, ending up
[4] with a dash 04 on the policy number, the Air
[5] Tractor was a part of the policy at the
[6] beginning of the policy.

[7] **Q:** On the declarations page.

[8] **A:** Correct. That's the difference.

[9] **Q:** So it would be your testimony that whatever
[10] coverage there was within the four corners of
[11] that policy as of April 10, 2002, carried
[12] forward into the policy which is Exhibit A
[13] starting May 19th, 2002.

[14] **A:** No.

[15] **Q:** Where then is the contract different or are the
[16] forms different?

[17] **A:** April 10, 2002, policy was a USAIG policy.

[18] **Q:** I'm saying the last AIG policy that ended as of
[19] April 10th, between those two what would your
[20] answer be?

[21] **A:** To my knowledge, those are similar in policy.

[22] **Q:** As you sit here today, can you think of any
[23] differences between them other than those
[24] you've already described?

[25] **A:** I don't recall any differences, no.

Page 76

[1] **Q:** Is your testimony now the gypsy moth coverage
[2] was added to Exhibit A which had not existed in
[3] the policy which ended on April 9th of 2002;
[4] is that correct?

[5] **A:** I don't recall if it was in the earlier policy,
[6] but it would be a definite addition to if not
[7] already there in the May 19th, 2002, policy.

[8] **Q:** Does that now encompass all of the changes that
[9] you're aware of?

[10] **A:** That I'm aware of at this time.

[11] **Q:** And that's your aware of at this time based
[12] upon having reviewed the file that you have
[13] with you today.

[14] **A:** Yes.

[15] **Q:** When did you first become aware that Scott and
[16] Sarah Petersen were using the Air Tractor for
[17] transition turbine training?

[18] **A:** I never had direct conversations with Scott or
[19] Sarah regarding transition training that they
[20] are providing with the Air Tractor 503.
[21] However, the day of the loss I was reading a
[22] trade publication magazine and in that
[23] publication was a comment to the editor looking
[24] for transitioning training. He had indicated
[25] that he had heard that Pontiac Flying Service

Page 77

[1] was going to provide that. That same day I
[2] took that trade publication back to my
[3] assistant, Angie, who had just hung up on the
[4] phone with our client Scott or Sarah Petersen
[5] indicating that she had had the loss that
[6] morning.
[7]   Q: So making a long story short since I asked for
[8] the date, it was May 5th of 2003; correct?
[9]   A: The loss occurred 5-5-2003, yes, and that was
[10] when I was aware of the possibility that they
[11] were using this airplane for that training.
[12]   Q: So prior to that time you were not aware of
[13] that.
[14]   A: No.
[15]   Q: When do you become involved in the renewal of
[16] policies?
[17]   A: Depends on the —
[18]   Q: By you I'm referring to the agency.
[19]   A: The agency we generally try and get involved —
[20] with every agency things will vary depending on
[21] weekends, days and things of that nature, but
[22] generally 120 days out we start the renewal
[23] process.
[24]   Q: And as I understand your role or relationship
[25] to your clients, you want to find out their

Page 78

[1] operations in setting up for a renewal what it
[2] is that they're doing and what they need
[3] coverage for, in other words, monitoring their
[4] businesses.
[5]   A: Yes, and upon renewal seeking information that
[6] might have changed.
[7]   Q: So when you're going to them for renewal, you
[8] want to get an update on their business so you
[9] can counsel with them and advise them as to
[10] what coverages they should have.
[11]   A: We get an update based on what they tell us
[12] alone.
[13]   Q: If you knew as of the time that you were
[14] setting up for renewal — and you said how many
[15] days, 120?
[16]   A: Generally.
[17]   Q: So if this is May 19th would be the date
[18] you've got to replace that policy, we go back
[19] April, March, February, January. So the
[20] renewal process would start in approximately
[21] January for that policy?
[22]   A: In our notes, January 30th of '03 the renewal
[23] update was sent to the insured which we clearly
[24] marked the airplanes were for ag uses only.
[25]   Q: And if you had known that they were using the

Page 79

[1] plane for turbine transition training, is that
[2] something that you would have brought to their
[3] attention regarding coverage for that use?
[4]   A: Yes.
[5]   Q: And would that be a part of the monitoring
[6] responsibility that you have?
[7]   A: Yes.
[8]   Q: So it is your testimony that you didn't know
[9] that they were using it for transition training
[10] and that, therefore, didn't bring it to their
[11] attention prior to May 5th of 2003?
[12]   A: Yes.
[13]   Q: What publication was it that you were reading?
[14]   A: It's called the Ag Air Update.
[15]   Q: What is that publication?
[16]   A: It's a newspaper that's published by a
[17] gentleman out of Georgia that just does a
[18] general publication for ag pilots and ag
[19] operations. He publishes it monthly.
[20]   Q: And is that something that you subscribe to?
[21]   A: I get it because I'm an advertiser.
[22]   Q: So you put ads in that?
[23]   A: Yes.
[24]   Q: And were you putting ads in that magazine back
[25] in 2002?

Page 80

[1]   A: Yes.
[2]   Q: How frequently would you have an ad in the
[3] magazine?
[4]   A: Every month.
[5]   Q: Would you then read the magazine on a monthly
[6] basis and see your ad?
[7]   A: Not in total, but I read bits and pieces of it,
[8] yes.
[9]   Q: I take it you would certainly look for your ad
[10] to make sure they put it in there, wouldn't
[11] you?
[12]   A: Yes. Can I extend that comment?
[13]   Q: Not at the moment. If you want to, your
[14] counsel can bring it out. Now I have a couple
[15] of issues here. For instance, is this one of
[16] the Ag Air Updates? Is that the magazine or
[17] paper that you're referring to?
[18]   A: Yes.
[19]   Q: And which volume and issue is that?
[20]   A: This is the November 27th issue, 2002.
[21]   Q: And does that have something on it, a
[22] post-it —
[23]   A: Yes, it does.
[24]   Q: — on the cover? And what does that post-it
[25] say?

National Union Fire Company  v.
Pontiac Flying Services, Inc.

Page 81

[1] A: PFS ad Page 7A.

[2] Q: Let's turn to 7A and what do we have?

[3] A: We have a turbine transition ad by Pontiac
[4] Flying Service.

[5] Q: This is the same magazine that you've referred
[6] to in which you advertise?

[7] A: Yes.

[8] Q: Is it your testimony then that you didn't read
[9] that issue?

[10] A: I didn't see that issue. I didn't see that ad.
[11] That is my testimony.

[12] Q: Now I will show you —

[13] MR. BANOVETZ: What's the date on
[14] that one?

[15] A: 27 November, 2002.

[16] BY MR. MUELLER:

[17] Q: Do you have an ad in there as well?

[18] A: I do.

[19] Q: And you're proud of that add?

[20] A: Do I have to answer that?

[21] Q: No. At what page is your ad?

[22] A: 16A.

[23] Q: And what page is the Petersen ad?

[24] A: 7A.

[25] Q: Now I'll show you another issue of Ag Air

Page 82

[1] update. What is the publication date on that
[2] one?

[3] A: April, 2003.

[4] Q: And is that the same magazine that you review?

[5] A: Yes.

[6] Q: Is that the same magazine that you have ads in?

[7] A: Yes.

[8] (Marked for identification
[9] Deposition Exhibit G.)

