E-FILED
Friday, 06 October, 2006 12:00:21 PM
Clerk, U.S. District Court, ILCD

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

NATIONAL UNION FIRE
COMPANY OF PITTSBURGH,
PA.,

    Plaintiff,

vs.

PONTIAC FLYING SERVICES,
INC.,

    Defendant and   No. 03-1288
    Third Party
    Plaintiff,

vs.

HARDY AVIATION
INSURANCE, INC.,

    Third Party
    Defendant.

    The deposition of BRENDAN T. BOLGER, CPCU, called by the Defendant/Third Party Plaintiff Pontiac Flying Service, Inc., for examination, taken pursuant to notice, taken before CARYL L. HARDY, RPR, a notary public within and for the County of Cook and State of Illinois, at 10 South LaSalle Street, 16th Floor, Chicago, Illinois, on the 16th day of December, A.D., 2005, commencing at 9:17 a.m.

**Page 2**

APPEARANCES:

CASSIDAY & MUELLER,
416 Main Street
Suite 323
Peoria, Illinois 61602
(309) 676-0591
BY: MR. DAVID B. MUELLER,

Appeared on behalf of the Defendant/Third Party Plaintiff Pontiac Flying Services, Inc.;

CLAUSEN MILLER, PC,
10 South LaSalle Street
16th Floor
Chicago, Illinois 60603
(312) 855-1010
BY: MS. DIANE M. BARON,

Appeared on behalf of the Third Party Defendant Hardy Aviation Insurance, Inc.;

CLIFFORD LAW OFFICES,
120 North LaSalle Street
Suite 3100
Chicago, Illinois 60602
(312) 899-9090
BY: MR. MICHAEL KRZAK,

Appeared on behalf of the Estate of Neil Webster.

**Page 3**

I N D E X

EXAMINATION OF BRENDAN T. BOLGER, CPCU   PAGE

By Mr. Mueller.............................. 4
By Mr. Krzak...............................114
By Mr. Mueller.............................127
By Ms. Baron...............................128

EXHIBITS MARKED

Bolger Deposition Exhibit A............... 8
Bolger Deposition Exhibit B............... 57

RECEIVED

JAN - 5 2006

CASSIDY & MUELLER

**Page 4**

    (The witness was duly sworn.)
    MR. MUELLER: Let the record show that this is the deposition of Brendan Bolger who has been -- is it Bolger?
    THE WITNESS: Bolger.
    MR. MUELLER: And I'll try to get that right -- who has been identified as an expert witness in this case on behalf of the Third Party Defendant, Hardy Insurance Agency.
    BRENDAN T. BOLGER, CPCU, called as a witness herein, having been first duly sworn, was examined upon oral interrogatories, and testified as follows:
    DIRECT EXAMINATION
BY MR. MUELLER:
    Q.   Brendan, have you been deposed before?
    A.   I have.
    Q.   And I notice from your CV and disclosure of opinions that, in fact, you have testified in a number of cases --
    A.   That is correct.
    Q.   -- is that accurate?
    A.   That is correct.
    Q.   And your current business is that of an

Page 5

```
1    opinionator; in other words, you render opinions
2    and testify as to your opinions?
3         A.   That is part of my business, yes.
4         Q.   And what are other parts of the business?
5         A.   Insurance consulting and reviewing
6    insurance programs of various entities.
7         Q.   At the present time, what is the breakdown
8    percentage-wise between those two activities:
9    Insurance consultant and opinionator?
10        A.   I would say opinion is.
11        Q.   Opining?
12        A.   Opining, there's the word.  Opining has
13   probably been the most active case now.  I've been
14   retired from the regular business for about
15   12 years and only do the consulting on an as-come
16   basis.
17        Q.   Now, are you listed in any of the witness
18   identification services or the like as someone who
19   is an expert witness in insurance matters?
20        A.   To my surprise, I've determined this
21   morning that I am.
22        Q.   And by which of them, if you know?
23        A.   Diane says Defense Research Institute?
24        MS. BARON:  Just for the record, DRI,
```

Page 6

```
1    Defense Research Institute, that's correct.
2         MR. MUELLER:  Those rascals on the defense
3    side.  I'm a DRI member.  I can say that.  I'm one
4    of those rascals, too.
5    BY MR. MUELLER:
6         Q.   How did you happen to be contacted in this
7    case?
8         A.   Diane found me in the Defense -- the DRI
9    listing and called me.
10        Q.   And how long ago was that?
11        A.   October 25th.
12        Q.   Of which year?
13        A.   This year.
14        Q.   So you've been involved in this case for
15   less than two months?
16        A.   That is correct.
17        Q.   And in contacting you, what did she tell
18   you about the case in that initial conversation?
19        A.   Basically the parties involved and that it
20   involved an aviation insurance policy.
21        Q.   Now, when you have been an opinionator in
22   cases, have you, first of all, testified on behalf
23   of plaintiffs, as well as defendants?
24        A.   I have.
```

Page 7

```
1         Q.   What has the breakdown on that been?
2         A.   I want to say it's probably 60 or
3    70 percent defense.
4         Q.   Have you testified -- let me draw back and
5    ask it this way.
6              What types of cases have you testified in?
7         A.   If you review my CV, it will be shown on
8    the list of cases.
9         Q.   This case involves the errors and
10   omissions of an insurance broker or producer.  Is
11   that your understanding?
12        A.   That is correct.
13        Q.   And if you would look at Exhibit A, can
14   you go through that exhibit with a pen and put a
15   checkmark beside each of the cases that involved
16   the errors and omissions of an insurance broker or
17   a producer?
18        A.   You've given me the wrong exhibit.
19        MS. BARON:  A is his report as opposed to
20   his CV.
21        MR. MUELLER:  I thought they were all
22   together.  This one has got them tabled together.
23        MS. BARON:  Oh.
24        THE WITNESS:  This has only got my
```

Page 8

```
1    opinion.
2         MR. MUELLER:  Well, I'll swap out As with
3    you.
4         THE WITNESS:  Okay.
5         MR. MUELLER:  Put the checkmark on that
6    one.
7              While he's doing that, I will ask the
8    court reporter to put an Exhibit A on that one that
9    seems to be complete.
10             (Bolger Deposition Exhibit A marked
11              for identification, 12-16-05.)
12   BY THE WITNESS:
13        A.   I believe that is it, the cases involving
14   brokers duties.
15        MR. MUELLER:  Now I've gummed this up.
16   You're going to have to put an Exhibit A on this
17   one because he has marked on it, if you would.
18        THE WITNESS:  Oh.
19   BY MR. MUELLER:
20        Q.   When I use the term broker, you understand
21   what that means?
22        A.   I believe I do.
23        Q.   Okay.  How do you define a broker?
24        A.   A broker can also be an agent.  However, a
```

**9**

```
 1   broker's duties are to his client, who is the
 2   purchaser of the insurance through his services.
 3       Q.   So when you have noted with a checkmark
 4   here in response to my question regarding brokers,
 5   that's the definition that you've used?
 6       A.   Yes.
 7       Q.   The duty of the broker then is to the
 8   client or the customer, the party purchasing the
 9   insurance?
10       A.   In most cases, yes.  There is one case
11   involved here where I was involved with a
12   general -- or an MGA, managing general agent,
13   versus their duties to a retail broker.  I was
14   treating that as a broker's duties also.
15       Q.   Which case would that be on this list?
16       A.   Well, actually, there are two cases
17   involved.  Cory and Associates versus Insurance
18   Brokers Service, Inc.
19       Q.   Where is that located on the list?
20       A.   That's in the year 2000.
21       Q.   That's C-o-r-y?
22       A.   C-o-r-y.
23       Q.   And that's the MGA?
24       A.   That's the surplus lines broker.  It's --
```

**10**

```
 1   either terminology would apply to it.
 2       Q.   Okay.  What's the other one?
 3       A.   The other was -- where the heck is it now?
 4   Oh.  The last one on that same page, Whitehall Bank
 5   versus -- I can't remember -- Insurance Brokers
 6   Services.
 7       Q.   And does that also involve an MGA or
 8   managing general agent?
 9       A.   They're both the same cases, if you will.
10   The first case was a case between the -- well, the
11   first one is the -- Cory and Associates was the
12   broker versus the retail -- the surplus lines
13   broker versus the retail broker.
14            The second case was the subject of the
15   insurance where the retail broker was supposed to
16   purchase, from the wholesale broker, property
17   insurance.
18       Q.   How would you define the relationship in
19   this case?
20       A.   This case is an insurance purchaser,
21   Pontiac Flying Service, with their insurance
22   broker, Hardy.
23       Q.   And is the term, at least in Illinois,
24   broker and producer the same?
```

