77

```
1    of...
2    BY MR. MUELLER:
3        Q.   I've got my copy here.  I can look over
4    your shoulder, and we can go through it.
5        A.   Okay.  That would be fine because I'm not
6    sure exactly -- I can't see numbering or anything
7    on these pages.
8            MS. BARON:  Some are upside down.
9            MR. MUELLER:  May I approach the witness?
10           MS. BARON:  You may approach the witness.
11           THE WITNESS:  Peacefully.
12           MS. BARON:  Peacefully.
13   BY MR. MUELLER:
14       Q.   Okay.  Your lawyer is sitting next to us
15   and I'm sure will disabuse me if I attempt to use
16   the wrong exhibit or otherwise flimflam you.
17       A.   Okay.
18       Q.   You've got the insuring agreement before
19   you.  Let's take a look at the liability coverage,
20   coverage A.  That would be the coverage for bodily
21   injury and death.
22       A.   Excluding passengers.
23       Q.   Yes, excluding passengers.
24       A.   Yes.
```

78

```
1        Q.   And the coverage there says that National
2    Union will pay on behalf of the insured -- that's
3    Pontiac Flying -- those sums which the insured,
4    Pontiac Flying, shall become legally obligated to
5    pay as damages because of bodily injury sustained
6    by any person, excluding any passenger -- and then
7    coming down below -- caused by an occurrence
8    arising out of the ownership, maintenance, or use
9    of the aircraft.  Correct?
10       A.   That is correct.
11       Q.   So if all we look at is the insuring
12   agreement, then the death of Lucente, let's say, or
13   Webster, whoever the pilot on the plane was, would
14   be covered under the insuring agreement?
15       A.   No.
16       Q.   Why not?
17       A.   They're passengers.
18       Q.   That's what I'm saying.  You missed the
19   question.  I said whoever was the pilot.
20       A.   Say it again then.
21       Q.   Okay.  Whichever one was flying the
22   plane --
23       A.   Right.
24       Q.   -- there would be coverage for Pontiac
```

79

```
1    Flying against any lawsuit that was brought by that
2    pilot under the insuring agreement of the policy.
3    Then we'll get into qualifications or exclusions or
4    anything.  I'm just talking the insuring agreement.
5        A.   We're having a basic problem.  This is a
6    third party liability covered, and Rick Lucente and
7    Mr. Webster -- I can't remember his first name --
8    were not third parties.
9        Q.   And you say they're not third parties.
10   What was the relationship, as you understand it, of
11   Lucente to Pontiac Flying?
12       A.   I believe he was acting as their employee.
13       Q.   Okay.
14       A.   He was an independent contractor acting as
15   an employee, I believe.
16       Q.   Okay.  Let's just say that he's an
17   independent contractor.  That point is not really
18   material for what we're going to talk about with
19   the policy.
20       A.   If you say so.
21       Q.   Okay.  Just indulge me.  We'll deal with
22   it hypothetically.
23           Assume that he was an independent
24   contractor, so there is third party liability here.
```

80

```
1    Would you agree that under the insuring agreement
2    at least, there would be coverage so we would have
3    to look someplace else to limit or qualify or
4    eliminate that coverage?
5        A.   I agree.
6        Q.   So then what would we do?
7        A.   We would next go to the exclusions.
8        Q.   Okay.  And are there any exclusions that
9    you would find applicable -- strike that.
10           The exclusion that we're talking about
11   here, is that dealing with aerial application?
12       A.   No.  I don't believe so.  Let me review.
13       Q.   Okay.  It's a little hard to get to, but
14   look up at the top line.  These are exclusions.
15   This policy does not apply...
16       A.   Exclusion 1 reads:  For any unlawful
17   purpose or for any purpose or use other than aerial
18   application unless specifically endorsed in the
19   policy.
20       Q.   So what you would be looking for then is
21   to see whether or not this flight fell within
22   aerial application under the policy?
23       A.   That is correct.
24       Q.   Correct?
```

# BRENDAN T. BOLGER, CPCU

81

1     A.   That is correct.
2     Q.   So for that, you would want to, since this
3 is in bold type, look for the definition of aerial
4 application --
5     A.   Yep.
6     Q.   -- correct?
7     So then we'll move on to that. Is there a
8 definition in the policy for aerial application on
9 page 10?
10     A.   Yes. It means the application of aircraft
11 of seeds, fertilizers, or chemicals and includes
12 flights required in direct support thereof.
13     Q.   So the use is covered as long as it falls
14 within the definition of aerial application as you
15 just read?
16     A.   That is correct.
17     Q.   And that brings us to your earlier
18 testimony. Since it is the use that we're looking
19 at that is covered and you have testified that
20 turbine transition flying is a covered use if done
21 by some, would you agree then that the policy
22 covers turbine transition training unless you can
23 find within the policy itself some limitation or
24 exclusion that specifies who can be giving or

82

1 receiving training?
2     MS. BARON: Object to the form.
3     THE WITNESS: Your questions are extremely
4 long.
5     MS. BARON: Convoluted, yes.
6     MR. MUELLER: That was a honey.
7 BY MR. MUELLER:
8     Q.   Okay. Would you agree that if there is a
9 covered use and in this case the use being training
10 for some which is covered under the policy, the
11 policy must specify where the dividing line is
12 between training for some people but not for
13 others?
14     MS. BARON: Same objection to form.
15 BY THE WITNESS:
16     A.   I will answer as best I can.
17 BY MR. MUELLER:
18     Q.   I wouldn't expect anything else.
19     A.   There is, in fact, a pilot warranty,
20 number one, which states who can operate that
21 aircraft. It specifically states that Scott
22 Peterson can operate that aircraft.
23     It also specifically states that anybody
24 with a certain number of hours can operate that

83

1 aircraft, again, as long as they are flying for
2 aerial application or in support thereof.
3     Rick -- pardon me. Yes. Rick Lucente did
4 train Scott Peterson in that aircraft after it was
5 purchased by Pontiac, and the underwriter knew it.
6     Q.   And so did Hardy, correct?
7     A.   And so did Hardy. But they knew he was
8 training Scott Peterson. We're not offering to
9 train anybody else. Nobody said we are going to
10 use this plane for training anybody other than
11 Scott Peterson.
12     When you -- when you leave that particular
13 type of training, Scott Peterson, and go elsewhere,
14 you've walked away from the policy.
15     Q.   Okay. And my question to you, if we
16 assume that turbine transition training is a
17 covered use of the aircraft, is there anywhere
18 within the four corners of the policy itself that
19 says that training is limited to Scott Peterson by
20 Rick Lucente?
21     A.   No.
22     Q.   And isn't one of the cardinal rules of
23 policy interpretation and construction -- and I may
24 be getting into the law here, so I'm asking you

84

1 based upon your knowledge and experience -- that an
2 exclusion or limitation on the coverage must be
3 expressed and written into the policy?
4     A.   That's true.
5     Q.   Now, in this case, we've come to the point
6 where you have testified that the standard of care
7 requires that a broker absolutely has the
8 responsibility of finding out what use is to be
9 made of an aircraft before insuring it?
10     MS. BARON: I'll just object to the form
11 of the question.
12 BY MR. MUELLER:
13     Q.   You recall that testimony?
14     A.   I recall the testimony, yes.
15     Q.   And in that context, the coverage in this
16 case was bound, as you have testified, on March 1st
17 of the 2002.
18     Did Randy Hardy ever, during that month of
19 February 2002, ask Scott Peterson or Sarah Peterson
20 whether they intended to use the plane for turbine
21 transition training?
22     A.   End of your question?
23     Q.   Finished. Did he ask?
24     A.   I don't know. He was told that they were

# BRENDAN T. BOLGER, CPCU

85

```
 1   not going to.  And both Scott and Sarah have
 2   testified that --
 3       Q.   Did you --
 4       A.   Let me finish.
 5            Both Scott and Sarah have testified they
 6   did not tell Mr. Hardy.
 7       Q.   But my question was did he ask.
 8       A.   I don't know how you expect a man to get
 9   information.  Does he have to ask when he's already
10   told?
11       Q.   Now, you just testified that it is the
12   responsibility to ask what use is going to be
13   made --
14       A.   I did not testify to that.
15            MS. BARON:  Let him finish his question,
16   and then you can answer.
17            THE WITNESS:  When you said ask, I stopped
18   you.
19   BY MR. MUELLER:
20       Q.   You agree with the statement that a broker
21   absolutely has the responsibility of finding out
22   what use is to be made of an aircraft before
23   insuring it.
24       A.   Did you say the word ask in that
```

