E-FILED
Friday, 06 October, 2006 12:03:36 PM
Clerk, U.S. District Court, ILCD

1  related to aerial application, was covered?

2      SCOTT PETERSEN:  To my knowledge,

3  yeah, it was all covered.

4      Q.   And that would be true whether it

5  was in the Arrow or the Warrior or an Air

6  Tractor, correct?

7      SCOTT PETERSEN:  Yes.

8      Q.   Do you recall whether you ever at

9  any time had any specific discussions with

10 Hardy or any other insurance agent concerning

11 insurance requirements for operating a flight

12 school?

13     SCOTT PETERSEN:  Not that I

14 remember.  I mean we were -- we were covered

15 on the aircraft when we purchased them, and

16 those were set up accordingly for what we

17 were using them for.

18     Q.   Did you ever have any correspondence

19 back and forth from Hardy Aviation concerning

20 your coverage?

21     SCOTT PETERSEN:  Other than the

22 policy.

23     Q.   Okay.  So you didn't write him a

24 memorandum saying here is the operations we

1    intend to engage in in our airport and --

2        SCOTT PETERSEN:  No.

3    Q.    Okay.  Is there anywhere else you

4    can think of that you advertised for turbine

5    transition training?

6        SCOTT PETERSEN:  I think "The Ag Air

7    Update" was the only publication and just the

8    referrals that Harold had.

9    Q.    And since this accident, have you

10   trained any other pilots for turbine

11   transition?

12       SCOTT PETERSEN:  Nope.

13   Q.    Okay.  So when you talked earlier

14   about pilots that were referred from Harold

15   Miller, what have you done with respect to

16   those referrals?

17       SCOTT PETERSEN:  We told them that

18   we are no longer offering turbine transition

19   training.

20   Q.    Is Rick Lucente the only person you

21   were using or intending to use for turbine

22   transition training?

23       SCOTT PETERSEN:  Yes.

24   Q.    Were you involved in any respect

1    with regard to preparing the syllabus or the

2    flight training course?

3          SCOTT PETERSEN:  No.  I think Rick

4    used what he had used when he had worked with

5    Harold when Harold did the turbine transition

6    training.

7       Q.   Did you ever sit down and go over

8    those requirements with him, or did you leave

9    that to him as the person maybe more

10   qualified?

11         SCOTT PETERSEN:  No.  I looked at

12   his syllabus as far as what he wanted to

13   accomplish.  As far as checking somebody out

14   in the turbine operations and having been

15   through it with him as a pilot, I was pretty

16   confident that he had covered all the bases

17   well.

18      Q.   How did you first come to meet Mr.

19   Lucente?  Was that through Harold Miller?

20         SCOTT PETERSEN:   That's correct.

21      Q.   Were you already doing some

22   subcontracting aerial application for Harold

23   Miller before you met Mr. Lucente?

24         SCOTT PETERSEN:  I met Rick at

31

1    Harold's flight school in the summer of 1996

2    when I went through his initial ag pilot

3    training course and he had gone through that

4    that prior season.

5        Q.    So were you and Rick Lucente both

6    doing some independent contract work for

7    Harold Miller, if you will?

8        SCOTT PETERSEN:  Yes.

9        Q.    Do you have any idea how much time

10   Mr. Lucente had in this specific aircraft at

11   issue, the 503?

12       SCOTT PETERSEN:  Not exact numbers.

13   I know he trained quite a few individuals.

14   Harold had numerous contacts throughout the

15   industry.

16       Q.    Did you ever have an opportunity at

17   some point before you elected to use Mr.

18   Lucente to do flight training for you to

19   review his logbooks and his personal logbooks

20   and look at his flight experience?

21       A.    Yes, I did.

22       Q.    This day of the accident, was this

23   the first in-the-air training session with

24   this particular student?

1           SCOTT PETERSEN:  Yes.

2       Q.   Did you have an opportunity to meet

3   Mr. Webster?

4           SCOTT PETERSEN:  Yes, we did.  The

5   accident happened on Monday.  The day before

6   on Sunday, the weather was inclement, and

7   they spent a little over two hours in the

8   classroom, Rick and Mr. Webster, going over

9   turbine operations, emergency procedures,

10  starts and those types of things, and things

11  that were related to the transition course,

12  and that is documented in Mr. Webster's

13  logbook.

14      Q.   Okay.  Did you have any type of

15  contract with Mr. Lucente, a written

16  agreement of any kind?

17          SCOTT PETERSEN:  No.

18      Q.   So it was a verbal contract by the

19  job basis?

