**E-FILED**
Wednesday, 25 October, 2006  10:59:16 AM
Clerk, U.S. District Court, ILCD

23 53 24 00 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) | |
| Plaintiff, | ) | |
| vs. | ) ) | |
| PONTIAC FLYING SERVICES, INC., JUSTYN WEBSTER, as Special Administrator of the Estate of NEIL WEBSTER, Deceased, and CAREN S. LUCENTE, as Independent Executor of the Estate of RICHARD P. LUCENTE, Deceased, | ) ) ) ) ) ) | No.     03-1288 |
| Defendants/ Third-Party Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| HARDY AVIATION INSURANCE, INC., | ) ) | |
| Third-Party Defendant. | ) | |

**HARDY AVIATION INSURANCE, INC.'S**
**REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Third-Party Defendant, HARDY AVIATION INSURANCE, INC.

("Hardy"), by its attorneys, DIANE M. BARON and CLAUSEN MILLER P.C., and submits the

following Reply in support of its Motion for Summary Judgment.

(a)    **Reply to Pontiac's Additional Material Facts**

1.    If by stating that Hardy Aviation Insurance, Inc. ("Hardy") is a licensed

"corporate" insurance broker, Pontiac means that Hardy is a corporation, then this statement is

undisputed and material.

2.    Undisputed and material.

3.    Undisputed and material.

4.    Undisputed and material.

5.     This paragraph is disputed as to the statement that Randy Hardy and Angie Banz specialize in "binding" insurance or that they "bind" insurance policies. All coverages are "bound" by the insurance company, not by Hardy. (Hardy dep., pp. 66-67) This paragraph is also disputed depending upon the meaning of the phrase "must understand the insurance policies." Hardy testified that he has never sold policies which he does not understand, but that he recognizes that he does not and cannot hold himself out as understanding all of the legal ramifications of every aspect of an insurance policy. (Hardy dep., p. 30)

6.     Immaterial; the Petersens were in the aviation and crop dusting business for years and had been purchasing insurance all during that time. Pontiac was a sophisticated insured, and Scott Petersen has been operating a flight school in some capacity since 1987. (Scott Petersen Sworn Statement, p. 46) Hardy testified: "I believe our responsibility as the agent is to help the client understand things as best as possible, but I think there is a prudent responsibility upon the client to understand and learn and read about his own policy . . . and if there's any questions regarding any particular thing, that they bring it to us because I don't think I could be held responsible for trying to determine what all their questions might be. (Hardy dep., p. 108) Pontiac's expert agreed, stating that when a client receives a policy, he should look at it and if he cannot understand it, he should ask. (Reavis dep., p. 61)

7.     Undisputed and material.

8.     Undisputed and material with the exception that it incorrectly states that coverages afforded by a standard form policy may be varied "for" endorsements to the policy; it should state "by" endorsements to the policy.

9.     Undisputed and material.

10.    This paragraph is disputed as to the statement that an insurance broker "binds" policies. All coverages are "bound" by the insurance company, not the broker (Hardy dep., pp. 66-67). Otherwise, undisputed and material.

11.    Again, this paragraph is disputed as to the statement that an insurance broker or producer is "binding" aviation insurance policies. All coverages are "bound" by the insurance company, not the broker. (Hardy dep., pp. 66-67) Otherwise, undisputed and material.

12.    It is undisputed that the AT503 was a dual cockpit dual control turbine powered agricultural aircraft. The remainder of this paragraph is disputed because it is not supported by the portions of the record cited. The AT503 was designed for both crop dusting and training. (Bolger dep., p. 89)

13.    Immaterial because this case involves Pontiac's use of the AT503, not Harold Miller's use or who he employed as a training instructor.

14.    Immaterial because this case involves Pontiac's use of the AT503 and the fact that it never requested that Hardy procure coverage for use of the aircraft for turbine transition training and never informed Hardy of such use. Whether another individual or entity was a client or customer of Hardy is immaterial.

