**E-FILED**
Monday, 27 November, 2006  03:14:29 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| NATIONAL UNION FIRE CO. OF PITTSBURGH, PA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 03-cv-1288 |
| PONTIAC FLYING SERVICE, INC., JUSTYN WEBSTER and VIRGINIA WEBSTER-SMITH as Co-Personal Representatives of the Estate of NEIL WEBSTER, Deceased, and CAREN LUCENTE, as Independent Executor of the Estate of RICHARD P. LUCENTE, Deceased, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| and | ) ) | |
| PONTIAC FLYING SERVICE, INC., | ) ) | |
| Third Party Plaintiff, | ) ) | |
| v. | ) ) | |
| HARDY AVIATION INSURANCE, INC., | ) ) | |
| Third Party Defendant. | ) | |

### <u>O R D E R</u>

Before the Court is a Motion for Summary Judgment (Doc. 108) filed by Third Party Defendant, Hardy Aviation Insurance, Inc. ("Hardy Insurance").  Third Party Plaintiff, Pontiac Flying Service, Inc., ("Pontiac Flying") has filed a Response to the Motion for Summary Judgment (Doc. 111) and Hardy Insurance has

filed a Reply to that Response (Doc. 113).  For the reasons set forth below Hardy Insurance's Motion for Summary Judgment is GRANTED.

**BACKGROUND**

The present litigation deals simply with insurance coverage but the issues arises out of a tragic aviation accident. On May 5, 2003 a small plane crashed killing two men in the plane, Rick Lucent and Neil Webster.  The plane which they were flying was an Air Tractor 503 (the "AT-503") that was owned by Pontiac Flying.  Lucente, a flight instructor, was using the AT-503 to provide turbine transition flight training for his student, Webster.

At the time of the accident, Pontiac Flying had a commercial liability policy (Doc. 109 Ex. 2) with National Union Fire Company of Pittsburgh (National Union).  The National Union Policy was an aerial applicator or "crop dusting" policy. It only insured the AT-503 for "application by aircraft of seeds, fertilizers or chemicals…."  (Doc. 109 Ex 2.)  The National Union Policy also covered flights required "in direct support" of crop dusting.  (Id.)  When the AT-503 crashed it was being used for training purposes not for crop dusting.  As a result, National Union commenced the present litigation by filing a declaratory action seeking to deny coverage.

Pontiac Flying asserted that they were entitled to coverage.  However, Pontiac Flying also filed a third party complaint against Hardy Insurance.  Pontiac Flying alleged that in the event that they were not entitled to coverage under the National Union Policy, then Hardy Insurance had been negligent as an insurance broker.  According to Pontiac Flying, Hardy Insurance was professionally negligent because Hardy Insurance failed to procure training insurance for the AT-503.

On August 19, 2005, this Court agreed with National Union that the AT-503 was not being used for aerial application but rather for training purposes.  Furthermore, this Court held that the flight was not made "in direct support" of crop dusting.  As a result, this Court held that Pontiac Flying was not covered under the National Union Policy and granted National Union summary judgment (Doc. 86).  Pontiac Flying then pursued their third party claim against Hardy Insurance for broker negligence. Hardy Insurance now seeks summary judgment against that third party claim.

With this procedural history in mind, it is necessary to turn back to the facts surrounding the procurement of insurance for the AT-503.  Pontiac Flying is owned by Sarah and Scott Petersen.  The Petersens purchased the AT-503 for Pontiac Flying from Harold Miller who owned and operated Harold Miller's Flying Service.  Before the sale, Harold Miller's Flying Service used

3

the AT-503 for training.  In addition, Lucente was a turbine transition training instructor for Harold Miller.

While the AT-503 was owned by Harold Miller, the plane was insured by Hardy Insurance.  In addition, the president of Hardy Insurance, James "Randy" Hardy ("Hardy"), knew that Harold Miller used the AT-503 for turbine transition training. (Hardy Depo. at 59-60.)