[10] BY MR. MUELLER:

[11] Q: Randy, I'll show you Exhibit G. I'm going to
[12] short-circuit this. Is that a copy of your ad
[13] from the magazine?

[14] A: Yes.

[15] Q: And that's the April, 2003, volume?

[16] A: Yes.

[17] (Marked for identification
[18] Deposition Exhibit G-1.)

[19] BY MR. MUELLER:

[20] Q: On Page 3A, and I'm referring you to
[21] Exhibit G-1, what do we have?

[22] A: We have a lot of advertisement and some script
[23] on the next page.

[24] Q: And is among the advertisements on Page 3A
[25] directly opposite your ad one for turbine

Page 83

[1] transition training for Pontiac Flying Service?

[2] A: Yes.

[3] Q: And is it your testimony then that you never
[4] read this Ag Air Update either?

[5] A: I have no idea.

[6] Q: Well, if you read the Ag Air Update April,
[7] 2003, would you agree that in opening the
[8] magazine up you would have on your right-hand
[9] side the turbine transition training ad of
[10] Pontiac Flying Service and directly opposite
[11] that your own ad for Hardy Insurance on the
[12] left-hand side?

[13] A: Is your question if I read it?

[14] Q: No. My question is if you opened it up
[15] assuming that you read it, you would have
[16] before you on the right-hand side the
[17] Petersens' ad and directly opposite that on the
[18] left-hand side your ad; correct?

[19] MS. BARON: Object to the for him of
[20] the question. Directly opposite? That's
[21] vague.

[22] BY MR. MUELLER:

[23] Q: Tell you what I'm going to do. I'm going to
[24] take a straight edge here and run it across
[25] from the Hardy — from the Petersen ad on the

Page 84

[1] right-hand side to the Hardy ad on the
[2] left-hand side. Would you agree that they're
[3] directly opposite each other?

[4] MS. BARON: On different pages.

[5] BY MR. MUELLER:

[6] Q: On different pages.

[7] A: Would I agree to that, yes. Eleven inches to
[8] be exact.

[9] Q: Is it still your testimony as you sit here
[10] today that while you were getting this policy
[11] ready for renewal you did not know that the
[12] Petersens were using this plane for turbine
[13] transition training?

[14] A: That is true.

[15] Q: Did you ever become aware of the fact that
[16] Scott and Sarah Petersen believed that they had
[17] coverage for the turbine transition training
[18] before the accident?

[19] A: Restate the question, please.

[20] MR. MUELLER: Want to read it back?

[21] (At this time the reporter read
[22] the pending question.)

[23] A: No.

[24] BY MR. MUELLER:

[25] Q: Did you ever become aware after the accident

Page 85

[1] that Scott and Sarah Petersen believed that
[2] they had turbine transition training throughout
[3] the time that they owned the Air Tractor?
[4]    A: No.
[5]    Q: How did you find out that the accident had
[6] occurred?
[7]    A: They called our office.
[8]    Q: By they, who are you referring to?
[9]    A: I believe Sarah called Angie.
[10]   Q: And reported the accident?
[11]   A: Yes.
[12]   Q: And did you then report the accident back to
[13] AIG?
[14]   A: Yes.
[15]   Q: And to whom did you report the accident?
[16]   A: When you are saying did I report, you mean our
[17] office.
[18]   Q: Your office.
[19]   A: On 5-5 of '03 Angie by virtue of her
[20] handwriting took the call from Sarah that Rick
[21] and a turbine student crashed and totalled this
[22] afternoon just outside of Pontiac. Rick and
[23] his passenger were killed. The aircraft was
[24] probably totalled.
[25]   Q: You're referring to what page, 119?

Page 86

[1]    A: 119.
[2]    Q: And my question dealt with notifying AIG.
[3]    MR. BANOVETZ: Page 121?
[4]    MR. MUELLER: That's a hint.
[5] Counsel, please don't tip the witness.
[6]    A: No, that's not the original.
[7]           BY MR. MUELLER:
[8]    Q: I'm not looking for the original. Let's focus
[9] on page 121. I was assuming we would get
[10] there. Did you yourself communicate by e-mail
[11] with Mary Beth Schwaegel regarding the
[12] accident?
[13]   A: Yes.
[14]   Q: And was that on May 6, the day after?
[15]   A: It is.
[16]   Q: Does that communication appear on pages 121 and
[17] 122 and 123 of Exhibit E?
[18]   MS. BARON: I just want to interject.
[19] Your question was when he first notified
[20] them of the loss and he has now found the
[21] document that responds to that question.
[22]   A: Page 127. The initial loss report was sent to
[23] the company, the company being AIG, page 107
[24] and the report is dated loss report.
[25]           BY MR. MUELLER:

Page 87

[1]    Q: And when was it sent?
[2]    A: Same date.
[3]    Q: And was that sent by ordinary mail or was that
[4] faxed?
[5]    A: We fax.
[6]    Q: Now we'll get to pages 121 to 123. After that
[7] communication, did you receive a response, and
[8] I'm talking about you Randy, in particular from
[9] Mary Beth Schwaegel?
[10]   A: 121, 122.
[11]   Q: And 123.
[12]   A: 123 I think is the same thing just all in one
[13] page.
[14]   Q: It is.
[15]   A: But 121 gives the dates.
[16]   Q: Let's work with 121, 122, okay?
[17]   A: After this communique that I sent to Mary Beth,
[18] I don't recall any conversation — if I had a
[19] conversation I don't recall what it was and I
[20] do not believe I had any response via e-mail
[21] responding back on this.
[22]   Q: Well, looking at 121, is that an e-mail to
[23] Randy, being you, from Mary Beth Schwaegel at
[24] the top dated Tuesday, May 6, 2003?
[25]   A: Yes, it is.

Page 88

[1]    Q: And I take it from that her reaction or AIG's
[2] reaction was to cancel the policy.
[3]    A: Yes, you're correct, I now see that. She did
[4] respond on the next day that they're going to
[5] non-renew the risk.
[6]    Q: Then you responded back to her by e-mail.
[7]    A: No.
[8]    Q: From Randy to Mary Schwaegel at AIG dot com?
[9]    A: My initial conversation to her was at 2:40 on
[10] May 6 on this form and she responded to me on
[11] May 6 at 4:43 p.m.
[12]   Q: So at the bottom of the form chronologically is
[13] an e-mail from you to her at 2:40 p.m. on May
[14] the 6th.
[15]   A: Correct.
[16]   Q: You had notified her of the loss previously.
[17]   A: The day before.
[18]   Q: Yes.
[19]   A: We had notified AIG. Whether it went to her or
[20] the claims department, I do not know. I'm
[21] assuming that she was made aware of it.
[22]   Q: I want to spend a little bit of time on pages
[23] 121 and 122.
[24]   A: I figured you would.
[25]   Q: You got me right. Is this something that you

Page 89

[1] typed yourself?
[2] A: Yes.
[3] Q: And were these your -- was this a sincere
[4] expression of your understanding of the events
[5] that had taken place as of May 6, 2003?
[6] A: It was my attempt to put as best a light on a
[7] bad situation to the underwriter because I knew
[8] that there was going to be a problem based on
[9] our knowledge of what was in the policy at the
[10] time of the loss as my attempt to act as an
[11] agent for my client to try and get the company
[12] to work with us on paying the loss.
[13] Q: And also a sincere expression of your
[14] understanding of the events that led to May 6,
[15] 2003; correct?
[16] A: Well, I don't understand the sincere but —
[17] Q: Well, your understanding of the events that led
[18] to May 6, 2003.
[19] A: Yes.
[20] Q: And it starts out, we're going to take this
[21] piece by piece: Well, as in the movie,
[22] Houston, we have a problem. You're referring
[23] to Apollo 14?
[24] A: Thirteen.
[25] Q: Thirteen. Thank you.