**11**

```
 1       A.   Broker, producer, agent are all licensed
 2   as a producer.
 3       Q.   And are you familiar with the standard of
 4   care of a broker or producer in the state of
 5   Illinois?
 6       A.   I believe I am, yes.
 7       Q.   And that is defined by statute; is it not?
 8       A.   I don't recall.
 9       Q.   Well, are you familiar with section 2201
10   of the Illinois Code of Civil Procedure?
11       A.   I'm probably aware of it, but I'm not sure
12   that I am.
13       Q.   Okay.  Since you're telling me you're
14   probably aware of it, would you give us what you
15   understand to be the statutory duty of an insurance
16   broker or a producer in this state?
17       A.   Well, I'm not about to try and quote the
18   actual law, but the duties of a broker to an
19   insured are; number one, understanding the risk
20   that the broker -- the insured wishes to insure.
21       Q.   So what you're doing, you're not telling
22   us what you believe the statute to say?
23       A.   No.
24       Q.   You're telling us what you understand the
```

**12**

```
 1   standard of care based upon your expertise --
 2       A.   That is correct.
 3       Q.   -- to be?
 4       A.   That is correct.
 5       Q.   And what you're giving us is the standard
 6   of care, based upon your experience, you understand
 7   to exist between a broker producer and a
 8   prospective insured?
 9       A.   That is correct.
10       Q.   Okay.  Now let's take it from the top,
11   give us each of the elements.  What's the first
12   there you were starting to talk about?
13       A.   Understand the risk that is to be insured
14   by conversations with the purchaser of the
15   insurance, contacting underwriters to arrange such
16   insurance.
17       Q.   You're running ahead of me.  Since this is
18   being taken down, let's pause for a moment and tell
19   us when you use the term underwriters to whom
20   you're referring.
21       A.   Insurance companies, people who take risk.
22       Q.   Now, the underwriter acts in what capacity
23   for the insurance company?
24       A.   He acts as the acceptor of exposures,
```

13

1  identifies the exposures that he is concerned
2  about, and actually agrees to underwrite the risk.
3      Q.   Another term, he's the one that -- the
4  underwriter is the one that binds the coverage?
5      A.   Yes.  He would be.
6      Q.   And he binds the coverage --
7      A.   Let me add to that a little bit.
8           There is also a question of agency that
9  comes in.  Agents are also allowed under agency
10 contract to bind coverage.  So the underwriter
11 isn't the only man who can underwrite.
12     Q.   I didn't mean to be exclusive in that, but
13 in the setting where we're dealing with the broker
14 and the underwriter, the broker doesn't have the
15 authority to bind the coverage; that comes from the
16 underwriter, correct?
17     A.   That is correct.
18     Q.   So once the underwriter understands the
19 risk or believes that he understands the risk, he
20 can then bind the insurance company to provide
21 coverage for that risk in exchange for a specified
22 premium?
23     A.   That is correct.
24     Q.   And I see from your CV that you are a

14

1  chartered property and casualty underwriter and
2  have been since 1960?
3      A.   That is correct.
4      Q.   What is that?
5      A.   It's a professional degree that is granted
6  after a certain amount of study and testing.
7      Q.   Is it something that you have to keep
8  current; in other words --
9      A.   Yes.
10     Q.   Are you retested, or are you simply passed
11 the first time and then pay your dues, so to speak?
12     A.   You have a continuing education
13 requirement, very similar to that of the licensing
14 laws of the state of Illinois.
15     Q.   And when it says chartered, is that a
16 license issued by the state of Illinois?
17     A.   It is not.  It is just strict -- a
18 professional degree.
19     Q.   Have you ever had any licenses from the
20 state of Illinois regarding insurance?
21     A.   I have since the age of 13.
22     Q.   I'm curious, but I don't want to take the
23 time to figure out what you do at 13.
24     A.   Took insurance orders.

15

1      Q.   Are you presently licensed in any respect
2  regarding insurance in the state of Illinois?
3      A.   I am not.  I allowed it to expire this
4  year.
5      Q.   Now, chartered property and casualty
6  underwriter, by underwriter, is that what you've
7  just defined for us as one who works for the
8  insurance company and binds the risks?
9      A.   No.  It is purely a professional degree.
10 Underwriters have it.  Brokers have it.  It would
11 not -- teachers have it.  Professors have it.
12     Q.   So you have never actually been an
13 underwriter then, one of those people that bound
14 coverages?
15     A.   No.  I have been an underwriter.
16     Q.   And from looking at it here, I see that
17 was with the Hartford, 1956, 1957?
18     A.   That is correct, plus prior that I didn't
19 list.
20     Q.   Have you been an underwriter; that is,
21 someone who binds risk for an insurance company,
22 since 1957?
23     A.   No.  I would say not.
24     Q.   Have you ever been an agent as you have

16

1  described it; that is, a person who represents the
2  insurer and has the authority to bind risks?
3      A.   Yes, I have.
4      Q.   In which of these occupations here under
5  employment did you serve in that capacity?
6      A.   Well, both, I guess, Rollins, Burdick,
7  Hunter.
8           I guess it should be noted that in the
9  insurance business, brokers and agents are the same
10 thing at the same time.  This is very difficult for
11 people to understand.  But, in fact, there are
12 agents' agreements between insurance companies and
13 brokers.  There have been cases, very big cases
14 recently in the news, Mr. Spitzer in New York.
15     Q.   Spitzer, I think.
16     A.   Spitzer.  I didn't meet the man at all,
17 but he brought up the conflict of interest that it
18 is apparent in the relationships between brokers
19 and agents being the same time -- being the same
20 thing at the same time.  It is the way the business
21 has been done in the insurance industry for so many
22 years that it's really not a conflict, but it
23 allows for more freedom of arranging contracts on
24 behalf of clients.

# BRENDAN T. BOLGER, CPCU

17

1    Q.    I notice that you graduated from DePaul in
2    1954. What did you --
3    A.    I did not graduate.
4    Q.    I take it then that you've never been to
5    law school?
6    A.    No.
7    Q.    You don't have a law degree?
8    A.    No, sir.
9    Q.    You don't have the license to practice
10    law?
11    A.    No, sir.
12    Q.    You don't purport to hold yourself out as
13    a lawyer?
14    A.    No, sir.
15    Q.    You don't purport to make legal
16    interpretations or constructions then of contracts?
17    A.    No, sir, not as a lawyer.
18    Q.    And you don't purport then -- strike that.
19    Insurance policies are legal contracts;
20    are they not?
21    A.    They are.
22    Q.    And you've been in the business here since
23    you were 13. My Lord, that's, what, 60 years?
24    A.    Yeah.

18

1    Q.    So you're familiar with the fact then that
2    there are literally hundreds and hundreds of court
3    decisions interpreting insurance policies and what
4    they mean?
5    A.    Ad nauseam.
6    Q.    And based upon your knowledge and
7    experience, you understand that the meaning, the
8    legal significance, of a contract depends upon the
9    interpretation given to it by a court of law?
10    A.    That is correct, whether accurate or not.
11    Q.    Whether accurate or not. I've disagreed
12    with many and rejoiced over others.
13    Getting back to an agency, you understand
14    also that the term agent or agency is a legal term?
15    A.    It is. And I will not try to give a legal
16    opinion on what it means.
17    Q.    Nor would I ask you to.
18    A.    Very good.
19    Q.    Going back into what you've just told us
20    about a broker being an agent and an agent being a
21    broker under various circumstances, in that regard,
22    are you saying that an individual, depending upon
23    the contract that he has with an insurance company,
24    can be an agent for that insurance company and have

19

1    binding authority for that company and at the same
2    time, depending upon his relationship to another
3    insurance company, he may be a broker?
4    A.    Yes.
5    Q.    He can't bind that insurance company?
6    A.    Yes.
7    Q.    But he can go to them to see if they'll
8    insure a risk for his customer?
9    A.    That is correct.
10    Q.    And where Elliot Spitzer is having fun
11    with AIG and others is where the agent wearing the
12    broker's hat or the broker wearing the agent's hat
13    has actually cut a deal with the insurance company
14    potentially to the detriment of the insured?
15    A.    I believe that is one case in point.
16    Q.    That would be the AIG, wouldn't it?
17    A.    No, because AIG is not a broker or an
18    agent. It is an underwriter.
19    Q.    Okay. But they're swept into it because
20    of the relationship with which of the insurance
21    brokerages?
22    A.    Whichever one you wish to name.
23    Q.    All the big ones are in it?
24    A.    Yeah. It was a way of doing business.