86

```
 1   statement?
 2       Q.   No, I didn't.
 3       A.   No.  You said he was to determine.  You
 4   can determine by asking, or you can determine by
 5   being told.
 6            Sarah and Scott Peterson told him they
 7   were not using it for that.  And they also stated
 8   in the deposition that they did not tell him that
 9   they were going to use the aircraft for that
10   purpose.
11       Q.   Did he have the responsibility to ask what
12   use they were going to make of the aircraft?
13       A.   He should probably ask him are you going
14   to use it to be a submarine.  It would make the
15   same sense.  Are you going to charter it out?  Are
16   you going to carry passengers?  How many questions
17   should he ask to determine what he's going to do
18   when the client says:  I am going to use this for
19   gypsy moth spraying?
20       Q.   What did Randy Hardy ask, if anything,
21   regarding the use to be made of the aircraft?
22       A.   I don't know.  It's not contained in the
23   deposition.
24       Q.   Now, let's look at the deposition,
```

87

```
 1   page 95.  Question to Randy Hardy:  Can you think
 2   of any conversations in which the term turbine
 3   transition training was used with Scott Peterson
 4   prior to this accident?  No.
 5            Do you recall that testimony?
 6       A.   I don't recall that, but he didn't recall
 7   it.
 8       Q.   Well, in actuality, it's a fact, is it
 9   not, that the subject of turbine transition
10   training was discussed between Randy Hardy and
11   Scott Peterson?
12       A.   That's correct, as a possible use of
13   another aircraft.
14       Q.   When you say as a possible use of another
15   aircraft, what are you referring to?
16       A.   The AGA before he even bought the AT-503.
17       Q.   This is another turbine-driven plane?
18       A.   No.
19       Q.   Well, listen to the question in which the
20   term turbine transition training was used with
21   Scott Peterson prior to this accident.
22            You're familiar with the fact that turbine
23   transition training was, in fact, discussed with
24   Scott Peterson and by Randy Hardy prior to the
```

88

```
 1   policy becoming effective on March 1st, 2002,
 2   correct?
 3       A.   As respects turbine training of Scott
 4   Peterson.
 5       Q.   So the subject did, in fact, come up?
 6       A.   Yes.
 7       Q.   Now, you have testified that Randy Hardy
 8   knew that this was a dual cockpit plane?
 9       A.   That is true.
10       Q.   And that Randy Hardy knew that this dual
11   cockpit plane, during the time that he had the
12   coverage for Harold Miller, had been used for
13   turbine transition training also, correct?
14       A.   By Harold Miller, yes.
15       Q.   Okay.  Are you aware of anything that
16   Randy Hardy did to find out whether this plane was
17   going to be used by Scott Peterson for turbine
18   transition training?
19       A.   I can only recall statements of the
20   Petersons that they didn't tell him.
21       Q.   Okay.  My question to you, though, is do
22   you know of anything that Randy Hardy did to find
23   out if the plane was going to be used for turbine
24   transition training?
```

# BRENDAN T. BOLGER, CPCU

89

1  A.   Nope.  I don't recall it, other than from
2  Mr. Peterson.
3  Q.   Is it your testimony that he asked
4  Mr. Peterson if he was going to use the plane for
5  turbine transition training?
6  A.   That is not my testimony.
7  Q.   And it's a fact, is it not, that when the
8  plane was owned by Harold Miller that Harold Miller
9  used it for crop dusting and for training?
10  A.   I use my car to drive kids to school.  Is
11  a buyer going to use it to drive kids to school?  I
12  don't know.
13  Q.   Exactly.  So if you're writing coverage
14  for somebody that is going to be commercially
15  chauffeuring kids to school, you're going to want
16  to know whether that use is made of the vehicle;
17  are you not?
18  A.   If that's what he's going to do, yes.
19  Q.   And it's a fact, is it not, that this
20  plane had been used for turbine transition training
21  and was designed as a training aircraft and that it
22  could be used both for training and crop dusting,
23  correct?
24  A.   It was designed for both.

90

1  Q.   So can we agree that Randy Hardy knew that
2  this plane had the capability of being used for
3  training?
4  A.   True.
5  Q.   And --
6  A.   It had the capability of doing stunt
7  flying.  It had the capability of flying parachutes
8  out.  Where do I go with it?
9  Q.   It's where Randy Hardy goes with it.  And
10  my question to you is given the obligation to
11  ascertain what uses are to be made of the plane,
12  was it incumbent upon him to ask whether they were
13  going to use the plane for training?
14  A.   It was incumbent on him to rely on what
15  the insured told him he was going to do.  He was
16  going to get his own training, and he was going to
17  use that aircraft for gypsy moth spraying.  That's
18  what he told Hardy.
19      Now, why does Hardy have to go any further
20  than -- he didn't even ask.  He was told: This is
21  what I'm going to do.
22  Q.   Well, let's take a look at the Randy Hardy
23  Bible on aviation insurance, the Darrell T. Elkins.
24  A.   I know nothing about the manual.

91

1  Q.   Okay.  In the manual they say that the
2  most -- one of the most important things in
3  aircraft insurance is to understand the type of
4  aircraft which is to be insured.
5      Would you agree with that?
6  A.   Certainly.
7  Q.   And they set forth also the various types
8  of aircraft, including what's referred to as
9  two-place fixed-wing aircraft.
10      MS. BARON:  If you're going to ask him
11  questions about it, do you want to refer him to a
12  page so he can read it and know what you're
13  referring to?
14      MR. MUELLER:  Page 11.
15      THE WITNESS:  Are we back to the policy?
16      MR. MUELLER:  No.  We're now on the book.
17      THE WITNESS:  Well, I don't have that
18  book.
19      MR. MUELLER:  I know.  I know.  But your
20  lawyer does.
21      MS. BARON:  Well, I'm not going to have
22  him sit here and read the whole thing.
23      THE WITNESS:  No.  And I'm not about to do
24  it either.

92

1      MS. BARON:  Okay.  All right.  Now we're
2  looking at page 11.
3  BY MR. MUELLER:
4  Q.   Looking at page 11, last paragraph at the
5  bottom of the page: Two-place fixed-wing aircraft:
6  An aircraft equipped with two seats produced by a
7  major manufacturer usually used as training
8  aircraft.
9  A.   That's not true.  That's not true.
10  Q.   You're disagree with the Bible?
11  A.   It's your Bible, not mine.
12      MS. BARON:  Objection to form.
13  BY MR. MUELLER:
14  Q.   It's not my Bible.  It's Randy Hardy's
15  Bible.  It's a good book.  It's Pentecost.
16      MS. BARON:  Objection to form.
17  BY THE WITNESS:
18  A.   I don't care who it is.  My brother's
19  two-place has got two cockpits, too.  Does he use
20  it for training?  Hell, no.  Most steermans are
21  used now as historical usage.
22  BY MR. MUELLER:
23  Q.   Would you agree that a reasonable broker
24  under the circumstances of being asked to insure a

# BRENDAN T. BOLGER, CPCU

93

```
1  two-place fixed-wing aircraft would be charged with
2  asking for all of the uses to be made of that plane
3  in order to ascertain whether it was to be used --
4      A.  No.
5      Q.  -- for training purposes?
6      A.  He's already been told by the client what
7  he's going to do with it.
8      Q.  Where do you get what he is told is going
9  to be the use made of the plane?
10     A.  The reason for purchasing the aircraft,
11  according to the Petersons, was to do gypsy moth
12  spraying.  The reason for having Scott Peterson
13  undergo additional training is he only had five
14  hours when he bought it, so the underwriter wanted
15  additional training so that he had more experience
16  in the aircraft that they were insuring.  That's as
17  far as they went about training.
18          Scott Peterson needed additional training.
19  Nobody said we're going to train other people.
20  That didn't -- never did come up.
21     Q.  And my question was -- and we're getting
22  back to the standard of care, that a reasonable
23  insurance broker, knowing that a training plane --
24  training-capable plane was being purchased by his
```