20          SCOTT PETERSEN:  Verbal as needed.

21      Q.   Okay.  So your intention would be

22  that when you had a student referred to you,

23  you would call Mr. Lucente and tell him you

24  had a new student?

1          SCOTT PETERSEN:  And see when he was

2  available to work with them.

3      Q.   Did you check with Mr. Webster to

4  see if he carried any type of renter's or

5  non-owned insurance?

6          SCOTT PETERSEN:  No.

7      Q.   Did Mr. Webster make any inquiries

8  concerning insurance coverage for the

9  aircraft during his training?

10         SCOTT PETERSEN:  No.

11     Q.   How did you happen to come into

12  contact with Mr. Webster as a student pilot?

13        SCOTT PETERSEN:  He was referred by

14  a man by the name of Del Finup, F-i-n-u-p, in

15  Lakeview, Michigan; and Neil was looking for

16  work up in Michigan.  He had grown up, I

17  think, in the Detroit area, had spent the

18  last several seasons flying out of Wyoming.

19  And Mr. Finup had, I believe, a 402 Air

20  Tractor, turbine Air Tractor, that he was

21  looking to put him in for that season.

22     Q.   So Mr. Finup was looking for

23  somebody to train Mr. Webster to fly for Mr.

24  Finup, correct?

34

1    A.    That's correct.

2    Q.    There was never any intention, as

3    far as you recall, to have Mr. Webster do any

4    aerial application flights for Pontiac Flying

5    Service?

6         SCOTT PETERSEN:  No.

7    Q.    And were you furnishing any type of

8    training materials for Mr. Lucente?

9         SCOTT PETERSEN:  Yes, we had a

10    current POH that included all the procedures

11    for the aircraft as well as a current weight

12    and balance.

13    Q.    Okay.  In terms of instructional

14    materials, the syllabus or textbooks,

15    anything like that that you provided?

16         SCOTT PETERSEN:  No.  He had all

17    that with him.

18    Q.    Okay.  Was Mr. Webster required to

19    purchase any training materials?

20         SCOTT PETERSEN:  No.

21    Q.    What was the rate of compensation

22    for Mr. Lucente for his training?

23         SCOTT PETERSEN:  I believe he was

24    paid $100 per flight hour.  Was that the

35

1    arrangement?

2         SARAH PETERSEN:  No.

3         SCOTT PETERSEN:  No?

4         SARAH PETERSEN:  It was $100 per for

5    instruction hour whether it was classroom or

6    flight.

7         SCOTT PETERSEN:  Okay.  I stand

8    corrected.

9    Q.    So it was $100 per hour whether it

10   was ground or in the air, correct?

11        SARAH PETERSEN:  Yes.

12   Q.    And you would trust Mr. Lucente to

13   turn in his time.  Is that how you would do

14   that?

15        SCOTT PETERSEN:  Absolutely.

16   Q.    What were the terms of the deal with

17   Mr. Finup in terms of what you'd be

18   compensated for getting Mr. Webster trained?

19        SCOTT PETERSEN:  I believe it was

20   $5,200.

21   Q.    And what would Mr. Webster be

22   required to pay for his training?

23        SCOTT PETERSEN:  5,200.  I believe

24   Mr. Finup was going to pay that.

36

1      Q.    I'm sorry.  I misspoke.  Mr. Webster

2  was to pay how much for his training?

3          SCOTT PETERSEN:  Mr. Finup was going

4  to pay for him.

5      Q.    Oh, Mr. Finup was paying for him?

6  Okay.  So Mr. Webster doesn't pay anything on

7  this.

8          SARAH PETERSEN:  No.

9          SCOTT PETERSEN:  No.  I believe the

10  arrangement was he was going to work that

11  back off when he went to work for Del.

12      Q.    Okay.  Did you ultimately get any

13  payment from Finup?

14          SCOTT PETERSEN:  No.

15      Q.    Did you have any discussions with

16  Mr. Webster concerning what insurance

17  coverage he might carry through Finup's

18  operation?

19          SCOTT PETERSEN:  No.

20      Q.    He was presently flying some

21  aircraft for Mr. Finup at the time?

22          SCOTT PETERSEN:  No.

23      Q.    So he would be a new pilot for Mr.

24  Finup?

1       SCOTT PETERSEN:   That's correct.

2       Q.   Did you know Mr. Finup before he

3   called you about this referral?

4       SCOTT PETERSEN:   Yes.

5       Q.   Where do you know Mr. Finup from?

6       SCOTT PETERSEN:   I had previously

7   taken Mr. Miller's son who was working for

8   another operator on the Lakeview Airport, I

9   believe, back in '97 and had met Del at that

10  time, and then I'd also seen him at the

11  national conventions and at the NAAA, the

12  National Ag Aviation Association, their

13  spring meetings, the board meetings and

14  stuff.   I had seen him around different

15  places.