15.    Immaterial because this case involves Pontiac's use of the AT503 and the fact that it never requested that Hardy procure coverage for use of the aircraft for turbine transition training and never informed Hardy of such use. Another owner's use of the plane and Hardy's knowledge thereof are immaterial to the issues in this case. Moreover, Scott Petersen stated in his sworn statement that he purchased Harold Miller's <u>assets</u>. He did not state he purchased Miller's business. (Scott Petersen Sworn Statement, p. 37) Pontiac's expert testified that he

never saw anything to indicate that the Petersens ever told Hardy they were taking over Harold Miller's business. (Reavis dep., p. 84)

16.    Disputed. When Angie Banz wrote AIG on February 12, 2002 for a quote for Pontiac's purchase of the AT503, she stated in her letter that "Scott [Petersen] has been through Harold Miller's turbine transition course and has 40 turbine hours now." (Hardy dep., Ex. E, Bates no. 045)

17.    Disputed. The portions of the record cited do not support this statement of an "absolute obligation." As Pontiac's expert testified, a client must provide essential information to the insurance broker. (Reavis dep., p. 67) It was incumbent on Hardy to rely upon what Pontiac told him its use of the plane would be. (Bolger dep., p. 90, 92-93)

18.    Disputed. The one page of the record cited does not support these statements. The insurance applications signed by Pontiac which included the AT503 state the aircraft's uses as "chemical, seed and fertilizer application." There is nothing on these Pontiac applications stating it was applying for coverage to run a turbine transition training business. (Reavis dep., pp. 77-81; Ex. 12) Banz' letter to AIG dated February 12, 2002 also states that the Petersens' plan for the AT503 they were considering purchasing was ag use:

> The insured is thinking of purchasing an AT503 valued at $350,000, for ag use only.

(Hardy dep., Ex. E, Bates Nos. 042, 045)

In addition, Banz did discuss the use of the AT503 with Sarah Petersen, as evidenced by Banz' file note of her conversation with Sarah on February 26, 2002. In it, Banz states "they have two guaranteed gypsy moth contracts which is why they bought the 503."

(Hardy dep., Ex. E, Bates No. 112)

In reviewing Banz' letter to AIG of February 12, 2002, Hardy testified:

> The insured is thinking of purchasing a 503 for ag use only. Scott has been through Harold Miller's turbine transition course and has 40 turbine hours now. In addition, he attended the Covington PT-6 course, so, based on the information I'm seeing here, he had been through Harold Miller's course, had transition training and was purchasing the airplane for ag use only in his business.

(Hardy dep., p. 128)

19.    Disputed, as this is a hypothetical statement, not a fact. As stated in Paragraph 18 above, Banz had a conversation with Sarah Petersen regarding the use of the AT503, as indicated in her file note of such conversation on February 26, 2002. (Hardy dep., Ex. E, Bates No. 112)

20.    Undisputed and material. Pontiac never told Banz or Hardy that it was planning to use the AT503 for turbine transition training. As stated in Paragraph 18 above, Sarah Petersen told Banz they were purchasing the AT503 for gypsy moth spraying.

21.    Undisputed and material, with the exception that coverage was "bound" by the insurer, not by Hardy, who is the broker. See Paragraph 11 above.

22.    Undisputed and material.

23.    Undisputed and material.

24.    Disputed. When Angie Banz wrote AIG on February 12, 2002 for a quote for Pontiac's purchase of the AT503, her letter stated: "The insured is thinking of purchasing an AT503 valued at $350,000 for ag use only. Scott [Petersen] has been through Harold Miller's turbine transition course and has 40 turbine hours now. In addition, he attended Covington's PT-6 ground course." (Hardy dep., Ex. E, Bates Nos. 042, 045; Hardy dep., p. 128-130) Banz stated the insurer "did not make any mention of any further training being acquired by Scott to be able to fly the airplane, and from the notes in the file and the faxes back and forth to the underwriter, no further mention of any further training was required of Scott in order to be able to fly the airplane for ag use on the policy." (Banz dep., p. 35)

25.    Disputed. The portions of the record cited do not support these statements. When asked in his deposition whether Hardy ever told him Rick Lucente could train anyone in the AT503 and be covered by the insurance policy, Scott Petersen said "No." (Scott Petersen dep., pp. 48-49) When asked in his Sworn Statement whether Hardy advised him that transition training would be covered under Pontiac's policy, Scott Petersen stated "that I don't recall." (Scott Petersen Sworn Statement, p. 27)

26.    Disputed. Frank Kimmel stated in his affidavit that Scott Petersen admitted to him in the spring of 2002 that he knew he did not have coverage under the National Union policy for turbine transition training. (Kimmel Affidavit, Ex. 11) When asked in his deposition whether Hardy ever told him Rick Lucente could train anyone in the AT503 and be covered by the National Union insurance policy, he said "No." (Scott Petersen dep., pp. 48-49) Additionally, Scott Petersen's subjective belief is immaterial since he never communicated it to Hardy.