The Petersens created Pontiac Flying in February of 2002 to purchase the business and assets of Harold Miller's Flying Service.  In the course of purchasing Miller's assets, the Petersens sought a quote for insurance coverage for the AT-503. While the Peterson's allege that they intended to use the plane for the same purposes that Miller had been using the plane, Scott Petersen acknowledges that their initial inquiries were only into procuring crop dusting insurance. (Petersens' Statement at 25.)

On February 28, 2002 the Petersens purchased the plane and on the same day Scott Petersen had a conversation with Hardy regarding insurance coverage for the plane.  According to Scott Petersen, Hardy told Mr. Petersen to get additional turbine transition training in the AT-503.  Mr. Petersen agreed to get additional training and asked Hardy to add Rick Lucente as an instructor in the Policy.  (Scott Petersen Dep. at 37.) According to Scott Petersen, Hardy assured Mr. Petersen that

4

Lucente was covered as a turbine transition training instructor.
(Scott Petersen affidavit at 3.)

While Hardy himself does not recall whether such a
conversation took place (Hardy Dep. at 68), Hardy Insurance
argues that Hardy would not have made such a statement.
Specifically, Hardy would not have asked Scott Petersen to
obtain additional training because internal memorandum between
AIG (the insurance provider at the time) and Hardy's office
makes no mention of any further training being required.  (Banz
Dep. at 35.)  However, Pontiac Flying points out that Scott
Petersen did receive training in the AT-503 and listed in the
flight log that a flight made with Rick Lucente before the
accident was for "insurance requirements."  (Scott Petersen Dep.
Exs. 5-6.)

Hardy Insurance emphasizes that the Petersen's other
company, Pontiac Flying Service (not "Pontiac Flying Service,
Inc."), owned planes that were used for flight instruction and
Sarah Petersen specifically obtained training insurance on their
other planes.  Despite being aware of the need for training
insurance, Hardy Insurance emphasizes that neither Scott nor
Sarah Petersen ever requested insurance for training members of
the public in the AT-503.

To further support their position that Scott Petersen was
aware that he needed additional insurance for turbine transition

training, Hardy Insurance brings forward the testimony of Frank
Kimmel.  Kimmel is an insurance agent and fellow pilot who
previously worked with Scott Petersen.  Kimmel testified that he
had a conversation with Scott Petersen in the spring of 2002.
In that alleged conversation, Scott Petersen discussed training
in the AT-503 and told Kimmel that his insurance did not cover
training in the AT-503 for training purposes.  (Kimmel
Affidavit.)  Scott Petersen, for his part, denies that such a
conversation ever took place.  (Scott Petersen Affidavit.)

Pontiac Flying emphasizes other facts.  Namely, they point
to an advertisement that was placed by Pontiac Flying in "Ag Air
Update."  Ag Air Update is a national publication that focuses
on crop dusting and similar services.  Pontiac Flying advertised
their training course in Ag Air Update from December 2002
through May of 2003.  Pontiac Flying argues that Hardy himself
must have seen the advertisement and been aware of the training
course.  Not only did Hardy subscribe and regularly read parts
of Ag Air Update, but Hardy Insurance advertised in the same
magazine.  In fact, Hardy Insurance's advertisement even
appeared on the opposite page from Pontiac Flying's
advertisement.  (Hardy Dep. at 84.)

In addition, Pontiac Flying emphasizes an internal e-mail
that supports their credibility.  Soon after the crash, Sarah
Petersen contacted Hardy regarding coverage.  Thereafter, Hardy

6

sent an e-mail to AIG in which he stated that "I believe Sara[h]
when she tells me they assumed or presumed they had [transition
training coverage] since they transitioned Scott and they bought
the aircraft Harold was using for training." (Hardy Dep. Ex.
E.)