Page 90

[1] A: I have a bad sense of humor.
[2] Q: It's understandable. When you say we have a
[3] problem, the "we" is a collective pronoun,
[4] you're referring to yourself and to AIG?
[5] A: No, I'm referring to my client in that verbiage
[6] that we being my client and assuming that would
[7] include us if there was any question as to
[8] coverage.
[9] Q: Is it your testimony you were not including
[10] Mary Beth Schwaegel and AIG as part of the we?
[11] A: Any time you have a loss that involves the
[12] death of two people, we, meaning all parties
[13] involved, it's always a problem. But in the
[14] text of what you're trying to say, I think, I
[15] would not include AIG in that statement, no.
[16] Q: And the next sentence: Yesterday we turned in
[17] a loss for Pontiac Flying Service on their
[18] AT503 which you've testified to.
[19] A: Yes.
[20] Q: Then you go on: At the time we were unaware of
[21] the use during the loss. Is it your testimony
[22] that you were unaware what they were doing with
[23] the plane that day or is it your testimony that
[24] you were unaware that they had ever been using
[25] that plane for turbine transition training in

Page 91

[1] direct support of aerial application?
[2] A: At the time that the loss was turned in, which
[3] was the day before, we were unaware of any use
[4] of that airplane being for turbine transition
[5] training or training of any kind.
[6] Q: I'll ask you are you the only one in your
[7] office that reads the Ag Air Update?
[8] A: Different people may appear to look at it from
[9] time to time, but I don't know to the extent of
[10] what they read on the periodicals.
[11] Q: It's available in the office, in any event, for
[12] them to read.
[13] A: If I give them a copy.
[14] Q: So it comes to you directly?
[15] A: Yes.
[16] Q: And do you ever hold it out from them?
[17] A: Holding out would be the improper term but do I
[18] ever ----
[19] Q: Do you ever make it unavailable to them?
[20] A: Make it unavailable, no.
[21] Q: In fact, the Ag Air Update is somewhat the
[22] Bible of what's going on in the aerial
[23] application or agricultural application, is it
[24] not?
[25] A: No.

Page 92

[1] Q: What other publication is?
[2] A: The National Agricultural Aviation Association
[3] publishes a bi-monthly magazine which I also
[4] advertise in.
[5] Q: Who in your office is responsible for the
[6] advertising?
[7] A: I am responsible for seeking the advertising.
[8] I usually have my bookkeeper handle the
[9] details.
[10] Q: Do you use an advertising agency or do you
[11] advertise directly with Ag Air Update?
[12] A: I have an advertising specialist that procures
[13] and puts together my ads and depending on
[14] the — quite honestly the time frame it's going
[15] to take whether I feel like it or not, either
[16] have him send it directly or I do it myself.
[17] Q: Who has the responsibility of verifying that
[18] the ads whether they're in Ag Air Update or
[19] whether they're in the other publication are
[20] actually being printed?
[21] A: No one. No one has responsibility.
[22] Q: So you could be getting took and you wouldn't
[23] know it.
[24] A: Could be. We try to look at every one of them
[25] but don't know if we do or not.

Page 93

[1] Q: Going on with page 121: It now appears the
[2] aircraft was being used for turbine transition
[3] training, thus the reason for an additional
[4] person being on board. You were aware as you
[5] have testified prior to this time that it was a
[6] dual cockpit; correct?
[7] A: Yes.
[8] Q: And that it had been used for turbine
[9] transition training in direct support of aerial
[10] application by Harold Miller before; correct?
[11] A: Yes.
[12] Q: Did you ever tell Scott Petersen that he was
[13] not covered for turbine transition training in
[14] that plane? Did you ever tell him that?
[15] A: Yes.
[16] Q: And when did that conversation take place?
[17] A: It would vary, but my recollection of all of
[18] our paperwork clearly states for ag use only,
[19] and whether or not I have had conversations
[20] with him I don't recall, but there have been —
[21] prior to this loss there was a request for
[22] training on a different airplane which we
[23] sought coverage for and were able finally to
[24] get after a period of time only because when he
[25] originally called during the policy period

Page 94

[1] after he bought the 503 he did not have enough
[2] time to be considered someone that would be
[3] able to train and our records will show that
[4] originally the companies — all companies
[5] denied coverage for training in a separate
[6] aircraft only to continue working with the
[7] underwriter to finally get her to agree to it
[8] after he had some more time. So conversations
[9] about training had taken place throughout the
[10] policy period and I'm sure — not having
[11] anything in front of me, I'm sure that the
[12] conversation came up that we don't have
[13] training at this time, we don't have training
[14] in anything and he knew that.
[15] Q: When I'm dealing with conversations, as I
[16] understand it, you recall no specific
[17] conversations with Scott Petersen in which the
[18] term turbine transition training was used with
[19] respect to this plane prior to the accident; is
[20] that correct?
[21] A: The ability to put that on paper and show it to
[22] you, no.
[23] Q: Is what I'm saying correct, that you know of no
[24] conversations with him in which the term
[25] turbine transition training was used prior to

Page 95

[1] the accident?
[2] A: I'm sorry. Part of your question I understood
[3] but the second part say again, please.
[4] Q: Is it true that you recall no conversations
[5] with Scott Petersen in which the term turbine
[6] transition training was used prior to the
[7] accident?
[8] A: No, that's not true because I don't recall
[9] whether we discussed it or not in its form that
[10] you have indicated.
[11] Q: That's a fairly straightforward question. Can
[12] you think of any conversations in which the
[13] term turbine transition training was used with
[14] Scott Petersen prior to this accident?
[15] A: No.
[16] Q: And would the same be true for Sarah Petersen?
[17] A: I don't know. No, I don't know.
[18] Q: Do you know of any conversations with Sarah
[19] Petersen?
[20] A: Again, the conversations we had about
[21] transition training whether it be turbine or
[22] piston or just training in ag airplanes took
[23] place. The exact content of those
[24] conversations I can't testify to because I
[25] don't remember.

Page 96

[1] Q: Now getting back to my question because I'm
[2] going to stay with it, the question used the
[3] term turbine transition training. We've gotten
[4] past that with Scott Petersen. My question is
[5] are you aware of any conversations with Sarah
[6] Petersen in which the term turbine transition
[7] training was used before the accident?
[8] A: No.
[9] Q: And you have testified previously that turbine
[10] transition is exactly that, that it is
[11] transitioning from a piston-driven plane to a
[12] turbine-driven plane for an aerial application.
[13] A: Yes.
[14] Q: And that instruction in aerial application is
[15] the instruction on how to fly the planes for
[16] the purpose of applying the chemical, seeds and
[17] fertilizers; correct?
[18] A: Generally, yes.
[19] Q: And having reviewed your file, would it be
[20] accurate to say that the subject of turbine
[21] transition training for this plane after it was
[22] acquired by Scott and Sarah Petersen does not
[23] appear before the accident?
[24] A: Restate that again. I'm sorry.
[25] Q: Does the term turbine transition training as it

Page 97

[1] relates to this plane appear in your file to
[2] your knowledge any place before the accident?
[3]    A: No.
[4]    Q: And you go on to say on page 121: I let it go
[5] yesterday and was able to speak with Sarah
[6] Petersen today. The I being yourself?
[7]    A: Yes.
[8]    Q: And had you known Scott or Sarah Petersen
[9] before?
[10]    A: Yes.
[11]    Q: And did you consider them nice people?
[12]    A: Yes.
[13]    Q: And in talking to Sarah Petersen that day on
[14] the 5th, she was devastated by this, wasn't
[15] she?
[16]    A: Yes.
[17]    Q: When you say you let it go, what did you have
[18] that you let go of?
[19]    A: I wasn't going to discuss coverages with her on
[20] the day of the accident because she was already
[21] upset.
[22]    Q: And so had you talked to Sarah Petersen
[23] yourself the day before when you said I let it
[24] go yesterday?
[25]    A: I don't recall.