20

1    Now, again, there -- that case is very
2    broad. Let me not go too far.
3    Q.    Well, I don't want to get into it any
4    further than we have. We've only got --
5    A.    I may have gone too far because some
6    brokers do some things and other brokers do other
7    things, and I don't want to make any broad-brush
8    assumption. There was one allegation that a broker
9    was using his power to feed particular insurance
10    companies business getting A, B, and C quotes.
11    Q.    And they were kicking back to him?
12    A.    And they were kicking back to him. That
13    is not proper brokerage activity.
14    Q.    Okay. Well, in this case, just so we draw
15    the lines, we have identified Randy Hardy and the
16    Hardy Insurance Agency as brokers for Pontiac
17    Flying Service?
18    A.    I agree.
19    Q.    And as brokers for Pontiac Flying Service,
20    they owed their duty to Pontiac Flying Service?
21    A.    I agree.
22    Q.    And in that regard, as we're going into
23    the standard of care, one component of that duty
24    was to understand the risk to be insured?

21

1    A.   That is correct.
2    Q.   Then the second was to contact the
3 underwriters, being the people with the insurance
4 company, to procure the coverage which they
5 understand that the insured should have?
6    A.   That is correct.
7    Q.   And then going on, what other components
8 of the duty would there be?
9    A.   To maintain -- or to understand the
10 qualifications of the insurance carrier financially
11 to bear this risk.
12    Q.   So you don't want to insure them with a
13 fly-by-night that's likely to go out of business?
14    A.   Even the non-fly-by-nights go out of
15 business.
16    Q.   We know some of them.
17    Okay. Assume that we have the broker who
18 first believes at least that he understands the
19 risk. Secondly, he contacts the underwriters to
20 arrange for the insurance which the insured should
21 have and is satisfied that the carrier is
22 financially capable of paying off in the event of a
23 loss.
24    What other obligations?

22

1    A.   To review the policy documents issued by
2 the carrier, to make sure that they do, in fact,
3 address the risk that he has placed.
4    Q.   Now, when you use the term risk that he
5 has placed, does he place the risk, or does he
6 simply come back to the insured and say to the
7 insured: Here's the coverage that I can get for
8 you that I believe responds to your needs, and it's
9 then up to the insured to accept or reject the
10 coverage?
11    A.   It's up to the insured to accept or reject
12 the coverage at the end of the day, yes.
13    Q.   So the broker doesn't really place the
14 risk; he makes the proposal, and the insured
15 accepts it, and the risk is then covered by the
16 insurance contract which is issued by the insurance
17 carrier?
18    A.   I believe that is accurate. I'm not
19 exactly sure what you're trying to get at.
20    Q.   Well, if I made it too clear, then I
21 couldn't sneak up on you.
22    A.   Okay.
23    Q.   Let's go on and make sure that we get all
24 of the elements that you believe the standard of

23

1 care to encompass.
2    We've now reviewed the policy, and we're
3 sure that the risk placed is what the insured
4 should have. Anything else?
5    A.   Continuing communication between the
6 insured and the underwriters to maintain the
7 program as it is required.
8    Q.   When you say as it is required, what are
9 you talking about requirement-wise? Where do we
10 get these requirements? Is that the requirement
11 for the insurance, or is that the requirement of
12 state law?
13    A.   It's a requirement of insurance.
14    Q.   In other words, to make sure that what the
15 insured is doing still is covered and making sure
16 that what the insurance company is offering covers
17 the insured's needs?
18    A.   Correct, as known.
19    Q.   And would you agree that -- strike that.
20    Is this standard of care the same for
21 personal lines as it is for commercial lines, or
22 are we only talking about one or the other?
23    A.   No. It would be the same in either case.
24 Know the risk, make sure it's placed with the

24

1 proper carrier.
2    Q.   Were you ever involved in the sale of
3 personal lines?
4    A.   Yes, I have.
5    Q.   And during what period or periods were you
6 selling personal lines?
7    A.   All my life.
8    Q.   Now, as far as commercial lines, that
9 would be business-type coverages?
10    A.   That is correct.
11    Q.   And insofar as keeping a continuing
12 communication with both the insured and the
13 insurer, that would include monitoring, in a
14 commercial lines case, the business of the insured
15 to see to it that he has the coverage that he
16 needs?
17    A.   The term monitoring is very broad. I
18 would expect an insured to contact me if he intends
19 to change his operations in any manner that I'm not
20 aware of.
21    Q.   Okay. Since you say it's a very broad
22 term, I want your definition and understanding of
23 the term monitor.
24    MS. BARON: I'm just going to object to

# BRENDAN T. BOLGER, CPCU

25

```
 1   the form of the question.
 2   BY THE WITNESS:
 3        A.   That's extremely broad.
 4        MS. BARON:  Monitor as to what?
 5   BY THE WITNESS:
 6        A.   Check his blood pressure?  I don't know.
 7   BY MR. MUELLER:
 8        Q.   Well, we're talking about it in the
 9   context of an insured's business.  And you said it
10   is broad to monitor the insured's business, and I
11   want to know what you understand that broad term to
12   mean.
13        A.   To understand what the man is doing as a
14   businessman.  In this case, Hardy Aviation asked
15   Pontiac what they were doing, and they were doing
16   chemical spraying, fertilizer spraying.
17        Q.   Well, I disavow the latter portion of the
18   answer, the definition that he gave as to
19   understand what the insured is doing as a
20   businessman without regard to its application in
21   this case specifically.
22            What other components, if any, are there
23   of the standard of care?
24        A.   Collection of premium, I assume; and
```

26

```
 1   return of premiums unearned when they are received
 2   from the underwriters.
 3        Q.   I've got one more for you.  How about
 4   transmitting the premiums then onto the insurance
 5   company so you keep the coverage in force?
 6        A.   That's part of the duty of collectioning,
 7   yes.  We assume that you do not play with the money
 8   as some of us have.
 9        Q.   In 1957 you went with Rollins, Burdick, &
10   Hunter.  I think I understand the business of
11   Rollins, Burdick, but for the record, tell us what
12   that involved.
13        A.   Rollins, Burdick, & Hunter were insurance
14   brokers to individuals and corporations covering
15   all lines of insurance.
16        Q.   When you say all lines of insurance,
17   you're including within that life insurance?
18        A.   Yes.
19        Q.   I see your degree is in the property and
20   casualty lines.
21        A.   That is correct.
22        Q.   Have you done any other type of insurance
23   sales or brokerage?
24        A.   I have.
```

27

```
 1        Q.   Have you done life insurance?
 2        A.   I have.
 3        Q.   Would you agree then that every line of
 4   insurance is different, has its own components?
 5        A.   Without a doubt.
 6        Q.   And that those components, if you want to
 7   look at the key core of them, is the risk that is
 8   insured?
 9        A.   That is correct.
10        Q.   Life insurance, it's a life; property
11   lines, it's the property itself against loss;
12   casualty lines, it's essentially liability and so
13   forth?
14        A.   In very broad terminology, yes.
15        Q.   Yes.  I'm trying to be broad.
16        A.   Yes, yeah.
17        Q.   And then within each of those broad-based
18   coverage lines, there are subcategories or
19   subcoverages?
20        A.   Very numerous.
21        Q.   And that's particularly true in liability
22   coverages?
23        A.   That's true.
24        Q.   Is workers' compensation a liability
```

28

```
 1   coverage?  Would you say that comes under casualty
 2   or not?
 3        A.   Workers' comp comes under casualty, but it
 4   is not truly a liability insurance.  It is -- there
 5   is a liability aspect to workers' comp called
 6   employers liability, a section of the policy.
 7        Q.   Your coverage B?
 8        A.   Coverage B.
 9            Coverage A is actually a -- a law -- a
10   response to a law requiring employees be
11   recompensed for their injuries.  And that is
12   usually run by each state.
13        Q.   And you have, as we've just discussed,
14   been in the insurance business and around all of
15   these lines of coverage now for approximately
16   60 years?
17        A.   That is correct.
18        Q.   And would you consider yourself to be an
19   expert in insurance coverage matters?
20        A.   In certain insurance coverage matters.
21        Q.   Tell us which ones you believe yourself to
22   be an expert.
23        A.   Casualty and property.  No life, no
24   accident, health.  I had experts to support me if I
```

**29**

1 needed them in those areas.
2   Q.   I do some product liability work, for
3 instance, cranes and things of that sort.  And the
4 rule is that if you are selling a product or
5 holding yourself out to sell it, that you are
6 viewed as an expert with respect to that product.
7       I'm going to ask you if you would agree
8 with that definition as it would relate to
9 insurance brokers, if they're selling an insurance
10 product line, that they are holding themself out to
11 be experts as to that product.
12   A.   I'm not sure that I would say they are
13 experts.  I think they're holding themselves out as
14 professionals with knowledge in these fields.  I'm
15 not sure the term expert would apply.
16   Q.   Okay.  Are you saying then that as far as
17 you're concerned, you're knowledgeable, but not an
18 expert?  Are you placing yourself in a higher
19 category than the person who is selling the
20 product?
21       MS. BARON:  I'm going to object to the
22 form of the question.
23       MR. MUELLER:  You may answer.
24

**30**

1 BY THE WITNESS:
2   A.   I'm having difficulty with the question.
3 BY MR. MUELLER:
4   Q.   Are you smarter and brighter than those
5 boys so you can say I am an expert but they
6 weren't?
7   A.   That sounds very self-serving, but I would
8 say yes, I believe my experience is broader than
9 theirs.
10   Q.   Would you agree -- and let's take it a
11 step down.
12       When you say that they are professionals,
13 what is meant by the term professional in your
14 parlance?
15   A.   They understand the risks that they're
16 trying to insure.  They understand, as best we can
17 without court decisions to change it, what the
18 policies will do.  And they understand what markets
19 to approach to arrange coverages as they are
20 required.
21   Q.   What do you mean by what markets to
22 approach?
23   A.   What insurance companies would be
24 approachable for this coverage.