94

```
1  proposed insured and having the obligation to know
2  what uses are going to be made of that plane, was
3  he obligated to ask what uses are to be made of the
4  plane?
5      A.  You keep on getting back, obligated to
6  ask.
7      Q.  Yes.
8      A.  He was obligated to determine.  How do you
9  determine how the use is going to be made?  You
10  either ask a question, or the insured says:  I'm
11  going to use the plane for this.
12     Q.  Okay.
13     A.  Why do you say we have to ask?
14     Q.  Because in order to find out all of the
15  uses that the insured is going to make of the
16  plane, you have to ask, don't you?
17     A.  Yes.  We say:  What are you going to do.
18  I'm going to do gypsy moth spraying.
19     Q.  Okay.
20     A.  Now, that's what I know what I'm going to
21  do.
22     Q.  Wherein did you find anywhere in the
23  testimony or the record that Randy Hardy asked what
24  uses they were going to make of this plane?
```

95

```
1      A.  When he was asked to add the gypsy moth
2  contract to the coverage under the policy, he was
3  told that we bought this plane to do gypsy moth
4  spraying.
5      Q.  And when was that?
6      A.  Right around February, March area of 2002.
7      Q.  Had they already purchased the plane by
8  then or not?
9      A.  I'm not sure.  I wouldn't be able to pin
10  it down.
11     Q.  Do you know of anything that was said to
12  Randy Hardy regarding the use of that plane before
13  the coverage was bound on March the 1st, 2002,
14  because I want to find out exactly where it is in
15  the record?
16     A.  I'd have to review completely.
17     Q.  So the answer is as you sit here now, you
18  don't?
19     A.  I can't without reviewing the whole file
20  again.
21     Q.  So would you agree that at a minimum
22  before the coverage is bound, March 1st, 2002, that
23  there was the obligation on the part of the agent
24  to determine what use was to be made of the plane?
```

96

```
1      A.  And he did so.
2      Q.  Okay.  But the answer is yes?
3      A.  Yes.
4      Q.  Okay.  Now, let's come to your previous
5  testimony regarding the applicability of custom and
6  usage, the broker's knowledge of custom and usage.
7          Do you know in the area of aerial
8  application whether turbine transition training for
9  a pilot was customarily recognized as a component
10  of aerial application within the definition?
11     A.  I cannot answer that.
12     Q.  You don't know?
13     A.  Don't know.
14     Q.  And if it was consistently known and
15  believed by persons in the agricultural aviation
16  industry to the point where it was a custom and
17  usage, that turbine transition training was a
18  component of aerial application, is that something
19  which Randy Hardy would be charged with knowing?
20         MS. BARON:  Objection to form of the
21  question, incomplete hypothetical.
22  BY THE WITNESS:
23     A.  If it was normal custom and usage in
24  aerial application of offering turbine training to
```

# BRENDAN T. BOLGER, CPCU

97

1 others other than employees or independent
2 contractors of your firm, then I'd say Hardy should
3 have known it.
4 BY MR. MUELLER:
5    Q.   Okay.  And is it your testimony that if
6 the custom and usage was that the turbine
7 transition training to your own employees was a
8 part of aerial application, is that something that
9 Randy Hardy also should have known?
10   A.   Yes, if that's the custom and usage.  I'm
11 relying on you.  You're saying that's the custom
12 and usage.
13   Q.   Well, I know that to be the fact.
14   A.   Okay.
15   Q.   And how would Randy Hardy keep up with the
16 custom and usage?
17   A.   Just general exposure to the risks
18 themselves.
19   Q.   Well, would one way of keeping up being to
20 go to the professional conventions, trade shows,
21 that kind of thing?
22   A.   No way, absolutely not.
23   Q.   Would one way of being able to keep up
24 with what the custom and usage is to refer to the

98

1 trade publications?
2    A.   Absolutely not.  You have listed my --
3 you've seen my CV.  You've seen the type of
4 business my clients were in.  Do you really believe
5 that I went to all their conventions and read all
6 of their trade journals?  No way.  That's not
7 possible.
8    Q.   Not for a minute, but you were never
9 involved in -- and you've testified to this -- the
10 subspecialty line of aerial aviation coverage.
11   A.   I was in the subsection of architectural
12 engineers' errors and omissions, doctors' errors
13 and omissions.  Do you think I went to their
14 conventions; that I read their journals?  No way.
15   Q.   Well, what is your understanding of the
16 type of insurance that Randy Hardy sells?
17   A.   He sells third party property and
18 liability insurance.
19   Q.   What limited field?
20   A.   I don't know what he's -- I have no idea
21 what the site of his business is.
22   Q.   I'm not talking about the location he's
23 in, Wichita.  I'm talking about --
24   A.   I'm not either.

99

1    Q.   I'm talking about the type of specialty
2 coverage.
3    A.   I realize he sold aviation insurance.  Are
4 you telling me he never sold homeowners; he never
5 sold automobile?
6    Q.   That's what I'm telling you.
7    A.   I don't know that.
8    Q.   Indulge me.
9    A.   No.  I won't indulge you.  You're getting
10 hypothetical as hell.
11        MS. BARON:  That's all right.  He can do
12 that.  Just keep it in mind.
13 BY MR. MUELLER:
14   Q.   I'm asking you to assume that he limits
15 his business to the sale of aviation insurance.
16   A.   How do they spell assume?
17        MS. BARON:  Let's --
18        MR. MUELLER:  If you can't spell assume,
19 then more is the pity.
20        MS. BARON:  I need a break.  Let's take a
21 break.
22        (A recess was taken.)
23 BY MR. MUELLER:
24   Q.   Do you have any quarrel with Randy Hardy

100

1 in light of your just-completed testimony in his
2 subscribing to publications or magazines within the
3 field of aerial application?
4    A.   No.
5    Q.   Would that be something that a specialist
6 in aerial application insurance coverage would want
7 to do?
8    A.   He could do so, yes.
9    Q.   And would you agree that a reasonable
10 insurance broker acting within the standard of
11 care, if he learned of a use of an aircraft that he
12 didn't believe was covered, to bring it to the
13 attention of the insured?
14   A.   Yes.
15   Q.   And are you aware of Randy Hardy's
16 placement of ads in these trade publications that
17 he read that were exactly opposite ads for turbine
18 transition training on the part of Pontiac Flying
19 Service?
20   A.   I've seen that.
21   Q.   And if he is a person of normal reading
22 ability and normal vision, was there anything that
23 would keep him from seeing the ad for turbine
24 transition training on the part of Pontiac Flying?

# BRENDAN T. BOLGER, CPCU

101

```
1        A.   If he wasn't looking for it, he wouldn't
2   see it.
3        Q.   Do you read things in magazines, for
4   instance, that you're not looking for?
5        A.   Not very often.
6        Q.   So would it be the case then that in
7   reading a magazine or a publication, you would only
8   look for specific things and not look for matters
9   of general interest?
10       A.   Just the way I read a newspaper.
11       Q.   Would you agree that if Randy Hardy saw
12  that ad in the publication to which he subscribed
13  and in which he regularly advertised, that if he
14  didn't believe turbine transition training was
15  covered, he had the responsibility to bring that to
16  the attention of Pontiac Flying?
17       MS. BARON:  Objection to the form.
18  BY THE WITNESS:
19       A.   You're assuming he saw the add.
20  BY MR. MUELLER:
21       Q.   I'm assuming that he saw it, yes.
22       A.   At that point he might have had a
23  question.  I don't know.
24       Q.   But would you agree with the statement
```

102

```
1   that once a policy is written and a broker-client
2   relationship is established, the broker has the
3   responsibility to monitor the insured's business
4   and to keep current with the insured's coverage?
5        A.   The term -- the term monitor is a
6   difficult word.  He will expect the insured to say:
7   I'm going into a new business; I'm changing my
8   operation; I told you I was doing one thing; now
9   I'm doing something else.  I would expect the
10  insured to know to tell the broker that that was
11  happening.
12       Q.   Okay.  Can you answer my question, though?
13  Would you agree with the statement as I gave it to
14  you that included the word monitor?
15       A.   No, because I don't know what the term
16  monitor means.
17       Q.   Are you aware that Randy Hardy held
18  himself out as monitoring the insured's business
19  and keeping current with the insured's coverage?
20       A.   What did Randy Hardy mean by monitoring?
21       Q.   Do you have any criticism with Randy Hardy
22  if he kept his fingers on the pulse, so to speak,
23  of the business of his insureds such as the
24  Petersons?
```