16      Q.   How did Mr. Finup know that you had

17  an Air Tractor?   How did he know that he

18  could send somebody here to get trained?

19      SCOTT PETERSEN:   The aerial

20  application business is a small entity; and

21  generally, if there's something going on,

22  everybody knows.   And Mr. Finup, him and

23  Harold had a long-standing relationship.   He

24  knew that I had purchased Harold's assets.

38

1    Q.   Did you pay any type of workers'

2    compensation or anything for Mr. Lucente, did

3    you?

4        SARAH PETERSEN:   What do you mean?

5    Q.   Like did you have a work comp policy

6    that he was included under?

7        SARAH PETERSEN:   Yes.

8    Q.   So he was a named employee for work

9    comp?

10       SARAH PETERSEN:   No, he was

11   considered a private contractor.

12   Q.   He would come under your work comp

13   in terms of what your work comp covered?

14       SARAH PETERSEN:   You know, that I

15   don't know.

16   Q.   Okay.

17       MR. GUY:  So you don't know if any

18   benefits have been paid to the Lucente family

19   on behalf of the workers' compensation

20   policy?

21       SARAH PETERSEN:   No, I do not know

22   that.

23       MR. GUY:  Do you know if there's any

24   discussions about paying it one way or the

1    other?

2         SARAH PETERSEN:  I know that they

3    have requested information from me which I

4    have submitted to them.

5         MR. GUY:  So it's under

6    investigation?

7         MR. CAUGHEY:  I don't think she said

8    that.

9         MR. GUY:  Okay.

10        SARAH PETERSEN:  I don't know.  They

11   have requested information from me, I sent it

12   to them, and I have not had any contact with

13   them.

14        MR. GUY:  And who is they?

15        SARAH PETERSEN:  That would be

16   Travelers, the insurance company.

17        MR. GUY:  Okay.  Do you have a

18   contact at Travelers?

19        SARAH PETERSEN:  Yes, there would be

20   something on that sheet of paper.

21        MR. GUY:  Okay.

22

23   BY MR. BANOVETZ:

24        Q.  Did you have a plan or did you

1  anticipate in terms of percentage of use what

2  percentage of use would be aircraft flight

3  training and what percentage of use would be

4  anticipated to be aerial application?

5      SCOTT PETERSEN:  I never calculated

6  that.

7      Q.  Can you estimate the number of hours

8  it was used for aerial application at the

9  time of the accident on behalf of your

10 business?

11     SCOTT PETERSEN:  No.

12     Q.  Okay.  Did you have any other

13 student signed up for training at the time of

14 the accident?

15     SCOTT PETERSEN:   No.

16     Q.  Did you meet with Mr. Webster for

17 the purpose of training him or going over

18 flight logs, syllabus, flight books or

19 logbooks, anything at all?

20     SCOTT PETERSEN:  No, I did not.  Mr.

21 Lucente went through his logbook.

22     Q.  Was your contact with Mr. Webster

23 pretty much, hello, nice to meet you?

24     SCOTT PETERSEN:  I had had phone

41

1    conversations with him when the initial was

2    set up, and I had FAXed to him directions on

3    how to get here, when to meet, what to

4    expect.

5        Q.    Were you generally aware of what

6    flight maneuvers Mr. Lucente would be

7    performing as part of the training process?

8        SCOTT PETERSEN:  Yes.

9        Q.    What sort of maneuvers are required,

10   just off the top of your head, for turbine

11   transition training?

12       SCOTT PETERSEN:  There's a large

13   emphasis on engine starts.  That's one of the

14   most critical things in the turbine industry.

15   If you don't pay attention, you can cook an

16   engine.  As far as the flying, we went over

17   emergency procedures, stall awareness, steep

18   turns.  I think those things stick out in my

19   mind the most.

20       Q.    Was there a minimum altitude that

21   Mr. Lucente would require for steep turns?

22       SCOTT PETERSEN:  If I recall when I

23   went through the training course, we were

24   1,500, 2,000 AGL.

42

1      Q.    Do you know who owns the property

2    where the aircraft crashed?

3          SCOTT PETERSEN:   City of Pontiac.

4      Q.    City of Pontiac.   Has the City of

5    Pontiac made any sort of claim with respect

6    to remediation of the land or environmental

7    cleanup?   No?   You have to answer out loud.

8    I'm sorry.

9          SCOTT PETERSEN:   No.

10     Q.    Okay.   Have you heard from the EPA

11   or has the NTSB talked to you about remedial

12   environmental remediation at the site?