27.    Disputed for the same reasons as Paragraph 26 above.

28.    Disputed for the same reasons as Paragraph 26 above.

29.    Immaterial. Whether Scott Petersen decided to have additional training in the AT503 is immaterial to the issue of the insurance requested of Hardy and procured.

30.    Disputed, as the page of the record cited does not support this statement. Hardy was asked about a policy with an endorsement: "When you've got an endorsement on a policy and the policy comes up for renewal, is it your responsibility to the client to confirm that the client wants the same coverage that existed under the . . . expiring policy?" He stated "If your question is assuming that the policy is with the same company, the company being Pontiac Flying Service, yes." (Hardy dep., p. 42)

31.    Disputed as the portions of the record cited do not support this statement.  The coverage was placed with USAIG in April 2002 and then returned to AIG in May 2002 for gypsy moth coverage.  (Sarah Petersen Sworn Statement, p. 9)

32.    Disputed as the portions of the record cited do not refer to a <u>duty</u> to monitor. Hardy agreed that <u>if he had known</u> Pontiac was using the AT503 for turbine transition training, he would have brought to their attention coverage for that use.  However, he did not know Pontiac was using it for turbine transition training prior to the crash.  (Hardy dep. pp. 78-79) Banz testified in the cited testimony that they try to monitor the insurance program of their clients and try to keep up to date with changes that may affect their clients' insured risks.  (Banz dep., pp. 10-11)  Pontiac's own expert does not believe Hardy has any duty to read trade magazines to search for information regarding his clients.  (Reavis dep., p. 71)  Bolger stated that the term "monitor" is a difficult word and that a broker "will expect the insured to say:  I'm going into a new business; I'm changing my operation; I told you I was doing one thing; now I'm doing something else.  I would expect the insured to know to tell the broker that that was happening."  (Bolger dep., p. 102)

33.    Undisputed and material.

34.    Undisputed and material.

35.    Undisputed and immaterial.  Hardy's ads are immaterial to the issues in this case as they have nothing to do with Hardy's actions in procuring insurance policies for Pontiac.

36.    Disputed, as it is incomplete.  The two ads appeared opposite to one another <u>on</u> <u>different pages</u>.  (Hardy dep., p. 84)  Also, Hardy's ads are immaterial to the issues in this case as stated in Paragraph 35 above.

37.    Disputed as it inaccurately states what is contained in the cited portion of he record. Hardy stated he "read bits and pieces" of the magazine and made sure the magazine had placed his ad in it. (Hardy dep., p. 80) He also testified he did not see the November 27, 2002 issue. (Hardy dep., p. 81)

38.    Undisputed and material.

39.    Undisputed and material as neither Scott nor Sarah Petersen ever told Hardy of such use of the aircraft.

40.    Disputed as inaccurate statement. Hardy did not agree to include Rick Lucente as a training instructor in the AT503. Frank Kimmel stated in his affidavit that Scott Petersen admitted to him that the knew he did not have coverage under the policy for turbine transition training. (Kimmel Affidavit, Ex. 11) Scott Petersen never had any intention to have Mr. Webster, who was being training in the AT503 when it crashed, do any aerial application flights for Pontiac. (Scott and Sarah Petersen Sworn Statement, p. 34) Neither Scott nor Sarah Petersen ever told anyone at Hardy that Pontiac was offering turbine transition training to the public. (Scott Petersen dep., p. 37, Ex. 6; Sarah Petersen dep., p. 13) Scott Petersen testified that Hardy never told him that Rick Lucente could train anyone else in the AT503 and the plane would be covered. (Scott Petersen dep., pp. 48-49)

41.    This is disputed only to the extent that it inaccurately states an insurance producer or broker can "bind" coverage. Insurance coverages are bound by the insurance company, not the broker. (Hardy dep., pp. 66-67) Otherwise, undisputed and material.