     With these facts in mind, Pontiac Flying now argues that
Hardy Insurance owed them a duty of profession skill in
procuring insurance for the AT-503, that Hardy Insurance
breached that duty, and as a proximate result Pontiac Flying is
without coverage for a service that they believed was covered by
their insurance policy.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

     Summary judgment should be granted where "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). The moving party has the responsibility of informing the
Court as to portions of the record that demonstrate the absence
of a genuine issue of material fact. Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986). The movant may meet this burden by
demonstrating "that there is an absence of evidence to support
the nonmoving party's case." Id. at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [s]he bears the burden of proof at trial." Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); see also Celotex Corp., 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2nd 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary

judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986).

**ANALYSIS**

The arguments presented by both Pontiac Flying and Hardy Insurance in their briefs are almost exclusively factual.  In particular, Hardy Insurance makes numerous arguments which challenge the credibility of the Pontiac Flying's evidence and emphasize the weight of their own evidence.  Specifically, Hardy Insurance makes the following arguments: 1) The Petersens were operating a flying school;  2) Scott Petersen knew that he did not have insurance for a flight school; and 3) the Petersens were aware of the specific insurance requirements for a flight training business.  None of these three factual arguments are appropriate for summary judgment.

First, Hardy Insurance argues that Pontiac Flying was operating a flying school.  Nowhere in the evidence cited by the Hardy Insurance do the Petersens specifically state that they were operating a flight school.  While it is implied in counsel questions, the Petersen repeatedly state that they were only providing an individual course in turbine transition training. (Scott Petersen Dep. at 49.)  This Court is not persuaded by Hardy Insurance's semantic argument and notes that at the summary judgment stage, this Court must accept that the

9

Petersen's were simply providing a turbine transition training course rather than operating an entire school.

Secondly, Hardy Insurance alleges that Scott Petersen knew that he did not have training insurance. Specifically, Hardy Insurance points to the statement of Frank Kimmel. Therein, Kimmel stated that Scott Petersen told him that the AT-503 did not have training insurance. However, Scott Petersen specifically denies that this conversation ever took place. (Scott Petersen Affidavit at 5.) Once again, at the summary judgment stage, this Court must accept factual dispute in Pontiac Flying's favor and assume that such a conversation never took place.[1]

Hardy Insurance's third factual argument is also without merit. Hardy Insurance alleges that the Petersens were aware of

---

[1] In addition, this Court finds it distasteful that Hardy Insurance listed the conversation with Frank Kimmel as an "undisputed material fact." This Court has noticed that this is part of an increasing habit among practicing attorneys in this district. Attorneys seem to be regularly asserting that certain facts are "undisputed material facts" when they are clearly in dispute. See, e.g., Ransdell v. Heritage Enterprise, Case No. 04-1209 (Order Denying Summary Judgment, November 14, 2006) (in which Magistrate Judge Gorman noted that it was wholly improper to characterize such facts as "undisputed"). Rule 3.3 of the Illinois Rules of Professional Conduct (which have been adopted by this Court under Local Rule 83.6) forbids an attorney from making a statement of material fact which the lawyer knows or reasonably should know is false. Asserting that a fact is undisputed when it is clearly in dispute is not only a violation of Rule 3.3, but it also undermines an attorney's credibility before the Court. Counselors practicing in this district need to take note and cease this distasteful habit.

the insurance requirements for flight training.  The implication
is that if the Peteresens knew they needed specific insurance
for flight training then they were aware that they were not
covered for flight training under the National Union Policy.
However, the Petersens specifically stated that they were under
the impression that they had insurance coverage for flight
training.  Even if the Petersens knew that they needed specific
insurance for flight training and they allegedly sought such
insurance for their other planes, then such facts still only
challenge the Petersens' credibility.  It is still entirely
possible that the Petersens knew of the differences between crop
dusting insurance and training insurance, yet were under the
impression that they had training insurance.  Because this Court
can not make credibility determinations at the summary judgment
stage this third argument is without merit.