Page 98

[1]    Q: Had you talked to Scott Petersen when you say I
[2] let it go?
[3]    A: When I say I let it go, I don't recall — I
[4] don't think I talked to either one of them that
[5] day. I think it was the next day. But when I
[6] say I let it go yesterday, I meant that I did
[7] not call them back to advise them that they had
[8] never called us or advised us to add transition
[9] training — turbine transition training to the
[10] policy, so I did not address it that day.
[11]    Q: She was concerned because one of the pilots
[12] wasn't named to the file which was this Rick
[13] Lucente who was killed. We indicated to her
[14] that when she called about using him, he met
[15] the OPW and did not need to be named. What
[16] does that mean? What's the OPW?
[17]    A: OPW is open pilot warranty. With various
[18] policies depending on how they write it, they
[19] can put what's called an open pilot warranty on
[20] the policy. If a pilot meets an open pilot
[21] requirement which maybe — and it varies from
[22] company to company, instead of physically
[23] naming each pilot on the policy, if they meet
[24] that requirement, we don't have to name them on
[25] the policy.

Page 99

[1]    Q: So in this conversation with Sarah Petersen,
[2] her concern as you understand it was that there
[3] might not be coverage because Rick Lucente was
[4] not specifically named.
[5]    A: I don't know what her concerns were.
[6]    Q: Was that your understanding —
[7]    A: I don't know.
[8]    Q: — when you typed in the words she was
[9] concerned because one of the pilots, Rick
[10] Lucente wasn't named? Does that refresh your
[11] recollection of her concern regarding the
[12] coverage?
[13]    A: Well, I'm not going to speak on behalf of
[14] Sarah, but my conversation led me to believe
[15] that they might be concerned that one of their
[16] pilots who wasn't named to the file, there
[17] might be a problem probably. I don't know. I
[18] indicated to her that since he met the open
[19] pilot warranty, naming him or not naming him
[20] did not matter. Whether I went on to explain
[21] that the use of the policy is what's the main
[22] issue, I don't know.
[23]    Q: Well, isn't that exactly what you did starting
[24] with the next sentence? It gave me the
[25] opportunity to ask her about the way she called

Page 100

[1] in the loss as training.
[2]    A: Yes.
[3]    Q: So you're getting into that.
[4]    A: Yeah.
[5]    Q: Now you previously testified that you didn't
[6] understand that the Petersens believed that
[7] they had coverage for transition turbine
[8] training before the accident. Do you recall
[9] that testimony?
[10]    A: Yes.
[11]    Q: The next sentence says: Much to her surprise,
[12] I had to break the news. So now in reading
[13] this, is it your understanding that the
[14] Petersens did in fact believe that they had
[15] coverage for that use?
[16]    A: Well, I can't testify to what they did or did
[17] not believe, but I was under the assumption
[18] that they thought they had coverage.
[19]    Q: And do you believe that Sarah Petersen was
[20] sincere in that conversation?
[21]    A: I think Sarah Petersen was hoping that she had
[22] coverage, not knowing whether she did or not.
[23]    Q: Well, do you believe that she was sincere in
[24] being surprised?
[25]    A: I don't know. I do not know. Can't testify to

National Union Fire Company     v.
Pontiac Flying Services, Inc.

Page 101

[1] her state at that time.

[2] **Q:** Well, was it your opinion at that time as it
[3] appears here, much to her surprise is your
[4] term, isn't it?

[5] **A:** That's my term.

[6] **Q:** And she didn't say much to my surprise, did
[7] she? That's your interpretation of the
[8] conversation, isn't it?

[9] **A:** Yeah. That is my interpretation, yes.

[10] **Q:** Then you go on to say: I had to break the news
[11] that we had never been given a request to add
[12] transition training to the file and we did not
[13] cover this aircraft for that use.

[14] **A:** Correct.

[15] **Q:** When you told her that, the next sentence says
[16] that they were very upset; would that be an
[17] accurate —

[18] **A:** Well, they're upset in general because of the
[19] accident, and I felt she was upset that there
[20] may not be coverage for that accident. That's
[21] why I said they may not be thinking straight.

[22] **Q:** It's a fact, is it not, and I'm directing your
[23] attention to Exhibit D, you were never provided
[24] with a definition of the term, quote, flights
[25] required in direct support thereof, end of

Page 102

[1] quote, as it is used in the following policy
[2] provision? And I will direct you jointly to
[3] Exhibit A, page 10, which is the policy
[4] definition which is set forth. Quote, aerial
[5] application means the application by aircraft
[6] of seeds, fertilizers or chemicals and includes
[7] flights required in direct support thereof by
[8] National Union or anyone else. That appears as
[9] Interrogatory No. 6 at the bottom of page five
[10] and your answer being at the top of page six:
[11] No.

[12] **A:** Correct.

[13] **Q:** And you have testified that your answer would
[14] be the same today as it was then, so we
[15] understand that nobody has ever defined the
[16] term for you, flights required in direct
[17] support thereof as it applies to aerial
[18] application; is that correct?

[19] **A:** The definition is in the policy.

[20] **Q:** Is that correct, no one has ever defined the
[21] term flights required in direct support thereof
[22] for you?

[23] **A:** This is the definition. That is the
[24] definition.

[25] **Q:** I would like for you to take however much time

Page 103

[1] you want or need in Exhibit A to find among the
[2] definitions one for flights required in direct
[3] support thereof.

[4] **A:** I can't. I don't have that, no.

[5] **Q:** Would you agree with me if I represented as
[6] opposed to having you go page for page through
[7] the policy that the policy does not any place
[8] define the term, flights required in direct
[9] support thereof?

[10] **MR. BANOVETZ:** Objection to the use
[11] of the word term as opposed to phrase.

[12] **MR. MUELLER:** Your objection is
[13] noted.

[14] **A:** Are you asking me if there's any place in the
[15] policy that further defines flights required in
[16] direct support thereof?

[17] **BY MR. MUELLER:**

[18] **Q:** That's right.

[19] **A:** No.

[20] **Q:** Doesn't appear in there.

[21] **A:** No.

[22] **Q:** Never has been defined for you by an AIG or
[23] anyone else; correct?

[24] **A:** We all —

[25] **Q:** Is that correct or not? Never has been defined

Page 104

[1] for you.

[2] **A:** Not in that form, no. That is not correct the
[3] way you're stating it, no.

[4] **Q:** Tell me because I note here, I say set forth
[5] the definition and you don't set forth the
[6] definition. You say, no, that it's never been
[7] defined for you; is that correct? Look at
[8] Exhibit D.