**31**

1   Q.   Because they're working -- the broker is
2 working both ends, I take it?  He's got his client
3 that he has to understand what risk needs to be
4 insured, so he's working that end because no
5 client, no commission, no coverage.  And at the
6 same time, he's got to place the risk, so he's also
7 working the insurance company end?
8   A.   That is correct.
9   Q.   And we've already identified Randy Hardy
10 and the Hardy Insurance Agency here as the broker.
11       Now, who would be the underwriter in this
12 case, as you understand it?
13   A.   AIG.
14   Q.   And who with AIG?
15   A.   I don't recall seeing a name.
16   Q.   Okay.  I'll give it to you.  Mary Beth
17 Schwaegel?
18   A.   Okay.
19   Q.   Do you recall the name Mary Beth?
20   A.   I do remember Mary Beth's name, yeah.
21   Q.   And do you recall what I refer to as a
22 great balloon communication between them; that is,
23 the Houston, we've got a problem e-mail?
24   A.   I remember reading the e-mail, yes.

**32**

1   Q.   And that was, as you understood it, to the
2 underwriter, Mary Beth Schwaegel?
3   A.   That is correct.
4   Q.   And is it also your understanding that
5 Mary Beth Schwaegel was the underwriter at the time
6 the coverage for the AT-503 was bound on March the
7 1st of 2002?
8   A.   I believe she was.
9   Q.   And she would be the person then who would
10 have bound that coverage as we have gone through
11 it?
12   A.   Bound and issued endorsements.
13   Q.   Would it be accurate to say that if you
14 really want to know what a policy means from the
15 insurance company's perspective, you would ask the
16 underwriter what was intended when it was bound?
17   A.   Absolutely.
18   Q.   So in this case, if we wanted to know what
19 the coverage was that was intended by National
20 Union, we would look to Mary Beth Schwaegel?
21   A.   That is correct.
22   Q.   Because you're in this case as an expert
23 for -- and I'm not going to say representing, but
24 you're an expert in this case for the broker, Randy

33

1  Hardy, correct?

2      A.   I believe I'm an expert on his behalf,

3  yes.

4      Q.   Yes.  I mean, you're not here speaking on

5  behalf of National Union or AIG?

6      A.   No, I am not.

7      Q.   Have we now run through all of the

8  components of the standard of care owed by a broker

9  to an insured?

10     A.   I believe so.

11     Q.   I will come back to those serially in a

12  moment.

13          Why did you leave Rollins, Burdick, &

14  Hunter?

15     A.   Difference of opinion on salary.

16     Q.   On selling polices?

17     A.   On salary.

18     Q.   Oh, okay.

19     A.   I wanted more money.

20     Q.   Understandable.  We all do.

21     A.   That's right.

22     Q.   As senior vice-president when you left,

23  what were your day-to-day activities?

24     A.   Handling clients' requirements.  I was not

34

1  a corporate officer as such.

2      Q.   Who were the corporate officers then?  If

3  senior vice-president doesn't make it, who were the

4  boys?

5      A.   Well, again, you have corporate duties, or

6  you don't have corporate duties.  I had no

7  corporate duties or management authority at all.

8      Q.   So you were working and feeding the

9  fellows that owned the business?

10     A.   It was a corporation.

11     Q.   Okay.

12     A.   And I was a stockholder, so yeah.

13     Q.   When is the last time that you actually

14  called upon an insured -- let's say a business in

15  the capacity as a broker to attempt to place

16  coverage?

17     A.   1993.

18     Q.   And at that time you were with Arthur J.

19  Gallagher & Company?

20     A.   That is correct.

21     Q.   And what is the business of Arthur J.

22  Gallagher & Company?

23     A.   The same as Rollins, Burdick, & Hunter:

24  Insurance brokers, corporate and personal.

35

1      Q.   When is the last time that you made a cold

2  call on any prospective insured to see if you could

3  place business?

4      A.   '92 or '93.  I'm not sure which.

5      Q.   So throughout this period of time down to

6  1993, you were actually out there pounding the

7  bricks selling policies?

8      A.   That makes it sound a lot harder than it

9  was.

10     Q.   I don't mean to make it sound harder.  You

11  were making contacts with insureds in an attempt to

12  place policies.

13     A.   That is correct.

14     Q.   And why was it that you left Arthur J.

15  Gallagher & Company in 1993?

16     A.   I was dissatisfied with the support staff

17  at Gallagher; and as a result, decided just to

18  retire from the active business as a broker.

19     Q.   Dissatisfaction in what regard?

20     A.   The method of doing business at Gallagher

21  was completely different from that -- the way it

22  was done at Rollins, Burdick, Hunter, which became

23  Aon afterwards.  I'm not sure if that should come

24  out.  But when I left, that was known as Aon.

36

1      Q.   You mean Rollins, Burdick, & Hunter?

2      A.   Rollins, Burdick, Hunter became Aon

3  Corporation.

4      Q.   Okay.

5      A.   But at RBH/Aon, we had marketing

6  departments so that I would deal with the clients,

7  and in most cases, I would deal with the marketing

8  department.  But in a lot of cases, I would deal

9  directly with underwriters.  It would depend on the

10  account.

11     Q.   When you say the marketing department, is

12  that the component then you would -- as the broker

13  in compliance with the standard of care, you would

14  ascertain -- you would make the call on the

15  insured, you would ascertain the risk to be

16  covered, and then the underwriting -- or marketing

17  would have the responsibility of interfacing with

18  several insurance companies to place the business?

19     A.   That is correct.

20     Q.   Okay.  So that would, as you operate as a

21  broker, leave you purely in a relationship with the

22  insured?

23     A.   In that specific method of doing business,

24  yes, but I was a little bit different than most.  I

37

1  was allowed to go to underwriters myself. And I
2  did this primarily in the casualty liability, comp
3  umbrella, excess liability coverages.
4      Q.   Would you agree that in those situations
5  where your contact -- you were the person dealing
6  with the account that the responsibility, the buck
7  stopped with you?
8      A.   Yeah.
9      Q.   And is that, as you understand it in this
10 case, that the broker is Randy Hardy, and
11 therefore, the buck stops with Randy Hardy?
12     A.   I agree.
13     Q.   In the breadth of your experience when you
14 were actually involved in sales, did you sell any
15 aviation policies?
16     A.   I did.
17     Q.   And would you agree that aviation
18 insurance is a specialty line?
19     A.   It is.
20     Q.   And what is meant by specialty line so we
21 get it defined here for the record?
22     A.   It's a very limited marketplace, limited
23 to a specific type of liability exposure and hull
24 exposure.