103

```
1        A.   I don't understand what you mean by
2   keeping his fingers.
3        Q.   Okay.  Would you have any criticism of
4   Randy Hardy in monitoring the business of his
5   insureds?
6        MS. BARON:  Objection to form.
7   BY THE WITNESS:
8        A.   You're still using the word monitoring.
9   Can you change that anyway?
10  BY MR. MUELLER:
11       Q.   I'm using the term monitoring as you
12  understand the term monitoring, and I'm asking you
13  if that's the term that Randy Hardy uses, do you
14  have any criticism of Randy Hardy for doing that?
15       MS. BARON:  I'm going to object to the
16  form of the question.
17  BY THE WITNESS:
18       A.   I can't answer the question.
19  BY MR. MUELLER:
20       Q.   What makes the question difficult for you
21  to answer?
22       A.   Monitoring strikes me as a word requiring
23  almost daily contact.
24       Q.   Are you aware that Randy Hardy held
```

104

```
1   himself out to his insureds as one who monitored
2   their businesses once coverage was placed?
3        A.   Did he monitor their business or the
4   insurance business?
5        Q.   He monitored the insurance coverage that
6   they had in the context of their business.
7        A.   Not possible.  I can't be in daily contact
8   with clients.
9        Q.   What contact do you believe that the
10  standard of care requires of a broker once a policy
11  is written?
12       A.   The policy is written and delivered, paid
13  for by both parties, all money is transferred
14  properly, it requires no further action until
15  renewal unless the insured comes and says:  I've
16  got some changes.
17       Q.   Would you agree that in insurance, the
18  broker should not mislead the insured as to the
19  coverage that he has under a policy?
20       A.   An insurance broker should never mislead.
21       Q.   And are you familiar with what I've
22  referred to as the balloon letter, the Houston, we
23  have a problem communication?
24       A.   I believe I have read that letter.
```

# BRENDAN T. BOLGER, CPCU

105

```
1       Q.   Or e-mail or whatever it was.
2            MS. BARON:  I think it was an e-mail.
3            MR. MUELLER:  E-mail, you're right.
4            THE WITNESS:  Do you have the Bates number
5  on that?
6            MR. MUELLER:  Yes.  It's 121, 122, and
7  123.
8            THE WITNESS:  Let me read back to that.
9            (Brief pause.)
10 BY MR. MUELLER:
11      Q.   You've testified that you've never talked
12 to Randy Hardy, as I recall your words, never met
13 the man --
14      A.   That is correct.
15      Q.   -- correct?
16           So you have never discussed with him what
17 he intended to be saying or what he understood in
18 this Houston, we've got a problem e-mail?
19      A.   I've never discussed it with him, no.
20      Q.   So in reading it, you have to take it at
21 face value to get any understanding yourself,
22 correct?
23      A.   That is correct.
24      Q.   Did you come up with an understanding from
```

106

```
1  having read this as to the message that was being
2  communicated back to the underwriter, Mary Beth
3  Schwaegel, immediately following the loss?
4            MS. BARON:  I'm going to object to the
5  form.
6  BY THE WITNESS:
7       A.   I'm sorry.  I think I should pay closer
8  attention to what you were saying as trying to read
9  this at the same time.  I made a mistake.
10 BY MR. MUELLER:
11      Q.   Okay.  When you read it, did you come to
12 an understanding of what the communication meant?
13      A.   Yes.  I did come to an understanding.
14      Q.   Now, when he says we in the introductory
15 line:  Houston, we have a problem --
16      A.   Uh-huh.
17      Q.   And we know that's a quote from Apollo 13?
18      A.   Yes.
19      Q.   He's communicating with Mary Beth
20 Schwaegel?
21      A.   Right.
22      Q.   And she's the underwriter?
23      A.   Correct.
24      Q.   And she's the one who was the underwriter
```

107

```
1  in deciding whether or not training coverage would
2  be afforded to Scott Peterson after this policy
3  became effective?
4       A.   Correct.
5       Q.   That had to come from the underwriter
6  because that couldn't come from Randy Hardy, right?
7       A.   That is also correct.
8       Q.   So do you understand when the
9  communication is we have a problem that he's
10 referring to Mary Beth Schwaegel as one side of the
11 we and he, Randy Hardy, as the other side of the
12 we?
13           MS. BARON:  Objection; calls for
14 speculation.
15           MR. MUELLER:  I'm asking for his
16 understanding.
17 BY THE WITNESS:
18      A.   I'm having trouble because the term we
19 could be just Hardy Aviation has a problem.  I
20 don't know.
21 BY MR. MUELLER:
22      Q.   Okay.  Did you arrive at any conclusions
23 yourself in that regard as to who was referred to
24 by we?
```

108

```
1       A.   Yeah.  I think Hardy Aviation has a
2  problem.  They didn't know the guy was doing
3  turbine training.
4       Q.   And that's a problem for them?
5       A.   Sure, it is, until they can clarify what
6  happened.
7       Q.   Do you see any potential problem there for
8  Mary Beth Schwaegel in having cleared this plane
9  for training as a component of aerial application?
10      A.   No, not at all.
11      Q.   So that would be, you know, clear within
12 the definition of aerial application, as you
13 understand it, that Scott Peterson could receive
14 training?
15      A.   Absolutely.
16      Q.   Okay.  Now come to page 123.
17      A.   That's the same statement, isn't it?
18      Q.   Yes, it is, but that gets it all on one
19 page where you don't have to turn back and forth.
20      A.   Oh, okay.
21      Q.   The sentence in the next to last full
22 paragraph, the one that starts with:  Our files are
23 clear, the sentence that --
24      A.   Okay.
```

# BRENDAN T. BOLGER, CPCU

109

1    Q.  -- starts with:  They may have assumed,
2   since commercial and ag use, what difference is the
3   training, especially since transition for Scott was
4   approved.
5        Did you read that?
6    A.  You started one place, and then you went
7   somewhere else.
8    Q.  No.  I started to connect you with the
9   paragraph that I'm talking about, the next to last
10  sentence in that paragraph.  And I'll give it to
11  you again.
12   A.  There it is.
13   Q.  They may have assumed, since commercial
14  and ag use, what difference is the training,
15  especially since transition for Scott was approved.
16       Did you read that sentence?
17   A.  I've seen the sentence.
18   Q.  Okay.  And did you understand then from
19  that sentence, if you didn't know it before, that
20  training was approved for Scott on that plane?
21   A.  I knew that the training was approved for
22  Scott on that plane.
23   Q.  Okay.
24   A.  What they assumed it might mean is

110

1   something else again.
2    Q.  Okay.  And then do you see there that
3   Randy Hardy is indicating that what was told to
4   them about the training may have led them to assume
5   that training was available for commercial and ag
6   use?
7    A.  I'm missing a question.
8        MS. BARON:  Are you referring to a
9   specific quote here?
10       MR. MUELLER:  I'm referring to the
11  sentence.
12  BY MR. MUELLER:
13   Q.  And what I am saying is --
14       MS. BARON:  Okay.
15  BY MR. MUELLER:
16   Q.  -- do you agree that what Randy Hardy is
17  expressing is that may be the Petersons were caused
18  to believe that because training was available for
19  Scott that training was available for commercial
20  and ag use?  Do you see that in that sentence?
21   A.  I see a statement saying that they may
22  have assumed.  That's all I see.  I don't know why
23  they assumed.
24   Q.  And I want to get back.