13         SCOTT PETERSEN:   No.

14         SARAH PETERSEN:   No.

15     Q.    Did Mr. Lucente complete any

16   paperwork with respect to Neil Webster that

17   he provided to you about Mr. Neil Webster's

18   background or experience or anything?

19         SARAH PETERSEN:   The only thing that

20   we have is we got a copy of his current

21   medical and a copy of his pilot's license.

22     Q.    Have you heard from an attorney or

23   someone else from either Webster or Lucente's

24   estates concerning any possible liability

43

1    claim?

2         SCOTT PETERSEN:  The estate of Mr.

3    Webster, I believe, we did receive --

4         SARAH PETERSEN:  We received a

5    letter stating that they had retained

6    counsel.  There was nothing further

7    indicated.

8    Q.    Okay.  Nothing with respect to Mr.

9    Lucente?

10        SARAH PETERSEN:  No.

11   A.    No.

12   Q.    Have you had any communications with

13   anybody from Mr. Lucente's family?

14        SARAH PETERSEN:  We are very close

15   to his wife.

16   Q.    And you have talked to Mr. Lucente's

17   wife?

18        SARAH PETERSEN:  Many times.

19        SCOTT PETERSEN:  Yes.

20   Q.    And she hasn't said anything at this

21   point about a claim?

22        SCOTT PETERSEN:  No, not that I'm

23   aware of.

24   Q.    Do you have a copy of what you got

44

1    from Mr. Webster's attorney?

2        SARAH PETERSEN:  Yeah.

3    Q.    You kept a copy of that, okay.  Have

4    you had any communications at all with the

5    bank where the loan on the aircraft was

6    taken?

7        SARAH PETERSEN:  No.

8        SCOTT PETERSEN:  No.

9    Q.    What bank is that?

10        SCOTT PETERSEN:  That's the Bank of

11    Pontiac.

12    Q.    Okay.  Are you making some sort of

13    payments on the aircraft at the present time?

14        SARAH PETERSEN:  No.  There is a

15    scheduled yearly annual payment that's due

16    in --

17        SCOTT PETERSEN:  November.

18        SARAH PETERSEN:  -- November.

19    Q.    Has the bank been put on notice of

20    the loss?

21        SCOTT PETERSEN:  Yes.

22        SARAH PETERSEN:  Oh, yeah.

23    Q.    Is there a specific person that you

24    deal with at the bank?

1          SCOTT PETERSEN:  Yes, Adam Ingles.

2      Q.   Okay.  Has Adam made inquiry

3  concerning insurance coverage on the

4  aircraft?

5          SCOTT PETERSEN:  No.

6      Q.   Has the NTSB made any order or

7  entered any order requiring that the aircraft

8  be maintained at its present location and

9  that it not be destroyed?

10         SARAH PETERSEN:  No.

11         SCOTT PETERSEN:  No.

12     Q.   As far as you know, are you free to

13  do with the airplane whatever you want at

14  this point?

15         SCOTT PETERSEN:  I don't believe

16  that is the case.  The last I was under the

17  understanding that it was to be stored and

18  not disturbed until it was released.

19     Q.   Okay.  Just so I'm clear, other than

20  Mr. Hardy, did you have any discussion with

21  any other insurance agents or anyone else for

22  that matter about insurance requirements for

23  operating flight school?

24         SCOTT PETERSEN:  No.

1    Q.    And you have been operating a flight

2    school in some capacity since 1987.  Is that

3    correct?

4         SCOTT PETERSEN:  That's correct.

5    Q.    But no turbine transition training

6    until the incident at issue?

7         SCOTT PETERSEN:  That's correct.

8    Q.    Okay.  And the only policy you've

9    carried is either the AIG policy or the

10   US AIG policy?

11        SCOTT PETERSEN:  That's also

12   correct.

13   Q.    Okay.

14        SCOTT PETERSEN:  Right?

15        SARAH PETERSEN:  I am not clear

16   about the company that has the policies for

17   the other rental aircraft.  I don't believe

18   that's AIG or US AIG.  I hate to appear -- I

19   don't know that that company covers our other

20   aircraft.  I think that's just the ag

21   aircraft.  I would have to look at the

22   policies to see who it is.

23   Q.    You think you might have another

24   policy with another company?

1    SARAH PETERSEN:  Not for this

2  aircraft, no.  But you are asking if

3  everything is covered by US AIG.  I don't

4  believe so.  I think our rental planes, the

5  Grumman, the Warrior, the Arrow, I believe

6  they are covered by a different company.  I

7  think the only thing that is covered with the

8  US AIG or AIG, whoever, is the ag items.

9    Q.  Okay.  That's what I was thinking

10  because I don't recall seeing these other

11  airplanes:  the Grumman, Arrow, Warrior, I

12  don't remember seeing those on this policy.