42.    (a) Disputed as incomplete, as Bolger stated that Sarah and Scott Petersen testified they did not tell Hardy they were using the AT503 for turbine transition training. (Bolger dep., p. 86) Bolger further stated Hardy was entitled to rely on what the Petersens told

him about the uses of the plane. (Bolger dep., p. 90) He also stated he did not agree that a reasonable broker under the circumstances of being asked to insure a two-place fixed-wing aircraft would have a duty to ask for all of the uses to be made of that plane in order to ascertain whether it was to be used for training purposes. Hardy was already told by the Petersens what they were going to do with it. (Bolger dep., pp. 92-93) When asked whether the standard of care requires that a broker understand all of the uses that <u>might</u> be made of the aircraft, he stated "No." (Bolger dep., p. 112) Once Pontiac told Hardy the aircraft was to be used for gypsy moth spraying, Hardy had no obligation to ask if passengers or co-pilots would be on the plane or if it would be used for turbine transition training. (Bolger dep., pp. 117-118) Bolger testified "[I]f the man says: I'm going to use it for gypsy moth spraying, that's why I bought it I don't have to investigate all the other uses he might do. He's got to tell me." (Bolger dep., p. 119)

        (b)     Undisputed and material.

        (c)     Undisputed providing the broker is <u>aware of</u> and understands that the insured is making such a use of the instrumentality.

     43.     Undisputed to the extent it referred only to Scott Petersen. Bolger testified "when you leave that particular type of training, Scott Petersen, and go elsewhere, you've walked away from the policy." "Nothing said we are going to use this plane for training anybody other than Scott Petersen." (Bolger dep., p. 83)

     44.     Disputed; the cited portions of the record do not support this statement.

     45.     Disputed; the cited portions of the record do not support this statement.

     46.     Disputed; the cited portions of the record do not support this statement.

47.    Disputed; the cited portions of the record do not support this statement.  He testified "when you leave that particular type of training, Scott Petersen, and go elsewhere, you've walked away from the policy." (Bolger dep., p. 83)

48.    Disputed; the cited portions of the record do not support this statement.  When asked about this email, Hardy testified that they had instances with the Pontiac account where Scott Petersen thought Sarah had done something and Scott thought Sarah had taken care of it. Hardy stated he believes that after the crash the Petersens "had hoped and wished" they had made this change in the policy.  However, it was never requested by them and was not there.  In his email, Hardy did not want to come across to AIG that Sarah was "trying to out and out lie" about it. (Hardy dep., p. 123)  Hardy never stated that the Petersens may have been "misled" in any way.

49.    It is undisputed that Rick Lucente had sufficient hours of flight time to be covered as a pilot under the National Union policy's OPW (open pilot warranty) if he was flying the plane for a covered use.  With respect to Rick Lucente, Scott Petersen stated that he spoke to Hardy about "adding him as an open policy pilot to fly the airplane if we needed him to do aerial application." (Scott Petersen Sworn Statement, p. 26)  Hardy testified that Sarah Petersen called after the crash and was concerned because a pilot involved in the crash, Rick Lucente, was not listed in their policy.  Hardy told her that since he had sufficient hours of flying time to meet the policy's open pilot warranty provision, he would be a covered pilot.  Sarah did not tell Hardy at that time that the plane was being used in a turbine transition training business.  (Hardy dep., pp. 99)  The remaining sentence is disputed in that the Petersens never informed Hardy that they were using Lucente as a training instructor for their turbine transition training school and never requested coverage for such use of the aircraft.  (Scott Petersen dep., pp. 20, 30-31, 37, 48-49);

Scott Petersen Sworn Statement, pp. 25, 28; Hardy dep., p. 76; Sarah Petersen dep., pp. 10, 24-26)  Scott Petersen testified that Hardy never told him Rick Lucente could train anyone in the AT503 and he would be covered.  (Scott Petersen dep., pp. 48-49)

### (b)    Argument

Nowhere in Pontiac's lengthy response does it present <u>any</u> evidence to dispute the facts that (1) Pontiac never told Hardy it was operating a turbine transition flight training school, offering flight training to the public for a fee; (2) Pontiac never requested insurance coverage for operating such a flight training school with the AT503; and (3) Hardy had no knowledge that Pontiac was operating a flight training school with the AT503 until after the crash.