Pontiac Flying likewise would also like this Court to make
factual inferences which can not reasonably be made.  Pontiac
Flying would like this Court to assume that Hardy actually read
Pontiac Flying's advertisement in Ag Air Update and was thus
aware that Pontiac Flying was offering a course in turbine
transition training.  Pontiac Flying would like this Court to
assume that because Hardy himself looked at his own
advertisement on one side of a page he must have read Pontiac
Flying's advertisement on the opposite side of the page.

However, Hardy himself testified that he never read the Pontiac
Flying advertisement.   There is no evidence that Hardy was aware
of the advertisement, ever saw the advertisement, or much less
ever read the advertisement.[2]  It would be unreasonable for this
Court to assume without additional evidence that Hardy himself
read the Pontiac Flying advertisement and was maliciously or
negligently withholding a recommendation that Pontiac Flying
needed additional insurance. Without such evidence, the
existence of the two advertisements alone is not sufficient to
survive summary judgment.[3]

Instead of relying upon the elaborate factual arguments
that are made by both sides, this Court must instead take only

---

[2] Pontiac Flying argues without evidence against Hardy's
credibility when he states that he never saw the advertisement.
According to Pontiac Flying, denying ever seeing the
advertisement is akin to one alleging that they never saw an
oncoming bus.  This Court notes that missing an advertisement
hidden among other advertisements is nothing like missing an
oncoming bus.

[3] Furthermore, this Court is not inclined to base broker
liability solely on the fact that a client's advertisement was
near the broker's own advertisement.  If this Court held that
Pontiac Flying's advertisement matters in this case, then this
Court would be imposing an unreasonable duty upon insurance
producers.  Under such a legal regime, if an insurance broker or
agent looked at his own advertisement, he would be required to
read all the advertisements that were near his own advertisement
to find any ads which were placed by his clients.  He would then
need to investigate whether any of the services advertised by
his clients were not covered under the clients' policy and take
any measures necessary to inform the clients of gaps in their
coverage.  Such a legal regime would pose an unreasonable burden
upon insurance agents and brokers, and this Court is not
inclined to create such a duty.

those undisputed facts that are supported by the evidence in the light most favorable to Pontiac Flying. Accordingly, for purposes of this motion, the Court assumes that the following facts as true:

The Petersens purchased the assets of Harold Miller's Flight Service. Harold Miller's Flight Service provided crop dusting and flight training. The Petersens contacted Hardy Insurance about acquiring insurance for their new assets. Hardy Insurance was aware of Harold Miller and knew his business provided crop dusting and flight training. The Petersens made initial inquiries into obtaining crop dusting insurance but not training insurance.[4] Hardy Insurance provided Pontiac Flying with insurance to cover crop dusting. In so doing, Hardy Insurance never asked if the Petersens needed insurance to cover flight training for the public and the Petersens never told Hardy Insurance that the AT-503 needed coverage for training members of the public.

Hardy himself did request that Scott Petersen personally get additional training. Scott Petersen agreed to the request and asked for Lucente be added to the insurance policy. Hardy

---

[4]  Scott Petersen was asked in his sworn statement "did you yourself do any research or take any steps to see about what the insurance requirements would be for the aerial application or the turbine transition training?" He responded by saying "not for the transition training, just for the aerial application." (Petersens' Sworn Statement at 25.)

assured Petersen that Lucente could be covered under the policy. However, the Petersens never asked for insurance so that Lucente could provide training *for the public*. [5]  On the other hand, Hardy never asked if Lucente should be added to the policy as someone who would be training customers.

With these facts in mind, the issue before the Court is whether a trier of fact could reasonably conclude that Hardy Insurance breached its duty toward Pontiac Flying.  Pontiac Flying never specifically told Hardy Insurance that they needed coverage for Lucente to train Pontiac Flying customers. Accordingly, the more specific issue is whether an insurance producer can be held liable for failing to procure insurance when he was never told of the insured's specific requirements but never asked or investigated into the specific needs of the insured.