[9] **A:** My statement is correct.

[10] **Q:** So you don't set forth the definition.

[11] **A:** No.

[12] **Q:** And you don't identify any person or persons
[13] from whom that definition was received, do you?

[14] **A:** No.

[15] **Q:** And you don't identify any documents that
[16] evidence that definition, do you?

[17] **A:** No.

[18] **Q:** And do you understand in this case that AIG in
[19] response to our requests has no definition for
[20] that term either?

[21] **A:** I don't know what their statement is on that.

[22] **MR. BANOVETZ:** Same objection as to
[23] the form of the question, the use of the
[24] word term.

[25] **BY MR. MUELLER:**

1:03-cv-01399-EM-BGC re #111-7    Page 28 of 34
National Union Fire Company    v.
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 105

[1] Q: Well, I would suggest that you might benefit
[2] from obtaining a copy of AIG's responses when
[3] we asked them for the definition of the term.
[4] Now you go on and state: Please state whether
[5] or not Hardy ever defined the term, quote,
[6] flights in direct support thereof, this is
[7] Interrogatory No. 7, as it is used in the
[8] following policy provision, quote, aerial
[9] application means the application by aircraft
[10] of seeds, fertilizers or chemicals and includes
[11] flights required in direct support thereof for
[12] Pontiac Flying, and if your answer is in the
[13] affirmative then please identify the person and
[14] any documents which provide that definition.
[15] And your answer to that is: Hardy gave Pontiac
[16] the policy.
[17] A: Yep. Yes.
[18] Q: And is that your answer as you sit there today?
[19] A: Yes.
[20] Q: And is that consistent with your obligation and
[21] responsibility as you have described it to
[22] review the policy with your insureds to see
[23] that they understand the terms of the policy?
[24] MR. BANOVETZ: Objection. Misstates
[25] his prior testimony.

Page 106

[1] MS. BARON: I'll join in that. You
[2] can answer it. I just don't know that it
[3] correctly states what you testified to
[4] already, mischaracterizes. Go ahead.
[5] A: Well, it is mischaracterization in that all of
[6] us being in the business understand quite a bit
[7] about different things and we understand the
[8] policy as best we can, but at all times the
[9] policy is the final wording and it goes to the
[10] customer and it's the customer's responsibility
[11] to read and understand the policy. If they
[12] have any questions about that, they contact us
[13] to see seek advice from the insurance company
[14] as to the what the response to their question
[15] is.
[16] BY MR. MUELLER:
[17] Q: Would you agree that there are few things that
[18] are more confusing than the language of one of
[19] these policies?
[20] A: Depends on who you ask.
[21] Q: Well, I'm asking you.
[22] A: Would I agree to the fact that policies are
[23] written —
[24] Q: In a confusing fashion as far as the
[25] policyholders are concerned.

Page 107

[1] A: Yeah, I'll have to agree to that, sure. You
[2] guys wrote them. Excuse my comment. Strike
[3] that.
[4] MR. BANOVETZ: I'm not sure I
[5] understand the answer.
[6] (Discussion held off the record.)
[7] (Thereupon, a recess was taken;
[8] whereupon, the following was
[9] had:)
[10]
[11] BY MR. MUELLER:
[11] Q: When we left off, you were talking about or had
[12] just answered a question which discussed the
[13] fact that — if I recall it that nothing's more
[14] confusing than reading one of these insurance
[15] policies. Do you recall that?
[16] A: I do and I would agree.
[17] Q: And, therefore, as the expert or at least as an
[18] expert in comparison with the insureds, would
[19] you agree that it's your responsibility to
[20] clarify the confusing matters to make sure that
[21] they understand what the coverage they're
[22] purchasing is?
[23] A: Not in that form, no.
[24] Q: Where does your obligation to relieve the
[25] confusion leave off?

Page 108

[1] A: I believe our responsibility as the agent is to
[2] help the client understand things as best as
[3] possible, but I think there is a prudent
[4] responsibility upon the client to understand
[5] and learn and read about his own policy as
[6] confusing as it may be as we've indicated, and
[7] if there's any questions regarding any
[8] particular thing that they bring it to us
[9] because I don't think I could be held
[10] responsible for trying to determine what all
[11] their questions might be.
[12] Q: But if you read a policy as you have testified,
[13] you want to be sure that in selling it you
[14] understand what it means; correct?
[15] A: As best as we can, yes.
[16] Q: I mean certainly since you're the guy who is
[17] selling them, you have to assume that you can
[18] read and understand them better than the
[19] policyholders; is that right?
[20] A: Yes.
[21] Q: Let's mark this as Exhibit H.
[22] (Marked for identification
[23] Deposition Exhibit H.)
[24] BY MR. MUELLER:
[25] Q: Have you ever seen that before?

Page 109

[1] **A:** I have seen the website. I haven't seen it on
[2] paper.

[3] **Q:** And would you agree that this is the Hardy
[4] Aviation website as of Tuesday, July 13th,
[5] 2004, two days before?

[6] **MS. BARON:** Two days ago you mean?
[7] Just before what?

[8] **MR. MUELLER:** That's a legitimate
[9] complaint.

[10]       **BY MR. MUELLER:**
[11] **Q:** On the front page —

[12] **A:** You're just talking about the front page?

[13] **Q:** I'm talking about this being your website as of
[14] the date, Tuesday, July 13th, 2004.

[15] **A:** Yes.

[16] **Q:** And who prepared the newsletter there in June
[17] of — is that 2004 or 2003? When was that
[18] newsletter prepared?

[19] **A:** I have no idea where you got this. I have no
[20] idea.

[21] **Q:** Let me represent for the record that if we were
[22] to go to your website today and print it out,
[23] this would be what would come off because I did
[24] that on Tuesday and this is exactly what we
[25] got.

Page 110

[1] **A:** Well, I recognize the information. I recognize
[2] what you're saying. To be honest with you, I
[3] didn't realize that my website guy had put my
[4] newsletter on there, but that's fine.

[5] **Q:** Was that newsletter June 11, 2003, or was that
[6] 2004 and it's just —

[7] **A:** It appears I wrote this newsletter to our
[8] clients and future customers on June 5, 2003.

[9] **Q:** And when you say you, you're talking about
[10] Randy Hardy. These are your words?

[11] **A:** Yes.

[12] **Q:** And on the first page above the little bracket
[13] on the bottom, Get a Quote, you say also we
[14] will monitor your total insurance program
[15] keeping you up-to-date with changes that may
[16] affect your insured risk.

[17] **A:** Yes.

[18] **Q:** And is that the responsibility that you have to
[19] your current insureds?

[20] **A:** That's our desire that we have to our current
[21] insureds.

[22] **Q:** So, for instance, Scott and Sarah Petersen, is
[23] this part of the monitoring that you had
[24] ongoing at the time they were seeking a renewal
[25] of their policy in the January, 2003?

Page 111

[1] **A:** That would be correct.

[2] **Q:** And you have testified that you were unaware
[3] that they were using this Air Tractor for
[4] turbine transition training as of that time
[5] frame when you were working on the renewal;
[6] correct?

[7] **A:** The time frame leading up to the accident?

[8] **Q:** Yeah, talking about January, 2003, when you
[9] were working on a renewal of the policy that
[10] was going to expire on May 19.

[11] **A:** That's correct.