38

1      Q.   When you say hull, that's a term of art,
2  isn't it? What does hull mean?
3      A.   That's the body of the aircraft itself.
4      Q.   So that's your property damage?
5      A.   That's your property damage. That is one
6  type of property damage.
7      Q.   Got you.
8      A.   It's not a liability coverage. It is --
9      Q.   Property?
10     A.   -- first party.
11     Q.   First person.
12          And were you ever involved in the
13 commercial lines aviation insurance?
14     A.   Again, we have to discuss commercial. Are
15 you talking United Airlines? Are you talking
16 corporations like Goodrich, Armco, Baxter, Roper
17 Corporation? I did all of their aviation
18 coverages.
19     Q.   United Airlines?
20     A.   No. Sorry. I made a comma there, and it
21 didn't come out.
22     Q.   That's it. When you're talking, it's not
23 like reading.
24          Let's get your experience in commercial

39

1  aviation insurance. What did you do?
2      A.   I placed aviation hull liability and
3  aviation products liability on behalf of various
4  clients. Leaving out the products liability and
5  just taking -- sticking with the hull liability
6  coverage, the clients were Goodrich, Armco --
7      Q.   Wait. Let's get these one at a time and
8  we'll go back.
9          Goodrich, that's the tire people?
10     A.   That is correct. Akron, Ohio.
11     Q.   Got you.
12          The next?
13     A.   Armco.
14     Q.   How is that spelled?
15     A.   A-r-m-c-o.
16     Q.   And what is Armco?
17     A.   Steel manufacturing, Middletown, Ohio.
18     Q.   Okay.
19     A.   Baxter Laboratories.
20     Q.   Baxter, the pharmaceutical people?
21     A.   Hospital supplies, sir. They are not
22 pharmaceuticals.
23     Q.   Okay.
24     A.   The -- DePaul -- not DePaul. Northwestern

40

1  University, but that was not aviation hull and
2  liability. That was a charter problem. They flew
3  their football teams and basketball teams around
4  the country on charter aircraft.
5      Q.   And were you acting as the broker for
6  Northwestern, or were you acting as the broker for
7  the charter company?
8      A.   Northwestern.
9      Q.   And did Northwestern own its -- a division
10 or subsidiary of Northwestern own the planes that
11 it would charter to the school?
12     A.   No, it did not.
13     Q.   So there would be a third party charterer
14 involved in this relationship?
15     A.   That is correct.
16     Q.   And was that hull coverage?
17     A.   No, purely liability.
18     Q.   Okay. Any others?
19     A.   Did I mention Roper Corporation?
20     Q.   Roper?
21     A.   R-o-p-e-r.
22     Q.   The ovens?
23     A.   Stoves, lawn mowers.
24     Q.   Okay.

**41**

```
1        A.   Crown Controls, New Berlin, Ohio.
2        Q.   Is that Crown with an E or just Crown with
3   an N?
4        A.   C-r-o-w-n.
5        Q.   What type of --
6        A.   Forklift trucks and aerial --
7        Q.   Hydraulic aerial work platforms?
8        A.   No.  The aerial TV antenna, rotating
9   systems.
10       Q.   Okay.  Got you.
11       A.   I mentioned Baxter.
12            Continental Bank here in the state of
13  Illinois.
14       Q.   Formerly.
15       A.   Formerly.
16            Theirs was a non-owned aviation.  They did
17  not have their own aircraft.
18       Q.   Let me ask this.  Did you ever act as a
19  broker on behalf of a fixed-base operator; that is,
20  somebody that was running an airport and doing the
21  chartering out of the airport?
22       A.   No, I did not.
23       Q.   Did you ever broker insurance on behalf of
24  someone who was chartering the planes -- owned the
```

**42**

```
1   planes and was chartering them either with or
2   without the pilots?
3        A.   I did not.
4        Q.   Would it be accurate to say then that your
5   involvement, both from the hull coverage and the
6   liability side, would be on behalf of people that
7   owned their planes or were using planes owned by
8   someone else?
9        A.   Yes.
10       Q.   And did you place hull coverage with
11  various insurers?
12       A.   I did.
13       Q.   And what companies write hull coverage?
14       A.   Very limited anymore.  You've got AIG,
15  which is a master name for things like National
16  Union.
17       Q.   Did you ever write any with National
18  Union, the Plaintiff in this case that brought us
19  all this misery?
20       A.   Yeah.
21       Q.   Anyone else?
22       A.   AIG, that's American Inter- -- pardon
23  me -- American -- what is it again?  I'm getting my
24  names screwed up.
```

**43**

```
1        Q.   US AIG?
2        A.   US AIG.  That's what it is.
3             Aviation Underwriters, Lloyd's market.
4        Q.   You're saying Aviation Underwriters is the
5   Lloyd's?
6        A.   No, no.  Aviation Underwriters is another
7   separate firm.
8        Q.   Okay.
9        A.   Similar to US AIG.
10            And Lloyd's Underwriters and --
11       Q.   Is there also a Phoenix?
12       A.   Yeah, but I'm not sure who they underwrite
13  with.  I don't think -- I think Phoenix is part of
14  Travelers or something like that.
15       Q.   In any event, I asked the ones that you
16  are aware of, and you've given us those?
17       A.   Right.
18       Q.   And you've testified previously that
19  aviation insurance is a specialty line.  And when
20  you're dealing with a specialty line, is it
21  incumbent upon a broker such as yourself or Randy
22  Hardy to be an expert regarding the policies that
23  you sell?
24            MS. BARON:  I'm going to object to the
```

**44**

```
1   form.
2   BY THE WITNESS:
3        A.   I have trouble with the word expert.
4   BY MR. MUELLER:
5        Q.   I know you do.  That's why I asked it.
6             Okay.  Let's put it this way.  To be a
7   professional with respect to the policies that you
8   sell.
9        A.   Professional and familiar with the
10  policies he sells.
11       Q.   Would you agree, at a minimum -- and we'll
12  put this down there as a floor below which you just
13  don't go.  You would expect that the broker in a
14  specialty line would understand the policies that
15  he's selling?
16       A.   He can understand the form of the
17  policies, but as to interpreting them, we're going
18  a little bit too far when you say does he
19  understand the policies.  How far do you mean by
20  understanding?  Can he interpret various conditions
21  of the policy?  Never.  He has to go to the
22  underwriter and say what did you mean.
23       Q.   But would you agree that it is his
24  responsibility before selling the policy -- whether
```

**45**

1 he gets his knowledge from having read the policy
2 or from having read Bibles on the policy or from
3 asking the underwriter, that before he sells that
4 product, he knows what it is that he's selling?
5     A.  I believe so.
6     Q.  And in the specialty line, that would mean
7 that he would be charged with knowing the
8 different -- I'll put it this way -- customs and
9 usages that relate to that specialty?
10     A.  I would say so, yes.
11     Q.  And if it's aviation, then he would be
12 charged with knowing the customs and usages that
13 relate to aviation insurance?
14     A.  I would say so, yes.
15     Q.  And either he knows them himself because
16 he's involved in aviation, or he learns them from
17 the insurance company or from a Bible or from
18 taking courses, correct?
19     A.  Wherever he gets his education.
20     Q.  But he's got to have the education?
21     A.  He's got to have some education.
22     Q.  And would you agree also that he has to
23 know the customs and usages in the aviation
24 industry from the perspective of the insureds so he

**46**

1 can understand what those risks are?
2     A.  I believe so.
3     Q.  So he's the guy that's in the middle; he's
4 got to know what the risks are through the customs
5 and usages from the insured, and then he's got to
6 know how the insurance company, the underwriter,
7 deals with those risks in the specialty line?
8     A.  I agree.
9     Q.  And would you agree also that the real
10 expert -- and I know you don't like the term, but I
11 think you'll agree with this one -- the real expert
12 on what a specialty line policy provides is going
13 to be the underwriter that prepares the policy and
14 puts the policy out into the marketplace?
15     A.  I'm sorry. I don't catch your question.
16     Q.  Okay. Would you agree that the expert
17 with respect to what a policy insures is going to
18 be the company that writes it?
19     A.  Yes.
20     Q.  And the voice of the company that writes
21 it vis-a-vis the broker is going to be the
22 underwriter?
23     MS. BARON:  Objection to form.
24     THE WITNESS:  Very good.

**47**

1 BY THE WITNESS:
2     A.  I think we're going a little bit too far
3 by saying the underwriter, Mary Beth, is the final.
4 BY MR. MUELLER:
5     Q.  Well, I didn't get to that. I was going
6 to get there on the next question.
7     A.  When you got to the underwriter, you got
8 to Mary Beth as far as I was concerned.
9     The company, if you're talking about the
10 company as an underwriter, yes.
11     Q.  Okay. But the voice, as far as the broker
12 is concerned, that he's dealing with when he wants
13 to understand if he's placing this insurance to
14 provide coverage for his client or customer, the
15 person he is relying on is the underwriter?
16     A.  The individual underwriter named Mary Beth
17 who is not an attorney.
18     Q.  That's right.
19     A.  Very good.
20     Q.  Okay. So in this case, Randy is relying
21 upon Mary Beth to understand the policy in the
22 context of the coverage which he's seeking?
23     A.  I believe so.
24     Q.  Let's come on down further and let me ask

**48**

1 you a couple of background questions.
2     What's your experience in aviation per se;
3 not just aviation insurance, but aviation? Are you
4 a pilot?
5     A.  No. My brother is and my son is.
6     Q.  Okay. Have you ever been a pilot?
7     A.  No. It scares the hell out of me.
8     Q.  I've got to ask the question. Do you fly
9 with them?
10     A.  Nope. I did with my brother. I've never
11 flown with my son, and he's very upset with that.
12     Q.  You try to discourage him from this?
13     A.  No. That was his choice.
14     Q.  Okay. Have you ever owned an airplane
15 yourself?
16     A.  No. My brother and my son have. I've
17 insured both of them.
18     Q.  Would it be accurate to say then that your
19 experience with aviation in and of itself is
20 limited to being a passenger on generally a
21 commercial airline and writing the aviation
22 policies that you've described?
23     A.  That's true.
24     Q.  And are you involved in agriculture?