111

1    A.  I'm missing something.
2    Q.  Would the standard of care require that
3   the broker, when there may be confusion over what
4   the coverage means, to clarify that to the insured?
5    A.  If he is aware of such confusion, yes.
6   But at this point -- this is after the accident --
7   he becomes aware that they are confused.  It is too
8   late at that point to clarify.
9    Q.  And if he is the one who created that
10  confusion, would you agree that he had the
11  responsibility early on to make certain that they
12  understood that training coverage under aerial
13  application was limited to Scott and not to anyone
14  else?
15   A.  I believe he -- I'm not sure.  Your
16  question -- I'm sorry -- gets so involved.
17       MS. BARON:  Do you want to have it back?
18       THE WITNESS:  Why don't you just read it
19  back, if you could?
20       (Record read.)
21       MS. BARON:  I'm going to object to the
22  form.
23  BY THE WITNESS:
24   A.  Based on your premise, if he was

112

1   responsible, yes.
2   BY MR. MUELLER:
3    Q.  Okay.
4    A.  But that never came out, did it?
5    Q.  I want to ask you in the context of
6   aircraft uses, whether the standard of care
7   requires that the broker -- a question to make sure
8   that the broker understands, for the purposes of
9   coverage, all of the uses that might be made of the
10  aircraft.
11   A.  No.
12   Q.  To what extent is he obligated to explore
13  or ask about the uses to be made of the aircraft?
14   A.  He is required to determine from the
15  insured what they are going to do with the
16  aircraft.  He doesn't ask different questions about
17  how it's used.  I mean, he doesn't ask is this
18  going to be used for carrying crew.  He says what
19  are you going to do.  And they turned around and
20  said:  We bought this aircraft and we're going to
21  use it for gypsy moth spraying.  And Scott is going
22  to have to get additional hours because he only has
23  five hours.  That's as far as it went.
24   Q.  And it's your testimony that you believe

# BRENDAN T. BOLGER, CPCU

**113**

1 at least that that conversation between Randy Hardy
2 and the Petersons took place before March 1st,
3 2002, when this policy went into force and effect?
4    A.   Yes.
5    Q.   And if you're wrong in that regard and
6 those conversations never took place, your opinion
7 would be the opposite, I take it?
8        MS. BARON:  Objection to the form.
9 BY THE WITNESS:
10    A.   I have a problem with that again.
11 BY MR. MUELLER:
12    Q.   Your opinion would be -- I'm not asking
13 what the use of the plane was -- if the subject did
14 not come up and was never asked by Randy Hardy;
15 that he did not meet the standard of care and
16 not --
17    A.   You've got double negatives now.  I'm
18 confused.
19        MS. BARON:  I'm going to object to the
20 form of the question.  I think it's been asked and
21 answered.
22 BY THE WITNESS:
23    A.   I can't answer because, somehow or
24 another, that question sounds like it's a double

**114**

1 negative.
2 BY MR. MUELLER:
3    Q.   Well, it's not.
4    A.   Can we read it back again?
5    Q.   No.  Let's restate it.
6    A.   Okay.
7    Q.   I'm sure it's not a double negative, but
8 it wasn't really very good anyway.  I don't need to
9 hear it again.
10        MS. BARON:  Try it again.
11        MR. KRZAK:  Do you want me to try it?
12        MR. MUELLER:  Okay.
13        MS. BARON:  Are we going to go up until
14 noon?
15        MR. MUELLER:  I am virtually finished.  In
16 fact, I will surrender the floor to counsel for
17 Webster.
18        MS. BARON:  Okay.
19            DIRECT EXAMINATION
20 BY MR. KRZAK:
21    Q.   If Randy Hardy did not have a conversation
22 with Scott Peterson or Sarah Peterson about the use
23 of the aircraft prior to getting the policy, would
24 he have breached his duty to understand the use for

**115**

1 which the aircraft was to be used for?
2        MS. BARON:  Objection to form.
3 BY THE WITNESS:
4    A.   You say if they did not have a
5 conversation before it was added to the policy, but
6 they did have a conversation.
7 BY MR. KRZAK:
8    Q.   Assume --
9    A.   That's the point.  See, when you do an
10 assumption that didn't happen, I'm not sure how I
11 should answer.
12    Q.   Assuming they didn't have that
13 conversation before the policy -- or before the
14 March date --
15    A.   Okay.  They did not have this
16 conversation.
17    Q.   Right.  Assume they did not have that
18 conversation before then.
19    A.   Okay.
20    Q.   Did he then, Randy Hardy, breach his duty
21 to understand the risk to be insured?
22    A.   He didn't know, that's right.  He didn't
23 know if he didn't have the conversation.
24    Q.   Okay.  In your years of experience, have

**116**

1 you developed a means of understanding the risks to
2 be insured on different policies you've issued?
3    A.   Yes.
4    Q.   And how do you go about doing that?
5    A.   Mostly by filling out applications as
6 required by underwriters to place that coverage.
7    Q.   In addition to that, would you have
8 conversations with the insured?
9    A.   Yes.
10    Q.   Do you have any checklist or anything you
11 used in doing that?
12    A.   Yes, I do.
13    Q.   And how would you go about doing what's on
14 your checklist?
15    A.   Oh, Lord.  I've got a checklist for just
16 about every policy that I've ever written.
17    Q.   Is it the custom and practice in the
18 industry to use some type of checklist when you're
19 talking to somebody to determine the risk to be
20 insured?
21    A.   Yeah.  Usually, though, it's an
22 application provided by the underwriter.
23    Q.   Okay.
24    A.   The underwriter provides an application

BRENDAN T. BOLGER, CPCU

117

1  which addresses the questions he wants answered.
2      Q.   Okay.  In circumstances where you're
3  talking directly to the person that's going to be
4  insured, would you agree it's important to ask
5  follow-up questions of that person to be sure that
6  you understand the full risk to be insured?
7      A.   As long as we understand a follow-up
8  question is a question based on what has been said
9  so far.
10     Q.   Let me ask this then.  Randy Hardy knew
11 that when Harold Miller owned this airplane, it was
12 used for turbine transition training, true?
13     A.   I understand that.
14     Q.   Okay.  And Randy Hardy knew that this
15 plane had two seats, true?
16     A.   He did.
17     Q.   As a reasonable broker, is it your
18 testimony that when Scott Peterson told Randy Hardy
19 that this was to be used for gypsy moth spraying
20 that Randy Hardy had no duty, knowing what he knew
21 the plane had been used for before, to ask if
22 passengers or co-pilots could be on that plane and
23 would be covered?
24     A.   No.

118

1      Q.   So they would have an obligation to do
2  that, or they had no obligation to do that?
3      A.   He had no obligation to follow up and ask
4  that.
5      Q.   And why not?
6      A.   Because he was told it was going to be
7  used for gypsy moth spraying.
8      Q.   As a reasonable broker, it's your opinion
9  then that he would have no obligation to ask the
10 Petersons if it would be used for turbine
11 transition training?
12     A.   None.
13     Q.   So despite the fact that he knew of two
14 other possible uses that this plane had been used
15 for immediately before it was sold to Scott
16 Peterson, it's your testimony that as a reasonable
17 broker, he did not have to ask those follow-up
18 questions to the Petersons?
19     A.   He did not.
20     Q.   Okay.  He could just sit there, be moot,
21 and ask no follow-up?
22          MS. BARON:  I'm going to object as to the
23 form of the question as to follow-up.
24

119

1  BY THE WITNESS:
2      A.   Again, he relied on the insured to tell
3  him what they were doing with the aircraft.  Should
4  he -- I don't know how many different uses this
5  aircraft can be put in.  And I'm sure you don't
6  either.  I mean, it is an aircraft that flies.  You
7  can use it for almost anything that you need it for
8  to fly.  You can carry passengers.  You can carry
9  luggage.  You can carry anything.
10 BY MR. KRZAK:
11     Q.   So as a broker in your issuance of
12 aviation policies in the past, once someone told
13 you, for example, they would use the plane to carry
14 passengers, it was your custom and practice to not
15 ask any follow-up questions or any additional
16 questions as to what they would use that plane for?
17     A.   No.  If the man said:  I'm going to use it
18 to carry passengers, I'm going to ask him more
19 about the passenger service:  Is he charging a fee;
20 is -- there's all kinds of questions to get into.
21          But if the man says:  I'm going to use it
22 for gypsy moth spraying, that's why I bought it, I
23 don't have to investigate all the other uses he
24 might do.  He's got to tell me.

120

1      Q.   And knowing that that plane has two seats,
2  you would not have to ask him if he's going to be
3  using it for gypsy moth spraying, if he's ever
4  going to carry a passenger?
5      A.   No.
6      Q.   You would not have to ask him if he was
7  going to ever carry another pilot?
8      A.   No.
9      Q.   And why not?
10     A.   Why?  Why should I?  It's got two seats in
11 it.  The underwriter knows there are two seats in
12 it.  If he's going to be carrying passengers for
13 hire, then maybe I've got to ask that, but he
14 didn't say he was going to do that.
15          I have to rely on the client to tell me
16 what he is doing with his business.  I can't just
17 guess what he might do as a side issue.  I mean,
18 there are so many things you can use an airplane
19 for:  Stunt flying.  My brother uses his for stunt
20 flying.  Do we declare it?  Hell, yes, because
21 that's not what we expect the steerman to be used
22 for.
23     Q.   How did you know your brother used it for
24 stunt flying?