13    SARAH PETERSEN:  No, I believe those

14  are covered by a different company, but I

15  don't recall which company that is.

16    Q.  Okay.  Do you have any means of

17  finding out what company that is?

18    SARAH PETERSEN:  Yes, that's in the

19  file.

20    Q.  Is that something you could do now?

21  Can we take a break and do that?

22    SCOTT PETERSEN:  Yeah, we can take a

23  break and do that.

24    MR. CAUGHEY:  Or we can send it to

48

1    you.

2            MR. GUY:  Whatever is convenient for

3    you.  Did you have at the time or do you now

4    have a file that you kept on Mr. Lucente, any

5    paperwork on him, medical or pilot

6    certificate?

7            SARAH PETERSEN:   Yes, I have a copy

8    of his -- I don't recall exactly what's in

9    the file; but I know that in the past I've

10   had his medical, and I've had -- and I always

11   have a copy of his Illinois license, his

12   applicator license.

13

14   BY MR. BANOVETZ:

15       Q.   Did you have an opportunity to meet

16   Mr. Coker when he was out here?

17           SCOTT PETERSEN:  Yes.

18       Q.   The investigator, Dave Coker?

19           SARAH PETERSEN:  Yes.

20       Q.   Did you give him everything you had

21   on Mr. Lucente?

22           SARAH PETERSEN:  I gave him

23   everything that he asked for.  I don't recall

24   what those items would have been.

1          MR. GUY:  Do you have any excess

2    insurance which may apply to this incident?

3          MR. BANOVETZ:  Umbrella coverage?

4          SARAH PETERSEN:  Not that I'm aware

5    of.

6          MR. GUY:  Okay.

7

8    BY MR. BANOVETZ:

9          Q.   Well, Peter, I think I'm just about

10   through my questions.  If you want to take a

11   minute and I'll take a minute and we'll see

12   if we've got anything else here.

13         MR. GUY:  Do you know where Mr.

14   Lucente's logbooks are, his pilot logbooks?

15         SARAH PETERSEN:  I'm not aware of

16   where they are.

17         MR. GUY:  Okay.

18         MR. BANOVETZ:  Peter, is that about

19   it for you?

20         MR. GUY:  I don't think I have

21   anything else.

22         MR. BANOVETZ:  I don't think we have

23   anything further.  Counsel?  Okay.  We'll go

24   off the record then.

50

1              (WHEREUPON THERE WAS A DISCUSSION

2       OFF THE RECORD.)

3

4              (FURTHER THE WITNESSES SAYETH NOT.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

51

1    STATE OF ILLINOIS    )

                          )  SS.

2    COUNTY OF LIVINGSTON)

3         I, LYNN J. WATSON, a Certified

4    Shorthand Reporter in and for the County of

5    Livingston and State of Illinois, do hereby

6    certify that the witnesses herein, prior to

7    the taking of said sworn statement, were by

8    me duly sworn to testify the truth insofar as

9    they might be interrogated concerning the

10   same; and that the said sworn statement was

11   on that date taken stenographically and

12   afterwards transcribed by me, and that the

13   foregoing is a true and accurate transcript

14   of the testimony so given on said date.

15        Dated July 16, 2003.

16

17

18

19

20   _Lynn J. Watson_____
     C.S.R., R.P.R.
     C.S.R. License No. 84-1744

21

22

23

24

STATE OF ILLINOIS
COUNTY OF LIVINGSTON

)
)
)
)
)
)
)
)
IN RE: PONTIAC FLYING SERVICE     )
)
)
)
)
)
)
)
_____   )

I, Sarah Petersen, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken July 14, 2003, that I have read the foregoing transcript of the deposition, consisting of pages 1 to 51 inclusive, and affix my signature to same.

_____
                                              Sarah Petersen

Subscribed and sworn to
Before me this _____ day of
_____, 2003

_____
Notary Public

STATE OF ILLINOIS
COUNTY OF LIVINGSTON

)
)
)
)
)
)
)
)
IN RE: PONTIAC FLYING SERVICE        )
)
)
)
)
)
)
)
)

I, Scott Petersen, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken July 14, 2003, that I have read the foregoing transcript of the deposition, consisting of pages 1 to 51 inclusive, and affix my signature to same.

_____
Scott Petersen

Subscribed and sworn to
Before me this _____ day of
_____, 2003

_____
Notary Public