Since Pontiac has no evidence to dispute these facts, it grasps for straws, arguing extensively about what coverage Scott Petersen "thought" he had and how a belief that he had training coverage for himself in 2002 to do aerial application for Pontiac somehow entitled him to reasonably believe he had coverage for others in his operation of a turbine transition flight training school in 2003.  He claims that because he made this assumption, it was Hardy who misled him by not telling him otherwise, even though he admits Hardy had no knowledge of his turbine flight training business.  Pontiac cites no case authority to support this novel theory.

While Scott Petersen states he does not recall a conversation with Frank Kimmel, Kimmel does remember it and recalls that in this conversation in the spring of 2002 Scott Petersen admitted that he knew he did not have insurance coverage to give turbine transition training to the public or for passengers to fly in the plane.

Pontiac also argues, without supporting case authority, that no matter what use Pontiac told Hardy it planned for the plane, it was still Hardy's duty to make sure there were not any other uses Pontiac had not disclosed.  That is absurd.  Pontiac was a sophisticated insured; the Petersens operated the Pontiac, Illinois airport since 1997, and owned and rented aircraft and

engaged in crop dusting. (Scott Petersen Affidavit, par. 7)  Scott Petersen operated a flight school in some capacity since 1987. (Scott Petersen Sworn Statement, p. 46)  There was no reason for Hardy to interrogate the Petersens further in disbelief or not to rely upon their representations as to their intended use of the aircraft.  They had done business together for years.  As Pontiac's own expert agreed, a client must provide essential information to the insurance broker as much as he can. (Reavis dep., p. 67)  Pontiac easily could and should have informed Hardy of their operation of a flight training school with the AT503.  Pontiac had the duty to tell Hardy about this use of the aircraft, and it is unreasonable for the Petersens to argue that they were unaware they should have informed him of it.

The Petersens' contention that Hardy had no communications with them about their planned use of the aircraft is contrary to the record.  First, the insurance applications Hardy submitted to Pontiac in 2002, which the Petersens signed, both describe the use of the AT503 as only "chemical, seed, fertilizer application," and state that passengers are excluded. (USAIG Application for coverage from 4/10/02 to 4/10/03, signed by Scott Petersen, Hardy dep., Ex. E, Bates No. 070-071; AIG Aviation application for coverage from 5/19/02 to 5/19/903, signed by Sarah Petersen, Hardy dep., Ex. E, Bates No. 068-069)

Secondly, Angie Banz' letter to AIG dated February 12, 2002 also states that the Petersens' planned use of the AT503 they were purchasing was ag use: "The insured is thinking of purchasing an AT503 valued at $350,000, for ag use only." (Hardy dep., Ex. E, Bates No. 42; Hardy dep., p. 128)

In reviewing that letter from Banz to AIG, Hardy testified:

> The insured is thinking of purchasing a 503 for ag use only.  Scott has been through Harold Miller's turbine transition course and has 40 turbine hours now.  In addition, he attended the Covington PT-6 course.  So, based on the information I'm seeing here, he had been through Harold

Miller's course, had transition training and was purchasing the airplane for
ag use only in his business.

(Hardy dep., p. 128)

Thirdly, Banz' file note of her conversation with Sarah Petersen on February 26, 2002 states "they have two guaranteed gypsy moth contracts, which is why they bought the 503." (Hardy dep., Ex. E, Bates No. 112)   Contrary to Pontiac's argument, Hardy did not merely "assume" the use of the plane was crop dusting.   Banz, who handled the Pontiac account, discussed it with Sarah, and both Scott and Sarah signed off on its uses on the policy applications.

The record is clear that the Petersens told Banz why they purchased the AT503, their planned use for it and the coverage they wanted.  Moreover, the Petersens knew they would need different coverage for doing flight training with that plane.  Scott had asked Hardy about possibly doing training with another plane, an Ag Cat.  Hardy testified that he recalls discussing with them, prior to the crash, what changes would be needed in the policy for training coverage:

> [P]rior to the accident when they called me about doing training in their aircraft, we talked over the phone, in general conversation about the policy and what is required, the changes in the policy to do training coverage.
>
> Q:     When you're talking about training coverage, you're talking about training coverage using an Air Cat?
>
> A.     Any airplane for that matter, but in this particular case the Ag Cat that he called about, but it's a general question about changing your policy to include training.
>
> Q.     With whom did you talk?
>
> A.     Scott.