In an effort to expand the concept of broker negligence, Pontiac Flying argues that the proper standard of care for an insurance producer for cases such as this must be established by expert testimony.  Pontiac Flying presents cases that apply professional negligence standards based upon expert testimony to doctors, hospitals, dentists, attorneys and accountants.

---

[5] Scott Petersen was specifically asked in his deposition whether he told Hardy Insurance that he was offering training.  Scott Petersen responded with an unequivocal "no."  (Scott Petersen Dep. at 39.)

However, Pontiac Flying does not present a single case where expert testimony formed the standard of care for insurance broker negligence.  Under Illinois law "in an action against an insurance agent for damages sustained as a result of the agent's alleged failure to obtain proper insurance coverage, expert testimony [is] unnecessary to establish a standard of care." Lee v. Calfa, 528 N.E.2d 336 at 343 (Ill.App.Ct. 1988); Wheaton Nat. Bank v. Dudek, 376 N.E.2d 633 (Ill.App.Ct. 1978); But see, Spires v. Acceleration Nat. Ins. Co., 417 F.Supp.2d 750 (D.S.C. 2006).  Furthermore, an avalanche of expert testimony can not impose or enlarge a legal duty where such a duty does not exist in law.  Block v. Lohan Associates, Inc., 645 N.E.2d 207 at 221 (Ill.App.Ct. 1993).

This is not to say that the opinions of the experts in this case are not relevant.  Based upon their expert's testimony, Pontiac Flying argues that "an insurance provider has an affirmative duty to determine the uses which an insured intends to make of the instrumentality for which coverage is sought." (Doc. 111 at 36.)  In addition, Pontiac Flying points to Mr. Hardy's own testimony in which he acknowledges that he has the responsibility of determining the use of the aircraft.  (Hardy dep. at 37.)  However, both parties agree that Pontiac Flying informed Hardy Insurance that the plane would be used for crop dusting.  Accordingly, the issue is whether Hardy Insurance had

15

an affirmative duty to inquire or investigate into additional
uses of the plane.

Pontiac Flying's expert asserts that Hardy had a duty to
ask about additional uses.  Specifically Hardy had a duty to
inquire about training, because, in addition to crop dusting,
one of the designed uses of the plane was training.

The opinion of Pontiac Flying's expert may represent good
business practices.  Indeed, it might be good business practice
for an insurance agent to inquire not just about training but
also about other potential uses of a small two-seat plane
including sightseeing, transportation, search and rescue, stunt
flying and law enforcement.  However, the standards for ideal
business practices are different than the standards for broker
negligence.  Indeed, the opinions of Pontiac Flying's expert can
not, on its own, expand the body of law in Illinois governing
broker negligence.

Insurance producer negligence is governed by the Illinois
Insurance Placement Liability Act of 1996 and is codified in the
Illinois Code of Civil Procedure.[6]  Specifically, the law states

---

[6] The fact that this statue is codified in the Illinois Code of
Civil Procedure does not pose a problem.  Under the Erie
Doctrine, this Federal Court should rely upon federal procedural
law and state substantive law and would not typically rely upon
the Illinois Code of Civil Procedure.  However, despite the fact
that this specific law is codified as a procedural rule, this
Court notes that the rule is actually substantive.  Simply
because a law is codified in the rules of civil procedure does

that "an insurance producer [7] . . .  shall exercise ordinary care
and skill in renewing, procuring, binding, or placing the
coverage requested by the insured or proposed insured." 735 ILCS
5/2-2201(a).  The statute limits the liability which can be
placed upon an insurance producer by stating that an insurance
producer can not be found liable "under standards governing the
conduct of a fiduciary or a fiduciary relationship."  735 ILCS
5/2-2201(b).  However, the statute also specifically provides
that the provision of the statute do not "limit or release an
insurance producer… from liability for negligence concerning the
sale, placement, procurement, renewal, binding, cancellation of
or failure to procure any policy of insurance." 735 ILCS 5/2-
2201(d).