[12] **MR. BANOVETZ:** I'm sorry. I'm not
[13] sure if I understood the answer. You said
[14] he was unaware or aware?

[15] **A:** We were aware.

[16] **MR. MUELLER:** Excuse me just a
[17] second.

[18] **A:** We were unaware of the use of the airplane at
[19] that time.

[20]       **BY MR. MUELLER:**
[21] **Q:** And it is also your testimony that that would
[22] be something that would affect the insured
[23] risk?

[24] **A:** Yes.

[25] **Q:** Now I'll direct you to page two of three.

Page 112

[1] **A:** I don't have two of three. Okay.

[2] **Q:** Got that?

[3] **A:** Yes.

[4] **Q:** And what you're saying then in June of 2003
[5] that you don't want your insureds to have any
[6] surprises.

[7] **A:** I now remember why I wrote this. Okay.

[8] **Q:** That's what you say at the bottom, you have no
[9] surprises?

[10] **A:** We prefer no surprises, correct.

[11] **Q:** And Sarah Petersen based upon page 121
[12] expressed surprise, did she not, that there was
[13] no coverage for a turbine transition training?

[14] **A:** My word was surprised, and as I stated earlier,
[15] I think her true feeling was that she was in
[16] hopes but I assume was meaning surprised.

[17] **Q:** This newsletter if the date is accurate, June,
[18] 2003, was written approximately a month after
[19] your e-mail which appears on page 121?

[20] **A:** Yes.

[21] **Q:** And do you also state that — this is on page
[22] two of three above "fly safe", if I don't have
[23] you confused yet then read your policy. That's
[24] enough to confuse anyone.

[25] **A:** Yes.

National Union Fire Company    v.
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

Page 113

[1]    MR. MUELLER: And at this point we'll
[2] take half an hour break.
[3]    (Thereupon, a noon recess was taken;
[4] whereupon, the following:)
[5]         BY MR. MUELLER:
[6]    Q: We're back on the record after a break and we
[7] left off, as I recall, with a discussion of the
[8] exhibit that was your web page and the last
[9] portion of that. Let's come back to page 121
[10] where we left off. Do you recall ever
[11] explaining any portions of the policy in
[12] question to Scott and Sarah?
[13]    A: Yes.
[14]    Q: And do you recall explaining any portions of
[15] the policy to Scott and Sarah before the
[16] accident?
[17]    A: Yes.
[18]    Q: And when would that have taken place?
[19]    A: The exact date I don't have, but prior to the
[20] accident when they called me about doing
[21] training in their aircraft, we talked over the
[22] phone in general conversations about the policy
[23] and what is required, the changes in the policy
[24] to do training coverage.
[25]    Q: When you're talking about training coverage,

Page 114

[1] you're talking about training coverage using an
[2] Air Cat?
[3]    A: Any airplane, for that matter, but in this
[4] particular case the Ag Cat that he called
[5] about, but it's a general question about
[6] changing your policy to include training.
[7]    Q: With whom did you talk?
[8]    A: Scott.
[9]    Q: And was he talking to you then about the
[10] turbine aircraft or was it limited to the Air
[11] Cat or do you remember?
[12]    A: My recollection that we only talked about the
[13] possibility of getting the Ag Cat, a piston
[14] aircraft to do training in.
[15]    Q: And that would be training, per se, for aerial
[16] application as you've described it. In other
[17] words, knowing how to fly the plane so that you
[18] could actually put out chemicals, seeds and
[19] fertilizer.
[20]    A: Yes.
[21]    Q: Now coming back on page 121, picking up again
[22] with the conversation between you and Sarah.
[23]    A: Okay.
[24]    Q: Was that conversation that you're referring to
[25] on the 5th or was that on the 6th, the same day

Page 115

[1] as the memorandum?
[2]    A: I believe it's on the 6th, the conversation I
[3] had that day with him.
[4]    Q: The next sentence: She told me over the phone
[5] she was under the understanding or they assumed
[6] that since we added Scott back in the beginning
[7] for transition training by Harold Miller who
[8] they bought this aircraft from, that gave them
[9] transition training coverage just like the
[10] school they bought the aircraft from. Do you
[11] recall that discussion?
[12]    A: Yes.
[13]    Q: Now you have previously testified that you
[14] don't recall any discussions with Scott and you
[15] don't have any memoranda of discussions with
[16] Scott or Sarah either regarding — just between
[17] you and them regarding a coverage for the Air
[18] Tractor. Do you recall that?
[19]    A: I recall the conversation, but when you say
[20] coverage for the Air Tractor —
[21]    Q: Yes. You had testified previously that you had
[22] no memory of specific conversations with either
[23] Scott or Sarah regarding coverage for the Air
[24] Tractor at the time it was purchased.
[25]    A: Correct.

Page 116

[1]    Q: And you looked through the file and you were
[2] unable to find any memoranda or anything else
[3] regarding conversations of that type.
[4]    A: That I had, but I found —
[5]    Q: That you had.
[6]    A: That I had personally, no, I did not find any
[7] conversations.
[8]    Q: Did you find any memoranda of any sort
[9] regarding transition training coverage on that
[10] plane at the time it was acquired?
[11]    A: Just the notes that Angie had in the file.
[12]    Q: And could you find those notes?
[13]    A: Okay. Here's the note.
[14]    Q: Have you located a page?
[15]    A: Page 118. I'm sorry. That was about the Ag
[16] Cat.
[17]    Q: That's 6-19. We're talking about in the time
[18] frame February 8th to March 1st.
[19]    A: When she originally handled the airplane
[20] policy.
[21]    Q: That's right. We're talking about transition
[22] training having been discussed under that
[23] policy. Her letter to them is Page 51 if that
[24] gives you any frame of reference telling them
[25] that they got the coverage.

National Union Fire Company   v.
Pontiac Flying Services, Inc.

Page 117

[1]    A: Here it is.

[2]    Q: What page?

[3]    A: Page 109. You understand that the various
[4] committees that I'm on —

[5]    Q: Wait a minute. I'm the one who asks the
[6] questions and I don't believe there's one
[7] pending other than asking you to find the page
[8] which you've identified as page 109.

[9]    A: Correct.

[10]    Q: And the notation on page 109 is made 2-8-09, so
[11] that's the first record of trying to get
[12] coverage for this plane?

[13]    MS. BARON: I believe it's 2-8-02,
[14] not 2-8-09.

[15]    BY MR. MUELLER:

[16]    Q: I'm sorry. I read it instead of remembering
[17] it. 2-8-02.

[18]    A: Yes, this is the first contact that Angie had
[19] with them regarding getting an actual quote for
[20] this airplane.

[21]    Q: And as far as there being turbine transition
[22] coverage for that plane as a part of the quote,
[23] is there any reference to that?

[24]    A: Scott before he can fly this plane would have
[25] to have a turbine transition check out —

Page 118

[1]    Q: Does that appear here?

[2]    A: Yes.

[3]    Q: Where does that appear?

[4]    A: Check out by Harold Miller's turbine transition
[5] course 40 hours in the turbine. He's also been
[6] to the Covington PT-6 course.

[7]    Q: That was the training that he had received as
[8] of that point in time.

[9]    A: This is the training for Scott, yes.

[10]    Q: That's his history of training.

[11]    A: Yes.

[12]    Q: Down to that point in time.

[13]    A: Yes.

[14]    Q: Is there any other notation or record regarding
[15] turbine transition training in that plane?