# BRENDAN T. BOLGER, CPCU

49

```
1    A.   Not really, no.
2    Q.   Have you ever been a farmer?
3    A.   Nope.
4    Q.   Have you owned any farms?
5    A.   No.
6    Q.   Other than planting seeds in your garden
7  or seedlings in your garden, have you had anything
8  to do with agriculture?
9    A.   No.  It's limited to the seedlings in my
10 garden.
11   Q.   And as far as edible crops are concerned,
12 that would consist of whatever it is you planted
13 yourself, whether it's corn, beans, or turnips?
14   A.   I've done that as a victory garden during
15 World War II.  I was pretty young at the time.
16   Q.   Yes, but you were pretty young when you
17 started in the insurance business, too.
18   A.   True.
19   Q.   Would you accept that this case involves a
20 subspecialty of insurance known as agricultural
21 aviation insurance?
22   A.   Yes.
23   Q.   And did the same things apply in your
24 opinion to that subspecialty as applied to the
```

50

```
1  general specialty of aviation insurance?
2    A.   I believe so.
3    Q.   In other words, the insurance company that
4  writes the policies is charged with knowing the
5  customs and usages in agricultural aviation just
6  the same as they are if they're writing policies
7  for aviation?
8    A.   I would agree.
9    Q.   And that the broker, if he is selling
10 policies that are involved in agricultural
11 aviation, is charged with knowing the customs and
12 usages in agricultural aviation just as he's
13 charged with knowing customs and usages in
14 aviation?
15   A.   Yes.
16       MS. BARON:  Can we take a break?
17       MR. MUELLER:  Sure.
18            (A recess was taken.)
19 BY MR. MUELLER:
20   Q.   Brendan, I'll direct you back again to --
21 I think it's Exhibit A, which is your expert report
22 and CV.
23   A.   That's right.  You've got them combined.
24 Okay.
```

51

```
1    Q.   In any event, I'm going to refer you to
2  Exhibit A.  The first two pages are designated
3  expert report; is that correct?
4    A.   That is correct.
5    Q.   And that is your report as the expert in
6  this matter?
7    A.   That is correct.
8    Q.   And does this report set forth all of the
9  opinions which you have in this case?
10   A.   All that I've been requested.
11   Q.   Now let me ask you this.  What opinions
12 were you requested to give in this case?
13   A.   I was requested to review the depositions
14 and exhibits provided me, which are listed, the
15 documents that are listed, and give my opinion as
16 to the duties of Pontiac Flying Service to Hardy in
17 placing coverage on an AT-503.
18   Q.   Wait a minute.  Pontiac Flying is the
19 insured.  You were asked to opine that --
20   A.   That's right.
21   Q.   Have you ever been an insured?
22   A.   Did I -- did I say something wrong?
23       MS. BARON:  Maybe.  I think you said
24 duties of Pontiac to Hardy.
```

52

```
1        THE WITNESS:  Oh.  I reversed it.  I
2  reversed.
3        MS. BARON:  That's the problem.
4  BY MR. MUELLER:
5    Q.   I didn't think you were an insured.
6    A.   No, no, no.  I'm sorry.
7    Q.   Okay.  Duties of...
8    A.   Hardy Aviation Insurance in placing
9  coverage for Pontiac Flying Service.
10   Q.   And specifically in placing coverage on
11 the AT-503?
12   A.   That is correct.
13   Q.   And the AT-503, as you understand it, is a
14 dual cockpit turbine-driven aircraft?
15   A.   That is correct.
16   Q.   Made by Air Tractor?
17   A.   That's my understanding.
18   Q.   And in that connection, when you
19 understood the duties of Hardy, was that in the
20 context of the standard of care?
21   A.   Yes.
22   Q.   So you ran it through the standard of care
23 meat grinder that we've discussed here, all of the
24 elements?
```

53
```
 1      A.    To my knowledge, yes.
 2      Q.    Were you asked to render any other
 3  opinions other than whether or not Hardy met the
 4  standard of care in placing coverage for the
 5  AT-503?
 6      A.    I don't believe I have.
 7      Q.    And coverage for the AT-503, as you
 8  understand it, was placed on March 1st of 2002?
 9      A.    Early 2002.  I don't want to specify the
10  date.  I can't give the exact date.
11      Q.    Okay.  I think we'll all around the table
12  agree that the coverage was bound and effective
13  March 1st of 2002.
14      A.    Now that I think about it, yes.
15      Q.    And the dealings as they related to that
16  plane were generally between the Hardy Insurance
17  Agency and Pontiac Flying, Scott and Sarah
18  Peterson, during the month of February 2002 leading
19  up to the effective date?
20      A.    I agree.
21      Q.    Now, I direct your attention to the
22  documents reviewed section of your report.  In our
23  notice, we have asked you to bring your file with
24  you.  Have you done that?
```

54
```
 1      A.    I did.
 2      Q.    Okay.  And could we see that?
 3      A.    All the documents I have reviewed are in
 4  that folder.  And this is the rest of my file.
 5      Q.    Okay.
 6      A.    Which you can --
 7          MS. BARON:  Do you want to see the whole
 8  thing?
 9          MR. MUELLER:  I want to see the whole
10  thing.
11          MS. BARON:  You got it.
12          THE WITNESS:  Do want to see these
13  documents, too?
14          MR. MUELLER:  Yes.
15  BY MR. MUELLER:
16      Q.    Brendan, have you reviewed any documents
17  other than those which are listed on the first page
18  of your report?
19      A.    I have not.
20      Q.    Are you aware of any books, manuals,
21  treatises, rules, regulations which set forth the
22  standard of care which is owed by a broker to a
23  prospective insured?
24      A.    They are probably too numerous to even
```

55
```
 1  remember.
 2      Q.    Are there any that you consider to be
 3  authoritative?
 4      A.    No.
 5      Q.    Are we to believe then that the criteria
 6  of the standard of care that you have testified to
 7  are derived from your experience in the field as
 8  opposed to any specific written materials that you
 9  could direct us to?
10      A.    That is correct.
11      Q.    You have reviewed the depositions of --
12  and I'm looking at them -- James Randall Hardy --
13  that's Randy Hardy -- Angie Vance, Scott Peterson,
14  Sarah Peterson, Marshall Revis, the Third, and the
15  sworn statement of Scott and Sarah Peterson.
16      A.    Correct.
17      Q.    Have you reviewed any other sworn
18  materials or testimony?
19      A.    Not if it's -- not if it's not listed.
20      Q.    And were there any things in those
21  depositions, that sworn testimony that you believe
22  to be false or untrue?
23      A.    No.  Wait a minute.  There are -- I have
24  difficulty with the broad question of false
```

56
```
 1  questions, false or untrue.
 2      Q.    Let me put it this way.
 3      A.    Let me explain my problem.
 4      Q.    Okay.
 5      A.    I have nothing at all -- no problems at
 6  all with the testimonies of the Petersons or the
 7  Hardy Aviation group.  I don't agree completely
 8  with the statements of Marshall Revis.
 9      Q.    Okay.  So as far as you're concerned, what
10  was testified to by the Petersons and by Randy
11  Hardy and by Angie Vance, you can accept what they
12  said as true?
13      A.    I can.
14      Q.    And as I understand it, your opinions of
15  necessity are based solely then upon those
16  materials which are identified here and which you
17  received and reviewed between October 25th and the
18  date of your expert report?
19      A.    That is correct.
20      Q.    We received -- strike that.
21          Do you recall in Randy Hardy's deposition
22  that he testified to using and relying upon a
23  specific manual for the purposes of training his
24  employees in the field of aviation insurance?
```

# BRENDAN T. BOLGER, CPCU

57

1   A.   I believe there was some reference to some
2   material.
3   Q.   And I will represent to you that we have
4   been quite persistent and ultimately successful in
5   having that manual produced by none other than
6   Randy Hardy himself. And I will show you what has
7   been marked here -- and by agreement, we're simply
8   attaching the first page because counsel provided
9   me with a copy of it and would have it.
10        (Bolger Deposition Exhibit B marked
11        for identification, 12-16-05.)
12  BY MR. MUELLER:
13  Q.   Exhibit B, which is the first page of a
14  manual designated Aviation Insurance and
15  Introduction to General Aviation Insurance in the
16  United States by Darrell T. Elkins, Ph.D., through
17  J.A. Elkins Brothers Publishing Company, I would
18  ask if you have ever seen that manual.
19  A.   I have not.
20  Q.   And would you agree that if Randy Hardy
21  relies upon that manual for the standard of care
22  that Randy Hardy -- that his opinions as expressed
23  in his deposition should be consistent with it?
24       MS. BARON:  I'm going to object to the

58

1   form of the question. It misstates the record.
2   BY THE WITNESS:
3   A.   Having never seen this document before, I
4   have no idea.
5   BY MR. MUELLER:
6   Q.   Well, do you have any reason to say that
7   Randy Hardy is relying for his opinions and
8   testimony on the standard of care on the wrong
9   materials?
10  A.   I know nothing about these materials. How
11  can I testify?
12  Q.   Okay. Would you agree that for someone to
13  be holding themselves out as a professional, to use
14  your term, in the specialized and subspecialized
15  field of agriculture aviation insurance that one of
16  the sources of their expertise would be manuals and
17  specialized materials?
18  A.   Could be.
19  Q.   You can't comment on this one because you
20  haven't read it?
21  A.   That's correct.
22  Q.   Let me ask you this also. Have you talked
23  with anyone who is involved in the agricultural
24  aviation industry?