# BRENDAN T. BOLGER, CPCU

**121**

```
1     A.   He told me.
2     Q.   Okay.  Did you ask him?
3     A.   No.  I never excepted him to get into that
4  business.
5     Q.   Did you say to him what are you going to
6  use your plane for?
7     A.   He's a 60-year-old retired real estate
8  broker.  Do you really think he's going to go into
9  stunt flying?  I sure as hell didn't, but he did.
10    Q.   How did you find that out?
11    A.   He told me about it.
12    Q.   Did you have to ask him any other
13  questions about what else he was going to use the
14  plane for?
15    A.   He also got into carrying disabled
16  individuals.
17    Q.   How did you find that out?
18    A.   He told me about it.
19    Q.   Did you ask him about it?
20    A.   No.  How would I ever think that he was
21  going to get into carrying disabled individuals?
22    Q.   So your testimony is that when you're the
23  broker for an aviation insurance policy, that once
24  someone tells you one use for the airplane, you do
```

**122**

```
1  not have to follow up with them and say:  Are you
2  going to use it for anything else?  It's their duty
3  to tell you all of their uses?
4     A.   Yes.  It's their duty to tell me what
5  they're going to do with the aircraft.
6     Q.   Have you published any articles or books
7  or journals about insurance brokerage?
8     A.   I have published in my CV.  I believe it's
9  listed.
10    Q.   I didn't see anything listed in there is
11  why I was asking.
12    A.   The last item, I think, on my CV.  By
13  published, that's another term.  Are you talking to
14  the public?  Are you talking to the firm I worked
15  for?  I published something for a firm I worked
16  for.
17    Q.   Sure.  The only publication I see listed
18  on here is Insurance Programs for Large
19  Construction --
20    A.   That is correct.
21    Q.   Now, have you written other things for
22  other companies that you worked for?
23    A.   No.
24    Q.   Okay.  Have you ever written anything or
```

**123**

```
1  published anything on the responsibilities of
2  brokers or agents in specialty lines?
3     A.   No.
4     Q.   In these other cases that you've listed on
5  here that you've testified in, have you ever
6  disclosed what's called rule 213 disclosures?  Do
7  you know what those are?
8     A.   It rings a bell.  That's all I can say.
9     Q.   Have you ever testified in any Illinois
10  cases over the past five to ten years?
11    A.   All of them are Illinois case.
12    Q.   Any out of federal court and state court?
13    A.   Yes.
14    Q.   In those cases, have you written opinions
15  like you've written them in this case?
16    A.   Yes.
17    Q.   Have you ever written any opinions on what
18  the responsibilities of brokers or agents are in
19  specialty lines?
20    A.   I don't believe I've ever put anything out
21  as broad as that.  I believe I might have said
22  something specifically --
23    Q.   Okay.
24    A.   -- as how you would report a claim, what
```

**124**

```
1  the duties are of the broker in reporting a claim,
2  and those claims that -- I've shown the broker
3  duties cases.
4     Q.   Right.  Well, we've talked about these
5  duties that you had, and I think there were about
6  eight elements that you included about
7  understanding the risk, contacting underwriters,
8  all those elements you listed before.
9     A.   Yeah.  I didn't list them all because
10  there's other duties.
11    Q.   Sure, the ones you listed today.
12         Have you ever put those duties down in
13  written form in any of the cases you've worked on?
14    A.   No.
15    Q.   Okay.  Has anybody ever put those in
16  written form for you and then you signed off on
17  them as your opinion?
18    A.   No.
19    Q.   I just want to make sure I understood
20  something before because I think the question was
21  asked with a double negative on that, make sure of
22  your testimony.
23         Have you acted in the capacity as an
24  underwriter at any time since 1957?
```

BRENDAN T. BOLGER, CPCU

125

1    A.    No.  Pardon me.  Yes.  Bellfont Insurance
2  Company was a captive insurance company of Armco
3  Steel.
4    Q.    And --
5    A.    Bellfont decided they wanted to go into
6  the business of underwriting insurance, so we
7  started in London.  And London would submit risks
8  to me for my review and then submit to them at
9  Bellfont to accept or reject.  And they would ask
10 my opinion, and I would give my opinion.
11   Q.    Okay.
12   A.    Whether you consider that underwriting --
13 I had no final authority.  I could not bind the
14 company.  That act had to be done by the officers
15 of Bellfont.
16   Q.    When was that that you last did that?
17   A.    '84, '85, '86 probably up through '90.
18   Q.    You testified earlier that you allowed
19 your license to expire this year?
20   A.    That's correct.
21   Q.    Any reason for that?
22   A.    Why give the state money for a license I'm
23 not going to use?
24   Q.    Has your license ever been suspended,

126

1  revoked?
2    A.    No, no.
3    Q.    Was 1993 the last time you acted as a
4  broker?
5    A.    Yes.
6    Q.    Okay.  And since that time, you've acted
7  as a consultant and giving expert testimony?
8    A.    That is correct.
9    Q.    We talked about the percentage breakdown,
10 but never really got to it before.  In the last
11 five years, how much work has been consulting and
12 how much has been expert testimony?
13   A.    I was still consulting pretty actively in
14 2001, 2002, but after that, I stopped.
15   Q.    So since 2002 then, the only thing you've
16 done is expert testimony?
17   A.    Right.  And all the cases are listed.
18   Q.    And in 2001 and 2002, what percentage was
19 the expert testimony; what percentage was the
20 consulting?
21   A.    Are we talking about hours or income?
22   Q.    Income.
23   A.    Income, consulting was probably 35,
24 40 percent.

127

1    Q.    Okay.  And then how about hours?
2    A.    Then consulting would go up.
3    Q.    Okay.
4    A.    Consulting would be somewhere in the 60,
5  70 range.
6    Q.    What's your hourly rate?
7    A.    $200.
8    Q.    And is that the rate you've had on this
9  case for the past two months?
10   A.    That's correct.
11   Q.    How many hours have you put in on this
12 case?
13   A.    In my file, which you have a copy of, I
14 have my file work record.
15   Q.    Okay.
16   A.    That will show you the hours, the days,
17 what I was doing.
18       MR. KRZAK:  That's all that I have.
19       MR. MUELLER:  Okay.  A brief, brief
20 follow-up.  Then I'm on my way.
21           REDIRECT EXAMINATION
22 BY MR. MUELLER:
23   Q.    Did Randy Hardy ever ask, prior to
24 March 1st, 2002, what uses the plane was to be put

128

1  to by Pontiac Flying?
2        MS. BARON:  I'm just going to object
3  because it's been asked and answered.
4  BY THE WITNESS:
5    A.    I honestly don't know if he asked.  I
6  don't know that that comes out in the depositions.
7  BY MR. MUELLER:
8    Q.    Did he have an obligation to ask what uses
9  the plane was to be put to, or would he be -- would
10 his obligation be satisfied by simply asking what
11 use indicating the predominant use?
12   A.    Again, I don't -- I was not there for the
13 conversation.  All I know is that the Petersons
14 told Randy they were going to use it for gypsy moth
15 spraying.  Whether that was in response to an ask
16 or a question or just their statement:  This is
17 what we're going to do, I don't know.
18       MR. MUELLER:  Have a Merry Christmas.
19       THE WITNESS:  Thank you.
20       MS. BARON:  I have one quick question.
21           CROSS-EXAMINATION
22 BY MS. BARON:
23   Q.    You stated that your opinions were based
24 on the materials that you reviewed for this case?

129

1    A.    That's correct.

2    Q.    Are they also based upon your years of

3 training, experience?

4    A.    Oh, yes.  Obviously based on my

5 experience, yes.

6         MS. BARON:  Thank you.  That's all I have.

7         MR. MUELLER:  We were willing to give him

8 that one.

9         MS. BARON:  I know.

10        We will reserve.

11             (AND FURTHER DEPONENT SAITH NOT.)