(Hardy dep., pp. 113-114)

Pontiac never sought training coverage for the AT503, even for Scott Petersen. However, even if Scott Petersen thought he had such coverage for himself to train in the AT503, that in no way means there was coverage to operate a flight training school offering turbine transition to members of the public. The Petersens knew they needed different coverage for such a business and never asked Hardy for it or even informed him of that operation. Scott Petersen admitted Hardy never told him there was coverage for Rick Lucente to train others in the aircraft. (Scott Petersen dep., pp. 48-49) There is simply no evidence that Hardy in any way misled Pontiac into believing it had insurance coverage for such a flight training operation.

Pontiac argues in its response that this is a case of assumptions. However, as this Court stated in its prior Order: "[I]t would be unreasonable to assume that clearance for Scott to receive additional turbine transition training in 2002 meant clearance for student pilots generally to receive it in 2003." (Order of 8/19/05, Ex. 1) The Petersens' subjective "assumptions" or "understandings" first expressed after the crash and admittedly never conveyed to Hardy before then, are questionable and Pontiac's unreasonable assumption of such coverage does not create a question of material fact or a duty for Hardy under Illinois law. As Hardy testified: "[W]e had no knowledge of the school, we had no knowledge of the training, we had no knowledge that they had bought Harold's Flying Service." (Hardy dep., p. 121)

Despite Pontiac's criticism and apparent disbelief that neither Hardy nor Banz saw Pontiac's ads for its turbine transition training school in the Ag Air Update, the fact remains that they did not. Pontiac offers no evidence to dispute that fact, and as Pontiac's expert agreed, Hardy had no duty to read trade magazines to search for information on his clients. On the other hand, Pontiac knew it was running those ads and was using the plane for a business other than

aerial application. It also knew additional insurance coverages were needed for that business, yet admittedly never even told Hardy about its turbine transition flight training school.

As stated in the case authority cited in Hardy's motion, under Illinois law an insurance broker is not liable to the insured if he acts in good faith and with reasonable care, skill and diligence to place insurance in compliance with the insured's instructions. The undisputed facts show that Hardy fulfilled these requirements for Pontiac. Summary judgment should properly be granted in his favor.

Respectfully submitted,

By:    /s/  Diane M. Baron

Diane M. Baron - Bar No. 6187430
Clausen Miller P.C.
10 South LaSalle Street
Chicago, IL 60603
Telephone: (312) 855-1010
Fax: (312) 606-7777
E-Mail: dbaron@clausen.com
Attorneys for Third Party Defendant,
HARDY AVIATION INSURANCE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jeffrey B. Rock
HASSELBERG ROCK BELL & KUPPLER
Suite 200 - Associated Bank Building
4600 N. Brandywine Drive
Peoria, Illinois  61614
Tel. No.:  309-688-9400
Fax No.:  309-688-9430
jrock@hrbklaw.com
cpoehlman@hrbklaw.com

Kevin P. Durkin
CLIFFORD LAW OFFICES
120 N. La Salle Street
31st Floor
Chicago, Illinois  60602
Tel. No.:  312-899-9090
Fax No.:  312-251-1160
kpd@cliffordlaw.com

Mark T. Banovetz
TRESSLER SODERSTROM MALONEY
& PRIESS
Sears Tower - 22nd Floor
233 South Wacker Drive
Chicago, Illinois 60606
mbanovetz@tsmp.com

David B. Mueller
CASSIDY & MUELLER
323 Commerce Bank Building
416 Main Street
Peoria, IL  61602
Tel. No.:  309-676-0591
Fax No.:  309-676-8036
dmueller@cassidymueller.com
jstieghorst@cassidymueller.com

Michael S. Krzak
CLIFFORD LAW OFFICES
120 N. La Salle Street
31st Floor
Tel. No.:  312-899-9090
Fax No.:  312-251-1160
msk@cliffordlaw.com
jmg@cliffordlaw.com

CLAUSEN MILLER P.C.

By:    /s/  Diane M. Baron
_____

Diane M. Baron - Bar No. 6187430
Clausen Miller P.C.
10 South LaSalle Street
Chicago, IL 60603
Tel: 312.855.1010; Fax: 312.606.7777
E-Mail:  dbaron@clausen.com
Attorneys for Third Party Defendant

1086945.1                                16