This statutory framework is relevant because much of the
case law governing brokers arises out of various claims that
brokers breached their fiduciary duties.  See, e.g., Faulkner v.
Gimlmore, 621 N.E.2d 908 (Ill.App.Ct. 1993); Kanter v.
Deitelbaum, 648 N.E.2d 1137 (Ill.App.Ct. 1995).  Since 735 ILCS

---

not preclude a federal court from relying upon it if the law is
actually substantive.  See, e.g., Hinkle by Hinkle v. Henderson,
85 F.3d 298 (7th Cir. 1996).  The particular law in this case
has been relied upon by other federal courts.  See, e.g., Harris
v. Illinois Vehicle Premium Finance Co., 2000 WL 1307513
(N.D.Ill., 2000).  Therefore, this Court will appropriately rely
upon this statute.
[7] There is no dispute in this case over whether Hardy Insurance
is an insurance producer.  The insurance policy in this case
states directly on the first page that Hardy Insurance is the
"producer" of the insurance policy.  (Doc. 109 Ex. 2.)

5/2-2201(b) has eliminated any liability under standards governing a fiduciary relationship, the grounds for liability have been reduced by statute.  Despite this, even under the more expansive concept of fiduciary liability, Hardy Insurance would not be liable in this case.

Under Illinois law, a particular burden is placed on an insurance broker to exercise competence and skill in rendering services; thus, the broker must inform the insured of all material facts *within the broker's knowledge* that may affect the transaction or the subject matter of the relationship.  AYH Holdings, Inc. v. Avreco, Inc., 826 N.E.2d 1111 at 1130-1131 (Ill.App.Ct. 2005)(emphasis added).  The implication is that if a fact is not within the broker's knowledge then no duty is placed on the broker to inform the insured of the consequences of that fact.

Furthermore, insureds have the primary responsibility to determine their own insurance needs.  Nielsen v. United Servs. Auto. Ass'n, 612 N.E.2d 526 at 530; Plumb v. Fluid, 124 F.3d 849 at 858 (7th Cir. 1997).  Specifically, it is the insured who best knows his insurance needs and the premiums he can afford. Nielsen, 612 N.E.2d at 532.  The broker, on the other hand, is not liable if he acts in good faith and with reasonable care, skill and diligence to place the insurance in compliance *with his principal's instructions*.  Faulkner, 621 N.E.2d at 911

18

(emphasis added).  Again, the implication is that the insured must provide instructions concerning his wishes and only if those instructions are not followed can the broker be found liable.  In this case, Scott Petersen's instructions to Hardy were to add Lucente as an instructor so that Scott Petersen could be trained.  Scott Petersen did not instruct Hardy to add coverage so that Lucente could provide a training course for the public.

As already noted by this court in the Order granting National Union summary judgment on August 19, 2005, there is a substantial difference between insurance for an owner to receive training in his own plane and insurance for providing training to the public.  It would be unreasonable to assume that insurance for Scott Petersen to receive additional training meant clearance for student pilots generally to receive training.  Accordingly, unless Scott Petersen instructed Hardy of the need for additional insurance to provide a course for training the public, there is no way that Hardy could be expected to procure such insurance.  That is to say, Hardy himself could not be expected to follow instructions that were never given.

Some jurisdictions have provided that an insurance broker can have a duty to advise a client that there are gaps in coverage if there is a special relationship. That relationship

can be developed through either an agreement or discussions on
the subject of the broker advising the client of the client's
needs.  Should the client then justifiably rely upon the
broker's guidance, then the broker could be found liable for
negligence.  See, e.g., Peter v. Schumacher Enterprises, Inc.,
22 P.3d 481 (Alaska 2001).  However, Pontiac Flying does not
allege that such a special relationship existed or that such an
agreement was made.