[16]    A: Any other record, no. Not on this memo.

[17]    Q: Is there any other memo that makes reference to
[18] the subject matter we were discussing, adding
[19] Scott back in the beginning for transition
[20] training by Harold Miller? Is there any record
[21] of that?

[22]    A: We reference at least on page 106, I don't have
[23] the date of this memo, but it was at the time
[24] that Scott was looking at starting an ag school
[25] on the piston airplanes, re to Mary Beth

Page 119

[1]    Schwaegel: As I stated over the phone, this
[2] client went through school himself at Harold's
[3] Flying Service, going on to explain that Harold
[4] is not the lead person any more and that
[5] Harold's going to help Scott set this up and
[6] help oversee it meaning the school.

[7]    Q: But do you know whether that relates to the
[8] piston aircraft or the turbine?

[9]    A: No, I don't know.

[10]    Q: Looks like the piston, doesn't it, when they're
[11] talking about dual instruction in the Cat?

[12]    A: Well, per what's written, yes.

[13]    Q: Getting back to the question, would it be
[14] accurate now that you've looked through the
[15] file that there are not any documents in that
[16] file that show or relate to transition training
[17] by Harold Miller on this particular plane?
[18] Just so it's clear in the record, I'm referring
[19] to the Air Tractor.

[20]    A: Well, the 109 note, the way we wrote the
[21] memo —

[22]    Q: You're talking about the one on page 109, the
[23] 2-8-02.

[24]    A: Yes.

[25]    Q: That makes no reference to future turbine

Page 120

[1] transition training, does it?

[2]    A: No, it does not.

[3]    Q: Does it make any reference to turbine
[4] transition training in this particular plane?

[5]    A: It refers to the fact that to get Scott
[6] approved on this airplane, he already has gone
[7] through Harold Miller's course that Harold had
[8] when he owned the airplane.

[9]    Q: But you don't know whether the turbine
[10] transition training with Harold was in this
[11] plane or some other turbine plane, do you?

[12]    A: Well, he only had one.

[13]    Q: Do you have any records of any sort that show
[14] turbine transition training in this plane
[15] involving Scott Petersen after March 1 — after
[16] the policy went into force and effect after
[17] March 1 of 2002?

[18]    A: I don't understand the question.

[19]    Q: Do you have any records in your file that show
[20] turbine transition training received by Scott
[21] Petersen in this plane after it was covered on
[22] March 1, 2002?

[23]    A: I'd have to look at my files. Unless there was
[24] a certificate put together or not, I don't
[25] know.

National Union Fire Company v.
Pontiac Flying Services, Inc.

Page 121

[1] Q: As far as Exhibit E, the documents you produced
[2] for us and that you've gone through here today,
[3] you don't find any such materials, do you?
[4] A: Correct.
[5] Q: What I refer to as the, Houston, we have a
[6] problem memo, it continues on: Scott and Sarah
[7] bought this aircraft from Harold Miller who was
[8] selling out his aircraft, and as I just found
[9] out, his school as well. She isn't holding us
[10] responsible yet, however, who knows how these
[11] deals will fall. What are you referring to
[12] when you say deals and fall?
[13] A: Well, just exactly what it says. You never
[14] know what — peoples' attitudes change and
[15] their memories change a lot of times after a
[16] loss and what I was referring to there was that
[17] we had no knowledge of the school, we had no
[18] knowledge of the training, we had no knowledge
[19] that they had bought Harold's Flying Service.
[20] However, sometimes in my business after an
[21] accident depending on how it's going to
[22] financially affect somebody, their memory
[23] changes.
[24] Q: But at the same time then you continue on that
[25] you believed when Sarah when she told you that they

Page 122

[1] assumed or presumed that they had this,
[2] referring to coverage, since they transitioned
[3] Scott and they bought the aircraft Harold was
[4] using for training. Does that appear there?
[5] A: Yes.
[6] Q: At that point in time, it was your belief that
[7] Sarah was being sincere.
[8] A: My comment there —
[9] Q: Did you believe she was being sincere?
[10] MS. BARON: I'm going to object to
[11] the form of the question as being too
[12] broad. Sincere about what?
[13] MR. MUELLER: He can say that he
[14] doesn't recall that she was sincere when
[15] she said that she assumed that they had
[16] the coverage since they transitioned Scott
[17] and bought the aircraft Harold was using
[18] for training.
[19] A: What I meant by that was I can believe that she
[20] believed that but not necessarily that that's
[21] what it was.
[22] BY MR. MUELLER:
[23] Q: So you believed that she was sincere in that
[24] belief whether it's accurate or not.
[25] A: I'm not using the term sincere.

Page 123

[1] Q: Well, do you believe she was insincere then?
[2] A: I'm not going to use that term. I can't —
[3] Q: When you use the term you believe someone — if
[4] I were to say to you this is a wooden table and
[5] you say I believe you, what do you mean when
[6] you use the term believe? What are your
[7] beliefs founded on?
[8] A: If you'll allow me to expand on this, I'll
[9] explain it which is at the time we had and have
[10] always had with this account problems with the
[11] wife and the husband both thinking that they've
[12] done something when they hadn't, and so trying
[13] to be an agent to my client and trying to
[14] express to the insurance company that even
[15] though there was no coverage, I believe they
[16] thought they believed, however you want to put
[17] that, and I believe that they had hoped and
[18] wished that somebody had made this change in
[19] the policy. It wasn't there and that's evident
[20] from everything that we have and was never
[21] asked for, but I did not want to come across to
[22] AIG that I felt like she was trying to out and
[23] out lie because I didn't believe that she was
[24] trying to do just that.
[25] Q: Did you know or as you sit here today do you

Page 124

[1] know whether there was ever transition training
[2] coverage on that plane after it was purchased
[3] by Scott and Sarah?
[4] A: No.
[5] Q: You don't know?
[6] A: No, there is no transition coverage on that
[7] airplane except to put Scott in the airplane,
[8] whatever that was.
[9] Q: But you've testified there aren't any records
[10] of that and you weren't involved in talking —
[11] A: Any time you jump on another airplane you
[12] transition to another airplane so that's the
[13] definition of the term. He's transitioned in
[14] the airplane. Is he transitioning others or in
[15] the business of transitioning others, no, and
[16] I'll testify to the fact that that was never
[17] part of the policy nor part of any of the
[18] conversations.
[19] Q: Now going on, the sentence that appears in the
[20] next paragraph: They may have assumed since
[21] commercial and ag use, what difference is the
[22] training especially since transition for Scott
[23] was approved. Now, do you —
[24] A: I think you're taking that out of context.
[25] Q: I'm taking the sentence in its entirety, am I

Page 125

[1] not?

[2] A: But the paragraph is what clearly sets that
[3] sentence up.

[4] Q: Well, I'm going to ask the questions my way.
[5] It says transition for Scott was approved. Did
[6] you give that approval?

[7] A: No, the insurance companies give the approval.

[8] Q: Do you know that the insurance company talked
[9] directly to Scott?

[10] A: No, they talked to us and we passed it on to
[11] our client.

[12] Q: Did you give that approval to Scott acting as
[13] the agent for the insurance company?

[14] A: I am not an agent for the insurance company.
[15] I'm an agent for my client.

[16] Q: Did you give that approval to Scott?

[17] A: I don't know.

[18] Q: Do you know of anybody else who gave that
[19] approval to Scott?

[20] A: I don't know.