59

1   A.   No.
2   Q.   Would you agree that if you wanted to know
3   what the custom and usage and understanding in the
4   agricultural aviation industry is that that would
5   be a good source?
6   A.   Not necessarily.
7   Q.   Well, would you agree that the president
8   of the Agriculture Aviation Association would be
9   likely to know and understand the custom and usage
10  in that field?
11  A.   Not necessarily.
12  Q.   Okay. Let's put it this way. You've
13  testified that someone within a sub subspecialty
14  such as agricultural aviation insurance should know
15  the customs and the usages in that field in selling
16  policies for coverage of that specialty lines.
17  Would one of the sources of understanding customs
18  and usages be to actually talk to persons in that
19  specialized field?
20  A.   That would be one way of getting
21  information.
22  Q.   Can you think of any others?
23  A.   Not right off the bat.
24  Q.   Were you provided with the affidavits of

60

1   agricultural aviation representatives, people in
2   the businesses of flying these planes in the
3   agricultural applications?
4   A.   No.
5   Q.   So you haven't seen the Elkins manual, and
6   you haven't seen the -- you haven't seen any of the
7   affidavits of the agricultural applicators?
8   A.   No.
9   Q.   Do you believe that Randy Hardy satisfied
10  the standard of care in selling specialty lines
11  insurance by understanding the customs and usages
12  in that field?
13  A.   Restate that question.
14  Q.   Okay. Do you believe that Randy Hardy
15  satisfied the standard of care in selling specialty
16  line insurance in the field of agricultural
17  aviation by understanding the customs and usages
18  within that field as they apply to the coverages?
19  A.   I do.
20  Q.   And I've got the names here. You have not
21  read them. The affidavit of Frank Ousley, nor have
22  you talked to Frank Ousley, correct?
23  A.   Don't know the man.
24  Q.   You haven't talked to or read the

61

1  affidavit of Denny Stokes, S-t-o-k-e-s, of Stokes
2  Flying Service, past president of the National
3  Agricultural Aviation Association?
4       A.   I have not.
5       Q.   Or of Carey, C-a-r-e-y, Rucker,
6  R-u-c-k-e-r, the current vice-president of the
7  National Agricultural Aviation Association?
8       A.   It is not listed in the documents
9  reviewed.
10      Q.   The answer is you have not, right?
11      A.   That's what I said.
12      Q.   Okay.  I'm sorry.  I don't mean to belabor
13 the point.
14           Do you have an understanding as to who a
15 fellow by the name of Harold Miller was or is?
16      A.   I believe that he was the owner of the
17 AT-503 that was purchased by Scott Peterson.
18      Q.   And do you know what the business of
19 Harold Miller was?
20      A.   He was also in agricultural spraying, but
21 he was also in the schooling of pilots.
22      Q.   Since you've never flown either a
23 turbine-driven, nor a piston-driven plane, do you
24 understand the difference between the two?

62

1       A.   I understand that there is a difference in
2  their actions and how to fly them.
3       Q.   Now, you used the term school.  You're
4  familiar enough with what we're dealing with
5  coverage-wise in this case there's a training of a
6  specialized nature known as turbine transition
7  training?
8       A.   I'm aware of that.
9       Q.   And you're also aware, I take it, that
10 turbine transition training is transitioning
11 someone who is an experienced pilot in
12 piston-driven aircraft to the nuances of flying a
13 turbine-driven plane?
14      A.   That is correct.
15      Q.   So it is not a school in the sense of
16 starting someone out to make them a pilot, but
17 rather, it is taking a pilot and showing him how to
18 fly a different type of plane?
19      A.   It's a school, teaching him how to fly a
20 big turbine aircraft.
21      Q.   So you would define school as any type of
22 educational experience involving one or more
23 persons who are there to learn?  Would that be a
24 school from your perspective?

63

1       A.   Yes.
2       Q.   Small school, but...
3       A.   Oh, yeah.
4       Q.   And what was your understanding as to the
5  use that Harold Miller made of the AT-503 when he
6  owned the plane?
7       A.   My understanding is he used it for gypsy
8  moth spraying.  And I guess he did some education
9  with it, too.
10      Q.   In fact, he used that plane for turbine
11 transition training, correct?
12      A.   That is correct, yes.
13      Q.   And have you heard the name Rick Lucente,
14 L-u-c-e-n-t-e?
15      A.   I have.
16      Q.   And who is he?
17      A.   He is a pilot with a certain amount of
18 hours of experience in the AT-503.  And he was, in
19 fact, a pilot that Scott Peterson hired at times.
20      Q.   On --
21      A.   I believe he also was the pilot that
22 trained Scott Peterson.
23      Q.   And you understand then that Scott
24 Peterson received his turbine transition training

64

1  from Rick Lucente at Harold Miller's?
2       A.   That is my understanding, yes.
3       Q.   And also then subsequent or after
4  March 1st of 2002, he received additional turbine
5  transition training from Rick Lucente when Pontiac
6  Flying owned the plane, correct?
7       A.   That is correct.
8       Q.   And do you understand who the insurance
9  broker was for Harold Miller when Harold Miller
10 owned this plane?
11      A.   I believe it was Hardy Aviation.
12      Q.   And did Hardy Aviation ever show you the
13 coverage or coverages that were in force and effect
14 for the AT-503 when it was in the possession of
15 Harold Miller?
16      A.   Never did.
17      Q.   Would that be important for you to know
18 and understand what type of coverages there were on
19 that plane if you were a broker being asked to
20 provide coverage for that plane?
21           MS. BARON:  Objection to the form of the
22 question.  Coverage for who?
23           THE WITNESS:  Yeah.
24           MR. MUELLER:  Coverage for the purchaser

# BRENDAN T. BOLGER, CPCU

**65**

1 of that plane from Harold Miller.
2 BY THE WITNESS:
3    A.   No.
4 BY MR. MUELLER:
5    Q.   Well, wouldn't it be of benefit to a
6 broker to know what type of coverages are available
7 for the uses that Harold Miller was making of the
8 plane?
9    A.   Why?  It is not the same service that
10 Pontiac was going to use.
11    Q.   And wouldn't it be a short reference if
12 you were the broker looking to the underwriting
13 side and say:  Hey, what coverage can we get out
14 there for it to know who was already covering that
15 plane?
16    A.   No.
17    Q.   Wouldn't it keep you from having to do the
18 work of going back through all of the underwriters
19 to say:  Hey, we've got the same plane, the same
20 uses on that plane; how about carrying the coverage
21 over?
22    A.   I disagree with what you just said.  You
23 said the same uses.  It's the same plane.  I'll
24 give you that.

**66**

1    Q.   Okay.
2    A.   But the same uses?  No.  We were going to
3 go into agricultural spraying using an AT-503 for
4 gypsy moth spraying.  That's what Sarah Peterson
5 and Scott Peterson were going to do.
6    Q.   Oh.  So what you're saying is that there
7 might have been other coverage or coverage
8 available for all the uses that Harold Miller was
9 making of the plane, but you wouldn't be interested
10 in looking into those if you were the broker
11 because it wasn't going to be used for those?
12    A.   That is correct.
13    Q.   In arriving at your opinions, I want to
14 make absolutely sure and certain beyond all
15 peradventure that I know everything that you have
16 relied upon.
17         Now, we know all of the documents that you
18 have reviewed are set forth on your expert report.
19 Have you received any information from anyone that
20 has also gone into your mental computer in arriving
21 at your opinions?
22    A.   Not to my knowledge.
23    Q.   You have never, as I understand it then,
24 had a separate conversation with Randy Hardy about

**67**

1 any of these matters?
2    A.   Never met the man.
3    Q.   Or talked to him over the telephone?
4    A.   Never talked to him on the phone.
5    Q.   And the same would be true of Angie Vance?
6    A.   That is true.
7    Q.   And there aren't any third party witnesses
8 out there that have been blowing smoke to you?
9    A.   I know Marshall Revis.
10    Q.   Okay.  But as far as this case is
11 concerned, there aren't any third party witnesses
12 out there that you've talked to or upon whom you
13 rely in any respect for your opinions?
14    A.   Not at all.
15    Q.   Now, you've testified that you haven't
16 read the Elkins manual and that you haven't read
17 any materials that you would consider authoritative
18 in defining the standard of care particularly as it
19 would apply in this case.  Is that correct?
20    A.   Let me step back.  The standards of care,
21 I have read all kinds of documents in my
22 experience.
23    Q.   But none that you can point out to us and
24 say:  Here, go to this material?