12

13

14

15

16

17

18

19

20

21

22

23

24

---

130

1              UNITED STATES DISTRICT COURT
               FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3  NATIONAL UNION FIRE COMPANY      )
   OF PITTSBURGH, PA.,              )
4                                   )
             Plaintiff,             )
5                                   )
        vs.                         )  No. 03-1288
6                                   )
   PONTIAC FLYING SERVICES, INC.,   )
7                                   )
             Defendant and          )
8            Third Party Plaintiff, )
   vs.                              )
9                                   )
   HARDY AVIATION INSURANCE, INC.,  )
10                                  )
             Third Party Defendant. )
11
             I hereby certify that I have read the
12 foregoing transcript of my deposition given on
   December 16, 2005, at the time and place aforesaid,
13 consisting of Pages 1 through 129 inclusive and I
   do again subscribe and make oath that the same is a
14 true, correct and complete transcript of my
   deposition so given as aforesaid.
15
16         Please check one:
17
             _____ I have submitted errata sheet(s)
18           _____ No corrections were noted
19
20           _____
                BRENDAN T. BOLGER, CPCU
21
   SUBSCRIBED AND SWORN TO
22 before me this _____ day
   of _____, A.D., 2005.
23
24    _____ Notary Public

---

131

1  STATE OF ILLINOIS )
                     ) SS.
2  COUNTY OF COOK    )

3

4         I, CARYL L. HARDY, Certified Shorthand

5  Reporter No. 084-3896, Notary Public in and for the

6  County of Cook, State of Illinois, do hereby

7  certify that previous to the commencement of the

8  examination, said witness was duly sworn by me to

9  testify the truth; that the said deposition was

10 taken at the time and place aforesaid; that the

11 testimony given by said witness was reduced to

12 writing by means of shorthand and thereafter

13 transcribed into typewritten form; and that the

14 foregoing is a true, correct, and complete

15 transcript of my shorthand notes so taken as

16 aforesaid.

17        I further certify that there were present

18 at the taking of the said deposition the persons

19 and parties as indicated on the appearance page

20 made a part of this deposition.

21        I further certify that I am not counsel

22 for nor in any way related to any of the parties to

23 this suit, nor am I in any way interested in the

24 outcome thereof.

---

132

1         I further certify that this certificate

2  applies to the original signed and certified

3  transcripts only.  I assume no responsibility for

4  the accuracy of any reproduced copies not made

5  under my control or direction.

6         IN TESTIMONY WHEREOF I have hereunto set

7  my hand and affixed my notarial seal this 30th day

8  of December, A.D., 2005.

9

10

11         _____
                CARYL L. HARDY, CSR, RPR
12

13 My Commission Expires

14 March 22, 2008

15

16

17

18

19

20

21

22

23

24

**BRENDAN T. BOLGER, CPCU**
**Consultant / Opinion Witness**
**Insurance Coverage & Practices**
**1310 Mulberry Lane**
**Mt. Prospect, IL 60056-1428**
**Tel./Fax. 847-259-2515**

**Education:**

DePaul University – 1950-1954
CPCU – 1957-1960

**Certification:**

Chartered Property and Casualty Underwriter – 1960
Illinois Insurance Broker – 1950

**Employment:**

Various Insurance Companies – 1950-1954
U.S. Army – Spc.III – Finance – 1954-1956
Hartford Accident & Indemnity Company – Underwriter – 1956-1957
Rollins Burdick Hunter – Senior Vice President – 1957-1991
Arthur J. Gallagher & Co. – Area Senior Vice President – 1991-1993
Insurance Consultant / Opinion Witness 1993-Present

**Employment Responsibilities:**

Senior Account Executive for major accounts with exposures in the following fields:

Steel Manufacturing, Architects and Engineers, Insurance Companies, Consumer Goods Manufacturing, Construction Operations, Wrap-up Programs, Hospital Supply Manufacturing, Universities, Medical Group Practice, Strip and Deep Mining, Banking, Real Estate, Trust Department Operations, Oilpatch Supply Operations, Pipeline Operations, Chemical and Rubber Manufacturing, Food Manufacturing, Rail and Aircraft Leasing, and Property Management.



Bolger
Exhibit No. A
Date: 12-16-05
Caryl L. Hardy

**Expertise:**

- Captive Insurance Companies – Management
- Architects & Engineers Professional Liability
- London Market Excess Liability
- Bermuda Market – Excess Liability
- Bermuda Market – D & O Liability
- Bermuda Market – Fiduciary Liability
- Nuclear Energy Liability
- Aircraft Products Liability
- Directors and Officers' Liability
- Aviation Hull and Liability
- London Market Property Insurance
- Property & Casualty Reinsurance
- Primary Casualty – Retros – Large Deductible Programs
- Wrap-ups
- Miscellaneous Professional Liability
- Excess Workers Compensation
- Self Insurance Programs
- Kidnap & Ransom Insurance
- Variations in Claims Made Forms
- Universities
- Banks
- Stockbrokers
- Lawyers
- Manufacturers
- Pharmaceuticals
- Foreign Programs – Local and D.I.C.
- Fronting Programs for Captive Insurance Companies

**Consulting Fees:**

$200 per hour plus travel expense.

- Away From Residence: Billable Time begins at time of exit from residence (hotel) till time of return to residence (hotel).
- At Residence (Hotel): Billable time begins when work on the project begins and ends when work on the project ends.

**Expenses:** Receipts will be provided for all expenditures exceeding $25.00 (except for use of private auto)

**Airplane Travel:** Business class fare (if available) on air travel of less than four hours, first class fare for all other travel.

## OPINIONS/DEPOSITIONS/TRIALS

| DATE | OPINION | DEPOSITIONS | TRIALS | CASE | SUBJECT |
|------|---------|-------------|--------|------|---------|
| | X | | | Affiliated F. M. v. Owens Corning Fiberglass | |
| | X | | | Armco Inc. v CIGNA | Crime |
| | X | X | X | Continental Bank v A.I.G. | Directors & Officers |
| | X | | | Baxter Laboratories v Zurich | Products Liability |
| | X | | | Anderson v MIGA | Pollution Liability |
| | X | | | Armco/Reserve Mining v Travelers | Pollution Liability |
| 00 | X | | | Armco v Maryland Casualty | Asbestos Coverage |
| | X | | | Snap-On-Tools v American Excess | Aggregate Limits |
| | X | X | X | Marsh & McLennan v Emergency Technical Services | Brokers Services/ Pollution Liability |
| | X | | | Baxter Healthcare v British Companies | Legal Representation |
| | X | | | Naperville Chauffeuring v Gruenberg | Association Captive |
| | X | | | Sears Roebuck v Seneca Ins Co | Products Liability |
| | X | | | Multinational Concessions v Betzelos-Sunset | Additional Insured Mortgagee |
| | X | | | Wilmington Liquid Bulk Terminals v Somerset Marine | Marine Coverage |
| | X | | | Kline v Ohio Casualty | |
| | X | | | MacCready v Gutman Ins. Services | Broker/Employee Relations |
| 97 | X | | | American States Ins. Co. v Guy Viti Ins. Agcy. | Broker Duties |
| 98 | X | X | | Illinois Founders Ins Co. v Associates General Insurance | Claim Reporting Duties |
| 99 | X | | | Laurice Westerman v Chapman Ins. Agcy. | Broker Duties |
| | X | | | United States Fire Protection v National Union | Directors & Officers Liability |
| 00 | X | | | Illinois Casualty v Costello's | Brokers Duties To Explain Policy Exclusions |
| 00 | X | X | | Cory And Assoc. v Ins. Brokers Serv. Inc. | Surplus Lines Broker Duties To Retail Broker |
| 00 | X | X | | Burmac Metal Finishing v Flynn Ins. Agcy. | Brokers Duties To Client |
| 01 | X | | | Capitol & Louisiana Bldg. LLC v CAN & Crissie | Brokers Duties To Client |
| 01 | X | | X | IBJ Whitehall Bnk & Tr v Insurance Brokers Service | Wholesale Brokers Duties To Insureds (see Cory v IBS) |

surplus lines

surplus lines

| | | | | | |
|----|---|---|---|-------------------------------------------------|------------------------------------------|
| 01 | X | | | Equity Residential Properties v Lexington Ins. Co. | Meaning of Standing Timber Exclusion |
| 01 | X | X | X | Nick Revelis v Otto Felix | Broker Duties to Client Accident & Health Coverage |
| 03 | X | X | | Alternative Distr. Sys. V Corporate Ins. Sp. | Warehousemen's Legal Liability |
| 03 | X | | | Gibby's Lounge v Affiliated Ins. Grp. | Property value & loss payee |
| 04 | X | | | Chicago Housing Authority vs Insurers | Application of Aggregate limits |
| | | | | | |
| | | | | | |
| | | | | | |

## ATTORNEYS SERVED

Bates Meckler Bulger & Tillson
Gray, Plant, Mooty, Mooty and Bennett P.A
McCullough, Campbell & Lane
Arnstein & Lehr
Tribler Orpett & Meyer
Pope Cahill & Devine Ltd.
Wiley Rein & Fielding
O'Melveny & Meyers
Cooney & Conway
Thompson Hine & Flory LLP
Nelson, Dries, Connell & Kramer S.C.
Heyl Royster Voelker & Allen
Anderson Kill & Olick, P.C.
Nixon Peabody LLP
French Kezelis & Kominarek P.C.
Ungaretti & Harris

## PUBLICATIONS

Insurance Programs For Large Construction Projects.