    At least one jurisdiction would support Pontiac Flying and
has imposed a duty on the part of a broker to inquire into the
adequacy of an insurance policy. See, e.g., Poluk v. J.N. Manson
Agency, Inc., 653 N.W.2d 905 (Wisc.App.Ct. 2002).  However,
other jurisdictions have specifically held that no such duty
exists.  Gabrielson v. Warnemunde, 443 N.W.2d 540 (Minn. 1989);
Hill v. Grandey, 321 A.2d 28 (Vt. 1974).  Indeed, at least one
jurisdiction has imposed a duty upon the insured to inquire into
the adequacy of his policy.  Wisniski v. Brown & Brown Ins. Co.
of PA, 906 A.2d 571 at n. 6 (Pa.Super.Ct. 2006).  Pontiac Flying
has not presented any Illinois cases that have imposed a duty to
inquire upon the insured.  Accordingly, given the disagreement
among jurisdictions, this Court is not inclined to pave the way
for creating a duty that brokers must inquire into the adequacy
of a policy based solely upon expert testimony.

Finally, Pontiac Flying argues that Hardy Insurance breached their duty to not mislead Scott Petersen.  Once against Pontiac Flying basis this duty upon expert opinions.  However, unlike the previous alleged duties which they raise, there is some basis for the duty to not mislead under Illinois law. Illinois courts have ruled that a broker must not mislead an insured.  Lake County Grading Co. of Libertyville, Inc. v. Great Lakes Agency, Inc., 589 N.E.2d 1128 at 1132 (Ill.App.Ct. 1992). While this duty is based upon a broker's fiduciary duty, there is no indication that Illinois courts have abandoned this duty since the passage of the Illinois Insurance Placement Liability Act of 1996.  See, Cincinnati Ins. Co. v. Guccione, 719 N.E.2d 787 (Ill.App.Ct. 1999).

However, there is a significant distinction between when Illinois courts have held a broker liable for misleading a client and this case.  When Illinois courts have allowed a claim against an insurance broker to proceed for misleading the client, the client alleges that the broker actually made a misleading statement.  Cincinnati Ins. Co., 719 N.E.2d at 791. In this case, Scott Petersen and Randy Hardy allegedly had a conversation about Scott Petersen receiving training in his own plane.  Scott Petersen walked away from that conversation with the assumption that he had insurance coverage for all training in his plane.  In this case, it is not alleged that Randy Hardy

ever told Scott Petersen that he was covered for training members of the public in his plane.  That would have been a misleading statement and the outcome of this case would be different.  Insurance brokers can not be expected to control assumptions that are drawn by a client if they do no make a false or misleading statement.

Other jurisdictions have likewise found a broker not liable when the client was under a false impression but the broker never made a misleading statement. <u>See</u>, <u>Hackethal v. National Casualty Co.</u>, 234 Cal.Rptr 853 (Cal.Ct.App. 1987); <u>Baldwin v. Lititz Mut. Ins. Co.</u>, 393 S.E.2d 306 (N.C.App.Ct. 1990); <u>DeTemple v. Southern Ins. Co.</u>, 740 P.2d 500 (Ariz.App.Ct. 1987); <u>President v. Jenkins</u>, 814 A.2d 1173 (N.J.Super.Ct. 2003)(reversed on other grounds); <u>Stroman Realty, Inc. v. State Farm Lloyds</u>, 2003 WL 22672223 (Tex.App. 2003).

In this case, there is no allegation that Randy Hardy ever made a specific false or misleading statement, only that Scott Petersen walked away from a conversation with a false assumption.  Without an allegation that Hardy made a false statement, this Court can not hold Hardy Insurance liable for the assumptions that a client develops.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment be GRANTED.

CASED TERMINATED.

ENTERED this  27th  day of November, 2006.

                              s/ Joe Billy McDade
                              Joe Billy McDade
                    United States District Judge