[21] Q: Do you know how that approval came into being
[22] then, whether it was an endorsement to the
[23] policy or whether it was an interpretation of
[24] the existing policy language?

[25] A: No, I don't.

Page 126

[1] Q: Now if — let's make the assumption that
[2] transition training for Scott was approved
[3] although it doesn't appear in the policy or in
[4] your file, would that be an interpretation of
[5] the policy by AIG?

[6] A: I'm sorry. I was still thinking about this.

[7] Q: We've previously been down the road of how we
[8] know what coverage there is under a policy.
[9] There is either going to be an endorsement in
[10] the policy or there is going to be language in
[11] the policy itself.

[12] A: Correct.

[13] Q: And since we know we don't have an endorsement
[14] on this policy for transition training for
[15] Scott and we also know that Scott was covered
[16] for transition training, that would have to be
[17] coverage under the existing policy, would it
[18] not?

[19] A: Yes.

[20] Q: And coverage under the existing policy for that
[21] purpose or that interpretation would have come
[22] from AIG? Well, did it come from you?

[23] A: Restate it, please.

[24] Q: Did you interpret the policy so that it
[25] provided turbine transition training for Scott?

Page 127

[1] A: No.

[2] Q: So the interpretation that the policy would
[3] include coverage for turbine transition
[4] training for Scott came from AIG; correct?

[5] A: No, and I don't — I'm absolutely losing the
[6] track that you're trying to —

[7] Q: I will ask you to assume as based upon your
[8] memo here and information I've received from
[9] Scott that there was turbine transition
[10] training for him under this policy after the
[11] plane was covered.

[12] A: Under this policy after the plane was covered.

[13] Q: That's right.

[14] A: My understanding of the note as I saw it was he
[15] had already been through turbine transition
[16] training. I do not know whether that was prior
[17] to his picking up the airplane or he had been
[18] transitioned by Harold after he bought the
[19] airplane.

[20] Q: If we assume that he was transitioned to by
[21] Harold after he bought the plane and that there
[22] was coverage for that transition and that that
[23] was the result of the interpretation of the
[24] policy since there are no endorsements, you
[25] have testified that you didn't give that

Page 128

[1] interpretation, therefore the interpretation
[2] could only come from AIG; is that right?

[3] A: No. Page 42.

[4] Q: Who else could have provided the interpretation
[5] for Scott that there would be coverage for
[6] transition training for him under this policy?

[7] A: Well, you keep using the term interpretation.
[8] We don't use that term, interpretation. I can
[9] tell you based on Page 42 of Angie's note to
[10] Mary Beth —

[11] Q: You're talking about February 12, 2002, page 42
[12] of Exhibit E.

[13] A: The insured is thinking of purchasing a 503 for
[14] ag use only. Scott has been through Harold
[15] Miller's turbine transition course and has 40
[16] turbine hours now. In addition, he attended
[17] the Covington PT-6 course. So based on the
[18] information I'm seeing here, he had been
[19] through Harold Miller's course, had transition
[20] training and was purchasing the airplane for ag
[21] use only in his business.

[22] Q: Now, do you know as appears in your memo page
[23] 121 and 122 whether there was specifically
[24] transition training coverage for Scott after he
[25] bought the aircraft?

National Union Fire Company  v.
Pontiac Flying Services, Inc.

JAMES RANDALL HARDY
July 15, 2004

---

Page 129

[1] **A:** I do not know of any transition training for
[2] Scott after he bought the aircraft.
[3] **Q:** If the transition — I'm talking about
[4] transition training coverage. Do you know
[5] whether there was any transition training
[6] coverage for Scott after he bought the
[7] aircraft?
[8] **A:** Your question is not —
[9] **Q:** I mean you can answer yes or no, I do know or I
[10] don't know whether there was any transition
[11] training coverage for Scott.
[12] **A:** If I answer yes, it answers the question — it
[13] answers your question that's asked improperly.
[14] **MS. BARON:** If you don't understand
[15] his question or there's something about it
[16] that isn't clear, just let him know.
[17] **A:** Well, when you say that for Scott transition
[18] training, are you talking about for Scott to
[19] receive transition training or for Scott to be
[20] able to give transition training?
[21]        **BY MR. MUELLER:**
[22] **Q:** I'm talking about for Scott to receive
[23] transition training. Come back and look at
[24] page 121.
[25] **A:** I understand. Any time an individual buys an

Page 130

[1] airplane, my understanding of the memo I read
[2] to you was that he had received this training
[3] prior to that. After he buys the airplane and
[4] we name him as a pilot on the policy based
[5] upon — or we add the airplane to the policy
[6] with him being a pilot on that policy, so we
[7] added the airplane to the policy, Scott was an
[8] approved pilot on the policy already. Any
[9] transition training or any training
[10] additionally done after he buys the airplane
[11] could or could not have been done, I don't
[12] really know. I'm assuming that he wanted to go
[13] out and get comfortable in the airplane so he
[14] did some more training.
[15] **Q:** Would there have been the coverage then as you
[16] refer to on page 121, transition training
[17] coverage for Scott to receive additional
[18] training in the plane from another pilot?
[19] **A:** No.
[20] **Q:** So you don't know what Sarah is referring to
[21] there when she says —
[22] **A:** His transition training was to get
[23] transitioning himself. You're using the term
[24] transitioning. That would be in his case we
[25] added the airplane with one seat — if that's

Page 131

[1] what you're trying to get to, one seat. He
[2] knows it was one seat. We did not have
[3] additional seats in the airplane covered, so
[4] transitioning could be himself going up by
[5] himself getting comfortable in the airplane or
[6] it could just be additional training.
[7] **Q:** If — and I'm going to ask you to indulge in a
[8] couple of assumptions since you have no
[9] recollection of being involved specifically in
[10] the matter. If the coverage was issued to
[11] Scott for the plane conditioned upon his
[12] receiving additional turbine transition
[13] training in that plane by Harold Miller or by
[14] Rick Lucente, was there coverage for that
[15] additional training?
[16] **MS. BARON:** Object to the
[17] hypothetical nature of the question, but
[18] you can answer if you can.
[19] **A:** That's a loaded question again —
[20]        **BY MR. MUELLER:**
[21] **Q:** I know.
[22] **A:** — in that there is coverage for the aircraft
[23] once it's added to the policy for a pilot to be
[24] in that aircraft. Is there coverage for an
[25] additional seat in that airplane, no.

Page 132

[1] **Q:** So it is your testimony that there would be no
[2] transition a turbine training coverage for
[3] Scott —
[4] **A:** No.
[5] **Q:** — after he purchased the plane —
[6] **A:** That is not my statement, no.
[7] **Q:** Where would there be turbine transition
[8] training coverage for Scott after the effective
[9] date of the policy, March 1, 2002?
[10] **MR. BANOVETZ:** I'm just going to
[11] object to the continued use of the term
[12] coverage for Scott. Form of the question
[13] because it misstates the way the coverage
[14] is written.
[15] **MR. MUELLER:** What you're saying is
[16] the coverage would be on the plane.
[17] **MR. BANOVETZ:** Yes.
[18]        **BY MR. MUELLER:**
[19] **Q:** Now if there were transition training coverage
[20] on the plane that included training for Scott
[21] after the plane was purchased, are you aware of
[22] that?
[23] **A:** No. You asked me if I was aware of it. The
[24] answer to the question is no. I know exactly
[25] what the coverage was.

---