**68**

1    A.   No, no, not at all.
2    Q.   And you've also testified that you believe
3 that what Randy Hardy testified to to be true?
4    A.   I believe that.
5    Q.   Now, I've got some questions here for you
6 that I want you to take your time thinking about,
7 as I'm sure you have the other questions.  I'm
8 going to ask if you would agree with these
9 statements or disagree with these statements, and
10 then we'll deal with them as we go.
11         Would you agree with the statement that it
12 is the responsibility of the insurance broker to
13 find out what use is to be made of a plane when a
14 request is made to insure it?
15    A.   I do.
16    Q.   So let's put this hypothetically.
17         Assume that you're back in your halcion
18 days as a broker and you've -- and I've come to you
19 and I have said that I'm going into the flight
20 business and I just bought an AT-503 --
21    A.   I'm sorry.  I lost -- can we start again?
22 I've lost track.  You've got me getting involved
23 here.
24    Q.   I come to you as a broker.  You're hanging

69

1  your shingle out as a broker, and I say to you:
2  I'm just getting into the fixed-based operator
3  business and I have bought an airplane here and I
4  want insurance for it.
5       Would you be able, just based on that
6  information, to go out and get the policies that I
7  might need either for whole coverage or liability?
8       A.   No.
9       Q.   So what would you do?
10      A.   What are you going to do with the
11  airplane?
12      Q.   You would ask me what I was going to do
13  with the airplane?
14      A.   Yeah.
15      Q.   And would you agree that the standard of
16  care requires that you ask what I'm going to do
17  with the airplane?
18      A.   Right.
19      Q.   And that same standard of care would apply
20  to Randy Hardy.  He would be charged with asking
21  Scott Peterson:  What are you going to do with that
22  airplane?
23      A.   If Scott Peterson told Randy Hardy, I'd
24  want to --

70

1       Q.   Wait.  Yes or no?  Would he be charged
2  with asking?
3       A.   I will not answer the question.
4       Q.   What?
5       A.   I will not answer the question in that
6  order.
7            MS. BARON:  Yes.  I'll just object.  Let
8  the witness answer the question.
9            MR. MUELLER:  He has to answer the
10  question that I posed.
11           MS. BARON:  He's trying to.
12           MR. MUELLER:  Well, let me backtrack just
13  a minute then.
14  BY MR. MUELLER:
15      Q.   Would you also agree with the statement
16  that knowing the use of the aircraft is the
17  responsibility of the broker?
18      A.   Yes.
19      Q.   Would you also agree with the statement
20  that the broker absolutely has the responsibility
21  of finding out what use is to be made of an
22  aircraft before insuring it?
23      A.   Yes.
24      Q.   All those things are necessary to satisfy

71

1  the standard of care?
2       A.   That is correct.
3       Q.   And in this particular case, do you know
4  whether Randy -- okay.  Let's go back before that.
5            When Randy Hardy had the insurance
6  coverage on the AT-503, would you agree that he
7  knew that the AT-503 was being used by Harold
8  Miller for turbine transition training?
9       A.   I believe he did.
10      Q.   And would you agree that he knew that that
11  turbine transition training was being given by Rick
12  Lucente?
13      A.   I believe he knew that.
14      Q.   And would you agree that at the time that
15  Pontiac Flying acquired the plane that Randy Hardy
16  knew that Scott Peterson would thereafter be
17  receiving turbine transition training from Rick
18  Lucente?
19      A.   I agree.
20      Q.   And that that turbine transition training
21  would be received by Scott Peterson after coverage
22  had been bound on the National Union policy?
23      A.   I agree.
24      Q.   And would you agree that the underwriter,

72

1  Mary Beth Schwaegel, knew and, in fact, required
2  that Scott Peterson receive turbine transition
3  training after the coverage had been bound?
4            MS. BARON:  I'll object to the form.
5  BY THE WITNESS:
6       A.   I agree.
7  BY MR. MUELLER:
8       Q.   And would you agree that Mary Beth
9  Schwaegel knew that Scott Peterson was to receive
10  turbine transition training from Rick Lucente after
11  March 1st of 2002?
12           MS. BARON:  Objection to form as to what
13  she knew.
14  BY THE WITNESS:
15      A.   I agree.
16  BY MR. MUELLER:
17      Q.   Now, in the insurance coverage, whether it
18  is liability insurance coverage or property lines
19  coverage, the two areas with which you're most
20  familiar, would you agree that there are components
21  of the policy known as the insuring agreement and
22  the exclusions?
23      A.   Standard, yes.
24      Q.   And have you reviewed the policy in this

73

1    case?
2         A.    I have.
3         Q.    And have you reviewed both coverage A,
4    which, as I recall, is the bodily injury coverage,
5    and coverage F, which is the all risks hull
6    coverage?
7         A.    I have.
8         Q.    And would you agree that the insuring
9    agreements on both coverages -- and I -- strike
10   that.
11             Let me ask you not in a legal context
12   because we know you're not testifying as a lawyer,
13   but as someone who has 60 years of experience in
14   dealing with policies of this sort.
15             When I use the term insuring agreement,
16   what do you understand that to mean?
17        A.    The insuring agreement.  It's a different
18   issue.  It's a defined term.
19        Q.    And the defining term is this is what is
20   covered under the policy?
21        A.    That is correct.
22        Q.    And the rule is that it is covered under
23   the policy unless it is otherwise excluded?
24        A.    Subject to the conditions and exclusions

74

1    of the policies.
2         Q.    Subject to the conditions and exclusions.
3    I'm sorry.
4             The third part of the policy then is going
5    to be the conditions?
6         A.    The third part of the policy will be
7    conditions.  It may be in the conditions section,
8    or it could be endorsements attached thereto.
9         Q.    Exactly.  And endorsements qualify or
10   modify what appears in the four corners of the base
11   policy?
12        A.    That is correct.
13        Q.    So if you want to determine under the
14   bodily injury coverage, for example, whether or not
15   a risk or a potential loss is covered, you would
16   look first at the insuring agreement?
17        A.    Correct.
18        Q.    And then having looked at the insurance
19   agreement, you would want to see whether or not
20   there is an exclusion which qualifies limits or
21   eliminates some aspect of the coverage?
22        A.    That would be next.
23        Q.    Do you want to take a look at the policy
24   itself?

75

1         A.    Specifically which policy do you wish to
2    look at now?
3         Q.    I wish to look at the National Union
4    policy which is the subject of the case.
5         A.    The one effective May 19th, 2002, to 2003?
6         Q.    The one that would be effective on the
7    date of the loss.
8         A.    Okay.
9         Q.    Now, I've got a couple of other basic
10   questions before we get into it.
11             This is what is known as an aircraft
12   policy, correct?
13        A.    I believe it's known as that, yes.
14        Q.    And an aircraft policy then provides
15   coverage on the aircraft itself, correct?
16        A.    Not solely.
17        Q.    One of the components is on the aircraft
18   itself?
19        A.    Let us say there is coverage for liability
20   arising out of the use of the aircraft, and there
21   is coverage for damage to the aircraft itself.
22        Q.    And what you were looking at for coverage
23   in the context of both the insuring agreement and
24   the exclusions is whether the use of that aircraft

76

1    falls within the coverage afforded by the policy,
2    correct?
3         A.    Correct.
4         Q.    And the use in this case that we're
5    talking about is whether or not training is covered
6    under this policy, correct, turbine transition
7    training?
8         A.    For whom?
9         Q.    Turbine transition training for anyone.
10        A.    No.
11        Q.    What?
12        A.    No.
13        Q.    Is it your testimony that you read this
14   policy as providing turbine transition training for
15   some persons but not for others?
16        A.    That is correct.
17        Q.    And would that be true under both the
18   liability and the property or hull coverages?
19        A.    That is correct, both.
20        Q.    Now, do you have the insuring agreement
21   there before you?
22             (Brief pause.)
23   BY THE WITNESS:
24        A.    I'm afraid the copying has left me kind