# AVIATION
# INSURANCE

## An Introduction to General Aviation Insurance in the United States

by
DARRELL T. ELKINS, Ph.D.

## JOHN NICHOLS
Insurance Agency, Inc.
Houston, Texas

J. A. ELKINS BROTHERS PUBLISHING CO.
P.O. Drawer 785
Porter, Texas 77365



Bolger
Exhibit No. B
Date: 12-16-05
Caryl L. Hardy

**BRENDAN T. BOLGER, CPCU**
**Consultant / Opinion Witness**
**Insurance Coverage & Practices**
**1310 Mulberry Lane**
**Mt. Prospect, IL 60056-1428**
**Tel./Fax. 847-259-2515**

**Education:**

DePaul University – 1950-1954
CPCU – 1957-1960

**Certification:**

Chartered Property and Casualty Underwriter – 1960
Illinois Insurance Broker -- 1950

**Employment:**

Various Insurance Companies – 1950-1954
U.S. Army – Spc.III – Finance – 1954-1956
Hartford Accident & Indemnity Company – Underwriter – 1956-1957
Rollins Burdick Hunter – Senior Vice President – 1957-1991
Arthur J. Gallagher & Co. – Area Senior Vice President – 1991-1993
Insurance Consultant / Opinion Witness 1993-Present

**Employment Responsibilities:**

Senior Account Executive for major accounts with exposures in the following fields:

Steel Manufacturing, Architects and Engineers, Insurance Companies, Consumer Goods Manufacturing, Construction Operations, Wrap-up Programs, Hospital Supply Manufacturing, Universities, Medical Group Practice, Strip and Deep Mining, Banking, Real Estate, Trust Department Operations, Oilpatch Supply Operations, Pipeline Operations, Chemical and Rubber Manufacturing, Food Manufacturing, Rail and Aircraft Leasing, and Property Management.



# AVIATION INSURANCE

## An Introduction to General Aviation Insurance in the United States

by
DARRELL T. ELKINS, Ph.D.

## JOHN NICHOLS
### Insurance Agency, Inc.
### Houston, Texas

J. A. ELKINS BROTHERS PUBLISHING CO.
P.O. Drawer 785
Porter, Texas 77365



Bolger
Exhibit No. B
Date 2-16-05
Caryl L. Hardy

**Expertise:**

- Captive Insurance Companies – Management
- Architects & Engineers Professional Liability
- London Market Excess Liability
- Bermuda Market – Excess Liability
- Bermuda Market – D & O Liability
- Bermuda Market – Fiduciary Liability
- Nuclear Energy Liability
- Aircraft Products Liability
- Directors and Officers' Liability
- Aviation Hull and Liability
- London Market Property Insurance
- Property & Casualty Reinsurance
- Primary Casualty – Retros – Large Deductible Programs
- Wrap-ups
- Miscellaneous Professional Liability
- Excess Workers Compensation
- Self Insurance Programs
- Kidnap & Ransom Insurance
- Variations in Claims Made Forms
- Universities
- Banks
- Stockbrokers
- Lawyers
- Manufacturers
- Pharmaceuticals
- Foreign Programs – Local and D.I.C.
- Fronting Programs for Captive Insurance Companies

**Consulting Fees:**

$200 per hour plus travel expense.

- Away From Residence: Billable Time begins at time of exit from residence (hotel) till time of return to residence (hotel).
- At Residence (Hotel): Billable time begins when work on the project begins and ends when work on the project ends.

**Expenses:** Receipts will be provided for all expenditures exceeding $25.00 (except for use of private auto)

**Airplane Travel:** Business class fare (if available) on air travel of less than four hours, first class fare for all other travel.

## OPINIONS/DEPOSITIONS/TRIALS

| DATE | OPINION | DEPOSITIONS | TRIALS | CASE | SUBJECT |
|---|---|---|---|---|---|
| | X | | | Affiliated F. M. v. Owens Corning Fiberglass | |
| | X | | | Armco Inc. v CIGNA | Crime |
| | X | X | X | Continental Bank v A.I.G. | Directors & Officers |
| | X | | | Baxter Laboratories v Zurich | Products Liability |
| | X | | | Anderson v MIGA | Pollution Liability |
| | X | | | Armco/Reserve Mining v Travelers | Pollution Liability |
| 00 | X | | | Armco v Maryland Casualty | Asbestos Coverage |
| | X | | | Snap-On-Tools v American Excess | Aggregate Limits |
| | X | X | X | Marsh & McLennan v Emergency Technical Services | Brokers Services/ Pollution Liability |
| | X | | | Baxter Healthcare v British Companies | Legal Representation |
| | X | | | Naperville Chauffeuring v Gruenberg | Association Captive |
| | X | | | Sears Roebuck v Seneca Ins Co | Products Liability |
| | X | | | Multinational Concessions v Betzelos-Sunset | Additional Insured Mortgagee |
| | X | | | Wilmington Liquid Bulk Terminals v Somerset Marine | Marine Coverage |
| | X | | | Kline v Ohio Casualty | |
| | X | | | MacCready v Gutman Ins. Services | Broker/Employee Relations |
| 97 | X | | | American States Ins. Co. v Guy Viti Ins. Agcy. | Broker Duties |
| 98 | X | X | | Illinois Founders Ins Co. v Associates General Insurance | Claim Reporting Duties |
| 99 | X | | | Laurice Westerman v Chapman Ins. Agcy. | Broker Duties |
| | X | | | United States Fire Protection v National Union | Directors & Officers Liability |
| 00 | X | | | Illinois Casualty v Costello's | Brokers Duties To Explain Policy Exclusions |
| 00 | X | X | | Cory And Assoc. v Ins. Brokers Serv. Inc. | Surplus Lines Broker Duties To Retail Broker |
| 00 | X | X | | Burmac Metal Finishing v Flynn Ins. Agcy. | Brokers Duties To Client |
| 01 | X | | | Capitol & Louisiana Bldg. LLC v CAN & Crissie | Brokers Duties To Client |
| 01 | X | | X | IBJ Whitehall Bnk & Tr v Insurance Brokers Service | Wholesale Brokers Duties To Insureds (see Cory v IBS) |

| 01 | X |   |   | Equity Residential Properties v Lexington Ins. Co. | Meaning of Standing Timber Exclusion |
|----|---|---|---|---|---|
| 01 | X | X | X | Nick Revelis v Otto Felix | Broker Duties to Client Accident & Health Coverage |
| 03 | X | X |   | Alternative Distr. Sys. V Corporate Ins. Sp. | Warehousemen's Legal Liability |
| 03 | X |   |   | Gibby's Lounge v Affiliated Ins. Grp. | Property value & loss payee |
| 04 | X |   |   | Chicago Housing Authority vs Insurers | Application of Aggregate limits |
|    |   |   |   |   |   |
|    |   |   |   |   |   |
|    |   |   |   |   |   |

## ATTORNEYS SERVED

Bates Meckler Bulger & Tillson
Gray, Plant, Mooty, Mooty and Bennett P.A
McCullough, Campbell & Lane
Arnstein & Lehr
Tribler Orpett & Meyer
Pope Cahill & Devine Ltd.
Wiley Rein & Fielding
O'Melveny & Meyers
Cooney & Conway
Thompson Hine & Flory LLP
Nelson, Dries, Connell & Kramer S.C.
Heyl Royster Voelker & Allen
Anderson Kill & Olick, P.C.
Nixon Peabody LLP
French Kezelis & Kominarek P.C.
Ungaretti & Harris

## PUBLICATIONS

Insurance Programs For Large Construction Projects.